UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


UNITED STATES OF AMERICA                    Case No. 1:06-cr-44

vs.                                         Grand Rapids, Michigan
                                            April 2, 2009
MICHAEL WAYNE HESHELMAN,                     2:29 p.m.

              Defendant.                    HON. JANET T. NEFF
_____/


ARRAIGNMENT, INITIAL PRETRIAL CONFERENCE, DETENTION HEARING
     BEFORE THE HONORABLE HUGH W. BRENNEMAN, JR.
          UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:        Mr. Daniel Y. Mekaru
                           United States Attorney's Office
                           The Law Building - Fifth Floor
                           330 Ionia Ave., NW
                           Grand Rapids, MI  49503
                           (616) 456-2404


For the Defendant:         Mr. Christopher E. Tracy
                           Honigman Miller Schwartz and Cohn LLP
                           444 W. Michigan Ave.
                           Kalamazoo, MI  49007
                           (269) 337-7708

2

<u>I N D E X</u>

<u>WITNESSES - GOVERNMENT</u>:                                <u>PAGE</u>

TIMOTHY WETHERBEE

      Direct examination by Mr. Mekaru        20
      Cross-examination by Mr. Tracy          34


<u>WITNESSES - DEFENSE</u>:

None

<u>EXHIBITS</u>                                      <u>MARKED</u>    <u>RECEIVED</u>

GX#1 - FBI Form 302                              22          22
GX#2 - Affidavit in support of extradition       24          25
GX#3 - Extradition fax                           25          25
GX#4 - Heshelman letter to embassy               29          30
GX#5 - Heshelman letter to embassy               31          31

1              Grand Rapids, Michigan

2              Thursday, April 2, 2009 - 2:29 p.m.

3              THE COURT:  The next matter, Mr. Mekaru?

4              MR. MEKARU:  Yes, your Honor.  It's the matter of

5  United States versus Michael Wayne Heshelman, case number 1:06-

6  cr-44.  This is the date and time set for Mr. Heshelman's

7  arraignment, his detention hearing, and initial pretrial

8  conference.

9              THE COURT:  Fine.  Thank you.

10             You are Michael Wayne Heshelman?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Fine.

13             Counsel, would you bring your client up to the

14  lectern for purposes of the arraignment?

15             MR. TRACY:  Yes.  Your Honor, Chris Tracy on behalf

16  of Michael Heshelman and, obviously, the defendant is present as

17  well.

18             THE COURT:  All right.

19             Before we go any farther, Mr. Heshelman, I don't want

20  to mispronounce your last name.  How do you pronounce it?

21             THE DEFENDANT:  That's correct, your Honor.

22  Heshelman, yes, sir.

23             THE COURT:  All right.  Mr. Heshelman, this is the

24  United States District Court for the Western District of

25  Michigan.  You are here because you have been charged in a multi-

4

1  count Indictment with various allegations of wire fraud and money

2  laundering and so forth.

3          First of all, have you received a copy of this

4  Indictment?

5          THE DEFENDANT:  Yes, we have, your Honor.

6          THE COURT:  Have you had a chance to read it over?

7          THE DEFENDANT:  Yes, I have, your Honor.

8          THE COURT:  There are in this Indictment 52 separate

9  counts, each count is a separate criminal charge, and you are not

10 charged in all of these counts but you are charged in a large

11 number of these counts.  Do you understand that each of these

12 counts is a separate criminal charge?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  You are charged in Count 1 with

15 conspiring to commit wire fraud.  Counts 2 through 27 with

16 actually committing wire fraud.  In Count 28 with conspiring to

17 commit money laundering.  In Counts 29 through 34 with actual

18 instances of money laundering.

19         In Counts 35 through 38 you are charged with

20 committing international money laundering.  And in Counts 39

21 through 46 you are charged with engaging in monetary transactions

22 and property derived from money laundering.

23         Do you understand all of those charges?

24         THE DEFENDANT:  I'm not sure I understand the last

25 one, your Honor.

1          THE COURT:  Mr. Mekaru, do you want to explain what

2    the government means when it alleges that the defendant engaged

3    in transactions -- property transactions derived from unlawful

4    activity, specifically, money laundering?

5          MR. MEKARU:  Yes, your Honor.  Essentially what those

6    charges involve would be the spending of illegal proceeds and

7    spending more than $10,000 of monies that were derived from, in

8    this case, a fraudulent scheme.

9          So under 1957 you're prohibited from spending those

10   proceeds.  Under 1956 it would involve transactions that were

11   engaged either to conceal the nature of those proceeds or to

12   facilitate, to further facilitate the scam.

13         THE COURT:  And where does property come into this?

14         MR. MEKARU:  Your Honor, property can either be,

15   well, it's real or personal property, and within the definition

16   of the statute property would include funds, cash.

17         THE COURT:  Would you read Counts 39 through 46 or at

18   least the text of those counts?  They've been grouped together

19   and there's -- I know part of that information is contained in a

20   chart, but if you would read the part above that.

21         MR. MEKARU:  Yes, your Honor.

22         THE COURT:  And, Mr. Heshelman, you can follow along

23   if you wish --

24         THE DEFENDANT:  Thank you, your Honor.

25         THE COURT:  -- in Counts 39 through 46.

1        MR. MEKARU:  All right.  Counts 39 through 46.

2        "Money Laundering.  Introduction.  The grand jury

3    incorporates by reference Counts 1 through 27 of this

4    Indictment.  On the following dates listed Michael Wayne

5    Heshelman received a victim's funds which he used to

6    purchase goods and services and to pay personal expenses.

7        "Charge.  On or about the following dates in the

8    Southern Division of the Western District of Michigan and

9    elsewhere, the Defendant, Michael Wayne Heshelman, did

10    knowingly engage in monetary transactions by, through, and

11    to a financial institution affecting interstate commerce in

12    criminally derived property of a value greater than

13    $10,000, such monetary transactions as described below

14    having been derived from a specified unlawful activity;

15    that is, wire fraud."

16        Your Honor, the counts go on to in table form list

17    the number of the count, the date of the wire transaction or

18    transfer, the amount of that wire transfer, who the funds were

19    sent from and who they were sent to.

20        And it's the government's theory of this case that

21    Mr. Heshelman directed the attorney, Kenneth Warner Mayer, to pay

22    funds to the listed entities essentially paying his hotel bill

23    and transferring money for his use and benefit in many cases in

24    foreign countries.

25        THE COURT:  All right.  Thank you.

1          Mr. Heshelman, does that help you understand the

2     nature of the charges?

3          THE DEFENDANT:  The word "property" as you described

4     it on there was went through me, what property they were trying

5     to explain I had bought with any of these proceeds.

6          THE COURT:  Okay.  I think that answers that question

7     then.  Do you understand these charges?

8          MR. TRACY:  Beyond that, your Honor?

9          THE DEFENDANT:  Yeah, but I didn't buy any property.

10         THE COURT:  I'm not asking if you did it or not.

11         MR. TRACY:  No, he's asking do you understand the

12     charges?

13         THE DEFENDANT:  Yes, I understand the charges.

14         THE COURT:  All right.

15         Counsel, do you want these charges read again or any

16     other charges read?

17         MR. TRACY:  No, your Honor, we waive formal reading

18     beyond what Mr. --

19         THE COURT:  Thank you.

20         Now, Mr. Heshelman, I think we went over the maximum

21     penalties before but I'm going to do it again.

22         The maximum penalty for Count 1, the charge of

23     conspiring to commit wire fraud, that carries a maximum penalty

24     of not more than five years in prison and a fine of not more than

25     $250,000.  There would also be a period of supervised release

after any prison term of not more than three years.  There would

be a mandatory special assessment of $100, and restitution could

be ordered as well.

