UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


UNITED STATES OF AMERICA                Case No. 1:06-cr-44

vs.                                     Grand Rapids, Michigan
                                        April 6, 2009
MICHAEL WAYNE HESHELMAN,                8:18 a.m.

            Defendant.                  HON. JANET T. NEFF
_____/



DETENTION HEARING
BEFORE THE HONORABLE HUGH W. BRENNEMAN, JR.
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For the Government:      Mr. Daniel Y. Mekaru
                         United States Attorney's Office
                         The Law Building - Fifth Floor
                         330 Ionia Ave., NW
                         Grand Rapids, MI  49503
                         (616) 456-2404


For the Defendant:       Mr. Christopher E. Tracy
                         Honigman Miller Schwartz and Cohn LLP
                         444 W. Michigan Ave.
                         Kalamazoo, MI  49007
                         (269) 337-7708

I N D E X

WITNESSES - GOVERNMENT:                                    PAGE

BRENDA MOORE

        Direct examination by Mr. Mekaru          3
        Cross-examination by Mr. Tracy           23
        Redirect examination by Mr. Mekaru       27


TIMOTHY WETHERBEE

        Direct examination by Mr. Mekaru         40
        Cross-examination by Mr. Tracy           44



WITNESSES - DEFENSE:

BRENDA MOORE

        Direct examination by Mr. Tracy          74
        Cross-examination by Mr. Mekaru          77



CLOSING ARGUMENT

        By Mr. Mekaru                            53
        By Mr. Tracy                             60



EXHIBITS                            MARKED     RECEIVED

GX# 6 - $25,000 check, 12/7/00         7           8
GX# 7 - $60,000 check, 3/7/01          9           9
GX# 8 - Warranty deed, 6/1999         14          16
GX# 9 - Warranty deed, Aug 27, '03    14          16
GX#10 - Deed, Oct. 2004               14          16
GX#11 - Parcel ID                     36          43
GX#12 - Property information          41          43

1              Grand Rapids, Michigan

2              Monday, April 6, 2009 - 8:18 a.m.

3              THE COURT:  Good morning, gentlemen.  We are here to

4    resume the detention hearing in the matter of United States

5    versus Michael Wayne Heshelman.

6              I understand the parties may want to produce some

7    additional evidence and that's fine.  Whoever would like to start

8    may go first.

9              MR. MEKARU:  Good morning, your Honor.

10             Your Honor, I believe where we left off is that we

11   had a presentation of evidence by the government, took testimony,

12   proffered evidence from the defense, and then the government

13   asked to be permitted to present evidence in response and to call

14   Brenda Moore as a witness.

15             THE COURT:  All right.

16             MR. MEKARU:  So we call Brenda Moore.

17             BRENDA MOORE, GOVERNMENT'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19   BY MR. MEKARU:

20   Q    Good morning, Ms. Moore.

21   A    Good morning.

22   Q    My name is Daniel Mekaru.  I'm the prosecutor in this case.

23   Could you please state and spell your name for the record?

24   A    My name is Brenda Moore, B-r-e-n-d-a  M-o-o-r-e.

25   Q    Thank you.  Ms. Moore, as I understand you are a resident

4

1  of Michigan.  You live in Battle Creek?

2  A     Correct.

3  Q     How long have you lived in Michigan?

4  A     Almost all my life.

5  Q     And your brother is Michael Heshelman?

6  A     Correct.

7  Q     All right.  Now, as I understand he's your only sibling?

8  A     Correct.

9  Q     So at this point in terms of your immediate family is he

10 your only immediate surviving family from your parents, or are

11 your parents still alive?

12 A     Correct, my parents are deceased.

13 Q     Okay.  Now, counsel for your brother Mr. Heshelman had

14 presented some information suggesting that you'd be willing to

15 allow Mr. Heshelman to stay with you, correct?

16 A     Correct.

17 Q     Okay.  Has he lived with you in the past?

18 A     Yes.

19 Q     In Michigan as well as in Florida?

20 A     We never lived in Florida --

21 Q     Okay.

22 A     -- but he lived --

23 Q     You had some property there?

24 A     Yes.

25 Q     That was this residence on Bowdoin?

1  A      Correct.

2  Q      Bowdoin Circle, Sarasota, Florida?  All right.  That was a

3  home at some point that you perhaps with your husband had owned?

4  A      Yes.

5  Q      Okay.  Now, this case may take some time, we're talking

6  possibly -- well, if we go to trial it could be another six

7  months, and it could be another few months even after that before

8  there's a sentencing if Mr. Heshelman were convicted of these

9  charges, so he could be living with you for a while.  Is that

10 going to cause any problems?

11 A      I'd be happy to have him.

12 Q      And, you know, as part of the I guess the concern here

13 about securing his appearance, it's possible that the Court could

14 I guess order that some sort of bond be posted on behalf of Mr.

15 Heshelman.

16         Are you also willing to post some sort of bond or

17 hold your house out as collateral for that bond?

18 A      We'd have to see what kind of bond you're talking about.

19 Q      Well, it's not going to be only five dollars and it's not

20 going to be any more than you could afford, but would you be

21 willing to put up your home?

22 A      I'd have to know how much it is in order to do that and I'm

23 not familiar with those proceedings, so until I know more about

24 it I don't know if I can answer it correctly.  I would do

25 whatever I could do.

Q     Okay.  Well, and just so you understand when we're talking
about somebody putting up their home essentially is that they're
vouching for the person as being able -- that the defendant will
show up in court and if he doesn't that your home could be taken
by the government because he's basically a bail jumper.  You
understand that?

A     I understand that.  I don't have any problem with that.

Q     Okay.  So by doing that are you essentially -- you'd be
essentially vouching for him that he would be coming into court;
you understand that?

A     I understand that.

Q     And you'd be holding yourself out responsible for his
appearance; you understand that?

A     I understand that and don't have any problem with it.

Q     Okay.  Now, and you realize here that by doing that you
could be putting yourself in an awkward position where you want
to take care of family, and that's understandable, but if he were
to start packing up, for example, and making indications that he
was going to flee that could put you in a bit of a quandary
between reporting your brother as a potential risk of flight and
trying to support him and trying to protect him.  Do you
understand that?

A     Yes, I do.

Q     Okay.  And are you going to report him if you see that he's
preparing to leave?

1  A    Well, we're all family; we'll do whatever it takes.

2  Q    Okay.  So the answer is "yes" you would report him?

3  A    Yes.  Yes.

4  Q    Okay.  Ma'am, has your brother given you large sums of

5  money in the past?

6  A    He has given me some money.  I don't remember how much.

7  Q    Well, in December 2000 did he give you a check for $25,000?

8  A    I don't remember that.

9          MR. MEKARU:  May I approach, your Honor?

10          THE COURT:  Yes.

11          (Government's Exhibit No. 6 marked.)

12  BY MR. MEKARU:

13  Q    You have before you what's been marked as Exhibit No. 6.

14  Do you recognize the check?

15  A    Yes, I do.

16  Q    Okay.  What is this check?  What does it represent?

17  A    I guess I don't understand your question.

18  Q    Okay.  Well, let's go through this then.

19          THE COURT:  What was the date of the check?

20          MR. MEKARU:  Sorry.  It's December 7th, 2000.  It's

21  in the amount of $25,000 made payable to Moore Homes, Inc., and

22  it's drawn on the account of Kenneth Warner, and on the subject

23  line there's for it looks like an "R. Heshelman."  Perhaps a "B."

24          THE COURT:  You may go ahead your question.

25          MR. MEKARU:  Thank you.

1          THE COURT:  I just wanted to know the date.

2          MR. MEKARU:  Yes, sir.  I just wanted to get a record

3    on what's included.

4          THE COURT:  Fine.

5          MR. MEKARU:  Move for the admission of Exhibit No. 6.

6          MR. TRACY:  No objection.

7          MR. MEKARU:  All right.

8          THE COURT:  Fine.  Admitted.

9          (Government's Exhibit No. 6 admitted.)

10   BY MR. MEKARU:

11   Q    All right.  So we've gone over a little bit in terms of

12   what the check indicates.  Now, this is a $25,000 check for your

13   benefit, correct?

14   A    Actually it was for the benefit of taking care of my

15   father.

16   Q    Okay.  Now, this is a check from the account of Kenneth

17   Warner.  Now was this, in fact, monies that was given to you by

18   your brother?  I mean, Mr. Warner doesn't know your family so he

19   wouldn't be taking care of your father.

20   A    I don't know anything about that.  I just know that my

21   brother had said he would help me with the care of my father and

22   so he sent me money.

23   Q    Okay.  You didn't know here the money came from?

24   A    No.

25   Q    Back in 2000 was your brother employed?

9

1  A      As far as I know my brother's always been employed.

2  Q      Okay.  As an investment advisor?

3  A      I don't know the title.

4  Q      Okay.

5           MR. MEKARU:  Your Honor, may I approach?

6           THE COURT:  Yes.

7           (Government's Exhibit No. 7 marked.)

8  BY MR. MEKARU:

9  Q      I have before you what has been marked as Exhibit No. 7.

10 Do you recognize that check?

11 A      Yes.

12 Q      All right.

13           MR. MEKARU:  Your Honor, the date of the check is

14 March 7th, 2001.  It's for $60,000 payable to Moore Homes, again

15 drawn on the account of Kenneth Warner, Attorney at Law.

16           Move for the admission of Exhibit No. 7.

17           MR. TRACY:  No objection.

18           THE COURT:  Admitted.

19           (Government's Exhibit No. 7 admitted.)

20 BY MR. MEKARU:

21 Q      All right.  Ms. Moore, again this is another check for your

22 benefit?

23 A      Well, I took care of my father for several years with the

24 kind of verbal agreement that my brother would help me whenever

25 he could.

1  Q     Now, why are these checks written out to Moore Homes?

2  A     Because that's the name of the assisted living home where

3  my father stayed.

4  Q     It's the same as your last name?

5  A     Correct.

6  Q     So is this your business?

7  A     It is.

8  Q     Oh, okay.  So were there any other residents who were

9  getting your assistance at Moore Homes?

10 A     Correct.

11 Q     How many other?

12 A     That was in 2000.  Probably about 15.

13 Q     So rather than writing the checks out to you individually

14 because your business isn't necessarily helping your father; your

15 family is?

16 A     My business was caring for my father.  Moore Care Homes is

17 a business that cares for elderly people and that's where my

18 father resided.

19 Q     Okay.  I know.  I just want to understand though that the

20 check was written to the business and not to you personally?

21 A     Correct.

22 Q     A lot of times people have two parts of their lives.  They

23 have a personal life and their business life.

24        While there was a little bit of a blending here I'm

25 just confused as to why the check wasn't written to you because

1 this is to take care of your personal family albeit it's for

2 someone who is receiving services from your business. But for

3 whatever reason he decided to send this directly to the business.

4 A    He was being taken care of by Moore Homes. Moore Homes

5 check can only be cashed through Moore Homes. It was deposited

6 in Moore Homes.

7 Q    Okay. Do you remember Special Agent Wetherbee?

8 A    Not really.

9 Q    Okay. Well, actually I don't know if he quite remembered

10 you much either but he had been out to your home. I'd asked if

11 he remembered what you looked and he shook his head, too. Okay.

12            He came out to see you in 2005, does that sound about

13 right, in December?

14 A    I think that's about right.

15 Q    Okay. And he had come out to ask you about these checks as

16 well. Do you remember that, that discussion?

17 A    Actually, I don't remember that.

18 Q    Okay, because he does.

19 A    Okay.

20 Q    He does remember that discussion.

21            Do you remember telling him that these checks

22 represented the sale of a home, your house in Florida, and that

23 this was money that you earned from the sale of that house?

24 A    No, I don't remember that.

25 Q    Well, let's see. Did at some point -- let's back up then.

1  At some point did Mr. Heshelman, your brother, sell a house for

2  you?

3  A    I don't remember all the circumstances of that.  It's been

4  quite a while ago.

5           We sold our house in Florida.  Mike helped us but I'm

6  not sure how that all occurred.  It could have very well been

7  that this money was from that but I don't remember that for sure,

8  and I don't know who Mr. Kenneth Warner is.

9  Q    Okay.  But when you -- let me back up then.  But you knew

10 when you got the checks in Exhibit No. 6 and No. 7 that they were

11 from your brother to help pay for your father?

