UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

- - - - - - - - - - -

UNITED STATES OF AMERICA,

                Plaintiff,            No.   1:06-CR-44

           vs.                  Hon.  JANET T. NEFF
                                        United States District Judge

MICHAEL WAYNE HESHELMAN and
BRYCE HENRY SHERWOOD,

                Defendants.

_____/

GOVERNMENT'S TRIAL BRIEF

DONALD A. DAVIS
United States Attorney

DANIEL Y. MEKARU
Assistant United States Attorney

330 Ionia Avenue NW, 5th Floor
P.O. Box 208
Grand Rapids, MI  49501-0208
(616) 456-2404

I.  STATEMENT OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  STATUTE AND ELEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    A.    Count 1: 18 U.S.C. §371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    B.    Counts 2 through 27: 18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    C.    Count 28: 18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    D.    Counts 29 through 34: 18 U.S.C. § 1956(a)(1)(A). . . . . . . . . . . . . . . . . . . 12
    E.    Counts 35 through 38: 18 U.S.C. § 1956(a)(2)(A)). . . . . . . . . . . . . . . . . . . 13
    F.    Counts 39 through 46: 18 U.S.C. § 1957. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. EVIDENTIARY ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A.    Business Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    B.    Summary Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    C.    Transcript of Recorded Interview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    D.    Stipulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    E.    Defendant's Out-of-Court Statements Constitute Hearsay . . . . . . . . . . . . . . 17
    F.    Rule 404 (b) Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        1.    Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        2.    Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    G.    Co-Conspirator's Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    H.    Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I.  STATEMENT OF PROCEEDINGS

On February 23, 2006, a federal grand jury issued a criminal indictment charging Michael Wayne Heshelman, Bryce Henry Sherwood, and Dennis R. Mickelson with one count of conspiracy to commit wire fraud, in violation of Title 18 U.S.C. Section 371; twenty-six counts of wire fraud, in violation of Title 18 U.S.C. Section 1343; one count of conspiracy to commit money laundering, in violation of Title 18 U.S.C. Section 1956(h); six counts of money laundering, in violation of Title 18 U.S.C. Section 1956(a)(1)(A)(i); four counts of international money laundering, in violation of Title 18 U.S.C. Section 1956(a)(2)(A); and eight counts of money laundering, in violation of Title 18 U.S.C. Section 1957.

On March 30, 2009, Defendant Heshelman made his initial appearance in the Western District of Michigan.  A detention hearing was started on April 2, 2009, and continued on April 6, 2009.  Defendant Heshelman was ordered detained as a risk of flight.  (See R.50, Detention Order).

On December 18, 2008, Defendant Sherwood made his initial appearance in the Middle District of Florida.  Defendant Sherwood was released on a $50,000 bond with conditions.  On March 23, 2009, Defendant Sherwood appeared with Counsel in the Western District of Michigan and his bond was continued.

On December 24, 2009, Defendant Mickelson made his initial appearance in the Eastern District of Pennsylvania.   Defendant Mickelson was released on $50,000 bond with conditions and was ordered to appear in the Western District of Michigan on January 26, 2009.  On January 26, 2009, Defendant Mickelson appeared as scheduled and his bond was continued.

Final Pretrial is scheduled for May 26, 2009.  Trial date is set for June 2, 2009.  On May 20, 2009, the Defendants' Motion to Dismiss was denied by this court.

## II.  STATEMENT OF FACTS

The Indictment alleges criminal conduct from at least July 2, 1999, and continuing until on or about February 23, 2006.  Since the Indictment was filed in February 2006, the Defendants have continued to send lulling correspondence to the victims.  Defendants Michael Heshelman, Bryce Sherwood, Dennis Mickelson and others devised a scheme in which one or more of them would claim to be a successful investment and financial advisor with access to secret investment opportunities not available to the general public.  Sherwood solicited the investors while Mickelson acted as a reference and as a successful investor.  Heshelman and others falsely represented to victims that their principal would be safe as it would remain in the attorney's trust account and the victim would be the sole signatory on the account.  Instead, Heshelman and others spent the funds for their own use and benefit, such as paying $5,000 per month for a fully furnished apartment in New York City, paying for travel between Switzerland and the United States, meals at restaurants, and lodging at the EMA Hotel Betriebs in Zurich, Switzerland.  Moreover, they recruited new victims and gave a portion of their principal investment to previous victims, falsely claiming to the previous victims that the funds were a return on their investments.  Heshelman maintained bank accounts for his benefit at Comerica Bank and JPMorganChase held in the name of First Ban-Corp Ltd. and Investors First Ban-Corp Ltd.

