1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,
                                    DOCKET NO. 1:06-CR-00044-01
6    vs.

7
     MICHAEL WAYNE HESHELMAN,
8
                         Defendant.
9    _____/

10

11            EXCERPT TRANSCRIPT OF JURY TRIAL

12           TESTIMONY OF BRYCE HENRY SHERWOOD

13          BEFORE THE HONORABLE JANET T. NEFF

14              UNITED STATES DISTRICT JUDGE

15               GRAND RAPIDS, MICHIGAN

16                   June 4, 2009

17

18   Court Reporter:          Glenda Trexler
                              Official Court Reporter
19                            United States District Court
                              685 Federal Building
20                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
21

22   Proceedings reported by stenotype, transcript produced by

23   computer-aided transcription.

24

25

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3       MR. DANIEL Y. MEKARU
         U.S. ATTORNEY
 4       The Law Building
         330 Ionia Avenue, N.W.
 5       P.O. Box 208
         Grand Rapids, Michigan 49501-0208
 6       Phone:  (616) 456-2404
         Email:  Daniel.mekaru@usdoj.gov

 7
     FOR THE DEFENDANT:
 8
         Mr. Christopher E. Tracy
 9       Honigman, Miller, Schwartz, and Cohn, LLP
         444 West Michigan Avenue
10       Kalamazoo, Michigan 49007
         Phone:  (269) 337-7708
11       Email: ctracy@honigman.com

12                         *   *   *   *   *

13                               Grand Rapids, Michigan

14                               June 4, 2009

15                   EXCERPT OF PROCEEDINGS

16                   BRYCE HENRY SHERWOOD

17               (The oath was administered)

18           THE WITNESS:  I do.

19           THE CLERK:  Be seated, please.  State your name for

20   the record, please.

