```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION


 3   _____

 4   UNITED STATES OF AMERICA,

 5                      Plaintiff,
                                        DOCKET NO. 1:06-cr-44
 6   vs.

 7
     MICHAEL WAYNE HESHELMAN,
 8
                       Defendant.
 9   _____/

10

11                        VOLUME I

12              TRANSCRIPT OF JURY TRIAL

13        BEFORE THE HONORABLE JANET T. NEFF

14             UNITED STATES DISTRICT JUDGE

15             GRAND RAPIDS, MICHIGAN

16                   June 2, 2009

17

18   Court Reporter:          Glenda Trexler
                              Official Court Reporter
19                            United States District Court
                              685 Federal Building
20                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
21

22   Proceedings reported by stenotype, transcript produced by

23   computer-aided transcription.

24

25
```

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3        MR. DANIEL Y. MEKARU
          U.S. ATTORNEY
 4        The Law Building
          330 Ionia Avenue, N.W.
 5        P.O. Box 208
          Grand Rapids, Michigan 49501-0208
 6        Phone:  (616) 456-2404
          Email:  Daniel.mekaru@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
          MR. CHRISTOPHER E. TRACY
 9        HONIGMAN, MILLER, SCHWARTZ, AND COHN, LLP
          444 West Michigan Avenue
10        Kalamazoo, Michigan 49007
          Phone:  (269) 337-7708
11        Email: ctracy@honigman.com

12                        *   *   *   *   *

13                              Grand Rapids, Michigan

14                              June 2, 2009

15                              9:27 a.m.

16                     P R O C E E D I N G S

17        (Open court, no jury)

18             THE COURT:  Good morning everybody.

19             MR. TRACY:  Good morning, Your Honor.

20             MR. MEKARU:  Good morning, Your Honor.

21             THE COURT:  This is the date and time set for trial

22   in case number 1:06-cr-44, United States of America versus

23   Michael Heshelman.

24             Counsel, please put your appearances on the record

25   and introduce anybody who is at counsel table with you this
```

1    morning.

2              *MR. MEKARU:*  Yes, Your Honor.  Daniel Mekaru on

3    behalf of the United States.  With me this morning is

4    Timothy Wetherbee with the FBI.  Seated next to him is

5    Harper King.  Ms. King is with my office.  She'll be assisting

6    us with the audiovisuals.

7              *THE COURT:*  The technology stuff.

8              *MR. MEKARU:*  Yes, ma'am.

9              *THE COURT:*  Thank you.

10             *MR. TRACY:*  Good morning, Your Honor, Chris Tracy on

11   behalf of the defendant Michael Heshelman.  Mr. Heshelman is in

12   court obviously this morning as well.  Kathy Springstead, who

13   the Court has allowed me to retain, is also an expert in

14   technology and a variety of things in terms of an investigator

15   is at counsel table as well.  And Melody VanAntwerp that we've

16   introduced to the Court before, V-A-N capital A-N-T-W-E-R-P.

17   I'm spelling okay this morning.  Is a summer associate with our

18   firm who is also with us today.  Thank you, Your Honor.

19             *THE COURT:*  Thank you, Mr. Tracy.  I do want to put

20   one thing on the record before we bring the jury up.  We had a

21   meeting in chambers, as I indicated at the final pretrial,

22   mostly to deal with certain housekeeping matters such as

23   scheduling and so forth, but we clarified something we put on

24   the record at the final pretrial, and that has to do with the

25   issue of use of the term "Ponzi scheme."  And after some

1    discussion, it is my determination that that phrase not be used

2    during the course of this trial based significantly on

3    definitions of that term as found in case law from the

4    Eleventh Circuit as well as from Black's Law Dictionary.

5          Based on the intended proofs by the government, I do

6    not believe that the alleged fraudulent scheme charged against

7    the defendant meets the definition of that phrase, which is

8    also one that is rather highly charged in the current

9    atmosphere, financial atmosphere, and has been used so widely

10   in the media that it's my view that to use that phrase in

11   prosecuting this defendant would be unfair and perhaps

12   prejudicial.

13         And so it's my instruction to the government and to

14   its witnesses that that phrase not be employed throughout the

15   course of the trial.

16         And, Mr. Mekaru, if you want to put any objection to

17   that on the record, please do so at this time.

18         *MR. MEKARU:*  No, Your Honor.  I think we've discussed

19   this matter.  We recognize the issues that may arise by the use

20   of the term "Ponzi scheme."  While we think it could be a term

21   of art that is appropriate given the case, we recognize that

22   the Court has discretion on how to handle that sort of

23   information, and so we will honor the Court's instruction and

24   advise our witnesses not to use that term, and I'm not going to

25   object to your limitation on us.  Thank you.

1          *THE COURT:*  Thank you, Mr. Mekaru.

2          Do you have any comment, Mr. Tracy?

3          *MR. TRACY:*  No, Your Honor.  Thank you for listening

4     to us in chambers on it, and I appreciate it.  Thank you.

5          *THE COURT:*  Thank you.

6          Are we ready for the jury?

7          *MR. MEKARU:*  Yes, Your Honor.

8          *MR. TRACY:*  Yes, Your Honor.

9          *THE COURT:*  Okay.  We'll bring the jury up, and we'll

10    get started with voir dire straight away.

11         *THE CLERK:*  Everyone rise.  This Court is in recess.

12       *(Recess taken at 9:31 a.m.)*

13     *(The jury venire entered the courtroom at 9:39 a.m.)*

14         *THE COURT:*  Good morning everybody.

15         *ALL:*  Good morning.

16         *THE COURT:*  And welcome to the United States District

17    Court for the Western District of Michigan.  I'm

18    Judge Janet Neff, and I am going to be presiding in this case

19    over the next few days.  You have all been summoned or invited

20    to be with us so that we can choose a jury to hear this case

21    which is being brought by the United States government.

22         I'm going to do this in phases, which is my normal

23    practice.  I'm first going to make some introductory remarks,

24    and then the panel itself, all of you, will be sworn, and I

25    will get into the specific -- some of the specific questions

that are necessary to be answered in order to impanel a jury.
And after that phase of the process is completed, 14 of you
will be brought forward for additional questioning.

I'll tell you right up front that the process of a
jury trial involves a lot of listening, listening by jurors and
listening by the judge.  It's really a process that is directed
and controlled in terms of what happens in the well of the
courtroom by the lawyers.

You're going to meet a lot of people and hopefully
see a process unfold in front of you which is one that is
extremely important in our system of justice, and be part of
it, which to me is not only important but in some ways
affirming of our whole system of government.

Now, a little bit about the players in this drama
that's going to unfold.  As I indicated, I am -- I will be the
presiding judge in this case, and my role has to do with,
number 1, perhaps first and foremost, is to act as something of
an umpire or a referee.  My job is to make sure that the
parties, both the government and the defendant, receive a fair
and just trial.  And that is what I will strive for to the best
of my ability.

But my job also is to make sure that the process
moves along, that it not be hung up unnecessarily.  The
witnesses and the evidence will be presented to you by the
government and perhaps by the defendant, and we want to keep

1    that process moving along.  There's a recognition that your

2    time is valuable, our time is valuable, and we want to respect

3    that as we go through.

4              The other -- some of the other major players here

5    will be the lawyers representing the government and

6    Mr. Heshelman who is the defendant.  They have a role as well,

7    and that is to present witnesses and evidence and to seek to

8    persuade one way or the other to their point of view.

9              The jury that is ultimately selected to hear this

10   case from among your ranks really in the end constitute the

11   most important people in the courtroom.  And I have said this

12   for almost 40 years now as a lawyer and a judge, the jury, the

13   people who ultimately sit in those chairs, are the ultimate

14   deciders of the facts.  That panel, that number of people will

15   decide what actually has been proven in this case, what has

16   been shown, and they will decide what the fate of the

17   government and the defendant in terms of their presentation

18   will be.

19             Now, one, perhaps two, crucial factors here.  As I

20   said, and you will hear, this is a criminal case brought by the

21   government.  The defendant starts the process with a

22   presumption of innocence, and that presumption, which is one of

23   the cornerstones of our criminal justice system, remains with

24   him throughout the proceedings and until and unless such time

25   as the jury deliberates and decides otherwise.

1          The government has the obligation to prove its case

2     beyond a reasonable doubt, and it is that point at which the

3     jury must make its determination.

4          Now, I'm going to give you one more caution, and that

5     is you're going to hear a lot of repetition, unfortunately, of

6     concepts that are important to your role as jurors.  And it's

7     something that, I guess, is time tested.  You say something

8     often enough and hopefully it will become part of the fabric of

9     the proceedings.

10         So with that I'm going to start with asking Susan,

11    who is my court clerk and case manager, to swear you as a

12    panel, and we will then begin the questioning.

13         *THE CLERK:*  Would the jury panel please rise and

14    raise your right hand.

15      *(Jury panel sworn)*

16         *ALL:*  I do.

17         *THE CLERK:*  Thank you.  Be seated.

18         *THE COURT:*  This is a criminal case the government

19    has brought against Michael Wayne Heshelman, who you will meet

20    in a little while.  Mr. Heshelman is charged with being a party

21    to a fraud.  He is charged in an Indictment, which is a

22    document that is no proof of anything.  It simply states the

23    formal charges against the defendant.

24         The actual charges run to 52, 53 separate counts, and

25    we will get into those in some more detail later.  But for

1    purposes of the questioning at this point, I would simply tell

2    you that this is an alleged financial fraud in which the

3    government claims and will argue that Mr. Heshelman was

4    involved in attempting to receive monies from individuals for

5    investment purposes.

6              Now, in general, is there anybody who has physical

7    problems, health, hearing, vision, or other problems that would

8    make it difficult for you to sit and hear this case which will

9    take place this week Tuesday through Friday and at least part

10   of next week, maybe even all the way through next Friday?  Is

11   there anybody who cannot make the commitment?

12             And when I say that, oftentimes there are reasons

13   that are presented that are not really substantial.  Let me say

14   that this is a major commitment to make for the government and

15   for Mr. Heshelman, and it is not to be dismissed by potential

16   jurors lightly.  I know that it is true that many of you don't

17   want to be here, but it is important for you to be here.  The

18   contribution that you make is crucial.  And so when you

19   consider the questions that are going to be asked which might

20   lead to you being excused, I want you to think very carefully

21   about them before you bring forward your excuses.

22             And I can also tell you that in spite of the fact

23   that you may not want to be here, I can almost guarantee you

24   that if you are selected to sit on this jury and you sit

25   through it and participate in it and become part of the

1    ultimate verdict, you will find it to be an extremely

2    worthwhile and rewarding experience in your lives and one that

3    is very important to our government.

4            So having lectured that point, again I ask if there

5    are any health, hearing, vision, or other physical disabilities

6    which would make it difficult or impossible for you to

7    participate in this trial?  Yes, sir.

8            THE CLERK:  Judge, there is a microphone.

9            THE COURT:  There is a microphone.  Mr. Mekaru, would

10   you hand that to the juror.

11           Sir, what is your number, please?

12           PROSPECTIVE JUROR 13:  I'm number 13.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR 13:  My name is Barney McDaniel.

15   Right now I'm in the process of physical therapy on my right

16   foot.  I go three days a week.  I also, because of the fact

17   that General Motors just filed bankruptcy, I retired last

18   September from General Motors, and I'm trying to get all of my

19   appointments done within a month so, that way it's not

20   completely out of my pocket just in case my insurance is one of

21   the first things that they take from me.

22           And I'm also trying to set up appointments because

23   I -- my vision is not the greatest, and I've got to keep

24   adjusting whatever I'm trying to read with my arms, and I'm

25   going to get in to some vision to get glasses.

1          THE COURT:  Well, let me say this, that first of all,

2     everybody who is going to participate in this process is going

3     to have to make sacrifices in time, if not in income.  To the

4     extent that your physical therapy takes place three days a

5     week, we can give you some estimates of when you could schedule

6     those appointments.

7               For instance, we will not have trial days -- a trial

8     day next Monday, and so the -- I do believe that we can -- I

9     can tell you that we will adjourn most days by three or

10     three-thirty in the afternoon, which should give you enough

11     time to make those appointments.

12               Where is your -- is your physical therapy in

13     Traverse City?

14          PROSPECTIVE JUROR 13:  Yes, Your Honor.

15          THE COURT:  Let me just say that we are a little

16     short on jurors this morning.  If we can avoid using you, we

17     will, but I'd like you to remain to see where we go.  Okay?

18          PROSPECTIVE JUROR 13:  Okay.

19          THE COURT:  Thank you.

20               Anybody else who has a similar kind of problem?

21               Now, this case, the United States versus Michael

22     Wayne Heshelman, has had some little publicity in the local

23     press.

24               Has anybody read or heard anything about this case?

25     Does Mr. Heshelman's name ring any bells with you?

1          Two other individuals were involved, a Mr. Sherwood

2    and a Mr. Mickelson.  Nobody -- nobody indicates that they have

3    heard about the case.

4          Just to give you a little idea of, if I can find it,

5    what this case is about, essentially it was a scheme to draw

6    potential investors in to send money to Mr. Heshelman who then

7    made the representation that he would invest the money and

8    obviously provide returns and so forth.  The government is

9    going to claim that there was no investment actually planned.

10         Is there anybody for whom the charge itself would

11   present a difficulty in being fair and impartial?

12         No.  Good.  And we'll follow up on that in a little

13   while.

14         I'm going to ask now the lawyers to introduce

15   themselves, and please pay close attention to their names.

16   They are going to identify their witnesses and ask you if you

17   know any of them or have any connection with any of them.

18         Mr. Mekaru, for the government, please.

19         MR. MEKARU:  Yes, Your Honor.  Good morning.

20         ALL:  Good morning.

21         MR. MEKARU:  My name is Daniel Mekaru with the

22   United States Attorney's Office here in Grand Rapids.  I'm the

23   prosecutor in this case.  Seated next to me is Special Agent

24   Timothy Wetherbee.  He's with the FBI.  He's also here in

25   Grand Rapids.  Seated next to him at the end is Harper King.

1    Ms. King is with my office, and she'll be helping us with the

2    audiovisual, the technology, and the presentation of the

3    evidence.

4          I'm going to read through here a list of individuals

5    who are going to be testifying in this case.

6          The first witness we're looking at is Pastor Alan

7    Moody.  He's from the Middleville, Michigan, area.

8          Next is a Betty Herndon from Texas.

9          William Vos who is with the FBI.  He is also here in

10   Grand Rapids.

11         Bryce Sherwood.  Mr. Sherwood is from Florida.

12         Debra Featherstone.  She's from California.

13         Timothy Oliver is from Minnesota.

14         Stephen Williams is from Florida.

15         Mitchell Miller who is from Florida but I believe was

16   recently residing in Dubai.

17         Anthony Loiacono.  He's from California.  It's

18   spelled L-O-I-A-C-O-N-O.

19         Next is Dennis Mickelson.  Mr. Mickelson is from

20   Pennsylvania.

21         Paul Ramsey is from Tennessee.

22         Brenda Moore is from Battle Creek.

23         Allan Clyde is from Utah.

24         Robert Amenta, A-M-E-N-T-A, he is from New York,

25   New York City.

1           Deputy Mark Hill who is with the Marshal Service who

2   is from the Grand Rapids area.

3           And then we have a -- two custodians from the banks.

4   All right.  From J.P. Morgan Chase we have a John Tinay.  I

5   believe that's spelled T-I-N-A-Y.  He's from the Grand Rapids

6   area.

7           And then from Comerica Bank we have Roxanne Bilski.

8   Melissa Johnson.  Thank you.  Melissa Johnson.  She's also from

9   the Grand Rapids area.

10          Brian Turner who is from Ontario, Canada.

11          A Kenneth Warner who is from Florida.

12          And then Agent Wetherbee.  Those are the lists of

13  witnesses.

14          THE COURT:  Is there anybody who is familiar with

15  Mr. Mekaru or any of the persons that he has just named for

16  you?  No response.  Thank you.

17          Mr. Casey.  Tracy.  I'm sorry.

18          MR. TRACY:  Thank you, Your Honor.

19          Good morning.  My name is Chris Tracy.  I represent

20  Mike Heshelman who is the defendant in this case.  And with me

21  is Kathy Springstead.  Ms. Springstead is an investigator and

22  will help with the audiovisual, which I know nothing about.  We

23  have some of that.  And also a summer associate with our firm,

24  Ms. VanAntwerp.  That will be people that you may see from my

25  side of the case.

```
 1            I practice law with a firm called Honigman Miller,
 2   thank you very much, that is -- I'm in the Kalamazoo office,
 3   but they are also based in Lansing and Detroit and so forth in
 4   case you've happened to have heard that name before.
 5            The government has for sure set its witnesses.  Or
 6   probably for sure set.  The defense in this case, it's sort of
 7   a little bit -- we need to be more flexible depending on how
 8   they call and so forth, but a potential list of witnesses, and
 9   they may not be called depending on how the rest of the case
10   comes in, one would be a gentleman by the name of Michael Boyd,
11   B-O-Y-D.  He's in the financial arena out in the Connecticut
12   and New York area.
13            Another one is a gentleman by the name of
14   Arron Jepson.  I believe he spells it A-R-R-O-N, a little bit
15   different spelling.  He's from Utah.
16            There's another one by the name of Pierre LaBauve.  I
17   think the last name is spelled L-A-B-A-U-V-E.  He's from
18   Oregon.  And then it's possible Mr. Heshelman will testify as
19   well.
20            At this point that would be, Your Honor, my list of
21   potential witnesses that I'm aware of.
22            THE COURT:  Thank you, Mr. Tracy.
23            Anybody whose names you've heard from Mr. Tracy who
24   are familiar to you in any context?  No response.  Thank you.
25            As I indicated and as you're going to hear more of,
```

in a criminal case the jury decides whether the government has
proven its case against the defendant.

Now, sometimes there are individuals who have reasons
to believe they can't do that, either religious or moral or
ethical reasons that they believe they cannot perform that duty
to make that judgment.

Does anyone here fall into that category?  No.  Very
well.

Does anybody have any quarrel with the basic concept
that Mr. Heshelman as he sits here today and throughout the
trial that is about to start is presumed innocent?  There's,
again, this basic concept of American criminal justice.

Can everybody say to themselves and say to this Court
that you can abide by that basic concept?

If you are selected as a juror, can you also say that
you would be able to render a verdict based on all of the
evidence and testimony and the lawyers' arguments and the
instructions on the law?  That is, do you think you could
return a verdict whether for the government or the defense?
Would you be able to decide?  That's the real question that you
have to answer.

One of the major things that a juror has to do, and
it is something that we do in all of our daily lives without
really thinking twice about it, but we decide on the
credibility or the believability of the people we encounter all

1    the time, whether it's our spouse or our children or people we

2    encounter in business.  We have conversation with them, we

3    decide whether we can rely on or believe what they tell us or

4    what they say to us.

5          That basic concept is really heightened in a trial

6    because you will be hearing testimony from witnesses who will

7    be sitting in this seat to my left.

8          Is there anybody who has difficulty with that very

9    idea, that the credibility, the believability of witnesses will

10   be a crucial part of the function you will play as jurors?

11         Very well.  Susan, would you fill the box, please.

12         *THE CLERK:*  Yes.  I have one quick question.

13         *THE COURT:*  What?

14         *THE CLERK:*  Okay.  As I had indicated, I will be

15   calling you by your juror number and your first and last name

16   initials.

17         The first person I call will take the farthest seat

18   in the last row, and then we'll fill that back row, and then

19   we'll start with the front row after that.

20         Juror Number 33, LW.  Juror Number 14, LS.

21   Juror Number 44, GB.  Juror Number 46, DQ.  Can we get a

22   Blizzard?  I'm sorry.

23         *THE COURT:*  There was a great commercial about that

24   last night on TV.

25         *THE CLERK:*  Juror Number 13, BM.  Juror Number 18,

1    KH.  Juror Number 47, CB.  Juror Number 31, RR.  You'll take

2    the first seat in the front row, please.  Juror Number 52, BK.

3    Juror Number 17, TG.  Juror Number 55, DS.  Juror Number 15,

4    RB.  Juror Number 54, RN.  And Juror Number 19, SC.

5            The box is full, Your Honor.

6            *THE COURT:*  Thank you.

7            *MR. TRACY:*  Your Honor, would it be okay if we just

8    read the numbers back just to make sure I have them in the

9    right sequence?

10           *THE COURT:*  Sure.

11           *THE CLERK:*  Certainly.  I'll start with seat 1 in the

12   back row.

13           *MR. TRACY:*  Yes.

14           *THE CLERK:*  33, 14, 44, 46, 13, 18, 47.

15           Front row 31, 52, 17, 55, 15, 54, 19.

16           *MR. TRACY:*  Thank you very much.

17           *THE COURT:*  Ladies and Gentlemen, you should

18   understand that the juror questionnaires which you filled out

19   and submitted have been made available to the attorneys for the

20   government and for the defense, and so it is not in any

21   way intended to invade your privacy but merely, as is this

22   whole process, is intended to ensure that we can ask the right

23   kind of questions to seat a fair and impartial jury.  That's

24   really the bottom line here.

25           And the questions that you will be asked to answer

1    over the next hour or so are all geared towards that, and I

2    hope and I trust that you won't take them personally as

3    invasions of your privacy or as an attempt to find out things

4    that you simply don't want to disclose.

5            If there is a point in time when there's something

6    you need to ask a question about, please don't hesitate to do

7    that.  Raise your hand.  Or if it's something that is -- that

8    you think is confidential that you don't want to share with the

9    entire courtroom, let me know that, and we will talk about it

10   over there at the sidebar where there's a separate microphone.

11           The whatever confidential information you have will

12   be reported on the record, but it will not be broadcast to the

13   full courtroom.

14           Now, how many of you have served on juries before?

15   Oh, my goodness.  The last trial I had almost nobody had.

16   Let's start in the back row with Juror Number 33.  Was it a

17   criminal or a civil case?

18           *PROSPECTIVE JUROR 33:*  It was a civil case.

19           *THE COURT:*  Civil case?

20           *PROSPECTIVE JUROR 33:*  Yes.

21           *THE COURT:*  And did it go to verdict?

22           *PROSPECTIVE JUROR 33:*  Yes.

23           *THE COURT:*  Was there anything -- was there anything

24   about that experience that would influence your ability to sit

25   impartially in this criminal case?

```
1                  PROSPECTIVE JUROR 33:  No.

2                  THE COURT:  Okay.  Was it in state or federal court,

3      do you remember?

4                  PROSPECTIVE JUROR 33:  It was state.

5                  THE COURT:  State court?  Circuit court or district?

6                  PROSPECTIVE JUROR 33:  Gosh, it was back in the '80s.

7                  THE COURT:  Oh, gosh.  Okay.  All right.  You'll be

8      forgiven for not remembering.

9                  Who is next?  Yes, ma'am.

10                 PROSPECTIVE JUROR 14:  It was a criminal trial.

11                 THE COURT:  Okay.

12                 PROSPECTIVE JUROR 14:  And it was district court.

13                 THE COURT:  Okay.  So it was a relatively minor

14     offense?

15                 PROSPECTIVE JUROR 14:  Yeah, I guess -- well,

16     I -- honestly, I don't remember if it was minor.  I mean, do

17     you want me to tell you what it was?

18                 THE COURT:  Well, I'm just interested -- how long ago

19     was it?