Counts 2 through 27, as I said before, are all

separate counts of wire fraud.  Each carries its own penalty.  In

each case the maximum penalty is again not more than five years

in prison and a fine of not more than $250,000.  There'd be a

period of supervised release after any prison term of not more

than three years, a $100 special assessment and again

restitution.

The penalty for conspiring to commit money laundering

as well as Counts 29 through 34, which allege the actual money

laundering incidents themselves, each of those charges carries a

maximum penalty of not more than 20 years in prison and fine of

not more than $500,000 or twice the value of the property

involved in the transaction whichever is greater.

There would also be a period of supervised release

after any prison term of not more than three years.  Again, there

could be restitution ordered, and there would be a mandatory $100

special assessment as to each count.

Counts 35 through 38 alleging international money

laundering each carry a maximum penalty of not more than 20 years

in prison and a fine of $500,000 or twice the value of the

monetary instrument or funds involved in the transportation,

transmission or transfer, whichever is greater.  Again, there

1  would be a period of supervised release after any prison term of

2  up to three years, restitution, and a special assessment of $100.

3            So that's for Counts 35, 36, 37 and 38.

4            Counts 39 through 46 each carry a maximum penalty of

5  not more than ten years in prison and a fine of not more than

6  $250,000, a period of supervised release after any prison term of

7  not more than three years, restitution, and a mandatory special

8  assessment of $100.

9            Do you understand the maximum penalties for each of

10  those counts pertaining to you?

11            THE DEFENDANT:  Yes, your Honor.

12            THE COURT:  Count 53 is not a separate criminal

13  offense.  It's labeled "Forfeiture allegations."

14            And in this provision the government is putting you

15  on notice and the other defendants on notice that it seeks to

16  have you forfeiture certain money or other property that was

17  obtained as a result of the other alleged violations or was used

18  to facilitate those violations.

19            So in effect they are asking you give up any right,

20  title, or interest you'd have to that property as a result of

21  this purported criminal behavior.  That would all be in addition

22  to any fines that would otherwise be imposed.

23            Again that's a notice provision; it's not a separate

24  criminal offense.  Do you understand that?

25            THE DEFENDANT:  I think so, your Honor.

1          THE COURT:  All right.  Now, you have the right to

2    have an attorney represent you at all times in this matter.  You

3    have the right to court-appointed counsel if you cannot afford to

4    hire your own attorney.

5          Mr. Tracy, I don't recall if we appointed you are you

6    are retained?

7          MR. TRACY:  I'm appointed, your Honor.

8          THE COURT:  You're appointed.  All right.  Fine.

9          So Mr. Tracy will represent you as these proceedings

10   continue.  If you find you have the resources to hire an attorney

11   yourself you are, of course, free to do that and that person

12   would substitute in for Mr. Tracy, I presume.

13         You also have the right to remain silent, and that

14   means you don't have to talk about this case with anybody.

15   Whatever you do say can be used against you in court.  You are

16   free, of course, to talk in confidence to your attorney.

17         Do you understand those rights?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  The law presumes that you are innocent of

20   these charges and that means the burden is on the government to

21   prove that you're guilty.  And the government has to prove your

22   guilt of these charges beyond any reasonable doubt before you can

23   be convicted of them.

24         THE DEFENDANT:  Thank you, your Honor.

25         THE COURT:  This means -- you don't have to thank me.

1    Those are rights that you have.

2                 THE DEFENDANT:  I understand.

3                 THE COURT:  You have the right to have a trial on

4    these charges and that would be a public and a speedy trial and a

5    trial by a jury with the assistance of your attorney.  And at

6    that trial you have the right to confront and cross-examine any

7    witnesses called by the government to prove its case against you.

8                 You have the right to call witnesses to testify on

9    your behalf.  If you want somebody to come in who doesn't want to

10   come in voluntarily for some reason you can obtain a court order,

11   we call that a subpoena, to have that person brought in.

12                Your attorney can present other evidence on your

13   behalf and you have the right to testify at trial if you want to.

14   You have the right not to testify at trial if you don't want to,

15   again, because you have the right to remain silent.

16                And you also have the right to plead either not

17   guilty or guilty to each of these charges.  Do you believe you

18   understand those rights?

19                THE DEFENDANT:  Yes, your Honor.

20                THE COURT:  I have received a Defendant's Rights Form

21   and it looks like you've signed this form earlier this afternoon.

22   Is that your signature?

23                THE DEFENDANT:  Yes, your Honor.

24                THE COURT:  Did you have a chance to read this form

25   over before you signed it?

1          THE DEFENDANT:  Yes, I did, your Honor.

2          THE COURT:  Any questions about it?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  All right.  Any questions about anything

5     I've talked to you about so far this afternoon?

6          THE DEFENDANT:  No, your Honor.

7          THE COURT:  All right.

8          Counsel, how does your client plead to these charges?

9          MR. TRACY:  He pleads not guilty, your Honor.

10          THE COURT:  Thank you.  A plea of not guilty will be

11    entered as to all counts.  That concludes the arraignment.

12    Please have a seat.

13          MR. TRACY:  Thank you.

14          THE COURT:  At this point we will move into the

15    initial pretrial conference.  I have received an initial pretrial

16    conference summary statement from both parties.

17          Are there going to be modifications to either one of

18    these?  Government?

19          MR. MEKARU:  No, your Honor.

20          THE COURT:  Mr. Tracy?

21          MR. TRACY:  No, your Honor.

22          THE COURT:  All right.  Let's go through them briefly

23    or quickly at least.

24          As far as oral statements are concerned under Rule

25    16(a)(1)(A), there are certain records of oral statements that

1  are identified here and this indicates these records or

2  statements have been furnished to defense counsel.

3          Is that correct, Mr. Mekaru?

4          MR. MEKARU:  Yes, your Honor.

5          THE COURT:  All right.

6          Mr. Tracy, you have received those?

7          MR. TRACY:  I just got them, your Honor, so I believe

8  I have.

9          THE COURT:  All right.  Fine.

10         As far as written or recorded statements under

11  16(a)(1)(B), the government states there are 89 consensually

12  monitored telephone calls and e-mail correspondence over a period

13  of approximately five years.

14         There are some letters that are dated here, and that

15  all of this has been disclosed to defense counsel, and I guess

16  there is an attachment here that lists the dates of recordings

17  and e-mails in question.

18         Mr. Mekaru, you've turned over that material?

19         MR. MEKARU:  Yes, your Honor.  If I may.

20         I explained to counsel, we provided a disk that

21  contains all of the reports in this matter with the attachments.

22  So if there was a recording we have the 302 of that incident.

23         Rather than actually attaching the recording we

24  attached the transcript of the recording, advised counsel that if

25  he wants to hear the actual recording or get a copy of that to

1  let us know and then we can make a copy for him.

2           There was just so many recordings that are actually

3  on tape.  It would take a little longer than just copying them

4  digitally so we'd ask for his cooperation to limit the production

5  at this point to just the transcripts with the option of

6  providing him with whatever tape recording he wants.

7           We did provide him with one recording we thought was

8  of particular importance.  He has the recording, the transcript,

9  along with the FBI report that went along with that incident.

10          THE COURT:  All right.  Fine.

11          Is that agreeable to you, Mr. Tracy?

12          MR. TRACY:  Yes, your Honor.

13          THE COURT:  Fine.  Thank you.  Thank you.

14          And the government has disclosed the defendant's

15  prior criminal history, and as far as physical evidence is

16  concerned it consists of certain records including bank records,

17  wire transfers, checks, miscellaneous business records and hotel

18  information.