12 A    Yes.

13 Q    Okay.

14 A    I did know that.

15 Q    So even if you didn't know who Mr. Warner was --

16 A    Yeah.

17 Q    -- you still knew what the money represented?

18 A    Yes, I knew what the money represented.

19 Q    Okay.  Back to this conversation with Special Agent

20 Wetherbee.  There was an indication here in Exhibit No. 7, this

21 First Investors Ban-Corp.  Do you see that?

22 A    I do.

23 Q    Do you know what that is?

24 A    It's the name on my brother's e-mail.

25 Q    Is that his business?

1  A    I don't -- I don't know.  I don't know really anything

2  about my brother's business.

3  Q    Well, back in December 2005 you advised, "The money must

4  have been from the sale of her house in Florida, provided the

5  address of the home as 451 Bowdoin, B-o-w-d-o-i-n, Circle,

6  Sarasota, Florida.  Michael Heshelman sold the house for her and

7  these were the proceeds of the sale."  Do you remember anything

8  like that?

9  A    I wish I could.  I just it's been so long ago I really

10 don't remember all the circumstances.

11 Q    Now, but you were a signatory on Mr. Heshelman's business

12 account, First Investors Ban-Corp?

13 A    Only for a brief period of time.

14 Q    Why were you, I mean, you were a signatory on a business

15 account and you don't know anything about the business?

16 A    I only did it so that I could be available to help him with

17 his checking account while he was in town, but I knew nothing

18 about any of that.

19 Q    Would it be fair to say that you, well, at least you

20 indicated to Agent Wetherbee that you not only don't know much

21 about his investments but you really didn't want to know much

22 about his investments because you were concerned that his

23 dealings were a little shady?

24 A    No, I never said that.

25 Q    Or that he dealt with shady individuals?

14

1  A    I never said that either.

2  Q    All right.

3           MR. MEKARU:  May I approach, your Honor?

4           THE COURT:  Mm-hmm.

5           (Government's Exhibit Nos. 8, 9 and 10 marked.)

6  BY MR. MEKARU:

7  Q    I hand you what have been marked Exhibits 8, 9 and 10.

8           MR. MEKARU:  One moment, your Honor, while I provide

9  counsel with copies.

10          THE COURT:  Fine.

11          MR. TRACY:  Thank you.

12          THE COURT:  May I see copies of those two checks,

13 please that have been admitted?

14          THE WITNESS:  Sure.

15          THE COURT:  Thank you.

16 BY MR. MEKARU:

17 Q    Okay.  Ms. Moore, have you had an opportunity to take a

18 look at Exhibits 8, 9 and 10?

19 A    Mm-hmm.

20 Q    Is that a "yes?"

21 A    Yes.

22 Q    Thank you.  Exhibit No. 8, if you look at this, it's a

23 warranty deed, and the date of that is in June of 1999?

24 A    Mm-hmm, I see that.

25 Q    Okay.  And the address that is associated with this

1  warranty deed is 451 Bowdoin Circle?

2  A    I see that.

3  Q    Okay.  So is this the deed for the house that you owned in

4  Florida?

5  A    I don't know that I've ever seen it.  It says "warranty

6  deed" but I don't know that I've ever seen it.  Mr. --

7  Q    Okay.  But at least is it fair to say that this is a --

8            THE COURT:  Excuse me, she was still answering.

9            MR. MEKARU:  Sorry, your Honor.

10            THE WITNESS:  Mr. Gordon may have had it but I don't

11  think I ever had it.

12  BY MR. MEKARU:

13  Q    Okay.  If you'd take a look at the transaction, would it be

14  fair to say that Donald F. Moore and Brenda K. Moore, husband and

15  wife, are referenced?

16            Towards the top around the area of the date?  This is

17  a warranty deed, warranty deed made and executed 21st day of June

18  A.D., 1999.

19  A    Oh, I see it now.

20  Q    Okay.  It's a lot of verbiage within the paperwork.  But

21  would the date of this transaction coincide about the time that

22  you purchased that property?

23  A    I'm not sure I understand that.

24  Q    Okay.  Well, do you remember buying the house in Florida?

25  A    Yes, I remember buying the house in Florida?

1  Q    Okay.

2  A    But I don't remember what year we bought the house in

3  Florida.  If I'd have had an opportunity to look that up I could

4  have but, you know, we've had many properties and so I don't

5  really remember the exact date.

6  Q    Okay.  Look at the next document, Exhibit No. 9.  This is

7  another warranty deed.

8            MR. MEKARU:  Oh, your Honor, I'm sorry.  Move for

9  admission of -- let me do this en masse.  Move for the admission

10 of Exhibit Nos. 8, 9 and 10?

11           MR. TRACY:  No objection.

12           THE COURT:  All right.  Nos. 8, 9 and 10 will be

13 admitted.

14           (Government's Exhibit Nos. 8, 9 and 10 admitted.)

15           MR. MEKARU:  Thank you.

16 BY MR. MEKARU:

17 Q    All right.  Exhibit No. 9 is another warranty deed?

18 A    Yes, I see it.

19 Q    It states, this indenture is made as of the 27th day of

20 August, 2003, between Donald F. Moore and Brenda K. Moore,

21 husband and wife, with a mailing address in Battle Creek, and

22 Michael W. Heshelman, with the mailing address of the 451 Bowdoin

23 Circle.  Do you see that?

24 A    I do.

25 Q    Okay.  So at some point did you sell the house to your

1  brother?

2  A     With the intention of him selling it so that we could get

3  rid of it because we weren't going to be in Florida any longer.

4  Q     Was this a seasonal residence?

5  A     Yes.

6  Q     Okay.

7  A     We rented it out when we weren't there.

8  Q     So was there any real money exchanged in this transaction?

9  A     I really don't remember.  If the one check was for that

10 then -- but I just really don't remember.  I just really don't

11 remember all that.

12 Q     Now, in some of the paperwork and research that was done by

13 the probation office there's some reason to believe this

14 residence was worth $1 million.  Maybe that's closer to today's

15 value.  Does that sound about right?

16 A     Well, we sure didn't buy it for that.

17 Q     Okay.  Do you remember how much you bought it for?

18 A     I think it was around 250,000, somewhere in there.

19 Q     Okay.  Because if you go -- well, so this was a significant

20 investment, though, even at 250,000?

21 A     Well, not any more significant than any other properties we

22 had bought.

23 Q     Well, and it sounds like you're pretty sophisticated about

24 buying property in Florida and --

25 A     Actually, no, we weren't that sophisticated.  It just

1  happened.  We found it in the paper.

2  Q      Or experienced then?

3  A      Yeah.  No, not really.

4  Q      Okay.  How many properties have you owned in Florida?

5  A      Oh, just that one and another one that we bought prior to

6  that one, but it was for a leased option and we decided not to

7  opt.

8  Q      So only two?

9  A      Yeah.

10  Q      Okay.  So this only the second property you purchased and

11  you don't remember how much you sold it for?

12  A      No, I don't.  I have all that at home but, no, not off the

13  top of my head.

14  Q      Well, ballpark?

15  A      No, I don't.

16  Q      Did you make money or lose money?

17  A      Well, I don't think we made a whole lot of money.

18  Q      All right.  So in Exhibit No. 10 this house is being sold

19  in October 2004 by Michael W. Heshelman to a Mr. and Mrs. Monzon,

20  M-o-n-z-o-n.  Do you have any knowledge of that transaction?

21  A      I don't know who they are.

22  Q      Did you receive the proceeds of that sale?

23  A      I don't know.

24  Q      So all you know is that you had signed over this house, a

25  $250,000 house, to your brother and you don't know what happened

1  to the money at all?

2  A    My husband and I at that time had some other financial

3  things that we had to take care of, and the Florida house was the

4  least interest at that time and so I just asked my brother if he

5  would help me with it.

6  Q    These other concerns, were you need of money?

7  A    Well, I just had business in Michigan and I no longer had

8  interest in Florida.

9  Q    You needed money?

10  A    Doesn't everyone?  I mean, we had business things we needed

11  to take care of, taxes and things like that, and so we tried our

12  best to keep all our interest in Michigan, and if my brother

13  could help me sell the house then that would be one other

14  financial obligation I wouldn't have because we weren't able to

15  go down there very often.

16  Q    And, ma'am, the reason why I'm asking these questions about

17  this property comes back to the statement reported by Agent

18  Wetherbee all the way back to 2005 about what these checks

19  represent.

20  A    The checks represented the care for my father is all I

21  knew.

22  Q    Okay.  Well, that wasn't what you had told the agent back

23  in 2005.

24        MR. TRACY:  Your Honor, there's a little bit of

25  arguing going on here.  Obviously she was mistaken in what she

1    said to Wetherbee back in '05 or '06 because the timing doesn't

2    jive based on what's right in front of the Court.

3            So I don't think we should argue with the witness.

4    She's done the best she can in terms of remembering.  I don't

5    think it helps to argue.

6            THE COURT:  All right.  Well, your point is well

7    taken on arguing.

8            You can ask questions.

9            MR. MEKARU:  Yes, your Honor.

10   BY MR. MEKARU:

11   Q    I'm not trying to, forgive me, I'm not trying to argue.

12   I'm just trying to sort out here the difference between your

13   statement today and what was reported back in 2005, and this is a

14   significant amount of money that we're talking about, $85,000.

15           THE COURT:  I'm sorry, where does the number

16   "$85,000" come from?

17           MR. MEKARU:  The total, 60,000 plus 25,000.

18           THE COURT:  I don't know what you're talking about.

19           MR. TRACY:  The two checks.

20           MR. MEKARU:  The two checks.  Forgive me, your Honor.

21           THE COURT:  I see.  All right.  I'm sorry.

22           MR. MEKARU:  I'm sorry.

23   BY MR. MEKARU:

24   Q    The two checks.

25   A    And your question?

1  Q     So I'm asking with respect to $85,000 -- well, let's see.

2         Did you get -- you're indicating today you don't

3  remember getting any money whatsoever from the sale of the house,

4  but Agent Wetherbee had no idea that you had any sort of property

5  in Florida, so --

6         MR. TRACY:  Objection, your Honor.  One, she's not

7  indicated she didn't get any money.  And, two, I don't know what

8  Mr. Wetherbee knew and didn't know.

9         THE COURT:  Sustained.

10         MR. MEKARU:  All right.

11  BY MR. MEKARU:

12  Q     So let's see.  When Mr. Heshelman gave you the $60,000

13  check did he indicate to you that he had come into some money?

14  A     I never asked my brother about any of his finances.

15  Q     Would it surprise you at all if that money came from Alan

16  Moody, one of the named victims in this case?

17  A     I don't know Alan Moody.

18  Q     The agent had asked whether you knew where Mr. Heshelman

19  was back in 2005.  At that point was he residing in Switzerland?

20  A     That's what I told the agent that I recall.

21  Q     And according to some of the paperwork here Mr. Heshelman

22  had been living in Switzerland from approximately 2003 until

23  early this year.  Does it sound about right?

24  A     It sounds about right.

25  Q     Would he come home -- in fact, in 2003, 2004, would he come

1  back home to the states with any regularity?

2  A    No.

3  Q    But he did come back at times, correct?

4  A    The last time that I remember was either 2002 or 2003. I

5  can't remember for sure but I think it was around Christmas, one

6  of those times.

7  Q    Did he ever tell you that he wanted to stay out of the

8  country?

9  A    No.

10 Q    Or that he was worried about being arrested?

11 A    No.

12 Q    In December 2008 did you know where he was living?

13 A    Is that when the agent came; is that what you're saying?

14 Q    No, I'm sorry, 2008, earlier, this Christmas?

15 A    I'm sorry, repeat that again.

16 Q    Did you know where Mr. Heshelman was living in December

17 2008?

18 A    Yes, I knew he was in jail.

19 Q    Before he was arrested. All right, listen to this. How

20 about November 2008, do you know where he was living?

21 A    No, I never knew where he was living. I always was able to

22 get a hold of him by e-mail and telephone and I didn't know.

23 Q    So even if you'd been contacted by the FBI you wouldn't

24 have been able to --

25 A    No.

1  Q     -- provide any address?

2  A     No.

3            MR. MEKARU:  No further questions.

4            THE COURT:  May I see the exhibits, please?

5            Mr. Tracy, you may proceed.

6            MR. TRACY:  Your Honor, is it possible once you're

7  done, can I have the witness have the exhibits back because I

8  just had a couple follow-up things to go over?

9            THE COURT:  Certainly.  I will hand all five exhibits

10  back to the witness.

11            MR. TRACY:  Thank you, your Honor.

12            MR. MEKARU:  Your Honor, I do have extra copies if

13  you want to have another set for yourself.