From on or about March 7, 2001 through March 27, 2001, Heshelman and others transmitted or caused to be transmitted 27 wire transfers totaling $1,500,000.00, which represent proceeds of the fraud.  Counts 2-27 of the Indictment detail each individual wire transfer.

-4-

In addition, during the month of March 2001, Heshelman and others conspired to commit certain money laundering offenses and knowingly conducted financial transactions, domestically and internationally, in an effort to lull payments to and from investors in furtherance of their scheme to fraudulently obtain money for their own use and benefit. Counts 28 through 34 of the Indictment detail the conspiracy and each individual wire transfer.

During an interview with FBI Special Agents, Sherwood claimed that he typically found investors for Heshelman. Sherwood and Mickelson were paid finders' fees for each new investor presented to Heshelman. Thereafter, Kenneth Warner Mayer, Heshelman's attorney, drafted contracts which were signed by Heshelman. These contracts provided that 30% of the investment would be used for expenses and the remainder would stay in the trust account. According to Sherwood, Heshelman promised the investors that they would be paid the London InterBank Offered Rate or "Libor" plus one to two percent interest, during a twelve-month period. In addition to the monthly interest, Heshelman claimed that the investors would receive their money by the end of the year, totaling approximately ten times their original investment. Sherwood stated that the investors were told that their investments were protected from risk because their funds remained in the escrow account held by Heshelman's attorney.

Examples of the fraud scheme perpetrated by Heshelman and the others include the following: based on false representations made by Heshelman and the others and at their direction, on or about December 23, 1999, Alan Clyde transferred $1,080,000 via wire to an escrow account held by Kenneth Warner Mayer, Heshelman's attorney. Alan Clyde was shown a digital photograph of a box that Heshelman claimed to contain $100 million of

Federal Reserve Debentures"  The box was supposedly from the 1930's and sealed.  The U.S.

Federal Reserve advised that there was no such thing as a "Federal Reserve Debenture" and that

the story of sealed boxed from the 1930's was a classic fraud scheme.  On or about May 12, 2000,

Paul Ramsey transferred $1,080,000 via wire to the escrow account held by Kenneth Warner

Mayer; on or about June 8, 2000, Paul Ramsey transferred approximately $1,500,000 via wire to

the escrow account held by Kenneth Warner Mayer; on or about May 16-19, 2000,  Stephen

Williams transferred $1,000,000 via wire to the escrow account held by Kenneth Warner Mayer;

and on or about September 8, 2000, Brian Turner transferred approximately $1,000,000 via wire

to the escrow account held by Kenneth Warner Mayer.  These other individuals were told that

their money would safe and invested.  In reality, these funds were for the use and benefit of

Heshelman and the others.

In or about December 2000, Sherwood solicited Alan Moody to invest in secured

placement bonds.  Sherwood moved to Middleville, Michigan to attend the church where Alan

Moody was a pastor.  After their initial meeting, Sherwood introduced Moody to Heshelman to

further discuss the investment.  Heshelman told Moody that the entry level into these bonds was

usually $10 million.  Nonetheless, Heshelman was willing to permit Moody to invest in the

bonds for $1 million.   Heshelman told Moody that the funds would be placed in an escrow

account at Mellon United National Bank in Miami, Florida and held in the name of Kenneth

Warner, his attorney, for the benefit of Heshelman.   Heshelman further advised Moody that the

funds would never leave the account.  Rather, Heshelman would borrow the money using the

escrow account as collateral.  Heshelman would only buy bonds that were already contracted to

sell. Thus, there was no risk to Moody's money. Heshelman represented that the funds would produce at least an 8% return per year, and more likely would produce a 15% return each month.

Based on these representations, Moody agreed to invest approximately $2.5 million. At Heshelman's direction, on December 6, 2000, Moody wired $1 million and, on March 6, 2001, Moody wired $1.5 million, to account number 007-506117-1, to be held in an escrow account by Kenneth Warner for the benefit of Heshelman, at Mellon United National Bank. The funds were not invested as promised. Rather, the funds were transferred to Heshelman, Mickelson, and Sherwood for their own benefit and use. After Moody's $1 million deposit, $995,985 was transferred via wire to Brian Turner by Heshelman as a return of Turner's investment money. After Moody's $1.5 million deposit, Sherwood directed $160,400 be deposited into his own account and directed $379,600 to be paid to other investors. Dennis Mickelson received $50,000 as a finders fee for being a reference as a successful investor. Michael Heshelman wire transferred $102,000 of Moody's investment into his own personal accounts. Additionally, other investors were sent funds directly from the proceeds of Moody's investment. The money sent to the other investors was represented to be returns on their investments. Heshelman also made the following wire transfers for his own personal benefit: $25,000 to the EMA Hotel Betriebs in Zurich, Switzerland; $75,000 to First-Ban corp Ltd, in New York; $25,000 to Investors First Ban-Corp at Comerica Bank; and $25,000 to The Athaeneum Hotel in England for Heshelman room fees. Heshelman also sent $105,000 to AutoOz, a business owned by Heshelman's cousin. Heshelman represented that the $105,000 was his personal investment into his cousin's business.