21           THE WITNESS:  Bryce Henry Sherwood.

22                       DIRECT EXAMINATION

23   BY MR. MEKARU:

24   Q.  All right.  Mr. Sherwood, where do you live?

25   A.  Mulberry, Florida.
```

1   *Q.*   Are you from the West Michigan area?

2   *A.*   Yes, I am.

3   *Q.*   Originally, I guess, born and raised here?  Have you lived

4   here for a while?

5   *A.*   Yes, sir.

6   *Q.*   Approximately how long did you live in West Michigan?

7   *A.*   Thirty-five to 40 years.

8   *Q.*   And then how long ago did you move to Florida?

9   *A.*   I've been in Florida for five years.

10  *Q.*   Could you speak up, sir?  Or speak into the mic.  That

11  might help.

12  *A.*   I've lived in Florida for five years.

13  *Q.*   Okay.  Now, Mr. Sherwood, were you indicted by a federal

14  grand jury in February of 2006?

15  *A.*   Yes, sir.

16  *Q.*   Now, you may not have known about the certain charge then,

17  but were you eventually shown a copy of the Indictment and

18  advised that you were being charged?

19  *A.*   Yes.

20  *Q.*   Sometime in December of 2008?

21  *A.*   Correct.

22  *Q.*   All right.  And as it relates to that charge, were you

23  indicted along with Mr. Michael Heshelman?

24  *A.*   Yes.

25  *Q.*   And Dennis Mickelson?

1    A.   Yes.

2    Q.   So the three of you were named in the indictment, and

3    there was also an indication that maybe others that were

4    unnamed or people who may be known or unknown to the

5    grand jury?

6    A.   Yes.

7    Q.   Have you pled guilty to a charge as it relates to your

8    indictment?

9    A.   Yes.

10   Q.   Okay.  Did you sign a plea agreement?

11   A.   Yes, I did.

12   Q.   You have before you some binders.  I want you to turn to

13   what's marked as Volume II.  It might be the other one.

14          THE COURT:  It should be right down at the bottom

15   there.

16          MR. MEKARU:  The white one.

17          THE COURT:  It says "Volume II" on the bottom.

18          MR. MEKARU:  And on the side also, on the end of the

19   binder will be a number.

20   Q.   (BY MR. MEKARU)  Okay.  Could you please turn to tab

21   number 22.  Are you there?

22   A.   I'm there.

23   Q.   Okay.  Do you recognize the exhibit that's been marked as

24   Number 22?

25   A.   Yes.

1   Q.   What is it?

2   A.   It's my plea agreement.

3   Q.   Would you turn to the last page, page 10 of 10 of

4   Exhibit Number 22.

5        Does that have your signature?

6   A.   Yes, it is.

7   Q.   Did you sign it on May 20th, 2009?

8   A.   Yes.

9        MR. MEKARU:   And I would move for the admission

10  of Exhibit Number 22.

11          THE COURT:   Mr. Tracy?

12          MR. TRACY:   No objection, Your Honor.

13          THE COURT:   It's admitted.

14          MR. MEKARU:   All right.   May we publish this, please.

15  Q.   (BY MR. MEKARU)   All right.   I just want to go over this

16  briefly so we all have an understanding of your plea agreement.

17       In paragraph 1 you're agreeing to plead guilty to Count 1

18  of the Indictment, right?

19  A.   Yes.

20  Q.   Count 1 is the conspiracy charge, conspiracy to commit

21  wire fraud?

22  A.   Yes.

23  Q.   All right.   Now, there's an additional provision here that

24  relates to a motion that was heard by this Court where there

25  was some question about trying to get the charges dismissed,

1  right?

2  A.   Correct.

3  Q.   And as part of your plea agreement you reserved the right

4  to have that issue reviewed by the next court, the Court of

5  Appeals?

6  A.   Yes.

7  Q.   Is that essentially what that other language is?

8  A.   Yes.  Yes.

9  Q.   All right.  Paragraph 2.  Paragraph 2 just outlines the

10  elements of the offense and that you understood them.

11      Paragraph 3 outlines some penalties that may associate for

12  you on that charge, and then paragraph 4 is your agreement to

13  pay some restitution in this case.

14      The next paragraph.

15          THE CLERK:  Mr. Mekaru, remember to keep your voice

16  up for the jurors.

17          MR. MEKARU:  Sorry.  Maybe I'll do this again.

18  Q.   (BY MR. MEKARU)  All right.  Paragraph 5 is your agreement

19  to pay some forfeiture, 6 agreeing to disclose where money

20  might be now.

21      More important, the most important part of what we're

22  getting at now, I think, is paragraph 7.  Paragraph 7, you

23  agreed to cooperate with the U.S. Attorney's Office and the FBI

24  and any other law enforcement agency, correct?

25  A.   Correct.

1    *Q.*   All right.  And that includes either meeting with the FBI

2    and disclosing information or testifying at trial if need be,

3    correct?

4    *A.*   Correct.

5    *Q.*   And you're testifying here today in part because of your

6    commitment in the plea agreement?

7    *A.*   Yes.

8    *Q.*   All right.  Why don't we go to the next page.

9        Okay.  This is a continuation of your cooperation

10   provisions.  There's a provision regarding how your sentence

11   might be computed.

12       Go down to the next page.  The next page.  That paragraph

13   that dealt with some of the -- your rights on appeal and about

14   your sentence.  Essentially you decided to let the judge

15   sentence you, but you're not going to ask that her sentence be

16   reviewed by the Court of Appeals.

17   *A.*   Right.

18   *Q.*   Is that about what it's providing?

19   *A.*   Yes.

20   *Q.*   Okay.  All right.  Now, this is what you're getting, I

21   guess, in exchange for your cooperation.

22       Would that be fair to say?

23   *A.*   Yes.

24   *Q.*   Paragraph 10, the U.S. Attorney's Office is agreeing to

25   move to dismiss all the other charges against you --

1   *A.*   Yes.

2   *Q.*   -- right?  I mean, this was a fairly lengthy Indictment,

3   so there might be some 40-plus charges, right?

4   *A.*   Correct.

5   *Q.*   Okay.

6           *THE COURT:*  Mr. Mekaru, one thing I would interject

7   here, it should be clear that Mr. Sherwood was represented by

8   counsel throughout these proceedings.  Correct?

9           *MR. MEKARU:*  Yes.  Yes, ma'am.

10  *Q.*   *(BY MR. MEKARU)*  All right.  Paragraph -- subparagraph B

11  deals with a way your sentence could possibly be reduced.  Is

12  that about right?

13  *A.*   Yes.

14  *Q.*   Now, in terms of your sentence, is it possible that there

15  really are a couple ways in which your sentence could be

16  reduced, one is by accepting responsibility for your crime?

17  *A.*   Yes.

18  *Q.*   And the other is if the government moves to reduce your

19  sentence based on your cooperation?

20  *A.*   Yes.

21  *Q.*   All right.  And you know all this based on your counsel's

22  advice to you and telling you about how the law kind of works

23  for your sentencing?

24  *A.*   Yes.

25  *Q.*   All right.  So at this point would it be pretty fair to

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    say that the decision to move for departure, though, really

2    rests with the United States Attorney's Office; is that right?

3    A.   Yes.

4    Q.   But even if we do move for a reduction, it's still up to

5    the judge, in this case Judge Neff, to decide whether to give

6    you a reduction or reduce your sentence, right?

7    A.   Correct.

8    Q.   Okay.  Let's go to next page, please.

9         That's a continuation of that paragraph and just an

10   acknowledgment that your information that's not known to the

11   government prior to your cooperation, prior to your proffer,

12   can still be used to help compute your sentence as it comes

13   time for sentencing, right?

14   A.   Right.

15   Q.   Okay.  Next page.

16        All right.  This is just an acknowledgment.  This is an

17   agreement between yourself and your attorney and the

18   United States government, correct?

19   A.   Correct.

20   Q.   But it does not necessarily bind this Court, Judge Neff?

21   A.   That's correct.

22   Q.   Okay.  Paragraph 12 is that it's limited to, again, to the

23   United States Attorney's Office and not any other prosecuting

24   authority.

25        Go to next page.  And the next page.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1      All right.  And this is a copy of the signature.  You

2  indicated this is your signature in the middle?

3  *A.*   Yes.

4  *Q.*   And that's your attorney's signature below?

5  *A.*   Yes.

6  *Q.*   All right.  And as the judge indicated, you were

7  represented through this whole proceeding?

8  *A.*   Correct.

9  *Q.*   All right.  Okay.  Now let me see if I can summarize here

10  where we're at.

11      Mr. Sherwood, so you're testifying here today really with

12  the hope and with the understanding, first of all, the

13  understanding that the government has agreed to reduce the

14  number of charges you're facing, right?

15  *A.*   Yes.

16  *Q.*   Which could have the potential of reducing the amount of

17  time that you ultimately face, right?

18  *A.*   Yes.

19  *Q.*   You're also testifying today with the hope that Judge Neff

20  and with the government's motion will reduce your sentence,

21  right?

22  *A.*   Yes.

23  *Q.*   So you really have some incentive here to testify; would

24  that be fair to say?

25  *A.*   Yes.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  Q.   Okay.  But you also signed a proffer agreement?

2  A.   Yes.

3  Q.   And a plea agreement.  So there are two agreements here.

4  Again, the proffer agreement is another agreement that we won't

5  use your words against you essentially?

6  A.   Correct.

7  Q.   What's the effect of you lying at this point on the

8  proffer agreement and on the plea agreement?

9  A.   I would lose both the proffer agreement and the

10  plea agreement.

11  Q.   So the protection of the proffer agreement would go away?

12  A.   Yes.

13  Q.   And all your statements could be used against you?

14  A.   Correct.

15  Q.   Okay.  And you would lose the protection of the

16  plea agreement and all the charges could be brought back again?

17  A.   Yes.

18  Q.   All right.  Now, Mr. Sherwood, do you know

19  Pastor Alan Moody?

20  A.   Yes, I do.

21  Q.   How do you know Pastor Alan Moody?

22  A.   I met him at church, at First Baptist Church of

23  Middleville.

24  Q.   Did you eventually join that church?

25  A.   Yes, I did.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Q.   Now, were you aware at some point that Pastor Moody had --

2   and his family -- had come into some money?

3   A.   Yes.

4   Q.   And as far as you know, did they come into that money

5   prior to you joining the church?

6   A.   Yes.

7   Q.   And as far as you know, roughly how much time passed

8   between their receiving the money and you joining?

9   A.   I do not know.

10   Q.   Less than a year or so?

11   A.   No, it was longer than that.  I'm not sure.

12   Q.   All right.  Nonetheless, that had all happened before you

13   joined the church?

14   A.   Yes.

15   Q.   And when you joined the church, this is that First Baptist

16   Church in Middleville, at that point in time were you

17   representing yourself to be some sort of an investment advisor?

18   A.   Yes.

19   Q.   Financial advisor?

20   A.   Yes.

21   Q.   Were you in fact a genuine investment advisor?

22   A.   No.

23   Q.   That was a lie?

24   A.   Yes.

25   Q.   And did you have a discussion with Alan Moody,

1  Pastor Alan Moody, about investment opportunities that he could

2  participate in to help him get a better rate of return?

3  *A.*    Yes.

4  *Q.*    And did you present him with a plan for his money?

5  *A.*    Yes.

6  *Q.*    Was this investment -- what was this investment plan for

7  Pastor Moody's money?

8  *A.*    I introduced him to Michael Heshelman with the objective

9  of increasing his yield and that there would be a lot more

10  money made working with Michael than what he was currently

11  making at the time.

12  *Q.*    Well, what was the investment itself?

13  *A.*    The investment itself was presented as a bond opportunity

14  in Europe, a trade known as a buy/sell agreement, and that they

15  would buy bonds at a lower price and sell them at retail.

16  *Q.*    Now, as far as you know, does that, as a strategy, as an

17  investment strategy, does something like that even exist?

18  *A.*    Yes, on the United States bond markets people buy and sell

19  bonds all day long.

20  *Q.*    Okay.  What's the old adage:  Buy low, sell high?

21  *A.*    Yes.

22  *Q.*    That's how you make a profit?

23  *A.*    Correct.

24  *Q.*    Okay.  But as much as that might exist as a strategy

25  overall, was the plan that you were presenting to Pastor Moody,

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    that you and Michael Heshelman were presenting, was that a

2    legitimate investment?

3    *A.*   No.

4    *Q.*   Well, then what was going to happen to Pastor Moody's

5    money?

6    *A.*   It was going to be sent to an attorney's account in

7    Florida, and it would be managed from there, from the

8    attorney's account.

9    *Q.*   When you say -- what do you mean by managed?

10   *A.*   I would say it was supposed to have gone into a secured

11   account that was held in an escrow account, and then there was

12   supposedly money that would be made trading in bonds.  That the

13   yield was out of range for what could happen, and the reality

14   was the money was going to go there and be used for other

15   purposes.

16   *Q.*   Okay.  So jumping back and forth here, and I realize

17   there's a story that's being told to Pastor Moody about what's

18   going to supposedly happen to the money, and then there's the

19   reality of where the money actually went.  Would that be fair

20   to say?

21   *A.*   Yes.

22   *Q.*   Okay.  So let's focus first on what story is being told to

23   Pastor Moody.

24        What was Pastor Moody being told about what is going to

25   happen to his investment?

1    A.   He was told his funds would be held in a secure account

2    that would require two signatures to be moved out of that

3    account.

4    Q.   Okay.  And then once that money went into that secure

5    account, what was -- the investment you said would then be to

6    buy and sell these bonds?

7    A.   Yes, that's what was told to Mr. Moody.

8    Q.   Well, if the money is supposed to remain in the attorney

9    trust account or in this account, how would the money then be

10   used in these investment transactions?

11   A.   It couldn't be.

12   Q.   According to what was represented to Pastor Moody, were

13   these funds being used as some sort of collateral?

14   A.   I don't know.  They were not used -- I don't know what

15   they were used for.

16        Could you repeat the question, please?

17   Q.   Sorry.  Again I'm focusing here on what Pastor Moody is

18   being told about what is supposed to happen to his money.

19   A.   He was told that his money was going to stay in the

20   attorney escrow account, a trust account to be held for

21   the -- for collateral for the purchase of buy and sell 10-year

22   bonds.

23   Q.   Okay.  So again let me see if I understand this.  So

24   Pastor Moody's money was supposed to stay in this attorney's

25   account and be used as collateral for leverage to do these

1    other transactions?

2    A.   That's correct.

3    Q.   All right.  And did Pastor Moody eventually agree to

4    engage in this investment plan?

5    A.   Yes, he did.

6    Q.   Did he first send in December of 2000 a million dollars?

7    A.   Yes.

8    Q.   In March of 2001 did he again agree to send some more

9    money?

10   A.   Yes.

11   Q.   How much?

12   A.   $1.5 million.

13   Q.   And was he given instructions on where to send the money?

14   A.   Yes.

15   Q.   Where was he supposed to send it?

16   A.   To an Attorney Ken Warner's escrow account.

17   Q.   Now, this attorney, Ken Warner, was this attorney

18   Mr. Moody's attorney?

19   A.   No.

20   Q.   Was he your attorney?

21   A.   No.

22   Q.   Whose attorney was he?

23   A.   Michael's attorney.

24   Q.   Where was Ken Warner located?

25   A.   In Miami, Florida.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  *Q.*   And at this time where was Mr. Heshelman?

2  *A.*   Either in Florida, in Sarasota, Florida, or Battle Creek,

3  Michigan.

4  *Q.*   Okay.  Did he also spend time in New York?

5  *A.*   Yeah, and also New York.

6  *Q.*   And what about in Europe?

7  *A.*   He had spent time in Zurich, and he had told me he had

8  been in London, Madrid, Spain, and cities in Germany.

9  *Q.*   Okay.  So as far as you know, was he spending a fair

10  amount of time in Europe?

11  *A.*   Yes.

12  *Q.*   All right.  So once the money went in and Pastor Moody

13  began to ask about the status of his investment, what was he

14  told?

15        *MR. TRACY:*  Your Honor, foundationally there's a lot

16  of "What was he told?" without who is telling him.  We're not

17  getting the foundation of who is having these conversations.

18        *THE COURT:*  That's fair enough.

19        Mr. Mekaru.

20        *MR. MEKARU:*  Okay.  Yeah, I think that makes sense.

21  *Q.*   *(BY MR. MEKARU)*  Let's focus on breaking it down to what

22  you're telling Pastor Moody.  And I gather at some points in

23  time you may have been a party to conversations where

24  Michael Heshelman is also talking to Pastor Moody.  True?

25  *A.*   Yes.  Yes.

1    Q.   All right.  So what were you telling Pastor Moody about

2    the status of his investment?

3    A.   I had --

4            THE COURT:  I'm sorry.

5            JUROR NUMBER 33:  A little closer to the microphone

6    maybe?

7            THE COURT:  Yes, please slide it forward.

8            MR. MEKARU:  Please slide it forward.  Thank you.

9            THE WITNESS:  Okay.

10           MR. MEKARU:  Much, much better.

11   Q.   (BY MR. MEKARU)  The question was:  What were you telling

12   Pastor Moody about his investment once the money went in?

13   A.   I repeated the -- I would talk to Michael, and he would

14   tell me what he was doing, and I would relay that message on to

15   Alan.

16           THE COURT:  Mr. Sherwood, I would ask you when you

17   refer to Michael, would you please make it clear who Michael

18   is.

19           THE WITNESS:  Yes, ma'am.  Michael Heshelman would

20   tell me what he was doing, and I would relay that message on to

21   Alan.

22   Q.   (BY MR. MEKARU)  All right.  So then what sort of

23   information was being passed on to Pastor Moody?

24   A.   That there were different deals being done, that there

25   would be a different transaction was taking place than what was

1    originally said.  That they were trying to do -- he was

2    attempting to do other deals that would make the money and

3    restore the money to Mr. Moody.

4    Q.   Now, were there multiple conversations with Pastor Moody

5    about the status of his money?

6    A.   Yes.

7    Q.   So regular conversation about what was happening with his

8    money?

9    A.   Yes.

10   Q.   And what were you telling Pastor Moody about the status of

11   his money and the status of the deal?

12   A.    I was telling him that Michael was

13   working -- Michael Heshelman was working on completing the

14   transactions, multiple different transactions, and that he

15   would keep us informed of what was going on in Europe at the

16   time.  In Zurich or whatever city he was in.

17   Q.   Was Pastor Moody given some indication that as much as he

18   was working on it, that it was close to being closed, close to

19   being finished, that his deal was almost done?

20   A.   Yes.  Yes, sir.

21   Q.   All right.  And was the statement that you made that

22   Michael Heshelman is trying to work on the deal, trying to

23   close the deal and -- trying to close the deal, was that

24   truthful or was that a lie?

25   A.   He had -- I had relayed the message from Michael, and I

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  told that to -- from Michael Heshelman, and I related that on

2  to Alan Moody.

3       Was it a lie?  I believe it was a lie, that there was no

4  deal.

5  Q.  And the statement that the money is coming, that the money

6  is almost -- is coming next week, is coming in the next day or

7  so, was that truthful or was that honest?  Truthful or honest

8  or a lie?

9  A.  That was a lie.

10 Q.  Now, what about some conversations that you participated

11 in where Mr. Heshelman is also talking to Pastor Moody?  What

12 was Mr. Heshelman telling Pastor Moody about his investment,

13 about the status of his investment?

14 A.  Mr. Heshelman was telling him that he was near to closing

15 several different transactions and that the original

16 transaction did not proceed, but he was -- he had other

17 transactions he was doing.  That he believed that he was about

18 to finish a major transaction that would restore the funds and

19 make money for Mr. Moody.

20 Q.  And were there multiple communications between

21 Mr. Heshelman and Mr. Moody that you participated in?

22 A.  I believe so, yes.

23 Q.  Was anything in common about the nature of those

24 communications?

25 A.  They were all attempting to keep Mr. Moody working with

1    Mr. Heshelman and myself.

2    Q.   Essentially to continue to delay things?

3    A.   Yes, continue to delay things.

4    Q.   And continue to delay his expectation that his money was

5    coming?

6    A.   Yes.

7    Q.   Or was Pastor Moody asking for his money back?

8    A.   I believe he had asked for his money back at a meeting we

9    had in Battle Creek, and then I believe -- I just can't exactly

10   remember, but he -- I can remember him asking about the status

11   of his money and when he would get it back, and that -- but I

12   cannot remember the exact location where we were when he asked

13   for it back.

14   Q.   Because eventually he did take some action to try to get

15   some monetary recovery, though, right?

16   A.   Yes, he did.