20                 PROSPECTIVE JUROR 14:  It was in the nineties.

21                 THE COURT:  Okay.  Did it involve any kind of a

22     financial --

23                 PROSPECTIVE JUROR 14:  No.

24                 THE COURT:  -- misdeed?  No?

25                 Okay.  Anything about that experience that would
```

1    affect your ability in this case to listen to all of the

2    evidence, to hear what the government has to say, what the

3    defense might have to say, and decide impartially?

4              *PROSPECTIVE JUROR 14:*  No, nothing.

5              *THE COURT:*  Okay.  Great.

6              Who was next in the back row?  No?

7              Okay.  Front row.  Yes, sir.

8              *PROSPECTIVE JUROR 55:*  Yeah, it was a criminal, and

9    it was district, and, yes, it went to verdict.

10             *THE COURT:*  Okay.  And what kind of a case was it?

11             *PROSPECTIVE JUROR 55:*  I think it was about 10 or 12

12   years ago.  I think it was a landlord dispute or something like

13   that.

14             *THE COURT:*  Okay.  Okay.  Nothing to do with

15   investments or financial matters or anything like that?

16             *PROSPECTIVE JUROR 55:*  No.

17             *THE COURT:*  Okay.  Any reason why that experience

18   would in any way affect your ability to sit as a juror in this

19   case?

20             *PROSPECTIVE JUROR 55:*  No, ma'am.

21             *THE COURT:*  Okay.  Who else?  Yes, sir.

22             *PROSPECTIVE JUROR 54:*  It was a murder trial.

23             *THE COURT:*  Okay.  And that was probably in circuit

24   court?

25             *PROSPECTIVE JUROR 54:*  Correct.

1           THE COURT:  Locally or someplace else?

2           PROSPECTIVE JUROR 54:  Locally, yes.

3           THE COURT:  Okay.  And that's pretty heavy-duty

4    responsibility in that kind of a case.  Am I right?

5           PROSPECTIVE JUROR 54:  That's correct.

6           THE COURT:  And having gone through that experience,

7    do you think that it had any effect on your ability to render a

8    fair and impartial verdict in this case?

9           PROSPECTIVE JUROR 54:  I don't think it would.

10          THE COURT:  Okay.  Yes, ma'am.

11          PROSPECTIVE JUROR 19:  It was embezzlement.  It was

12    about 12 years ago, and it rendered a verdict.

13          THE COURT:  And was it in federal or state court?

14          PROSPECTIVE JUROR 19:  State.

15          THE COURT:  Okay.  Would that experience in any way

16    affecting your ability, you think, to set it aside and decide

17    this case on its own merits aside from that?  This is a totally

18    different situation.

19          PROSPECTIVE JUROR 19:  It would not.

20          THE COURT:  Okay.  It would not.

21          Okay.  Anybody else who has sat on a jury before?

22    Okay.  Great.

23          Is there anyone here who has had either themselves, a

24    close family member, a close friend who has been involved in a

25    criminal charge, who has been charged criminally, either by the

1   state or the federal government?  Yes, sir.

2           PROSPECTIVE JUROR 54:  I have a good friend, close

3   friend that got it for embezzlement.

4           THE COURT:  I'm sorry?

5           PROSPECTIVE JUROR 54:  He was convicted of

6   embezzlement.

7           THE COURT:  Okay.  And how close a friend?

8           PROSPECTIVE JUROR 54:  30-year, 40-year friend.

9           THE COURT:  Did you have any -- did you testify at

10  the trial?

11          PROSPECTIVE JUROR 54:  I didn't testify.

12          THE COURT:  Okay.  Did you attend any of the trial?

13          PROSPECTIVE JUROR 54:  No.

14          THE COURT:  Okay.  Have you spoken with him since?

15          PROSPECTIVE JUROR 54:  Yes, since he's been out of

16  prison.

17          THE COURT:  Again, that experience, does it affect

18  your ability to render a fair and impartial verdict in this

19  case which also involves claim of a financial crime?

20          PROSPECTIVE JUROR 54:  I don't think it would.  I

21  can't be positive.

22          THE COURT:  Mr. Mekaru.

23          MR. MEKARU:  Forgive me, Your Honor, if I may ask.

24  With the responses, just for the record, could we have the

25  jurors identify themselves by number when they are responding?

1          THE COURT:  Certainly.  That's a very good idea.

2          MR. MEKARU:  Thank you.  So the last response would

3     have been by Juror 54?

4          THE COURT:  Yes.  Thank you.

5          Someone else had their hand up.  Yes, sir, Number --

6          PROSPECTIVE JUROR 13:  Thirteen.

7          THE COURT:  -- 13.

8          PROSPECTIVE JUROR 13:  Yeah, my wife's sister

9     murdered one of her children, and we went through a long trial

10    with both the mother and the father serving 30 to 60 right now

11    in prison.

12         THE COURT:  Oh, my gosh.  That must have been awful

13    for your family.

14         PROSPECTIVE JUROR 13:  Yeah.  We adopted the three

15    younger kids, which was two nephews and a niece, that me and my

16    wife adopted that we have right now.

17         THE COURT:  Okay.  Now, the nature of that offense is

18    obviously quite different from what is charged here.  But that

19    also, I'm sure, was quite a difficult experience for you to go

20    through individually and as a family.

21         Do you think that your experience in that trial would

22    carry over in any way to your ability to be a fair and

23    impartial juror in this case?

24         PROSPECTIVE JUROR 13:  No, Your Honor.

25         THE COURT:  Okay.  Thank you very much.

1              Yes, sir, Number --

2         *PROSPECTIVE JUROR 15:*  Fifteen.

3         *THE COURT:*  -- 15.

4         *PROSPECTIVE JUROR 15:*  I had a friend from high

5    school who was convicted and sent to jail numerous times for

6    various federal offenses and misdemeanors who I believe is

7    currently awaiting another trial.

8         *THE COURT:*  Okay.  What was the nature of the

9    offenses?

10        *PROSPECTIVE JUROR 15:*  Um, I never went court

11   proceedings or any of the procedures.  I only know that he was

12   convicted of breaking into cars as well as I believe some minor

13   thefts as well as -- there was really quite a few of them.  I

14   can't remember them all.

15        *THE COURT:*  Okay.  Again, your experience with your

16   friend, do you think that would have any impact on your ability

17   to be fair to Mr. Heshelman?

18        *PROSPECTIVE JUROR 15:*  No, Your Honor.

19        *THE COURT:*  Or the government?

20        *PROSPECTIVE JUROR 15:*  No, Your Honor.

21        *THE COURT:*  Okay.  Anybody else?

22        *MR. MEKARU:*  Your Honor.

23        *THE COURT:*  Yes, Mr. Mekaru.

24        *MR. MEKARU:*  If I may, I don't know how you would

25   like to handle these questions on these blocks of areas, but

1    with respect to -- you know, just maybe consider something here

2    with respect to some of the answers given by particular

3    prospective jurors.  For example, Juror Number 15 had mentioned

4    that he thought his friend may have some sort of federal case.

5    There was some follow-up questions I'd like to pursue.  Would

6    you like to do that as we go incrementally with these blocks of

7    questions, or would you want to wait until the end?

8         THE COURT:  I kind of like to skip around a little

9    bit, Mr. Mekaru, because I think it gives a little better

10   chance to not just focus on one person at a time, and you will

11   have an opportunity to do some follow-up at the end, and I

12   assume you'll take some good notes, and that will let you

13   follow up appropriately with the individual you want to speak

14   to.

15        MR. MEKARU:  Sorry.  Thank you.

16        THE COURT:  Thank you.

17        Have any of you had any training or education or work

18   experience either in the legal field or in the financial field?

19   Yes, number 15 again.

20        PROSPECTIVE JUROR 15:  I'm going to college right now

21   for business, general management.  That includes financial

22   classes as well as business law classes.

23        THE COURT:  How far along are you?

24        PROSPECTIVE JUROR 15:  I have two more semesters to

25   go, so I'm almost done.

1          THE COURT:  Where are you in school?

2          PROSPECTIVE JUROR 15:  Central Michigan University.

3          THE COURT:  Okay.  I think I'll leave Mr. Casey to

4    follow up on that.

5          PROSPECTIVE JUROR 15:  Okay.

6          THE COURT:  Or Mr. Mekaru, as they desire.

7          Anybody else who has?  Yes, sir, number 52?

8          PROSPECTIVE JUROR 52:  Fifty-two.  Yeah, I go to

9    Calvin College, and I'm an accounting major, so we learned a

10   little bit about it, but I don't know about it.

11         THE COURT:  Okay.  In any of your class work have you

12   studied various kinds of investment -- not -- I don't want to

13   say scheme, but investment vehicles or that sort of thing?

14         PROSPECTIVE JUROR 52:  Just like talked about it a

15   little bit.

16         THE COURT:  Okay.  Any preconceived notions about

17   matters financially?

18         PROSPECTIVE JUROR 52:  Not really.

19         THE COURT:  Okay.  Is there anybody here who

20   considers themselves to have been a victim of an investment

21   fraud?  I mean, let's face it, there's been an awful lot in the

22   newspaper and in the media about matters such as this in the

23   last year or so.

24         Does anybody feel they have been caught up in that

25   kind of a situation?  No response.

1          Anybody here who deals with or who has sought the
2    advice of an investment advisor?  Yes, ma'am, number 19.
3          PROSPECTIVE JUROR 19:  Just my 401.  You mean -- is
4    that what you mean?
5          THE COURT:  Yes.
6          PROSPECTIVE JUROR 19:  I just was there last Friday I
7    believe it was.
8          THE COURT:  And your relationship with your advisor
9    is?
10         PROSPECTIVE JUROR 19:  Just purely business.
11         THE COURT:  Okay.  And no reason to think ill of him
12    or her?
13         PROSPECTIVE JUROR 19:  No.
14         THE COURT:  Okay.
15         THE CLERK:  Judge?
16         THE COURT:  Yes.
17         THE CLERK:  We have two people with hands up.
18         THE COURT:  I'm sorry.  Beg your pardon.
19         PROSPECTIVE JUROR 14:  Yes, I consult with my
20    financial advisor probably twice a year, but I would hold no
21    ill will, it's my son.  So I just wanted to get that out there.
22         THE COURT:  Yeah.  Well, we hope you remain on good
23    relationships with him.
24         PROSPECTIVE JUROR 14:  Yes.
25         THE COURT:  Okay.  Number 46.

1          *PROSPECTIVE JUROR 46:*  The same thing.  We've had a

2     history with financial investments going through one we know.

3     We don't currently do that anymore, but we have in the past, my

4     husband and I.

5          *THE COURT:*  Anything about your relationship with

6     your financial advisor that would make you feel particularly

7     strongly one way or the other?

8          *PROSPECTIVE JUROR 46:*  No.

9          *THE COURT:*  Okay.  Yes, ma'am, number 17.

10         *PROSPECTIVE JUROR 17:*  Also the same, 403(b)

11    investment, meet yearly for our retirement.

12         *THE COURT:*  Okay.  And no other kinds of

13    entanglements or anything of that nature?

14         *PROSPECTIVE JUROR 17:*  No, ma'am.

15         *THE COURT:*  Okay.  I know we talked a little bit

16    about criminal cases and so forth, but is there anybody here

17    who has had difficulties with various and sundry federal

18    agencies, of which there are many?

19         Sometimes we encounter the federal government in

20    places where we least expect to.  Anybody who has had that kind

21    of an experience that would leave you wary of the government in

22    general?  Okay.

23         At the end of the trial after the evidence and

24    testimony are all before you, I will give you instructions on

25    the law, and one of those instructions will be that you are to

1    render a verdict only on the evidence that you see and hear in

2    this courtroom.

3             Is there anybody who thinks that they cannot follow

4    those directions, those legal instructions?  And they go on for

5    a while.  And you'll have a copy of them to read in the jury

6    room when you deliberate.  But they contain the legal context

7    in which the factual determinations have to be made.

8             Is there anybody who thinks that that cannot -- they

9    cannot follow and abide by the law and apply the law to the

10   facts?  No?  Good.

11            THE CLERK:  There is one juror.

12            THE COURT:  I'm sorry, yes, ma'am.

13            PROSPECTIVE JUROR 44:  44.

14            THE COURT:  Number 44?

15            PROSPECTIVE JUROR 44:  Yes.  I was in a resource room

16   when I went through school, and there's a lot that I just don't

17   understand.  You know, like a lot of the big words that are

18   said, things like that.

19            THE COURT:  Okay.  Well, you know, that's kind of one

20   of the things that I think a lot of jurors face when they come

21   into this room.  And we will do our best -- I will do my best;

22   I'm sure Mr. Mekaru and Mr. Tracy will also do their best to

23   explain.  Because really, how many of us in the scheme of

24   things in our daily lives get involved in sophisticated

25   financial dealings?  I know I don't.  And so we will, to the

1    best of our ability, explain those and going forward would hope

2    that if we miss the boat, you'll ask us.

3              *PROSPECTIVE JUROR 44:*  Okay.

4              *THE COURT:*  Okay?  Is that fair enough?

5              Yes, sir.  Number --

6              *PROSPECTIVE JUROR 13:*  Number 13.

7              *THE COURT:*  -- 13.

8              *PROSPECTIVE JUROR 13:*  I just had one other question

9    as far as mentioning about my vision or whatever.  At home even

10   filling out the questionnaire, I use the magnifying glass to

11   make the words bigger because the print was so small.

12             *THE COURT:*  Okay.

13             *PROSPECTIVE JUROR 13:*  I didn't bring nothing like

14   that with me, so would something like that be already here or

15   something I've got to bring from home or --

16             *THE COURT:*  Well, some of the exhibits will be

17   displayed on that large screen, and others will be, I assume,

18   in paper size.  And if you need some magnification, I suspect

19   we can find some for you here.  In fact, I might even have -- I

20   might even have some in my office.  I'll have to take a look.

21   I don't carry one with me.

22             Yes, ma'am, Number 33.

23             *PROSPECTIVE JUROR 33:*  May I speak privately?

24             *THE COURT:*  Yes, certainly.

25             *THE CLERK:*  Attorneys.

1          *(At sidebar on the record)*

2               *PROSPECTIVE JUROR 33:*  As I sit here looking out, I

3     know that I do know the police officer Mark Hill.  At one

4     time -- I have a 17-year-old daughter, and at one time we were

5     having the police come regularly to take her to school and to

6     find her when she ran away, and at one point she was raped.  I

7     don't remember which time he came, but I do know that he came

8     at one time.  Now, since I don't remember which time he was

9     there --

10              *THE COURT:*  Sure.

11              *PROSPECTIVE JUROR 33:*  -- what it was for, I don't

12    see how it would have any influence, but I do want to let you

13    know.

14              *THE COURT:*  Mr. Mekaru.

15              *MR. MEKARU:*  You had said your daughter was sexually

16    assaulted?

17              *PROSPECTIVE JUROR 33:*  Yes, she was.

18              *MR. MEKARU:*  So she was -- I think the judge asked

19    the question about a victim of crime.

20              *PROSPECTIVE JUROR 33:*  Yes.

21              *MR. MEKARU:*  So the connection with not only the

22    victimization but the connection with law enforcement, anything

23    about that experience --

24              *PROSPECTIVE JUROR 33:*  No.

25              *MR. MEKARU:*  -- both with a family member being

1    assaulted as well as your contact with law enforcement?

2            PROSPECTIVE JUROR 33:  No, it would not influence me

3    in this in any way.

4            THE COURT:  Mr. Tracy.

5            MR. TRACY:  Mark Hill now is with the

6    Marshall Service, right?  Or no.

7            THE CLERK:  He has been for at least 15 years.

8            PROSPECTIVE JUROR 33:  Maybe he's not the person I

9    remember, but he certainly looks very familiar.

10           MR. MEKARU:  Ma'am, Mark Hill, Deputy Marshal, is not

11   in the courtroom here today.

12           PROSPECTIVE JUROR 33:  Oh, okay.

13           MR. MEKARU:  There are different deputies in the

14   courtroom.

15           PROSPECTIVE JUROR 33:  All right.  Then who is the

16   officer who is sitting there?

17           MR. TRACY:  Sitting with him is Special Agent

18   Tim Wetherbee.  Maybe he just looks like the guy.

19           PROSPECTIVE JUROR 33:  Maybe he looks like the

20   officer then.

21           MR. TRACY:  Sitting at plaintiff's table.

22           PROSPECTIVE JUROR 33:  Okay.  Then he's not the one

23   that I remember must be.  I just wanted to clear it up so there

24   was no question.

25           THE COURT:  Okay.  Good.

1    *MR. TRACY:*  I have nothing further on that.

2    *THE COURT:*  Thank you.

3    Mr. Mekaru.

4    *MR. MEKARU:*  Thank you.

5    *THE COURT:*  Okay.  Thank you.

6    *(Sidebar discussion concluded)*

7    *THE COURT:*  Is there any other reason that I haven't

8    touched on?  And the lawyers are going to ask you some

9    questions shortly, but is there any other reason that I have

10   not asked about why you think you could not sit as a fair and

11   impartial juror in this case?

12   Very well.  Thank you.

13   Mr. Mekaru, any follow-up?

14   *MR. MEKARU:*  Yes, Your Honor.  Thank you.

15   Juror Number 54.

16   *PROSPECTIVE JUROR 54:*  Yes.

17   *MR. MEKARU:*  The judge was asking you questions about

18   your personal experience, and someone who was close to you had

19   been charged and convicted of embezzlement, and she asked you

20   whether there was any concern about your ability to set your

21   feelings aside with your friend and his experience and isolate

22   those and consider this case fairly.  And if I may suggest,

23   there was a little hesitation in your response.

24   *PROSPECTIVE JUROR 54:*  Yeah, I thought about it after

25   I did that, and I still think there's a hesitation here.  I've

1    tried to put it in my mind, you know, how I feel about the two,

2    and just -- because I didn't think he was guilty, and he got

3    convicted, and it just never sat right with me, and it just --

4    I don't know.

5              *MR. MEKARU:*  I mean, embezzlement is a financial

6    crime.

7              *PROSPECTIVE JUROR 54:*  Right.

8              *MR. MEKARU:*  And that's essentially what we're

9    talking about here.

10              *PROSPECTIVE JUROR 54:*  Right.

11              *MR. MEKARU:*  Really what we're asking for you to

12    do -- it's hard because you haven't heard the case yet -- but

13    we are asking you to kind of look down in your heart of hearts,

14    do you really think you can set aside that emotional connection

15    with your friend and consider another financial case?

16              *PROSPECTIVE JUROR 54:*  Right, and that's what I

17    was -- I have a hesitation.  I can't come out and say I could

18    do that.

19              *MR. MEKARU:*  Okay.  So, I'm sorry, so you cannot come

20    out and say you fairly could consider this case?

21              *PROSPECTIVE JUROR 54:*  Right.  I would guess that's

22    the way it would go.

23              *MR. MEKARU:*  Okay.  Let's see, Juror Number 15.

24              *PROSPECTIVE JUROR 15:*  Yes.

25              *MR. MEKARU:*  Yes, sir.  As you gathered from my

1  questions of the judge, I did have a question about your

2  friend.

3      PROSPECTIVE JUROR 15:  Uh-huh.

4      MR. MEKARU:  You indicated that he has had some

5  contact with law enforcement, the prosecution's office, both at

6  the state and federal level.

7      PROSPECTIVE JUROR 15:  I'm not sure.  The situation

8  was I was friends with him for about two or three years in high

9  school, I brought him to the church youth group.  And I went

10 away and I lived in Mt. Pleasant for the last three years and

11 have been home during the summers.  I didn't have much contact

12 with him.  I discovered that he was in jail, and I wrote

13 letters and visited him once or twice in jail.  And he was

14 released, and then he went back in, and then he was released

15 again, and I think he's awaiting another trial.  So I don't

16 know all the details.  I know there were some federal offenses.

17 I can't tell you exactly what they are, though.  I'm not

18 entirely certain.

19      MR. MEKARU:  May I ask his name?

20      PROSPECTIVE JUROR 15:  Tyler Dumay.  Although I think

21 the court could have mispronounced the name.  He was known as

22 Deevy.  It's odd, but . . .

23      MR. MEKARU:  Now, so this is somebody you've gone to

24 visit, so I gather you're still fairly close with him?

25      PROSPECTIVE JUROR 15:  Um, as close as you can be

1    with someone who is behind bars.  I haven't been able to speak

2    to him for a number of months, and I sent him a letter telling

3    what's going on, and I never got any response, and I haven't

4    had any contact with him since.

5         MR. MEKARU:  Well, is there anything about that

6    situation -- you have a friend who is actually going through

7    the criminal justice system.

8         PROSPECTIVE JUROR 15:  Yes.

9         MR. MEKARU:  Been prosecuted perhaps multiple times.

10        PROSPECTIVE JUROR 15:  Yes, he has.

11        MR. MEKARU:  Anything about that experience with your

12   friend and your emotions and your feelings for a friend and

13   what he's going through that might affect your ability to sit

14   and consider this case fairly?

15        PROSPECTIVE JUROR 15:  No.  This is a completely

16   unrelated matter, and he -- yeah, he's not -- that's a

17   situation that he has put himself in unfortunately.

18        MR. MEKARU:  Okay.  So along those lines, do you feel

19   he's been fairly treated?

20        PROSPECTIVE JUROR 15:  Yes, I definitely think he's

21   been fairly treated.

22        MR. MEKARU:  Okay.  Juror Number 13.  You had shared

23   with us this pretty tragic situation with a family member.

24        There's -- in this case we will be calling family

25   members in to testify.  We're actually looking at asking the

1    defendant's sister and a cousin to come in to testify.  It's

2    not going to be a -- and I don't think it's necessarily going

3    to be an easy thing for them, but they are going to be put in

4    that situation.

5           Is there anything about that where we'll be calling

6    witnesses where there's a family connection and a close

7    affinity that may resonate with you in your own experience and

8    cause you to be concerned about being able to consider this

9    case fairly and impartially?

10           *PROSPECTIVE JUROR 13:*  Well, right now I'm still --

11    even though it's been a few years since -- because we had

12    raised my niece for 18 months before the FIA gave my niece back

13    to her mom and dad, you know.  They are serving 30 to 60 right

14    now.  And I still have a hard time, you know, thinking about

15    things like that as far as family members and all what we went

16    through in the trial that we went through.

17           But as far as this case right here being, you know,

18    different, because it's not a murder case, and so I think I

19    would see things different in this case.

20           *MR. MEKARU:*  Okay.  Because it is -- by no means is

21    this anything like the violent crime involved with a murder.

22    It's a financial case.

23           *PROSPECTIVE JUROR 13:*  Right.

24           *MR. MEKARU:*  So you can separate out your experience

25    in dealing with that case from this?

1              *PROSPECTIVE JUROR 13:*  Yes.

2              *MR. MEKARU:*  Okay.  Again, if there's any hesitation,

3      please let me know.  I do sense some.

4              *PROSPECTIVE JUROR 13:*  I guess it's the whole process

5      itself.  You know, I went through almost probably close to a

6      year and a half in and out of court until the things got

7      finalized, and I still -- even though the case is different,

8      I'm not sure.

9              *MR. MEKARU:*  Well, I'm going to press you a little

10     bit on this.  You said you're not sure.  Not sure suggests to

11     me you really can't set aside that case from this one.

12             Is that true?

13             *PROSPECTIVE JUROR 13:*  I guess it's the emotional

14     thing.

15             *MR. MEKARU:*  Okay.

16             *PROSPECTIVE JUROR 13:*  With, you know, bringing in

17     family.

18             *MR. MEKARU:*  Sure.  I understand.

19             Okay.  Let's see, Juror Number 52, you said you were

20     studying accounting.  How far along are you?

21             *PROSPECTIVE JUROR 52:*  I just graduated my sophomore

22     year.

23             *MR. MEKARU:*  Okay.  So in your accounting classes

24     have you done any case studies involving allegations of fraud

25     or misconduct with respect to accounting?

1        *PROSPECTIVE JUROR 52:*  Like when we were talking

2   about that, the subject and such, he mentioned different things

3   and explained them, but it wasn't -- we didn't really take

4   notes.  We weren't tested on it.  So it wasn't in depth really.

5   He mentioned it and stuff.

6        *MR. MEKARU:*  Having that in your background, it may

7   on the one hand be helpful because of the financial aspects of

8   this case, but also can you set aside what you may have learned

9   in school about some frauds and other activities and instead

10  focus solely on the facts as presented in this case and

11  separate those out?

12        *PROSPECTIVE JUROR 52:*  Yeah.

13        *MR. MEKARU:*  I know that, Juror Number 14, you had

14  indicated some concern about your health, in particular I think

15  your vision.

16        *PROSPECTIVE JUROR 14:*  It's not really a vision issue

17  all of the time.  It's towards the end of the day.  I have an

18  eye condition that I'm being treated for, and as my eyes tire,

19  that's what it amounts to.

20        *MR. MEKARU:*  Okay.  I want you to understand that a

21  lot of this case is going to involve going over documents.  We

22  have a screen here which we'll be projecting, projecting

23  records --

24        *PROSPECTIVE JUROR 14:*  Right.

25        *MR. MEKARU:*  -- and you're going to have to review

1    them.  The exhibits are going to be sent back to the jury room.

2            *PROSPECTIVE JUROR 14:*  Right.

3            *MR. MEKARU:*  So a lot of time is going to be

4    dedicated to going over the records.

5            Now, understanding your medical needs and your

6    concern about making certain that you want to take care of

7    yourself, anything at all about the fact this may be

8    document-intensive that would cause you some concern?

9            *PROSPECTIVE JUROR 14:*  No.  My job is

10   document-intensive as well.  It's just -- it's just a matter of

11   I would say probably by evening that it's an issue.  So before

12   5:00 or before 4:00, I don't think it's going to be any kind of

13   a medical problem.

14           *MR. MEKARU:*  Okay.  As the judge suggested, we should

15   be done by --

16           *PROSPECTIVE JUROR 14:*  Right, right.

17           *MR. MEKARU:*  -- 3:30, 4:00.

18           *PROSPECTIVE JUROR 14:*  That's why I don't expect a

19   problem with it.

20           *MR. MEKARU:*  Likewise, Mr. --

21           *PROSPECTIVE JUROR 15:*  Juror 15.

22           *MR. MEKARU:*  No, Mr. -- 13.

23           *PROSPECTIVE JUROR 13:*  Barney McDaniel.

24           *MR. MEKARU:*  Yes, sir.  You had indicated some

25   problems with vision.  I know when we get older, I've been

1    finding this, that I start -- the arms start getting longer.

2    But most of the documents are going to be presented up on the

3    screen, and any problem with seeing documents at that distance?

4         PROSPECTIVE JUROR 13:  I'm not for sure.  I know I

5    sit -- when I go to church, I sit in the second pew back, and

6    they also have a screen that comes down with the words on it,

7    and I have no problem.  But I've never tried sitting at like

8    the back of the church to see if I can still see all the words

9    or whatever.

10        MR. MEKARU:  Okay.  So the second pew from the front.

11        PROSPECTIVE JUROR 13:  From the front, yes.

12        MR. MEKARU:  All right.  Okay.  Okay.  Juror

13   Number 44.

14        PROSPECTIVE JUROR 44:  Yes.

15        MR. MEKARU:  And you've been very candid with us

16   about your concerns about the nature of the case and the

17   financial aspect, the terminology.  As the judge suggested,

18   we'll do what we can to try to translate terms into lay terms,

19   because as the judge suggested here, we're not necessarily

20   coming from a financial background.

21        PROSPECTIVE JUROR 44:  Right.

22        MR. MEKARU:  But again, it will involve lots of

23   documents, reviewing them.  Primarily numbers.  Primarily

24   numbers.

25        PROSPECTIVE JUROR 44:  Yes.

1          MR. MEKARU:  And you're going to be seeing names and

2    such, and there will be some contracts that will be part of the

3    case.

4          PROSPECTIVE JUROR 44:  Yeah, I don't think I would be

5    able to read.  I can't read very well.

6          MR. MEKARU:  Okay.  And I don't mean to embarrass

7    you.

8          PROSPECTIVE JUROR 44:  That's fine.

9          MR. MEKARU:  Sure.  So given the nature of the case,