19          In addition, there are documents, correspondence, e-

20  mails, summary documents, spreadsheets, pictures, photographs,

21  and transcripts.  These are available for inspection and copying,

22  and counsel should make contact with the FBI special agent

23  identified here.

24          MR. MEKARU:  Your Honor, again if I may?

25          THE COURT:  Yes.

1          MR. MEKARU:  Regarding the bank records, there's a

2    large banker box of documents that have been -- they're being

3    scanned by my office.  It's my understanding per my assistant

4    we're up to about 4,000 pages.  Those records are going to be

5    copied, we hope, onto a DVD and we can provide counsel with a

6    copy of those records.

7          We've also provided him with actually a spreadsheet

8    that will break down a lot of that information into a more easily

9    digestible form.  That has been turned over.

10          We were hoping, actually, to get done with the

11    scanning these week.  I don't know if that's going to be possible

12    since today's Thursday, but as soon as we get the scanning done

13    we'll turn those over.  It'll probably be next week.

14          THE COURT:  All right.  So you're going to turn over

15    a scanned copy of all of these documents, and I assume they're

16    available for inspection on an individual basis by Mr. Tracy?

17          MR. MEKARU:  Yes, your Honor.

18          THE COURT:  All right.

19          That's agreeable with you, Counsel?

20          MR. TRACY:  Yes, it is, your Honor.

21          THE COURT:  Fine.  There apparently are going to be

22    no reports as far as the government is concerned regarding

23    scientific tests or examinations.

24          MR. MEKARU:  Again, I'm sorry.

25          My agent advises -- and it doesn't relate to Mr.

1    Heshelman -- but we had a document that was discovered in the

2    former residence of Mr. Sherwood.  The document was preserved for

3    fingerprints and examined.  The fingerprint analysis came back

4    negative for any of the charged defendants.

5              My apologies.  When we filed this I was unaware that

6    there was a fingerprint report.  He's since found it so --

7              THE COURT:  So there was a fingerprint report?

8    You're going to furnish that or --

9              MR. MEKARU:  That was provided to counsel I think as

10   a separate discovery item.

11             THE COURT:  All right.  And as a matter of fact you

12   did check that off in one box but not the left hand index box, so

13   we'll just note that the government does expect to have a report

14   or has at least one report available pertaining to fingerprints.

15             The parties have agreed upon reciprocal discovery.

16   Defense counsel or defendant has requested disclosure of 404(b)

17   evidence.  The government will provide pretrial notice of 404(b)

18   evidence by two weeks prior to the final pretrial conference.

19             Now, are you telling us that you intend to definitely

20   do it and you will do it by that date, or are you telling us that

21   you don't know if you're going to do it but if you do it you'll

22   do it by that date?

23             MR. MEKARU:  Your Honor, at this juncture we do

24   intend to introduce 404(b) evidence if all the defendants go to

25   trial.  I think some of it may relate, for example, more to Mr.

1  Sherwood.  There is evidence of other fraudulent activity by Mr.

2  Heshelman.

3          We've provided counsel with reports for all of the

4  other activity.  It's included in that CD so we did provide

5  detail of all of that.

6          At this juncture we do intend to introduce at trial

7  404(b) evidence.  The reason why we'd ask for it two weeks prior

8  is to the extent that we find anything else among the records of

9  the FBI we'll want to have the opportunity to continue to have

10 the option of pursuing other 404(b) evidence.

11         THE COURT:  Well, it sounds like you do presently

12 intend to introduce some as things stand today.

13         MR. MEKARU:  Yes, sir.

14         THE COURT:  All right.  So I'll note that.

15         This will be a jury trial.  The government estimates

16 it will take two weeks to try the case.

17         Mr. Tracy, from your brief encounter with this case

18 is that a reasonably accurate estimate at this point as far as

19 you know?

20         MR. TRACY:  I have nothing to suggest otherwise at

21 this point.

22         THE COURT:  Fair enough.

23         Now, I don't know if the government has a policy on

24 plea negotiations in this case or not.

25         You did not indicate that you did, Mr. Mekaru.  Do

1   you have such a policy and, if so, would you state it for the

2   defendant's benefit?

3              MR. MEKARU:  Yes, your Honor.  It is generally the

4   policy of the Department of Justice that if a case is going to be

5   resolved through a negotiated resolution, that those discussions

6   be resolved no later than seven days prior to the date set for

7   trial.

8              Given the nature of this case and the complexity of

9   the allegation and the amount of documents involved any sort of

10  plea deadline is going to be substantially before the date of the

11  trial.

12             We will provide counsel, your counsel, with a

13  proposed plea offer along with a deadline if that's going to --

14  if the case is going to be resolved through a negotiated

15  resolution.

16             THE COURT:  Thank you, Mr. Mekaru.

17             Obviously, the defendant has no obligation to plead

18  guilty whatsoever but if he does want to enter into negotiations

19  with the government we do have that policy and he ought to be

20  aware of it.

21             Is there anything else we need to talk about as far

22  as the initial pretrial conference is concerned, Mr. Mekaru?

23             MR. MEKARU:  Your Honor, I realize this isn't

24  necessarily this Court's scheduling matter but I just wanted to

25  make note that the district court did set this matter for trial

1   in May.

2          I spoke to counsel about this.  Given the fact that

3   he's just now coming into the case we would ask this Court in

4   general to reschedule the trial date to allow counsel enough time

5   to prepare.  I don't know even if with a revised date whether

6   that's even enough time given the nature of the allegation but,

7   thank you.

8          THE COURT:  Where do the other two defendants stand?

9   Are they -- I think there are two other defendants?

10         MR. MEKARU:  Yes, sir.  They've already appeared.

11         THE COURT:  All right.  May I suggest this since I

12  think just kind of throwing it up in the air and hoping somebody

13  catches the ball might not work.

14         The two of you might want to talk to Judge Neff's

15  case manager perhaps following today's hearings if that's

16  convenient and see what can be done at least to let her know the

17  problems, and if that doesn't resolve it you might want to file

18  something with Judge Neff's office, but I have no control over

19  here docket and I think I'd be an unnecessary cog in the

20  machinery to have it keep going through my office because from

21  now on you're dealing directly with Judge Neff's office.

22         MR. MEKARU:  Yes, your Honor.

23         THE COURT:  All right.  Thank you.

24         We're also slated for a detention hearing.  Are the

25  parties prepared to go forward with that at this time?

1          MR. MEKARU:  Yes, your Honor.

2          MR. TRACY:  Yes, your Honor.

3          THE COURT:  All right.

4          MR. MEKARU:  Your Honor, I would note for the Court

5   that the pretrial services officer has not had an opportunity to

6   interview the defendant so I think at this point you have a

7   little less information than you might typically have but we are

8   prepared to go forward.

9          THE COURT:  Well, the defendant was extradited into

10  this country from Switzerland; is that correct?

11         MR. MEKARU:  That is correct, your Honor.

12         THE COURT:  Does anybody have that material?

13         MR. MEKARU:  I do, your Honor.

14         THE COURT:  All right.

15         MR. MEKARU:  Your Honor, I think for the matter of an

16  orderly proceeding and hearing and introduction of exhibits I'd

17  like to call Special Agent Tim Wetherbee.