14            THE COURT:  No, I don't need one.

15                          CROSS-EXAMINATION

16  BY MR. TRACY:

17  Q     Ms. Moore, could I ask you a favor, from 6, 7, 8, 9, 10

18  kind of in order so you can see them all at once, can you just

19  kind of put them out in front of you?  Does that look okay,

20  Brenda?

21  A     Yes, that's fine.

22  Q     Okay.  Good morning, by the way.

23  A     Good morning.

24  Q     Exhibit 6 first, in the subject line where I believe it's

25  an R., first initial R. Heshelman from this December 2000 check,

24

1  does that mean something to you?  What is R. Heshelman?

2  A    "R" is Robert.

3  Q    Was that your father?

4  A    Yes.

5  Q    Okay.  We won't go into too many details.  I'm sorry to

6  upset you.  And I take it your father was still alive, probably

7  passed away maybe in 2001; does that sound about right?

8  A    My father passed away on December 12th, 2000.

9  Q    2000, okay.  So the checks that came in here, the one in

10 December of 2000 and then on Exhibit 7, one shortly thereafter in

11 March of 2001, those were close in time to when your father was

12 being taken care of by your home, Moore Homes, and then

13 ultimately deceased?

14 A    Yes.

15 Q    Okay.  Now, the 302 that counsel was referring to where

16 apparently Agent Wetherbee came out to meet with you, it's dated

17 in terms of transcription 12/14 of 2005, so that would have been

18 nearly five years after your father's passing, correct?

19 A    Correct.

20 Q    Prior to your father's passing did your mother also stay

21 under your care at Moore Homes?

22 A    My mother was in her own home but I cared for her there.

23 Q    Okay.

24 A    And so did my brother.

25 Q    So your brother also came up from Florida to help with

25

1   that; is that correct?

2   A      That's correct.

3   Q      And your mother passed in the '90s sometime?

4   A      April the 5th, 1996.

5   Q      Okay.  So do you recall whether your brother also assisted

6   you or perhaps directly to a facility in terms of your mother's

7   care as well?

8   A      I'm not sure I understand that, Chris.

9   Q      Did he help with the care in terms of financially as well

10  for your mother's care?

11  A      Not really.  I did most of that, and then when daddy needed

12  care then he helped with that.

13  Q      Okay.  And that was kind of an understanding between the

14  two of you --

15  A      Right.

16  Q      -- brother and sister?  Okay.

17            Now, according to the 302 that Agent Wetherbee wrote

18  up, when you made statements back in 2005 according to his

19  version of the statement, your memory back then was you thought

20  that these two checks, Exhibit 6 and 7, may have tied to the sale

21  of your home down in Florida.  Do you recall questions about that

22  just a minute ago from counsel?

23  A      I don't remember him asking me that.  I don't remember

24  answering in that way.  I remember him talking to me about the

25  check but I don't -- I really don't recall that.

1  Q    Okay.  But now when we look at -- when we have them all in

2  front of us, it at least appears by Exhibit 8 that most likely

3  you and your husband purchased the property down in Sarasota in

4  1999, June of '99?

5  A    Yes.

6  Q    And it at least appears by Exhibit 9 that in August of '03

7  some sort of sale or transfer occurred between you and your

8  husband over to Michael of that same residence, correct?

9  A    Yes.

10  Q    Now, that would be several years after your father's death,

11  correct?

12  A    Yes.

13  Q    So if the sale occurred and any monies were exchanged

14  between Michael and you and your husband, that would have been

15  way after the time that these two checks came in on Exhibit 6 and

16  7, correct?

17  A    Yes.

18  Q    So it'd have been really nearly impossible for any of the

19  proceeds from the sale pertaining to Exhibit 9 to have anything

20  to do with the two checks, Exhibit 6 and 7, correct?

21  A    Correct.

22  Q    And then to the extent there was any proceeds that came

23  from the sale when Michael sold it to the Monzons -- if I'm

24  saying the that right, M-o-n-z-o-n -- on Exhibit 10 that appears

25  to have occurred in October of '04, correct?

1  A    Correct.

2  Q    And again way after the time that these two checks occurred

3  in Exhibit 6 and 7?

4  A    Correct.

5  Q    And so to your best recollection today the two checks that

6  pertain, Exhibit 6, 25,000, and Exhibit 7, 60,000, your best

7  memory is that those pertain to assisting with your father's

8  care?

9  A    Correct.

10 Q    Is there anything else you'd like to add for the Court with

11 respect to that?

12 A    No.

13        MR. TRACY:  Nothing further, your Honor.

14        THE COURT:  Can I see the exhibit?

15        Mr. Mekaru, anything further?

16                    REDIRECT EXAMINATION

17 BY MR. MEKARU:

18 Q    So, Ms. Moore, did you treat the monies then from -- well,

19 just so I'm clear again.  Forgive me for bringing up this subject

20 again, but with your father's passing you indicated it was

21 December 12th roughly?

22 A    Yes.

23 Q    2000?

24 A    Yes.

25 Q    The second check is on March 2nd, 2001.  Are you still

1   saying it was related to the expenses associated with his care?

2   A    I took care of my father for almost three years and so that

3   was I'm sure what my brother felt I deserved because of the care

4   that I gave him.

5   Q    Was there any sort of building associated with that or any

6   sort of --

7   A    Just the deposit in Moore Homes.

8   Q    So this would be considered as a gift as to you or income

9   to Moore Homes?

10  A    It's income to Moore Homes for the care of my father.

11  Q    Okay.  That's true also with the $25,000?

12  A    That's correct, they both went into Moore Homes.

13  Q    All right.  Thank you.

14           MR. TRACY:  Nothing further from me.

15           THE COURT:  All right.

16           Let me just ask you a couple of questions.  Let's go

17  back to these checks, No. 6 and 7.  You don't know who Kenneth

18  Warner is?

19           THE WITNESS:  No, I don't, sir.

20           THE COURT:  Never heard his name?

21           THE WITNESS:  No.

22           THE COURT:  Okay.  Did you make any inquiry of your

23  brother why Kenneth Warner was sending these checks?

24           THE WITNESS:  No, I didn't.

25           THE COURT:  You just deposited them?

1            THE WITNESS:  Yes.

2            THE COURT:   Let me show you Government's Exhibit No.

3    7.  It looks like there's an endorsement on the back of the

4    check.  Do you know whose name that is?

5            THE WITNESS:  That says "Moore Homes."

6            THE COURT:  All right.  And then on the first check,

7    Government's Exhibit No. 6, that's your signature, Brenda Moore,

8    on the back of the check?

9            THE WITNESS:  My signature and my husband's

10   signature.  We're both under Moore Homes.

11           THE COURT:  Okay.  Now, you said speaking of the

12   homes and your husband, you said you'd be willing to put up your

13   house.  Is that in your name or is it in your name and your

14   husband as well as yourself?

15           THE WITNESS:  It's in both our names.

16           THE COURT:  And he'd be willing to put up the house

17   as well?

18           THE WITNESS:  Yes, he would.

19           THE COURT:  Knowing that if defendant failed to

20   appear you'd lose the house?

21           THE WITNESS:  Correct.

22           THE COURT:  Government's 8, 9 and 10 are these

23   warranty deeds, and just so that I have these straight 8 is the

24   warranty deed from someone called Designer Homes of Sarasota and

25   the deed is to you and your husband; is that correct?

30

1               THE WITNESS:  Correct.

2               THE COURT:  So is this a brand new home?

3               THE WITNESS:  No.

4               THE COURT:  Who's Designer Homes, Inc.?

5               THE WITNESS:  Down there on the bottom of it says

6     "William Gardner," I think "Garden" or "Gardner."

7               THE COURT:  Well, who is Designer Homes of Sarasota?

8               THE WITNESS:  William Gardner.

9               THE COURT:  Is that a company that sells homes?

10              THE WITNESS:  No.  It's just, I don't know, maybe

11    it's just his, I don't know how to explain it.  He did some real

12    estate and that was his home and so he sold that to my husband

13    and I.

14              THE COURT:  Okay.  And you said I think you testified

15    that it was for about $250,000?

16              THE WITNESS:  Yes, I believe so.

17              THE COURT:  All right.  And then Government's Exhibit

18    9 is a deed between you and your husband and the defendant.  And

19    you give title to your brother?

20              THE WITNESS:  Correct.

21              THE COURT:  Aside from the $10.00 that it says here

22    that he paid you which you always see on any deed, did he pay you

23    any other money at that time?

24              THE WITNESS:  No.

25              THE COURT:  You testified the purpose of this deed

31

1   was to put it in his name so he could sell it down in Florida?

2              THE WITNESS:  Correct.

3              THE COURT:  And then Government's Exhibit No. 10

4   shows that, in fact, he did sell this property on October 19th,

5   2004, to the Monzons.  That's your understanding?

6              THE WITNESS:  That's what it says but I don't know --

7              THE COURT:  You said you didn't know that?

8              THE WITNESS:  Yeah, I don't know.

9              THE COURT:  Now, you would have gotten the money from

10  that, I take it, since you put the -- you bought the house in the

11  first place, you hadn't received any money from your brother when

12  he put the house in his name, so you would have received the

13  benefit of the proceeds from this deed; is that right?

14             THE WITNESS:  You know what, I don't really remember

15  but I have all that at home.  If the Court needs that I can

16  provide it.

17             THE COURT:  I'm not asking the amount in this

18  question.  I'm asking as I understand the concept of the sale you

19  bought the house with your husband?

20             THE WITNESS:  Yes.

21             THE COURT:  You put the title in your brother's name

22  to sell it for you?

23             THE WITNESS:  Yes.

24             THE COURT:  He sold it for you?

25             THE WITNESS:  Yes.

1            THE COURT:  And the logic would be that you would

2    received the proceeds from it.

3            THE WITNESS:  If there was any equity in it.  We had

4    it a short time.

5            THE COURT:  Yes.  Now, you had it for how long?

6            MR. TRACY:  Roughly four years, your Honor.

7            THE COURT:  About four years.  So you don't recall

8    getting any money back?

9            THE WITNESS:  No, I don't because we bought it on a

10   land contract in the beginning from the Designer Home man, and

11   then --

12           THE COURT:  He gave you a warranty deed for it.

13           THE WITNESS:  Yes.

14           THE COURT:  That's not a land contract.

15           THE WITNESS:  No.  But he did that then we took it to

16   the bank so we had it before then for I think a year.

17           THE COURT:  Well, you say you bought it in '89 or '98

18   rather than '99.

19           THE WITNESS:  Again I really can't remember all the

20   dates to help you out but if you need me to provide that I can.

21           THE COURT:  Well, normally you don't get a warranty

22   deed on a land contract until it's paid off.

23           MR. TRACY:  I think that's what she's saying, your

24   Honor.  She bought it on a land contract.

25           THE COURT:  Okay, so it was paid off in 1999?

33

1              THE WITNESS:  No, we never paid it off.

2              MR. TRACY:  She took a mortgage.

3              THE COURT:  Well, apparently --

4              THE WITNESS:  I took a mortgage for it.

5              THE COURT:  I see.  I see.  But you paid off the

6  seller, the guy that gave it to you?

7              THE WITNESS:  The mortgage company paid off the

8  seller.

9              THE COURT:  Yes, okay.

10             THE WITNESS:  Yeah.

11             THE COURT:  So you then owed the bank?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  And you don't know how much

14 you owed on the house?

15             THE WITNESS:  Well, in the beginning it was around

16 $250,000, I think, but I don't have any idea really how that all

17 worked out as far as what it was sold for or whatever after my

18 brother took care of it for us.

19             THE COURT:  Well, you --

20             THE WITNESS:  Because we didn't have very much equity

21 into it at all.

22             THE COURT:  There's the period between 1999 and 2004,

23 which is about a five-year period here, isn't it?  It was titled

24 in your name and your husband's name.

25             THE WITNESS:  Yes.

34

1          THE COURT:  So you were responsible for taking care

2   of it?

3          THE WITNESS:  Yes.

4          THE COURT:  Not your brother?

5          THE WITNESS:  Right.

6          THE COURT:  All right.  And during that time did you

7   have any equity in the house?

8          THE WITNESS:  Well, at 11 percent I think not.

9          THE COURT:  Okay.  The most the mortgage could have

10  been for was 250,000, isn't that right?

11         THE WITNESS:  I think so, yes.

12         THE COURT:  All right.  This is the property at 451

13  Bowdoin Circle?

14         THE WITNESS:  Bowdoin, mm-hmm.

15         THE COURT:  Bowdoin Circle, okay.  Now, the pretrial

16  services report that the Court had received shows that according

17  to Lexis Nexis records which keep track of these things, public

18  records, that house was sold in October of 2004 for $1 million.