-7-

### III.  STATUTES AND ELEMENTS

**A.      Count 1: 18 U.S.C. §371**

Count 1 of the Indictment charges the Defendants with conspiring to commit wire fraud,

in violation of Title 18, United States Code, Section 371.  Section 371 states the following:

> If two or more persons conspire either to commit any offense against the United
> States, or to defraud the United States, or any agency thereof in any manner or for
> any purpose, and one or more of such persons do any act to effect the object of the
> conspiracy, each shall be fined under this title or imprisoned not more than five
> years, or both.

18 U.S.C. §371.  The essential elements of the crime of conspiracy under 18 U.S.C. § 371 have

been defined in the Sixth Circuit pattern jury instructions.  Jury instruction 3.01B states, in part,

the following:

> First, that two or more persons conspired, or agreed, to commit the crime of [wire fraud].

> Second, that the defendant knowingly and voluntarily joined the conspiracy.

> And third, that a member of the conspiracy did one of the overt acts described in the
> indictment for the purpose of advancing or helping the conspiracy.

Sixth Circuit Pattern Jury Instructions, §3.01B (2005).

.      "The existence of a criminal conspiracy need not be proved by direct evidence, a common

plan may be inferred from circumstantial evidence.  Furthermore, once a conspiracy has been

established, only slight evidence is necessary to implicate a defendant."  *United States v.*

*Poulous*, 895 F.2d 1113, 1117 (6th Cir.1990)  Proof of a formal agreement is not necessary to

establish a conspiracy; a tacit or mutual understanding between the parties is sufficient to prove

conspiratorial agreement.  *United States v. Barger*, 931 F.2d 359, 269 (6th Cir. 1991) (conspiracy

may be inferred from acts done with common purpose, or circumstantial evidence that can

reasonably be interpreted as participation in common plan); *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990) (defendant's agreement to participate in kickback scheme and insurance fraud can be inferrred from his actions).

Although some participation in the conspiracy is required, each conspirator need not participate in every phase of the criminal venture provided there is assent to contribute to the common plan or scheme. *Hughes*, 895 F.2d at 1140. It is also unnecessary to prove that a defendant was aware of each act of his co-conspirators in furtherance of the conspiracy. *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988). Nor is it necessary to prove a defendant's specific role in the conspiracy, only that the defendant knew of, intended to join and participated in the conspiracy. *United States v. Fortson*, 194 F.3d 730, 735 (6th Cir. 1999)

It is well settled that all the overt acts in furtherance of a conspiracy need not be alleged in the indictment. *United States v. Henson*, 848 F.2d 1374, 1385 (6th Cir. 1988); *United States v. Atisha*, 804 F.2d 920 (6th Cir. 1986) (introduction of evidence of third stolen truck, where indictment alleged theft of two trucks, proper in prosecution of conspiracy to hijack trucks). There is no requirement that all conspirators participate in an overt act or that the overt act be a "joint activity," only that it is in furtherance of the conspiracy. *United States v. Taylor*, 176 F.3d 331, 336 (6th Cir. 1999).

**B.     Counts 2 through 27: 18 U.S.C. § 1343**

Counts 2 through 27 of the Indictment charge the Defendants with committing wire fraud and aiding and abetting wire fraud, in March 2001, in violation of Title 18, United States Code, Section 1343. Section 1343 states, in part, the following:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343 (2001). Section 1343 was amended on July 20, 2002, to increase the maximum statutory penalty to twenty years.

The essential elements of the crime of wire fraud under 18 U.S.C. § 1343 have been defined in the Sixth Circuit pattern jury instructions. Jury instruction 10.02 states, in part, the following:

First, that the defendant knowingly participated in and devised a scheme to defraud;

Second, that the scheme included a material misrepresentation or concealment of a material fact;

Third, that the defendant had the intent to defraud; and

Fourth, that the defendant caused another to use wire, radio or television communications in interstate and foreign commerce in furtherance of the scheme.