17   Q.   I mean, he -- he took some action to foreclose the home

18   you were living in.

19   A.   That's correct.

20   Q.   And -- let's see.

21   A.   Yes.

22   Q.   Sorry.  There were actually two mortgages that were given

23   to Pastor Moody.  Is that true?

24   A.   True.

25   Q.   There was first a mortgage that you gave him that you

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    signed, right?

2    A.    Yes.

3    Q.    But at the time you weren't actually on the deed of the

4    home, it was set into trust, it was in your wife's name, but

5    nonetheless, that first mortgage was not valid, right?

6    A.    Correct.    Correct.

7    Q.    And you knew at the time that you gave it to him that it

8    really wasn't a valid mortgage?

9    A.    Correct.

10   Q.    So you gave him a worthless piece of paper essentially?

11   A.    Yes.

12   Q.    And that was to induce him to invest another 1 1/2 million

13   dollars?

14   A.    Yes.

15   Q.    And when he tried to file it and found out that it wasn't

16   a genuine mortgage, did he come back to you and demand yet

17   another one from you and your wife?

18   A.    Yes.

19   Q.    And you gave him that?

20   A.    Yes.

21   Q.    Did you tell him that you had already gotten another

22   mortgage on that home?

23   A.    No.

24   Q.    That was another lie or omission?

25   A.    Yes.

1  *Q.*   That house that was mortgaged, this was the residence you

2  were living in?

3  *A.*   Yes.

4  *Q.*   How much was this house worth?

5  *A.*   Eight hundred to nine hundred thousand dollars.

6  *Q.*   And the house at some point when you bought it was paid in

7  full?

8  *A.*   Yes.

9  *Q.*   We'll come back to this, but the money for that house, did

10  that come from yet another investor?

11  *A.*   Yes.

12  *Q.*   So this is somebody else's money that you stole and used

13  to buy this house?

14  *A.*   Yes.

15  *Q.*   And then how much of a mortgage did you take out on the

16  house with the bank?

17  *A.*   I believe it was $400,000.

18  *Q.*   So let me see if I understand this.  You paid cash for

19  this house that was roughly a million dollars?

20  *A.*   Yes.

21  *Q.*   When you say 800 or 900, was it closer to a million or

22  thereabouts?

23  *A.*   Probably.

24  *Q.*   And you took out a mortgage, you got some more cash out of

25  the house?

1    A.   Yes.

2    Q.   Did you pay anything against that mortgage, make any

3    payments?

4    A.   No.  Not much.

5    Q.   So this house was -- you got a million in cash to pay for

6    a house you didn't have, and then you got from the bank another

7    400-something thousand dollars?

8    A.   Yes.

9    Q.   And then you gave a mortgage first to Pastor Moody that

10   was not genuine, and eventually when he did get one, he was

11   second in line?

12   A.   Yes.

13   Q.   Now, do you know Dennis Mickelson?

14   A.   Yes, I do.

15   Q.   He was also indicted with you?

16   A.   Yes, he was.

17   Q.   Did Dennis Mickelson play a part in selling Pastor Moody

18   on this investment?

19   A.   Yes.

20   Q.   What was his role?

21   A.   I would meet people and introduce them to Dennis, and he

22   would talk with the client and proceed to verify that they had

23   the money, and then he would work with us to close the deal,

24   and the money would be sent to Kenneth Warner's escrow account.

25   Q.   So he helped pitch the deal?

1   A.   Yes.

2   Q.   Did he also act as some sort of reference?

3   A.   Yes.

4   Q.   So at times was he acting as a -- someone who was working

5   with this investment group and other times acting as an

6   investor who was successful?

7   A.   Yes.

8   Q.   And did other people also play a part in not necessarily

9   trying to pitch the deal on the front end, but on the back end

10  did other people play a part in trying to delay things, to

11  delay the demand for money?

12  A.   I think it was myself and Dennis and

13  Michael Hesh -- Dennis Mickelson and Michael Heshelman were the

14  ones that would keep the delay going.

15  Q.   Do you know Ron Featherstone?

16  A.   Yes, I know Ron Featherstone.

17  Q.   Okay.  Who is Ron Featherstone?

18  A.   He is -- he was an officer of Michael's company.

19  Michael Heshelman's company.

20  Q.   Did you have conversations with him?

21  A.   Yes.

22  Q.   Were you aware of what he was doing as part of all this?

23  A.   No.

24  Q.   Do you know his wife?

25  A.   No, I do not.

1   Q.   All right.   In addition to Pastor Moody, did you make this

2   same pitch on this investment scheme to others?

3   A.   Yes.

4   Q.   Let's go through a list, then.

5        Did you participate in the presentation to a Brian Turner?

6   A.   No.

7   Q.   How about a Timothy Oliver?

8   A.   No.

9   Q.   Paul Ramsey?

10  A.   Yes.

11  Q.   Okay.   And what was your participation with Paul Ramsey?

12  A.   I had introduced him to Michael Heshelman for the purpose

13  of placing money with him to create a higher-yield income from

14  those funds.

15  Q.   All right.   So he was essentially presented with the same

16  investment opportunity, that he could make more money and get a

17  greater return?

18  A.   Yes.

19  Q.   Was the investment instrument something similar to what

20  was presented to Pastor Moody?

21  A.   Yes.

22  Q.   Was that truthful and honest?

23  A.   No.

24  Q.   Or was that a lie?

25  A.   It was a lie.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  Q.   How about Allen Clyde?

2  A.   Yes, I introduced him to Michael Heshelman as well.

3  Q.   And what was Allen Clyde told about this investment?

4  A.   That he would receive a significant yield far exceeding

5  what he could earn in the bond or equity markets.

6  Q.   And was that a lie?

7  A.   Yes.

8  Q.   And how about Stephen Williams?

9  A.   I don't know if I ever spoke with Stephen Williams

10  directly, but he was represented by an accountant named

11  Pierre Labauve.

12  Q.   Pierre Labauve.  And what was Pierre Labauve told about

13  this investment?

14  A.   That there would be a significant yield, the same as we

15  had told the other investors.

16  Q.   And that, again, was a lie?

17  A.   Yes.

18  Q.   All right.  Now, did Mr. Ramsey send money and invest with

19  you and Michael Heshelman?

20  A.   Yes.

21  Q.   Did Mr. Clyde?

22  A.   Yes.

23  Q.   And Mr. Williams?

24  A.   Yes.

25  Q.   Now, when all of these people invested -- Mr. Ramsey,

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Mr. Williams, Mr. Clyde -- did you receive some sort of money?

2   A.   Yes, I did.

3   Q.   Did other people who also had helped pitch this to

4   Mr. Ramsey, Mr. Clyde, and Mr. Williams, did they also receive

5   some money?

6   A.   Yes.

7   Q.   Did Mr. Mickelson also participate with any of these

8   people?

9   A.   Yes, he did.

10  Q.   Did you talk about the fact that you were receiving money

11  with Mr. Mickelson or Mr. Heshelman?  Did you -- did everyone

12  know that everyone was getting money?

13  A.   Yes.

14  Q.   And all this money that was sent by Mr. Ramsey, Mr. Clyde,

15  and Mr. Williams, did it go into Ken Warner's attorney trust

16  account?

17  A.   Yes, it did.

18  Q.   Did you have the authority to tell Ken Warner, "Send me

19  money"?

20  A.   No, I did not.

21  Q.   So how did you get your money?

22  A.   I would tell Mr. Heshelman -- we had agreed that there

23  would be payments to us upon the completion when the money was

24  sent into the attorney's escrow account.

25       I did one time pass along a note, an email to Mr. Warner

1    indicating that I had received direction from Mr. Heshelman to

2    pay out certain payments.  I believe that's part of the package

3    here.

4    *Q.*    Okay.

5    *A.*    But I did not have authority over the account.

6    *Q.*    So would it be fair to say you always had to ask

7    Michael Heshelman to get your money?

8    *A.*    Yes.

9    *Q.*    And you made reference to some sort of email or some sort

10   of document.

11   *A.*    Yes.

12   *Q.*    Can you flip your binder to Exhibit Number 3.  I'm sorry,

13   the other binder.

14        Are you there?

15   *A.*    Yes.

16   *Q.*    Okay.  Do you recognize Exhibit Number 3?

17   *A.*    Yes, I do.

18   *Q.*    What is Exhibit Number 3?

19   *A.*    It's my email to Ken Warner to pay in six different wire

20   transfers.

21   *Q.*    All right.  Could you put that up, please.

22        All right.  Beginning at the top with your name, and is

23   that your address?

24   *A.*    Yes.  Yes, it is.

25   *Q.*    And it's dated March 2nd, 2001?

1    *A.*   Yes.

2    *Q.*   Is it sent on or about that time?

3    *A.*   Yes, sir.

4    *Q.*   And it says, "To Ken."  Who is that?

5    *A.*   Ken Warner.

6    *Q.*   And the reference here is "Michael is in England . . ."

7    Who is Michael?

8    *A.*   Michael Heshelman.

9    *Q.*   ". . . and has, I believe, sent you a partial list of

10   people who are to receive payments today."

11       How did you know that?

12   *A.*   I had spoken with Mr. Heshelman, and he had given me

13   directions of who to pay, and I wrote up the email.

14   *Q.*   So this list that you're putting together is in

15   consultation with Michael Heshelman?

16   *A.*   Yes.

17   *Q.*   Now, "The funds should be in your account today.  There

18   will be a $1,500,000 deposit made coming from Northern Trust."

19   *A.*   Yes.

20   *Q.*   Now, the money, the 1.5 million, actually came in a little

21   later than March 2nd.  So was there a little bit of delay

22   between this fax and the money, or was this just prepared

23   earlier?

24   *A.*   I do not know.

25   *Q.*   And the 1.5 million, whose money was that?

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1   A.   Mr. Moody's.

2   Q.   "Here are the people who are to receive funds."

3   "Paul Ramsey."

4        Is that the same Paul Ramsey who invested money with you

5   and Michael Heshelman?

6   A.   Yes.

7   Q.   Do you remember how much money Mr. Ramsey invested?

8   A.   Two -- over $2.5 million.

9   Q.   Any idea why Mr. Ramsey is getting $100,000 of

10  Pastor Moody's money?

11  A.   He was demanding an interest payment on his money.

12  Q.   Larry Hall gets $80,000.  Any idea why Mr. Hall is getting

13  $80,000?

14  A.   He was also an investor with Michael Heshelman.

15  Q.   Pierre Labauve.  You had said that Pierre Labauve was the

16  attorney or accountant or somehow related to Stephen Williams?

17  A.   Yes.

18  Q.   Why is Pierre Labauve getting $89,600?

19  A.   He was receiving also an interest payment.

20  Q.   There's a parenthetical there.  "You have his banking.

21  Also, he owes me $10,400."

22       What's that about?

23  A.   I cannot remember.

24  Q.   Next there's "ICW Dream Homes, Larry Telford/

25  VIP Services."

1        Why is Mr. Telford and ICW receiving $60,000?

2   A.   Mr. Telford is also an investor with Mr. Heshelman.   And

3   it was an interest payment that was being demanded.

4   Q.   Now, Larry Telford, did Larry Telford have an association

5   with another, another individual by the name of Peter Fodor or

6   Peter Fodor?

7   A.   Yes.

8   Q.   I think that's F-O-D-O-R.   Does that sound about right?

9   A.   Yes.

10  Q.   Okay.   I'm just spelling it for the court reporter.

11       All right.   You had mentioned before that another investor

12  had given you around a million dollars to invest and that you

13  used that money to buy your house.

14  A.   Yes.

15  Q.   Was that somehow related to --

16  A.   Yes, it is.   It came from Larry Telford.

17  Q.   So you said that Mr. Telford was investing with

18  Michael Heshelman?

19  A.   Correct.

20  Q.   So were there -- was this one deal or two deals?

21  A.   Two deals.

22  Q.   So in one deal, Mr. Telford and Mr. Fodor invested with

23  you around a million dollars?

24  A.   Yes.

25  Q.   And how much did they invest with Michael Heshelman?

1   A.   I believe it was $760,000.

2   Q.   And the presentation to Mr. Telford, was it similar to,

3   the same presentation that was made to Mr. Ramsey, Mr. Clyde,

4   and Mr. Williams?

5   A.   Yes.  Yes, it was.

6   Q.   And did Mr. Fodor make efforts to try to get money back

7   from you?

8   A.   Yes.

9   Q.   So this $60,000 is being paid back to Larry Telford.  Is

10   that related to the money that you had taken as part of this

11   investment, or was it related to money that

12   Michael Heshelman --

13   A.   It was related to Michael Heshelman.

14   Q.   All right.  Dennis Mickelson gets $50,000.

15   A.   Yes.

16   Q.   Why is Dennis Mickelson getting $50,000?

17   A.   He had an agreement with Michael that he'd receive money

18   when depositors -- when deposits were made.

19   Q.   Get a cut?

20   A.   Yes.

21   Q.   The next item, Bryce Sherwood gets $160,400.

22   A.   Yes.

23   Q.   Is that your cut?

24   A.   Yes.

25   Q.   Now, who decided how much money that you would get?

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    *A.*   Michael Heshelman had an agreement that I would

2    get -- with me that I would get 10 percent of what I raised on

3    this last one, on this last transaction.

4    *Q.*   Well, you brought the money.  Couldn't you have demanded

5    more?

6    *A.*   Yes.

7    *Q.*   You could have asked for it, but who ultimately decides?

8    *A.*   Michael Heshelman.

9    *Q.*   And then attached to this there are a bunch of

10   instructions regarding where the money is going to be wired.

11   *A.*   Yes.

12   *Q.*   And are these all your accounts, you or your wife, and/or

13   your wife?

14   *A.*   Yes.  Yes.

15   *Q.*   And did you also pass along additional banking information

16   for these other instructions?  I don't believe it's in the

17   attachment, but do you remember at the time?

18   *A.*   I only -- I cannot remember, but maybe -- it's on the

19   list.  It says, "See attached banking for Paul Ramsey," so I

20   must have had that.

21   *Q.*   And was there a similar sort of distribution of money

22   every single time somebody invested with Michael Heshelman

23   where you participated in pitching the investment?

24   *A.*   Yeah, we would receive money every time that someone made

25   an investment.

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    Q.   Did you tell Alan Moody that you were getting $160,400 of

2    his money?

3    A.   No, I did not.

4    Q.   In fact, you told him at some point that you weren't going

5    to get paid until after the deal was done?

6    A.   That's correct.

7    Q.   You lied to him?

8    A.   Yes, I did.

9    Q.   To his face?

10   A.   Yes, I did.

11   Q.   And all these communications that you were having with

12   Mr. Moody were right to his face, right?

13   A.   Most of the time, yes.

14   Q.   And most of these conversations you're lying to him about

15   where his money is?

16   A.   Yes.

17   Q.   And the same sort of lies and lulling and telling that

18   money is coming and delaying were made to Mr. Ramsey,

19   Mr. Clyde, Mr. Williams, and to Mr. Telford?

20   A.   Yes.  Regarding Mr. Clyde, I had very little contact with

21   him.  I had spoken to his attorney.

22   Q.   Okay.  That was Mr. Jepson?

23   A.   Arron Jepson, who actually -- who knew Michael Heshelman

24   from previous encounters.

25   Q.   The same sort of delay --

1   A.   Yes.

2   Q.   -- was being passed along to Mr. Jepson?

3   A.   I believe so.  I did not have a lot of contact after

4   Mr. Jepson realized that he knew Michael directly, and then

5   they dealt directly.

6   Q.   Okay.  Well, so all this money that's going to you, is any

7   of this going to any sort of investment on the behalf of these

8   investors?

9   A.   No.

10  Q.   You're spending it?

11  A.   Yes.

12  Q.   Using it for your use and benefit?

13  A.   Yes.

14  Q.   Paying bills, going to restaurants, travel?

15  A.   Uh-huh.  Yes.

16  Q.   I'll go through my list here.

17       All right.  You mentioned -- let's start up with 5A.

18       Okay.  Mr. Sherwood?  Mr. Sherwood?

19  A.   Yes.

20  Q.   It might be -- whatever is easier for you, but we'll put

21  it up on the screen, or if it's easier to see it off the hard

22  copy, that's fine.

23  A.   All right.

24  Q.   All right.  5A.  Money going to Thornbrook International.

25  Do you have any idea who that is?

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    A.   No, I do not.

2    Q.   Do you know anything about that transaction?

3    A.   No, I do not.

4    Q.   All right.  Turn to B, 5B, John Grayshan.  Do you know who

5    that is?

6    A.   No, I do not.

7    Q.   So did you instruct him to receive any money?

8    A.   No, I did not.

9    Q.   Mitch Miller.  Do you know who that is?

10   A.   I know Mitch Miller.  He was an acquaintance of

11   Michael Heshelman's.

12   Q.   An acquaintance.  Just a friend, or was he some sort of

13   business associate?  What was the nature of their connection?

14   A.   When I had met him, he was introduced as a business

15   associate of Michael Heshelman's.

16   Q.   He was introduced.  Who introduced you?

17   A.   Michael Heshelman introduced me to Mitch Miller.

18   Q.   So you actually met him in person?

19   A.   Yes, I did.

20   Q.   Where did you meet Mitch Miller?

21   A.   In New York.

22   Q.   This is in New York City?

23   A.   New York City.

24   Q.   Go to the -- we'll come back to New York City in just a

25   moment.  We'll go to the next one.

1        "Orange County Teachers Credit Union," and "Special

2   instructions, if any:  For further credit to

3   Debra Featherstone."

4        Any idea on why Debra Featherstone received money?

5   A.   No, I do not.

6   Q.   Are you directing this?

7   A.   No, I'm not.

8   Q.   Go to next one, 5E, EMA Hotel.  I think Betriebs actually

9   is German for company.  So EMA Hotel company?

10  A.   No idea.

11  Q.   But this indicates that it's in Zurich, Switzerland.  Does

12  Zurich, Switzerland, have any significance to you?

13  A.   That's where Michael Heshelman was located for several

14  years.  I could only speculate about what it's for.

15  Q.   Okay.  The next page, 5F, Investors First Ban-Corp?

16  A.   That was Mr. Heshelman's company.

17  Q.   Now, was this company -- did it consist of a

18  brick-and-mortar building?

19  A.   No, it did not.

20  Q.   What was it?

21  A.   It was a company that he held.  It was a paper company or

22  a documentation-type company, but I do not believe it had a

23  physical address, a brick-and-mortar office that I'm aware of.

24  Q.   Who was Investors First Ban-Corp?

25  A.   It was Michael Heshelman's company, a corporation.

1  Q.   And what did it consist of other than paper in terms of

2  people, anything?

3  A.   The only person that ever introduced himself as an officer

4  of the company was Ron Featherstone.

5  Q.   Next in 5G, Bristol Plaza.

6  A.   That's an apartment in -- building in New York City where

7  Michael Heshelman kept a residence.

8  Q.   Have you been there?

9  A.   Yes, I have.

10  Q.   You've stayed there?

11  A.   Yes, I have.

12  Q.   Now, this is a -- is it a long-term-stay hotel?

13  A.   I don't know, but it was a furnished apartment.

14  Q.   Okay.  How many apartments did Mr. Heshelman have?

15  A.   One that I'm aware of.

16  Q.   And was this an apartment that he had maintained for an

17  extended period of time?

18  A.   Yes.

19  Q.   How long?

20  A.   I had known about the apartment -- he had been in the same

21  place in New York for over a year.

22  Q.   Over one year?

23  A.   Over one year.

24  Q.   The next is 5H, this Arron Jepson, and this is the

25  individual you said might be associated with --

1   *A.*   With Allen Clyde.

2   *Q.*   I'm sorry, Allen Clyde?

3   *A.*   Yes, with Allen Clyde.

4   *Q.*   Pierre Labauve was -- we'll get back to that.

5   First Ban-Corp, 5I?

6   *A.*   That was also a company of Michael Heshelman's.

7   *Q.*   Any building associated with it?  Any physical location

8   associated with this?

9   *A.*   None that I'm aware of.

10  *Q.*   As far as you know, who -- what was the entirety of

11  First Ban-Corp?  What was it?

12  *A.*   It was Michael Heshelman's shell-type company that was

13  just used in name.  It was a business company or a corporation.

14  *Q.*   All right.  5J is Paul Ramsey.

15  *A.*   Yes.

16  *Q.*   We already talked about Mr. Ramsey receiving money.  So

17  was this an actual follow-up on your fax instructing that money

18  be sent to Mr. Ramsey?

19  *A.*   I believe so.

20  *Q.*   It appears to be that?

21  *A.*   It appears to be that.

22  *Q.*   Okay.  5K, AutoOz.  Do you have any knowledge of that?

23  *A.*   AutoOz was a car remanufacturer.  It did upgrades to

24  vehicles, and it was owned by I believe it was a cousin of

25  Michael Heshelman's.

1    *Q.*    Okay.  5L, Marie Gosse-Gardet or Gardet.

2    *A.*    She was somebody that I had met in New York one time that

3    purported to be working with Michael Heshelman on some

4    investments.

5    *Q.*    Was it just -- as far as you know, was this purely a

6    business relationship, or was there any sort of personal

7    relationship with Ms. Gosse-Gardet?

8    *A.*    I believe it was just a business relationship.

9    *Q.*    And this was what was represented to you by whom?

10   *A.*    By Michael Heshelman.

11   *Q.*    Latimer Enterprises?

12   *A.*    No idea.

13   *Q.*    CMC Group, 5N?

14   *A.*    No idea.

15   *Q.*    5O, Sharon Carlson?

16   *A.*    No idea.

17   *Q.*    5P.  This is money that's going to you?

18   *A.*    It's going to me.

19   *Q.*    So this would be apparently some confirmation that money

20   is going to be sent to you?

21   *A.*    Yes.

22   *Q.*    And you did in fact receive money?

23   *A.*    Yes, I did.

24   *Q.*    Okay.  Next we have 5A -- 5Q to Michael Heshelman and HSBC

25   Bank in London, England.

1    I think you had mentioned once that Michael had spent some

2   time in London.