10   you really don't think you'll be able to process the evidence?

11         PROSPECTIVE JUROR 44:  (Nodding head).

12         MR. MEKARU:  I am back to you, Juror Number 15.  I

13   think you indicated you have a father who is a pastor?

14         PROSPECTIVE JUROR 15:  That's correct.

15         MR. MEKARU:  I think I indicated in explaining who

16   our potential witnesses are, we do have a pastor who is going

17   to be testifying, and the government's allegation is that he's

18   a victim in this case.

19         Is there anything at all about your family

20   relationship as being a pastor that will affect you and make

21   you -- that won't make it possible for you to consider this

22   case fairly when we have a witness, one of the victims here who

23   is himself a pastor?

24         PROSPECTIVE JUROR 15:  I see that this is -- I mean,

25   they are both pastors, but this is a separate case, a

1    separation.  I don't perceive any problems.

2              MR. MEKARU:  I think this is true for both of you,

3    Juror Number 52 and 15.  I gather both your classes are done

4    now and it's summer break?

5              PROSPECTIVE JUROR 15:  Correct.  I'm taking summer

6    classes right now, but they are marketing, management, and an

7    oppression class.  It's not really financial stuff.

8              MR. MEKARU:  Are you missing any classes?

9              PROSPECTIVE JUROR 15:  They are online classes.  I'll

10   be okay.  Thank you for your concern, though.

11             MR. MEKARU:  I'm sorry, Your Honor.  I'm taking a

12   look at my notes.  Thank you.

13             THE COURT:  Thank you.  Mr. Tracy.

14             MR. TRACY:  Thank you, Your Honor.  Good morning

15   again.

16             ALL:  Good morning.

17             MR. TRACY:  I'm Chris Tracy, as you heard before.

18   And as you heard before, I represent the defense.  There's one

19   general question I would like to ask all of you.  The

20   government gets to go first in this case.  They have the

21   burden, as the judge explained, the beyond-a-reasonable-doubt

22   standard.  So they get to go first.  And based on my

23   conversations with Dan, that may take all of this week and

24   early into next week with their witnesses.  I have a right to

25   cross-examine those witnesses, but it's their case first.

1       So my question to you is this:  Given the fact that

2  the government gets to go first, do any of you believe -- and

3  if you could just raise your hand if you're answering yes to

4  this -- do any of you believe you would have a problem holding

5  off prejudging or making a judgment in the case until such time

6  as you've heard all of the evidence, including any of the

7  defense that I put on on behalf of my client?  Will any of you

8  have a problem with that?  Okay.  Thank you.

9       Now I have a few specific questions, and there may be

10 a couple of other general ones.

11      Juror Number 14, is it Ms. Scribner?

12      *PROSPECTIVE JUROR 14*:  Scriver.

13      *MR. TRACY*:  Scriver.  I'm sorry.  I believe on your

14 questionnaire, do you work currently for the State of Michigan?

15      *PROSPECTIVE JUROR 14:*  No my husband is retired from

16 there.

17      *MR. TRACY*:  Okay.  He's retired from there.

18      *PROSPECTIVE JUROR 14:*  Yes.

19      *MR. TRACY*:  Okay.  He's retired.  I didn't understand

20 that.  And he worked for the Department of Human Services

21 there?

22      *PROSPECTIVE JUROR 14:*  Yes.

23      *MR. TRACY*:  Anything about the fact that he happened

24 to work for a different branch of government, would that impact

25 you?

1              PROSPECTIVE JUROR 14:  No, no.

2              MR. TRACY:  Okay.  Juror Number 18, is it Mr. Hines?

3              PROSPECTIVE JUROR 18:  Yes, sir.

4              THE COURT:  Mr. Tracy, we are going to try to just

5    refer to the jurors by number.

6              MR. TRACY:  By number, juror number.  18 then.  Sorry

7    about that.

8              Your -- one of your parents is an attorney; is that

9    correct?

10             PROSPECTIVE JUROR 18:  Yes.

11             MR. TRACY:  Is that your mother or father?

12             PROSPECTIVE JUROR 18:  My father.

13             MR. TRACY:  Okay.  Is he still practicing?

14             PROSPECTIVE JUROR 18:  Yes.

15             MR. TRACY:  Does he practice here in Michigan?

16             PROSPECTIVE JUROR 18:  Yes.

17             MR. TRACY:  What kind of law does he practice?

18             PROSPECTIVE JUROR 18:  He does a lot of bankruptcy,

19   criminal defense.

20             MR. TRACY:  I take it he's probably been at it for

21   about 25 or 30 years?

22             PROSPECTIVE JUROR 18:  30 years.

23             MR. TRACY:  What town does he practice in?

24             PROSPECTIVE JUROR 18:  Cadillac.

25             MR. TRACY:  Do you know if he's ever handled a case

1    along these lines that you're aware of?

2              PROSPECTIVE JUROR 18:  Probably.

3         MR. TRACY:  Okay.  Do you talk a lot with him about

4    his cases at all?

5              PROSPECTIVE JUROR 18:  No, not really.

6         MR. TRACY:  Anything about the fact that your dad is

7    an attorney and maybe discussed some things along the line, is

8    that going to impact you one way or the other with respect to

9    this case?

10             PROSPECTIVE JUROR 18:  No.

11        MR. TRACY:  Okay.  And Juror Number 17, right?

12             PROSPECTIVE JUROR 17:  Uh-huh.

13        MR. TRACY:  Both you and your spouse served in the

14   Air Force?

15             PROSPECTIVE JUROR 17:  Correct.

16        MR. TRACY:  Is your husband still in?

17             PROSPECTIVE JUROR 17:  No.

18        MR. TRACY:  And you're also out of the Air Force at

19   this point?

20             PROSPECTIVE JUROR 17:  Correct.

21        MR. TRACY:  Approximately what period of time did you

22   serve?

23             PROSPECTIVE JUROR 17:  In '86.

24        MR. TRACY:  Back in the eighties?

25             PROSPECTIVE JUROR 17:  Uh-huh.

1          *MR. TRACY:*  Where were you stationed?

2          *PROSPECTIVE JUROR 17:*  In Nebraska.

3          *MR. TRACY:*  Was that a good experience?

4          *PROSPECTIVE JUROR 17:*  Yes.

5          *MR. TRACY:*  Anything about the fact that you served

6     for a branch of the Air Force or the government, would that

7     impact you one way or the other with respect to the case?

8          *PROSPECTIVE JUROR 17:*  No.

9          *MR. TRACY:*  No?  Okay.  Thank you.

10         And then Juror Number 15, sorry to press you again

11    about the fact that your father is a pastor.

12         *PROSPECTIVE JUROR 15:*  It's quite all right.

13         *MR. TRACY:*  Just no qualms at all about the fact that

14    part of it is the person has to take an oath or affirm that

15    they are going to tell the truth when they take the witness

16    stand, you're not going to give the fact that somebody happens

17    to be a pastor of a church more credence than a different

18    witness?

19         *PROSPECTIVE JUROR 15:*  Pastors are people too, and

20    I'll have to evaluate his credibility.  I assume it's a he.

21    His or her credibility as --

22         *MR. TRACY:*  Him in this case.

23         *PROSPECTIVE JUROR 15:*  -- as much as anybody else.

24    Because pastors are sinners too.  No one is perfect.  So if

25    he's believable as the truth to say, then I'll try to listen

1    and evaluate it fairly.  But if he's not, I also have to call

2    that out too.  Just because he's a pastor doesn't necessarily

3    make him more or less credible.  It just makes him a person.

4              MR. TRACY:  I think as you hear the evidence, I think

5    you'll hear it could be a doctor, a lawyer, or a candlestick

6    maker.  It happens to be that he's a pastor that invested

7    monies and will testify about that.

8              So the pastor label doesn't impact you?

9              PROSPECTIVE JUROR 15:  He's still a person with just

10   a different label.

11             MR. TRACY:  Okay.  Anybody else have a relationship

12   either with a pastor or clergy or anything that you think just

13   because it happens to be that's his profession, and he may even

14   be referred to that while he's on the witness stand, anybody

15   else, if you would raise your hand, have a concern about that,

16   about perhaps giving that person more or less credibility as a

17   witness?  Thank you.

18             And then Juror Number 19, and I know you've talked

19   about this a little bit already, one of the -- I think it was

20   just one time you served as a juror previously?

21             PROSPECTIVE JUROR 19:  Uh-huh.

22             MR. TRACY:  And that happened to be you said -- you

23   called it an embezzlement case, right?

24             PROSPECTIVE JUROR 19:  Yes.

25             MR. TRACY:  Could you speak up just a little?  I'm

1    sorry.

2              PROSPECTIVE JUROR 19:  Yes.

3              MR. TRACY:  Do you remember whether that was a civil

4    or criminal proceeding, if you can recall?

5              PROSPECTIVE JUROR 19:  Well, I think it was probably

6    criminal because it had to do with bank deposits.  But I don't

7    know that much about it.

8              MR. TRACY:  Well, sometimes one businessperson -- you

9    know, like to say if there's two partners in a business, one

10   could be claiming that the other one in a civil case has

11   embezzled something from them.  But your recollection was that

12   it had something to do with bank funds, so it may have been the

13   state government or federal government that were bringing that

14   action?

15             PROSPECTIVE JUROR 19:  I'm sorry, I wish I could

16   remember the detail of it.  It's been 12, 13 years now --

17             MR. TRACY:  Okay.

18             PROSPECTIVE JUROR 19:  -- and I just can't remember.

19             MR. TRACY:  Where do you think the trial occurred?

20   Do you remember what town it was in?

21             PROSPECTIVE JUROR 19:  Cadillac.

22             MR. TRACY:  Okay.  So there's no federal court up

23   there, right, so it had to have been state.

24             PROSPECTIVE JUROR 19:  No.

25             MR. TRACY:  Any other details you can remember about

1    that case?

2            *PROSPECTIVE JUROR 19:*  No.  It was a business in

3    Downtown Cadillac.

4            *MR. TRACY:*  And the jury returned a verdict of guilty

5    in that case?

6            *PROSPECTIVE JUROR 19:*  Yes.

7            *MR. TRACY:*  But anything about your service then and

8    the fact that it happened to involve bank funds and

9    embezzlement, would that impact you at all with respect to

10   listening to the evidence in this case and rendering what you

11   and the other jurors feel is a fair verdict?

12           *PROSPECTIVE JUROR 19:*  It wouldn't.

13           *MR. TRACY:*  Excuse me just one second, Your Honor.

14           I have nothing -- no further questions, Your Honor.

15   Thank you.

16           *THE COURT:*  Thank you, Mr. Tracy.

17           Gentlemen, would you join me at sidebar, please.

18       *(At sidebar on the record)*

19           *THE COURT:*  Mr. Mekaru, any challenges for cause?

20           *MR. MEKARU:*  Yes, Your Honor.  Juror Number 44, she

21   is in seat 3, she's indicated that she's not going to be able

22   to review the evidence, and, therefore, won't be able to really

23   render her verdict based on the evidence.

24           *THE COURT:*  I agree.  Anybody else?

25           *MR. MEKARU:*  Yes, ma'am.  Juror Number 54, seat

1    number 12, the individual who has a friend who has been

2    convicted of embezzlement and feels he was treated unfairly.

3    We feel he still has an emotional response, as he's indicated,

4    and that he would not be able to consider this case fairly.

5             THE COURT:   That's not my recollection of what he

6    said.

7             Mr. Tracy, do you want to comment?

8             MR. TRACY:   Well, I think he says he obviously still

9    has issues with the fact that that occurred.  I don't think

10   that he necessarily goes to the extent to say that he can't be

11   impartial.  So I don't know whether or not any follow-up

12   questions are in order or not, but I didn't hear him go into

13   that extent.  He clearly said he had some hesitation.  To what

14   degree that is, I'm not sure.

15            MR. MEKARU:   I thought I pressed him on that and

16   asked him can he set that aside and he said no.

17            THE COURT:   There at the end I think he did waver

18   somewhat, so I'll grant that as well.

19            Any others, Mr. Mekaru?

20            MR. MEKARU:   Your Honor, I do remain concerned about

21   Juror Number 13.

22            THE COURT:   Are you making a motion or no?

23            MR. MEKARU:   Yes, Your Honor.  He's indicated with

24   his family connection with that case --

25            THE COURT:   Well, except that was such a vastly

1  different --

2          *MR. MEKARU:*  He did ultimately say that he thought it

3  would be different enough that he could set it aside, but I was

4  on the fence with him.

5          *THE COURT:*  I'm going to deny that.

6          *MR. MEKARU:*  Okay.

7          *THE COURT:*  Any others?

8          *MR. MEKARU:*  No, Your Honor.

9          *THE COURT:*  Mr. Tracy?

10          *MR. TRACY:*  I don't have any for cause, Your Honor,

11  no.

12          *THE COURT:*  Okay.  Very well.

13      *(Sidebar discussion concluded)*

14          *THE COURT:*  Ladies and Gentlemen, I probably should

15  have explained this a little more in detail earlier, but in

16  this process the lawyers have a responsibility to, after they

17  have heard the jurors being questioned, to determine whether

18  they have a valid reason to have a juror excused.  These are

19  called excuses for cause.

20          Later on they will be able to also excuse a certain

21  number for no cause at all.  But they can explain to the Court

22  their concerns about the ability of jurors going forward to be

23  fair and impartial based on the answers that they have given.

24  And this is their responsibility to their individual clients.

25  And I want to make sure that you understand that this is not

1    any kind of a personal insult to you.  It is simply their

2    experience and judgment that leads them to believe that an

3    individual, particular individual should not be a part of the

4    jury.

5              And with that in mind, I have granted two such

6    motions.  First, Juror Number 44, you are excused, ma'am.  And

7    Juror Number 54, you are also excused, sir.  And thank you very

8    much for your service.  We will then fill those two slots with

9    other members.  Thank you.

10             *THE CLERK:*  Juror Number 58, KS, if you'll take the

11   seat in the back row.

12             Juror Number 57, SB, if you'll take the seat in the

13   front row.

14             *THE COURT:*  57?

15             *THE CLERK:*  Yes, 57.

16             *THE COURT:*  As questions were being asked of the

17   original 14, I looked out occasionally at the rest of the jury

18   panel, and I think you were all listening quite closely.  But I

19   will repeat some questions and then ask some more general ones.

20             Have either of you sat on juries before?  Yes, ma'am.

21   Can you tell me a little bit about your experience?

22             *PROSPECTIVE JUROR 58:*  It was a criminal trial.  I

23   was in college.  I don't remember a lot about it, but it

24   involved someone doing some personal property damage.

25             *THE COURT:*  Okay.  That was then probably in state

1    court?

2          PROSPECTIVE JUROR 58:  Yes.

3          THE COURT:  District Court?

4          PROSPECTIVE JUROR 58:  I don't remember.

5          THE COURT:  Was the -- what was the verdict in that

6    case?

7          PROSPECTIVE JUROR 58:  Guilty.

8          THE COURT:  Guilty?  Was there anything about that

9    experience that you think matches up with this kind of

10    situation, which is as we've indicated an alleged fraud, that

11    would affect your ability, do you think, to be fair and

12    impartial in this case?

13          PROSPECTIVE JUROR 58:  No.

14          THE COURT:  No.  No prior experience from Juror

15    Number 57.

16          Do either of you -- have either of you ever had an

17    experience with the criminal justice system, either yourself or

18    a friend or a close family member?

19          PROSPECTIVE JUROR 58:  I had a very close personal

20    friend who just had charges pressed through the Metron case and

21    the charges were dismissed.

22          THE COURT:  And we're speaking now to Juror 58.  Your

23    relationship with your close friend and her experience in the

24    criminal justice system, would that affect your ability to

25    listen to the government, listen to the defense, and decide

1    impartially?

2        PROSPECTIVE JUROR 58:  No.

3        THE COURT:  Okay.  Number 57, anything of that nature

4    in your background?

5        PROSPECTIVE JUROR 57:  No.

6        THE COURT:  Have either of you been involved in

7    investment matters either with an investment advisor, or do you

8    think you've been in any way victimized in a financial way?

9    No?  Neither one of you.

10        In listening to the fairly extensive questioning that

11   went on earlier, do either of you -- does anything occur to

12   either one of you that would disqualify you in your own mind

13   from being a fair and impartial juror in this case regarding

14   the government and Mr. Heshelman?  Neither of you?  Very well.

15        Mr. Mekaru, would you like to ask some brief

16   follow-up?

17        MR. MEKARU:  Yes, Your Honor.  Juror Number 57, you

18   had indicated that you were concerned about your hearing, that

19   you would be hearing out of your right ear?

20        PROSPECTIVE JUROR 57:  Uh-huh.

21        MR. MEKARU:  It was problematic.  Can you hear

22   anything out of that side?

23        PROSPECTIVE JUROR 57:  A little.  And if I turn my

24   head to catch what I need to so I'm hearing out of my left ear

25   more.  It's from childhood ear infections.

1          MR. MEKARU:  Now, we're going to be playing some

2    audiotapes.  Some of them are pretty faint, but we should have

3    some transcripts that will go along with that.  So any problem?

4          PROSPECTIVE JUROR 57:  No.

5          MR. MEKARU:  I do believe that the court may even

6    have some system where we could hook up even remote headphones.

7          THE CLERK:  I don't know if we have that in here.

8    I'll have to check.

9          PROSPECTIVE JUROR 57:  It shouldn't be any problem.

10          MR. MEKARU:  If at some point you feel you have a

11   problem hearing, could you let us know perhaps?

12          PROSPECTIVE JUROR 57:  Yes.

13          MR. MEKARU:  That's true with anyone else.  If you

14   have problems hearing, if you'll let us know.

15          Juror Number 58, ma'am, you've mentioned your

16   friend's involvement in a particular case.  I didn't quite

17   recognize that.

18          PROSPECTIVE JUROR 58:  Yeah, it was a nursing home

19   case in Big Rapids where there was the death of a patient and

20   the Attorney General . . .

21          MR. MEKARU:  Gotcha.  All right.  I remember that

22   matter.

23          Now, she was originally charged?

24          PROSPECTIVE JUROR 58:  She was.

25          MR. MEKARU:  And then those charges were dismissed?

1          *PROSPECTIVE JUROR 58:*  Correct.

2          *MR. MEKARU:*  I can understand for your friend and for

3    yourself someone being charged is a pretty serious matter.

4          *PROSPECTIVE JUROR 58:*  Uh-huh.

5          *MR. MEKARU:*  And that while there's some, I mean,

6    perhaps even relief in having the charges dismissed, I can also

7    see there being some feelings about that whole situation.

8          Is there anything about that matter involving your

9    friend and how she may have been treated or the case had been

10   handled by the Attorney General's office that would affect your

11   ability to consider this case?

12         *PROSPECTIVE JUROR 58:*  I don't think so.

13         *MR. MEKARU:*  Okay.  Just so I'm clear now, that

14   was --

15         *PROSPECTIVE JUROR 58:*  That's a "no."

16         *MR. MEKARU:*  That was the Michigan Attorney General,

17   and we are --

18         *PROSPECTIVE JUROR 58:*  That was the Michigan.

19         *MR. MEKARU:*  And this is the United States Attorney.

20         *PROSPECTIVE JUROR 58:*  Yes, I have the distinction.

21         *MR. MEKARU:*  Okay.  Your Honor, may I follow up on

22   something Mr. Tracy had asked one of the other jurors earlier?

23         *THE COURT:*  No, Mr. Mekaru, we're dealing here with

24   the two new jurors.

25         *MR. MEKARU:*  Very good.  Thank you.

1          *THE COURT:*  Mr. Tracy?

2          *MR. TRACY:*  Thank you, Your Honor.  Jurors 58 and 57,

3    I think you heard my question about making sure you reserve

4    judgment until you hear the whole case.

5          Any problems with that for either of you?

6          *PROSPECTIVE JUROR 57:*  No.

7          *PROSPECTIVE JUROR 58:*  No.

8          *MR. TRACY:*  Thank you.  I also asked questions about

9    some of the witnesses that may take the stand, particularly

10   people that may have the titles of doctor, pastor, et cetera.

11   Anything about -- either of you -- about somebody's profession

12   in life that may give them more credibility than some other

13   witness?

14         *PROSPECTIVE JUROR 57:*  No.

15         *PROSPECTIVE JUROR 58:*  No.

16         *THE COURT:*  Okay.  Gentlemen, at sidebar, please.

17     *(At sidebar on the record)*

18         *THE COURT:*  Mr. Tracy, any challenge for cause to

19   either 57 or 58?

20         *MR. TRACY:*  No.

21         *THE COURT:*  Mr. Mekaru?

22         *MR. MEKARU:*  No.

23         *THE COURT:*  Okay.  I'm going to give you --

24         *THE CLERK:*  I've got one.

25         *THE COURT:*  Okay.  -- a sheet for peremptory

1   challenges.

2          Mr. Mekaru will fill his out first.  Mr. Tracy then

3   will go next.  And then I will excuse whoever, if any.

4          If there is a second round, Mr. Tracy will go first,

5   and Mr. Mekaru will go second.

6          *MR. TRACY:*  Okay.  Do we use the same sheet of paper?

7          *THE COURT:*  Yes.

8          *THE CLERK:*  And, Judge, did you make sure they are

9   aware that there are no backstrikes?

10          *THE COURT:*  No backstrikes.  We talked about that.

11          *MR. TRACY:*  We are aware of that, yes.

12       *(Sidebar discussion concluded)*

13          *THE COURT:*  Okay.  Jurors Number 13, Number 15, and

14   Number 31, you are all excused, and thank you very much for

15   your service.  Please don't think that having come here, and

16   particularly from a long distance, that your time or effort has

17   either been unappreciated or wasted.  It has not.  All of you

18   have already performed an important, valuable service, which I

19   personally appreciate and I thank you for.  Thank you.

20          *THE CLERK:*  Juror Number 17, MS.  If you'll please

21   take the seat in the back row.

22          I'm sorry, Juror Number 2, MS.  I called the wrong

23   number.  My apologies.  Seat in the back row.

24          Juror Number 30, SH, if you'll take the last seat in

25   the back row.

1          THE COURT:  No, the first seat in the front row,

2    right?

3          THE CLERK:  Oh.  Yes.  You can come all the way

4    around if you would like to save yourself from -- okay.

5          Juror Number 10, GK, if you'll take the third seat

6    over in the front row.

7          THE COURT:  Okay.  Juror Numbers 2, 30, and 10, now I

8    hope you aren't offended by the use of numbers instead of

9    names.

10         Have any of you, any of the three of you sat on a

11   jury before?  Yes, sir.

12         PROSPECTIVE JUROR 10:  I sat in circuit court.

13         THE COURT:  This is Juror Number 10?

14         PROSPECTIVE JUROR 10:  Yes.

15         THE COURT:  Okay.  You sat in circuit court.  Was

16   that recently?

17         PROSPECTIVE JUROR 10:  Oh, 15 years ago.

18         THE COURT:  A criminal case or civil?

19         PROSPECTIVE JUROR 10:  Criminal.

20         THE COURT:  What type?

21         PROSPECTIVE JUROR 10:  It was a statutory rape.

22         THE COURT:  Okay.  Very much different from the

23   allegations in this case.

24         PROSPECTIVE JUROR 10:  Yes.

25         THE COURT:  Did the case go to verdict?

1          *PROSPECTIVE JUROR 10:*  Yes, it did.

2          *THE COURT:*  And what was the verdict?

3          *PROSPECTIVE JUROR 10:*  The verdict was guilty.

4          *THE COURT:*  And was there anything about that

5    experience that would give you a sense one way or the other of

6    how another criminal case ought to go?

7          *PROSPECTIVE JUROR 10:*  No.

8          *THE COURT:*  Okay.  You could be fair and impartial --

9          *PROSPECTIVE JUROR 10:*  Yes.

10          *THE COURT:*  -- if you were a member of this panel?

11          *PROSPECTIVE JUROR 10:*  Yes.

12          *THE COURT:*  Okay.  Number 2 or Number 30, have either

13    of you sat on juries before?

14          *PROSPECTIVE JUROR 2:*  No.

15          *THE COURT:*  Have any of the three of you had prior

16    experience yourselves, your family, your close friends with the

17    criminal justice system?

18          *THE COURT:*  No.  Okay.

19          Any particular reason that you can think of why this

20    case presents challenges to you as a potential juror?  As we've

21    said several times, it involves allegations of financial fraud.

22          Have you, for instance, had experience with a

23    financial advisor or been what you'd consider to be a victim of

24    a financial fraud yourself?  Yes, ma'am, Number 2.

25          *PROSPECTIVE JUROR 2:*  I do speak with a financial

1    advisor about once a month.  Recently it's been more often.

2    I've spoken to her three times in the past week.  She manages

3    an account for me that was set up by my grandfather, and he,

4    for as long as I can remember, drilled in stories of being

5    really untrustworthy of anyone who wants to control your money.

6            THE COURT:  And that's an interesting point.  Would

7    that in any way, do you think, color your ability to listen and

8    balance all of the facts?  I mean, you heard the number of

9    witnesses who are going to testify.  It's a lot.  There's going

10   to be a lot of testimony.  There's going to be a lot of

11   evidence.  And your viewpoint, as drummed into you by your

12   grandfather, would that affect your ability to be fair and

13   impartial do you think?

14           PROSPECTIVE JUROR 2:  I wouldn't say I have a strong

15   bias, but I do tend to be wary.

16           THE COURT:  Well, what does that mean exactly?

17           PROSPECTIVE JUROR 2:  I don't think that because of

18   his profession I would force a personal judgment on the

19   defendant, if that helps you at all.

20           THE COURT:  It doesn't.

21           PROSPECTIVE JUROR 2:  My wariness only pertains to my

22   accounts and the fact that I'm not willing to change them from

23   what my grandfather set up for me.

24           THE COURT:  Can you separate that out from what is

25   going to go on in this courtroom over the next few days?  The

1  fact that there will be testimony from the government about

2  what Mr. Heshelman did, said, the people he interacted with.

3  There will be undoubtedly some controversy from the defense

4  side with regard to what the witnesses testified to.  Is your

5  personal view going to interfere with your ability to listen to

6  that in a fair and impartial way?

7           PROSPECTIVE JUROR 2:  I don't believe it would affect

8  it, no.

9           THE COURT:  Okay.  Thank you.

10          Do either of the other two of you have any

11 experience?  Yes, sir.

12          PROSPECTIVE JUROR 10:  Yes, I use a financial

13 advisor.

14          THE COURT:  Number 10.  Sir, is it someone you see

15 regularly?

16          PROSPECTIVE JUROR 10:  Oh, three to four times a

17 year.

18          THE COURT:  And would your relationship with your

19 financial advisor in any way color your view?  Understanding

20 that we're going into this without any knowledge.  I mean,

21 we're all a blank slate here for now.  Would you say that your

22 slate is already written upon based upon your relationship?

23          PROSPECTIVE JUROR 10:  No.

24          THE COURT:  Okay.  Anything from Juror Number 30?

25          PROSPECTIVE JUROR 30:  I will be using one soon, but

1    I don't think it would make any judgment.

2            THE COURT:  Okay.  Have any of you had any training

3    in the financial realm?  Any education?  Yes, Number 2.

4            PROSPECTIVE JUROR 2:  I have a bachelor's degree in

5    business, and I took in addition to basic finance, I did take

6    an investment course and a course in business law as well as

7    international law.

8            THE COURT:  Okay.  What is your employment?

9            PROSPECTIVE JUROR 2:  I'm actually currently a

10   student again.

11           THE COURT:  Oh, you're, okay, working on a master's

12   degree?

13           PROSPECTIVE JUROR 2:  No, I worked in the business

14   field and decided to change my focus rather than an MBA into

15   health.

16           THE COURT:  Into?

17           PROSPECTIVE JUROR 2:  Health.

18           THE COURT:  Okay.  In the course of your attaining

19   your bachelor's degree in business, did you study case studies

20   involving financial frauds of various types?

21           PROSPECTIVE JUROR 2:  Financial fraud, no.

22           THE COURT:  Okay.  Is there anything about your

23   educational or work experience that would incline you one way

24   or the other in this case, either for the defense or for the

25   government?