18         TIMOTHY WETHERBEE, GOVERNMENT'S WITNESS, SWORN

19                        DIRECT EXAMINATION

20  BY MR. MEKARU:

21  Q    Special Agent Wetherbee, how are you currently employed?

22  A    I'm a Special Agent with the FBI here in Grand Rapids.

23  Q    How long have you been in law enforcement?

24  A    About 17 years.

25  Q    As part of your duties as an FBI agent do you investigate

1  violations of federal criminal laws?

2  A     Yes, I do.

3  Q     Would that include allegations of wire fraud, mail fraud,

4  or scams that cross state or international boundaries?

5  A     Yes.

6  Q     Including other associated offenses such as money

7  laundering?

8  A     Yes.

9  Q     Were you involved in the investigation of Michael Wayne

10 Heshelman?

11 A     Yes, I was.

12 Q     All right.  Are you familiar with the case and the

13 allegations?

14 A     Yes.

15 Q     All right.  At some point did you actually have some

16 communication with Mr. Heshelman in or about November of 2006?

17 A     Yes, I did.

18           MR. MEKARU:  Your Honor, if I could approach the

19 witness.

20           THE COURT:  Yes.

21           MR. MEKARU:  Your Honor, if I may I'd like to do

22 this, give you a full set of documents and as we go through we'll

23 introduce them to avoid zig-zagging back and forth.

24           THE COURT:  All right.

25           Any objection, Counsel?

1            MR. TRACY:  No, your Honor, no objection.

2            (Government's Exhibit No. 1 marked.)

3  BY MR. MEKARU:

4  Q    All right, Agent Wetherbee, you have before you what's been

5  marked as Government Exhibit No. 1.  Is this an FBI Form 302?

6  A    Yes, it is.

7  Q    It's essentially a report of some sort of contact with some

8  sort of investigative activity by the agent?

9  A    Yes, it is.

10 Q    Is this your 302?

11 A    Yes.

12 Q    Does this relate to a conversation you had with Mr.

13 Heshelman?

14 A    Yes.

15           MR. MEKARU:  Your Honor, move for the admission of

16 Exhibit No. 1.

17           MR. TRACY:  No objection, your Honor.

18           THE COURT:  Admitted.

19           (Government's Exhibit No. 1 admitted.)

20 BY MR. MEKARU:

21 Q    All right.  Agent Wetherbee, can you tell us a little bit

22 about the context of your contact with Mr. Heshelman?

23 A    Mr. Heshelman called me at my office and I spoke with him

24 over the telephone.  He called to ask about an investigation that

25 was involving him.

1  Q    All right.  Does this document essentially report some of

2  the statements that Mr. Heshelman made?

3  A    Yes.

4  Q    All right.  For purposes of this issue of detention, I put

5  your attention to the last paragraph.

6  A    Yes.

7  Q    Did you have a discussion about where Mr. Heshelman was

8  living so you could have an opportunity to contact him again if

9  you wished or some discussion of that nature?

10 A    I asked him if he would provide his address for me.  He

11 provided his telephone number, his cellular telephone number, and

12 told me that he was living in an apartment in Zurich,

13 Switzerland, but declined to provide that address to me.  His

14 statement to me was if I tell you where I'm living you'll come

15 and arrest me.

16 Q    Now, as to the context of that statement, did Mr. Heshelman

17 know at this point that he was under some sort of investigation?

18 A    He was aware that we had conducted grand jury in the

19 matter, and he was aware that it had been going on for some -- a

20 number of months.

21       And he inquired at that point in time whether he was

22 going to be arrested.  I did not specifically tell him whether he

23 was or he wasn't.  I told him that time was a grand jury

24 investigation; that if he wanted to find out further information

25 on it that he could talk to our legal attache who was at the

1  embassy in Berne, Switzerland.

2  Q    Okay.  That last point according to the embassy or to the

3  consulate, that's not referenced in the 302?

4  A    No, I did not put that in there.

5  Q    But, nonetheless, do you have a clear recollection that was

6  part of the conversation?

7  A    Yes.

8              (Government Exhibit No. 2 marked.)

9  Q    All right.  You have before you what's been marked as

10  Government Exhibit No. 2.  Can you tell us what Government

11  Exhibit No. 2 is?

12  A    It is an affidavit in support of extradition.  It appears

13  that part of it is the affidavit that was done by the Assistant

14  United States Attorney, yourself, and part of it was the arrest

15  warrant, part of it was the relevant statutes, and part of it was

16  also my affidavit for the support of the extradition.

17              And then finally the attachments to it are a passport

18  photograph, a fingerprint card for Mr. Heshelman.

19  Q    The passport photograph, does it say "Application for

20  Passport?"

21  A    Yes, it does.

22  Q    Does it appear per this document that the passport

23  application may have been made while in Switzerland, in the lower

24  left hand corner?

25  A    Yes, there is a stamp there for the American consulate

1  officer in Berne, Switzerland, Thomas Rice.

2  Q    And this extradition affidavit was actually presented

3  before this Honorable Court, before Hugh W. Brenneman, Junior?

4  A    Yes, it was.

5  Q    All right.  Now, was the request for extradition actually

6  forwarded onto the Swiss authorities?

7  A    I believe it was, yes.

8          (Government Exhibit No. 3 marked.)

9  Q    All right.  You have before you what's been marked as

10 Government Exhibit No. 3.

11 A    Yes.

12         MR. MEKARU:  I'm sorry, your Honor, as a housekeeping

13 matter, we move for the admission of Exhibit No. 2.

14         MR. TRACY:  No objection.

15         THE COURT:  Two will be admitted.

16         (Government's Exhibit No. 2 admitted.)

17         MR. MEKARU:  All right.

18 BY MR. MEKARU:

19 Q    Exhibit No. 3.  What is Exhibit No. 3?

20 A    This is a fax to the US Department of Justice regarding the

21 extradition of Mr. Heshelman from Switzerland.

22         MR. MEKARU:  Move for the admission of Exhibit No. 3.

23         MR. TRACY:  No objection, your Honor.

24         THE COURT:  No. 3 will be admitted.

25         (Government Exhibit No. 3 admitted.

1 BY MR. MEKARU:

2 Q    Now, would it be fair to say that Exhibit No. 3 is

3 essentially confirmation that Mr. Heshelman had been ordered

4 extradited from Switzerland?

5 A    Yes.

6 Q    Now, do you know as to whether or not -- back up.  Were you

7 briefed by authorities in Switzerland as to the status of the

8 extradition proceeding?

9 A    I got some notifications from our legate there, whatever he

10 could find out what was going on with it.

11 Q    Okay.  Just so the Court and the defendant understands, is

12 a legate, is this an FBI agent who's posted in a foreign country

13 to act as a liaison between the domestic FBI and foreign

14 agencies?

15 A    That would be correct.

16 Q    Okay.  Now, according to the information you received from

17 the legate, did Mr. Heshelman agree to return to the United

18 States voluntarily?

19 A    It was his understanding that he was fighting extradition.

20      MR. TRACY:  Your Honor, I'm going to object to that,

21 your Honor.  We don't have any basis for that in terms of what we

22 have in terms of the exhibit, and it's a comment that I don't

23 have any basis to cross-examine on.

24      THE COURT:  I'll sustain the objection based on the

25 way the question was asked.

1          MR. MEKARU:  Okay.  Just so we understand though,

2    your Honor, hearsay is permissible in this proceeding.

3          THE COURT:  Well, I'm aware of that.

4          MR. MEKARU:  Thank you.

5          THE COURT:  But I think you have to lay some

6    foundation for the question.

7          MR. MEKARU:  Yes, sir.  I just wanted to clarify.

8    Thank you.

9    BY MR. MEKARU:

10   Q    All right.  In December 2008, Agent Wetherbee, were you

11   advised that there was some sort of action taken against Mr.