19  Are you aware of that?

20         THE WITNESS:  No.

21         THE COURT:  Did you receive $1 million?

22         THE WITNESS:  No.

23         THE COURT:  Did you receive $750,000?

24         THE WITNESS:  No.

25         THE COURT:  All right.  You don't know where that

1  750,000 went?

2                THE WITNESS:  I don't know that it sold for that.

3  Other than what it says there I don't know anything about it.

4                THE COURT:  All right.  If these Lexis Nexis records

5  are correct you don't know where the money went?

6                THE WITNESS:  I don't know anything about it.

7                THE COURT:  And you don't recall if you got any money

8  or not?

9                THE WITNESS:  No.

10                THE COURT:  I understand you had some financial

11  problems up here.  It sounds to me like that's what you testified

12  to.  Wouldn't you be concerned about what happened to the money

13  from your house that you owned in Florida?

14                THE WITNESS:  We didn't have any equity in it, sir,

15  in so, therefore, I wasn't worried about it.  I just knew that I

16  couldn't continue the large payments on it, and the company that

17  was trying to rent it out wasn't doing a very good job, and so my

18  husband decided that we just would see if my brother could sell

19  it for us.

20                THE COURT:  All right.  You stated that you didn't

21  know your brother's address in Switzerland.  Did you know what

22  city he lived in?

23                THE WITNESS:  Yes.

24                THE COURT:  What city was that?

25                THE WITNESS:  Zurich.  Couldn't think of it, sorry.

1              THE COURT:  Okay.  Obviously you never visited him;

2    is that correct?

3              THE WITNESS:  No.

4              THE COURT:  You never sent him anything in the mail?

5              THE WITNESS:  One time I did, I sent a Christmas

6    gift, but I don't remember.  I never wrote him or anything like

7    that.  We e-mailed every day mostly.

8              THE COURT:  Do you remember how you sent him a gift,

9    where you addressed it to?

10             THE WITNESS:  No, I don't.  I think he moved several

11   times so I don't know.  I only had one maybe when he first moved

12   there.

13             THE COURT:  All right.

14             Any further questions based on the ones that I've

15   asked?

16             MR. MEKARU:  Your Honor, may I approach?

17             THE COURT:  Yes.

18             (Government's Exhibit No. 11 marked.)

19             MR. MEKARU:  Your Honor, I'm just showing it to

20   counsel.  I didn't intend to introduce this so I didn't have

21   extra copies.  I approach the witness with what's been marked as

22   Exhibit No. 11.

23   BY MR. MEKARU:

24   Q    Looking over your shoulder, this is a Grantors of Sarasota

25   County Parcels.  There's a parcel ID.  I'll represent to you that

1    that parcel ID matches the parcel ID of the property we're

2    talking about, this Bowdoin address, okay.  Will you accept that?

3    I can also get the other documents if you'd like.

4    A    No.  This is -- I understand what you're saying.

5    Q    Okay.  All right.  The grantor is Michael Heshelman.  The

6    sales date is October 19th, 2004.  You see the amount of the

7    sale?

8    A    Mm-hmm.

9    Q    What is that?

10   A    It says one million.

11   Q    Okay.  Will you show that to the --

12   A    Oh, mm-hmm.

13            THE COURT:  Mm-hmm, all right.

14            MR. MEKARU:  Thank you.

15            THE COURT:  You're moving to admit this?

16            MR. MEKARU:  Sorry, your Honor.  Yes, sir.

17            MR. TRACY:  Your Honor, I don't know where that comes

18   from.  I don't know, you know, it appears to be off of some

19   website.  I mean, I know we can have hearsay but I don't know --

20            THE COURT:  Are you objecting to it or not?

21            MR. TRACY:  Yes.

22            THE COURT:  On what basis?

23            MR. TRACY:  I don't know what the website is.  I

24   don't know who obtained it.  I don't have any foundational

25   information at all.

38

1          You know, this witness obviously can't verify the
2  authenticity of it.  She's looked at it.  So I object on all of
3  those bases.
4          THE COURT:  Counsel?
5          MR. MEKARU:  Your Honor, if you'd like I can call the
6  agent to establish the foundation of the request for the research
7  on this record.
8          THE COURT:  We can wait until then.
9          MR. MEKARU:  Thank you.
10          MR. TRACY:  I have no other questions, your Honor, in
11  case we're waiting for me.
12          THE COURT:  Since we have the defendant's only
13  sibling on the stand let me ask a couple other questions that.
14          How do you spell Heshelman?
15          THE WITNESS:  Are you speaking to me, sir?
16          THE COURT:  Yes.
17          THE WITNESS:  H-e-s-h-e-l-m-a-n.
18          THE COURT:  Try that again?
19          THE WITNESS:  H-e-s-h-e-l-m-a-n.
20          THE COURT:  Okay.  Have you ever known your brother
21  to spell it with an "R", Hershelman instead of Heshelman?
22          THE WITNESS:  No.
23          THE COURT:  Have you ever known him to spell it with
24  an "I," Hesheiman?
25          THE WITNESS:  No.

39

1          THE COURT:  Are you familiar with the name "Hersher?"

2          THE WITNESS:  No.

3          THE COURT:  Did you know that your brother, according

4    to the police records that the Court has been furnished,

5    absconded from probation in the State of Florida back in February

6    of 1996?

7          THE WITNESS:  No.

8          THE COURT:  Did you know he was on probation back in

9    1996?

10          THE WITNESS:  I did know.

11          THE COURT:  What was he on probation for?

12          THE WITNESS:  I don't know.

13          THE COURT:  When did you first know he was on

14    probation?

15          THE WITNESS:  I guess when he first got on he told me

16    about it, but --

17          THE COURT:  You don't remember the time frame?

18          THE WITNESS:  No, I don't remember the time frame.

19          THE COURT:  And you have no idea what the charges

20    were?

21          THE WITNESS:  No.

22          THE COURT:  Did you know your brother's address when

23    he was down in Florida?

24          THE WITNESS:  451 Bowdoin.

25          THE COURT:  Did you rent the property to him down

40

1  there?

2          THE WITNESS:  No, he just stayed there.

3          THE COURT:  All right.  That was in 1998 when you

4  bought the property?

5          THE WITNESS:  I believe so.

6          THE COURT:  Do you know what his address was prior to

7  that time?

8          THE WITNESS:  No.

9          THE COURT:  All right.

10          Unless the parties have further questions, may this

11  witness be excused?

12          MR. MEKARU:  Yes, your Honor.

13          MR. TRACY:  Yes, your Honor.  Thank you.

14          THE COURT:  And thank you very much.

15          THE WITNESS:  Thank you.

16          MR. MEKARU:  Your Honor, I'd like to recall Special

17  Agent Wetherbee.

18          TIMOTHY WETHERBEE, GOVERNMENT'S WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MR. MEKARU:

21  Q    Agent Wetherbee, when we were last in court, after we got

22  done we had some discussion about securing information about the

23  property we were talking about, this 451 Bowdoin Circle in

24  Sarasota, Florida?

25  A    That's correct.

1  Q    Did you make a request of your staff at the FBI to do a

2  record search for the property?

3  A    I did.

4  Q    And in response were they able to produce onlines and deed

5  records as well as online records regarding the property?

6  A    Yes.

7  Q    And those documents, are they represented by Exhibits 8, 9

8  and 10 regarding the deeds?

9  A    Yes.

10  Q    In addition, were you able to do some sort of financial

11  checks to see if you could find out the transaction price

12  associated with some of the sales?

13  A    Correct.

14  Q    And some of that information is indicated in Exhibit No. 11

15  A    Yes.

16          MR. MEKARU:  Your Honor, may I approach again?

17          THE COURT:  Yes.

18          MR. MEKARU:  I'm going to mark this as Exhibit No.

19  12.  Because we did this incrementally I'll do two separate

20  exhibits.

21          (Government's Exhibit No. 12 marked.)

22  BY MR. MEKARU:

23  Q    Were Exhibit No. 11 and No. 12 together?

24  A    Yes.

25  Q    And these are records that were collected by the FBI?

1   A      Yes.

2   Q      Exhibit No. 12, does that provide further detail regarding

3   the property on Bowdoin?

4   A      Yes, that's more detailed information on that property.

5   Q      Including there perhaps the current resident or somebody's

6   actually identified as the property owner?

7   A      Yes, on this one it's identified as Kristen Rocks.

8   Q      All right.  As well as some description regarding the date

9   of construction of the property as well as the, actually, the

10  footprint of the house?

11  A      Yes.

12  Q      And the square footage?

13  A      Yes.

14  Q      There's some indication toward the bottom in the small

15  print that much of this information was gleaned from the records

16  of the county?

17  A      From the Sarasota County Property Assessor's Office.

18  Q      Okay.  And have you seen the pretrial services report?

19  A      Yes.

20  Q      All right.  And it indicates according to Lexis Nexis that

21  the value of the property and the value of the sale was

22  approximately $1 million?

23  A      Yes.

24  Q      Does that coincide with what was represented on Exhibit No.

25  11?

43

1   A      Yes.

2              MR. MEKARU:  All right.  Move for the admission of

3   Exhibit No. 12 and No. 11.

4              THE COURT:  Mr. Tracy, have you seen No. 12?

5              MR. TRACY:  Just briefly I did, yes.

6              THE COURT:  All right.  Objection?

7              MR. TRACY:  Can I see them again just real quick,

8   your Honor?

9              THE COURT:  Of course.

10             MR. TRACY:  Is it okay if I approach?

11             THE COURT:  Certainly.

12             MR. TRACY:  Thank you.  No objection, your Honor.

13             THE COURT:  All right.  Thank you.  No. 11 and 12

14  will be admitted.

15             (Government Exhibit Nos. 11 and 12 admitted.)

16  BY MR. MEKARU:

17  Q    Just two more quick areas I want to cover, Agent Wetherbee.

18  Prior to your discussion in talking to Ms. Moore in 2005, did you

19  have any knowledge of Mr. Heshelman owning property in Florida?

20  A      I did not, no.

21  Q    Did you know of this Bowdoin address?

22  A      No.

23  Q    Or the number?

24  A      No.

25  Q    Did you examine the banking records for Mr. Kenneth Warner?

44

1  A    Yes, I did.

2  Q    The money that's represented by the $65,000 check, were you

3  able to trace back the source of those funds?

4  A    It was $60,000.

5  Q    I'm sorry, $60,000?

6  A    Yes.

7  Q    Where did the money come from?

8  A    It was a deposit made the same day by Mr. Alan Moody.

9  Q    One of the named victims in this case?

10  A    Yes.

11  Q    Nothing further.  Thank you.

12          MR. TRACY:  Your Honor, may I approach, since I only

13  have one copy of 11 and 12.

14          THE COURT:  Certainly.  Go ahead.  And if you want --

15  I'm sorry, you wanted --

16          MR. TRACY:  Thank you, your Honor.  I'm sorry to keep

17  stealing them back from you.

18          THE COURT:  You're welcome to look at them.

19          MR. TRACY:  Okay.

20                    CROSS-EXAMINATION

21  BY MR. TRACY:

22  Q    I'll just set these out in front of you, Tim.

23  A    Thank you.

24  Q    So, on Exhibit 12, did you actually print this off or did

25  somebody from your office do it?

45

1  A    Somebody from my office.

2  Q    Okay.  So this says "page one of one" on the first page of

3  Exhibit 12, correct?

4  A    Correct.

5  Q    And then the second page of Exhibit 12 also says "page one

6  of one," right?

7  A    Yes.

8  Q    But it looks like it'd be related to the same address?

9  A    Correct.

10 Q    All right.  Have you actually gone to this address

11 physically in Sarasota?

12 A    I have not.

13 Q    All right.  So the ownership on Exhibit 12 shows Kristen

14 Rocks, correct?

15 A    That is correct, yes.

16 Q    Now, you might need to see Exhibit 10, but do you remember

17 off the top of your head from Exhibit 10, which is the deed

18 transfer from Mr. Heshelman to someone --

19 A    Yes.

20 Q    -- is it to Kristen Rocks?

21 A    No, it was not.

22 Q    It was to Monzons or something like that?

23 A    Something like that, yes.

24 Q    Okay.  So obviously when this was printed off, the first

25 page of Exhibit 12, there's been a change of ownership again?

46

1  A     Appears to be.

2  Q     Okay.  Do you know anything about Kristen Rocks?

3  A     It's a name that has come up in association with Mr.

4  Heshelman.  I don't know the exact association.

5  Q     They're not married or anything as far as you're aware?

6  A     As far as I'm aware, no.

7  Q     Okay.  But in any event as far as you're aware she's

8  independently now purchased this property from the Monzons?