A "scheme to defraud" includes any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.

The term "false or fraudulent pretenses, representations or promises" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth. They include actual, direct false statements as well as half-truths and the knowing concealment of material facts.

An act is "knowingly" done if done voluntarily and intentionally, and not because of mistake or some other innocent reason.

A "material" fact or matter is one that has a natural tendency to influence or be capable of influencing a person's decision. [Any misrepresentation or concealment must be reasonably calculated to deceive persons of ordinary prudence and comprehension.]

To act with "intent to defraud" means to act with an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself [to another person].

To "cause" wire, radio or television communications to be used is to do an act with knowledge that the use of the communications will follow in the ordinary course of business or where such use can reasonably be foreseen.

The term "interstate [foreign] commerce" includes wire, radio or television communications which crossed a state line.

Sixth Circuit Pattern Jury Instructions, §10.02 (2005)

The Government's allegation is that the Defendants lied to Alan Moody about the nature of the investment, where his money was invested, and the safety and security of his investment. Rather than invest the money, the Defendants took the money for their own use and benefit. They also used some of Alan Moody's principal to make fraudulent interest payments to earlier investors. The scheme of paying investors "returns" from the principal is a classic Ponzi scheme. *See United States v. Miller*, 531 F.3d 340 (6th Cir. 2008) (Ponzi scheme charged as wire fraud); *United States v. Flynn*, 265 Fed.Appx. 434 (6th Cir. 2008); *In re Mark Benskin & Co., Inc.*, 1995 WL 381741 (6th Cir. June 26, 1995) (intent to defraud may be reasonably inferred from nature of Ponzi scheme itself); *United States v. Benson*, 79 Fed.Appx. 813 (6th Cir. 2003).

The Sixth Circuit held that devising and perpetrating a Ponzi scheme is, itself, evidence of an intent to defraud. "[S]ince there has never been a suggestion that any source of income existed except new loans (if such may be considered 'a source of income'), the question of intent to defraud is not debatable." *Conroy v. Shott*, 363 F.2d 90 (6th Cir. 1966).

**C.    Count 28: 18 U.S.C. § 1956(h)**

Count 28 of the Indictment charges the Defendants with conspiring to commit money laundering, in violation of Title 18, United States Code Section 1956(h).

Section 1956 states, in part, the following:

(h)    Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

There are two elements of the 1) two or more persons conspired, or agreed, to commit the crime of money laundering; and 2) the defendant knowingly and voluntarily joined the conspiracy.

The Supreme Court held that there is no requirement to prove an overt act under § 1956(h). *Whitfield v. United States*, 543 U.S. 209, 219 (2005). Following *Whitfield*, the Sixth

Circuit stated that "all the government had to prove" in a § 1956 case, is that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir.2006) (*citing Whitfield*, 543 U.S. at 211).

> **D.      Counts 29 through 34: 18 U.S.C. § 1956(a)(1)(A)**

Counts 29 through 34 of the Indictment charge that the Defendants committed money laundering and aided and abetted each other in the commission of money laundering, in violation of Title 18, United States Code Section 1956(a)(1)(A).

Section 1956 states, in part, the following:

> (a)      (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
> (A)      (i) with the intent to promote the carrying on of specified unlawful activity;

> * * *

> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

The essential elements of the crime of money laundering under 18 U.S.C. § 1956(a)(1)(A) have been defined in the Sixth Circuit pattern jury instructions.  Jury instruction 11.01 states, in part, the following:

> First, that the defendant conducted a financial transaction.

> Second, that the financial transaction involved property that represented the proceeds of wire fraud.

> Third, that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

> Fourth, that the defendant had the intent [to promote the carrying on of wire fraud.

> The term "financial transaction" means
> (A) a transaction which in any way or degree affects interstate or foreign commerce
> (i) involving the movement of funds by wire or other means or

-12-

     \* \* \*

 (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

.

The term "financial institution" means [*insert definition from 31 U.S.C. § 5312(a)(2) or the regulations promulgated thereunder*]].

The word "conducts" includes initiating, concluding, or participating in initiating or concluding a transaction.

The word "proceeds" includes what is produced by or derived from unlawful activity.

The phrase "knew that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the defendant knew the property involved in the transaction represented the proceeds of some form, though not necessarily which form, of activity that constitutes a felony under state or federal law. The government does not have to prove the defendant knew the property involved represented proceeds of a felony as long as he knew the property involved represented proceeds of some form of unlawful activity.