3   A.   Yes.

4   Q.   Do you know anything about this HSBC bank account?

5   A.   No, I do not.

6   Q.   5R, again Michael Heshelman, but it's going to UBS Bank in

7   Zurich.  Do you know anything about this UBS Bank?

8   A.   No, I do not.  I know about the bank, but I do not know

9   about this account.  I've heard --

10  Q.   You've heard of the bank?

11  A.   Yes.

12  Q.   Do you have any idea what Mr. Heshelman is doing with the

13  money that's at UBS or at HSBC?

14  A.   No.

15  Q.   Okay.  Go to 5S, Hanover Hill Heritage, further credit to

16  Larry Kibler/Earl and Patricia.

17  A.   No idea.

18  Q.   5T is money going to Joy Sherwood.  5U is money going to

19  Bryce or Joy Sherwood.  5V is going to Dennis Mickelson.  This

20  is all information that was on your --

21  A.   My fax.

22  Q.   -- one-page letter or fax.

23       Highland Equities?

24  A.   I do not know who Highland Equities, who that is.

25  Q.   Now, the $89,600 --

1    A.    Oh, okay.

2    Q.    -- does that ring a bell?

3    A.    Yes, it does.

4    Q.    Okay.

5    A.    I did not recognize the name Highland Equities.

6    Q.    But that was -- you had instructed that money be sent?

7    A.    That was for Pierre Labauve.  And maybe that's the name of

8    his company that he uses.

9    Q.    X is more money to you and your wife.

10   A.    Uh-huh.

11   Q.    Y, Ralph Trustees Limited, the Athaeneum Hotel.  It's in

12   England.

13   A.    Uh-huh.

14   Q.    Do you know anything about this?

15   A.    No, I do not.

16   Q.    Do you have any idea where Michael Heshelman was

17   staying --

18   A.    No.

19   Q.    -- in London?

20   A.    No, I do not.

21   Q.    Next, 5Z, Prism Mortgage.  Do you know anything about

22   that?

23   A.    No, I do not.

24   Q.    How about the name Timothy Oliver?

25   A.    No.  Only from what we've heard here.

1   Q.   Okay.  5Z.  5AA, TD Bank, for further credit to ICW

2   Dream Homes.

3   A.   That's Larry Telford.

4   Q.   Okay.  More money -- 5BB is more money to you.

5        5CC is Erna Van Schelt.  Any idea who that is?

6   A.   No, I do not.

7   Q.   The money is going to Reinach, Switzerland.

8   A.   No, I --

9   Q.   5CC.

10  A.   I do not know that name.

11  Q.   Okay.  But Switzerland, again, is that where Mr. Heshelman

12  was living?

13  A.   Yes.

14  Q.   Money to Mitchell Miller.  Or Mitch Miller, excuse me.

15  And again more money to Arron Jepson.  And then money here on

16  5FF to Hans Wilof.  Any idea who Hans Wilof is?

17  A.   No, I do not.

18  Q.   5GG, Robert Tringham.

19  A.   I know Robert Tringham.

20  Q.   You know who that is?

21  A.   Yes, I do.

22  Q.   Okay.  Who is Robert Tringham?

23  A.   He was a person also living at the Bristol Hotel that

24  Michael Heshelman had a working relationship with.

25  Q.   Okay.  And what was the nature of the connection?

1  *A.*   They were attempting to do transactions together or

2  talking about transactions together.

3  *Q.*   Now, they are talking about doing transactions, and he's

4  talking about doing deals.  And you're talking to him on the

5  phone, and he's talking about doing this deal, and that's being

6  passed along to Pastor Moody.

7      As you're saying this, did you see any evidence that they

8  were actually doing and following through with what they are

9  claiming?

10 *A.*   No.

11 *Q.*   Any paperwork, any sort of documentation showing they are

12 doing this trading activity?

13 *A.*   I never saw any account statements or bank or brokerage

14 statements that would indicate there was a deal going on.

15 *Q.*   Now, as much as they are talking about this, did you ever

16 see any money come in from the investment returns?

17 *A.*   No, I did not.

18 *Q.*   The only money that's coming in, is that coming in from

19 other investors?

20 *A.*   Yes, it is.

21 *Q.*   5HH.  Again, money to the Bristol Plaza.

22     5II, it's a check going to Moore Homes.

23     Any idea what that might be for?

24 *A.*   I have an idea.

25 *Q.*   I'm sorry, who that's to.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   A.   I believe it was to his -- this -- I believe it was to his

2   sister and brother-in-law.

3   Q.   What's his sister's name?

4   A.   Brenda Moore.

5   Q.   Are they related to Moore Homes?

6   A.   No idea.

7   Q.   Now -- okay.  Let's now turn to tab 12.

8        Do you have that in front of you?

9   A.   Yes, I do.

10  Q.   All right.  12A is a summary.  Do you see that?

11  A.   Yes, I do.

12  Q.   All right.  This is a summary of where Pastor Moody's

13  money went according to the bank statements.  And we've covered

14  all of that, I think, already through the individual wire

15  transfers.

16       12B is a list here of transactions associated with

17  Timothy Oliver and Prism Mortgage.

18       Now, you indicated that you did not participate in this --

19  A.   That's correct.

20  Q.   -- this activity with Mr. Oliver.

21       So as we go through this, it doesn't appear that there's

22  any money being sent to you?

23  A.   That's correct.

24  Q.   The next, 12C, Allen Clyde.

25  A.   Yes.

1   Q.   Now, you said you had some communication with Allen Clyde.

2   Did you get any money?

3   A.   It doesn't show here, but yes, yes, I did.

4   Q.   So there's actually some activity, some transactions where

5   you received money, but it's not reflected in this summary?

6   A.   That's correct.

7   Q.   How much money did you receive?

8   A.   Approximately $470,000.  Not this account.  I mean, from

9   Mr. Clyde or from total?

10  Q.   Not total.  From Mr. Clyde.

11  A.   Oh.  $50,000.

12  Q.   There's some other people -- let's go forward.

13       Paul Ramsey, 12D.  You received money from Paul Ramsey's

14  investment?

15  A.   Yes.

16  Q.   There's some other names here.  Do you recognize any of

17  these other -- as you go through this, do you recognize any

18  other individuals who have been associated with

19  Michael Heshelman, any other names?

20  A.   I think we went through the list.  Dennis Mickelson,

21  myself, Mitch Miller, and the Orange County Teachers Federal

22  Credit Union was Featherstone.  That's the names I recognize.

23  And now Prism Mortgage because I've seen the page prior to

24  this.

25  Q.   Okay.  Let's go down to 12E, Mr. Williams.  And again,

1   this is an individual who had some association with

2   Pierre Labauve?

3   A.   Yes.

4   Q.   Again, this, you can see you got a sum of money?

5   A.   Yes.

6   Q.   Now, 12F contains a summary of funds that have been

7   identified by the government as potentially being related to

8   Michael Heshelman either through his companies or by hotels and

9   such and totaling over 1.9 million.

10      There's under 12G a summary of accounts that have been

11   identified associated with you.

12   A.   Yes.

13   Q.   Now, as we indicated with respect to I think it was

14   Mr. Ramsey, there's another $50,000 that wasn't reflected on

15   the spreadsheet that may add to this total.

16      Assuming -- assuming this -- assume this with me, please:

17   That this summary of $470,000 did not include -- if it didn't

18   include that $50,000 from Mr. Ramsey's money, the total here

19   might increase to 500?

20   A.   It might, but I would -- I would think that it was a

21   carryover.  Some of the people came at the same time, so I may

22   have been double paid on one, under one ledger, and it would

23   reflect that, I think, if we went through it.

24   Q.   Okay.  So as best as you can recall, how much money did

25   you receive from your participation?

1  A.   This would be correct, I would believe, the $470,000.

2  There may be the other 50.  We'd have to look through this.

3  Q.   All right.  And last, Mr. Mickelson received about

4  1 1/2 million dollars.

5  A.   Yes, that's what I'm told.

6  Q.   Can you see any sense how it is that you

7  received -- forgive me, I'm going to use round numbers -- about

8  50,000, $500,000, Mr. Mickelson receives 1.5 million, and

9  Mr. Heshelman receives 1.9 million?  Can you give us some

10 explanation for this differentiation in how much money everyone

11 is getting?

12 A.   I cannot.  I would speculate on it.  That's all I could

13 do.  I don't know why they would get more.

14 Q.   Okay.  You have under that same binder a series of

15 transcripts.  I don't want to go through and play tapes again,

16 but I want to refer to transcripts.  It might be easier.

17 A.   Okay.

18 Q.   All right.  Let's go to 20F.  Page 10, please.  Let me

19 give you a little bit of context here for 20F.

20      20F is on January 5th, 2004.  This is a recording of a

21 meeting in person between yourself, Mr. Heshelman, and

22 Pastor Moody at a Steak 'n Shake restaurant.  I think it's in

23 Battle Creek.

24      Do you recall that?

25 A.   Yes.

1    *Q.*   Do you remember that meeting?

2    *A.*   I -- yes, I do.  I thought it was at Bob Evans, but . . .

3    *Q.*   Well, wasn't there a first meeting in person?

4    *A.*   Well, there were several -- there were a couple meetings

5    in person.  There were meetings in person, but I just -- at

6    this time I can't remember it being at Bob Evans or at

7    Steak 'n Shake.

8    *Q.*   You do remember meeting at a restaurant?

9    *A.*   I do remember meeting with Michael and Alan at two

10   different times.

11   *Q.*   Okay.  All right.  I want to bring your attention now

12   towards the middle of this.

13       Pastor Moody is asking some questions about -- can

14   everybody read this all right as is?  All right, we'll leave it

15   this size.

16       Asking some questions about at some point that you were

17   selling the business to Michael Heshelman or vice versa.  Was

18   that some sort of representation that was being made to

19   Pastor Moody, that there was -- somehow the business was being

20   handed over to Michael Heshelman?

21   *A.*   I may be on the wrong page.

22   *Q.*   I might be on the wrong page too.

23       Okay.  Let me start again.  Because I'm looking at

24   here -- so you were working for him.  Pastor Moody is asking.

25   He said, "No, no."  And then, "How does he get paid?  What do

1  you get out of this?"  And Michael, Michael Heshelman,

2  responds, "He gets paid out of the broker fee."

3  A.    I see.

4  Q.    And then you come in.  "I get a fee if everything

5  gets -- after everything gets done, I'll get paid.  If he's

6  successful.  If he's not successful, I've got a big bill to

7  pay."

8       That was a lie?

9  A.    Yes.

10 Q.    So -- "This has no effect on you, though."  So, again,

11 that was a lie?

12 A.    Yes.

13 Q.    Now, as we go along here we go into page 12 and into 13,

14 Pastor Moody is asking more questions about, "Well, what's

15 happening with the money?"  And pressing a little more.  And

16 also where the money is.

17      To give a little context here.  About the bottom of 12.

18 "I understand -- I understand there's a certain amount of faith

19 here.  Everyone has to have faith."  This is Michael Heshelman

20 speaking.  "I still stand up every day.  It's all for good

21 things too.  It's not just for self-indulgence.  There's a lot

22 of good things involved in what we're doing."

23      Now, there was some representation here that this money

24 was going to be used to raise -- for humanitarian purposes.  To

25 raise money for charities and other public works and that sort

1  of projects.

2  A.   Yes.

3  Q.   Is that true or was that a lie?  As far as what you and

4  Mr. Heshelman were doing.

5       Pastor Moody might have had that goal, but with respect to

6  what you and Michael Heshelman were doing, any truth to trying

7  to raise money for humanitarian reasons?

8  A.   No.

9  Q.   Now, Alan Moody continues with ". . . a lot tougher road.

10  We're getting caught up in things.  Time frames and covering

11  promises of year outs.  It's been hanging over me for a while.

12  Michael Heshelman wants a million dollars."  I think

13  "Careful" -- oh, I think "careful" might have been a server in

14  the background.

15       Then you chime in, "We get a check for a million dollars,

16  it will be really quick, and you would be expecting" -- "what

17  would be the magic number to make your not just original debt

18  but what are your expectations to receive?"  I'm sorry.  I'm

19  paraphrasing that section.  Forgive me.

20       You're chiming in here and asking about what his

21  expectation is for receiving rather than just questioning about

22  his pressure on when the money is coming in.

23       What was the point of that?

24  A.   To delay his expectations.

25  Q.   Changing subject?  You're changing subject a little bit

1    about what maybe the money might be coming in as opposed to

2    when it's coming in?

3    A.    Probably.

4    Q.    Okay.  As this continues on, they are asking about what

5    was the expectation here, what were we going to be spending the

6    money on.

7         You go to page 14.  There's some discussion about Texas

8    oil stuff, oil contracts.  Do you remember that being discussed

9    with Pastor Moody?

10   A.    No, I went through the transcript here.

11   Q.    Now, there were some -- would it be correct, though, that

12   there were some conversations -- were you advised there were

13   maybe some conversations between Pastor Moody and

14   Michael Heshelman that you did not participate in?

15   A.    Yes.

16   Q.    And then we turn to page 16, and you're talking about --

17   you're in the stock market.  You don't have any contracts.

18   Michael Heshelman:  "We're contracted to buy" -- the waiter is

19   probably dropping off a check -- he continues, in the amount of

20   millions dollars of dollars every day.  You know, we are

21   contracted to sell that every day.  So the market moves up and

22   down on a daily basis.  Buy and sell whatever he wants.  And

23   again you're chiming in here.  "We're just not doing anything.

24   Today we're just waiting for reports to come out tomorrow

25   before we do anything.  Dead day."

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1        Did you really know what was going on?

2   A.   No.

3   Q.   So what are you doing?

4   A.   Trying to delay Mr. Moody from taking action.

5   Q.   Are you chiming in here trying to help Mr. Heshelman?

6   A.   Yes.

7   Q.   Trying to corroborate what he's saying to Pastor Moody?

8   A.   Yes.

9   Q.   And much of what you're doing when you're speaking with

10  Pastor Moody, is it an effort also to corroborate the

11  information that's being passed along from Michael Heshelman as

12  best you can?

13  A.   Yes.

14  Q.   All right.  Exhibit 21.  Do you see that?

15  A.   Yes, I do.

16  Q.   All right.  Now, I don't -- I don't know if you've

17  actually seen this document.  Have you seen it before?

18  A.   Yes.

19  Q.   When?

20  A.   Um, Monday.

21  Q.   Okay.  As part of the preparation for this case?

22  A.   Yes.

23  Q.   We asked you questions -- maybe the question was:  Have

24  you seen this document before?  Something along those lines

25  initially?

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    A.   No.

2    Q.   Okay.  I'm sorry.  So you hadn't seen it before?

3    A.   No, I have not.

4    Q.   But do you recognize the transaction that's occurring in

5    this that would be reflected in this invoice?

6    A.   Yes, I do.

7    Q.   The First Baptist Church of Middleville, Michigan.  That's

8    the church where you were a member?

9    A.   Yes.

10   Q.   That is Pastor Moody's church?

11   A.   Yes.

12   Q.   It reflects a transaction to buy a 1996 bus.

13        Do you remember that?

14   A.   Yes, I do.

15   Q.   Was there some discussion with Pastor Moody about

16   providing a bus to the church?

17   A.   Yes.

18   Q.   All right.  What was -- what were you telling Pastor Moody

19   about this bus?

20   A.   Pastor Moody asked about -- he said there was a need for a

21   bus for the church, and we had talked about it, and I

22   instructed him to ask Mr. Heshelman for the money to buy the

23   bus.  Maybe not instructed.  I directed him to

24   Michael Heshelman.

25   Q.   Okay.  So you weren't necessarily a party to those

1    conversations?

2    A.    I was a party to the conversation.  I asked -- but I was

3    not a party to the conversation when this -- when the money was

4    moved and the money went from Ken Warner to buy the bus.

5    Q.    All right.  Let me see if we can break this down.

6         At some point was there some discussion about somebody

7    either giving a bus, donating a bus, or buying a bus for the

8    church?

9    A.    Yes.

10    Q.    Was this conversation such that Pastor Moody was agreeing

11    to buy the bus for his own church?

12    A.    No.

13    Q.    Was it represented to Pastor Moody that somebody else

14    would provide the bus to the church?

15    A.    Yes.

16    Q.    Either being donated by a third-party or donated by

17    yourself or Michael Heshelman, but somebody was going to give a

18    bus to the church?

19    A.    Yes.

20    Q.    And rather than somebody else donating the bus, did you

21    have a conversation with Michael Heshelman about getting this

22    bus paid for?

23    A.    Yes.

24    Q.    And how was the bus going to be paid for?

25    A.    From Michael Heshelman's attorney's trust account with

1   Ken Warner.

2   Q.   Well, was there money already in there from somebody else?

3   A.   Somebody else or -- it was either somebody else's money or

4   Mr. Moody's money.

5   Q.   Now, how much time passed between Pastor Moody investing

6   1 1/2 million dollars and the bus being paid for?

7   A.   Two or three months maybe.

8   Q.   Well --

9   A.   I'm not sure.

10  Q.   Was it a relatively short period of time?

11  A.   It was a short period of time.

12  Q.   According to the banking records, it looks like the wire

13  transfer to Pastor Moody was on March 6th, 2001, and the

14  invoice is dated March 27th, 2001, but the banking information

15  behind that indicates that the wire transfer itself was made on

16  the 19th.

17  A.   Okay.

18  Q.   A matter of a couple of weeks.

19  A.   Okay.

20  Q.   Any reason to dispute that time line as being --

21  A.   No.

22  Q.   So when this issue came up for the actual payment of the

23  bus, who did you have to go talk to about making certain that

24  the bus actually got paid for?

25  A.   To Michael Heshelman.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Q.   And how did you reach him?

2   A.   Telephone.

3   Q.   Is that pretty -- is that probably the most common way in

4   which you spoke with Michael Heshelman?

5   A.   Yes.

6   Q.   Did Mr. Heshelman have a land line that you used, or was

7   it mostly --

8   A.   Mostly a cell phone.

9   Q.   So you met in person with Michael Heshelman, I think, on

10  numerous occasions?

11  A.   Yes.

12  Q.   Would you recognize him?

13  A.   Yes, I do.

14  Q.   Do you see him here in court today?

15  A.   Yes, I do.

16  Q.   Would you please describe for the record what he's

17  wearing.

18  A.   Wearing a black suit, white shirt, and a red tie.

19  Q.   Glasses?

20  A.   Glasses.

21       *MR. MEKARU:*  Your Honor, may the record reflect he's

22  identified the defendant?

23       *THE COURT:*  Yes.

24  Q.   *(BY MR. MEKARU)*  All right.  Just a few more points here,

25  Mr. Sherwood.

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    Mr. Sherwood, now in addition to the activity that you're

2  engaging in with Mr. Heshelman, you yourself have gone out and

3  done your own fraudulent activity, right?

4  A.   Yes, I have.

5  Q.   I mean, you've gone out and lied to other people and got

6  them to invest with you?

7  A.   Yes, I have.

8  Q.   You've indicated already that you had convinced

9  Mr. Telford and Mr. Fodor to send you a million dollars, and

10  that was in addition or apart from money that they already

11  invested with Mr. Heshelman, right?

12  A.   Correct.

13  Q.   Is there also a Denise Du Val?

14  A.   Yes.

15  Q.   Another individual who you convinced to give you money and

16  you paid her back?

17  A.   That's correct.

18  Q.   And that representation that there was some sort of

19  investment or a loan or whatever, was that a lie?

20  A.   Yes.

21  Q.   How much money did you --

22  A.   $12,000.

23  Q.   All right.  How about a man by the name of Chuck Bunting?

24  A.   Chuck Bunting, presented the same, an opportunity that

25  wasn't real.

1   *Q.*   Larry Hall?

2   *A.*   Larry Hall was also known as Bud Riley, and he had -- he

3   was also an investor with Michael, and I also received funds

4   from him.

5            *MR. MEKARU:*  One moment, Your Honor.

6            Your Honor, thank you.  I'll pass the witness.

7            *THE COURT:*  Thank you.  At this time, ladies and

8   gentlemen, we're going to take our morning break, and because I

9   have another commitment, we're not going to come back until

10  12:30.  So you will have a couple of hours, a

11  couple-of-hours-and-a-half break, and then we will come back

12  for the cross-examination of Mr. Sherwood.

13           *THE CLERK:*  Sit down for a minute.

14           *THE COURT:*  I just want to briefly reiterate the

15  cautionary instructions I've already given you several times,

16  and that is not to discuss the matter with anybody, even among

17  yourselves.  Not to try to reach any conclusions.  Not to do

18  any research.  Not to use any various electronic devices to

19  contact others with regard to what you're doing here today and

20  throughout this trial.  Not to come to any opinion.

21           We've really just gotten into the meat of the issues

22  that are going to be decided, so please keep those instructions

23  in mind as you go about taking your break.  Thank you.

24           *THE CLERK:*  Everyone rise, please.  This Court is in

25  recess.

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