```
 1              PROSPECTIVE JUROR 2:  No.
 2              THE COURT:  Either of the other of the two of you?
 3              Okay.  Can you think of any reason why if you were
 4     chosen to sit on this jury you could not be fair and impartial?
 5              POTENTIAL JURORS:  (No response)
 6              THE COURT:  Great.
 7              Mr. Mekaru, anything?
 8              MR. MEKARU:  No, Your Honor.
 9              THE COURT:  Thank you.
10              Mr. Tracy?
11              MR. TRACY:  Just a couple brief ones, Your Honor.
12              Juror Number 2, just to go back to your grandfather
13     for a second, what was his profession?
14              PROSPECTIVE JUROR 2:  Well, he had several.  He owned
15     his own cruise ship that was a small one in California.  He
16     also owned -- had his own fishing company, and he traveled from
17     Costa Rica to Alaska on a regular basis.
18              MR. TRACY:  So I take it you respected him a lot and
19     really took a lot of credence into what he decided to invest
20     in?
21              PROSPECTIVE JUROR 2:  Yes.
22              MR. TRACY:  So part of your thinking in terms of
23     probably really not changing the investments, even if an
24     advisor suggests something to you, is you're really honoring
25     what your grandfather suggested you do with those investments?
```

1          *PROSPECTIVE JUROR 2:*  If my current advisor gave me a

2     suggestion, I would follow her advice.  I really don't listen

3     to any other financial advisors, though.

4          *MR. TRACY:*  Okay.  And is your grandfather still

5     alive?

6          *PROSPECTIVE JUROR 2:*  No, he passed away four years

7     ago.

8          *MR. TRACY:*  Okay.  I think what you're getting at is

9     you're only going to trust somebody in a particular situation

10    when you have that sort of relationship developed?

11         *PROSPECTIVE JUROR 2:*  Yes.

12         *MR. TRACY:*  Okay.  And then Juror Number 30, I think

13    you indicated one of your children happens to be a minister,

14    correct?

15         *PROSPECTIVE JUROR 30:*  Yes.

16         *MR. TRACY:*  And you had heard my questions previously

17    just to make sure that, you know, everybody is really supposed

18    to be equal in terms of their profession or what have you.

19         The fact that certain witnesses may be this, that, or

20    the other thing, is that going to impact you at all?

21         *PROSPECTIVE JUROR 30:*  No.

22         *MR. TRACY:*  For both Juror Number 2 and 10, any

23    impact for you, the fact that somebody has a particular

24    profession?

25         *PROSPECTIVE JUROR 30:*  (Shaking head)

1          MR. TRACY:  And then I had this general question for

2     all the jurors before, so for all three of you as well, the

3     fact that the government gets to go first, any problem for any

4     of you, if you would just raise your hand, in reserving your

5     judgment and making sure you've heard all the evidence in the

6     entire case before you start to deliberate and draw any

7     conclusions?  Any problem with any of that?

8               No further questions.

9               THE COURT:  Thank you.

10              Gentlemen, sidebar, please.

11         (At sidebar on the record)

12              THE COURT:  Any challenges for cause, Mr. Tracy?

13              MR. TRACY:  None, Your Honor.

14              THE COURT:  Mr. Mekaru?

15              MR. MEKARU:  No, Your Honor.

16              THE COURT:  Thank you.  All right.  Mr. Tracy, you're

17    up.

18              MR. TRACY:  Thank you.

19         (Sidebar discussion concluded)

20              THE COURT:  Juror Number 30 and Number 10, you are

21    excused, and again my thanks to you for your attendance and

22    your attention.

23              THE CLERK:  Juror Number 22, JR, if you'll take the

24    first seat in the front row.

25              THE COURT:  What was the number again?

1              THE CLERK:  22.

2              THE COURT:  Thank you.

3              THE CLERK:  Juror Number 49, LH, if you'll take the

4    third seat in the front row.

5              THE COURT:  Good morning.

6              PROSPECTIVE JUROR 49:  Good morning.

7              THE COURT:  Have either of you sat on a jury before?

8              PROSPECTIVE JUROR 22:  Not on this side.

9              THE COURT:  What does that mean?

10             PROSPECTIVE JUROR 22:  Well, I was in law enforcement

11   for several years.

12             THE COURT:  Okay.  Why don't you tell us about that.

13             PROSPECTIVE JUROR 22:  Well, I worked for

14   Allegan County.

15             THE COURT:  As a sheriff's deputy?

16             PROSPECTIVE JUROR 22:  Deputy sheriff's sergeant for

17   23 years.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR 22:  And I was in court several

20   times off and on.

21             THE COURT:  Okay.  Were you mostly on road patrol or

22   inside?

23             PROSPECTIVE JUROR 22:  I did a little bit of

24   everything, to be honest with you, over the 23 years.  I

25   was -- well, I worked in the jail to start with.  And then I

1    went on road patrol, became a sergeant after two and a half

2    years.  I was the head of our marine division.  I was in our

3    dispatch center for a few years.  And then I went back on the

4    road patrol again.

5            THE COURT:  Okay.  So you've had a lot of contact

6    with defendants who have been charged with crimes?

7            PROSPECTIVE JUROR 22:  Yes.

8            THE COURT:  But not so much contact with defendants

9    who have been charged with financial crimes I would think.

10           PROSPECTIVE JUROR 22:  No, not financial crimes, no.

11           THE COURT:  Okay.  Your time in law enforcement, do

12   you think that it has created a leaning or a bias in favor of

13   law enforcement?

14           PROSPECTIVE JUROR 22:  I have to admit, yes, it does.

15           THE COURT:  Okay.  In spite of that -- and, you know,

16   I think it's probably fair to say that all of us based on our

17   experience have thoughts and ideas.  I don't know whether you

18   want to call them biases or leanings.  But in spite of that, do

19   you think that listening to instructions, legal instructions,

20   and which will tell you that you have to rely on what is said

21   in the courtroom, the testimony and the evidence that's

22   introduced, and that the defendant proceeds with the

23   presumption of innocence, that the government has the burden to

24   prove beyond a reasonable doubt and so forth, do you think that

25   all of that can be a part of your decisional process as a fair

1    and impartial juror?

2            PROSPECTIVE JUROR 22:  I guess to a certain extent,

3    but I have to admit that I lean towards law enforcement just in

4    general.  That's just the way I feel.

5            THE COURT:  Okay.  That's fair enough.

6            PROSPECTIVE JUROR 22:  And I have to admit that.

7            THE COURT:  Okay.  That's fair enough.

8            Juror Number 49, do you have any law enforcement

9    background?

10           PROSPECTIVE JUROR 49:  No, ma'am.

11           THE COURT:  Anybody in your family who does?

12           PROSPECTIVE JUROR 49:  No.

13           THE COURT:  Okay.  Any reason that you can think of

14   why you could not be a fair and impartial juror?

15           PROSPECTIVE JUROR 49:  No.

16           THE COURT:  Have you had any contact with or

17   connection to financial managers or advisors or investors?

18           PROSPECTIVE JUROR 49:  No, I haven't.

19           THE COURT:  No?  Okay.  Anything about what has been

20   asked this morning which would lead you to believe that you

21   could not follow my instructions on the law and decide the

22   facts fairly in this case?

23           PROSPECTIVE JUROR 49:  No, Your Honor.

24           THE COURT:  Okay.  Thank you.  I think based on the

25   comments of Juror Number 22, it is fair to excuse him.  Thank

1   you very much, sir.

2           PROSPECTIVE JUROR 22:  Thank you.

3           THE CLERK:  Juror Number 42, AB.

4           THE COURT:  Good morning, sir.

5           PROSPECTIVE JUROR 42:  Good morning.

6           THE COURT:  Is this your first time in the box?

7           PROSPECTIVE JUROR 42:  Yes.

8           THE COURT:  Okay.  Have you ever had any contact with

9   an investment advisor?

10          PROSPECTIVE JUROR 42:  No.

11          THE COURT:  A financial advisor?

12          PROSPECTIVE JUROR 42:  Nope.

13          THE COURT:  You've heard a lot about what this case

14  is going to be about or at least some in general.

15          Is there anything about it either from the law

16  enforcement side or the defense side which leaves you thinking

17  you could not be a fair and impartial juror in this case?

18          PROSPECTIVE JUROR 42:  No.

19          THE COURT:  Any connection with law enforcement?

20          PROSPECTIVE JUROR 42:  My mother was a dispatcher for

21  the Grandville Police Department for 17 years.

22          THE COURT:  Okay.  Did you talk about her work with

23  her at all?

24          PROSPECTIVE JUROR 42:  Just mostly her complaining

25  about calls that she got.

1          *THE COURT:*  I see.  Would that affect your --

2          *PROSPECTIVE JUROR 42:*  No.

3          *THE COURT:*  -- circumstances here?

4          *PROSPECTIVE JUROR 42:*  No.

5          *THE COURT:*  Okay.  Any reason why you can think that

6     you might not be able to be fair and impartial?

7          *PROSPECTIVE JUROR 42:*  No.

8          *THE COURT:*  Okay.  Mr. Mekaru, any questions for

9     either Jurors Number 42 or 49?

10          *MR. MEKARU:*  One moment, Your Honor.  No, Your Honor.

11          *THE COURT:*  Thank you.

12          Mr. Tracy.

13          *MR. TRACY:*  Yes, Your Honor, just a couple.  Thank

14     you.

15          Juror 49, I believe -- sorry, sometimes it's a little

16     hard to read.  Is it your husband who serves as a minister?

17          *PROSPECTIVE JUROR 49:*  Yes.

18          *MR. TRACY:*  And you heard my questions before about

19     people's occupations?

20          *PROSPECTIVE JUROR 49:*  Yes.

21          *MR. TRACY:*  Does that cause you any concerns in just

22     listening to the facts and not the person speaking in

23     determining whether they are more credible or not?

24          *PROSPECTIVE JUROR 49:*  No, sir.

25          *MR. TRACY:*  Okay.  Thank you.

```
 1              And then Juror 42, I think.  Which department did you
 2   say your mom was a dispatcher for?
 3              PROSPECTIVE JUROR 42:  Grandville.
 4              MR. TRACY:  Grandville?
 5              PROSPECTIVE JUROR 42:  Yeah.
 6              MR. TRACY:  So in this area, right?
 7              PROSPECTIVE JUROR 42:  Yeah.
 8              MR. TRACY:  But, again, the fact that she
 9   served -- she may have some entertaining stories to tell --
10              PROSPECTIVE JUROR 42:  Yeah.
11              MR. TRACY:  -- but other than that, nothing that's
12   going to impact you one way or the other?
13              PROSPECTIVE JUROR 42:  No.
14              MR. TRACY:  Nothing further, Your Honor.
15              THE COURT:  Thank you.
16              Sidebar, gentlemen, please.
17         (At sidebar on the record)
18              THE COURT:  Any challenge for cause?
19              MR. MEKARU:  No, Your Honor.
20              MR. TRACY:  No, Your Honor.
21         (Sidebar discussion concluded)
22              THE COURT:  Juror Number 49, you are excused, and
23   thank you very much for your service.
24              THE CLERK:  Juror Number 38, JS.
25              THE COURT:  Good afternoon -- no, not quite.  Good
```

1    morning.

2          You have listened attentively to the questioning, I

3    think, correct?

4          PROSPECTIVE JUROR 38:  Yep.

5          THE COURT:  In terms of the kinds of questions that

6    have been asked this morning, many of them have focused on this

7    idea of investments, investment advisors, and so forth.

8    Obviously because of the nature of the claims against the

9    defendant, Mr. Heshelman.

10          Have you had any direct or indirect contact with an

11   investment advisor?

12          PROSPECTIVE JUROR 38:  I have a financial planner.  I

13   meet with him three or four times a year.  He's a high school

14   friend.  I kind of went through him because he's a high school

15   friend.

16          Other than that, I speak with my brother quite

17   frequently about different investment opportunities, but

18   nothing other than that.

19          THE COURT:  Anything about that experience that would

20   in your view make you less likely to be a fair and impartial

21   juror if you were selected in this case?

22          PROSPECTIVE JUROR 38:  No.

23          THE COURT:  Have you any connection, relationship to

24   law enforcement at all, either yourself or your family or

25   friends?

1              PROSPECTIVE JUROR 38:  No.

2              THE COURT:  No?  Any other reason that you can think

3      of that you could not sit and listen to the testimony, look at

4      the exhibits, consider the arguments, and listen to the

5      instructions on the law and render a fair and impartial

6      verdict?

7              PROSPECTIVE JUROR 38:  No.

8              THE COURT:  Thank you.

9              Any questions, Mr. Mekaru?

10             MR. MEKARU:  Your Honor, did you ask him whether

11     the -- well, I'll just ask Juror 38.

12             Have you or your family members or close friends been

13     victims of any crimes?

14             PROSPECTIVE JUROR 38:  No.

15             MR. MEKARU:  Or been subject to any sort of charges

16     or any prosecution?

17             PROSPECTIVE JUROR 38:  No.

18             MR. MEKARU:  Thank you.

19             THE COURT:  Mr. Tracy?

20             MR. TRACY:  Thank you, Your Honor.

21             Juror 38, you're a teacher for a profession, correct?

22             PROSPECTIVE JUROR 38:  Correct.

23             MR. TRACY:  Is school almost out for you?

24             PROSPECTIVE JUROR 38:  Exams are Thursday and Friday.

25             MR. TRACY:  Will that be a problem for you?

1        *PROSPECTIVE JUROR 38:*  It's frustrating, but it will

2   get worked out.

3        *MR. TRACY:*  Okay.  I just wanted to make sure,

4   because I knew we were getting close to that time period.

5        So then your bachelor's degree from Hope, was that in

6   education then?

7        *PROSPECTIVE JUROR 38:*  Yep.

8        *MR. TRACY:*  Any emphasis you had at all?

9        *PROSPECTIVE JUROR 38:*  Mathematics, and a minor in

10  religion, and I picked up a minor in physics from Grand Valley.

11       *MR. TRACY:*  And none of that training would really be

12  brought to bear in terms of sort of investments or financial

13  things we may hear about?

14       *PROSPECTIVE JUROR 38:*  No.

15       *MR. TRACY:*  Nothing further, Your Honor.

16       *THE COURT:*  Thank you.

17       Sidebar, please.

18    *(At sidebar on the record)*

19       *THE COURT:*  Any challenge for cause, Mr. Mekaru?

20       *MR. MEKARU:*  No.

21       *THE COURT:*  Mr. Tracy?

22       *MR. TRACY:*  No, Your Honor.

23       *THE COURT:*  Mr. Tracy, you are up.

24       *MR. TRACY:*  No, Mr. Mekaru.

25       *THE COURT:*  I'm sorry.  I beg your pardon.

1          *MR. TRACY:*  Actually, I think you handed it to me, so

2     I'm probably up.  I think the judge is right.

3          *THE COURT:*  Sometimes.  Not often.

4          *MR. TRACY:*  Do you want that on the record?

5     *(Sidebar discussion concluded)*

6          *THE COURT:*  Ladies and Gentlemen, we apparently have

7     agreed upon a jury.  The remainder of you are excused from your

8     service today.  You should check with the jury clerk to make

9     sure you have all of the details in place.  But, again, my

10    personal thanks for your attendance and your attention this

11    morning, and enjoy your day.  Thank you.

12    *(Unseated jury venire members left the courtroom)*

13         *THE COURT:*  Susan, would you swear the panel, please.

14         *THE CLERK:*  Would the 14 of you please rise and raise

15    your right hand.

16    *(The oath was administered to the jury)*

17         *ALL:*  I do.

18         *THE CLERK:*  Thank you.

19         *THE COURT:*  Ladies and Gentlemen, we're shortly going

20    to take a break.  We've had a busy morning.  A long morning.

21    In fact, we probably -- I think probably the better thing to do

22    since it's after 11:30, is to take our lunch break now and come

23    back here ready to go at 12:30.  But I did want to give you

24    some additional thoughts or insights.

25         I think we all have the experience from time to time

1    of watching television programs about the law, and particularly

2    about the criminal law.  It seems like there are programs

3    without end that give us views of trials and criminal

4    investigations and so forth.  And what you're about to see

5    unfold in front of you is essentially going to be nothing like

6    that.  It will be, I think, much more instructive of what goes

7    on in the real world, and I think it will be not only

8    interesting but a very valuable learning experience.  And as I

9    indicated, a very valuable contribution to your community, our

10   community.  And so I thank you for being here and tell you that

11   you will be doing, as I said earlier, a lot of listening, as I

12   will as well in the next few days.  Just keep your eyes and

13   ears open and learn as much as you can, and at the end we'll

14   see where we are.

15           But thank you again, and if you can manage to be back

16   by 12:20 or -- well, that's not right either.  About 12:20,

17   12:30.  What I'd really like to do is be started at

18   quarter-of-one this afternoon.  So Susan will take you back to

19   the jury room.  She'll give you some information, some further

20   direction, and we'll see you back here very shortly.  Thank

21   you.

22           *LAW CLERK GEIGER:*  Judge Neff, what about the

23   cautionary instruction not to discuss the case?

24           *THE COURT:*  Stop.  See, I always forget something.

25           *THE CLERK:*  And, Jurors, when you stop, you will

1    never be going out that way again, so just wait, and I'll take

2    you out of courtroom.  Okay?

3            *THE COURT:*  It's always important for me to have able

4    assistants in the courtroom, and my law clerk just reminded me

5    of something that I often overlook.

6            During any break that we take, whether it be for

7    lunch or for simply a midmorning or midafternoon break, you are

8    not to discuss anything that you've heard or seen in the

9    courtroom.  It is only at the very end of the case when you

10   begin to deliberate, when everything has been presented to you

11   that you should begin to think about or discuss the outcome of

12   this case or what you have heard.

13           Don't go about trying to do any research.  Don't do

14   any reading about the kinds of things that you may hear or see

15   in this courtroom.  Everything that you will need to decide

16   this case is going to take place in this courtroom.  None of

17   those other extraneous matters should enter into in any way

18   your decisional process.

19           Beyond that, please do not use -- we have become such

20   a connected and an electronic society.  Please do not use your

21   cell phones, your personal digital assistants, your -- any of

22   those devices to either communicate with other persons about

23   this case or to do any research or investigation about it.

24   It's just crucial to the fairness of the process that we are

25   embarking on that you, as I said, take only from what you hear

1    in this courtroom into your decisional process, and no opinions

2    will be formed, hopefully, until the very end.

3            I will give you the opportunity to take notes.  There

4    will be -- you will be provided with some notebooks and writing

5    instruments.  Those should always be left in the jury room when

6    you leave for the day.  They will be safe and secure.

7            So with that, I apologize for bringing you back, but

8    now you can go with Susan, and she'll give you further

9    instructions.  Thank you.

10           *THE CLERK:*  Are you staying here, Judge?

11           *THE COURT:*  Yeah, just for a minute.

12      *(Jury exited the courtroom at 11:42 a.m.)*

13           *THE COURT:*  Okay.  We'll see you back here in time to

14    start at 1:45.  Yeah.  12:45.

15           *MR. MEKARU:*  Your Honor.

16           *THE COURT:*  Yes.

17           *MR. MEKARU:*  Just curious:  How long do you think

18    your instructions will take?  And then do you plan on going

19    right into the openings?

20           *THE COURT:*  Yes.  I think probably 15 minutes for the

21    instructions.  I've got a set of things that I talk with them

22    about, but not more than 15 minutes, and then directly into

23    opening statement.

24           *MR. MEKARU:*  Okay.

25           *THE COURT:*  Okay?

1          *MR. MEKARU:*  Very good.

2          *THE COURT:*  Good.

3          *MR. TRACY:*  Thank you, Your Honor.

4          *THE COURT:*  See you after lunch.

5          *MR. MEKARU:*  Thank you.

6      *(Recess taken at 11:43 a.m.)*

7      *(Back on the record at 12:59 p.m.)*

8      *(Open court, no jury)*

9          *THE COURT:*  I understand there's some question,

10    Mr. Mekaru, about sequestration of witnesses.

11         *MR. MEKARU:*  Yes, Your Honor.  Your Honor, we're

12    moving for the sequestration of all witnesses, but with this

13    understanding:  The victims in this case, in particular

14    Mr. Moody, has indicated that he would like to attend the

15    proceedings.  The Justice For All Act provides that victims

16    have the right to attend all proceedings even if they are being

17    called as witnesses.

18         I don't think there's going to be much of an issue as

19    a practical matter, because we intend to call Mr. Moody as our

20    first witness anyway.  The only additional question would be

21    whether he would be permitted to attend the instructions and

22    the opening statements.  But I think otherwise once he's

23    released from testifying, I think he would be permitted as a

24    member of the public then to hear the rest of the proceedings.

25         *THE COURT:*  Mr. Tracy, do you have any comment to