12   Heshelman in Switzerland?

13   A    I was advised that he had been arrested on Swiss charges,

14   yes.

15   Q    He wasn't arrested based on the activity that's the subject

16   of this indictment in the Western District of Michigan; is that

17   true?

18   A    That is correct.  Not at that time.

19   Q    Did the information you received detail at all what sort of

20   allegation was being made against Mr. Heshelman?

21   A    The only thing I was told that it was a 300,000 Euro fraud.

22          THE COURT:  I'm sorry?  Say that again.

23          THE WITNESS:  A 300,000 Euro fraud.

24          THE COURT:  Euro.  I'm sorry.  I thought you said

25   "year old."  All right.  300,000 Euro.

1           THE WITNESS:  Euro.

2           THE COURT:  Fine.  All right.

3    BY MR. MEKARU:

4    Q    Now, at the time of that arrest, is it fair to say the

5    Swiss authorities may have had some understanding that there was

6    some interest though by the US authorities in Mr. Heshelman?

7    A    Yes.  Yes.  They were aware that we were looking for him.

8    Q    Okay.  Now, did his arrest by the Swiss authorities prompt

9    some sort of action by the US regarding extradition?

10   A    Yes.  We went forward with obtaining a provisional arrest

11   warrant and filed extradition paperwork.

12   Q    As noted in Exhibit No. 2?

13   A    Yes.

14   Q    All right.  And were you being briefed by the legate, by

15   the FBI agent in Switzerland as to some of the information that

16   was ongoing with respect to the extradition?

17   A    Yes.

18   Q    Who was the legate?

19   A    It was Daniel Boyd.

20   Q    And was he being advised of the proceedings either through

21   the embassy or through the Swiss authorities?

22   A    He was making contact directly with the Swiss authorities.

23   Q    Now, according to the information that was being provided

24   by the Swiss authorities and passed to Special Agent Boyd and

25   onto you, what was happening with Mr. Heshelman's extradition?

1  A    That he was opposing the extradition.

2  Q    And did they, in fact, have a hearing?

3  A    This is my understanding, yes.

4  Q    And ultimately was Mr. Heshelman ordered extradited from

5  Switzerland?

6  A    Yes, according to this document he was -- they made a

7  decision February 27th of 2009.

8  Q    All right.  Also according to the document he did not seek

9  to appeal that decision?

10 A    Correct.

11 Q    All right.  Now, the result of that extradition action

12 ultimately resulted in Mr. Heshelman being transported from

13 Switzerland back to United States.  We had his initial appearance

14 earlier this week?

15 A    Yes.

16 Q    All right.  While Mr. Heshelman was in custody by the Swiss

17 authorities, was he in contact with the US embassy or consulate?

18 A    The legate did provide a few letters that he had written to

19 the embassy.

20          (Government Exhibit No. 4 marked.)

21 Q    You have before you what's been marked as Government

22 Exhibit No. 4.

23 A    Yes.

24 Q    What is Exhibit No. 4?

25 A    This is one of the letters that was provided to the embassy

30

1    signed by Mr. Michael Heshelman.

2                   MR. MEKARU:  Move for the admission of Exhibit No. 4.

3                   MR. TRACY:  No objection, your Honor.

4                   THE COURT:  Thank you.  No. 4 is admitted.

5                   (Government Exhibit No. 4 admitted.)

6    BY MR. MEKARU:

7    Q    All right.  Agent Wetherbee, who is the letter addressed

8    to?

9    A    US Consular, Embassador to Switzerland.

10   Q    If you look at the last page who's it signed by?

11   A    It's signed, "Sincerely, Michael Heshelman."

12   Q    Did much of this letter talk about the fact that he's been

13   ordered extradited and that he had some information that he

14   wanted to provide?

15   A    Yes, he did want to provide some information regarding the

16   plight of the US car makers in the UK and Europe as well.

17   Q    Okay.  If you turn to the third page of the letter where it

18   has the postscript --

19   A    Yes.

20   Q    -- could you read that for me?

21   A    "Postscript.  My company has or had 500 million Euros in

22   the deposit of UBS at the time of my arrest.  The arrest goes

23   back to charges for events that occurred in 1999 through 2001.

24   To my knowledge there is no complainant plaintiff, only the US

25   District Court of Western Michigan's word or interpretation of

1  events against mine."

2  Q     All right.  Now, at this point are you in any position to

3  either debunk or verify Mr. Heshelman's claim that he has 500

4  million Euros?

5  A     I do not.

6              (Government's Exhibit No. 5 marked.)

7  Q     All right.  And Exhibit No. 5, is this also another letter

8  that was sent to the US Embassy or consulate in Switzerland?

9  A     It's addressed to "Embassador to Switzerland, US

10  Consulate."

11  Q     If you'd turn to the last page, who's it from?

12  A     It's signed "M. Heshelman."  And the underneath it's

13  written out in printing, "Michael Heshelman."

14              MR. MEKARU:  Your Honor, I'd move for the admission

15  of Exhibit No. 5.

16              MR. TRACY:  No objection, your Honor.

17              THE COURT:  No. 5 is admitted.

18              (Government Exhibit No. 5 admitted.)

19  BY MR. MEKARU:

20  Q     All right.  Now without -- this is a multi-page letter, at

21  least 13, 14, 15, maybe 16 pages approximately?

22  A     It's numerous pages, yes.

23  Q     All right.

24  A     I haven't counted.

25  Q     It's not my intention to go through the entire letter but

1  is it fair to say that Mr. Heshelman is complaining about the

2  prosecution brought against him in the United States?

3  A    Yes.

4  Q    And also in addition he was talking about some of the

5  financial expertise that he could bring to bear on the current

6  global financial situation?

7  A    I believe that there was information there that he said he

8  could provide.

9  Q    Beginning on page 11, the bailout of the auto industry

10 going good, hyphen, yes, question mark, no, question mark.  Does

11 he go on to say that he has a plan?

12 A    Yes.

13 Q    All right.  If you go on to page 13 I think this is

14 actually again in the nature of a post-script where he talks

15 about his plan for the auto industry?

16 A    Yes.  On the top it says "Auto industry."

17 Q    The toxic bank?

18 A    On the top of the next page.

19 Q    Instruments?

20 A    Yes.

21 Q    Desalination plans, oil contracts?

22 A    Right, yes.

23 Q    And then the hydrogen -- source of hydrogen fuel?

24 A    Yes.

25 Q    Again after his sentence is yet another postscript.  Could

1 you read that?

2 A    After his signature on the last page?

3 Q    Yes.

4 A    It says, "I just heard on CNN about the election in June

5 for Iran.  I can help facilitate money for the campaign against

6 Ahmadinijad, seriously."

7 Q    All right.  Agent Wetherbee, after the indictment of Mr.

8 Heshelman, did the FBI make any efforts to try to flag Mr.

9 Heshelman's passport or his travel activity to see if he would

10 return back to the United States?

11 A    Yes, we did.

12 Q    Can you describe those efforts?

13 A    Yes.  We talked to Immigration and Customs Enforcement, and

14 they put a notice based on his passport for any officer that

15 checks his passport to notify both the local ICE agent and myself

16 of his entry into the United States.

17 Q    According to the ICE records, was there any indication of

18 Mr. Heshelman coming back into this country prior to March 27,

19 2009?

20 A    No.

21        THE COURT:  I'm sorry, what was that last question

22 again?

23 BY MR. MEKARU:

24 Q    Any indication of Mr. Heshelman returning to the United

25 States prior to March 27th, 2009?

34

1  A    Not between the date of the indictment and March 27th,

2  2009.