9  A     Yes.

10 Q     Has the Monzons --

11         THE COURT:  I'm sorry, you got two different answers

12 there.

13         THE WITNESS:  I do not know --

14         THE COURT:  All right.

15         THE WITNESS:  -- how she --

16 BY MR. TRACY:

17 Q     Has the Monzons name come up in any manner in this

18 investigation other than with Exhibit 10 purchasing a piece of

19 property?

20 A     No.

21 Q     That's the only way they've come up?

22 A     That's the only way they've come up.

23 Q     Okay.  Do you know how much Kristen Rocks paid the Monzons

24 for the property?

25 A     I do not.

1  Q     You do?

2  A     I do not.

3  Q     Okay.  And then Exhibit 11 there's a purchase price that

4  appears to be reflected of $1 million, correct?

5  A     That's correct.

6  Q     That's also page one of one?

7  A     That's correct.

8  Q     But here it says -- here in the "results" line on Exhibit

9  11 under the "Grantors" it says, "One pages at ten records per

10  page."  Is this all that came up regarding the sales related to

11  this piece of property; do you know?

12  A     I was not there when she ran the report but --

13  Q     Why wouldn't something show up in terms of the transfer

14  from the Monzons to Kristen Rocks?

15  A     I don't know.  I did not see that.

16  Q     Okay.  So do you know for sure whether or not Kristen Rocks

17  was the one that paid the million dollars to the Monzons or

18  whether it was the Monzons paying the million dollars to

19  Heshelman?  I mean, do we really know from what has been obtained

20  so far?

21  A     This is the date of transfer is 11/13 of 2008.  This date

22  of transfer was 10/19 of 2004.

23  Q     This date of transfer here that you're looking on in

24  Exhibit 12 it shows the grantor is a Joseph Ruby.  Do you see

25  that?

1  A      I see that.

2  Q      Okay.  So is that somebody else that's in between here that

3  may have purchased it?

4  A      Could very well be, yes.

5  Q      So we don't really know what's happened in terms of the

6  transactions with this property from '04 to present?

7  A      Correct.

8  Q      Okay.  And then on direct examination today counsel asked

9  you a question about whether you knew anything about the Bowdoin

10 address.

11         Now, Government Exhibit 1 from the other day, last

12 Thursday, this is your 302 report in November of '06, correct?

13 A      Correct.

14 Q      And this is regarding a telephone call that you had with

15 Mr. Heshelman at that point in time?

16 A      Correct.

17 Q      You were here in the states and he was in Switzerland?

18 A      Yes.

19 Q      By the way, before I forget just to clarify.

20         When we said last week when we were here on Thursday

21 that the Swiss authorities knew something about the charges

22 against Mr. Heshelman, did you actually mean Swiss authorities

23 that work for the Swiss government or was it your people with the

24 FBI or FBI affiliates over in Switzerland that knew?

25 A      Both.

1  Q      Both of them knew?

2  A      Both.

3  Q      Did you ever have communications with the Swiss

4  authorities, the one that actually worked for the Swiss

5  government?

6  A      No.  That was our legal attache who had direct contact with

7  them.

8  Q      So you don't know exactly what they know would have

9  occurred through your --

10          MR. MEKARU:  Your Honor, I'm sorry, I mean, this is a

11  little beyond the scope of this question.

12          MR. TRACY:  We're clarifying testimony that occurred

13  last Thursday before this Court.

14          THE COURT:  I recognize that this was not on -- that

15  it was not brought up on redirect but under the circumstances I'm

16  going to allow counsel the leeway to ask the question.

17  BY MR. TRACY:

18  Q      Really my question is you didn't have the direct

19  communications with anybody that were Swiss authorities that

20  actually worked for the Swiss government?

21  A      That is correct.

22  Q      Okay.  Now, back to the Bowdoin street address.  In your

23  302 in '06 I don't believe there's any mention of the Bowdoin

24  street; is that right?

25  A      That's correct.

1  Q     Now, do you know who Special Agent John Cotter, C-o-t-t-e-

2  r, is?

3  A     I have spoken to him since, yes.

4  Q     Okay.  Besides an investigation regarding Mr. Heshelman,

5  are you aware that Mr. Cotter interviewed Mr. Heshelman back in

6  February of '03?

7  A     I am aware of it, yes.

8  Q     And, in fact, in the discovery in this case, which I

9  presume you helped produce --

10 A     Right.

11 Q     -- the government's produced a copy of a 302 from February

12 of '03 from Mr. Cotter, correct?

13 A     Correct.

14 Q     And I believe he might have been investigating an Allen

15 Shepherd back then?

16 A     Right.

17 Q     And he interviewed Mr. Heshelman as part of that?

18 A     Yes.

19 Q     And Mr. Heshelman actually spoke with him and gave him some

20 information?

21 A     Correct.

22 Q     Now, one of the pieces of information from this 302 again,

23 Special Agent Cotter's in February of '03, it has both a

24 Switzerland address and a US address for Mr. Heshelman, does it

25 not?

1   A     It does, yes.

2   Q     Okay.  And you've seen this before?

3   A     I have, yes.

4   Q     Did you see it even before your interview in 2006 of Mr.

5   Heshelman?

6   A     Before 2006, yes, I believe I did.

7   Q     Okay.  And the address that's listed there for US is the

8   same Bowdoin Circle address in Sarasota, correct?

9   A     That is not.

10  Q     Oh, it's 541?

11  A     Yes.

12  Q     Is that a mistake or do you know?

13  A     I believe it's a mistake but I'm not sure.

14  Q     Okay.  But you at least knew that he was on Bowdoin Circle,

15  if I'm saying "Bowdoin" right or however it's supposed to be

16  said.

17  A     Yeah, once I read that interview.  I don't recall exactly

18  when I read that but, yes.

19  Q     Okay.  So when we look at Exhibits 8 through 12 or however

20  many we want to, Bowdoin here, that address is 451, correct?

21  A     Correct.

22  Q     But in Special Agent Cotter's it's 541?

23  A     Yes.

24  Q     Are you aware of anybody who ever lived at 541?

25  A     I'm not aware of that.  I did not run that address.

1  Q     So your inference would be that the numbers maybe got

2  transposed?

3  A     Possibly, yes.

4  Q     Okay.  But besides that Bowdoin street address there's also

5  an address in Switzerland, correct?

6  A     That is correct.

7  Q     So it says "Michael Heshelman doing business as Investors

8  First Ban-Corp," correct?

9  A     Yes.

10 Q     And then it gives an address on Nordstrasse in Zurich?

11 A     Correct.

12 Q     And I believe this would be an international phone number?

13 A     Yes.

14 Q     In an e-mail form as well?

15 A     Yes.

16 Q     And then also this address in Florida which may or may not

17 be correct, and a Florida phone number as well?

18 A     Correct.

19 Q     All of that information you would have had access to some

20 time in '03, '04, or '05?

21 A     Yes.

22 Q     Okay.

23              MR. TRACY:  Excuse me one second, your Honor.

24              Nothing further, your Honor.  Thank you.

25              THE COURT:  Mr. Mekaru?

1          MR. MEKARU:  No questions, thank you.

2          THE COURT:  All right.  Thank you.  You may step

3   down.

4          MR. MEKARU:  Nothing further, your Honor.  Thank you.

5          THE COURT:  All right.

6          Anything further on behalf of the defense?

7          MR. TRACY:  No, your Honor.

8          THE COURT:  Closing arguments?

9                         CLOSING ARGUMENT

10         MR. MEKARU:  Your Honor, just a few things about the

11  testimony.

12         There's just something I wanted to point out here;

13  that this house in Florida was purchased as represented by the

14  warranty deed in 1999.

15         The witness has indicated that she actually had

16  garnered some sort of interest in the property in 1998 and then

17  transferred it in 2003 to her brother Michael Heshelman so he

18  could sell it because he apparently was in a better position to

19  sell the residence, which ultimately happened in 2004.

20         Your Honor, in 2003 both the witness as well as the

21  information provided pretrial services indicates that the

22  defendant was in Switzerland.  A little odd that the defendant in

23  Switzerland was somehow closer in proximity and ability to handle

24  a transaction of a sale in 2004 than Ms. Moore who was in the

25  United States and residing in Michigan.

1          Your Honor, also regarding the transaction with the

2    million dollar sale.  The records indicated by pretrial services

3    as well as the records produced by the FBI indicate in 2004 that

4    the property was sold for $1 million.

5          We don't have any idea what that property looks like

6    but, nonetheless, the records indicate this is a million dollar

7    sale.

8          Ms. Moore has testified that she had no knowledge of

9    that sale or how much actually was involved in that transaction

10   but that the sale was supposed to be for her benefit.

11          THE DEFENDANT:  That's not true.

12          MR. MEKARU:  So now we've got -- if you'd like to

13   talk -- testify --

14          THE DEFENDANT:  I've love to talk.

15          MR. TRACY:  No, no, you're not talking.

16          THE DEFENDANT:  I'd love to talk.

17          MR. MEKARU:  Your Honor, so one of two things either

18   happened here.  Either the sale did, in fact, happen that was

19   supposed to be for her benefit and that she was never told the

20   property that she thought had minimal if any equity in it was

21   sold for a $750,000 gain, and that she was either lied to or

22   there was a lie of omission.

23          Or she did, in fact, receive those proceeds and

24   received some money and that she has -- that the witness has

25   misrepresented that fact to this Court.

1          So I'm not willing to challenge Ms. Moore's

2    credibility on this.  Let's assume that she's taken the oath, she

3    understands that, she's testified truthfully.  Then the records

4    indicate that she was essentially the victim of a $750,000 sale

5    that did not go to her benefit.  All right.

6          Now, why is that important with respect to this

7    defendant?  Your Honor, we've indicated we consider the defendant

8    to be a flight risk.  If this Court were to issue a bond he would

9    have to take an oath, take an oath that he would honor and appear

10   as directed by this Court.

11         We would suggest that if the defendant was willing to

12   lie to his own family about this sale, somebody who's clearly his

13   closest relative, his only surviving member of his family, we'd

14   have a little concern about his, you know, credibility and

15   representing to this Court that he would appear as directed,

16   number one.

17         Number two, the criminal history for this individual

18   indicates that he has been through the court system multiple

19   times and that he has been -- had demonstrated a record of non-

20   appearance and absconding.

21         Now, those are for matters that were far less serious

22   than he's facing today.  This is a multi-million dollar fraud

23   scheme.  He's facing penalties that are -- and advisory sentences

24   that are, as calculated by the government, in excess of ten

25   years.

1          The pressure that's being placed on the defendant at

2    this point would cause the government to believe that he has

3    little interest to stay in the United States to appear on these

4    charges.

5          Next question, does he have the ability to flee the

6    United States to avoid these charges?

7          Well, as indicated by his past residents he's been

8    living outside of the United States without any problems from

9    2003 until 2009, and that his family contacts in the United

10   States aren't so strong that he would feel the desire to come

11   back regularly.

12         I think Ms. Moore indicated he came back once, maybe

13   twice, to the United States.  While they've been in contact the

14   draw wasn't such that he would return on a regular basis.

15         He's traveled internationally.  We've seized his

16   passport, but as this Court's aware fraudulent documents do

17   exist.  They've caused problems.  They would be available to an

18   individual who has indicated that he has access to 500 million

19   Euros, some excess of $600 million.

20         Now, Counsel has queried as to whether that's his

21   business or actually his.  As the Court may recall from his

22   statement to this Court as initial appearance he indicated that

23   he has resources that would allow him to hire an attorney.

24         The Court asked Mr. Heshelman, "Do you have resources

25   that would allow you to hire an attorney?"

1            The defendant:  "In Switzerland, yes, sir.  The
2   problem -- may I speak, your Honor?"

3            "The Court:  Yes" -- excuse me -- "Please do."

4            "The defendant:  The problem is that I left
5   Switzerland because the US authorities and Swiss government have
6   locked all my accounts.  I have no access to those accounts.  In
7   due time if allowed I would be glad to hire my own attorney but
8   as of today I cannot."

9            "The Court:  Excuse me.  Go ahead."

10           "The defendant:  And from what I understand they've
11  just told me I have a bail hearing in a few days.  I have no
12  resource -- no source to access an attorney before then."

13           "The Court:  What will it take as far as getting
14  access to your assets in Switzerland so that you could use them?"

15           "The defendant:  It would probably -- it would take
16  me getting out on bail and probably about ten days."

17           The defendant has represented to this Court that he
18  can get that money.  Now, he would have access within ten days.
19  It'd be our assessment that he would have the resources to fund a
20  flight.