Sixth Circuit Pattern Jury Instructions, §11.01 (2005).

  **E.**  **Counts 35 through 38: 18 U.S.C. § 1956(a)(2)(A)**

 Counts 35 through 38 of the Indictment charge that the Defendants committed

international money laundering, in violation of Title 18, United States Code Section

1956(a)(2)(A).

 Section 1956 states, in part, the following:

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
 (A) with the intent to promote the carrying on of specified unlawful activity;

     \* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

 The essential elements of the crime of international money laundering under 18 U.S.C. §

1956(a)(2)(A) have been defined in the Sixth Circuit pattern jury instructions. Jury instruction

11.03 states, in part, the following:

First, that the defendant transmitted a monetary instrument or funds.

Second, that the defendant's transmission was from a place in the United States to or through a place outside the United States.

Third, that the defendant's transmission of the monetary instrument or funds was done with the intent to promote the carrying on of wire fraud.

Sixth Circuit Pattern Jury Instructions, §11.03 (2005).

**F.    Counts 39 through 46: 18 U.S.C. § 1957**

Counts 39 through 46 of the Indictment charge that Defendant Heshelman committed

money laundering, in violation of Title 18, United States Code Section 1957.  Counts 47 through

51 of the Indictment charge Defendant Sherwood with committing money laundering, in

violation of Title 18, United States Code Section 1957.  Section 1957 essentially prohibits the

spending of more than $10,000 of the illegal proceeds.

Section 1957 states, in part, the following:

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)    (1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.
(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

(c) In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.

(d) The circumstances referred to in subsection (a) are—

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

(2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

* * *

-14-

(f) As used in this section—
> (1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956 (c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956 (c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

> (2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

> (3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

The essential elements of the crime of international money laundering under 18 U.S.C. § 1957 have been defined in the Sixth Circuit pattern jury instructions. Jury instruction 11.06 states, in part, the following:

> First, that the defendant knowingly [engaged] [attempted to engage] in a monetary transaction.

> Second, that the monetary transaction was in property derived from specified unlawful activity.

> Third, that the property had a value greater than $10,000.

> Fourth, that the defendant knew that the transaction was in criminally derived property.

> Fifth, that the monetary transaction took place [within the United States ] [outside the United States but the defendant is a United States person].

Sixth Circuit Pattern Jury Instructions, §11.06 (2005).

## IV.  EVIDENTIARY ISSUES

### A.    Business Records and Duplicates

Some of the Government's evidence will consist of business records such as photocopied documents, and banking records. Records made and kept in the regular course of business are admissible under Fed. R. Evid. 803(6). That rule provides that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(6)  A memorandum, report, record, or data compilation, in any
form, of acts, events, conditions, opinions, or diagnoses, made at or
near the time by or from information transmitted by, a person with
knowledge, if kept in the course of a regularly conducted business
activity, and if it was the regular practice of that business activity
to make the memorandum, report, record, or data compilation, all
as shown by the testimony of the custodian or other qualified
witness, unless the source of information or the method or
circumstances or preparation indicate lack of trustworthiness.  The
term "business" as used in this paragraph includes business,
institution, association, profession, occupation, and calling of every
kind, whether or not conducted for profit.

It is not necessary that the authenticating witness be the actual recorder of the data or

have personal knowledge of it.  All that is required is that the witness be familiar with the record

keeping system.  *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986); *United States v.*

*Reese*, 568 F.2d 1246, 1252 (6th Cir. 1977).

The Federal Rules of Evidence allow the use of duplicates to the same extent as originals

unless there is a genuine question as to their authenticity.  Fed. R. Evid. 1003.  Federal Rules of

Evidence 1001(4) defines "duplicate" to include photocopies.  Also, under 28 U.S.C. § 1732(b),

the Federal Business Records Act, microfilm copies are admissible to the same extent as the

original would be, regardless of whether the original is still in existence.

**B.    Summary Exhibits**

Pursuant to Federal Rules of Evidence Rule 1006, the Government will introduce

summary exhibits to help the jury understand the scope of the conspiracy.  The summary exhibit

is based upon the checks, the dates (and times where known), the amounts of the checks, and the

banks and branch locations involved.

The Sixth Circuit in *United States v. Scales*, 594 F.2d 558 (6th Cir.), *cert. denied*, 441

U.S. 946, 99 S. Ct. 2168, 60 L. Ed. 2d 1049 (1979), recognized that summary charts are

admissible not only under Federal Rule of Evidence 1006 but by the "established tradition in the

Sixth Circuit, and others, permitting introduction of summary evidence with a proper limiting

-16-

instruction." *Id*. at 563.  *See also*, *United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir. 1988).