```
 1        (Jury leaves courtroom at 10:06 a.m.)
 2            THE COURT:  I just have one thing to put on the
 3   record before we go.  And this, I think, is for -- more for the
 4   jury's edification and really for my own, it's not clear to me,
 5   Mr. Mekaru, what the relationship was between Mr. Sherwood and
 6   Mr. Heshelman, and that is something that I would request that
 7   somebody clear up before this witness is excused.
 8            MR. MEKARU:  Yes, Your Honor.
 9            THE COURT:  Thank you.  We're adjourned.
10        (Recess taken at 10:08 a.m.)
11        (Jury entered the courtroom at 12:48 p.m.)
12            THE COURT:  Mr. Tracy.
13            MR. TRACY:  Thank you, Your Honor.
14                         CROSS-EXAMINATION
15   BY MR. TRACY:
16   Q.   Good afternoon, Mr. Sherwood.  Can you hear me okay?
17   A.   Yes, I can.
18   Q.   I think you have the mic in a good spot there, but if I
19   see it moving a little bit, I may just remind you so to make
20   sure the jury can hear.  Okay?
21   A.   Okay.
22   Q.   Now, this morning we had a chance to hear from you a
23   little bit about the plea agreement that you took in your own
24   case, and I need to go back over a couple items regarding that.
25        Now, your attorney is Landon Miller, correct?
```

1   A.   Correct.

2   Q.   And he's from Florida?

3   A.   Yes.

4   Q.   He was representing you throughout the process that led up

5   to your plea agreement?

6   A.   Correct.

7   Q.   And I presume -- and I don't want to get into the details

8   of your conversation with your attorney, that's between you and

9   him -- I presume he had an opportunity to walk you through what

10  are called the Federal Sentencing Guidelines?

11  A.   Yes.

12  Q.   And he also had an opportunity to talk to you about if you

13  decided to go to trial and were found guilty what range you may

14  be looking at in terms of years in prison?

15  A.   Yes.

16  Q.   And in general, was that range somewhere in the 10- to

17  15-year range?

18      MR. MEKARU:  I'm going to object, Your Honor.  This

19  is getting into the issue of penalties.  To the extent that

20  this has any -- the discussion of this defendant on what the

21  implication would be in effect for Mr. Heshelman, the idea of

22  punishment isn't for the purview of the jury.  Just the fact it

23  might be greater than it might be with a plea I think is going

24  to be adequate for the consideration of the bias of this

25  witness.

1            THE COURT:  And what is the actual basis of your

2    objection, Mr. Mekaru?

3            MR. MEKARU:  The objection is that we're getting into

4    punishment, and punishment is not an appropriate consideration

5    for the jury.  The jury is only supposed to consider guilt or

6    innocence.  And even in the jury instruction, the punishment is

7    not for their consideration.

8            And to the extent we have some discussion about how

9    much time Mr. Sherwood might have been facing, the implication

10   would be that Mr. Heshelman might be facing the same.

11           THE COURT:  Mr. Tracy, in addition to all of that, I

12   have a difficult time seeing relevance here, and so I'm going

13   to instruct you to stay away from this area of punishment.

14           The jury has heard about the plea agreement, they

15   know that there are considerations being made that have been

16   made to Mr. Sherwood with regard to that, and they also have

17   heard that the discretion in sentencing will be mine and mine

18   alone.

19           MR. TRACY:  Can I speak to that for one more second,

20   Your Honor?

21           THE COURT:  No, you may not.

22           MR. TRACY:  Can we do it at sidebar, then?

23       (At sidebar on the record)

24           MR. TRACY:  If he had already taken a 5K, or maybe

25   Rule 35 is better, if he had been in jail for three years and

1    then he comes back to him and all of the sudden the sentence

2    gets reduced from 180 months down to 50, we'd let it in.  All

3    I'm doing is explaining to the jury that the benefit he's

4    getting might be fairly substantial, and that goes toward --

5              THE COURT:  I think the jury has already figured that

6    out, and I really do not see that as pertinent to what their

7    eventual determination is going to be in this case.

8              MR. TRACY:  Okay.  So just so the record is clear,

9    I'm asking to go into it, and you're not letting me?

10             THE COURT:  Exactly.

11             MR. TRACY:  Thank you very much, Your Honor.

12        (Sidebar discussion concluded)

13   Q.   (BY MR. TRACY)  Okay.  Let's move to a different part of

14   the plea agreement that I think you went over a little bit but

15   I just want to make sure we're clear on.

16        Your -- there's a cooperation paragraph that Dan walked

17   you through this morning, and we don't need to look at it

18   again, I think it's paragraph 7 there.  Part of the reason

19   you're testifying here is pursuant to that cooperation

20   paragraph, correct?

21   A.   Correct.

22   Q.   But you're hoping to receive an additional benefit because

23   of that, correct?

24   A.   Correct.

25   Q.   And what you hoped will happen is that the government

1    either prior to your sentencing or after your sentencing will

2    move for a further reduction of whatever time you may be

3    facing?

4    A.    Correct.

5    Q.    That's what you're hoping for, correct?

6    A.    Yes, sir.

7    Q.    Now, Kathy, if we could bring up Government Exhibit 12G,

8    please.

9          And, Mr. Sherwood, if it's easier for you to see the

10   books, fine.  Or if you see it here, just like you did with

11   Dan, that's fine too.

12         Now, this was gone again over a little bit in your direct.

13   Your best recollection was this $470,900, which is the total at

14   the bottom, was approximately what you received through the

15   course of these investments that were made, correct?

16   A.    Correct.

17   Q.    In other words, that's the amount of money that came out

18   of Mr. Warner's account to you?

19   A.    Yes.

20   Q.    Now, you weren't aware or you couldn't be completely sure

21   whether or not another $50,000 or something, perhaps from

22   the -- which deal was that, was that the Clyde deal?

23   A.    I believe so.

24   Q.    Okay.  So that's Arron Jepson was his attorney, but

25   Allen Clyde?

1    A.    Correct.

2    Q.    You couldn't be sure whether or not some additional amount

3    should also factor in here that was roughly another 50 grand?

4    A.    Correct.

5    Q.    Okay.  But other than that, your statement to the jury,

6    that's the entirety of any monies that you received relating to

7    these investments?

8    A.    To the best of my recollection it is.

9    Q.    Okay.  Now, if we could go to -- I think 12H is

10   Mr. Mickelson's.

11         And while we're going there, what did you do with the

12   money, the 470 or the 500,000 that was -- what did you do with

13   the money you received from the investments?

14   A.    Used it for my personal benefit.

15   Q.    Okay.  The other money you got out of Peter Fodor, which

16   maybe we'll go into in a little more detail later, that money

17   went into buying your home?

18   A.    Yes.

19   Q.    Was it just the home, or did you also have some acreage

20   around it?

21   A.    It was a home and acreage.

22   Q.    Okay.  But this other money you got, close to 500 grand or

23   something, that also went to your personal benefit?

24   A.    Yes.

25   Q.    Not related to expenses or anything along the lines in

1    terms of trying to get these investment platforms in place, but

2    rather went to your personal . . .

3    A.    Yes.

4    Q.    Okay.  Mr. Mickelson -- and I think if we go to the next

5    page of his, please.

6          Now, the total at the bottom for him is a little more than

7    $1.5 million, correct?

8    A.    Correct.

9    Q.    Now, before today did you know that he had that much come

10   to him?

11   A.    When I read the Indictment I did.

12   Q.    Okay.  And you read the Indictment, what, earlier this

13   year for the first time?

14   A.    In December.

15   Q.    December of '08?

16   A.    Correct.

17   Q.    That's the first time you were aware of the amount of

18   money that purports to have gone to him through these accounts?

19   A.    Correct.

20   Q.    Now, did you get any money from Mr. Mickelson?

21   A.    Um, I do not believe so.

22   Q.    You don't recall ever him sharing any of the monies that

23   he got through these investments with you?

24   A.    I don't know.

25   Q.    You're not sure?

1    *A.*    I'm not sure.

2    *Q.*    Okay.  If you got monies from Mr. Mickelson, then that

3    obviously would have increased the amount of monies you

4    obtained above the 500 grand roughly, correct?

5    *A.*    Correct.

6    *Q.*    But you're not sure one way or the other?

7    *A.*    Correct.

8    *Q.*    Now, just going back to the 470 or roughly 500, that money

9    that you obtained, did you report any of that income to the

10   IRS?

11   *A.*    No.

12   *Q.*    And why not?

13   *A.*    It was given to me as -- purported to be a loan as advance

14   fees that would be 1099'ed at some time.

15   *Q.*    I don't understand.

16   *A.*    I would be -- I was -- it was given to me at the front end

17   of the deal as an advance that would be . . .

18   *Q.*    And it was your understanding that because it was some

19   sort of advance, you didn't need to report that income in the

20   year given?

21   *A.*    Correct.

22   *Q.*    Okay.  Did you later report it?

23   *A.*    No.

24   *Q.*    You never have reported it?

25   *A.*    No.

1    Q.   Now let's talk about your efforts, and I'll say just

2    generally for the time period from '99 to 2008, and maybe we'll

3    need to narrow in on a more specific period.

4         Did you ever go to Switzerland to assist Mr. Heshelman

5    with any of his work?

6    A.   No.

7    Q.   Did you ever have any meetings with any of the people that

8    he was meeting with over in Zurich or other parts of Europe in

9    terms of the work he was trying to accomplish?

10   A.   No.

11   Q.   Did you ever join any conference calls with any of those

12   people?

13   A.   No.

14   Q.   Now, you were in New York City at least on one occasion,

15   correct?

16   A.   Correct.

17   Q.   And I believe Mr. Moody in his direct said something like

18   he even maybe saw you, he was there too with maybe some kids on

19   a visit to the city and they saw you when you were there?

20   A.   That's correct.

21   Q.   Now, do you remember roughly when that was?

22   A.   No, I do not.  It would be in 2000 or 2001.  I cannot

23   remember.  It was several years ago.

24   Q.   Okay.  I take it since Mr. Moody's investments were in

25   December of 2000 and March of '01, it probably would have been

1  after those investments, correct?

2  A.   Yes, correct.

3  Q.   So sometime after -- either in or after 2001?

4  A.   Yes.

5  Q.   Okay.  But when you were in New York, did you meet with

6  any of Michael's connections in New York pertaining to any of

7  the transactions?

8  A.   Yes.

9  Q.   And who was that?

10 A.   I met Robert Tringham.  I met Ronald Featherstone.  I met

11 Mitch Miller.  And I met other people.  And I think -- I may

12 get the name wrong, but I believe I met a Donello, and I can't

13 remember his last name.

14 Q.   Okay.  Now, on your direct -- I'm sorry, go ahead.

15 A.   And I met a Marie Gosse-Gardet.

16 Q.   Okay.  Anybody else?

17 A.   Not that I can remember right now.

18 Q.   Okay.  Were these all in one meeting, or were they

19 multiple meetings?

20 A.   Multiple, different times.  Whether in meetings or social.

21 They weren't necessarily meetings.

22 Q.   I believe on direct with respect to Robert Tringham, I

23 think is his name, right, something like that?

24 A.   Yes.

25 Q.   With respect to him, you didn't have any real detail about

1    the type of investment Michael and Mr. Tringham were working

2    on; is that correct?

3    A.    Only I was told that they were working on a transaction,

4    on a buy/sell agreement.

5    Q.    Beyond that did you know anything else?

6    A.    No.

7    Q.    And then Mr. Featherstone, I think you described him as

8    sort of a partner, he might even have an office or title maybe

9    with one of Mr. Heshelman's companies?

10   A.    Yes.

11   Q.    But did you know anything beyond that in terms of what his

12   activities were?

13   A.    No.

14   Q.    And did you ask him about it?

15   A.    He is -- yes, I did, and all he said was he was working

16   with Michael, and there was not much detail given.

17   Q.    Okay.  Did you probe more deeply at all or try to get more

18   information?

19   A.    I tried, but I did not receive any more information.

20   Q.    Okay.  And then Mitch Miller, correct?

21   A.    Right.

22   Q.    And Mr. Miller, was it your understanding that Michael and

23   Mr. Miller, perhaps others, were working on some sort of bond

24   deals or currency deals?

25   A.    Um, yes.  I only met Mr. Miller at -- I was at dinner with

1    him a couple of times, and there was not a lot of business

2    talk.  But it was implied that he was working with Michael on a

3    couple of transactions.

4    Q.   Okay.  And in the context of those discussions, maybe with

5    Mr. Heshelman and Mr. Miller, maybe there were others, did the

6    concept of these new Kuwaiti notes or bonds or any of that come

7    up in the context of those discussions?

8    A.   I cannot remember.

9    Q.   So you don't have a real good level of understanding in

10   terms of what specifically Mr. Miller was working on either?

11   A.   No.

12   Q.   Just generally that there were some efforts being made?

13   A.   Yes.

14   Q.   And these meetings that you would have participated in,

15   we're talking sort of in the '01/'02/'03 time frame, or when do

16   you think?

17   A.   I believe that would be the correct time frame.

18   Q.   Okay.  And from your impressions of what you saw --

19   because on direct you sort of suggested that, you know, maybe

20   with the benefit of 20/20 hindsight you don't think any genuine

21   efforts are being made, but when you're seeing these meetings

22   taking place, at the time did you believe there were genuine

23   efforts being made to try to get investments in place?

24   A.   I believe at the time there was -- they were talking about

25   genuine investments, but I did not believe they could succeed

1    at those particular investments.

2    Q.    And is that because they really didn't have the skills and

3    abilities to pull it off?

4    A.    I don't know that.  I thought the numbers were too high to

5    receive.  And, you know, I did not believe there was the

6    possibility of getting that kind of a yield from a bank from

7    bond transactions.

8    Q.    Okay.  So you questioned the marketability to generate the

9    kind of yield they were talking about?

10   A.    Yes.

11   Q.    Now, have you done any independent investigation, or in

12   your experience in financial matters, were the types of yields

13   that they were shooting for, do those exist in the world in

14   terms of people making investments?

15   A.    Not that I'm aware of.

16   Q.    Okay.  But you don't know for sure because you don't know

17   about every return of investments around the world, correct?

18   A.    Correct.

19   Q.    But your reason for questioning whether things were

20   genuine was because the yield was higher than what you thought

21   it really could be?

22   A.    That and the -- we were constantly changing different --

23   there was a constantly changing different deal.  It was never a

24   conclusion.  It was just a delay or a change.

25   Q.    Okay.  But again, you don't know about the specifics of

1   what resulted in those delays, correct?

2   A.   Correct.

3   Q.   You don't know whether or not a deal was close to being

4   consummated and then a bank had some change in paperwork that

5   created, you know -- that precluded that deal from going

6   forward?  You don't know the details?

7   A.   That's correct.

8   Q.   Now, for most of the investors that got involved, you were

9   the initial contact person, correct?

10  A.   From seeing different names today, I'm not sure, but I

11  believe I was the majority of the money.

12  Q.   Right.  Because as you said on direct, Moody was you,

13  right?

14  A.   Correct.

15  Q.   Mr. Ramsey?

16  A.   Correct.

17  Q.   Clyde, several others?

18  A.   Yes.

19  Q.   So the way it was described to those people at the outset

20  and what the investment was going to involve was

21  Bryce Sherwood's words, right?

22  A.   No, I was repeating what -- I was telling what I was told.

23  Q.   Okay.  You have a spouse, correct?

24  A.   Yes.

25  Q.   Do you always repeat exactly correct what your spouse

1   tells you?  Does she think so?

2   A.   No.

3   Q.   Okay.  So what I want to be careful of, though, is the

4   meetings that were taking place, these were between

5   Bryce Sherwood and Alan Moody, for example?  In other words,

6   Michael Heshelman wasn't there?  These initial meetings.

7   A.   These initial meetings, they were just me.

8   Q.   Correct.  So what these investors are hearing about what

9   is going to be accomplished or what the platform may look like,

10  et cetera, that's your words to them that they are hearing for

11  the first time, correct?

12  A.   Yes.

13  Q.   Now, whether or not you repeated something that Michael

14  said or you repeated it correctly or not, we don't really know,

15  do we?

16  A.   That's right.

17  Q.   And then at some point, because we heard from this -- from

18  Mr. Moody on his examination -- at some point for some of these

19  investors you sort of bowed out of the way and lost

20  communication with them, correct?

21  A.   Yes.  Correct.

22  Q.   And for Mr. Moody, I think as he described it, that might

23  have happened pretty close in time to when you were being

24  evicted from your house and he was taking it over?

25  A.   Yes.

1   Q.   There was some tension created then?

2   A.   Yes.

3   Q.   And so from that point forward, you don't really know --

4   and that was maybe in the '04-'05 time frame -- you don't

5   really know what communications were going on between

6   Mr. Heshelman and Mr. Moody because you were out of the

7   picture?

8   A.   Correct.

9   Q.   But as far as you're aware, did Mr. Heshelman keep in

10  contact with these investors?

11  A.   As far as I'm aware.

12  Q.   Did you ever hear anything to the contrary?

13  A.   Yes, at times I would hear that he was hard to reach, and

14  people would call me and see if I had heard anything from him.

15  Q.   Okay.  But even though he was hard to reach -- I mean, he

16  was over in Switzerland, right?

17  A.   Right.

18  Q.   So that's a difference of a time zone of what, seven,

19  eight, nine hours or something like that, right?

20  A.   Five or six.

21  Q.   Five or six.  Okay.  So he's not right down the street.

22  But even though it may have been difficult and you couldn't get

23  him on that very same day, did he remain in contact as far as

24  you're aware with these investors?

25  A.   When --

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1          MR. MEKARU:  Your Honor, I guess can we get a little

2    foundation as to how this witness might know that?  This is for

3    relevancy.

4          All we have was the transition from this witness

5    stopped talking to Pastor Moody and then some question that,

6    Well, Mr. Heshelman continued to speak with him, and there's no

7    foundation about how he would know that and no foundation how

8    he would know he was communicating with other investors.  So if

9    we could just explore that, please.

10         THE COURT:  I think that's fair comment, Mr. Tracy.

11         MR. TRACY:  Okay.

12   Q.   (BY MR. TRACY)  Now, you had indicated that there were

13   times that people, maybe for example Mr. Moody, had indicated

14   it was difficult to get ahold of Mr. Heshelman and they may

15   contact you; is that correct?

16   A.   Yes.

17   Q.   Okay.  And other than Mr. Moody, did any other investor

18   raise that issue with you?

19   A.   Yes.

20   Q.   For example, was Mr. Ramsey doing that?

21   A.   Mr. Ramsey would call and say he'd been trying for days or

22   weeks to reach Michael.

23   Q.   Okay.  Ultimately did you hear back from Mr. Ramsey that

24   he was successful in speaking with Mr. Heshelman?

25   A.   Yes, he would call me afterwards and said that he had

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1   spoken to him.

2   Q.   So was there ever a time, whether it was Mr. Moody,

3   Mr. Ramsey, or anybody that called you and said, You know, I'm

4   giving up, I haven't heard from him for months, and the

5   communications are dead?  Did you ever have that kind of

6   contact with anybody?

7         MR. MEKARU:  Excuse me, Your Honor, to the extent

8   that he's getting this information from these other witnesses,

9   Mr. Ramsey, Pastor Moody, the fact that there's some sort of

10  communication itself is hearsay.  And Pastor Moody was