```
 1    make?
 2              MR. TRACY:  I don't have any comment one way or the
 3    other on that, Your Honor.
 4              THE COURT:  You have no objection to Mr. Moody -- I
 5    think probably the only real point at which it might be a
 6    concern would be during the government's opening statement.
 7              MR. TRACY:  I'm sure he's heard it before in
 8    discussion.
 9              THE COURT:  Do you think?
10              MR. TRACY:  Yeah.
11              THE COURT:  Okay.
12              MR. TRACY:  So I don't think it's going to change the
13    day in terms of what -- he's been working with them for years
14    and years, so I don't think it's really going to have any
15    impact one way or the other.
16              THE COURT:  Okay.  With that caveat, then that's
17    fine.
18              MR. MEKARU:  Your Honor, may I approach the -- I'm
19    trying to affix a label here on our exhibit binders.
20              THE COURT:  Oh, okay.
21              MR. MEKARU:  The plan here was, I think, to maybe
22    stack them up and get them out of your way and then labeling
23    the spine so we'll know which --
24              THE COURT:  Okay.
25              MR. MEKARU:  -- which exhibit volume.
```

1          THE COURT:  Are these more or less going to be

2    introduced in order?

3          MR. MEKARU:  I don't think so.

4          THE COURT:  Oh, dear.  So I'm going to be rifling

5    back and forth?

6          Okay.  Are we ready?

7          MR. MEKARU:  The government is ready, Your Honor.

8          MR. TRACY:  The defense is ready, Your Honor.

9          THE COURT:  Thank you.

10         Susan, would you get the jury, please.

11         THE CLERK:  Yes.

12       (Jury entered the courtroom at 1:04 p.m.)

13         THE COURT:  Please be seated.  Welcome back.  I hope

14    you found everything okay.

15         I would like to talk with you before we get started

16    with the actual trial to give you something -- some idea about

17    how things are going to go from here, at least procedurally.

18         Criminal trials usually start with an Indictment that

19    the government brings, and as we've already talked about a

20    little earlier, these are the formal charges that the

21    government brings against the defendant.  And I can't stress

22    enough to you that the Indictment itself, the fact that the

23    government has made a charge, it's just a document.  It's not

24    evidence, and it doesn't have any impact on the presumption of

25    innocence which I've talked about until such time as you

1    unanimously determine that the government has proven its case

2    beyond a reasonable doubt.

3         Now, in this case, as I said, there are a lot of

4    counts.  And I'm going to try to go through them fairly briefly

5    just to give you an idea of what the case is all about.  This

6    case deals with the allegation that the defendant,

7    Michael Wayne Heshelman and others, devised a scheme to defraud

8    potential investors.

9         In this alleged scheme the defendant claimed to be a

10   successful investment and financial advisor with access to

11   secret investment opportunities not available to the general

12   public.  The defendant stated that he wanted to invest the

13   money when really he and others spent the money that they got

14   from the investors for their own use and benefit.

15        In addition, the defendant and others recruited new

16   victims and gave a portion of their principal investment to

17   previous victims and falsely stated to previous victims that

18   the funds were a return on their investment.

19        Now, with respect to the individual charges, and I'm

20   going to just go through these fairly -- in a summary fashion.

21   Count 1 of the Indictment alleges that defendant conspired to

22   commit wire fraud.  And a conspiracy -- and you're going to

23   hear a lot about that term -- is simply an agreement by two or

24   more people to violate a criminal statute.  So that's Count 1.

25        Counts 2 through 27 charge the defendant with the

actual acts of wire fraud.

Count 28 charges the defendant with conspiracy to commit money laundering, which is a separate offense under federal law.

Counts 29 through 34 charge the defendant with laundering the proceeds of a fraudulent scheme.

Counts 35 through 38 charge the defendant with a crime of international money laundering.

And Counts 39 through 46 charge the defendant with spending more than $10,000 of the proceeds of a wire fraud.

Now, Mr. Heshelman denies all of the allegations and charges made by the government, and as I've told you and you will hear repeatedly, the government has the burden to prove beyond a reasonable doubt all of its allegations and all of the elements of the offenses charged.

Now, you heard Mr. Tracy talk to you about the order of things and that he accurately explained that the government, because it has the burden of proof, puts its case in first, and then the defendant has the opportunity to put in any case it chooses to do so, and then the government, if it wishes, has the right to rebuttal.

So here is how things are going to go.  The first thing that will happen after these introductory instructions is that Mr. Mekaru will have the opportunity to give an opening statement on behalf of the government.  Keep in mind, not only

1    at the beginning but all the way through, that any of the

2    remarks or comments made by the lawyers, either to you or to

3    me, during the course of this trial are not themselves

4    evidence.  What the lawyers say is not evidence.  They are

5    merely the remarks of counsel about the case.

6            And the opening statement really is just the first

7    opportunity of the lawyers to present to you what the

8    government intends to prove by way of its claims and charges

9    against Mr. Heshelman.

10           Now, after Mr. Mekaru finishes, Mr. Tracy will have

11   the opportunity, if he wishes, to make an opening statement of

12   his own.  Because a defendant in a criminal case doesn't have

13   to prove anything or bring forth any evidence.  Mr. Tracy

14   doesn't have to make an opening statement if he doesn't want

15   to.  Or he can even reserve it for a later time in the trial.

16   So that happens after the government's open.

17           Once we're past the opening statement stage is when

18   we get into sort of the meat of things.  That's when the

19   evidence starts to come in.  Witnesses are called to testify,

20   and the government will try to support its claims against

21   Mr. Heshelman.

22           There will be, as you heard earlier, numerous

23   witnesses.  There will be exhibits.  Many of them will be shown

24   to you on the screen; others will be in paper form.

25           After the government, through Mr. Mekaru, puts on its

1    case, its witnesses, its evidence, then defense counsel, if he

2    hasn't already given an opening statement, then Mr. Tracy would

3    have an opportunity to open.  But, again, he's not required to

4    do that.  And because he doesn't have to do anything -- doesn't

5    have to prove anything, he doesn't have to do anything at all.

6    He doesn't have to call any witnesses, doesn't have to offer

7    any evidence, and we won't know really until that time of the

8    trial whether he has decided to do that.

9            And I caution you this:  You cannot draw and must not

10   draw any inference, any negative inference from the fact, if it

11   does happen that way, that the defendant chooses not to offer

12   any testimony or evidence.

13           During the course of the trial there may be from time

14   to time objections made by the lawyers either to testimony or

15   to exhibits that may be offered.  That's where I get to talk

16   again.  It's my job to rule on the objections that are made by

17   the lawyers.  Just like an umpire calls balls and strikes, I

18   take a look at or listen to an objection that is made and make

19   a ruling based on the law.  And really there's no conclusion

20   that you can draw from that.  A lawyer makes an objection

21   because he thinks something is improper, it may or may not be,

22   and the judge then rules on it.

23           We talked earlier about credibility of witnesses, and

24   this is a crucial part of any trial.  When witnesses testify,

25   they will be sitting there, they will have taken an oath to

1    tell you the truth.  Please listen carefully.  And I know you

2    will.  I've watched you, and I've been through this process

3    many times, and I know that you will listen carefully.  Because

4    at some point you will be in the position of being the final

5    decider of who is telling the truth, how much of the truth they

6    are telling, whether they are telling only partly the truth.

7    So keep that in mind as witnesses come before you to testify.

8            Once we get through all of the witnesses and all of

9    the evidence that's going to be introduced in this case, there

10   will be a series of instructions on the law that is to be

11   applied to the facts as you determine them to be.  These

12   instructions will be written and they will be lengthy, and I'll

13   read them to you.  And I apologize in advance.  It's an awful

14   lot to take in, a lot of information, a lot of technical

15   information, but the one good thing about it is that you will

16   have a copy of the instructions to take with you into the jury

17   room when you deliberate so that you can refer to that during

18   the course of your deliberations.

19           After that, after the instructions are given, after

20   you will then have the context, you will have heard the fact

21   evidence, you will have heard the legal parameters or rules

22   that will apply, and at that time there will be the final

23   summation by the lawyers.

24           Again, because he has the burden of proof for the

25   government, Mr. Mekaru will go first.  And the job there is to

1    try to tie up what has happened in front of you during the

2    course of the trial, to try to wrap together the facts and the

3    law and to give you a view of what each of the lawyers thinks

4    the evidence has shown.

5         But, again, closing arguments themselves do not

6    constitute evidence.  They are merely the lawyers' attempts who

7    have tried the case to summarize it and to persuade you one way

8    or the other on your outcome.

9         As you know, you've been given notebooks.  If you

10   want to use them, I will say to you it's sometimes difficult to

11   take detailed notes and pay attention to what the witnesses are

12   saying at the same time.  If you do take notes, please be sure

13   that the note-taking doesn't interfere with listening and

14   considering the evidence that you hear.

15        Also, if you take notes, please don't discuss them

16   with anyone until such time as you begin your deliberations.

17   It's really not a very good process to do things like that

18   piecemeal.  And don't, as I indicated earlier, don't take them

19   with you when you leave for the day.  Please leave them in the

20   jury room.

21        If you don't take notes, that's fine.  That's

22   entirely up to you.  Some people would really rather just sit

23   and concentrate and listen, and that's perfectly fine.  Just be

24   sure to listen to the evidence and testimony as you hear it.

25        We do have an official court reporter who will

1    diligently take down everything that is said.  However, be
2    advised that there won't be a written transcript for you to
3    review as we go through the trial, and it will not be available
4    to you in reaching your decision.

5          At the end of the trial, once all of the testimony
6    and evidence and arguments and instructions have been made and
7    you've had an opportunity to soak all of that in, you will then
8    retire to deliberate and make a decision.  And your
9    deliberations will be secret.  You will never have to explain
10   your verdict to anybody.  You will, I think, collaborate.  At
11   least it's been my experience that when jury members spend a
12   number of days together they develop a certain cohesion as a
13   group, and hopefully you will collaborate on your collective
14   memory of what happened -- excuse me just a moment.  Ladies and
15   gentlemen, could you please keep your seats.

16         MR. MEKARU:  I'm sorry, Your Honor, we had a
17   technical problem with our transcripts, and we're just trying
18   to get copies of them.

19         THE COURT:  It's very distracting.

20         MR. MEKARU:  I'm sorry, Your Honor.  We'll instruct
21   them to wait until it's done.

22         THE COURT:  Thank you.  Again, hopefully you will
23   have a collective memory of what went on.  Some of you may
24   differ in your opinions, but you will be free to express
25   yourselves, to discuss among yourselves, and then determine the

1    facts based on what you've heard here.

2         I can't emphasize enough that your decision in the

3    end must be based only on what goes on in the courtroom and

4    ultimately what you discuss in your deliberations at the end of

5    the case.  Please don't talk to anybody else about this case if

6    you -- for instance, if you -- this courthouse is not designed

7    as well as it might be.  You might run into a witness or one of

8    the lawyers in the hallway or in the elevator.  Turn around and

9    go the other way.  Don't have any contact or conversation with

10   anybody who is connected with this case.  It would be improper,

11   and it is just something that you want to avoid if you can.  If

12   you are stuck in the elevator, simply ignore each other to the

13   best of your ability.  You have to remain untainted by any

14   outside influences that might occur.

15        I will tell you that as we have been preparing this

16   case for trial I've had contact with obviously with Mr. Mekaru

17   and with Mr. Tracy.  They are both well prepared, highly

18   professional, competent lawyers.  I think they are

19   knowledgeable, and I think that they will present to you a case

20   that you will find relatively easy to follow.  Some of the

21   subject matter is a little complicated perhaps, but I think

22   they will do their best to make things understandable to all of

23   us.  And I include myself in that as well.

24        We will, all of us, make our best effort to respect

25   your time.  We all have busy lives, and I realize, as I said

1    before, it is a sacrifice for each and every one of you to be

2    here.  You're giving up your time and you're giving up your

3    efforts in something that's quite important, but nevertheless,

4    it is a sacrifice.  But we appreciate your time.

5          There may be times when breaks are necessary to

6    consider legal matters.  There will be other breaks, I'm sure,

7    to give you a chance to just take a break from listening, to

8    give the court reporter a little chance to rest her fingers,

9    and to give all of us a chance to simply recharge.  And so

10   those breaks will be kept as short as possible, but there will

11   be some.

12         If -- finally, if you encounter any problems, if you

13   can't see, if you can't hear, if you need a break, just let me

14   know that.  Sometimes if I'm concentrating on what's going on

15   in the courtroom, you may have to, you know, make a little fuss

16   or a little bit of noise just to catch my attention, but

17   don't -- please don't be shy about that.  My goal is that you

18   be comfortable enough to listen and concentrate, and if you

19   need a break, you can't do that.  So just let me know.  Feel

20   comfortable, feel free to do that during the course of the

21   trial.

22         So with that I'm going to ask Mr. Mekaru to come to

23   the podium and make his opening statement.

24         *MR. MEKARU:*  May it please the Court, Ladies and

25   Gentlemen of the Jury, this is a case about lies and deceit.

1    The defendant, Michael Heshelman, and his coconspirators

2    devised a scheme to defraud.  Mr. Heshelman represented himself

3    to be some sort of investment advisor, a financial advisor who

4    had some specialized knowledge about some very sophisticated

5    financial instruments and financial transactions, and he

6    convinced people to invest with him.  But the defendant lied,

7    and rather than investing the money as promised, the defendant

8    and the others just spent it.

9         Now, you're going to hear the testimony of Pastor

10   Alan Moody.  Pastor Moody invested $2.5 million with the

11   defendant.  He was told his money would remain safe and stay in

12   a bank account that was controlled by an attorney and that his

13   money would be used as collateral for the sophisticated

14   financial transaction but would stay safe and secure in that

15   account.  But that was a lie.  Rather than the money staying

16   safe and secure in the account, it was transferred out.

17        Now, this $1 million -- excuse me -- in December 2000

18   Pastor Moody agreed to participate in these investments.  He

19   transferred the money into the account.  Rather than the money

20   staying in that lawyer's account, the money was transferred to

21   yet another investor, a man by the name of Brian Turner.  And

22   Mr. Turner thought he was just getting his own money back from

23   his own million-dollar investment.

24        In March of 2001 Pastor Moody again was convinced to

25   invest more money with the defendant and his coconspirators.

1    And he invested $1.5 million, wire transferred it in two parts,

2    but wire transferred it from Michigan down to the attorney's

3    account in Florida.  And rather than the money staying in the

4    account as promised, immediately that money started getting

5    transferred all over the country.  And in fact it went to

6    England and Switzerland.  It went to the defendant's accounts

7    and went to others.

8         Let me give you some examples about where this money

9    went and what you're going to hear during the trial.  $279,600

10   went to four other investors.  This is in total.  Went to four

11   other investors.  These four other investors thought they were

12   getting back something from their own investment with the

13   defendants.  You're going to hear the name of Allan Clyde,

14   Paul Ramsey, Stephen Williams, and Timothy Oliver as other

15   individuals who invested with the defendant and were receiving

16   money back from him but not from some sort of investment

17   vehicle, not some sort of trading strategy, but money that was

18   just gathered from other investors.

19        $160,000 went into the pockets of Bryce Sherwood.

20   Bryce Sherwood is a codefendant, one of the coconspirators.

21   One of the individuals who convinced Pastor Moody to invest

22   with Michael Heshelman.

23        You're also going to hear that $50,000 went into the

24   pockets of Dennis Mickelson, another codefendant, another

25   coconspirator.  Mr. Mickelson's role in this particular scheme

1    with Pastor Moody was to act as a reference.  Pastor Moody

2    called him up, and Mr. Mickelson vouched for the investment

3    prowess of Mr. Sherwood and Mr. Heshelman.

4            $160,000 went into the accounts of Mr. Heshelman.

5    And a total of $112,000 went to pay Mr. Heshelman's hotel

6    bills.

7            The last example, $125,000 went to pay for a bus, a

8    bus that went to Pastor Moody's church.  Now, what the evidence

9    will show is that the money for that bus came out of

10   Pastor Moody's own money, but the defendant and Mr. Sherwood

11   told him it was a donation.

12           Now, as this trial goes on I don't think there's

13   going to be any real question that there were wire

14   communications, there were wire transfers, that money is being

15   transmitted from Michigan, from Florida, and going overseas.

16   That's really not going to be much at issue here.  Really the

17   question is whether this whole scheme, this whole activity was

18   a fraud.

19           Now, this fraud, this lie of telling investors that

20   their money will be safe, it will stay secure and will be

21   invested for them was repeated, and was repeated to

22   Brian Turner, the man who got the first million dollars; it was

23   repeated to Timothy Oliver; it was repeated to Allan Clyde and

24   Paul Ramsey and Stephen Williams.

25           Now, you may be wondering how a pastor from

1    Middleville, Michigan, would somehow get 2 1/2 million dollars
2    to invest.  You'll hear him explain to you the story of how it
3    is that he got that money.
4         As you go through the evidence of this case, it will
5    be important for you to listen carefully to the testimony of
6    the investors and listen to what they were told about where
7    their money was going to be invested.  But even more important
8    than their testimony, it's going to be important for you to
9    review the bank records and review the records and go over and
10   determine where the money actually went and compare what they
11   were told to what actually happened to the money.
12        And the simple question for you will be:  Did the
13   defendant lie about where the money went?
14        You're going to be hearing testimony about all sorts
15   of different investment strategies.  About these things called
16   debentures, tranches, collateralized transactions, or
17   securitized transactions.  All sorts of financial terms may be
18   bandied about.  And many of these terms exist.  And some of
19   these strategies actually do exist.  There isn't a real
20   question about that.  But ultimately what the defendant was
21   saying about these investments was a lie.  Because while he's
22   telling people he's investing and using these fancy terms,
23   instead he and others are just spending the money.
24        Now, Bryce Sherwood, coconspirator, codefendant, he
25   will be testifying in this case, and he will be testifying and

1   telling you that it was all a lie.  His role in this was to

2   recruit people, to find people for Mr. Heshelman, to convince

3   them of Mr. Heshelman's financial expertise.  Bring them in and

4   let Mr. Heshelman close the deal.

5          Dennis Mickelson, another coconspirator, another

6   codefendant, will also be testifying at trial, and he will also

7   tell you that it was all a lie.  Mr. Mickelson's role, again,

8   was to go out and recruit people, bring people to Mr. Heshelman

9   so he can close the deal.  And once the money came in, what did

10  they do?  They divvied up the money.  Everybody who

11  participated in the fraud got a cut.  And they gave it to

12  participants, they gave it to people who helped them, they give

13  it to their friends and gave it to their family, and they paid

14  their bills.

15         And as for the investors, the defendants and their

16  coconspirators would get calls, "Where is our money?  When is

17  the deal going to come through?"  And the defendant and others

18  continued to tell them, "It's almost done.  It's coming.  It's

19  coming."  You know, "Next Tuesday.  Next Tuesday."  You know,

20  "We're almost there.  It hasn't fell through, but we're going

21  to go again, and it's going to come again."  It was always put

22  off and lulled into believing that the money was still safe and

23  the deal was going to close.

24         Now, Bryce Sherwood and Dennis Mickelson will be

25  testifying as part of a plea agreement that they each made with

the government. Now, the judge is going to instruct you that
these individuals, they pled guilty and they are testifying as
part of a deal. And you should consider their testimony with
greater caution. That makes sense. They might have some
incentive to lie.

But listen very carefully to their testimony. What
you should do is compare their testimony to the rest of the
evidence as it comes in. Is their testimony being corroborated
by other evidence or being contradicted by the other evidence?
And that will help you sort through and evaluate the
credibility of these witnesses.

You're also going to hear from the defendant himself.
That's because Pastor Moody was recording conversations that he
was having with the defendant. We'll be playing audiotapes,
and we may use some transcripts of these conversations that the
defendant had with Pastor Moody. And it will be important for
you to listen very carefully, pay attention to what the
defendant said about where the money had gone. Where was the
money going?

And also pay attention to how many times the
defendant says, "We're close." "It's soon." "Tomorrow."
"Monday." "It's coming." "Right around the corner." "Next
week." "Three days." "Seven days." "It's coming." "I'm
telling you, there's more money coming." "You're going to get
everything you put in and more."

1            And then we'll look at the bank records again and

2    compare the bank records to what the defendant was saying, and

3    ask yourself:  Was the defendant being honest?  Was he being

4    truthful in telling Pastor Moody where the money went?

5            Now, your job as a juror is to take the facts and

6    sort through what are the facts of this case, what's the truth

7    of this case, and then apply those facts to the law that the

8    judge will instruct you on.

9            Now, the charges that we're looking at are really, I

10   think it would be fair to say, in two groups.  We have

11   conspiracy -- we have this wire fraud set of charges and

12   another set of money-laundering charges.  They are really kind

13   of interrelated, but they are kind of distinct.

14           With respect to the wire fraud charge, the first

15   count is that the defendant, along with others, conspired to

16   commit the crime of wire fraud.

17           Conspiracy -- the legal concept of conspiracy is

18   really straightforward.  It's two or more people joining to

19   commit a crime.  And the defendant knowingly joined this

20   conspiracy to help commit this crime, and that somebody in this

21   conspiracy did an overt act, did something to further that

22   offense.

23           The substantive charge of wire fraud itself, the

24   actual counts of wire fraud, are going to be related to each

25   individual wire transaction, the movement of money.  The

1    elements in wire fraud, first we have to show that there was

2    some sort of scheme to defraud.

3        Second, that the scheme involved some sort of

4    material misrepresentation, some sort of lie.

5        Third, the defendant had the intent to defraud.

6        And last, the defendant used these wire

7    communications or wire transfers to help further the scheme.