3  Q    The passport, is that in the possession of the FBI?

4  A    Yes.

5  Q    Have you reviewed its contents?

6  A    Yes.

7  Q    Any stamps or indications according to the passport of Mr.

8  Heshelman returning to the United States prior to his extradition

9  and entry in March of 2009?

10  A    No.

11  Q    Nothing further.  Thank you.

12          THE COURT:  Cross-examination?

13          MR. TRACY:  Thank you, your Honor.

14                  CROSS-EXAMINATION

15  BY MR. THOMAS:

16  Q    Good afternoon, Special Agent Wetherbee.

17  A    Good afternoon.

18  Q    We've had a chance to just meet one another here briefly.

19  A    Yes.

20  Q    Let me go through a few things with you following up.  I'll

21  try to keep it somewhat consistent.  You still have the exhibits

22  in front of you, correct?

23  A    Yes.

24  Q    So this contact -- I'm sorry, I know you produced discovery

25  today but as you know that was about a half hour ago --

1  A      Yes.

2  Q      -- so I haven't gotten through it yet.  This contact that

3  occurred reflected --

4              THE COURT:  Counsel, if I may stop you right there.

5  You are certainly entitled to have more time to prepare, and the

6  Court is willing to give you that if you thought that was

7  necessary.

8              MR. TRACY:  Right.  Understand, your Honor.

9              I would like to proceed and depending on what the --

10 I know the Court doesn't have the benefit of the interview, which

11 we can talk a little bit after the agent leaves the stand, but I

12 would like to proceed some today depending on with the Court's

13 instruction we can determine whether we want to hold it over.

14             THE COURT:  Well, let me ask you about that --

15             MR. TRACY:  Okay.

16             THE COURT:  -- and if there's going to be a

17 likelihood of a possibility that we would hold this over because

18 your client wants to be interviewed, and for whatever other

19 reason, I will tell you that I have one, two, three, four -- six

20 more hearings depending on how one counts them before the end of

21 the afternoon plus the grand jury and it's already 3:15.

22             So if we're not going to wind this up today I would

23 rather cut it off sooner rather than later so that I can at least

24 afford the other people an opportunity to be heard today.

25             MR. TRACY:  Understand, your Honor.  One, I don't

1   think this is going to take very long in terms of my examination.

2              THE COURT:  Good.

3              MR. TRACY:  Two, I'm not sure that the interview

4   based on what I have had a chance to talk with my client about

5   and his family members, who I'll introduce to you in a minute, I

6   don't think the interview necessarily is going to give a lot more

7   information to the Court than what we can impart today.

8              What I guess I'm getting at is at the end of the day

9   if you think -- again, at the end of the day is more like a half

10   hour from now, if you think there's more information that is

11   needed I don't have a problem with moving things over to next

12   week, but I think --

13              THE COURT:  I'm not going to give you a progress

14   report on this.

15              MR. TRACY:  I understand, your Honor.

16              THE COURT:  If you want more time you're more than

17   welcome to have it.

18              MR. TRACY:  I don't think I need more time is what

19   I'm saying to you, and I don't know that we're going to do this

20   more efficiently at a later point in time because the agent's

21   here on the stand and it's kind of fresh in all of our minds

22   right now.

23              THE COURT:  Why don't you complete your cross-

24   examination of this agent?

25              MR. TRACY:  Okay.

1  BY MR. TRACY:

2  Q     So, in November of '06 this is at least when the transcript

3  was done from Exhibit 1, correct?

4  A     Yes.

5  Q     Besides this interview did you conduct any other interviews

6  with my client?

7  A     No.

8  Q     Did you have any other contacts with him?

9  A     He left a few voice mails on my answering machine which I

10 did not return.

11 Q     Okay.  And those were later dates than November of '06, if

12 you recall?

13 A     I believe that there were a few before that and then he

14 finally got a hold of me at my desk and then there were some

15 after that, I believe.

16 Q     Do you remember any contacts from him in '07?

17 A     Not specifically, no.

18 Q     Okay.  But in any event, in this instance he contacted you?

19 A     Yes.

20 Q     And he told you where he was over in Switzerland?

21 A     He told me he was in Zurich, yes.

22 Q     Correct.  He gave you his cell phone number?

23 A     Yes.

24 Q     And besides telling you that he was in Switzerland he also

25 told you he was in Zurich?

1   A     Yes.

2   Q     Okay.  And as far as you were aware was that true?

3   A     As far as I was aware, yes.

4   Q     Okay.  Did you have some other intelligence prior to him

5   telling you that that led you to believe that?

6   A     Yes.

7   Q     Okay.  And how long had he been in Switzerland as far as

8   your intelligence had told you?

9   A     Since about 2004.

10  Q     Okay.

11  A     And off and on before that.

12  Q     All right.  So that would you go back in points in time

13  prior to the indictment?

14  A     Yes.

15  Q     And as far as you're aware was he trying to hide that from

16  you at all, the fact that he was living in Switzerland?

17  A     No.

18  Q     Or from any of your other counterparts that were involved

19  with the case?

20  A     No.

21  Q     And did you ever try to find his actual location in

22  Switzerland?

23  A     Not personally but I did ask the Swiss to try to locate

24  him.

25  Q     Do you know whether they were successful or not?

1   A    They were not until a later date at which time they started

2   their investigation.

3   Q    Between today and some point in time did you also discover

4   besides having an apartment in Zurich he also had an office?

5   A    I was told of that by the Swiss, yes.

6   Q    Okay.  So here's a gentlemen apparently now based on what

7   you know now had an apartment and an office that he was

8   functioning out of in Zurich?

9   A    Yes.

10  Q    And had been doing that for some period of time?

11  A    Yes, as far as I'm aware.

12  Q    Now, the warrant, which I believe is part of Exhibit 2, not

13  that we need to necessarily look at it, that was issued, the

14  warrant for his arrest was issued back in February of '06?

15  A    That's correct.

16  Q    Did you ever specifically notify Mr. Heshelman of the

17  warrant being issued?

18  A    No, I did not.

19  Q    And as far as you're aware did he have any knowledge of the

20  warrant being issued?

21  A    No.

22  Q    Okay.  So that would be, yes, he did not have any

23  knowledge?  Just to be careful.  It's one of those double

24  negatives.

25  A    Okay, yes.  He was not specifically aware of any arrest

40

1  warrant.

2  Q    Okay.  And do you have any information that would lead you

3  to believe that he was aware of the indictment?

4  A    He was not.  No, I do not.

5  Q    Okay.  Now, both of his co-defendants, were they living in

6  the United States as far as you're aware?

7  A    Yes, they were.

8  Q    You were able to -- you or others working on your behalf or

9  working with you, you were able to arrest them at some point in

10  time?

11  A    Yes, we arrested them in December.

12  Q    Okay.  And December of what year?

13  A    2008.

14  Q    And as far as you're aware were they in contact with Mr.

15  Heshelman at all in the '08, '07, '06 time period?

16  A    I don't have a record of that.

17  Q    Okay.  Did you ever try to work through them or other

18  people that were involved in this case to make contact to Mr.

19  Heshelman?

20  A    There was a witness that was talking with him via e-mail

21  but not specifically asking him for his address, no.

22  Q    Okay.  And then those co-defendants, Mr. Mickelson and Mr.

23  Sherwood, as far as you're aware they're both currently on bond

24  from this court?

25  A    Correct.

1  Q    Now, the Swiss charges for a minute.  You had some passing

2  understanding that the charges involved, quote, unquote,

3  "$300,000 of a Euro fraud?"