21           Your Honor, the defendant is a US citizen; was
22  notified of extradition to come back to the United States rather
23  than voluntarily appear -- and he doesn't have any obligation to,
24  not suggesting that -- but he demanded an extradition hearing,
25  was given a right to a hearing, and was ordered out of

58

1  Switzerland.

2              Now, on one hand the defendant obviously can exercise

3  his rights.  But when the question comes as to whether the

4  defendant poses a risk of flight I'd ask this Court to consider

5  the fact that the defendant wasn't willing voluntarily to come

6  back to the United States.

7              THE COURT:  Mr. Mekaru, can you give me the time line

8  from when he I believe was arrested in Switzerland?  Is that when

9  he first knew about the extradition?  That's question number one.

10             Number two, how long the extradition process took?

11             MR. MEKARU:  Your Honor, as I recall the defendant

12 was arrested by the Swiss authorities on Swiss allegations of

13 misconduct in December of 2008.  I believe it was actually in

14 between Christmas and New Year's, maybe the 27th is my

15 recollection, and we were advised that they had initiated this

16 action and they were holding him on Swiss charges.

17             Now, that caused a query from the Swiss government

18 because they knew, based on contacts with the FBI's legate, that

19 we were interested in Mr. Heshelman to cause a query from them as

20 to whether we were interested in them pursuing extradition

21 because they had now located him which then triggered from us the

22 positive response.

23             We then went forward with the extradition.  The

24 hearing I believe was in February of 2009, the 23rd comes to

25 mind, thereabouts.

1          And then based on that presentation of the

2    extradition between December and February the United States

3    Attorney's Office along with the Department of Justice and the

4    state department were putting together the extradition paperwork,

5    advised and notified the Swiss authorities that we did want to

6    seek extradition.

7          There was I think essentially a provisional warrant

8    that was placed on the defendant and he was held in custody.  We

9    then perfected the extradition paperwork by the presentation of

10   the documents and that that actual hearing was some time in I

11   believe February of 2009.

12         The defendant was then -- there was sufficient

13   finding of an extradition by the Swiss authorities and they

14   ordered him extradited from Switzerland and back to the United

15   States.

16         I believe going back to Exhibit No. 3, the decision

17   was on February 27th, 2009, granting extradition.  There was a

18   delay in getting the logistics of the defendant being transported

19   back to the United States.

20         Two deputy marshals from this district actually flew

21   from the Western District of Michigan to Switzerland to secure

22   his appearance and returned I believe it was March 27th, Friday,

23   then he had his appearance in this court on the following Monday.

24         THE COURT:  You just stated that the defendant

25   exercised his right to protest the extradition?

1            MR. MEKARU:  That's my understanding, your Honor.  He

2    was queried as to whether he would waive extradition and he

3    declined to waive.

4            THE COURT:  Does the official record indicate the

5    basis for contesting the extradition?

6            MR. MEKARU:  No, your Honor.  Well, it might, your

7    Honor, but we don't have those records.

8            THE COURT:  Okay.

9            MR. MEKARU:  We were just notified of the results.

10           THE COURT:  Okay.

11           MR. MEKARU:  Your Honor, I think at this juncture

12   we've presented substantial information to suggest the defendant

13   is a risk of flight under 3142, and that even if this Court were

14   to impose some sort of conditions, even something along the lines

15   of detention and tether, that that would not necessarily prevent

16   the defendant from fleeing prosecution.

17           Tether, while we might be notified that he's out of

18   range, does not necessarily permit the government to respond

19   immediately.  The only way we can safely secure his appearance is

20   by having him held.

21           Thank you.

22           THE COURT:  Thank you, Mr. Mekaru.

23           Mr. Tracy?

24                         CLOSING ARGUMENT

25           MR. TRACY:  Thank you, your Honor.  Let's pick up

1  with the Swiss stuff if you wouldn't mind, your Honor, and again

2  I don't know that we have the full record in front of you.

3           What we do have is Government Exhibit 3 from last

4  week.  No indication of any hearing taking place over in

5  Switzerland, your Honor.

6           And being mindful of what --

7           THE COURT:  Did you say there wasn't one?

8           MR. TRACY:  I don't know.  I don't have the record.

9           THE COURT:  An official representative of the United

10 States government just represented there was a hearing.

11          MR. TRACY:  But he wasn't there and the agent --

12          THE COURT:  Well, yes, but some things are a matter

13 of public record, and if an attorney of this court represents

14 that it took place I'm going to give some credence to that under

15 the circumstances.

16          Now, if that's going to be a contested issue we ought

17 to find out about that.  If you're actually going to maintain

18 that there was not a hearing and that Mr. Mekaru's information is

19 wrong -- which I think is a rather significant point -- I'm glad

20 to take further proofs on this, but I want to know if that's a

21 serious objection on your part.

22          MR. TRACY:  Well, let me make a statement and then I

23 guess we can follow-up.

24          I had the agent on the stand last week and the Court

25 did as well.  The agent would be in the best position to know

1  based on the documents.  He was not aware whether there was a

2  hearing or not, so that's what the current evidence is before the

3  Court.

4         Rather than representations from counsel the agent

5  then would be the interaction between the United States and the

6  liaison over in Switzerland is not aware whether a hearing took

7  place in Switzerland.  So that's our current state of true

8  evidence before the Court.

9         The letter that comes from Switzerland indicates that

10  there was a decision not to lodge an appeal by my client but it

11  says nothing about a hearing taking place.  If the government has

12  something else I would --

13         THE COURT:  Mr. Tracy, what would the appeal have

14  been from?

15         MR. TRACY:  The decision --

16         THE COURT:  You don't start with an appeal by

17  definition so it has to be from something.

18         MR. TRACY:  Correct, your Honor, but we're making

19  assumptions.  I mean, I don't know Swiss law very well, and maybe

20  you do, maybe you've had other experiences and, you know, this is

21  my first time through the Switzerland component of it.

22         It's a decision that's handed, you know, I don't know

23  if it's more akin to an administrative decision in Switzerland, I

24  don't know, your Honor.

25         But there's a decision in this March 17th, 2009,

1  letter that says here's what has been decided on February 27th,

2  '09 by what they call their Federal Office of Justice, which

3  granted extradition to the United States.  I don't know what that

4  was; I don't know whether it was based on what we would normally

5  call a hearing or not.

6          THE COURT:  All right.

7          MR. MEKARU:  Your Honor, I'd like to object to the

8  characterization of the witness's testimony.  His testimony was

9  that he was not present.  He doesn't personally know whether

10  there was a hearing.  He was advised that there was a hearing,

11  that he was in communication with the FBI legate, and the

12  information he was receiving was that there was a hearing.

13          His personal knowledge, no.  Let me clarify that,

14  yes, he's acknowledging it was hearsay but that's what he was

15  advised, not that it didn't happen.

16          THE COURT:  And you don't recall it that way, Mr.

17  Tracy?

18          THE COURT:  Well, that could be.  That could be.

19  Again, it doesn't change the fact that this Court really doesn't

20  have the benefit, at least in my mind, to know that over in

21  Switzerland what exactly occurred at that hearing.

22          THE COURT:  Well, and I think this is an important

23  point.

24          Now, hearsay evidence is admissible at this hearing,

25  and if the testimony was from the agent that there was a hearing

1   even though he personally wasn't there because he's assigned here

2   in Michigan, that's one thing.

3           If he said he doesn't know if there was a hearing

4   then that's something else, and we can check that.  We have that

5   testimony on tape and we can play that back.

6           So perhaps we ought to do that.  The Court will do

7   that before it renders a decision in this case.

8           MR. TRACY:  What I understand happened in Switzerland

9   was that charges were brought.  Part of what was going on in

10  terms of an actual challenge to any extradition was a challenge

11  to those Swiss charges.

12          Remember, my client was in jail for about two months

13  in advance of any decision here by their Federal Office of

14  Justice.  So he retained counsel or had counsel appointed, I

15  don't know all those details at this juncture, your Honor, but

16  had counsel in Switzerland that was challenging the charges,

17  whatever those were in Switzerland.

18          And my understanding -- again, I've asked for the

19  records to be sent from Swiss counsel they have.  As you know, I

20  was just appointed last week, I don't have those yet.  My

21  understanding --

22          THE COURT:  You've done quite a bit in a very short

23  period of time.  The Court appreciates that.

24          MR. TRACY:  My understanding those charges, and I

25  don't know why they were dropped and maybe it has something to

1  do, I'm not sure, those charges have since been dropped.

2          Now, obviously my client, assuming that's correct,

3  had the right to challenge those charges in Switzerland just like

4  he would here.  And then at the point in time of extradition, at

5  least from what we have in Exhibit 3, he did not challenge the

6  ultimate decision of the Federal Office of Justice that led to

7  him being extradited.

8          THE COURT:  I don't know what that means.

9          MR. TRACY:  Well, it says right in here, your Honor,

10  it says, "The subject renounced" -- is their verbiage -- "to

11  lodge an appeal against the decision."

12          So there was no further challenge to the extradition

13  by my client or his counsel after some decision was made by their

14  office of Federal Justice in February of '09.

15          THE COURT:  Fine.  Did your client decline to waive

16  extradition?

17          MR. TRACY:  I believe that is correct, your Honor.

18  And I believe, again if we had the benefit of the papers from

19  Switzerland I think you'll see part of the reason for declining

20  that was he was in the midst of challenging the charges that were

21  pending against him in Switzerland.

22          THE COURT:  Now, tell me the connection between those

23  two things.  It's one thing to contest Swiss charges in

24  Switzerland against this Court.

25          MR. TRACY:  Yes.

1          THE COURT:  Extradition proceeding is entirely

2    separate because they were trying to remove him to this country

3    to face charges over here.

4          Now, why would he decline to waive extradition to the

5    Court over here in this country because he's contesting some

6    charges over in Switzerland?

7          MR. TRACY:  Well --

8          THE COURT:  I don't understand the connection at all.

9          MR. TRACY:  Okay.  Well, let's -- hopefully, you and

10   I will never be in that position --

11          THE COURT:  I hope so.

12          MR. TRACY:  -- but let's just try to put ourself in

13   Mr. Heshelman's shoes for a second.

14          You're picked up on what he at least believes are

15   sort of, quote, unquote, "bogus charges," in Switzerland that

16   apparently have been dropped at this time.  And that in the

17   context of that all of a sudden what also appears is that there's

18   a request for you to be extradited from the Swiss country that

19   you've now lived in for a period of time back to the United

20   States.

21          The one is tainting the other.  You're in the midst

22   of being taken in by authorities.  You're going to have a little

23   bit of suspicion about whatever is going on and whatever actions

24   are trying to be taken against you at that point in time.  I

25   think that's a pretty reasonable thing to go through in your

1    mind, your Honor, if you or I were in Mr. Heshelman's position at

2    the time.

3              THE COURT:  He had an attorney over there.

4              MR. TRACY:  That's correct, and I --

5              THE COURT:  That's what you said.

6              MR. TRACY:  That's my understanding, he had an

7    attorney.

8              And so I think the game plan was we need to get rid

9    of any charges that exist within Switzerland and we have the

10   right to challenge all of that, and if that's going to take some

11   time to do, that may also require us not to agree to the

12   extradition because if the extradition happens before those

13   charges are ended we may not be able to ever clear that

14   particular issue up.

15             Whether that was the right decision or not again I

16   was not his counsel.

17             THE COURT:  Are you saying that is what your client's

18   decision was or are you speculating as to what your client may

19   have done?

20             MR. TRACY:  I've talked to him about it.  Again, I

21   don't have -- I don't really want to put him on the stand for

22   these purposes as the Court can understand.  I've talked with him

23   about it and what he's represented to me is that is part of the

24   decision that occurred between he and his counsel in Switzerland.

25             So, yes, I have -- it's not me speculating about what

1    he was doing.  He's indicated that to me.

2              THE COURT:  So you are proffering that your client

3    declined to waive extradition because he wanted to fight the

4    charges over in Switzerland?

5              MR. TRACY:  That is correct, your Honor.

6              THE COURT:  Which were dropped once he agreed to

7    extradition?

8              MR. TRACY:  Or they were dropped in advance of the

9    extradition.  The timing of it, your Honor, I'm not as clear on--

10             THE COURT:  I see.

11             MR. TRACY:  -- but pretty much close in time is my

12   understanding.

13             So what I guess I'm saying is that that has to be --

14   it'd be a little different if the Swiss authorities had picked

15   him up simply based on these charges and that there was still

16   this delay and some challenge had occurred.