"There is no requirement in Rule 1006, however, that it be literally impossible to examine the underlying records before a summary or chart may be utilized.  All that is required for the rule to apply is that the underlying 'writings' be 'voluminous' and that in-court examination not be convenient."  *Scales* at 562.

"The admission of summaries under Federal Rule of Evidence 1006 is committed to the sound discretion of the trial court."  *Gomez v. Great Lakes Steel Division Nat'l Steel Corp*., 803 F.2d 250, 257 (6th Cir. 1986); *United States v. Campbell*, *supra*.

### C.    Transcripts of Tape Recorded Conversations

Conversations with the Defendants were recorded.   Transcripts are available to aid the jury.

### D.    Stipulations

The Government will propose a series of stipulations, including stipulations to the admissibility of the bank records, to obviate the need for custodial witnesses.  Also, the Government will propose that the Defendants stipulate to the accuracy of the transcripts of the recordings.

### E.    Defendant's Out-of-Court Statements Constitute Hearsay

A defendant's out-of-court statements constitute hearsay unless the Rules of Evidence provide for an exception, none of which exist here.  Fed. Rule Evid. 802; *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996)(defendant's exculpatory out-of-court statements constitute hearsay unless introduced by the prosecution) *cert. denied*, 522 U.S. 934 (1997). Conversely, the prosecution may introduce admissions by a defendant because they are not considered hearsay.  Fed. Rule Evid. 801(d)(2)(A).

The rule against admitting hearsay evidence is based upon the premise that in court, a fact finder should consider only those facts that the law considers reliable. The reason for a rule against hearsay has been explained by the Supreme Court this way:

> The hearsay rule, Fed. Rule Evid. 802, is premised on the theory that out-of-court statements are subject to particular hazards. The defendant might be lying, he might misperceive the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements--the oath, the witness's awareness of the gravity of the proceedings, the jury's opportunity to observe the witness's demeanor, and, most importantly, the right of the opponent to cross examine--are generally absent for things said out of court.

*Williamson v. United States*, 512 U.S. 594, 598 (1994). *See also*, *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).

The Sixth Circuit recently issued an opinion directly on point in *United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005). "Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses. Indeed, if such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *Id*. at 545. (Citations omitted).

The Panel cited with approval the Fourth Circuit case of *United States v. Wilkerson*, 84 F.3d 692 (4th Cir. 1996) (FBI agent not required to answer cross examination questions seeking to elicit exculpatory material), where the Fourth Circuit held:

> Admissions by a party-opponent are not considered hearsay and therefore can be admitted against that party. Fed.R.Evid. 801(d)(2). Thus, during direct examination, the government could have introduced inculpatory statements made by [the defendant]. The rules do not, however, provide an exception for

> self-serving, exculpatory statements made by a party which are being sought for
> admission by that same party.

*Id.* at 696.

A defendant who wishes to tell his side of the story in a trial must do so as a witness and face cross examination. Cross examination has been described as "the greatest legal invention ever invented for the discovery of the truth." *California v. Green*, 399 U.S. 149, 158 (1970)(internal citations omitted). Cross examination is essential where a statement carries no guarantee of reliability. Certainly a defendant's exculpatory statements to a police officer or victims are inherently unreliable, which is why the Rules of Evidence bar such out-of-court statements.

### F.    Rule 404(b) Evidence

The Government provided notice of intent to present evidence of other bad acts by the Defendants. Such evidence will be offered as proof the Defendants' fraudulent intent.

Rule 404(b) provides that other acts by a defendant may be introduced at trial if the purpose for the evidence is to establish a probative issue at trial rather than to show bad character. The Rule states in pertinent part that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character
> of a person in order to show action in conformity therewith. It may, however, be
> admissible for other purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or accident....

The Supreme Court dealt with Rule 404(b) in *Huddleston v. United States*, 485 U.S. 681 (1988). The Supreme Court set forth the basic analysis required in determining the admissibility of evidence under Rule 404(b). The Court stated that the rule "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge." *Huddleston* at 685. The Court continued, "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Id*. Finally, the Court quoted the Advisory

Committee Notes to Rule 404(b): "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." *Id*. at 688.

Rule 404(b) provides only that "bad acts" evidence is not admissible to prove character or criminal propensity. Such evidence, however, may be admissible for other purposes "such as," but not limited to, those listed in the Rule. The Sixth Circuit has noted that Rule 404(b) is "actually a rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." *United States v. Blakenship*, 775 F.2d 735, 739 (6th Cir. 1985).