11  available to answer those questions directly rather than

12  getting -- eliciting this testimony from Mr. Sherwood.

13        THE COURT:  I think we take your point, Mr. Tracy,

14  and I do think there's really a lack of materiality here.  I

15  mean, it's -- your point is taken.  I think the jury gets it.

16  I think I get it too.

17        MR. TRACY:  Okay.  If we have that in there, then

18  we'll move on.

19  Q.   (BY MR. TRACY)  Now, Dan asked you some questions about --

20  on your direct -- on his direct about your financial background

21  and the fact that roughly in '99 or 2000 that you were not a

22  financial advisor.  Do you recall that?

23  A.   Yes.

24  Q.   Is that accurate, you were not a financial advisor?

25  A.   I was not registered.

1    Q.    But at one point you were?

2    A.    Yes.

3    Q.    In fact, what kind of securities registered license did

4    you have?

5    A.    I had a Series 7 license.

6    Q.    And could you just explain to the jury briefly, what does

7    that mean?

8    A.    I was a registered stockbroker.

9    Q.    You turned away --

10   A.    I was a registered stock broker.

11   Q.    Okay.  And what did that mean you could do?

12   A.    I could buy and sell securities for clients:  Stocks,

13   bonds, mutual funds.

14   Q.    And you did that for a period of years?

15   A.    Yes.

16   Q.    Did you do that on your own, or did you work for

17   companies?

18   A.    I worked for a company.

19   Q.    And what was the company?

20   A.    I worked for A.G. Edwards and McDonnell Investment.

21   Q.    Okay.  And how many years did you do that for?

22   A.    Two or three.

23   Q.    And in what time frame, approximately?

24   A.    '96 to '99.

25   Q.    Okay.  So just a little before the time period that these

1   investments took place?

2   A.   Yes, sir.

3   Q.   So I take it to get your Series 7, you had to go through

4   certain testing and requirements, correct?

5   A.   Correct.

6   Q.   So you understood what that was all about?

7   A.   Yes.

8   Q.   Could you still function in some -- in providing financial

9   advice, even though you couldn't do it as a registered advisor,

10   could you do that?  Or what was the situation?  When you

11   were -- '99 to 2000 after you let it lapse?

12   A.   Um, I'm not quite sure what you mean.  Could I give you

13   advice?  I could say yes I could tell people.

14   Q.   Right, but you couldn't do it in the context of actually

15   trading --

16   A.   Correct.

17   Q.   -- stocks and so forth?

18   A.   That's right.

19   Q.   Okay.  Were you doing that at the time, '99/2000, once you

20   let your license lapse?  Or what were you doing for employment?

21   A.   I was finding customers, clients for Michael.  I had been

22   trying to just -- basically trying to find -- raise capital.

23   Q.   And were you doing other things besides that in terms of

24   working with Mr. Heshelman?  Were you a farmer, or were you --

25   were you doing anything else for employment?

1    A.    No.

2    Q.    Did you go back to get a different job at some point in

3    time?

4    A.    I've tried continually.

5    Q.    Okay.  Do you have employment currently --

6    A.    Yes.

7    Q.    -- or recently with Barrington Capital?

8    A.    It's not employment.  I'm doing a -- I work with them in a

9    commodities business, and I also am working on a -- with a

10   company that is going to do stock promotions for small

11   companies.

12   Q.    And Barrington Capital, they are out of New York?

13   A.    Out of Florida.

14   Q.    Oh, they are out of Florida.  I'm sorry.

15   A.    Yes.

16   Q.    Okay.  And you live down in Florida now, correct?

17   A.    Yes, sir.

18   Q.    And what's this other company besides Barrington Capital

19   that you're working with?

20   A.    It's a company that we're finding customers that we'll do

21   stock promotion with to tell their stories, to promote the

22   stock.

23   Q.    Okay.  Do you remember the name of that company?

24   A.    Yes.  Heitzman Holding Company.

25   Q.    Where are they out of?

1   A.   Florida.

2   Q.   So is it fair to say for some period of the last 15 or 20

3   years, maybe longer, feel free to correct me, in some capacity

4   you've been involved with the financial arena?

5   A.   Yeah, for 10 years.

6   Q.   For 10 years?

7   A.   Yes.

8   Q.   Isn't it a little longer than that since you had your

9   Series 7 license going back to '96?

10  A.   Yeah, I guess so.  I . . .

11  Q.   Okay.  And as far as you're aware, Mr. Heshelman never had

12  a securities license, correct?

13  A.   Correct.

14  Q.   And you were -- were you the only person involved with

15  this investments that had that training and that registration

16  at some point as far as you're aware?

17  A.   I don't know.

18  Q.   You don't know whether Mr. Mickelson ever did or anybody

19  else?

20  A.   I'm not aware.

21  Q.   Okay.

22  A.   Mr. Tringham said that he had worked for Barclays Bank for

23  several years.

24  Q.   Mr. Tringham?

25  A.   Tringham.  Said he was a -- and I believe it was

1   Barclays Bank that he had worked for.

2   Q.   Okay.  Did you believe him when he said that?

3   A.   I had no reason not to believe him.

4   Q.   Okay.  Now, let's talk a little bit about the claims or

5   lawsuits, that kind of thing, that may or may not have arisen

6   out of the investments that were here.

7        Now, we heard that there was at least a foreclosure-type

8   proceeding involving your home, correct?

9   A.   Correct.

10  Q.   And that was between you and your wife and Mr. Moody?

11  A.   Correct.

12  Q.   And ultimately he obtained your home, but by that point in

13  time you had already put another mortgage on it, correct?

14  A.   Correct.

15  Q.   Other than that, did anybody -- any of the investors you

16  brought to the table, anybody, did anybody sue you?

17  A.   Um, any other investors?  Not that I'm aware of.  I don't

18  think so.

19  Q.   Did Mr. Ramsey sue you?

20  A.   No.

21  Q.   Mr. Clyde?

22  A.   No.

23  Q.   Mr. Oliver?

24  A.   I --

25  Q.   I don't think you know Mr. Oliver maybe.  But as far as

1    you're aware, nobody has brought a lawsuit against you?

2    A.   Correct.

3    Q.   Are you aware of any lawsuits being brought against

4    Mr. Warner?

5    A.   No.  I have had no contact with him.

6    Q.   Okay.  Are you aware of whether any civil lawsuits or

7    claims have been brought against Mr. Heshelman?

8    A.   I have no idea.

9    Q.   How about against Mr. Mickelson?

10   A.   I have no idea.

11   Q.   Now, I believe during direct -- feel free to correct me if

12   I get this wrong -- your recollection was you were not sure

13   whether Mr. Moody had ever actually asked for his money back;

14   is that correct?

15   A.   I think that's correct.

16   Q.   Okay.  And I take it that means you never received any --

17   "you" meaning you personally -- ever received any written

18   requests for the money back from Mr. Moody?

19   A.   Not that I can recollect.

20   Q.   And do you recall ever seeing a written request for his

21   money back, meaning Mr. Moody, that was made to Mr. Warner?

22   A.   I have no way of knowing that.

23   Q.   Okay.  And do you recall whether you ever saw any written

24   request made by Mr. Moody for his money back made to

25   Mr. Heshelman or Investors First the company?

1    A.   I have no idea.

2    Q.   You don't know one way or the other?

3    A.   That's correct.

4    Q.   Now, do you recall in the joint venture-type agreements,

5    these promissory notes, do you recall that the investors signed

6    those?

7    A.   Yes.

8    Q.   Okay.  And do you recall in there that there was a

9    procedure, cease and desist letter, demand letter, this type of

10   thing that they could request their money back?

11   A.   Yes.

12   Q.   And again, you don't recall seeing Mr. Moody or any

13   investor that type of cease and desist letter ever coming in?

14   A.   I didn't ever see any.  Mr. Ramsey told me he had sent

15   one.

16   Q.   But you never saw a copy?

17   A.   I never saw a copy.  Um . . .

18   Q.   Go ahead.

19   A.   I've seen one, I think -- I think I've seen one since

20   then.

21   Q.   Okay.

22   A.   But I can't remember.  We went through all these

23   documents, and I'm not sure if there was -- but Mr. Ramsey had

24   told me he had sent a cease and desist and asked for his money

25   back.  But I have not seen that document.

1   *Q.*   Okay.  Now, you're aware that some of the investors did

2   get their money back.  Are you aware of that now?

3   *A.*   Um, just what I saw in the paperwork on the bank

4   statements.

5   *Q.*   Okay.  Let's look at one.

6       Kathy, if you can bring up 12 -- Government Exhibit 12B,

7   please.

8       This is the first page.  I think we're going to end up

9   looking at three of them.

10      Now, again, your best recollection was you were not

11  involved with the Tim Oliver Prism deal, at least directly,

12  correct?

13  *A.*   Correct.

14  *Q.*   But if we go to page 3, please, do you see the deposit

15  amount?

16          *MR. MEKARU:*  Your Honor, then I'm going to object.

17  If this witness has no knowledge regarding anything that has to

18  do with Mr. Oliver or Prism Mortgage, then why are we asking

19  him about that activity?

20          *MR. TRACY:*  He says he wasn't involved with the deal.

21  I'm asking whether he knew or not whether the return came or

22  not.  It's going to be a very easy question for him to answer

23  he does or he doesn't.

24          *THE COURT:*  Well, I'm sure -- he just said he doesn't

25  know anything about it, so how can he answer that question in

1    the affirmative?

2          *MR. TRACY:*  He could have not been involved with

3    making the Oliver deal and still know whether or not money went

4    back to him.  It's -- the follow-up question is --

5          *THE COURT:*  Do you know anything about the Oliver

6    deal, Mr. Sherwood?

7          *THE WITNESS:*  No, ma'am.

8          *THE COURT:*  Thank you.  Please move on.

9    *Q.*  *(BY MR. TRACY)*  Now, if you could look at what has been

10   marked as Proposed Exhibit V.  There's a binder.  See the black

11   binder that's next to you?  It's the defendant's exhibits.

12         You do know something about the Paul Ramsey deal, correct?

13   *A.*   Yes.

14   *Q.*   And that's -- this is a joint venture trust agreement

15   between Investors First and Paul Ramsey, correct?

16   *A.*   Which one are we on?

17   *Q.*   "V" as in Victor.

18   *A.*   "V"?

19   *Q.*   Are you there, sir?

20   *A.*   Yes.

21   *Q.*   So again, this is a joint venture trust agreement between

22   Paul Ramsey and Investors First, correct?

23   *A.*   Correct.

24   *Q.*   And this is the type of agreement that you've said you've

25   seen previously involving the investments, correct?

1   A.   Correct.

2   Q.   And in this one it appears that Mr. Ramsey invested a

3   little over a million dollars, correct?

4   A.   Correct.

5   Q.   And as part of this there's an agreement that dollars can

6   be used for expenses, correct?

7   A.   Correct.

8            MR. MEKARU:  Your Honor, is this exhibit in evidence?

9            THE COURT:  Not yet.

10           MR. MEKARU:  So in terms of questioning about the

11  substance of this exhibit, we're talking about -- asking

12  questions about an exhibit that's not in evidence.

13           THE COURT:  Are you offering this exhibit, Mr. Tracy?

14           MR. TRACY:  Sure, I can offer it.

15           MR. MEKARU:  Then I'm also going to object.  I don't

16  see any indication here that this witness participated in this

17  agreement.

18           MR. TRACY:  It's fine.  Mr. Ramsey is going to take

19  the stand, and the agreement is going to come in at that point.

20  But if we want to quarrel about it, I can go in a different

21  direction.

22           MR. MEKARU:  Well, Mr. Ramsey, I think, can testify

23  about it.  It sounds like we're asking a witness who doesn't

24  have knowledge about the document.

25           THE COURT:  Did you have anything to do with the

1   execution of this agreement, Mr. Sherwood?

2           THE WITNESS:  No.

3           THE COURT:  Have you ever seen it before this

4   litigation occurred?

5           THE WITNESS:  Yes, ma'am.

6           THE COURT:  You did?

7           THE WITNESS:  Yes.

8           THE COURT:  When did you see it?

9           THE WITNESS:  I saw it when it was sent to

10  Mr. Ramsey.  I saw it -- I saw a copy of what was going to be

11  sent to him.

12          THE COURT:  So you were aware of it?

13          THE WITNESS:  Yes, ma'am.

14          MR. MEKARU:  Okay.

15          THE COURT:  It's admitted.

16  Q.   (BY MR. TRACY)  So if we could publish Exhibit V,

17  Defendant's Exhibit V, Your Honor.

18       Kathy, if you could, now it's been faxed maybe once or

19  twice, the part about step 1.  There appears to be a step 1 or

20  2 or whatever.  In the middle of the page, please.

21       So it's a little hard to read, but it says there's a

22  million -- 1,080,000, right?

23  A.   Yes.

24  Q.   And it's talking about it going in, and then it goes on to

25  say $280,000 is released to the trust for expenses of

1   insurance, attorneys, travel, and the procurement of a bank

2   instrument acceptable to all parties.

3        Am I reading that correctly?

4   A.   Yes.

5   Q.   Okay.  You saw that prior to it going to Mr. Ramsey

6   because you saw a copy of it, correct?

7   A.   Correct.

8   Q.   And I take it -- did Mr. Ramsey ever object to that to

9   you?

10  A.   No, he did not.

11  Q.   And this expense-type thing, based on your recollection of

12  other similar agreements, was that in other agreements as well?

13  A.   Yes.

14  Q.   So $280,000 out of this portion of the investment for

15  Mr. Ramsey could be used for all of those things --

16  A.   Yes.

17  Q.   -- correct?

18  A.   Yes.

19  Q.   And as far as you're aware, were some of those monies used

20  for insurance or Mr. Warner's attorney's fees?  Do you know one

21  way or the other?

22  A.   No, I do not.

23  Q.   Okay.  I take it Mr. Heshelman did travel, because he went

24  over to Switzerland.

25  A.   Yes.

1    Q.    And you know he also traveled to New York?

2    A.    Yes.

3    Q.    Okay.  Now, Mr. Moody's recollection based on his

4    testimony was he never heard anything about expenses.

5         Does your recollection -- is it the same as Mr. Moody's or

6    different?

7    A.    I have no idea.  I believe we started with the same

8    documents.  I'm not -- I can't recall at the time.  It's been a

9    long time.

10   Q.    Independent of the documents, did you ever have any

11   discussion with Mr. Moody about whether expenses would have to

12   be taken out of the investment?

13   A.    No.

14   Q.    You don't recall having such a discussion?

15   A.    I do not recall the discussion.

16   Q.    Do you recall him ever asking about it?

17   A.    Yes.

18   Q.    And what did you tell him?

19   A.    It was on -- I don't know if it was -- it was not on the

20   first deposit he made but on the second.

21   Q.    Okay.  So his first deposit was of a million dollars in

22   December of 2000, correct?

23   A.    Correct.

24   Q.    And the second one was a million and a half in March of

25   2001?

1   A.   Correct.

2   Q.   You're saying what, in advance of the second one there was

3   some questions about expenses?

4   A.   He had asked if there would be -- what would be taken out

5   of that million and a half dollars.

6   Q.   And he asked that of whom?  You?

7   A.   Of me.

8   Q.   Anybody else present when it was asked?

9   A.   I can't -- I do not know if anyone else was present.  I

10  think we were alone.

11  Q.   Okay.  So this meeting took place sometime January,

12  February, or early March of 2001?

13  A.   Yes.

14  Q.   Okay.  And as far as you recall, was it a meeting in

15  person?

16  A.   Yes, we were together.

17  Q.   Okay.  And what is your recollection in terms of what you

18  told him?

19  A.   I told him that the money would be held for only one

20  purpose and that it would not be used for anything else.

21  Q.   So you told -- your statement to him was that it would not

22  be used for expenses?

23  A.   Correct.

24  Q.   So you lied to him?

25  A.   Yes, sir.

*Q.* And you knew based on other people's agreements that monies could be used for expenses?
*A.* Yes.
*Q.* Now, in the same binder -- if you still have the black one in front of you, correct?
*A.* Yes.
*Q.* Exhibit B, Proposed Exhibit B --
*THE COURT:* "B" as in boy?
*MR. TRACY:* Yes, Your Honor, thank you, "B" as in boy.
*Q.* *(BY MR. TRACY)* Have you ever seen this article before that is called, "An Introduction to Bank Debenture Trading Programs"? And just so you know, behind B is Exhibit B1 which is just a larger-print version of the same article.
*A.* Thank you. Thank you.
*Q.* But if you would have seen it, it would probably be in the form of the first Exhibit B.
*A.* I -- I don't think I've seen this before.
*Q.* Okay. Just to test your recollection a little bit on it, this may have something to do with some documents that Mr. Clyde or Mr. Jepson gathered about the time that Mr. Clyde was making his investment.
Does that refresh your recollection at all?
*A.* Um, no, I -- I had done some research and was trying to find information, but I can't remember if I saw this document

1    or not.

2    Q.   Okay.

3    A.   I'd have to look at it in more detail.

4    Q.   Okay.  We'll leave it at that for now.  Thank you.

5         Now, all of the investments that were made by the various

6    people, was Mr. Moody's amongst the last ones?

7    A.   Yes.  Yes.

8    Q.   March of 2001?

9    A.   Yes.

10   Q.   So no money -- new money came in after that; is that

11   correct?

12   A.   That's what I can recollect.

13   Q.   Okay.

14   A.   I did not have any other contracts that I'm aware of.

15   Q.   And after that fact, you never tried to go back and get

16   new money from Mr. Moody?

17   A.   After -- after the million and a half?

18   Q.   After the million and a half.

19   A.   No, I did not.

20   Q.   You didn't go back to Mr. Ramsey for new money?

21   A.   No.

22   Q.   You didn't go back to Mr. Clyde for new money?

23   A.   No.

24   Q.   And as far as you're aware, did Mr. Heshelman ever do

25   that?

1   A.   I would have no way of knowing that.

2   Q.   Okay.  But to your recollection, do you recall from

3   talking to these people, did any of them put new money in after

4   roughly March of 2001?

5   A.   No.

6   Q.   Now, on your direct we heard about some other deals that

7   didn't go so well for you that had, as I understood it, nothing

8   to do with Mr. Heshelman.

9   A.   Correct.

10  Q.   For example, this Chuck Bunting deal Mr. Heshelman knew

11  nothing about, correct?

12  A.   Correct.

13  Q.   That took place, what, in the '06-'07 time frame?

14  A.   Yes.

15  Q.   And one of the deals with Mr. Bunting, what was it for,

16  $40,000 or something?

17  A.   Yes.

18  Q.   Did Rameel Robinson get involved in that somehow, or did

19  you use his name?

20  A.   Yes.

21  Q.   That's a former 1989 University of Michigan basketball

22  player when they won the championship, right?

23  A.   Right.

24  Q.   Do you even know Rameel Robinson?

25  A.   No.

1   Q.   So you told Mr. Bunting that, what, Mr. Robinson was short

2   on some cash for a deal down in Florida?

3   A.   Yes.

4   Q.   And you got that 40 grand from him?

5   A.   Yes.

6   Q.   I take it none of it has been paid back?

7   A.   A small amount had been paid back.  Not much.

8   Q.   You paid him like a thousand dollars last week?

9   A.   Yes.

10  Q.   And then you also got Mr. Bunting or his partners involved

11  with another $150,000 deal?

12  A.   I didn't know it was that much.

13  Q.   Okay.  How much did you think it was?

14  A.   I had thought it was between 75 and a hundred thousand

15  dollars.

16  Q.   Okay.  But that one has also gone by the wayside?

17  A.   I don't know.  I believe so.

18  Q.   Okay.  And then this Denise Du Val.  I believe it's D-U

19  space capital V as in Victor A-L; is that right?

20  A.   That's right.

21  Q.   She was somebody else?  She had something to do with

22  HumaniGroup International?

23  A.   Yes.

24  Q.   So that's H-U-M-A-N-I and then G-R-O-U-P, all one word,

25  HumaniGroup International?

1    A.    Yes.

2    Q.    And this goes back to what, the '05-'06 time frame as

3    well?

4    A.    Yes.

5    Q.    Okay.  So Exhibit H, Proposed Exhibit H, for example, if

6    you can turn to that in your black binder.  And there's sort of

7    a group of pages here.  The first page of Proposed Exhibit H,

8    is that some emails --

9    A.    Uh-huh.

10   Q.    -- back and forth between you and Denise?

11   A.    Yes.

12   Q.    And you were giving her what, some update about the

13   investment, and she's inquiring about it?

14   A.    Yes.

15   Q.    Okay.  And these emails are from January 25 of '06,

16   correct?

17   A.    Yes.

18   Q.    And then the second page, this is a letter sent by

19   certified mail on the HumaniGroup stationary; is that correct?