8    That's what the -- wire fraud and conspiracy to commit wire

9    fraud.

10       Now, money laundering.  Money laundering.  We have a

11    charge here for conspiracy to commit money laundering which is

12    very similar to the conspiracy charge for wire fraud.  Two or

13    more people agreed to commit the crime of laundering money and

14    the defendant knowingly joined.

15       A little difference, slight difference is just that

16    there's no requirement for showing an overt act.

17       Now, to help in going over this so you have some idea

18    what to look for as you hear bits and pieces of evidence coming

19    in, these will be important points for you to follow in

20    eventually piecing it all together at closing.

21       The money laundering charge itself.  All right.  The

22    law prohibits engaging in financial transactions to promote a

23    crime.  So the elements here are that the defendant conducted a

24    financial transaction.

25       Second, that the transaction involved money that

represented proceeds, in this case the proceeds of wire fraud,

and that the defendant knew that the money came from some sort

of illegal activity.

         And last, the defendant had some sort of intent to

continue to promote that illegal activity.  All right?

         We also have charged the defendant with international

money laundering.  Very similar, but one essential difference

is that -- and we'll give you a more detailed instruction on

this -- but essentially that the money had some sort of

international movement.  That it went outside of the

United States.  Again, it has to be to promote the scheme of

wire fraud.

         And lastly the defendant is being charged with what's

essentially called spending these illegal proceeds.  Spending

more than $10,000 of these illegal proceeds.

         You know, was the -- the elements are that he

knowingly engaged in some sort of monetary transaction, the

money involved was derived from wire fraud, and it had a value

of greater than $10,000, the defendant knew that the money

involved was illegal, it came from something illegal, and then

this international -- excuse me -- either it took place in the

United States, or if it took place outside of the United States

that the defendant was an American citizen.

         Go through, sort through the facts, and we'll come

back and we'll start plugging those facts into the law at the

1    closing.  Because what you're going to find as we go through

2    this case is that the story here that the defendant committed a

3    scheme to defraud is pretty straightforward.  And that beyond a

4    reasonable doubt that the defendant is guilty as charged.  And

5    that the evidence will show, the evidence will show that talk

6    is cheap; that this fraud cost millions.  Thank you.

7              *THE COURT:*  Thank you, Mr. Mekaru.

8              Mr. Tracy, did you wish to open?

9              *MR. TRACY:*  Yes, Your Honor.  Thank you.

10             Good afternoon, Ladies and Gentlemen.  You've heard

11   this enough from me, so I won't repeat it again.  He gets to go

12   first.  He gets to go first in the opening statement.  He gets

13   to go first in the course of putting on the trial and the

14   evidence.  He gets to go last if he wants to put on rebuttal

15   evidence.  So you'll just hear from me at points in time, but I

16   hope that you'll understand that when we have a chance to put

17   on evidence or when we have a chance to ask questions, it's

18   every bit as important as whenever the government is putting on

19   its evidence.

20             I know you already pledged to that effect, but that

21   will happen during the course of his case-in-chief that may

22   start yet this afternoon.  It may be that you'll hear --

23   assuming Mr. Moody is the first witness to take the stand, he

24   may be on the stand for a period of hours, or maybe it won't be

25   that long hopefully, but Dan will get a chance to ask those

1   questions first, but then there will be a period of time that

2   will be cross-examination.  And when I get to probe back into

3   certain issues or to maybe cover whole new ground in that

4   cross-examination, all of those responses that come from

5   Mr. Moody or any other witness is every bit as important

6   whether it happens in the context of cross-examination as if it

7   happens in direct.

8         And those responses -- not what I say, not my

9   questions or Mr. Mekaru's questions -- but those responses from

10  the witness, those are -- that is evidence.  That is the thing

11  that you get to judge as the ladies and gentlemen of the jury.

12        Not Your Honor, not counsel, not anybody else in this

13  courtroom.  Only you all at the end of case will get to judge

14  that evidence, weigh the witnesses' credibility, determine what

15  you think makes sense, what doesn't make sense, and you all

16  collectively at that point in time at the end of the case will

17  get to deliberate on that.

18        But it takes a lot of patience and listening skills.

19  All of you are doing wonderfully so far, so thank you in

20  advance.  But I hope that you'll do that.  I'm confident that

21  you will.

22        Some of the things that I would ask you to look for a

23  little -- I think Mr. Mekaru tried to give you a little bit of

24  a roadmap from his perspective.  Well, as you might imagine, my

25  roadmap is a little different.  But listen to the responses

1    that come from the witnesses.  And maybe he'll show you most of

2    the documents that matter.  Now, you know, there's always

3    contracts typically when it comes to these kinds of

4    investments.  And this case is no different.  Almost all of

5    these investors entered into agreements or contracts when they

6    invested their money with Mr. Heshelman.  Or you'll hear this

7    company name, Investors First, which was a company or a trust

8    that Mr. Heshelman set up to be the vehicle under which these

9    investments came in.

10            When you hear about these agreements, and you'll see

11    them on the screen, either the government will introduce them,

12    or when it's our opportunity during cross-examination or

13    otherwise we'll introduce them, you'll see terms like "joint

14    venture trust agreement" or "promissory note."  Well, look at

15    them very carefully.  Look at them carefully when they are on

16    the screen in front of you, and then again you'll have a chance

17    to look at them at the end of the case when you deliberate.

18    Read the language of them very carefully.  Listen to whether --

19    the witnesses' responses about what they claim they were told

20    the investment was all about.  Does that resonate and does it

21    follow from what was actually contained within the documents

22    that they signed and agreed to?

23            I think you'll start to see a pattern, some

24    inconsistencies for what the investors wished was the case

25    versus what they actually agreed to in certain documents.

1          And among other things, as this evidence comes in,

2     whether it's through the document or through the witnesses'

3     testimony, here are some things that I think you'll start to

4     determine, you'll be able to see.

5          Back in 1999 or 2000 when this investment began to

6     now, so almost a 10-year period, not one single investor -- and

7     there was about ten of them or whatever, and some of which

8     you'll hear from and some of which you may not because the

9     government may not call them and we may not call them; that

10    happens in terms of how the case flows and decisions are

11    made -- but not one single investor of the few that invested

12    has ever filed any civil lawsuit or claim against Mr. Heshelman

13    or as far as I'm aware against anybody else that was involved.

14    You won't hear about any civil lawsuit.  You won't hear about

15    any intent by them to recover monies through that.  Very

16    typical process in our world of the United States.  Nothing.

17         And remember, there's a different standard in terms

18    of civil and criminal claims.  So a civil lawsuit -- and I'm

19    not trying to speak bad of my brothers and sisters in the

20    law -- you just sort of have to find a lawyer out there that

21    will file something on your behalf.  And they have to meet

22    certain standards in terms of filing that Complaint, but it

23    happens day-in and day-out.  In other words, what I'm saying to

24    you is, it's not that difficult to do.

25         Now, you'll also hear that some of the investors

1  received all of the money back that they invested.  You'll hear

2  from Brian Turner.  I believe the government has him scheduled

3  to testify sometime next week.  I think he's in Canada, so you

4  may hear from him via video feed rather than live in the

5  courtroom.  But he had an investment through I think some

6  company he called Thornbrook or something.  All of his money

7  came back to him.

8           You'll hear from Tim Oliver.  He had a company I

9  think called like Prism Mortgage or something like that.  I

10  think Mr. Oliver may even be a lawyer out West someplace.

11  Minnesota or somewhere.  There's people from Utah in this.

12  They are all over the place in this case.  But I think

13  Mr. Oliver got all of his money back, and then I think you'll

14  even see he got more.  And you ask yourself, Why did he get the

15  additional?  And if he did, why didn't somewhere during this

16  process didn't that come back in to help pay for other

17  investors?  And I don't know.  I don't know if we will get an

18  answer to that or not.  But I think it's a legitimate question

19  to have in your mind.

20           You'll also hear about some of the investors getting

21  some of their money back.  And again, you'll hear about some

22  that I think got very little of their money back or maybe even

23  some that got none of their money back.  At least in their own

24  mind.  And I'm not trying to cover that up.  That's not

25  something -- I mean, if you're wondering is that where Tracy is

1  going with his defense and Mr. Heshelman's defense in this

2  case:  No.  The reality is that the investment did not work out

3  as planned, but the investment wasn't also over in the sense

4  that, again, as I said at the beginning, most of these people

5  never asked for their money back.  And I'll cover that again in

6  a little more detail in a minute.  So, in other words, the

7  money is still invested.

8         Now, the fact that some of the people didn't get

9  their money back and the investment didn't work out as planned,

10  at least at this stage of the game or up until the time that

11  Mr. Heshelman was invested in the late part of 2008, that's a

12  far different thing than Mr. Heshelman ever intending to

13  defraud anybody, okay?  There's a lot of things that don't work

14  out as we planned for in life, whether they be investments or

15  otherwise.  Because something doesn't work out as it was

16  planned doesn't mean that person intended to defraud you.  And

17  again, that's the big issue in this case.  I agree with

18  Mr. Mekaru about that.  That's the issue that's the

19  government's burden that you'll need to very, very carefully

20  consider at the end of the case.

21         Some other things that I think you'll hear from in

22  terms of sort of a roadmap.  The investors, via the documents,

23  contracts, agreements, whatever you want to call them, each of

24  the investors allowed significant sums of money that they

25  invested to be used for expenses, in large amounts of expenses,

1    in order for the trading platform, again you'll hear it.

2    Whether or not it's truly complicated or not, I don't know.

3    It's beyond me.  It's not something with my skills that I would

4    be able to know the contacts in the world to go and figure out

5    how to do the trading platform that you're going to hear about.

6    But whether it's truly complicated or not I'll leave for your

7    judgment.  But the reality is that you needed these expenses to

8    do, among other things, travel to New York, which is one of the

9    banking and financial centers, travel to Switzerland or other

10   places in Europe, which is one of the banking financial

11   centers, to get these trading platforms in place.  And you'll

12   hear about large amounts of expenses:  Travel, lodging,

13   attorney.  Remember, you'll hear this name, Ken Warner.  You

14   may hear from him.  The government may call him to testify.  A

15   lawyer down in Florida that was involved with this.  You'll

16   hear about payments that were made to him, which I presume were

17   either fees or expenses.  You'll hear about seed money or maybe

18   you might call it feeder money that was needed to get with the

19   types of entities or professionals that could introduce the

20   investments and the trading platform or make the introductions

21   that were occurring.  And fairly substantial amounts of monies

22   in that vein being spent.

23          So if you hear from a witness on the stand that says,

24   No, I never understood a single dime was going to expenses,

25   please listen to that very carefully and judge later whether or

1    not that witness is credible in terms of what he or she is

2    saying.  Look at the documents and what the documents provide

3    for in terms of the amount of expenses that could be used.

4            The other thing you'll hear about, and you already

5    heard some about it from Mr. Mekaru, is about the level of

6    communications that exist in this case.

7            Now, the majority of what you're going to hear at the

8    beginning of the case obviously will involve Mr. Moody and some

9    taped conversations.  Maybe there will be some emails I don't

10   know whether the law will permit.  But it's not just

11   communications that occurred between Mr. Heshelman and

12   Mr. Moody.  Please listen to the other witnesses you'll hear

13   from, the other investors.

14           Paul Ramsey might be a prime example.  Or there's

15   others.  Literally from the day these investments started back,

16   you know, approximately some 10 years ago until the time that

17   Mr. Heshelman was arrested in Switzerland in late 2008, some of

18   these people he literally spoke with almost daily.  At least

19   weekly.  Moody again you'll see a lot from.  Ramsey.  Others.

20   Other investors.

21           Now, Bryce Sherwood, whose name you've already heard,

22   he was supposed to be and was the main point of contact for

23   most of these investors.  He's the one that brought them and

24   introduced them to this investment scheme and the plan in terms

25   of a trading platform.

1          Mr. Sherwood, you would think -- and he was

2    supposedly friends with some of these people as well -- you

3    would think that he would remain in contact with them

4    throughout the whole process.  And there's points in time that

5    he does.  But you'll hear, I think, from a variety of witnesses

6    that say at some point in the process Sherwood just fell off

7    the map.  He wouldn't return calls; he wouldn't return emails.

8    And I think you'll see that he went on to other things and did

9    some other bad acts that Mr. Sherwood and Mr. Mickelson may

10   have been involved in that had nothing to do with Michael

11   Heshelman.

12         It's a difficult thing, you'll have to sort of parse

13   through what was Sherwood and Mickelson up to versus what was

14   Mr. Heshelman up to?  One of the points being that even though

15   Mr. Sherwood fell out of contact and dodged and avoided and

16   didn't return calls of these investors, Mr. Heshelman never did

17   that.

18         You'll hear about him moving over to Switzerland in

19   the '03 or '04 time frame, getting -- being closer to Zurich

20   and a banking center where he was working on the types of

21   trading platforms and investments that you're going to hear

22   about.  And you're going to hear the witnesses never lost

23   contact with him.  They always had a phone number, always had

24   an email, always had return calls from him.  And literally some

25   of them, as they say, almost spoke weekly with him.

1          Now, what I'm asking you to think about is:  Is this

2     a guy that intended to defraud these people when for 10 years

3     he continued to work on the issues and he continued to stay in

4     communication with them, he continued to be at the same

5     business and office address in Zurich, he continued to be in

6     the same apartment that he rented over there?

7          In other words, he was very accessible to all of

8     these investors throughout the whole time period that this was

9     going on.  And unlike Mr. Sherwood, he never dodged or

10    attempted to avoid them or their questions about what was going

11    on.  So please keep that in mind as you sort of listen to the

12    evidence as it comes in.

13         Now, all of the investors' money -- other than these

14    other side deals that we'll talk about in a minute that

15    Sherwood and Mickelson apparently had going on that

16    Mr. Heshelman knew nothing about -- all of the investors'

17    dollars went through an attorney trust account, Ken Warner's,

18    or sometimes his name is Ken Warner Mayer.  I don't know

19    exactly what it was, but I call him Mr. Warner.  All of it went

20    through Mr. Warner's attorney trust account.  He was an

21    attorney down in Florida.  As far as I know he's still a member

22    of the Bar there.  I don't know.  And he acted as the escrow

23    agent on these accounts.  And the money that was paid into the

24    accounts for it to be moved around had to be approved by

25    Mr. Warner.  And I don't think you'll hear anything about any

1    claims being brought by any investors against Mr. Warner.  I

2    think you'll see some things where people noticed some claims

3    against him, or, you know, suggested to him -- even maybe a

4    claim went into the Florida Bar in terms of whether he should

5    be disciplined in terms of use of his account, but I don't

6    believe, again, like I said before, I don't believe that any

7    lawsuit came out of it.  And as far as I'm aware, the federal

8    authorities and no other authorities have ever brought any

9    charges against Mr. Warner.  Again, it was his account that was

10   used for these monies in terms of when they were funded and

11   when they were distributed out of the account.

12           Finally, you'll hear about the investment vehicle and

13   trading platforms and things again as we talked about that

14   Mr. Heshelman was trying to work on and has been working on for

15   a period of years.  I think you're going to -- I don't think

16   you're going to hear from any witness that indicates that the

17   type of trading platform doesn't exist in the world.  In fact,

18   I think you're going to hear to the contrary, that some of

19   them, for example Allan Clyde who is one of the investors out

20   in Utah, he had an attorney Arron Jepson look into things for

21   him.  You might even see part of Defense Exhibit B which is an

22   article that Mr. Clyde or Mr. Jepson obtained maybe off the

23   Internet or through some source about these trading platforms.

24   These platforms exist.

25           Now, are they more complicated than going and taking

1   a loan or opening an account at a bank down the street?  By all

2   means, yes.  And at the end of the day you'll have to judge

3   from the witnesses you'll hear from:  Did Mr. Heshelman have

4   the wherewithal, the financial acumen to pull it off?  It's

5   taken him a long time to do it if he does.  Maybe he simply

6   lacked the knowledge, skills, and abilities really to do it.

7           But, again, there's a big difference between him not

8   having the financial ability, the wherewithal, the connections

9   to do this in a timely manner versus him actually intending to

10  defraud anybody.

11          The documents -- and Mr. Mekaru tried to make it

12  sound like, you know, money came in and money went out to

13  another guy.  Money came in and money came out.  Please watch

14  the documents on this front very closely as well.  You're going

15  to see dollars moving over to, as near as I can tell, reputable

16  financial-type companies.

17          One, for example, that you'll see monies moving to

18  is -- I think it's at least a quarter of a million dollars,

19  maybe more -- to a Kennedy Funding, Inc.  It's a

20  well-established company.  It's been in business since I think

21  the mid-'80s in New Jersey.  And you'll have to look at what

22  was trying to be accomplished using fairly substantial amounts

23  of money, but when you're dealing with millions rather than

24  hundreds of thousands, some amount of seed money to get trading

25  programs in place.  So please look at those things as you look

at the documents as well.

I mentioned I think you're going to hear things, probably at least at minimum during my cross-examination, of Sherwood and Mickelson that they had other people bring claims or allegations against them in terms of defrauding other investors. These happen completely outside what was going to be talked about in the main in front of you here. It had nothing to do with Mr. Heshelman. And you have to ask yourself: What was Sherwood and Mickelson doing the whole time that this investment was taking place?

You're going to look at lots of dollars going to them. Did they take advantage of Mr. Heshelman or Mr. Warner or others that were involved? Did they ever earn anything that they were supposed to be doing in terms of their involvement with this case?

Even when you hear from Mr. Moody, pay attention to who was the person that introduced him to this investment? Who was the person he put his trust into? Did he put his trust into Mr. Sherwood when he shouldn't have? Did Mr. Sherwood ever do anything to earn any monies that he got?

Compare that at the end of the day with what you hear about in terms of the activities that Mr. Heshelman was involved with. Having moved over to Switzerland. Not completely being out of contact necessarily with Sherwood and Mickelson but being over in a place where these trading

1    platforms are done on a regular basis.

2            Was Sherwood and Mickelson trying to do anything to

3    get returns on the investors' monies during the '04, '05, '06,

4    '07 years, or was it only Mr. Heshelman at this point in time

5    that was putting in the effort?

6            And I think you'll have to judge at the end of the

7    day, you know:  Who is culpable if they have done this?  If

8    Sherwood and Mickelson had done bad things, or at least

9    allegedly have, to other investors, did they do some of that to

10   the investors here unbeknownst to Mr. Heshelman?  Where do each

11   of the lines of culpability lie?  You can't just lump them all

12   into one hoop or basket is my point.

13           Now, again, these investments have been on the

14   ground, so to speak, for a long time now.  And I don't know

15   where all your own investments are.  Your investments -- we've

16   heard from some of you a little bit about that during the

17   voir dire process.  But think about maybe some of your own

18   investments or investments that you know in your family.

19           Does one of your parents or something still own

20   Coca-Cola stock and have they since the thirties?  Do they own

21   a home still that they have had?  Or do you that you've had for

22   30-some years which is a type of investment?  Do you have real

23   estate or other things that you've owned for a long period of

24   time?  Any time you go into these things, there's a certain

25   level of risk.  And, boy, jeez, we've seen it a lot over the

1  last year or two.

2      *MR. MEKARU:*  Your Honor, Mr. Tracy, this is sounding

3  like argument.

4      *THE COURT:*  Mr. Tracy, I would ask you to kind

5  of -- you've been going quite a long time, and I think you are

6  getting into areas that aren't really germane to opening.

7      *MR. TRACY:*  Okay.  I have a couple more minutes,

8  Your Honor, and I'm done.

9      My point being, just because these investments took

10 as long as they have in terms of trying to work towards an end

11 goal by itself shouldn't mean that there again was any sort of

12 intent to defraud.  And maybe that's a point that you'll hear

13 from certain witnesses, but you'll have to sort of judge that

14 on your own.

15     In conclusion, and I think you've heard this already,

16 there will be a lot of evidence.  Evidence is not all equal.

17 You get to judge it equally.  Some of it will be boring, and we

18 apologize in advance if it gets repetitive.  But please stay

19 with us throughout the whole course of the whole trial.  At the

20 end of the trial it's the government's burden.  Mr. Heshelman

21 and I, we have no burden.  They have the burden to prove to you

22 that he intended to defraud these people, these investors,

23 beyond a reasonable doubt.  And I'm confident at the end of the

24 case you will return a verdict that the government has not met

25 that burden and find that Mr. Heshelman is not guilty of all

1    the charges brought before him.  Thank you very much for your

2    patience and your attention.  Thank you.

3              THE COURT:  Thank you, Mr. Tracy.

4              Mr. Mekaru, are you ready with your first witness?

5              MR. MEKARU:  Yes, Your Honor.

6              Your Honor, the government calls Pastor Alan Moody.

7              THE CLERK:  Sir, if you'll come forward and turn and

8    face me, please.  Watch the cords.  Raise your right hand,

9    please.

10                     GOVERNMENT WITNESSES

11                         ALAN MOODY

12                 (The oath was administered)

13              THE WITNESS:  I do.

14              THE CLERK:  Be seated, please.  State your full name,

15    please, and spell your last name for the record.

16              THE WITNESS:  My name is Alan Moody.  Last name is

17    M-O-O-D-Y.

18              THE CLERK:  I'm sorry, your first name, is that one

19    "L" or two?

20              THE WITNESS:  One "L."  A-L-A-N.

21              THE CLERK:  Thank you.

22                     DIRECT EXAMINATION

23    BY MR. MEKARU:

24    Q.   I'll get situated here.

25         Pastor Moody, where do you live?

DIRECT EXAMINATION OF ALAN MOODY

1    A.    9365 108th Street, Middleville, Michigan.

2    Q.    How long have you lived in West Michigan?

3    A.    Fourteen years.

4    Q.    And what is your vocation?