4  A    Correct.

5  Q    That's all you know?

6  A    That's all I know.

7  Q    Do you know what happened to those charges?

8  A    They were dismissed upon our obtaining a provisional arrest

9  warrant.

10  Q    Okay.  So, I mean, you've been involved with the system for

11  a while.  I mean, you don't know whether they had good evidence,

12  bad evidence, what evidence to support those charges, do you?

13  A    I do not.

14  Q    Okay.  Did the Swiss authorities, as far as you're aware,

15  were they aware of the charges against Mr. Heshelman brought here

16  by this Court or through the indictment that's --

17  A    Yes.

18  Q    -- before us?

19  A    Yes, they were.

20  Q    And had they been aware of that for some period of months

21  or years prior to --

22  A    Yes.

23  Q    -- the ultimate arrest?

24  A    Yes.  I had been dealing with our legal attache trying to

25  have them locate Mr. Heshelman for us.

1  Q    Okay.  The delay, which happens sometimes, is the delay,

2  was that more on their end or what was the -- why did it take so

3  long as you're concerned?

4  A    It took quite a while for them to put forth any major

5  effort into locating him.

6  Q    Okay.  Now, I'm assuming you don't know but just in case

7  you have any information.  The basis of Mr. Heshelman opposing

8  the extradition, do you know whether it had anything to do with

9  him having concerns about the charges the Swiss brought against

10 him?

11 A    I do not.

12 Q    Do you know one way or the other?

13 A    I do not.

14 Q    Okay.  And the only thing that we really have on what the

15 Swiss decided is this Exhibit 3 which is, I believe, a March 17th

16 '09 letter, correct?

17 A    Correct.

18 Q    And in there even though I think you made reference to

19 maybe a, quote, unquote, "hearing happening," there's no

20 reference to a hearing in that letter; am I correct?

21 A    Correct.

22 Q    So you wouldn't really know that for sure one way or the

23 other?

24 A    Correct.

25 Q    You didn't attend any proceedings over in Switzerland?

1  A      I did not.

2  Q      Another part you referenced is the passport of Exhibit 2,

3  it includes at least a portion of Mr. Heshelman's passport.  I

4  think it's the last three pages or so of Exhibit 2?

5  A      Yes.

6  Q      And in that passport there's emergency contact information,

7  correct?

8  A      Correct.

9  Q      And that's, I'm aware now having talked with her, that's

10  his sister Brenda Moore.  Are you aware that he has a sister

11  living in Battle Creek?

12  A      Yes.

13  Q      Okay.  And there's a Battle Creek address actually

14  indicated there, right?

15  A      Yes.

16  Q      And it says "relationship, sister?"

17  A      Yes.

18  Q      And gives a phone number?

19  A      Yes.

20  Q      Did you or anybody else at the FBI contact Mrs. Moore about

21  trying to track down her brother?

22  A      I did talk to Ms. Moore, yes, prior to the indictment.

23  Q      Prior to the indictment?

24  A      Yes.

25  Q      How about afterwards in terms of trying to get contact

44

1   information?

2   A    No, she told me at the time that I talked to her prior to

3   the indictment that she did not know where he was living, just

4   that he was living in Switzerland.

5   Q    But that would have been maybe late '05 or '06?

6   A    Correct.

7   Q    And we don't actually -- I mean three years pass after

8   that, correct --

9   A    Right.

10  Q    -- any terms of actually, okay.  And there's no additional

11  contact after that time you spoke with her prior to the

12  indictment?

13  A    That's correct.

14  Q    And the Exhibit 4, which is one of these letters to the US

15  Consular or Embassy, I want to be a little precise here because I

16  think you said the letter has reference in the "PS" component of

17  the letter on page three that he has -- "he" meaning Mr.

18  Heshelman -- has 500 million Euros, but the letter doesn't say

19  that, right?

20  A    I read it my company has or had 500 million Euros on

21  deposit in the deposit of UBS at the time of my arrest.

22  Q    Okay.  So he does not say that he, Mr. Heshelman, had 500

23  million Euros, correct?

24  A    Correct.

25  Q    It says something about a company having or having had 500

1  million Euros, correct?

2  A    Correct.

3  Q    And it doesn't say that it's in a bank account of his but

4  rather it says it's in deposit with UBS?

5  A    Yes.

6  Q    Okay.  Now, this flagging process that was discussed a

7  little bit in your direct testimony of his passport, did that

8  also include some flagging over in Europe?

9  A    It did not.  It was through our customs.

10  Q    Why wasn't something done over in Europe when you knew he

11  was living in Switzerland?

12  A    We did not do an Interpol Red notice because we were hoping

13  that he would venture back into the United States at which time

14  he could be arrested.

15  Q    But after a year or so passes, I mean, clearly you had the

16  option of doing a Red notice?

17          MR. MEKARU:  Your Honor, I'm going to object.  To the

18  extent that there's a delay he can explore that, but the question

19  as to the strategy behind waiting for Mr. Heshelman to return I

20  don't think has much bearing on -- that has to go to the

21  government's thoughts on whether he might return or not, not as

22  to the defendant's willingness to come back to the United States

23  and appear on charges.  I just don't see that as having much

24  bearing on the question of detention.

25          THE COURT:  Mr. Tracy?

46

1           MR. TRACY:  That's fine, your Honor.  I can move in a

2    little slightly different direction.

3           THE COURT:  All right.

4    BY MR. TRACY:

5    Q    Now, you mentioned in direct about the passport not showing

6    any travel back to the US, correct?

7    A    The only stamp from the US was on March 27th, 2009.

8    Q    Okay.  So in other words from some period in '03 or '04,

9    whatever the period was that he moved over in Switzerland, you

10   didn't see any other entry mark showing having come back to the

11   US prior to this past month?

12   A    That's correct.

13   Q    But did you see travel reflected throughout Europe?

14   A    Yes.

15   Q    And including to, say, countries like Spain and other

16   locations?

17   A    Yes.

18   Q    Did you pay attention to see where he actually went to?

19   A    Yes, there was.

20   Q    Was there fairly significant travel throughout Europe?

21   A    There was some, yes, not -- I wouldn't say significant but

22   some, yes.

23   Q    But some travel that occurred both in '07 and '08 and maybe

24   didn't matter whether it occurred in '09 yet or not but --

25   A    Yes.

1  Q    Okay.  So that was reflected in the passport?

2  A    Yes.

3  Q    So presumably again without getting into the strategy part

4  of it, if the procedures were working correctly and a Red notice

5  was in place, if he would have made the trip from say Switzerland

6  to Spain that probably would have triggered something?

7  A    It may have, yes.

8  Q    Okay.

9         MR. TRACY:  Excuse me one second, your Honor.

10        THE COURT:  Mm-hmm.

11        MR. TRACY:  Nothing further, your Honor.  Thank you.

12        THE COURT:  Fine.  Thank you.

13        Counsel, redirect?

14        MR. MEKARU:  No, your Honor.  Thank you.

15        THE COURT:  Thank you.

16        You may step down.  Please remain available.

17        Mr. Mekaru?

18        MR. MEKARU:  No further witnesses, your Honor.

19        THE COURT:  Defense?

20        MR. TRACY:  Your Honor, I think it may be -- again, I

21  know you have a schedule -- it may make some sense if I could

22  sort of indicate to you from our position what I think can occur

23  in terms of the family members he has.  If you directly need to

24  hear from any of the family members after --

25        THE COURT:  I'll tell you right up front that's your

1  decision, not mine.