17             We have to be mindful of the fact that there were

18   actual charges brought in Switzerland that also were in the

19   process of being challenged as part of that, and I'm just

20   pointing that out to the Court so the Court can understand the

21   context and what position my client and his counsel is in over in

22   Switzerland.

23             Now, and I'll go through whatever -- I mean, that's

24   about the end of the knowledge I have right now because again I

25   don't have the paperwork from Switzerland at this point in time.

1          The sale of the home.  You know, I don't know what

2    occurred and I don't really think anybody in this courtroom does

3    at this point, even Mrs. Moore who owned the home for a period of

4    time doesn't have a recollection and, you know, why necessarily

5    would she.  It goes back almost a decade for her now since when

6    she purchased the home and a little less than that since the sale

7    to her brother.

8          One, I'm not sure $250,000 was the price that was

9    paid for the home.  That's her best recollection to the Court or

10   what she thought was the most.  It could be 300; it could be 400;

11   it could be 500, we don't know as we sit --

12         THE COURT:  There's nothing to suggest that it was

13   more than $250,000.  Why are you saying it could have been

14   $500,000?

15         MR. TRACY:  Because reality based on what we have

16   before us, your Honor, it could be a lower or a higher number

17   because she's doing her best she can.  She's offered to provide

18   paperwork about what she actually paid for the home which I will

19   try to obtain from her but again I don't have the benefit of

20   that.

21         So what I think we should be a little cautious about

22   saying there was a $750,000 spread when there's really no true

23   evidence to justify that conclusion based on what I've seen.

24         The million dollar sale, the agent apparently had

25   records pulled.  We have them in Exhibit 11 and 12.  Again we

1  have no tie-in that that is exactly what was paid to Mr.

2  Heshelman at the sale.

3           It appears that there was a sale to another Ruby

4  gentleman afterwards and then after the Monzons and to Kristen

5  Rocks or Rocks after that.  We don't really know as we sit here

6  today what has happened, who got any monies out of that sale.

7           The reality is is that there's very significant

8  charges against my client.  These charges are I think the main

9  basis, if I understood from the government, as to why they have a

10 concern about his risk of flight.  Why we're going off on a

11 tangent in terms of the sale of the home I'm not sure.

12          Mrs. Moore came before you today.  She came and said,

13 look, you know, I'm willing to take in my brother.  My husband is

14 willing to take in my brother.  We're willing to take

15 responsibility.

16          We've lived in Battle Creek a long, long time.

17 That's in this district.  We'll take the responsibility of

18 getting him back and forth to court or over to my office or

19 whatever this Court would allow.  We'll put up the necessary bond

20 for that.

21          The Court may or may not recall that besides Mrs.

22 Moore, Angie the defendant's niece was here in court to support

23 him last Friday.  And his only -- his surviving aunt I believe of

24 his parents' generation, Marjorie, was here in court to support

25 him last Thursday, excuse me, as well.

1          So other family members were here besides Mrs. Moore.

2   She, of course, came back and indicated what she's willing to do

3   on behalf of, you know, the client as well.

4          In terms of the Florida probation issue for a minute,

5   I also again, you know, we don't have the benefit of the full

6   printout, your Honor, in terms of these charges.

7          I think when all is said and done we're going to find

8   out that there was one charge made back in '89 or '90 related to

9   a former company owned by my client that's some sort of

10  insufficient funds check of $1800 or something like that.

11      Ultimately those funds were paid.  The business he and some

12  partners were in was shutting down.  Funds were not paid out.

13  The check did not clear correctly.  Ultimately it was paid.

14          Now, the real question for the Court is not so much

15  that; it's what happened when he absconded or didn't show up for

16  probation, and I believe that was in the '95 or '96 time frame.

17          Well, you heard today from his sister what was going

18  on.  And again this is not an excuse; he should have done what he

19  needed to do.

20          He was up here taking care of his mother.  He

21  contacted the authorities down -- and remember his mother passed

22  away in I think '96 or '97, Mrs. Moore indicated.  He came up in

23  1995, this is what his sister indicated today, to help take care

24  of his mother.  He did not go back to Florida until after she

25  passed away.

1          When he went back to Florida he lived there from the

2    late '95-96 time frame --

3          THE COURT:  Say that again.  You're saying her

4    testimony was that he came up here and took care of their mother

5    and stayed up here for how long?

6          MR. TRACY:  He stayed up here --

7          THE COURT:  She testified to this?

8          MR. TRACY:  She testified to both of those things but

9    they were two different periods of time, your Honor.  He took

10   care of his mother in the '95 and '96 time period roughly before

11   she passed away.

12         THE COURT:  When did the sister testify that she was

13   -- that he was up here in 1995?

14         MR. TRACY:  For a long period of time, for months, is

15   what she indicated.  And then he went back and lived in Florida

16   in I believe that same Bowdoin Circle residence for a period of

17   time.

18         So the Florida authorities who had some warrant

19   apparently out for him or whatever, he was down there, he had a

20   driver's license in Florida, he had all of that information for a

21   period of time before he moved overseas.  And he came back up

22   here in the '99-2000 time frame to take care of his father, and

23   you will recall that Mrs. Moore's testimony was the father passed

24   away in December of 2000.

25         THE COURT:  I don't recall the testimony that way.

1          MR. TRACY:  You don't recall any of that testimony,
2    your Honor?

3          THE COURT:  I'll have to review the record.  I don't
4    recall it quite as clearly as you do about his being up here all
5    that time.

6          MR. TRACY:  Yeah, she had indicated in both
7    instances.

8          THE COURT:  Am I mistaken on that, Mr. Mekaru?

9          MR. MEKARU:  No, your Honor.  I asked the agent the
10   same thing and we're both thinking that that's why he was sending
11   money is that he wasn't coming up.

12         And we asked about whether he'd done much to support
13   family when the mother was in need of care, and my recollection
14   was that he didn't do much.

15         THE COURT:  I'll play back the testimony.  We have it
16   recorded and if it comes out the same way you recall it, Counsel,
17   I'll give you the benefit of the doubt certainly.

18         MR. TRACY:  That's fine.  We also have Mrs. Moore --

19         THE COURT:  I don't recall it the way you're
20   representing it.

21         MR. TRACY:  We still have her here.  I mean, if we
22   want to clarify briefly that's --

23         THE COURT:  Well, it's up to you, Counsel.

24         MR. TRACY:  I'll call her back to the stand then on
25   that issue, please.

1          MR. MEKARU:  If I may, what is the significance of
2    her --
3          THE COURT:  Well, apparently this has to do with
4    where the defendant was when he was in violation of his probation
5    down in Florida.
6          MR. TRACY:  If the government's taking the position
7    that he absconded one time and that's a flight risk, the Court
8    should have the benefit of knowing rightly or wrongly what he was
9    doing during that time period, and that's the relevance of it.
10          THE COURT:  I'll take the testimony.
11          You are reminded that you are still under oath.
12          THE WITNESS:  Yes.
13        BRENDA MOORE, DEFENDANT'S WITNESS, PREVIOUSLY SWORN
14                        DIRECT EXAMINATION
15    BY MR. TRACY:
16    Q    Well, I didn't want to do this with you twice in one day.
17    I'm sorry.  Okay.  Remind us again, do you remember, I think you
18    said it was the spring time that your mother passed away; is that
19    correct?
20    A    She passed away in April of '96.
21    Q    Okay.  And prior to that did you assist with her care
22    before her death?
23    A    She was in her home.  My brother was caring for her then.
24    Q    Okay.  And were you helping as well when you could?
25    A    Yes, when I could.

1    Q    Okay.  How long was she in her home in a condition, if you

2    will, that she needed assistance; if you can recall?

3    A    Let's see, at least a year.

4    Q    Okay.  And did your brother stay that whole year or was he

5    back and forth at points in time?

6    A    It's difficult to remember all of that but I know he cared

7    for my mother at least for six to eight months before her death,

8    and then continued to care for my father.

9    Q    Okay.  And so that, in the best of your recollection, might

10    have been in the '95 or '96 time frame?

11    A    Yes.

12    Q    Okay.  And from the records that were indicated I believe

13    by the judge earlier, it was your understanding he may have

14    absconded or did something in violation of his probation down in

15    Florida roughly in that same time frame?

16    A    I knew that he was on probation but I didn't know anything

17    about his other stuff.

18    Q    Correct.  That's what you testified before about?

19    A    Yes.

20    Q    Now the Court's drawn to your attention that his violation

21    down there occurred roughly in that same time frame?

22    A    I guess.

23    Q    Okay.  Now, in terms of your father, was he already in a

24    condition in the mid-90s that he also needed some assistance?

25    A    My dad had dementia while my mother was sick and quite

 1  severely afterwards.

 2  Q     Okay.

 3            MR. TRACY:  Excuse me one second.

 4            THE COURT:  Mm-hmm.

 5  BY MR. TRACY:

 6  Q     Did your father have surgery at some point?

 7  A     Yes.

 8  Q     And do you recall roughly when that would have been?

 9  A     No, I don't know exactly but I know he had back surgery.

10  Q     Okay.  Was that part of the reason that your brother came

11  up here?

12  A     Yes.

13  Q     And when your father had that surgery was your mother still

14  alive?

15  A     Yes.

16  Q     Okay.  And is that part of the reason why your father

17  couldn't help care for her?

18  A     They couldn't do anything for each other.

19  Q     Okay.  So once your mother passes in the spring of '06 do

20  you recall whether your brother stayed here for a period of time

21  to also assist with your father?

22  A     Yes, I know he did for at least a year-and-a-half.

23  Q     Okay.  And then at some point in time your father then

24  moved into your home care company?

25  A     Yes, my assisted living home.

1  Q     Okay.  And at that point in time Michael would be up here

2  less in terms of assisting?

3  A     Yes.

4  Q     And is your recollection he lived down in Florida at that

5  point?

6  A     Yes.

7  Q     Okay.

8             MR. TRACY:  Nothing further, your Honor.

9             THE COURT:  Cross-examination on that point?

10                      CROSS-EXAMINATION

11  BY MR. MEKARU:

12  Q     Okay.  So prior to April of 1995 would it be fair to say

13  the defendant was down in Florida?

14  A     Prior to April of 1995?

15  Q     And let me maybe a little bit more in terms of how the

16  schedule went here, the time line.  April of '96 your mother had

17  passed away.  And you said that for about a year or so prior to

18  her passing that your brother had come up to help and stay with

19  her?

20  A     I said I thought he cared for her about six to eight

21  months, somewhere in there --

22  Q     Six to eight months?

23  A     -- prior to her death.

24  Q     Okay.

25  A     I'm not sure though exactly about the dates but I know it

78

1    was for a good period of time.

2    Q    Six to eight -- I'm sorry, so six to eight months, so that

3    would be some time going backwards that would put it into maybe,

4    let's see, the fall of 1995 that he came up?

5    A    No, it's just too hard for me to remember the dates

6    exactly.  I just know that he cared for my mother for quite a

7    while in her home.

8    Q    Okay.  We'll do it as a year.  So, let's say she passed in

9    April of '96, let's give him a year that he was up in Michigan

10   helping, that would be April of 1995.

11            THE DEFENDANT:  Your Honor, I came up for my father's

12   surgery.

13            MR. MEKARU:  Your Honor, I'd ask the defendant that

14   if he wants to take the stand and testify --

15            THE COURT:  Counsel --

16            MR. TRACY:  Okay, I'll talk to him.

17            THE DEFENDANT:  I'm sorry, your Honor.

18            THE COURT:  Mr. Mekaru, you may proceed.

19   BY MR. MEKARU:

20   Q    Well, the records of probation, he wasn't in Michigan when

21   there was a probation violation then in September of 1994,

22   correct?

23   A    I guess if I knew my father's surgery I could answer it

24   more clearly for you and I can't.

25   Q    All right.  Or October of 1993 or July of 1990 or January

1  of 1990?

2  A    I can't answer that.  I don't know.  I don't remember.

3  Q    So really your testimony then isn't really of any help as

4  to his location at all as to why he's violating his probation,

5  would that be fair to say, because you don't --

6  A    Say that again?

7  Q    You don't know the timing at all of why he's violating

8  probation, right?

9  A    I don't know the timing of it.  I don't.

10  Q    Or when he's violating probation or where he is or what --

11  A    I didn't know anything about it.

12  Q    So your testimony only is that you can account for his

13  whereabouts some time in April 1995 through April 1996 and then

14  going forward?

15  A    If my father's surgery was prior to that then he was here,

16  if it wasn't then he wasn't, and I don't remember when my dad's

17  surgery was that long ago.