### 1.    Intent

In prosecutions where the Government is required to prove specific intent, the Sixth Circuit has held that if the charged crime requires specific intent to defraud, 404(b) evidence may be used to demonstrate fraudulent intent, regardless of any defense offered by the defendant. *United States v. Gold Unlimited Inc.*, 177 F.3d 472, 487 (6th Cir. 1999); *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998). Furthermore, the Sixth Circuit has said that Rule 404(b) evidence relating to fraudulent intent is unusually probative, as fraudulent intent is ordinarily not easily proved. 177 F.3d at 488; *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 379 (6th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998). "[W]here the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding any defense the defendant might raise." *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994), *cert. denied*, 513 U.S. 1115 (1995). See also *United States v. Matthews*, 440 F.3d 818 (6th Cir. 2006)(possession with intent to deliver cocaine is a specific intent crime and admission of Rule 404(b) evidence proper); *United States v. Campbell*, 845 F.2d 1374 (6th Cir. 1988)(prior false billings admissible to show knowledge and intent in filing false medicare claims).

-20-

### 2.    Plan

In *United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006), the defendant was charged with perpetrating a fraud.  The Court upheld the trial court's decision to admit evidence of three prior convictions for frauds and the use of false and fraudulent documents, such as false profit and loss statements, false tax returns, forged bank letters, and forged IRS documents.  The Court further stated, "While the three prior convictions are approximately 15 years old, we find that they are not too remote in time because of their similarities with the crime charged."  *Id*. at 810. The Court was persuaded by the similarities between the charged offenses and the conduct in the prior convictions.  For example, the defendant had a prior conviction for fabricating court orders to escape from federal custody, which was the same method of deception she used in the present case. *Id*.

In *United States v. Sager*, 227 F.3d 1138 (9th Cir. 2000), the trial court permitted the Government to present evidence of defendant Sager's prior mail fraud conviction under Federal Rule of Evidence 404(b).  In 1996, Sager had pled guilty to completing credit card applications and change of address requests for other people without their consent or knowledge, directing the credit cards to be sent to locations to which he had access, and then using these credit cards to obtain goods, services and cash.  In 1998, defendant Sager was charged with theft of mail, possession of stolen mail, and access device fraud.  The facts of the 1998 scheme were very similar to the 1996 scheme.  Defendant redirected mail, including credit cards, to an unsuspecting mail recipient and then intercepted the mail and used the credit cards to make unauthorized purchases.  The Court affirmed the presentation of this prior conviction for several purposes, including proving Sager's plan, intent, identity, knowledge, and for purposes of rebutting Sager's anticipated innocent explanation for his acts in this case.  *Id*.

In the instant case, Defendant Sherwood committed other investment frauds.  The Government may call Peter Fodor and Denise Duvall, who can testify about their own losses and the frauds perpetrated against them.

### G.    Co-Conspirator Statements

The Government's evidence will involve statements of co-conspirators.  Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if the statement is offered against a party and is "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy."  Although this is commonly referred to as the co-conspirator exception to the hearsay rule, *see, e.g., United States v. Howard*, 770 F.2d 57, 59-62 (6th Cir. 1985), the rule expressly provides that such statements are <u>not</u> hearsay.  *See United States v. Brown*, 555 F.2d 407, 422 n.35 (5th Cir. 1977).  In order to be admissible under Federal Rule of Evidence 801(d)(2)(E), the statements must be made in the course of, and in furtherance of, the conspiracy.  These requirements were discussed at length in *United States v. Hamilton*, 689 F.2d 1262 (6th Cir. 1982).  With regard to the "in the course of" requirement, the *Hamilton* court quoted from *United States v. Mayes*, 512 F.2d 637, 642-43 (6th Cir. 1975):

> [W]here a conspiracy contemplates a continuity of purpose and a
> continued performance of acts, it is presumed to exist until there
> has been an affirmative showing that it has been terminated; and its
> members continue to be conspirators until there has been an
> affirmative showing that they have withdrawn.

*Hamilton*, 689 F.2d at 1268.  The burden is on the defendant to affirmatively prove either that the conspiracy had been abandoned or that he had withdrawn.