20   A.    Yes.

21   Q.    And this one is dated January 31 of '06?

22   A.    Yes.

23   Q.    And it's from Denise to you?

24   A.    Yes.

25   Q.    And again, this pertains to her requesting monies back?

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1   A.   Yes.

2   Q.   And the third page of the letter, this one is from a

3   Caesar Gaton, G-A-T-O-N?

4   A.   Yes.

5   Q.   Did you know who that was?

6   A.   That was an associate of Denise Du Val's.

7   Q.   So he was involved with the investment as well?

8   A.   Yes.

9   Q.   And he's authorizing Denise to do what she needs to do to

10  intervene on behalf of getting the money back?

11  A.   Yes.

12  Q.   Now, in here it seems like -- on direct you said something

13  about the investment being 12,000 or something.  Here it's

14  talking about 25,000.  What's your recollection on that?

15  A.   There was -- Mr. Gaton had put in $25,000, I believe.

16  Q.   So the total investment was actually --

17  A.   Thirty-seven, yeah.

18  Q.   So 12,000 pertaining to Denise Du Val and the

19  HumaniGroup --

20  A.   Yes.

21  Q.   -- and then an additional 25,000 from Mr. Gaton?

22  A.   Yes.

23  Q.   And none of that got paid back?

24  A.   Correct.

25  Q.   And then the final page of Proposed Exhibit H, another set

1    of emails between you and Miss Du Val, correct?

2    A.    Correct.

3    Q.    And these are in the July 2006 time period?

4    A.    Yes.

5    Q.    And you've seen all these documents before?

6    A.    Yes.

7          MR. TRACY:  Your Honor, I would move for the

8    admission of Defense Exhibit H.

9          THE COURT:  Mr. Mekaru.

10         MR. MEKARU:  No objection.

11         THE COURT:  It's admitted.

12   Q.    (BY MR. TRACY)  Now, I don't think we got quite sufficient

13   details, at least for me, as it pertains to Mr. Fodor.  Is it

14   F-O-D-O-R?

15   A.    Yes.

16   Q.    Peter is his first name?

17   A.    Yes.

18   Q.    Now, I heard you describe it on direct.  In addition to

19   maybe making some investment either directly or indirectly into

20   the investments with Mr. Heshelman, he also invested a separate

21   million dollars with you?

22   A.    Yes.

23   Q.    What was that for?  What was he investing in?

24   A.    We were -- I had told him the same story I told Michael, I

25   mean, that we had used, and I was using that story to raise

1    capital myself.

2    Q.    Okay.  But did you -- were you over in Switzerland and

3    doing any of that?

4    A.    No.

5    Q.    Okay.  So instead of bringing an additional million

6    dollars -- I take it Investors First would have been happy with

7    another million dollars to use, right?

8    A.    Right.

9    Q.    So is this like the old expression, "There's no honor

10   among thieves" or something?  Or what's the point?  Why weren't

11   you putting it -- if you're feeling like you're scamming

12   somebody, why aren't you putting the million dollars into

13   Investors First if you thought that was just all a scam anyway?

14   A.    I didn't do it.  I didn't want to.

15   Q.    So you were keeping it for yourself?

16   A.    Yes.

17   Q.    Okay.  But in reality Mr. Heshelman was in New York City

18   in meetings and so forth with Mitch Miller and others, correct?

19   A.    Yes.

20   Q.    And he was living and had a business over in Switzerland,

21   in Zurich, correct?

22   A.    Yes.

23   Q.    You didn't have any of those things?

24   A.    Correct.

25   Q.    Now, what happened to Mr. Fodor's million dollars that he

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1   invested with you?

2   A.   Well, the money came from -- I did not meet Mr. Fodor

3   until seven years later.

4   Q.   Okay.

5   A.   But it came through Larry Telford, and I used the funds to

6   buy a house.

7   Q.   That's the money you used to buy the house?

8   A.   Yes.

9   Q.   Did you ever pay Mr. Fodor back any of his money?

10  A.   No.

11  Q.   You gave him promissory notes and the like?

12  A.   Yes.

13  Q.   But those ended up being worth nothing?

14  A.   Correct.

15  Q.   Do you know whether Mr. Fodor got any of his investment

16  back that he invested with Mr. Heshelman?

17  A.   I do not know.

18  Q.   Now, if we could bring up Government Exhibit 6C, Kathy.

19  Kind of like we did this morning with Mr. Vos.  And if you can

20  catch like the last four or five lines there.  That's okay.

21  That's fine.  We can stay there for a second.

22       This is the first thing of 6C, and Mr. Vos is the FBI --

23  just so you understand the context, Mr. Sherwood -- he

24  testified this morning that he created spreadsheets or summary

25  charts off of Mr. Warner's -- amongst other things --

 1    Mr. Warner's trust account so he could know where monies were

 2    flowing, okay?  So that's what we're going to be looking at.

 3         So if we go to the second page, and you see how the name

 4    Kennedy Funding, Inc. is highlighted there?

 5    A.   Yes.

 6    Q.   And there's a wire from Mr. Warner's trust account in

 7    October of '99 for $250,000 to Kennedy Funding.  Do you see

 8    that?

 9    A.   Yes.

10    Q.   Do you know what Kennedy Funding is?

11    A.   I know what they are, yes.

12    Q.   What are they?

13    A.   They are a mortgage company, a funding company.

14    Q.   Okay.  And they are out of New Jersey?

15    A.   I believe so.

16    Q.   Okay.  If you look at Proposed Defendant's Exhibit U,

17    which are some excerpts from Kennedy Funding's website.  Have

18    you ever gone to their website before?

19    A.   Yes.

20    Q.   Okay.  It's something you've looked at?

21    A.   Yes.

22    Q.   Does the -- there's three pages here.  There's the home

23    page, and then there's an overview of the company is page 2,

24    and then there's our story on page 3.

25         Have you looked at this stuff before?

1    A.   Yes.

2    Q.   The background of Kennedy Funding?

3    A.   Yes, I've seen this.

4    Q.   Okay.  Does this purport to be essentially in the same

5    format or basic form that you see on their website?

6    A.   I believe so.

7         MR. TRACY:  Okay.  Your Honor, I move for the

8    admission of Defense Exhibit U.

9         THE COURT:  Mr. Mekaru.

10        MR. MEKARU:  I guess my problem is, again, it's just

11   a foundation here.  I'll tell you what, that's fine, let's just

12   move for the admission.  We'll talk about this twice.  That's

13   fine.  No objection.

14        THE COURT:  I have some real serious questions about

15   this exhibit, Mr. Tracy.  I really, on a number of levels, I

16   really don't see the foundation, the necessary foundation.  So

17   even though the government seems not to have an objection, I

18   just have some serious questions about your foundation on this.

19        I mean, you can take all kinds of things off the

20   Internet.  We've talked to the jury about not doing this exact

21   kind of thing.

22        MR. TRACY:  But they are not doing it, Your Honor.

23   We have done it with the witness who has looked at it himself.

24   I can ask him questions independently, but I've moved for the

25   admission, and there's no objection, so if the Court is not

1   going to let it in, then I'll move on.

2           THE COURT:   That's the ruling.   It's not in.

3   Q.   (BY MR. TRACY)   Okay.   Are you aware that Kennedy Funding

4   was founded back in the 1980s?

5   A.   I have no idea when they were founded.

6   Q.   Okay.   But you've heard of them in your --

7   A.   Yes.

8   Q.   -- in your circles in terms of what you've done in the

9   financial arena?

10  A.   Yes.

11  Q.   This $250,000 that was wired through Mr. Warner's account

12  to Kennedy Funding, were you involved with that?

13  A.   I don't think so.

14  Q.   Okay.   Do you know what the purpose was for sending them

15  the money related to any investment or anything?

16  A.   No.

17  Q.   Okay.   Did you ever happen to hear anything after that

18  investment was made pertaining to any status of anything with

19  Kennedy Funding?

20  A.   Not that I can recollect.

21  Q.   Okay.   If we could go to the next page, please.

22          Now, in the middle of the page there you see highlighted

23  in December, later December -- well, the day before Christmas

24  in '99, a $150,000 wire transfer over to Merrill Lynch.

25          You know who Merrill Lynch is?

1   A.    Yes.

2   Q.    Do you know whether or not there was any investment

3   platforms, trading-type things going on with Merrill Lynch?

4   A.    No.

5   Q.    You don't know one way or the other.

6         Okay.  Okay.  If we could go to page 5 of 9.  And first,

7   Kathy, if we could start at the top of the page, that first

8   four or five of them, please.

9         So you'll see again on June 23 a wire going of 35,000 over

10  to Merrill Lynch, correct?

11  A.    Yes.

12  Q.    And then below that you see $500,000 going to

13  Environmental Training Institute.  Do you see that?

14  A.    Yes.

15  Q.    Do you know anything about any investments being made for

16  a trading platform, that type of thing, through Environmental

17  Training Institute?

18  A.    No.

19  Q.    And then if we go -- span out again, we go to the bottom

20  of the page, this October 2000 million-dollar investment going

21  to Puffin Investment Company.  Do you see that?

22  A.    Yes.

23  Q.    And were you aware that a gentleman by the name of

24  Alan Shepherd was associated with Puffin Investment?

25  A.    I know that now.

1  Q.   And how do you know that now?

2  A.   I was asked that question two or -- two or three weeks

3  ago.

4  Q.   In preparation for this?

5  A.   Yeah.  When I was going through my plea agreement.

6  Q.   Okay.  And you know that now, but you didn't know it back

7  in the 2000 time period?

8  A.   No.

9  Q.   So you don't know whether or not the million dollars being

10  sent to Puffin had something to do again with an investment

11  platform, trading platform-type thing?

12  A.   No, I don't.

13  Q.   Could you look at Proposed Defendant Exhibit R that's in

14  the black binder in front of you, please.

15  A.   Yes, I have it.

16  Q.   Okay.  Mr. Moody previously testified that Charles Pinney

17  approached him, and Charles Pinney indicated that he would pay

18  Mr. Moody $18,000 if Mr. Moody would get the government to back

19  away from its investigation of you.

20       Were you aware of that?

21  A.   No.

22  Q.   Do you know who Charles Pinney is?

23  A.   Yes, I do.

24  Q.   He's a friend of yours?

25  A.   No.

1   Q.   Somebody you know how?

2   A.   We were managing a 4X trading account for him.

3   Q.   What does that mean?

4   A.   I was trading currency for Mr. Pinney.

5   Q.   When?

6   A.   2003 or '4.

7   Q.   Okay.  So after the investments were made by Mr. Moody but

8   still during the period of time that you were speaking with

9   him?

10  A.   Yes.

11  Q.   Okay.  And did you ever see a copy of this Defendant's

12  Exhibit R before?

13  A.   No, I did not.

14  Q.   You've never seen it?

15  A.   No, sir.

16  Q.   You're referred to in it, correct?

17  A.   Yes.

18  Q.   Okay.  But nothing that ever crossed your desk?

19  A.   That's correct.

20  Q.   Okay.  Do you know whether Mr. Mickelson also knew

21  Charles Pinney?

22  A.   Yes, he did.

23  Q.   And how did he know him?

24  A.   I don't know how he knew him.  He introduced me to him.

25  Q.   Okay.  As far as you are aware, did Mr. Heshelman ever

1    know Mr. Pinney?

2    A.   I think -- yes, I think they spoke after the fact, after

3    this happened, after . . .

4    Q.   But you don't know for sure one way or the other?

5    A.   Yeah, I know that Michael knows him.  I know

6    Michael Heshelman knows him.

7    Q.   Okay.  But the two of them, Mr. Pinney and Mr. Heshelman,

8    weren't involved --

9    A.   That's correct.

10   Q.   -- the way you and Mr. Pinney were?

11   A.   That's correct.

12   Q.   Now, Government Exhibit 3 -- if we can bring that up,

13   Kathy, please.

14        We saw this -- maybe it will be okay on the screen,

15   Mr. Sherwood.  We saw this during your direct, correct?

16   A.   Yes.

17   Q.   Now, you described it as an email, I believe, right?

18   A.   Um, it was an email or an attachment to an email.

19   Q.   Because there's no email addresses here, but this could

20   have been an attachment to an email?

21   A.   That's correct.

22   Q.   But this is between you and Mr. Warner.  That's the "Ken"

23   in here, right?

24   A.   That's correct.

25   Q.   And there's no indication on this that there was any copy

1    that was sent to Mr. Heshelman, correct?

2    A.    Um . . .

3    Q.    I'm just asking on this document.

4    A.    On this document, no.

5    Q.    Okay.  And these are instructions that you sent to

6    Mr. Warner regarding payments to be made, correct?

7    A.    Yes, sir.  Yes, sir.

8    Q.    Now, the account in question where these monies are coming

9    out of, that's Mr. Warner's account, correct?

10   A.    Correct.

11   Q.    It's his trust account?

12   A.    Correct.

13   Q.    It's not an escrow account, it's a trust account?

14   A.    Yes.

15   Q.    And so the only person with authority over that account is

16   Ken Warner?

17   A.    Yes.

18   Q.    Not Michael Heshelman, correct?

19   A.    I would assume that, yes.

20   Q.    Not Bryce Sherwood?

21   A.    Correct.

22   Q.    And in this attachment or email, whatever it was, there

23   are no monies going to Mr. Heshelman, correct?

24   A.    That's correct.

25   Q.    There's monies going to you and Mr. Mickelson and to

1   others, but nothing is going on to Michael, correct?

2   A.   Correct.

3   Q.   Now, if we can also bring up Government Exhibit 1, please,

4   Kathy.

5        You can -- also, I didn't -- except this one, it can be

6   closed and just bring up 1.  I'm sorry.

7        Now, this is another one of those trust agreements or

8   promissory notes somewhat similar to one we saw with Ramsey

9   earlier, correct?

10  A.   Yeah.  I'd like to see it closer, but yes.

11  Q.   Okay.  Go ahead.  Just tell me when you have the binder in

12  front of you.

13  A.   Yes.

14  Q.   This one involves Mr. Moody, though?

15  A.   Yes.

16  Q.   And if we go to, I believe it's page 3, this one is

17  signed.  I mean, have you seen Mr. Heshelman's signature

18  before?

19  A.   Yes.

20  Q.   Does that appear to be his signature?

21  A.   Yes.

22  Q.   And it looks like you witnessed it, correct?

23  A.   Yes.

24  Q.   Is that your signature?

25  A.   Yes.

1    Q.   And then it looks like Mr. Moody's signature.  Does that

2    appear to be his from seeing it before?

3    A.   Yes.

4    Q.   And here at the bottom it says -- if we can scan out on

5    the bold stuff with Ken Warner.  Thank you.

6         Kenneth Warner Attorney at Law Trust Account, correct?

7    A.   Correct.

8    Q.   It doesn't say anything about an escrow account, correct?

9    A.   Correct.

10   Q.   Now, did you tell Mr. Moody something about an escrow

11   account?

12   A.   I can't remember if it's an escrow account or trust

13   account at this time.  I think I said escrow account.

14   Q.   Okay.  But that would have been your mistake?

15   A.   Yes.

16   Q.   Because it's a trust account?

17   A.   Yes.

18   Q.   And that's not something Mr. Heshelman told you to tell

19   him, that's just a mistake you made?

20   A.   If I made that mistake.

21   Q.   Okay.  Now, just briefly on this humanitarian stuff that

22   came up on your direct, because we didn't get into the detail

23   of that very much.  I take it that doing humanitarian projects,

24   that's fine, right?  You don't have any quarrel with that?

25   A.   That's correct.

1   Q.   And if monies were returned out of the investments, was

2   the game plan that some of the monies could be returned to the

3   investors but that some monies would also be available for

4   quote-unquote humanitarian projects?

5   A.   Yes.

6   Q.   And was the strategy related to that a tax strategy?  In

7   other words, let me flesh that out so you know where I'm going.

8        If $20 million was coming back to Mr. Moody and he wanted

9   to take 10 million of it directly but then 10 million of it

10  going towards a humanitarian project, had some advice been

11  given that that might be a tax strategy to avoid income that

12  would be attributed to him?

13  A.   I don't know.

14  Q.   You didn't investigate that?

15  A.   No.  There was --

16  Q.   Go ahead.

17  A.   There was a comment made that the particular money would

18  go to charity or nonprofit organizations or humanitarian

19  projects, but I don't remember -- I did not give tax advice.

20  Q.   Okay.  Proposed Exhibit Q in the black binder,

21  Defense Exhibit Q, is this a bank statement you've seen before?

22  A.   Yes.

23  Q.   From TCF Bank?

24  A.   Yes.  Yes.

25  Q.   In Ann Arbor, correct?

1    A.   Correct.

2    Q.   This is in your name?

3    A.   Yes.

4    Q.   And also in Larry Telford's name?

5    A.   Yes.

6    Q.   And the first page appears to be a page from a

7    September 19th, 2000, statement, correct?

8    A.   Correct.

9    Q.   And the second page, is that just perhaps a continuation

10   of that?

11   A.   I would believe so.

12   Q.   And then the third page, it's got I think it's a

13   government page number at the bottom, 236.

14   A.   Yes.

15   Q.   This is a portion of the statement or maybe the whole

16   statement from October 18th of 2000, correct?

17   A.   Correct.

18   Q.   And this is again relating to an account of yours?

19   A.   Yes.

20           MR. TRACY:  Okay.  I would move for the admission

21   of Defense Exhibit 2.

22           THE COURT:  Mr. Mekaru.

23           MR. MEKARU:  Your Honor, we really haven't laid a

24   foundation for this.  The relevance of this I think is getting

25   far afield.  We've already had lots of testimony about the fact

1    that this witness took money from these individuals, even more

2    documents on it, but I think we're getting a little far afield

3    from what's at issue here.  I think he's admitted he's lied and

4    stole from other people.

5              THE COURT:  Well, in looking at these bank

6    statements, Mr. Tracy, I'm having a hard time seeing the

7    relevance to this case.

8              MR. TRACY:  Well, Larry Telford is on there,

9    Your Honor, and the government brought him up during the

10   direct, and we don't know much about him, and now he and

11   Mr. Sherwood are on an account together.  I think I'm entitled

12   to ask about him.

13             THE COURT:  Well, you can ask him about Mr. Telford.

14   I just don't see what the record has to do --

15             MR. TRACY:  That's fine.  The government has about

16   five inches of bank statements, and I'm trying to get in three

17   pages, but that's fine.  I think this is the only bank

18   statement I have, Your Honor.  And my binder is nice and small,

19   and they have two of them, but okay.

20   Q.   (BY MR. TRACY)  Why were you on a bank statement with

21   Larry Telford?

22   A.   We were trying to do some things together.

23   Q.   And what did these things involve?

24   A.   We were trying to find other investments we could make.

25   Q.   That related to what?

1    A.    That related to trying to recover and to find a way to

2    make money to recover the losses.

3    Q.    Losses related to all of this?

4    A.    To the money that they put in with -- that he put in with

5    Michael.

6    Q.    Okay.  So you were trying to find a recovery?

7    A.    Yes.

8    Q.    Just like Mr. Heshelman, as far as you were aware, was

9    trying to do same thing and get a return in his efforts in

10   New York and Switzerland, correct?  As far as you knew, that's

11   what he was trying to do?

12   A.    Yes.

13   Q.    Okay.  Now let's just end with the bus, for example.  And

14   maybe your memory is not as good as Mr. Moody's.  But I believe

15   on direct you said that the discussions related to this bus

16   occurred between Mr. Moody and Mr. Heshelman and you weren't

17   hardly involved.

18   A.    I didn't say I was not hardly involved.

19   Q.    Okay.  What's the scenario then?

20   A.    Mr. Moody came and wanted to talk about the need for a bus

21   for the church, and he wanted -- and the church -- he had a

22   very successful ministry going with the young people, and there

23   was always transportation problems.  And he thought that if he

24   could get a bus, it would be good.  So we had talked about it,

25   and I can't remember where we talked about it.  If it was on

1    the phone or in person.

2    Q.   Let me just be careful.  Now you're starting to say "we."

3    This is you and Mr. Moody talking?

4    A.   I'm sorry, myself and Mr. Moody.

5    Q.   No Mr. Heshelman?

6    A.   No Mr. Heshelman.

7    Q.   He doesn't know anything about it at this point?

8    A.   At the first point, no.

9    Q.   Okay.

10   A.   And I remember saying we needed to talk to -- myself and

11   Mr. Moody would need to talk to Michael about the bus, about

12   getting a bus.

13   Q.   Okay.  And so your recollection is it had nothing to do

14   with the bus being donated?  You don't recall the conversation

15   between you and Mr. Moody?