5    A.    I have been the last few years here as director of

6    Lincoln Lake Baptist Youth Camp.

7    Q.    We've referred to you as Pastor Moody.  Are you in fact an

8    ordained minister?

9    A.    I am.  I was ordained in 1993.

10   Q.    What church or denomination are you affiliated with?

11   A.    Baptist.

12   Q.    I'm sorry, you were -- you've been ordained since when?

13   A.    Since 1993.

14   Q.    '93.  All right.  So back in 1999 through 2001 were you

15   employed as a pastor or acting in some sort of capacity along

16   those lines?

17   A.    Yes.

18   Q.    Where were you?

19   A.    I was at First Baptist Church in Middleville, Michigan, as

20   the assistant pastor in charge of youth ministries.

21   Q.    How long were you with the First Baptist Church in

22   Middleville?

23   A.    Eight years.

24   Q.    Roughly from what time period?

25   A.    1996 through 2003, '4.

*DIRECT EXAMINATION OF ALAN MOODY*

1   Q.   All right.  So, Pastor Moody, do you know a man by the

2   name of Bryce Sherwood?

3   A.   Yes, I do.

4   Q.   How do you know Bryce Sherwood?

5   A.   Bryce Sherwood came to our church in the summer of 2000

6   and visited, and part of my job responsibilities were to follow

7   up on the new contacts in the church, and so I got to know him

8   through that.

9   Q.   Did Mr. Sherwood eventually become a member of your

10  congregation?

11  A.   Yes, he did, in April of 2001.

12  Q.   As part of your, I guess, job duties of meeting new

13  members and new potential members, did you talk to him about

14  his employment?

15  A.   Yes, I did.

16  Q.   What was your understanding as to what Mr. Sherwood did?

17  A.   He explained to me when we went to meet with him that he

18  was an investment professional that had a special license that

19  nearly nobody else in the United States had, some very

20  expensive license that enabled him to do investments, and that

21  he did a lot of work for the government, the CIA, and other --

22  lots of stories of things that he had done in the past in the

23  investment world.

24  Q.   Did he present himself as having the wherewithal or any

25  indications that he in fact was successful in this field?

*DIRECT EXAMINATION OF ALAN MOODY*

1  A.   Yes.  The first night that he came to our church he was

2  looking for somebody that could let him know about a large

3  house on the lake is where he wanted to live, and he was

4  looking for a house in the million-dollar range, and that was

5  what he was looking to come in and buy so that he could -- he

6  said he needed to live closer to the airport because it was

7  taking too much time and money to keep having to hire a

8  helicopter to fly him to the airport.  And so he came in very

9  much speaking about his great amount of wealth.

10  Q.   Now, at some point did you have a discussion with him

11  about possibly investing with him?

12  A.   He asked me out to lunch one day, and we went to a

13  restaurant in Caledonia, September I believe it was, in the

14  fall of 2000, and he wanted to explain to me the opportunities

15  that he had and things that he was doing and let me know what

16  he was doing for his line of work.

17  Q.   Now, did you have money to invest?

18  A.   Yes, we did.

19  Q.   Was it a sizable amount of money?

20  A.   Yes, it was.

21  Q.   Now, eventually -- I'm going to jump ahead a little bit

22  here -- eventually did you invest with Bryce Sherwood and

23  eventually with Michael Heshelman?

24  A.   Yes, we did.

25  Q.   Would that be in the neighborhood of about 2 1/2 million

*DIRECT EXAMINATION OF ALAN MOODY*

1   dollars?

2   A.   Yes, sir.

3   Q.   How is it that you have 2 1/2 million dollars?

4            *MR. TRACY:*  Sidebar, Your Honor, please?

5       *(At sidebar on the record)*

6            *MR. TRACY:*  I think he's going to get into some

7   accident happening with his family.

8            *THE COURT:*  I'm sorry?

9            *MR. TRACY:*  I think Dan is going to get into with the

10  witness an accident happening with his family and there being a

11  recovery out of that, which I don't think is relevant for the

12  jury to hear about.

13           *MR. MEKARU:*  What we're talking about here is the

14  financial lack of sophistication of these individuals, where

15  they may have gotten their money from, why somebody like this

16  might have this money, and why it is that he may have been,

17  quite frankly, gullible enough to accept this representation

18  that this is someplace he could invest his money.

19           This individual doesn't have that wherewithal unless

20  he were to come across a situation to have all this money

21  brought to him.  What's also important is the fact that as far

22  as -- this is the government's theory on this -- we've talked

23  to Mr. Sherwood, that a settlement on that claim made national

24  news.  It was a hundred-million-dollar insurance settlement

25  that went to the family, and then the money was divvied up and

1   that was all part, so quickly after that happened is when

2   Mr. Sherwood shows up at the church and wants to join.

3           *THE COURT:*  Is it your intention to explore how much

4   detail with regard to that settlement?  Where it came from, why

5   they got it, and so forth?  Or just that they got a settlement?

6           *MR. MEKARU:*  Well, just the fact that this was --

7   we're talking about not a lot of detail, but explaining the

8   fact that this was a widely publicized, known case that Mr. --

9   Pastor -- Pastor Moody was known to have money.

10          *MR. TRACY:*  That part I don't care about, if he says

11  he got some sort of settlement.  What I don't want mentioned is

12  that it came from some horrible accident that occurred --

13          *THE COURT:*  Was it a personal injury case?

14          *MR. MEKARU:*  Yes.

15          *THE COURT:*  I think that if -- I think it's certainly

16  relevant that he had the money, why he had the money, but I

17  think that getting into any significant detail with regard to

18  the accident itself is out of bounds.

19          *MR. MEKARU:*  Well, I guess I would have preferred if

20  we were going to have this restriction on this as far as

21  limiting it that we would have had some sort of notice.

22          *THE COURT:*  It should have been.

23          *MR. TRACY:*  I didn't know you were going -- you did

24  this morning.  You did this morning.  That's the first time I

25  knew you were going into it.

*DIRECT EXAMINATION OF ALAN MOODY*

1          MR. MEKARU:  Clearly you knew about the fact that

2     this was where the money came from.  So my concern is that now

3     I'm getting to the point where I have to change what I go into

4     with the witness --

5          THE COURT:  My only concern is at this point I don't

6     think the particular details of the accident itself are

7     relevant.  That's, I think, fair.  The rest of it, I think, is

8     relevant, and you can get into it.

9          MR. TRACY:  And I don't mind if it's a leading

10    question.  So to avoid that, I don't mind that either.

11         THE COURT:  Well, let's go ahead with it and see

12    where we go.

13         MR. TRACY:  Okay.  Thank you, Your Honor.

14         (Sidebar discussion concluded)

15    Q.   (BY MR. MEKARU)  Pastor Moody, are you married?

16    A.   Yes, I am.

17    Q.   Your wife's name?

18    A.   My wife's name is Amy.

19    Q.   Amy?  At some point shortly before -- within the year

20    before Mr. Bryce Sherwood joined your church did your wife,

21    Amy, and you as her husband, come into some large amount of

22    money through an insurance settlement?

23    A.   Yes, through --

24    Q.   All right.  Hold on.  Just answer that.

25    A.   Yes.

*DIRECT EXAMINATION OF ALAN MOODY*

1    *Q.*    All right.  And was this part of a larger insurance

2    settlement that was made towards -- given to Amy, your wife's

3    parents and family, immediate family?

4    *A.*    Yes.

5    *Q.*    The total settlement that was given to your wife's family

6    was in the neighborhood of $100 million?

7    *A.*    Yes, it was.

8    *Q.*    Without going into the particulars of the incident that

9    gave rise to that settlement, did that accident or that suit

10   and the other incidents that surrounded it generate some press?

11   *A.*    Quite a bit.

12   *Q.*    Lots of regional press?

13   *A.*    And national.

14   *Q.*    Lots of national press?

15   *A.*    Yes.

16   *Q.*    Did the fact that the children of your wife's family, the

17   siblings, received some sort of money, was that also in the

18   public domain?

19   *A.*    Yes, it was.

20   *Q.*    Was it commonly known in your church that you and your

21   wife had come into a large amount of money?

22   *A.*    Yes, it was.  If they had watched the news, it was common

23   knowledge.

24   *Q.*    Approximately how much money had come into your immediate

25   family?

*DIRECT EXAMINATION OF ALAN MOODY*

1    A.   To Amy and I?

2    Q.   Yes.

3    A.   It was $10 million.

4    Q.   All right.  Now, after that -- now, when approximately did

5    you receive your portion of the settlement?

6    A.   Towards the end of --

7    Q.   Forgive me.  I'm also talking to your wife.  I realize

8    this was your wife's family.  To you and your wife.

9    A.   We received the funds at the end of 1999.

10   Q.   All right.  And when was the settlement announced in the

11   public record?

12   A.   During the fall and into the end of 1999 right there that

13   was all public news, newspapers, TV.

14   Q.   Okay.  And approximately when did Mr. Sherwood come to

15   your church?

16   A.   About six months later in the summer.  August, right in

17   that range, of 2000.

18   Q.   All right.  All right.  Now, once you received -- your

19   family received a portion of that settlement, was some of that

20   money invested with other entities?

21   A.   Yes.

22   Q.   And at some point did you have a discussion with

23   Mr. Sherwood about other investment opportunities?

24   A.   Yes.  The first time was at that lunch in Caledonia.

25   Q.   All right.  Now, what was your -- according to

*DIRECT EXAMINATION OF ALAN MOODY*

1    Mr. Sherwood, what was your understanding of what he was

2    telling you?  How was this money going to be invested?  How was

3    this money going to be invested?

4    A.    He said that he had an opportunity to have a 100 percent

5    safe and secure investment.  Zero liability was one of his

6    quotes.  That the money would never leave an account.  It would

7    just be borrowed against, leveraged against.  And so, Hey, the

8    stocks aren't doing well, you're even losing money, hey, if you

9    put it in here, worst-case scenario, you'll stay the same.

10   You're ahead of where you're at.  He said, again, he had been

11   doing this for years, he could provide references and lots of

12   opportunities to convince me that this was a reputable

13   opportunity.

14   Q.    Now, at some point did Mr. Heshelman become involved in

15   this?

16   A.    Yes.  He was involved in that, was referred to by

17   Mr. Sherwood as being the one who would do the investments.

18   And then we met with him in January of 2001.

19   Q.    Okay.  Hold on.  You say "we" met with him.  I want to

20   break that down a little bit.  Who is "we"?

21   A.    Mr. Sherwood and I.

22   Q.    With who?

23   A.    Mr. Heshelman.

24   Q.    All right.  And where was that?

25   A.    Battle Creek.

*DIRECT EXAMINATION OF ALAN MOODY*

1  Q.   So here in Michigan.  And what was the nature of the

2  conversation with Mr. Heshelman?

3  A.   It was to discuss the investment that we had made and how

4  it was doing, what the plans were, and just to kind of verify

5  the reality of what was going on and to provide me the

6  assurances that things were good.

7  Q.   Okay.  So hold on.  I may have missed something there.

8  Had you already invested money with Mr. Sherwood before meeting

9  with Mr. Heshelman?

10  A.   I had.

11  Q.   All right.  Had you talked with Mr. Heshelman prior to

12  investing with Mr. Sherwood?

13  A.   I don't believe so.

14  Q.   But as far as you understood when you first invested the

15  money, was Mr. Heshelman playing any part in this investment?

16  A.   Oh, yes, he was the one who was on the front with the

17  money doing the investments.  He was the one that was in

18  Switzerland taking care of doing the work and was -- as it was

19  first portrayed to me by Mr. Sherwood, Mr. Heshelman was an

20  employee of his.

21  Q.   Did you make any effort to try to verify what they were

22  telling you?

23  A.   Yes, I did.  Made a lot of phone calls trying to check up

24  on references.  I called to his church, called to references of

25  other investors that he gave me.

*DIRECT EXAMINATION OF ALAN MOODY*

1   *Q.*   Who gave you?

2   *A.*   Mr. Sherwood did.

3   *Q.*   Okay.  Did one of these references include a man by the

4   name of Dennis Mickelson?

5   *A.*   Yes, it did.

6   *Q.*   What was your understanding of Mr. Mickelson's position?

7   *A.*   That he was a long-term investor who had invested

8   $10 million with Mr. Sherwood and Mr. Heshelman.

9   *Q.*   How did you speak with Mr. Mickelson?

10  *A.*   I was given a phone number down in Sarasota, Florida, to

11  call and to talk to him and was told that they would only deal

12  with $10 million or bigger customers, so I wasn't supposed to

13  let them know that I had only done a million, and not to

14  mention the amount, but that to -- he would confirm the fact of

15  a multiyear track record of making monthly payments.

16  *Q.*   Okay.  Hold on a minute.  I'll break this down a little

17  bit.

18       Who is telling you not to tell Mr. Mickelson that your

19  investment is something smaller than $10 million?

20  *A.*   Mr. Sherwood did.

21  *Q.*   All right.  Why?  Why is that?

22  *A.*   Because they supposedly had a $10 million minimum

23  investment amount.

24  *Q.*   Well, if you only had a million dollars, where was this

25  other 9 million dollars supposed to come from?

1    A.    Mr. Sherwood said he was going to take care of putting it

2    in himself and finding some other investors that would join in

3    to make the complete package.  And it would be kind of like a

4    mutual fund of our monies to get that minimum, minimum level of

5    investment.

6    Q.    Where was your money to go?  What was to happen to your

7    money?

8    A.    It was to go into an escrow account that was being managed

9    by a man by the name of Ken Warner.

10   Q.    And did you have any idea -- what were you told about

11   Mr. Warner's position in all of this?

12   A.    That he was kind of like -- Mr. Warner was a safeguard.

13   That he was an outside entity from the company, and that he was

14   kind of the added security that my money was safe and secure,

15   and that it would be in his account and that it wouldn't leave

16   and that he would be personally managing that.

17   Q.    Was Mr. Warner in the investment field or in the legal

18   field?

19   A.    In the legal field as far as I know.

20   Q.    Was he suggested to you to be a lawyer?

21   A.    He was introduced as an attorney.

22   Q.    And any indication as to who he represented?

23   A.    That he worked for the company consisting of Mr. Sherwood

24   and Mr. Heshelman.

25   Q.    All right.  Okay.  Let me stop fiddling with my exhibits

*DIRECT EXAMINATION OF ALAN MOODY*

1  now that I've got that put together.

2      All right.  Now, at some point did you agree to invest

3  with Mr. Sherwood and Mr. Heshelman?

4  A.   Yes, I did.

5  Q.   How much money?

6  A.   In December we put in a million dollars.  December of

7  2000.  And then in March of 2001 we put in a million and a

8  half.

9  Q.   All right.  Well, how did you -- I want to break this down

10  a little bit.  Where did the money go?

11  A.   It went to Attorney Ken Warner's account at Mellon Bank.

12  Q.   How did you send him the money?

13  A.   We wired it from Northern Trust to Mellon Bank.

14  Q.   Were you given some sort of instructions as to how to do

15  the wire transfer?

16  A.   Yes.  He gave me a sheet with the instructions on it, with

17  the account numbers and the names.

18  Q.   Okay.  Now, your account with Northern Trust, where was

19  that?

20  A.   Right here in Grand Rapids.

21  Q.   And do you know where Mr. Warner was at?

22  A.   In Florida.  Down in Miami, Florida.

23  Q.   And I guess in relation to this -- we jumped ahead a

24  little bit -- but in relation to this million-dollar

25  investment, were there any sort of documents or any sort of

*DIRECT EXAMINATION OF ALAN MOODY*

1   agreements prepared?

2   A.   Yes.  Mr. Sherwood provided me with a contract, a

3   promissory note that was signed by Mr. Heshelman and himself.

4   Q.   All right.  Now, you've got a binder next to you that I've

5   got labeled on the spine as "Volume Number I."

6        Would you please turn to the first half of

7   Exhibit Number 1.  Are you there?

8   A.   Yes.

9   Q.   Okay.  Do you recognize Exhibit Number 1?

10  A.   Yes, I do.

11  Q.   What is it?

12  A.   This is the contract that was provided to me that was to

13  have been the signature of Mr. Heshelman and Mr. Sherwood.

14  Q.   There's a line there for a signature for Alan Moody.  Do

15  you recognize the signature?

16  A.   That is mine.

17  Q.   There's also another portion here that shows Ken Warner's

18  banking information on there.  It looks like the font is a

19  little different.  Any explanation as to the difference here?

20  A.   We had photocopied this.  This was information -- he had

21  given me this information several times, and we photocopied it

22  together here so it was all together in one place.

23            MR. MEKARU:  Okay.  I would move for the admission

24  of Exhibit Number 1.

25            THE COURT:  Any voir dire or objection, Mr. Tracy?

*DIRECT EXAMINATION OF ALAN MOODY*

1          *MR. TRACY:*  No objection, Your Honor.

2          *THE COURT:*  It's admitted.

3          *MR. MEKARU:*  All right.  May we publish this to the

4    jury?

5          *THE COURT:*  Yes.

6    Q.   *(BY MR. MEKARU)*  All right.  Investors First Ventures

7    Limited "Trust."  Any sense as to who Investors First Trust --

8    excuse me -- Investors First Ventures is?

9    A.   No.  Actually, when we got this document, I was surprised

10   that it had Mr. Heshelman's name on it first, but it was

11   explained that he was buying the company from Mr. Sherwood and

12   that he would be the one that I would be doing my business

13   with.

14   Q.   Let's go over that a little bit.  Did you originally think

15   that Mr. Sherwood was the principal?

16   A.   Yes.

17   Q.   And at some point did that change?

18   A.   Yes.

19   Q.   Was that before or after you put your money in?

20   A.   During and after.  In between the first amount and the

21   second amount.

22   Q.   Okay.  So, now, as you went forward, then, what was your

23   understanding as to who was the ultimate principal behind this

24   investment?

25   A.   That Mr. Heshelman was handling the investment.

1   Q.   Okay.  Now, this indicates that it's some sort of

2   "Promissory Note and Joint Venture Trust Warrantee."

3       Did you have any understanding as to what this document

4   actually represented?

5   A.   No.  That's not in my education background, and large sums

6   of money were not part of being in the pastor employment.

7   Q.   But it says it's some sort of promissory note.

8   A.   Yes.

9   Q.   All right.  Between Alan A. Moody and Investors First

10  Ventures Limited, Michael Heshelman as the trustee, right?

11  That's that second paragraph?

12  A.   Yes, it is.

13  Q.   Okay.  Why don't we zoom in on that middle paragraph.

14      All right.  "I, Michael Heshelman, hereby warrant and

15  certify the trust account for Investors First Ventures is free

16  of any liens and encumbrances under the strict guidelines under

17  the direction of Attorney Ken Warner . . ."

18      Is that the same Ken Warner you told us about before where

19  your money had gone?

20  A.   Yes, sir.

21  Q.   ". . . and the written trust agreement for the requirement

22  of two signatories to initiate the movement of any monies out

23  of that trust for any purpose except the return of the money

24  back to the investor in accordance with the terms of this

25  promissory note."

*DIRECT EXAMINATION OF ALAN MOODY*

1    Was that phrase explained to you?

2  *A.*   Yes, it was.

3  *Q.*   What were you told about that?

4  *A.*   I was told no monies could leave that account without my

5  signature on there as one of the two signators.

6  *Q.*   To be clear, did it have to be your signature?  I mean,

7  there are other people who signed this document.  We've got

8  Mr. Heshelman, Mr. Sherwood.

9  *A.*   It was explained to me that the money could not leave the

10  account without my signature on there.

11  *Q.*   And who explained that to you?

12  *A.*   Mr. Sherwood did.

13  *Q.*   Did you ask Mr. Heshelman about that as well?

14  *A.*   I don't believe that I did.

15  *Q.*   Now let's go down to next paragraph.

16    All right.  This is the paragraph noted as being a

17  promissory note.  "Hereby certifies and warrants with full

18  corporate and personal responsibility, I, Michael Heshelman,

19  for value received, the undersigned hereby jointly and

20  severally promise to pay within 240 business days the sum of

21  $1 million together with interest at libor plus 1 percent

22  per annum on the unpaid balance.  May be prepaid at any time in

23  whole or in part without penalty."

24    All right.  Within 240 business days of when?

25  *A.*   We assumed from the date that we made the investment.

1   *Q.*   But there was no date on this?

2   *A.*   That's correct.

3   *Q.*   Who wrote this agreement?

4   *A.*   I'm not sure.

5   *Q.*   Okay.  Did you write this agreement?

6   *A.*   I did not.

7   *Q.*   $1 million with interest at libor.

8       Do you understand what "libor" meant?

9   *A.*   No, I do not.

10  *Q.*   This note may be prepaid at any time in whole or in part

11  without penalty.

12      Has the note ever been paid?

13  *A.*   No, it has not.

14  *Q.*   Did you ever ask that this note be paid?

15  *A.*   Yes, I have.

16  *Q.*   All right.  Let's go to the next page.  Let's go to the

17  second paragraph.  I'm not going to read this, but do you have

18  any understanding as to what that paragraph meant to you?

19  *A.*    It was basically the fact that we could get our money back

20  at any time.  That any time at the end of 240 business days

21  that I could withdraw the funds and move them back to our

22  account.

23  *Q.*   Now, if money is invested in some sort of instrument, how

24  is it that you were going to be able to get it back out so

25  quickly?

*DIRECT EXAMINATION OF ALAN MOODY*

1  *A.*    Because the money was going to stay in the account.  It

2  was just going to be borrowed against, and they just needed to

3  borrow against it for long enough to make the buy/sell

4  agreement.

5  *Q.*    You say borrowed against.  You mean it was being held as

6  some sort of collateral or something along those lines?

7  *A.*    Yes.

8  *Q.*    So as far as you're concerned, would the money ever be

9  touched or used?

10  *A.*    No, it would never -- it was to never leave the account.

11  That was our understanding of it.

12  *Q.*    Was there any sort of agreement to use any portion of that

13  money for any sort of expenses or any other -- any other

14  incidentals?

15  *A.*    None whatsoever.

16  *Q.*    What about commission or some other sort of percentage of

17  that being paid to Mr. Sherwood or Mr. Heshelman?

18  *A.*    At different times I had asked them that, how they made

19  their money, and they told me that they didn't make any money

20  until I got my money back.  And that when I got paid, they

21  would get paid.

22  *Q.*    The agreement goes on to talk about, Do you accept a

23  facsimile and such, and then we have the signatures here on the

24  last page, page 3.

25        Now, did you actually see Mr. Heshelman and Mr. Sherwood

*DIRECT EXAMINATION OF ALAN MOODY*

1    sign this?

2    A.    Mr. Heshelman's signature was on it when Bryce presented

3    the paperwork to me, and then he signed it and I signed it.

4    Q.    Has Mr. Heshelman ever denied to you that this is his

5    signature, that he never executed this?

6    A.    No, he has not.

7    Q.    And did you wire transfer the money to that account that's

8    indicated here, to this Kenneth Warner Attorney at Law Trust

9    Account?

10    A.    Exactly to that exact detail.

11    Q.    Was it in one lump sum?

12    A.    Two different wires.  We had two trust accounts with

13    Northern Trust, and so we took half of it from Amy's and half

14    of it from mine.

15    Q.    Now, as of -- that was December of 2000, correct?

16    A.    Yes.

17    Q.    As of December 2000, what was your understanding as to

18    where the money went and where it was being held?

19    A.    It was being held in Mellon Bank, Miami, Florida, in the

20    escrow accounts of Attorney Ken Warner.

21    Q.    What about in 2001, any idea as to -- what was your

22    understanding as to where the money was?

23    A.    That it was still in that account.

24    Q.    Any discussion at all during that -- let's see, the focus

25    is on December/January/February/March, of that money being used

*DIRECT EXAMINATION OF ALAN MOODY*

1  for anything other than collateral?

2  A.  None whatsoever.

3  Q.  Did you ever authorize the money to go anyplace else?

4  A.  No, I did not.

5  Q.  All right.  So you had told us that you had started one

6  investment in December of 2001 and another one in March

7  of -- December of 2000 and March of 2001.  And in the

8  intervening time -- in the intervening time did that first deal

9  come to fruition at all?

10 A.  No, it did not.

11 Q.  Were you surprised at all?  I mean, was this supposed to

12 be a longer-term investment, or what was the representation to

13 you?

14 A.  There was a 90-day startup period that they needed for

15 things to get rolling, and then it was supposed to be a regular

16 monthly payout.  And so it was a long-term investment, and so

17 there wasn't any expectation on our part that there would be an

18 immediate return on the money.

19 Q.  How much money were you supposed to be getting?

20 A.  Again, the amounts changed numerous times and many times

21 in how much, but that they had said initially -- Bryce had

22 presented the fact that there would be an 8 to 15 percent

23 return per month.

24 Q.  I'm sorry, 8 to 15 percent per month?