2         MR. TRACY:  Okay.  What I want to tell you is who's

3  here and where they live and that kind of thing.

4         What I guess I'm saying is depending on where that

5  goes if you need to hear from them to verify any of that I'd be

6  happy to put them on the stand, but I do not wish to waste the

7  Court's time unless counsel wishes to inquire or the Court wishes

8  to inquire, and I guess I'm trying to save time a little bit.

9         THE COURT:  Well, I appreciate your effort.  If

10  you're simply going to tell me that so-and-so is here and they

11  live in Battle Creek, I don't need to hear testimony to that.

12  I'll take your representation.

13         MR. TRACY:  Yeah, that's what I'm trying to suggest.

14         THE COURT:  Sure.

15         MR. TRACY:  And if something else more detailed needs

16  to occur, that's fine.  But I have no witnesses to call at this

17  time but I would like to provide that information to the Court.

18         THE COURT:  All right.  Any proffer then?

19         MR. TRACY:  Okay.  So, your Honor, in terms of people

20  that I've been in contact with that are family members of my

21  client.  Brenda Moore, who we heard about a minute ago, emergency

22  contact on the passport, his sister, is here in court today along

23  with one of this nieces, Angie.  His aunt.

24         His parents are both deceased but his Aunt Marjorie,

25  who lives in Battle Creek as well, and his brother-in-law Don,

1  are all here on his behalf.  They all live in Battle Creek.  His

2  family was originally from Battle Creek.

3          They are all, depending on what the Court would

4  consider doing here in terms of the bond issue, they're all

5  willing, whether it be at any of their homes but maybe it makes

6  most sense for Brenda being his sister to have him have residence

7  here in the district, to assist in whatever way the Court

8  determines is appropriate to make sure he has arrived to court

9  hearings and anything else he needs to show up to.

10          As the Court may be aware -- I know obviously my

11  office location is in Kalamazoo so they're just down the road

12  from where I'm at in terms of being able to get back and forth in

13  terms of those issues.

14          I know that --

15          THE COURT:  Are you telling the Court that they would

16  be willing to put him up in their homes?

17          MR. TRACY:  Correct.

18          THE COURT:  All right.

19          MR. TRACY:  And they would also be willing if that --

20  other monitoring devices, whether it be a tether or other things,

21  whatever current things that are the state of the art at this

22  point in time, your Honor, if something needs -- a machine needs

23  to be placed in their home to that effect or any other thing,

24  they're on board with all of that occurring.

25          THE COURT:  Fine.  Thank you.

1    MR. TRACY:  In terms of that component that's all I

2  have to proffer.  I guess any other statements in terms of

3  supporting what I think would be a basis for bond I can do in

4  summary after, you know, if the government has other comments.

5    Thank you, your Honor.

6    THE COURT:  If there's no other proffers I guess I

7  have the testimony that I've heard, I've had your proffer, and

8  I've got this rather abbreviated report from the pretrial

9  services office.

10    Anything further, Mr. Mekaru?

11    MR. MEKARU:  Your Honor, I'm a little reluctant to do

12  this but the defendant has offered up his family essentially to

13  in some ways to vouch for him and to provide residence and some

14  claim of stability, and I question their suitability, so I'm

15  inclined to call Brenda Moore.

16    THE COURT:  All right.  I have several other matters

17  and this is -- I don't know how much longer this is going to

18  take.  I think I'm going to recess this and take the other

19  matters.  If we can still get back to this this evening we will,

20  otherwise, I'll have to put it over, but I have too many of those

21  people backing up.

22    MR. MEKARU:  Yes, sir.

23    THE COURT:  Mr. Tracy?

24    MR. TRACY:  I'm not trying to try your case.

25    THE COURT:  You're not.  You're not at all.

1            MR. TRACY:  My client -- to the extent the Court

2    would, you know, consider bond, obviously my client would like to

3    get out sooner than later and begin to make preparations for it.

4            If it works better for scheduling -- and I haven't

5    spoken to Dan in terms of what his schedule is -- if the Court

6    has open time Monday morning, because I think it'd be pretty

7    difficult if we're going to try to wait for the report for the

8    report to be done effectively between now and tomorrow, but I

9    wouldn't like to go much beyond Monday if we could avoid it.

10           I have a hearing down in Kalamazoo but not until 2:00

11   so for me I need to basically leave by 1:00, so I have pretty

12   much the whole morning available on Monday if that works for the

13   Court and for counsel, and I talked to my client and he

14   understands.

15           THE COURT:  Just a moment.  While she's checking is

16   Monday morning agreeable with you, Counsel?

17           MR. MEKARU:  Your Honor, if I may, I want to check my

18   schedule.

19           THE COURT:  All right.  We'll try to keep the

20   marshals from arresting you while you use that.

21           MR. MEKARU:  I know.  I was asking permission.  I

22   checked without -- it did it carefully, your Honor, I'm sorry.

23           THE COURT:  Well, some people believe in erring first

24   and then asking for forgiveness.

25           MR. MEKARU:  Your Honor, Anna Pakiela from probation

1  just noted she knows your schedule.  You have detention hearings

2  at 9:00, 10:00 and 11:00 and 11:15 on Monday.

3            THE COURT:  They also may get pushed back.  I don't

4  want to push this one back any further than necessary.

5            What do we have Monday afternoon?

6            MR. TRACY:  Again, I'm not sure how early we normally

7  start.  I can be here at 8:00 or 8:30 if -- just want to let the

8  Court know.

9            THE COURT:  Our office opens at 8:00.

10           MR. TRACY:  Yeah, so --

11           THE COURT:  The best time would be -- I've got

12 arraignments, detention hearings, 9:00, 10:00 and 11:00, maybe

13 11:30 on Monday.  I've got more hearings starting after lunch and

14 on Tuesday morning as well.  Tuesday afternoon -- Tuesday after

15 10:15 and all day Tuesday afternoon is free.  Would that be

16 workable?

17           MR. TRACY:  Your Honor, I'm on the east side of the

18 state that day for other matters.  I'm sorry.

19           THE COURT:  Well, this case gets priority so we'll

20 put it in at 8:00 on Monday morning.

21           That agreeable with you, Counsel, Mr. Mekaru?

22           MR. MEKARU:  In terms of assigning for tomorrow,

23 there's a pretrial services meeting, how much time do they need?

24           THE COURT:  Well, we're not going to do it tomorrow,

25 I'll tell you right now.

53

1           MR. MEKARU:  Then if the Court wants it Monday
2    morning we'll be there.

3           THE COURT:  Fine.  Good.  Everybody's agreed to that.
4    Reluctantly, perhaps.  We'll recess this matter until 8:00 Monday
5    morning.

6           MR. MEKARU:  And, your Honor, if I may?

7           THE COURT:  Yes.

8           MR. MEKARU:  So at this point may the record be clear
9    that Brenda Moore has been called as a witness and that she must
10   appear on Monday.

11          THE COURT:  Yes.

12          MR. TRACY:  She is available.

13          THE COURT:  Fine.  She'll be here.

14          MR. MEKARU:  Okay.  Thank you.

15          THE COURT:  Thank you.

16          (At 3:37 p.m., proceedings adjourned)

17                            — — — — —

CERTIFICATE


I, Patricia R. Pritchard, CER 3752, Certified Electronic Court Reporter for the State of Michigan, do hereby certify that the foregoing pages, 1 through 54, inclusive, comprise a full, true and correct transcript, to the best of my ability, of the proceedings and testimony recorded in the above-entitled cause.


April 21, 2009              Patricia R. Pritchard  /S/
                            Patricia R. Pritchard, CER 3752