18  Q    And did you have any discussions with your brother as to

19  what was more important taking care of some of these court

20  matters in Florida or coming back up?

21  A    We had no discussion.

22  Q    Okay.  No idea whether he could just go down there, report,

23  pay the fine, serve a little time, and then come back?

24  A    We had no discussion about it.

25  Q    No discussion of the fact that he might be violating his

1  terms of probation?

2  A     We had no discussion about it.

3  Q     Counsel has suggested this is only one incident but did you

4  have any knowledge of the fact that he had, in fact, been charged

5  on one, two, three, four, five different times?

6  A     No.

7  Q     All for writing bad checks?

8  A     No.

9  Q     Would that might have affected your decision about letting

10  him handle the sale of your home if you had known that he had

11  been involved in five charges for writing bad checks?

12         If you had known that he had been charged multiple

13  times in writing back checks, would it have changed your mind

14  about letting him sell your house for you?

15  A     It probably wouldn't have.

16  Q     Thank you.

17              THE COURT:  All right.  Any other questions?

18              MR. TRACY:  Nothing further, your Honor.

19              THE COURT:  Thank you.  You may step down.

20              MR. TRACY:  Okay, we can go back over any of that,

21  your Honor, if you want to but I think the point that I was

22  trying to make is there in terms of the best of her recollection

23  about what he was doing.

24              In terms of the access to money issue we went over

25  that already last week.  There's no indication in the evidence

1  that's before this Court that he has any sort of direct access to

2  any monies.  At this point he's filled out the form.  I've been

3  appointed as counsel.  I can assure you I have not received the

4  monies that are attributed to whatever is supposedly over in

5  Europe.

6          What was indicated in the statements that was Exhibit

7  4 or 5 of the letters over to the US Consulate in Switzerland was

8  that there was some account with UBS over in Switzerland through

9  a company and that he may or may not have access at that point in

10 time.  That's what we have.

11         At this point in time, you know, the money situation

12 I think is a very big question mark in terms of what he's able to

13 do.

14         I believe the statement he made is I heard it from

15 counsel because I wasn't, again, here on his initial appearance,

16 was that he might be able to raise funds for retaining private

17 counsel which, again, that may or may not be true at this point.

18         What that has to do necessarily with anything in

19 terms of him having funds to get out of the country or whatever,

20 again, I don't see a tie-in with respect to that.

21         We've gone over the family member situation.  I think

22 we've already gone over the limitations, whatever restrictions or

23 limitations this Court wishes to place on my client in terms of a

24 tether or other monitoring, whatever this Court deems

25 appropriate, we will agree to.

1          Mrs. Moore apparently also understands that because

2     both I and the Court had an opportunity to ask her about if some

3     of that needs to take place in her home she is agreeable to that

4     as well.

5          I mean, one other issue maybe not technically, your

6     Honor, an issue in terms of risk of flight but I think it's

7     important to point out.  This is going to be a very document

8     intensive case.  I've already gotten a first batch of documents.

9     It's very hard to prepare any sort of trial but particularly a

10    trial like this when the client is in lockup and I am having to

11    go visit him to go through very difficult documents.

12         Both of his co-defendants are out on bond.  Neither

13    of them are in this state.  I think there's limitations that can

14    be placed upon him by this Court that will allow him to remain

15    here, to show up for trial if that's where this case ultimately

16    goes, and allows us to properly and effectively prepare for the

17    trial.

18         So I thank you for listening and thank you, your

19    Honor, for your patience in terms of additional testimony.

20         THE COURT:  Well, thank you for a very vigorous

21    argument on behalf of your client.

22         Mr. Mekaru, you have the burden of proof in this

23    matter.  You can certainly have the last word if you have

24    anything further that needs to be talked about.

25         MR. MEKARU:  Your Honor, you just had queried the

1   parties as to whether there's much information about the

2   extradition.  I just would suggest the Court to refer back to the

3   letters written by the defendant about his extradition, the fact

4   that he felt that the charges were fraudulent and that he was by

5   the tone of these letters contesting his extradition.

6           Regarding his statement in court I do have a copy for

7   counsel of the transcript from that initial appearance.  And,

8   your Honor, while it's suggested there's no evidence the

9   defendant's own statement was that he could get -- "How long

10  would it take to get access to your assets in Switzerland?"  "It

11  would take me being out on bail and probably about ten days."

12  That was his own representation to this Court about having access

13  to funds.

14          Thank you.

15          THE COURT:  The issue before the Court is whether the

16  government has shown by a preponderance of the evidence that

17  there are no condition or combination of conditions that will

18  assure the presence of the defendant for future court proceedings

19  and/or whether the government has shown by clear and convincing

20  evidence that there is no condition or combination of conditions

21  that will assure the safety of the community.

22          This argument appears to be, one, that he is a flight

23  risk rather than a danger to the community.  I don't think I've

24  heard any argument made that he's a danger to the community.

25          And I will stand corrected if that's not the case,

1  Mr. Mekaru, but otherwise I'm going to address the flight issue.

2          MR. MEKARU:  Only a flight risk, your Honor.

3          THE COURT:  All right.  Thank you.

4          The grand jury has found probable cause to believe

5  the defendant's committed a number of financial crimes, these are

6  listed in the Indictment, and involve -- and they range from wire

7  fraud to money laundering and they carry some significant

8  sanctions as the government has pointed out in its motion to

9  detain which coupled with the defendant's age would, if he was

10 put in prison, would put him there until he's possibly quite old.

11         That's one factor, I suppose, that ought to be

12 considered.

13         But I think though that we have to look at the track

14 record of this defendant because there are three defendants that

15 face the same situation, I suppose.

16         I'm not particularly concerned about what happened to

17 the other two defendants.  I didn't sit on their cases, I don't

18 know the evidence that was presented, and if they're out on bond,

19 fine, but I don't know the situations at all in those cases.

20 Those do not dictate what happens here any more than if they had

21 been detained that I would automatically detain this gentleman.

22 So it's simply not an important consideration.

23         So we look at the background of this individual

24 defendant because what the government and the defense are asking

25 the Court to do is make a prediction about this defendant's

1  behavior in the future.

2          And I'm not sitting here as a judge as to what he did

3  in the past and punishing him for that if he committed a crime,

4  rather, I'm trying to figure out what he's likely to do in the

5  future, and the best way we have of looking at that, which is

6  something of an exercise in speculation, is to look at a past

7  history.

8          In this case the defendant has been previously

9  convicted in Florida on a couple of charges for passing a

10 worthless check on a couple of occasions, but that was back in

11 '89 and '90.

12         His track record since then was less than impressive

13 as far as how he conducted himself once he was under the

14 authority of the Court.  In other words, on probation, which is

15 tantamount to what we're talking about here.  If we place him

16 under the trust of the Court will he abide by the Court's rules

17 and regulations including appearing in court?

18         When he was given that option down in Florida he

19 violated probation in July of 1990.  Probation was modified and

20 extended in October of 1993.  There's another probation violation

21 and probation was revoked and he was put under two years

22 community control.

23         In September of 1994 he apparently had been returned

24 to probation and he again violated.  In May of 1995 there was

25 again a probation violation.  Community control was terminated

1  and he was ordered to jail for the weekends, and then he was

2  placed back on probation.

3       And in November of 1995 there was another probation

4  which resulted in a warrant being issued for his arrest, and the

5  record shows that he absconded from that probation in February of

6  1996.  That warrant remains outstanding, and that means it's been

7  outstanding for 13 years.

8       I should note there were at the same time of the

9  other two charges of worthless checks, there was apparently

10 another conviction for insufficient funds in a fraud case.

11      The probation violations for each of these three

12 offenses correspond to each other so I suspect that he was

13 sentenced essentially at the same time as to all of them, put on

14 probation, and then each time he violated probation he violated

15 it as to each charge, but there were all those individual

16 instances of probation violations.

17      At least one reason he hasn't been back in Florida is

18 the fact that he has been in Switzerland for some time.  He has

19 traveled freely around Europe or other countries at least but

20 never returned to this country.  If he did he never cleared up

21 the probation violation matter and the outstanding warrant

22 against him.

23      The representations before the Court from the

24 government are that he declined to waive extradition when given

25 the opportunity.  He declined to appeal from a determination

1  there but apparently declined to waive it in the first instance,

2  and the explanation given by Mr. Tracy was that he wanted to stay

3  and fight charges brought by the Swiss authorities against him

4  for apparent violations of Swiss law.

5          However, once he -- at least those charges have now

6  gone away.  I don't know if that was due to his counsel proving

7  they were no good or simply because the Swiss authorities saw no

8  reason to continue to pursue them once he was extradited to this

9  country.

10         But perhaps more of that will come out.  We don't

11  seem to have all the paperwork.  It appears from what I have

12  heard reliable evidence that he was afforded a hearing of some

13  sort over there, declined to waive extradition, it was a

14  contested matter, he lost and declined to appeal.

15         The Law Enforcement Information Network also reveals

16  the defendant has used three aliases in addition to his own name.

17  Perhaps those are misspellings although it's not that difficult

18  to spell Heshelman.  It's hard to believe there are three

19  different misspellings of them in the record, one of which is

20  Michael Hersher.  But the fact that a person is willing to

21  proceed under an alias is one more fact the Court needs to

22  consider in determining how reliable he would be if he was

23  released on bond.

24         Then there is the issue of whether or not the

25  defendant would have the resources to flee to avoid what might be

1  a relatively lengthy sentence, particularly at his age, if he

2  were convicted.

3        It is true that Mr. Heshelman spoke at the initial

4  appearance and said that he could obtain funds.  The pretrial

5  services report, however, reflects statements made since that

6  time by Mr. Heshelman stating that he denied possession of any

7  personal assets.  He reports possessing 500,000 -- it says

8  500,000 Euros but it's translated into $674 million -- not

9  500,000, it looks like 500 million.  I can't tell because the

10 commas are in the wrong place.  The number doesn't make any

11 sense.

12        It's been translated into American dollars, however,

13 in the amount of $674,854,906 in US currency in a trust located

14 in Switzerland under a business name attributed to him, Investors

15 First Limited, against which there are no liabilities.

16        There's been absolutely no suggestion that that trust

17 or his business is controlled by anybody else but him so he, in

18 effect, is representing there's $674 million available in

19 Switzerland, certainly enough to allow him to travel readily in

20 other parts of the world and never have to return to this

21 country.

22        There are, as far as liabilities are concerned, there

23 are some federal tax liens that have been filed against him in

24 this country for a total of $16,000.

25        His records to the ambassador in Switzerland

apparently written while he was detained also talked about having

ability to obtain funds, too, as I recall, but the letters speak

for themselves.

In short, while Mr. Tracy raises a variety of

challenges to all of the evidence it appears that we have a

person who has not been cooperative while on probation to state

authorities, who absconded from the state courts, who had a

warrant outstanding for 13 years, much of that time he spent in

Switzerland.

He needed to be extradited from Switzerland to be

brought back here.  He has more than adequate funds; in fact, he

has astronomical funds if he is to be believed once he gets

access to them which would make flight quite possible facing the

charges he's facing.

I appreciate his sister coming in here and

testifying.  Whether he's been candid with his sister or not I

don't know.  Perhaps Mr. Tracy is right, perhaps she paid more

than 250,000 for the house, although, I think she might remember

it if she paid 500,000.  But that would still leave 500,000

unexplained for.  The date of the sale or the records produced to

the Court show that the property was sold for $1 million when Mr.

Heshelman sold it.

I don't know what happened to that $500,000 or

$750,000 and his sister obviously doesn't know.  I think she

would have remembered if there had been that much profit on the

1  house.  I doubt that would have slipped her mind.

2          When everything's said and done I think the

3  government has shown by a preponderance of the evidence that

4  there are no conditions that will assure Mr. Heshelman's presence

5  in future court proceedings in this matter and very likely we'll

6  have to simply extradite him again from other country.  I don't

7  know what other conclusions to draw from this evidence so

8  defendant's ordered detained pending trial in this matter.

9          THE COURT:  All right.  Thank you.

10         (At 10:30 a.m., proceedings adjourned)

11                              _ _ _ _ _

CERTIFICATE


I, Patricia R. Pritchard, CER 3752, Certified Electronic Court Reporter for the State of Michigan, do hereby certify that the foregoing pages, 1 through 91, inclusive, comprise a full, true and correct transcript, to the best of my ability, of the proceedings and testimony recorded in the above-entitled cause.


April 22, 2009             <u>  Patricia R. Pritchard  /S/  </u>
                           Patricia R. Pritchard, CER 3752