A statement is made "in furtherance of" the conspiracy if it was intended to promote the conspiratorial objective.  *United States v. Hamilton*, 689 F.2d at 1270.  It need not actually further the conspiracy to be admissible.  *Id.*  In determining whether the "in furtherance" requirement has been met, courts have generally construed the term broadly.  *United States v. Gibbs*, 739 F.2d 838, 845 (3d Cir. 1984);  *United States v. James*, 510 F.2d 546, 549 (5th Cir. 1975).  As the Fifth Circuit stated in *James*, "Although this phrase has a talismanic ring to it, we must not apply the standard too strictly, lest we defeat the purpose of the exception."  *Id.* at 549.  The court may consider the nature of the statements as well as the time and circumstances under which the statements were made in order to determine whether they were in furtherance of the

conspiracy. *United States v. Handy*, 668 F.2d 407, 408 (8th Cir. 1982). The Sixth Circuit has noted that where the admissibility of co-conspirators' statements presents a close call, the district court's findings should not be disturbed. *United States v. Hamilton*, 689 F.2d at 1270-71.

The co-conspirators exception is not limited to oral statements. It may also include documents prepared during the course of and in furtherance of the conspiracy. *See, e.g., United States v. Diez*, 515 F.2d 892, 899-900 (5th Cir. 1975) (work papers of co-conspirator accountant admissible as co-conspirator statement or business records).

Co-conspirator statements do not violate the Sixth Amendment's confrontation clause, even if the declarant is not unavailable. *United States v. Crawford*, 124 S.Ct. 1354, 1374. Further, the Court held that while it would leave for "another day any effort to spell out a comprehensive definition of 'testimonial,'" it did hold that statements made in furtherance of a conspiracy "by their nature [are] not testimonial." *Id.* at 1367; *see also United States v. Reyes*, 2004 WL 613071 (8th Cir. March 30, 2004) ("Crawford does not support [the defendant's] argument . . . because co-conspirator statements are nontestimonial.") (citation omitted); *United States v. Robinson*, 2004 WL 790307 (5th Cir. Apr. 14, 2004) ("The constitutionality of rule 801(d)(2)(E) is well established. . . . As applied to the present case, this conclusion is not called into doubt by *Crawford* . . . because the statement challenged as hearsay was made during the course of the conspiracy and is non-testimonial in nature.") (citations omitted); *United States v. Saget*, 2004 WL 168772 (2d Cir. July 28, 2004) (Co-conspirator's statements contained sufficient guarantees of trustworthiness, such that admission of such statements did not violate confrontation clause).

In order to establish a foundation for admissibility of statements under this rule, the Government must show, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the Defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. *United States v. Bourjaily*, 781 F.2d 539, 542 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987); *United States v. Vinson*,

606 F.2d 149, 152 (6th Cir. 1979); *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). If it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible.  *United States v. Bourjaily*, 781 F.2d at 542.  This determination is made by the trial court, not the jury, under Federal Rule of Evidence 104(a).  *Id.* In making this determination, the court may take into consideration the proposed statements themselves.  *Id.*  Once the requirements for admissibility under Federal Rule of Evidence 801(d)(2)(E) have been met, statements by one conspirator are treated as vicarious admissions by all members of the conspiracy, *United States v. Kendricks*, 623 F.2d 1165, 1167-68 (6th Cir. 1980).

In the instant case, there were numerous conversations between Mr. Alan Moody and Defendant Sherwood where Sherwood continued his lulling efforts and lied to Mr. Moody. Those statements may be attributed to Defendant Heshelman.

H.    **Expert Testimony**

During the course of this trial, the Government will offer the testimony of Leonard Zawistowski.  Mr. Zawistowski is a Senior Special Investigator with the U.S. Federal Reserve.  It will testify that there is no such thing as a "Federal Reserve Debenture" and that boxes, like the photograph shown to Alan Clyde, were not issued or made by the U.S. Federal Reserve or the U.S. Government.  If called upon, he can testify that "Federal Reserve Debentures" and the "boxes" are common fraud schemes.  Rules 702 and 703 of the Federal Rules of Evidence govern testimony by expert witnesses.  Those rules state:

Rule 702.  Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703.  Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In qualifying experts, Rule 702 is to be broadly construed.  *Mannino v. International Mfg. Co.*, 650 F.2d 846, 849 (6th Cir. 1981).   In *Mannino v. International Mfg. Co.*, the Court stated that:

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact.

*Id*. at 851.

The Government will inquire of the Court as to whether the Court will permit the witness to testify that in his knowledge and experience, "Federal Reserve Debentures" are part of a classic fraud scheme.

Respectfully submitted,

DONALD A. DAVIS
United States Attorney

Date: May 20, 2009

/s/ Daniel Y. Mekaru
DANIEL Y. MEKARU
Assistant United States Attorney
PO Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404