16   A.   No, I said that was the idea, the objective was to have a

17   bus given to the church.

18   Q.   Okay.  And did you turn him on to some buses that were

19   down in Atlanta for that effect?

20   A.   I -- we looked on the Internet.  We were searching for

21   buses.  I can't -- I can't recall if I showed him some websites

22   or gave him some websites or phone numbers.  I don't know if I

23   directly found that bus or not, but I think we found some spots

24   where buses were available.

25   Q.   And the "we" would be you and --

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1   A.    Myself and Mr. Moody.

2   Q.    Again, no Mr. Heshelman?

3   A.    No Mr. Heshelman.

4   Q.    Okay.  So at this point in time the discussions were

5   between you and Mr. Moody and that's it?

6   A.    That was -- that was the first initial discussion.

7   Q.    Okay.  And then ultimately sometime later the bus is

8   purchased?

9   A.    I want to interrupt if I could.  We had an initial

10  discussion, and then there was a discussion passed along, and

11  we talked to -- or as he talked with Mr. Heshelman, I was

12  trying to find some buses available, and I'm not sure if I was

13  the one that found this particular bus or he found it or talked

14  to somebody else or not.

15  Q.    Okay.  Do you ever recall a conversation with

16  Mr. Heshelman where you raised the issue of the bus and he

17  simply said to you, "Look, if Mr. Moody wants to use his money

18  for that, it's his money, we'll buy the bus and it will be

19  there for the church"?  Did you have that conversation with

20  Mr. Heshelman?

21  A.    No.

22  Q.    You don't ever recall that?

23  A.    I do not recall that.

24          MR. TRACY:  Nothing further, Your Honor.

25          THE COURT:  Mr. Mekaru, do you have any redirect?

1        *MR. MEKARU:*  I'll try to be quick.

2                         REDIRECT EXAMINATION

3    *BY MR. MEKARU:*

4    *Q.*   You were asked questions, let's see, whether Mr. Mickelson

5    gave you any money out of the monies he received.  So if he had

6    given you a substantial amount of money, would you have

7    remembered that?

8    *A.*   Yes.

9    *Q.*   Mr. Mickelson.  If Mr. Mickelson was giving substantial

10   portions of money, 10,000, $20,000, would you have remembered

11   something like that?

12   *A.*   Yes.

13   *Q.*   So did that ever happen?

14   *A.*   I do not believe so.

15   *Q.*   Now, counsel was asking about all of these -- about these

16   people who were talking about deals.  That Mr. Heshelman is in

17   Switzerland doing deals and talking about deals.  And he's in

18   New York City and talking about deals.  And he's introducing

19   you to people who are talking about deals.  So everything

20   you've heard about all these deals, is that all coming from the

21   oral representations of these people?

22   *A.*   Yes.

23   *Q.*   Did you see any sort of documentation to substantiate that

24   they were actually doing these deals?

25   *A.*   No.

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  *Q.*   Any sort of records?  How about monthly account

2  statements?

3  *A.*   No.

4  *Q.*   Any sort of bank statements showing that they have got

5  accounts?

6  *A.*   No, sir.

7  *Q.*   So everything you've heard about all this trading

8  activity, is it just coming from word of mouth from all these

9  people?

10        *MR. TRACY:*  Objection, Your Honor.  We went over this

11  ground in direct, and he's covered it already.

12        *THE COURT:*  I think that's correct, Mr. Mekaru.

13  *Q.*   *(BY MR. MEKARU)*  All right.  Now, at the times of these

14  meetings with these other individuals, this is on cross, you

15  said that you didn't think that these investments could

16  succeed, right?

17  *A.*   Correct.

18  *Q.*   You said you thought that the yield was too high.

19  *A.*   Correct.

20  *Q.*   That was part of it.  And also that the deal was

21  constantly changing.

22  *A.*   Correct.

23  *Q.*   In addition, did you also have some sense that the money

24  was also gone?

25  *A.*   Yes, I did.

1    Q.    So there was no money to be had for these deals?

2    A.    That is what I believed.

3    Q.    Now, counsel had brought up this point that you were a

4    Series 7 license.

5    A.    Yes.

6    Q.    That's the registered representative licensing.

7    A.    Yes, sir.

8    Q.    And there's also some tests and examinations, and there

9    are licensing for investment individuals.

10   A.    Yes.

11   Q.    Series 63 for the multistate, something along those lines.

12   And there may be some registration for certified financial

13   advisors.  There may be a whole nother area --

14   A.    I did not have that.  I did not have that license.

15   Q.    You didn't have that, right?

16   A.    No, I had a 63 and a 7.  And a 63 was a -- and I also had

17   an insurance license.

18   Q.    Okay.

19   A.    A 63 is not just multistate.  It's more of an able to sell

20   brokerage products but not individual securities.

21   Q.    So you had some background in these financial instruments?

22   A.    Yes.

23   Q.    Stocks and bonds.  In your training and going through the

24   study for this licensing, and in your experience in the

25   brokerage industry, had you ever done much of anything with

1    this -- these buy/sell agreements and the bonds that

2    Mr. Heshelman was speaking of?

3    A.    No, I did not.

4    Q.    So the information that you learned about all of this, did

5    this all come pretty much from Michael Heshelman?

6    A.    Yes.

7    Q.    Now, was he conversant, though, in some of the terminology

8    of the brokerage industry?

9    A.    Yes, very.

10   Q.    You talked about debentures, tranches.  These are all

11   terms of art for securities, right?

12   A.    Correct.

13   Q.    So did he at least have the aura of understanding some of

14   these instruments?

15   A.    Yes.

16   Q.    And did he oftentimes pass on that same sort of

17   information to potential investors?

18   A.    Yes.

19   Q.    And as far as you know he is not a registered

20   representative, he's not a certified financial advisor, he's

21   not licensed in any way.

22   A.    Yes.

23   Q.    Now, you were also asked a question on cross whether

24   Mr. -- excuse me -- whether Pastor Moody had requested any

25   money back, and you weren't actually sure.

1    He was asking about where his money is and when this deal

2 is going to be done and when he could get some money back.

3 A.   Yes.

4 Q.   But the words of "Give me my money back" may not have

5 actually been uttered?

6 A.   Correct.

7 Q.   But any time anybody was asking about getting their money,

8 what were you doing in response?

9         MR. TRACY:  Objection, Your Honor, it assumes that

10 somebody did.  There's no foundation for that.

11        THE COURT:  Well, he's already -- he's testified that

12 Mr. Moody asked for some of his money back.  When was he going

13 to get his money back.  And I think he testified that some

14 others, including Ms. Du Val -- am I correct about that?

15        MR. TRACY:  She's outside the investment, though.

16        THE COURT:  Well, I understand that, but . . .

17        MR. TRACY:  All right.

18 Q.   (BY MR. MEKARU)  So when people, Mr. Ramsey, Mr. Moody,

19 other individuals who you had communication with, when they

20 were asking about when is money going to be coming in, whether

21 it be getting their money back or when is the deal going to be

22 done, are asking about getting some sort of return of money

23 coming their direction, weren't you just delaying them and

24 trying to put them off?

25 A.   Yes.

REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    *Q.*    Every single time?

2    *A.*    Yes.

3    *Q.*    Lulled them into believing the deal is almost going to be

4    done?

5    *A.*    Yes.

6    *Q.*    To avoid that final -- any way you could to avoid that

7    final demand of "I just want to close out"?

8    *A.*    Yes.

9    *Q.*    All right.  Now, counsel has gone over a contract here

10   that I think was Defense Exhibit V where Mr. Ramsey's deal

11   included an express provision for expenses, right?

12   *A.*    Yes.

13   *Q.*    And I think counsel covered the fact that there were other

14   contracts with other investors that may have had a similar sort

15   of express provision for expenses, right?

16   *A.*    Correct.

17   *Q.*    But I think as we've gone over, the format, this -- well,

18   would you please call -- thank you.

19        We don't have V.  Well, do you have a way to put that

20   Exhibit 1 on one side and V next to it?  Or not.

21        Well, the joint venture trust agreement, that language is

22   similar between these two exhibits, right?

23   *A.*    Yes.

24   *Q.*    And in terms of some of the other language about how this

25   is in agreement with Investors -- here we go -- Investors First

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    Ventures, I think even the address is similar, right?

2    A.    Yes.

3    Q.    All right.  And is there some sort of promissory note

4    aspect to Exhibit V?  Maybe page 2, if you can go through it.

5    A.    I don't have -- on the one on the left I see the

6    promissory note.

7    Q.    Yeah.

8    A.    Yes.  I'm sorry.

9    Q.    So it's a different document, right?

10   A.    Yes.

11   Q.    It's a different type of agreement, right?

12   A.    Yes, it is.

13   Q.    You don't see anything like that, and you don't see

14   anything in Exhibit Number 1 where there's an agreement for

15   expenses?

16   A.    That's correct.

17   Q.    So the deal with Mr. Ramsey was different than the deal

18   with Pastor Moody?

19   A.    Yes.

20   Q.    And your express representation to Pastor Moody -- that's

21   with respect to the first million dollars, right?  Contract --

22   Exhibit Number 1, that promissory note, it is for the million

23   dollars, and that's with respect to the December 2000 monetary

24   transaction, right?

25   A.    I believe so.

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    Q.   All right.  And with respect to the $1.5 million

2    transaction, there was a mortgage that was put on that --

3    A.   Right.

4    Q.   -- to support that --

5    A.   Correct.

6    Q.   -- and there was an oral representation that no money

7    would come out of that for expenses?

8    A.   Correct.

9    Q.   Okay.  Just a few more points.

10        There was a comment here about "No honor among thieves."

11        You had used Mr. Heshelman's same story and pitched that

12   to I guess it was Mr. Telford, and ultimately that passed

13   through to Mr. Fodor, right?

14   A.   Yes.

15   Q.   And the suggestion, though, that since you're the one who

16   pitched it and was able to close that deal, you kept the money

17   to yourself rather than sharing it?

18   A.   Yes.

19   Q.   So as far as that portion of the deal, did you need

20   Mr. Heshelman's participation to further that deal?

21   A.   No.

22   Q.   Was there any complaint from Mr. Heshelman that you didn't

23   share any of that money with him?

24   A.   No.

25   Q.   Did you ever tell him that you got additional money from

1    him?

2    A.    No.

3    Q.    From him, "him" being Mr. --

4    A.    Telford.

5    Q.    -- Telford and Mr. Fodor.  Okay.  No, no, we'll move on.

6          All right.  Pull up Exhibit 6C, please.

7              MR. MEKARU:  Susan, can we switch over?

8    Q.   (BY MR. MEKARU)  6C.  All right.  This is where we were

9    with counsel on the summary of the -- don't worry about zooming

10   in -- of the statement.

11        Can we go to page 2.  All right.  Now we're going into the

12   actual transaction activity.

13             Now, counsel was pointing out that there was this

14   Kennedy Funding transaction.  It's towards the bottom.

15             MR. MEKARU:  If I can have my penlight.  Thank you,

16   Harper.

17   Q.   (BY MR. MEKARU)  Okay.  It's October of '99, right,

18   $250,000?  And it was also pointed out that there was this

19   Merrill Lynch in December of '99.  That might be on the next --

20             THE CLERK:  Keep your voice up.

21             MR. MEKARU:  Sorry?

22             THE CLERK:  Keep your voice up.

23   Q.   (BY MR. MEKARU)  December '99 Merrill Lynch.  Right?

24   $150,000.  And then we've got, excuse me, August of 2000 --

25             MR. MEKARU:  Keep going.  Oh, sorry.  Back up.

1   You're right.

2   Q.   (BY MR. MEKARU)   Puffin Investment.  All right.  And

3   pointing to all these transactions.

4        Mr. Sherwood, all of these transactions, did they all take

5   place prior to Pastor Moody's investments?  Pastor Moody's

6   first deposit was in December of 2000.  His next one was in

7   March of 2001.

8   A.   Yes, according to the ledger they did take place prior to

9   that.

10  Q.   So did any of Pastor Moody's money go to any of those

11  entities?

12  A.   No.

13  Q.   This is all predating anything that has to do with

14  Pastor Moody?

15  A.   Correct.

16  Q.   We've already, I think, gone over where Pastor Moody's

17  money went, right?

18  A.   Yes.

19  Q.   So to the extent this has any relevance, it might have

20  some relevance to somebody else's investment but not

21  Pastor Moody's?

22  A.   That's correct.

23  Q.   You said Kennedy Funding was a mortgage company?

24  A.   I believe they are a mortgage company, yes.  They do

25  funding on buildings and projects, and they are a bridge loan

1    company.

2    *Q.*   So -- all right.  A mortgage company.

3        If in the traditional sense if somebody is a customer of a

4    mortgage company, if they are sending money to a mortgage

5    company, wouldn't it be essentially repaying a loan that they

6    may have had with that mortgage company?

7    *A.*   Yes, but Kennedy Funding charges fees up front to do

8    projects.  They have an up-front charge.  I'm aware of that not

9    because of this situation, but I know Kennedy Funding does

10   charge for appraisals of sites, and they do that with an

11   up-front charge.

12   *Q.*   So it's a fee, but that's not an investment.

13   *A.*   That's correct.

14   *Q.*   Okay.  The instructions that you sent to Ken on

15   Exhibit Number 3.  All right.  He had asked whether you had any

16   authority on the account.  And the only person that can

17   actually move money out of that account was Ken Warner because

18   he was the account holder, right?

19   *A.*   Yes.

20   *Q.*   This is a trust account.  This is an attorney trust

21   account.  Isn't a trust account being held in trust for his

22   clients?

23       *MR. TRACY:*  Your Honor, we have no foundation that

24   this witness has any understanding of what an attorney trust

25   account is used for.  Objection.

1              *THE COURT:*  That objection is sustained.

2    *Q.*   *(BY MR. MEKARU)*  All right.  But whose client is

3    Ken Warner's?

4    *A.*   Michael Heshelman.

5    *Q.*   All right.  Now, there's this other last point, this

6    question about these humanitarian investments and that

7    discussion.

8         And there was all sorts of talk here about being able to

9    fund some of Pastor Moody's projects.

10   *A.*   Yes.

11   *Q.*   And there's some suggestion that it would have been easier

12   to use some of these deals and more money would be available to

13   fund these humanitarian projects, right?

14   *A.*   Right.

15   *Q.*   Was there some sense, then, that Pastor Moody might be

16   more recipient or more -- excuse me -- more willing to invest

17   this money and delay things with the hope that he would be able

18   to fund these humanitarian efforts as opposed to his own

19   personal benefit?

20   *A.*   I don't quite understand.

21   *Q.*   Did you have some sense here -- were you tapping into

22   Pastor Moody's desire to fund these humanitarian efforts by

23   dangling out the possibility of even larger monies being

24   available for this humanitarian -- these humanitarian projects?

25   *A.*   Yes.

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Q.   Is that something you used to your benefit, that affinity

2   sort of connection?

3   A.   Yes.

4          MR. MEKARU:  Thank you.

5          THE COURT:  Mr. Tracy, do you have any recross?

6          MR. TRACY:  Yeah, just real briefly, Your Honor.

7   Thank you.

8          Kathy, if you could do like you did for Dan and bring

9   up Government Exhibit 1 and Defense Exhibit V together.

10                       RECROSS-EXAMINATION

11  BY MR. TRACY:

12  Q.   And Mr. Sherwood, it may be easier this time for you to

13  look at -- if you have the black binder in front of you with

14  Defendant's Exhibit V and you also keep the white one in front

15  of you with whichever -- the one that's got Government's

16  Exhibit 1 in it.  So if you have those close to one another,

17  that would be helpful, I think.

18         So Government Exhibit 1, again, that is involving

19  Mr. Moody, correct?

20  A.   Yes.  Yes.

21  Q.   And that's called Promissory Note and Joint Venture Trust

22  Warranty?

23  A.   Yes.

24  Q.   And you've seen that before in preparation for this trial?

25  A.   Yes.

*RECROSS-EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Q.   Okay.  And then Defense Exhibit V, that's part of the

2   documents that pertain to Mr. Ramsey's investment, correct?

3   A.   Yes.

4   Q.   So, if you would, flip three pages and go to the fourth

5   page of Defense Exhibit V.

6   A.   Okay.

7   Q.   Okay?  Now let's compare apples to apples.  The Moody

8   document; the Ramsey document.

9        Now, these are both promissory notes and joint venture

10  trust warranties, correct?

11  A.   Correct.

12  Q.   And nowhere in Mr. Ramsey's warranty -- if you flip to the

13  second page, flip to the third page -- nowhere in the

14  promissory note and warranty for Mr. Ramsey does it say

15  anything about the expenses, correct?

16  A.   Correct.

17  Q.   Okay.  Now, when you flip back to the beginning of

18  Defense Exhibit V, which is the joint venture trust agreement

19  for Mr. Ramsey, that's where we get the layout of the expenses

20  that can be used, $280,000 for this portion of his investment,

21  280 out of the one million some, so nearly 25, 30 percent,

22  correct?

23  A.   Correct.

24  Q.   That's where that's set forth, right?

25  A.   Yes.

*RECROSS-EXAMINATION OF BRYCE HENRY SHERWOOD*

1    Q.    Now go back to Government Exhibit 1.   This is not the

2    joint venture trust agreement.   Nowhere in the Government

3    Exhibit 1 is that exhibit included, correct?

4    A.    Correct.

5    Q.    There's only the promissory note and joint venture trust

6    warranty, correct?

7    A.    Correct.

8    Q.    Through the government, Special Agent Wetherbee, the

9    attorneys you've met with, have you ever seen the joint venture

10   trust agreement between Mr. Moody and Investor First Ventures?

11   A.    No.

12   Q.    So as far as we're aware, since we're going to see other

13   ones later for other investors, there very well may be a joint

14   venture trust agreement between Mr. Moody and Investors First,

15   correct?

16   A.    I wouldn't know of it.

17   Q.    But there were for other investors?

18   A.    Yes.

19   Q.    But it's not here?

20   A.    It's not here.

21   Q.    And now, by the way, this Government Exhibit 1, this is

22   for the first million dollars that Mr. Moody invested, correct?

23   A.    I believe so, yes.

24   Q.    You see where it says "Promissory Note"?

25   A.    Yes.

1    *Q.*    $1 million, correct?

2    *A.*    Yes.

3    *Q.*    There's -- I can't find the date on the document, but this

4    would be the -- appears to be the first one that goes in in

5    December of 2000, right?

6    *A.*    Yes.

7    *Q.*    I'm not seeing the second investment of 1.5 million.

8          Are you?

9    *A.*    No.

10          *MR. TRACY:*  Okay.  Thank you very much.

11          *THE COURT:*  Can we excuse Mr. Sherwood?

12          *MR. MEKARU:*  Yes, Your Honor.

13          *THE COURT:*  Thank you, Mr. Sherwood.

14                    *   *   *   *   *

15          I certify that the foregoing is a correct excerpted

16    transcript from the record of proceedings in the above-entitled

17    matter.

18

19    Date:  June 26, 2009

20

21                         **/s/ Glenda Trexler**

22                         _____
                           Glenda Trexler, CSR-1436, RPR, CRR

23

24

25

```
 1                    EXAMINATION INDEX

 2                                            PAGE

 3    BRYCE HENRY SHERWOOD

 4          DIRECT EXAMINATION BY MR. MEKARU:        2

 5          CROSS-EXAMINATION BY MR. TRACY:         61

 6          REDIRECT EXAMINATION BY MR. MEKARU:    118

 7          RECROSS-EXAMINATION BY MR. TRACY:      130

 8                     *    *    *    *    *

 9                      EXHIBIT INDEX

10    EXHIBIT                        OFFERED   ADMITTED

11    GOVT 22   Sherwood Plea Agreement      5          5

12    DFT H     Emails and letters          99         99

13    DFT U     Excerpts from Kennedy Funding's  103

14              website

15    DFT V     Joint venture trust agreement   88         89

16

17

18

19

20

21

22

23

24

25
```