25 A.  Per month.

1  Q.   So on an annual basis, I mean, that suggests somehow that

2  the money might even double?

3  A.   Yes.  That was -- the proposal there had been -- and,

4  again, the amounts varied and differed along the way as to how

5  much it was going to be -- but that there was a chance here to

6  over the course of a year or two to see our money double.

7  Q.   Now, were you seeing that sort of rate of return with any

8  other investments that you had?

9  A.   No.

10 Q.   Did that cause you any pause to hear that this investment

11 in one year would be able to double your money?

12 A.   Yes, it did.  And that's where I had asked for the

13 references of other clients that they had that I could talk to

14 and to find out, you know, was this working for other people?

15      Being in the business of being a pastor, I hadn't dealt

16 with anything like this before, so I was asking a lot of

17 questions from as many people as I could trying to find out

18 about the situation.

19      They also presented the fact that they had a special

20 license that other people didn't have, and that's how they,

21 more than any others, could do the special, special deal.

22 Q.   Did you have any concern at all about where your money

23 might go in the meantime?

24 A.   I was promised it was right there, that it was safe and

25 secure.

1  *Q.*   And at some point did you agree to invest another

2  1 1/2 million dollars?

3  *A.*   Yes, we did.  We were explained to the fact that the first

4  deal had gotten held up, that it wasn't going through, but they

5  had a quick turnaround deal that would be two weeks or less, 7

6  to 14 days, to jump into another one, and that this would cover

7  the first one and that one, and then eventually when they got

8  the first one worked out, we would benefit from that as well.

9  *Q.*   When you say "they" told you this, specifically who was

10 telling you this information?

11 *A.*   Mr. Sherwood and Mr. Heshelman.

12 *Q.*   Both?

13 *A.*   Both of them.

14 *Q.*   Separately or together?

15 *A.*   Together usually.  Mr. Sherwood would make a phone call on

16 his phone and call to Mr. Heshelman, and the three of us would

17 be in communication together.

18 *Q.*   Was there any sort of agreement that some monies of that

19 1.5 million, some monies of that could be used for expenses or

20 other things along those lines?

21 *A.*   No, there was not.

22 *Q.*   And where was that $1.5 million supposed to go?

23 *A.*   It was supposed to go into the escrow account as well with

24 Mr. Ken Warner and to stay there.  It was, again, a safe,

25 secure situation.

1    Q.    Did you get another agreement to that effect?

2    A.    I didn't get the same agreement that I got on the

3    1 million, but what Mr. Sherwood provided me was a mortgage on

4    his personal home on Duncan Lake with an appraisal of

5    1.8 million, and he wrote me a mortgage for 1.5.

6    Q.    So I understand, so he basically secured your investment

7    with a note or mortgage against his house?

8    A.    Yes, he did.

9    Q.    Was his house paid in full?

10   A.    Yes, it was.

11   Q.    All right.  So now we're into March of 2001.

12        Did that investment in fact turn around quickly and get

13   your money back?

14   A.    No, it did not.

15   Q.    What happened?

16   A.    Every day there was a new story for the delay.  And

17   basically if you can dream it up, it happened.  From flat tires

18   to missed flights, deaths of family members, banks that needed

19   built.  Just, yeah, hundreds and hundreds of stories why the

20   delays happened.

21   Q.    All right.  And let's be clear again.  Who is telling you

22   these stories about mishaps and delay?

23   A.    Mr. Sherwood and Mr. Heshelman.

24   Q.    Again, they are telling this to you separately or

25   together, or how is it being communicated to you?

1    A.    At times separately; at times together.

2    Q.    Now, as I understand this, though, Mr. Heshelman is, I

3    guess, overseas in Switzerland while Mr. Sherwood is still

4    attending your church, right?

5    A.    That's correct.

6    Q.    So would it be fair to say that at this point really your

7    primary point person, your primary contact would be

8    Mr. Sherwood?

9    A.    Yes, it was.

10   Q.    But in terms of the relationship between Mr. Sherwood and

11   Mr. Heshelman, who was the one who was actually supposed to be

12   controlling the investment overall?

13   A.    Mr. Heshelman.

14   Q.    Now, at some point did you get frustrated with this delay

15   and do something to try to get some of your money back?

16   A.    Yes, I did.  I was looking for any opportunities I could.

17   Q.    So at some point did you take some sort of action on that

18   mortgage?

19   A.    Yes, we did.

20   Q.    Okay.  Now, again, we're talking about the mortgage that

21   Mr. Sherwood gave you on his home?

22   A.    Yes.

23   Q.    Okay.  When was that?

24   A.    I don't remember exactly the year.  I'm thinking that it

25   was in 2003.

1  Q.   So between March of 2001 and this period of 2003 or so,

2  what was happening with respect to your communications with

3  Mr. Heshelman and Mr. Sherwood?

4  A.   I daily tried to be in communication with him.  I was

5  greatly concerned about the delays, the fact that I had risked

6  this money and it wasn't coming through.

7       At the same token we had dreams of doing something to

8  honor the deceased siblings of Amy and had created the

9  Elizabeth Foundation, and this was the money that was supposed

10  to be funding the foundation.  And so it was very urgent to try

11  to find that and get it back.

12  Q.   Okay.  So, I'm sorry, we're talking about taking some

13  action then on this mortgage.

14       Did you try to file that mortgage or take some sort of

15  action with that paperwork?

16  A.   Yes, I did.  I went to the Barry County Courthouse, tried

17  to record it, and then was told the fact as we went through the

18  title work on it that Mr. Sherwood did not own the home.

19  Q.   Did you find out who owned it?

20  A.   I did.  It had been placed into the Joy C. Sherwood

21  Limited Family Partnership Trust, and Joy C. Sherwood was the

22  only trustee.

23  Q.   Who was Joy C. Sherwood?

24  A.   Was Mr. Sherwood's wife.

25  Q.   Now, at this point we're into, I guess, 2003.  Had you

*DIRECT EXAMINATION OF ALAN MOODY*

1   made any sort of complaints to law enforcement about, about

2   this investment?

3   A.   I believe it was right around the same time that we were

4   starting to explore the options that something could be wrong,

5   and so we wanted to cover our bases and try to find that out.

6   And so the individual that was installing the security system

7   in our home said that he worked -- previously worked with the

8   FBI, and he put us in touch with Agent Wetherbee.

9   Q.   Now, you said you were concerned.  At this point had you

10  reached any conclusion as to whether -- about anything that had

11  happened to you that was illegal or that this was still

12  possible or anything along those lines?

13  A.   We were concerned.  We weren't sure if something had

14  happened to our money.  If we had been scammed or not.  We

15  weren't sure if something was going on, and so we were trying

16  to kind of pursue both directions.

17  Q.   All right.  Well, once you found out that the mortgage

18  that you had from Mr. Sherwood was no good, what did you do?

19  A.   I went and confronted him with it.  I found out it was,

20  well, he had taken out another mortgage on the home for

21  $500,000 in the meantime as well that he said he forgot to tell

22  me.  And then he said he forgot that he didn't own the home.

23  And so I started pursuing the fact of getting his wife to sign

24  a mortgage.  And I went through a lot of delays in that as well

25  in trying to get her to give us the mortgage that he had.

*DIRECT EXAMINATION OF ALAN MOODY*

1  Q.   Were you successful in getting a mortgage from

2  Joy Sherwood?

3  A.   I eventually was.  And she signed it.  They drew up the

4  papers.

5  Q.   And at some point did you take some action to foreclose

6  the home based on that mortgage?

7  A.   Yes, we did.  And I processed the foreclosure, and in that

8  processing of that found that there was this other mortgage

9  that was ahead of ours, so we were actually a second mortgage,

10  and then proceeded to buy out the first mortgage so that we

11  could own the home.

12  Q.   So eventually did you take possession of that home?

13  A.   Yes, we did.

14  Q.   When was that?

15  A.   I'd have to go back and look at the paperwork to give you

16  the dates.

17  Q.   Okay.  Now, while that is going on, this activity with the

18  mortgage is going on, did you eventually contact Special Agent

19  Wetherbee?

20  A.   Yes, I did.

21  Q.   And did you give him your complaint?

22  A.   Yes, I did.

23  Q.   Now, was there any sort of discussion about any sort of

24  investigative activities that might make sense to pursue at

25  that point?

*DIRECT EXAMINATION OF ALAN MOODY*

1    A.   Yes, we did.

2    Q.   Any discussion about recording conversations?

3    A.   Yes.

4    Q.   So were you provided with some sort of recording

5    equipment?

6    A.   Yes.

7    Q.   And did you record telephone calls or communications with

8    Mr. Sherwood and Mr. Heshelman?

9    A.   Yes, I did.

10   Q.   And was that at the direction of the FBI?

11   A.   Yes.

12   Q.   These conversations, would it be fair to say that in some

13   instances Mr. Sherwood was speaking to you by himself and

14   others Mr. Heshelman was speaking to you by himself, and

15   sometimes all three of you were joined in together?

16   A.   That's correct.

17   Q.   Okay.  And did you eventually provide these recordings to

18   Special Agent Wetherbee?

19   A.   Yes, I did.

20   Q.   Have you had an opportunity to listen to Proposed

21   Government Exhibits 2A through 2M?

22   A.   Yes, I have.

23   Q.   And have you reviewed the transcripts 2A through 2M?

24   A.   Yes, I have.

25          MR. TRACY:  I think it's 20, not 2.

1          MR. MEKARU:  Two is the tapes; 20 is the transcript.

2          MR. TRACY:  I'm sorry.

3  Q.    (BY MR. MEKARU)  Two is the tapes.  Have you listened to

4  the tapes?

5  A.    Yes, I have.

6  Q.    Have you reviewed the transcripts, all the 20s, 20A

7  through M?

8  A.    Yes, I have.

9  Q.    Now, all these recordings, were they made about time of

10  the conversations?

11  A.    Yes.

12  Q.    Do they accurately reflect that portion of the

13  conversation -- I think some of these are excerpts.  Did they

14  accurately reflect that portion of the conversation?

15  A.    Yes, they did.

16  Q.    Did you recognize your voice and the other voices on these

17  tapes?

18  A.    Yes, I do.

19  Q.    And the transcripts, have you reviewed the transcripts and

20  compared them to what's on the tapes?

21  A.    Yes, I have.

22  Q.    Do they accurately depict the conversations that occurred

23  on the recordings?

24  A.    Yes, they do.

25          MR. MEKARU:  Your Honor, we move for the admission

1    of Government's Exhibits 2A through 2M.  The transcripts are --

2    I'll do that first.  2A through 2M first.

3            THE COURT:  Mr. Tracy.

4            MR. TRACY:  No objection, Your Honor.

5            THE COURT:  They are admitted.

6            MR. MEKARU:  And then, Your Honor, we have a

7    stipulation that the transcripts for those recordings are

8    admissible.  This is marked as Stipulation Number 6.  Would the

9    Court like me to present that?

10           THE COURT:  I don't find it.

11           MR. MEKARU:  Your Honor, you don't have that in your

12   exhibit book.  And we today have finally been able to get all

13   the parties together to execute these.

14           THE COURT:  Okay.  Yes.

15   Q.   (BY MR. MEKARU)  All right.  Now, while -- as Mr. Tracy

16   pointed out, the tapes are all the 2's, the transcripts 20's.

17   Do you have up there, I think, Volume II?

18           MR. MEKARU:  May I approach, Your Honor?

19           THE COURT:  Yes.

20   Q.   (BY MR. MEKARU)  Let's move this around close.

21       Okay.

22           MR. MEKARU:  Your Honor, as I mentioned, we thought

23   we would be able to simultaneously display the transcripts and

24   play it if we can, so we went out and made copies of all of the

25   transcripts.

1              May I distribute these to the jury?

2              THE COURT:  Not until they are admitted.

3              MR. MEKARU:  I think we had a stipulation for the

4     admission.

5              MR. TRACY:  That's correct, Your Honor.

6              THE COURT:  I'm sorry.  So are you offering those as

7     exhibits, Mr. Mekaru?

8              MR. MEKARU:  Yes, Your Honor.

9              THE COURT:  All right.  What are the numbers?  20A

10    through 20M.  All I had was 2, but now apparently there's a

11    stipulation that we will add 20A through 20M.  Is that correct?

12             MR. MEKARU:  Yes, Your Honor.  We had the admission

13    of 2A through M and then the stipulation for the admission of

14    20A through 20M.

15             THE COURT:  Very well.

16             MR. MEKARU:  Thank you.  (Transcripts were passed out

17    to each juror)

18             THE COURT:  Let me just ask you, Mr. Mekaru, is it

19    your intention to go through all of these excerpts and play all

20    of them?

21             MR. MEKARU:  Yes.

22             THE COURT:  Have you done anything to determine how

23    much time is going to be taken up with that?

24             MR. MEKARU:  I think we tried to get some sense.

25    It's not quite -- not an hour.

*DIRECT EXAMINATION OF ALAN MOODY*

1       THE COURT:  Let me suggest that if we're talking
2   about an hour's worth of listening and looking at transcripts
3   that we do this tomorrow morning when everybody is a little
4   fresher.
5       MR. MEKARU:  That's fine.  We can also break it up
6   too, but that's fine.  We can do this tomorrow.
7       THE COURT:  I'm just not sure how you would break it
8   up.
9       What is the quality of the audio?
10      MR. MEKARU:  We were testing that this morning,
11  Your Honor.  Some of them are pretty faint, and other ones are
12  actually very loud.  So we're going to have to adjust the
13  volume slightly, which is why I think the transcripts will help
14  greatly.
15      THE COURT:  Well, let's start with some of them, but,
16  you know, I really, frankly, think that listening to these all
17  this afternoon is going to be very burdensome for the jury.
18      Let's start and see what they -- how it goes.
19      MR. MEKARU:  Yes, ma'am.
20  *Q.   (BY MR. MEKARU)*  All right.  Let's start with 2A, please.
21      THE COURT:  Are you going -- the transcripts are not
22  going to be on the screen; is that correct?
23      MR. MEKARU:  No, Your Honor.
24      THE COURT:  Okay.
25      MR. MEKARU:  That's why everybody has a copy now.

*DIRECT EXAMINATION OF ALAN MOODY*

1          *THE COURT:*  All right.

2    *Q.*    *(BY MR. MEKARU)*  Pastor Moody, on July 3rd, 2003, did you

3    record a conversation?

4    *A.*    Yes, I did.

5    *Q.*    All right.

6          *(Audio playing)*

7    *Q.*    Can you stop it for a second?  The voices are talking.  Do

8    you recognize that voice?

9    *A.*    Michael Heshelman.

10   *Q.*    All right.  Go ahead.

11         *(Audio playing)*

12         Stop it a second.  I'm sorry, "Never get the NKDs done."

13         Do you have any idea what "NKD" meant?

14   *A.*    New Kuwaiti dollars was what it was explained to me in one

15   conversation.

16   *Q.*    Okay.  So was that in a conversation as it relates to this

17   Kuwaiti oil baron?

18   *A.*    Yes.

19   *Q.*    So you were making a reference to your earlier

20   conversation.  What was the nature of that earlier

21   conversation?

22   *A.*    Trying to find out exactly what deal he was working on and

23   what we were waiting to get done, and so that was the previous

24   deal that he'd explained to me.

25   *Q.*    Go ahead.  Continue.

*DIRECT EXAMINATION OF ALAN MOODY*

1          (Audio playing)

2          Now, you were asking him about trying to leverage money

3     against Ken Warner's account.  Was that based on something you

4     were told by Mr. Sherwood or Mr. Heshelman?

5     A.    From Mr. Sherwood for sure, and then in our joint

6     conversations that had been my understanding from the both of

7     them that was what was taking place there.

8     Q.    Was that one of the first conversations you had about what

9     was going to happen with the money?

10    A.    That was further into the -- in between the first -- the

11    two investments.

12    Q.    So money was supposed to stay in the account and be used

13    as leverage for collateral --

14    A.    Yes.

15    Q.    -- for some investments?

16    A.    Yes.

17    Q.    And then later on was there some conversation about an oil

18    baron in Kuwait?

19    A.    Yes.

20    Q.    And then most recently there was some conversation about

21    currency trading?

22    A.    Yes.

23    Q.    These last two deals, the Kuwaiti oil and the currency,

24    are those consistent at all with what you were told about what

25    would happen with your money?

A.   We were originally told that they had special licenses

that enabled them to buy distressed bonds at a discount, and

that part of the security of the whole process was that

these -- I think they called it secured private placement, and

their license allowed them to do this, that they could find a

buyer for these before they would buy them, and so you would

just -- it was also a guaranteed no-lose deal because they had

the buyer in place before they would make the sale.

Q.   Does this have anything to do with currency?

        *MR. TRACY:*  Objection, Your Honor.  There's a little

bit of the use of the word "they."  And sometimes Mr. Mekaru

has cleaned that up.  But the witness's prior testimony was

only Mr. Sherwood had a specialized license, and I think it's a

little confusing.

        *THE COURT:*  Do you want to clear that up, Mr. Mekaru?

        *MR. MEKARU:*  Sure.

Q.   *(BY MR. MEKARU)*  All right.  Well, as suggested, I'll just

ask.  So can we clear that up as to who is "they"?

A.   "They" is Mr. Sherwood and Mr. Heshelman.  In the course

of the conversation with these two gentlemen, the position in

the company was changing, that Mr. Heshelman was buying it from

Mr. Sherwood.  Mr. Sherwood was transferring that special

license to Mr. Heshelman.  The story changed numerous times

along the way there, but that they both were involved in that,

both had special licenses involved in doing such trades.

*DIRECT EXAMINATION OF ALAN MOODY*

1    Q.   Okay.  Go ahead and continue.

2         *(Audio playing)*

3         Stop.  Back up a little here.  You say the money you put

4    in was for expenses to get the currency deal done.

5         Was that your understanding?

6    A.   No, it was not.

7    Q.   Now, it goes on here to say it doesn't appear that you

8    questioned him on that.  You didn't challenge him on that

9    statement that the money was being used for expenses.

10        What was your understanding of what he was telling you at

11   that point?

12   A.   Within the context of this huge amount of money that was

13   in this trust account of his, that they were using money out of

14   that for expenses, but that I still was going on the basis of

15   the numerous times that I've been promised that my money would

16   never leave the account, it would always be there safe and

17   secure.

18   Q.   Are you saying, though, at some point that the money was

19   transferred either to First Bank Union or First Bank of Miami

20   or along those lines?  Was that still within the control of the

21   attorney trust account, or was that going to some other trading

22   account?

23   A.   Those were some things that after we made the

24   million-and-a-half-dollar deposit my family and I flew down to

25   Florida to go check in with Ken Warner and find out just how

1    things were going there.  I wanted to go to the bank in person

2    and check on the investment and see where things were.  And go

3    into Mellon Bank.  Mellon Bank wouldn't talk to me.  And, in

4    fact, they escorted me from the bank.

5        And so I was concerned, and I went to Ken Warner's office,

6    tracked him down, and I went in and talked with him and again

7    received the assurances from him that they merely had a glitch

8    with Mellon Bank, there was nothing to worry about, that they

9    made a transfer over to First Union, and I could go to

10   First Union, check on the account, whatever I wanted to do, and

11   that everything was still safe and secure, my money was there

12   intact, and that's what that reference is to.

13   *Q.*   All right.  Go ahead and continue.

14       *(Audio playing)*

15       Did you receive any distributions on July 8th?

16   *A.*   No, I did not.

17   *Q.*   Did you try to call him then on July 9th?

18   *A.*   Yes.

19   *Q.*   Before you is what is 20D.  Was there a phone conversation

20   on July 9th?  Yes?

21   *A.*   Yes.

22   *Q.*   Was that with you, Mr. Sherwood, and Mr. Heshelman?

23   *A.*   Yes.  I don't have that information in front of me right

24   here, so I'm --

25   *Q.*   I'm sorry, can you turn to 20B.

*DIRECT EXAMINATION OF ALAN MOODY*

1   A.   20B.

2   Q.   I'm sorry, I thought you had turned to that.

3   A.   Here we go.  Now I'm with you.

4   Q.   That's the transcript of the tape recording that's at 2B.

5        All right.  Is this a fair indication of who had

6   participated in the conversation?

7   A.   Yes, it is.

8   Q.   All right.  Why don't we go ahead and play it.

9        *(Audio playing)*

10       You're trying to do a conference call.  Is that what's

11  happening?

12  A.   Yes, it is.

13       *(Audio playing)*

14       Okay.  We can stop it.  At that point did Mr. Heshelman

15  step out of the conversation?

16  A.   Yes, he did.

17  Q.   All right.  Now, according to that conversation there was

18  going to be some news here in about seven days?

19  A.   Yes.

20  Q.   Any news in seven days following?

21  A.   No.

22  Q.   Did you try to call him again on July 29, 2003?

23  A.   Yes.

24  Q.   Is that a conversation in transcript 20C?

25  A.   Yes, it is.

*DIRECT EXAMINATION OF ALAN MOODY*

1    Q.   All right.  Now, just so we're clear here, there's

2    indication of who the different voices are.

3         Is that a -- is that an accurate depiction as to who was

4    speaking?

5    A.   Yes, it is.

6    Q.   All right.  Go ahead and play it.

7         *(Audio playing)*

8         Stop it for a second.  The buzzing and clicking noise,

9    that's slightly different from the other recordings.  Any

10   reason for that?

11   A.   The cell phone was too close to the recorder.

12        *(Audio playing)*

13        *MR. MEKARU:*  Your Honor, may I continue?

14        *THE COURT:*  Yeah, let's do one more, and then I think

15   we're going to close for the day, Mr. Mekaru.

16        *MR. MEKARU:*  This one should be short as well.  Thank

17   you.

18   Q.   *(BY MR. MEKARU)*  All right.  Turn to 20D.

19        Well, sorry, I lost my thought here.

20        Now, there was some statement in here that the trading

21   would be done in about seven days and they would start

22   disbursing out.  That was in the middle of page 2 of

23   Exhibit 20C.

24        Any disbursements?

25   A.   None whatsoever.

1   *Q.*    Did you get any money?

2   *A.*    No.

3   *Q.*    20D.  December 9th, 2003, did you make another phone call?

4   *A.*    Yes, I did.

5   *Q.*    Was Mr. Sherwood a participant in this?

6   *A.*    No, he was not.

7   *Q.*    Okay.  Go ahead and play 20D, please.

8        *(Audio playing)*

9        *THE COURT:*  I think this is a good time to take a

10  break, Mr. Mekaru.

11       *MR. MEKARU:*  Yes, Your Honor.

12       *THE COURT:*  Mr. Moody, you can step down, if you

13  would, please.

14       Ladies and Gentlemen, we're going to take our break

15  for the day.  We will meet back here tomorrow morning.  If you

16  can be in the jury room not later than 8:15, we'll start

17  promptly at 8:30.

18       Keep in mind the instructions that I gave you before.

19  Don't discuss the case.  Don't do any research.  Don't form any

20  opinions.  Don't talk to anybody.  We're very, very early in

21  the process and not anywhere near the point of making decisions

22  or reaching conclusions.

23       So with that, I hope you have a pleasant evening, and

24  I'll see you first thing tomorrow morning.

25       *THE CLERK:*  Judge, would you like me to have them

1    leave the transcripts on their chairs?

2            THE COURT:  Yeah, I think that's probably a good

3    idea.  I think actually we'll collect them.

4            THE CLERK:  All right.  Leave them on your chairs.

5        (Jury exited the courtroom at 3:19 p.m.)

6            THE COURT:  I just have one quick thing for you.  I

7    would like to have your final draft of the proposed

8    instructions by Friday so that we can put them together over

9    the weekend.

10           MR. MEKARU:  I was hoping to have the weekend.

11           THE COURT:  Well --

12           MR. MEKARU:  That's fine.  We'll have them by Friday.

13           THE COURT:  That's a big process getting those things

14   coordinated between the two --

15           MR. MEKARU:  Sure.

16           THE COURT:  -- and so Friday is the deadline.

17           MR. MEKARU:  Yes, Your Honor.

18           THE COURT:  Okay?  Thanks.  We're adjourned.

19           MR. TRACY:  Thank you, Your Honor.

20       (Proceeding adjourned at 3:20 p.m.)

21                       *   *   *   *   *

22

23

24

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4     Date:  August 13, 2009

5

6

7                              **/s/ Glenda Trexler**

8                              _____
                              Glenda Trexler, CSR-1436, RPR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      EXAMINATION INDEX

 2                                              PAGE

 3   GOVERNMENT WITNESSES

 4   ALAN MOODY

 5        DIRECT EXAMINATION BY MR. MEKARU:        118

 6                    *    *    *    *    *

 7                       EXHIBIT INDEX

 8   EXHIBIT                          OFFERED   ADMITTED

 9   GVT 1        Promissory Note & Joint    132      133

10                Venture Trust Warrantee

11   GVT 2A-2M    Recordings                 149      149

12   GVT 20A-20M  Transcripts - Pursuant to  150      150

13                stipulation #6

14

15

16

17

18

19

20

21

22

23

24

25
```