```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3    _____

 4    UNITED STATES OF AMERICA,

 5                      Plaintiff,
                                        DOCKET NO. 1:06-cr-44
 6    vs.

 7
      MICHAEL WAYNE HESHELMAN,
 8
                      Defendant.
 9    _____/

10

11                        VOLUME III

12                  TRANSCRIPT OF JURY TRIAL

13            BEFORE THE HONORABLE JANET T. NEFF

14               UNITED STATES DISTRICT JUDGE

15                 GRAND RAPIDS, MICHIGAN

16                      June 4, 2009

17

18    Court Reporter:          Glenda Trexler
                               Official Court Reporter
19                             United States District Court
                               685 Federal Building
20                             110 Michigan Street, N.W.
                               Grand Rapids, Michigan 49503
21

22    Proceedings reported by stenotype, transcript produced by

23    computer-aided transcription.

24

25
```

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3        MR. DANIEL Y. MEKARU
          U.S. ATTORNEY
 4        The Law Building
          330 Ionia Avenue, N.W.
 5        P.O. Box 208
          Grand Rapids, Michigan 49501-0208
 6        Phone:  (616) 456-2404
          Email:  Daniel.mekaru@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
          MR. CHRISTOPHER E. TRACY
 9        HONIGMAN, MILLER, SCHWARTZ, AND COHN, LLP
          444 West Michigan Avenue
10        Kalamazoo, Michigan 49007
          Phone:  (269) 337-7708
11        Email: ctracy@honigman.com

12                          *   *   *   *   *

13                                   Grand Rapids, Michigan

14                                   June 4, 2009

15                                   8:27 a.m.

16                      P R O C E E D I N G S

17        (Jury entered the courtroom at 8:27 a.m.)

18             THE COURT:  Good morning everybody.

19             ALL:  Good morning.

20             THE COURT:  We are back on the record in case number

21   1:06-cr-44 with a continuation of trial.

22             Mr. Vos, as I'm sure you're well aware, you're still

23   under oath.

24             THE WITNESS:  Yes, Your Honor.

25             THE COURT:  And we are ready for Mr. Tracy's
```

1    cross-examination, I believe.

2              *MR. TRACY:*  Thank you, Your Honor.

3                   GOVERNMENT WITNESSES CONTINUED

4                            BILL VOS

5                        CROSS-EXAMINATION

6    *BY MR. TRACY:*

7    *Q.*   Good morning, Mr. Vos.

8    *A.*   Good morning.

9    *Q.*   How are you, sir?

10   *A.*   Good.

11   *Q.*   Could you remind the jury again, how long have you been

12   with the FBI?

13   *A.*   Since 2001.

14   *Q.*   And prior to that, I'm sorry --

15   *A.*   I was with the Internal Revenue Service.

16   *Q.*   Okay.  So you've been with the government for quite a

17   substantial part of your career?

18   *A.*   Twenty-one years.

19   *Q.*   All right.  If we could, Kathy, could you bring up

20   Exhibit 5A, please.

21       Now I'm not sure you looked at this one, but if you recall

22   5A or Exhibit -- tab 5 for the government goes all the way from

23   5A to 5II, I believe; does it not?

24   *A.*   Yes.

25   *Q.*   Okay.  And you've looked at these because you've used

*CROSS-EXAMINATION OF BILL VOS*

1   these documents for the work that you described yesterday?

2   A.   That's correct.

3   Q.   Okay.  So on this document you'll see there's a signature

4   line where this transaction has been ordered by somebody?

5   A.   Correct.

6   Q.   Under the signature line it says, "Ken Warner -- Kenneth

7   Warner, Esquire."  That's what that ESQ means, right?

8   A.   I assume.

9   Q.   Yeah, that's some fancy term for lawyer or something like

10   that.  I'm not real fond of that term.

11   A.   Yes, I guess.

12   Q.   Kenneth Warner is the person that's signing this, correct?

13   A.   It appears to be, yes.

14   Q.   And there's nothing that you've seen here or in any of

15   these 5A through 5II where Mr. Heshelman has signed, correct?

16   A.   I'm not aware of him signing.

17   Q.   Okay.  If we could also bring up 6C, please.

18        Now, this was introduced into evidence yesterday.  This is

19   the first page of it.  This is one of your summary charts that

20   you worked on, correct?

21   A.   Let me get to that.

22   Q.   Yep.  And this, again, is Government Exhibit 6C.

23   A.   Okay.

24   Q.   This is the front page of 6C, and this is a summary chart

25   you worked on?

1    A.    That is correct.

2    Q.    And this is out of one of Mr. Warner's accounts that was

3    at Mellon Bank, correct?

4    A.    Correct.

5    Q.    Okay.  If we could go to the next page of 6C.

6          So then at the bottom of this next page of 6C it says,

7    "Page 1 of 9," correct?

8    A.    Correct.

9    Q.    And here what you're doing is you're listing out in more

10   detail where payments were made out of that, out of

11   Mr. Warner's account?

12   A.    Correct.

13   Q.    Okay.  So, Kathy, at the bottom of the page, the last five

14   or six lines, if you could sort of highlight on those.

15         Now, we had a variety of things that Mr. Mekaru talked

16   with you about during your direct about payments to

17   Mr. Mickelson and Mr. Sherwood, et cetera, right?

18   A.    Correct.

19   Q.    I want to focus on a couple of other things.

20         You see this one here that's -- there's a few of them, but

21   October 25, '99, $250,000 going to Kennedy Funding, Inc.?

22   A.    Correct.

23   Q.    Okay.  Do you know anything about Kennedy Funding, Inc.?

24   A.    No, I do not.

25   Q.    There's a binder over there next to you, the black one

*CROSS-EXAMINATION OF BILL VOS*

1    that's the defense binder.  You can keep that one in front of

2    you too if it's possible.

3         And I think if you go to Defendant's -- Proposed

4    Defendant's Exhibit U, the tab U.  Hopefully I had it correct.

5    A.   Okay.

6    Q.   Do you see that?

7    A.   Yes, I do.

8    Q.   And this appears to be a web page from the Kennedy Funding

9    website?

10   A.   It appears to be, yes.

11   Q.   Okay.  Did you do any Google search or Internet search for

12   what Kennedy Funding was?

13   A.   I did a Google search two days ago.

14   Q.   For Kennedy Funding?

15   A.   For Kennedy Funding.

16   Q.   Did you come up with this website?

17   A.   I came up with this, yes, page.

18   Q.   Okay.  So you've looked at it before?

19   A.   Just glanced at this page only.

20   Q.   Okay.  And then there was a couple of other pages, like

21   you know how you can -- once you're on a website you can pull

22   up history or an overview of the company and the next one after

23   that the third page is about our story?

24   A.   Okay.

25   Q.   Did you do any of that while you were on the website?

1    A.   No.

2    Q.   But you did look at the front page of the website?

3    A.   Yes, I just Googled the name, and this was one of the

4    sites that came up with a hit as Googled.

5    Q.   Okay.  When you looked at it, were you aware of how long

6    Kennedy Funding has been in existence out in the

7    New York/New Jersey area?

8    A.   No, I have no information about Kennedy.

9    Q.   So you're not aware whether they started in the '80s or

10   '90s or anything?

11   A.   No.

12           MR. TRACY:  Your Honor, I think the Court could take

13   judicial notice of Exhibit U as being a website that exists

14   from Kennedy Funding, so I would move for the admission

15   of Exhibit U.  Defendant's Exhibit U.

16           THE COURT:  I'm not in a position to take judicial

17   notice of it, Mr. Tracy.

18           MR. TRACY:  Okay.

19           THE COURT:  Do you have any comment, Mr. Mekaru?

20           MR. MEKARU:  I would agree, Your Honor.  I don't

21   think there's -- either judicial notice is appropriate or

22   there's an adequate foundation for the admission of this.

23           THE COURT:  I really don't believe there's any

24   foundation, frankly, so that motion to admit this is denied.

25           MR. TRACY:  Okay.

1   Q.   *(BY MR. TRACY)*  Now, when we go to the second, the next

2   page, page 2 of 9, if you can, Kathy.  And if you would, where

3   you have the Merrill Lynch is highlighted, if you could make

4   that a little bigger.  I think that's fine.

5        You'll see there's a $150,000 wire transfer in

6   December 24th of '99 over to Merrill Lynch?

7   A.   That is correct.

8   Q.   And, of course, you know who Merrill Lynch is?

9   A.   I do know who Merrill Lynch is.

10  Q.   They are in the financial arena, correct?

11  A.   Correct.

12  Q.   If we could go to page 5 of 9.  And about the first five

13  or six top lines, if you would, Kathy.

14       While that's coming up, you see the one here on

15  June 23rd of 2000, $500,000 going to Environmental Training

16  Institute?

17  A.   Correct.

18  Q.   Did you do any investigation on what Environmental

19  Training Institute was?

20  A.   I did not, no.

21  Q.   You didn't Internet or Google search or anything?

22  A.   No.

23  Q.   So you're not aware of whether that was an investment that

24  came from Mr. Heshelman or Investors First to Environmental

25  Training Institute for a trading platform or whatever.  You

1    don't know one way or the other?

2    A.    I have no knowledge of that.

3    Q.    Okay.  And if we could scan that back up to the full page

4    again, please, Kathy.  And that's fine.

5          So at the bottom of that same page, page 5, you'll see an

6    August of 2000, a wire for a million dollars going to

7    Puffin Investment Company.  Do you see that?

8    A.    Correct.

9    Q.    Did you do any Google search or anything related to

10   Puffin Investment?

11   A.    No, I did not.

12   Q.    Okay.  And are you aware that your agency, the FBI, was

13   investigating Puffin Investment and Alan Shepherd that was

14   associated with that entity?

15   A.    I have no knowledge of Puffin Investment at all.

16   Q.    Did you -- do you know who Special Agent Cotter,

17   C-O-T-T-E-R, is with the FBI out in your Virginia branch?

18   A.    No, I do not.

19   Q.    So you've not seen any investigation materials from him,

20   302's where he interviewed Mr. Heshelman regarding

21   Puffin Investment and Alan Shepherd back in the 2003 time

22   frame?

23   A.    Not that I'm aware of, no.

24   Q.    Okay.  So you don't know whether or not any allegations of

25   fraud or anything were brought or were investigated pertaining

1    to Puffin Investment and Alan Shepherd?

2    *A.*    Not that I'm aware of, no.

3    *Q.*    And you've not done any investigation further in terms of

4    whether this million dollars to Puffin Investment was related

5    to the type of trading platform that Mr. Heshelman was trying

6    to put in place related to the investments?

7    *A.*    Again, I have no knowledge of them.

8    *Q.*    But you do know from your work that you did that a million

9    dollars went from Mr. Warner's account to Puffin Investment in

10   August of 2000?

11   *A.*    That is correct.

12   *Q.*    And if we could go to page 8.  You see at the bottom of

13   page 8 here a smaller wire in February of 2001.  I think it's

14   for $3,000, went to this gentleman Hans Wilof, if I'm saying

15   his name right, W-I-L-O-F?

16   *A.*    It appears to be, yes.

17   *Q.*    Okay.  And did you do any investigation about Hans Wilof?

18   *A.*    No, I did not.

19   *Q.*    And whether or not he was also associated with

20   Puffin Investments and Alan Shepherd?

21   *A.*    No, I did not.

22   *Q.*    I take it you never spoke to Special Agent Cotter that was

23   investigating Puffin Investments?

24   *A.*    No.

25   *Q.*    And do you know whether anybody else, Agent Wetherbee or

1   anybody else that you're working with on this case, did they

2   speak with Special Agent Cotter?

3   A.   I have no knowledge of who he talked to.

4   Q.   Okay.  Now, I believe during your direct you also talked a

5   little bit about this First Bank of Miami and First Union Bank

6   or something, correct?

7   A.   That is correct.

8   Q.   Okay.  And I think what you said was you

9   weren't -- nothing that you saw based on the documents you

10  reviewed showed any transfers going from the Mellon Bank Warner

11  account over to First Bank of Miami, correct?

12  A.   That I can remember, no.

13  Q.   Okay.  And you didn't see any transfers either going over

14  to some First Union or something, right?

15  A.   Not that I remember or are aware of, no.

16  Q.   Did you subpoena documents from First Bank of Miami?

17  A.   I do not subpoena documents.

18  Q.   Do you know whether documents were subpoenaed?

19  A.   No, I do not.

20  Q.   And do you know whether documents were subpoenaed from

21  First Union?

22  A.   Again, I do not know.

23  Q.   Okay.  Were you aware that Mr. Heshelman is -- originally

24  is from Battle Creek?  Were you aware of that based on any

25  involvement with this case?

1   A.   No, I do not.

2   Q.   Or that he was living down in Florida for a period of

3   time?

4   A.   Just from seeing the transactions in Florida.

5   Q.   Okay.  So you saw some of that?

6   A.   Yes.

7   Q.   Okay.  But a variety of the transactions, including, for

8   example -- we don't necessarily need to bring it up -- but your

9   government summary chart Exhibit 10C, et cetera, there were a

10  variety of transactions involving New York City and Zurich over

11  in Switzerland, correct?

12  A.   Correct.

13  Q.   Now, the Zurich that I know is spelled Z-U-R-I-C-K -- C-H,

14  but the ones that we see in your summaries it often has an "E"

15  in it, correct?

16  A.   Correct.

17  Q.   Z-U-E-R-I-C-H.

18  A.   Correct.

19  Q.   But as far as you're aware, that's the same Zurich,

20  Switzerland?

21  A.   Correct.

22  Q.   Now, from your knowledge of reviewing bank statements and

23  financial arena stuff, you're aware that New York City and

24  Zurich are two of the primary banking and financial centers in

25  the world, correct?

1    A.    Correct.

2    Q.    Battle Creek, Michigan, is not?

3    A.    Correct.

4    Q.    It's Cereal City?

5    A.    Correct.

6              MR. TRACY:  Thank you very much.

7              THE COURT:  Mr. Mekaru, any redirect?

8                        REDIRECT EXAMINATION

9    BY MR. MEKARU:

10   Q.    All right.  You were asked a question about whether there

11   was a subpoena for First Union or this First Bank of Miami.

12         Would it be the practice of a financial analyst to start

13   subpoenaing any and all banks in an investigation involving

14   financial fraud to see if there's any and all accounts that

15   might be related to a case?

16   A.    No.

17   Q.    So nothing to Fifth Third willy-nilly asking for something

18   relating to Michael Heshelman?

19   A.    No, we do not.

20   Q.    And even if a name is mentioned by someone or claimed to

21   be mentioned by someone, if there's no financial records to

22   substantiate that claim that there's money flowing in that

23   direction, nothing in the documents, as a financial analyst

24   would it make sense for you to follow up somebody's verbal

25   claim of where money went if it's not corroborated by the

1    documents themselves?

2    A.    No.

3    Q.    So again, so there's nothing that you can recall about

4    money going from the Mellon account for this attorney to First

5    Bank of Miami?

6    A.    Not that I'm aware of, no.

7    Q.    Okay.  Now, I think we've been -- we've talked about this

8    other a little, First Union.

9         Now, in reviewing some of the records with

10   Agent Wetherbee, I do think there might be some -- First Union

11   accounts might be related to a Dennis Mickelson, but

12   Dennis Mickelson, as you're aware, is that one of the

13   codefendants?

14   A.    Yes.

15   Q.    Okay.  But otherwise we don't have the -- you didn't see

16   the massive movement of $1.5 million into First Union?

17   A.    Not that I'm aware of, no.

18   Q.    Or $1 million into First Union?

19   A.    Again, not that I'm aware of.

20   Q.    And we're talking about this Kennedy Funding, the

21   Environmental Training Institute, Puffin Investments,

22   Merrill Lynch.

23        I mean, these are all -- this is all activity that was

24   going on in that attorney trust account, right?  As counsel

25   pointed out.

1  A.   That is correct.

2  Q.   But in your review of the records, with respect to

3  Pastor Moody's money, the million dollars that went in in

4  December of 2000 and the money that went in in March of 2001,

5  did Pastor Moody's money go to Kennedy Funding?

6  A.   Not that I'm aware of, no.

7  Q.   Did it go to Merrill Lynch?

8  A.   No.

9  Q.   Environmental Training Institute?

10  A.   No.

11  Q.   Puffin Investment?

12  A.   No.

13          *MR. MEKARU:*  Okay.  Thank you.

14          *THE COURT:*  Mr. Tracy, anything further?

15          *MR. TRACY:*  Nothing further, Your Honor.

16          *THE COURT:*  Thank you.  Thank you very much, Mr. Vos.

17  You're excused.

18          *THE COURT:*  Mr. Mekaru, yes, please.

19          *MR. MEKARU:*  We next call Bryce Sherwood.

20          *THE CLERK:*  Sir, if you'll just come right up here.

21  Right up there, and then turn and face me and raise your right

22  hand.

23                  BRYCE HENRY SHERWOOD

24              *(The oath was administered)*

25          *THE WITNESS:*  I do.

1          *THE CLERK:*  Be seated, please.  State your name for
2     the record, please.
3               *THE WITNESS:*  Bryce Henry Sherwood.
4                              DIRECT EXAMINATION
5     *BY MR. MEKARU:*
6     *Q.*  All right.  Mr. Sherwood, where do you live?
7     *A.*  Mulberry, Florida.
8     *Q.*  Are you from the West Michigan area?
9     *A.*  Yes, I am.
10    *Q.*  Originally, I guess, born and raised here?  Have you lived
11    here for a while?
12    *A.*  Yes, sir.
13    *Q.*  Approximately how long did you live in West Michigan?
14    *A.*  Thirty-five to 40 years.
15    *Q.*  And then how long ago did you move to Florida?
16    *A.*  I've been in Florida for five years.
17    *Q.*  Could you speak up, sir?  Or speak into the mic.  That
18    might help.
19    *A.*  I've lived in Florida for five years.
20    *Q.*  Okay.  Now, Mr. Sherwood, were you indicted by a federal
21    grand jury in February of 2006?
22    *A.*  Yes, sir.
23    *Q.*  Now, you may not have known about the certain charge then,
24    but were you eventually shown a copy of the Indictment and
25    advised that you were being charged?

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   A.   Yes.

2   Q.   Sometime in December of 2008?

3   A.   Correct.

4   Q.   All right.  And as it relates to that charge, were you

5   indicted along with Mr. Michael Heshelman?

6   A.   Yes.

7   Q.   And Dennis Mickelson?

8   A.   Yes.

9   Q.   So the three of you were named in the indictment, and

10  there was also an indication that maybe others that were

11  unnamed or people who may be known or unknown to the

12  grand jury?

13  A.   Yes.

14  Q.   Have you pled guilty to a charge as it relates to your

15  indictment?

16  A.   Yes.

17  Q.   Okay.  Did you sign a plea agreement?

18  A.   Yes, I did.

19  Q.   You have before you some binders.  I want you to turn to

20  what's marked as Volume II.  It might be the other one.

21           THE COURT:  It should be right down at the bottom

22  there.

23           MR. MEKARU:  The white one.

24           THE COURT:  It says "Volume II" on the bottom.

25           MR. MEKARU:  And on the side also, on the end of the

1   binder will be a number.

2   Q.   (BY MR. MEKARU)  Okay.  Could you please turn to tab

3   number 22.  Are you there?

4   A.   I'm there.

5   Q.   Okay.  Do you recognize the exhibit that's been marked as

6   Number 22?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's my plea agreement.

10  Q.   Would you turn to the last page, page 10 of 10 of

11  Exhibit Number 22.

12       Does that have your signature?

13  A.   Yes, it is.

14  Q.   Did you sign it on May 20th, 2009?

15  A.   Yes.

16           MR. MEKARU:  And I would move for the admission

17  of Exhibit Number 22.

18           THE COURT:  Mr. Tracy?

19           MR. TRACY:  No objection, Your Honor.

20           THE COURT:  It's admitted.

21           MR. MEKARU:  All right.  May we publish this, please.

22  Q.   (BY MR. MEKARU)  All right.  I just want to go over this

23  briefly so we all have an understanding of your plea agreement.

24       In paragraph 1 you're agreeing to plead guilty to Count 1

25  of the Indictment, right?

1    A.    Yes.

2    Q.    Count 1 is the conspiracy charge, conspiracy to commit

3    wire fraud?

4    A.    Yes.

5    Q.    All right.  Now, there's an additional provision here that

6    relates to a motion that was heard by this Court where there

7    was some question about trying to get the charges dismissed,

8    right?

9    A.    Correct.

10   Q.    And as part of your plea agreement you reserved the right

11   to have that issue reviewed by the next court, the Court of

12   Appeals?

13   A.    Yes.

14   Q.    Is that essentially what that other language is?

15   A.    Yes.  Yes.

16   Q.    All right.  Paragraph 2.  Paragraph 2 just outlines the

17   elements of the offense and that you understood them.

18        Paragraph 3 outlines some penalties that may associate for

19   you on that charge, and then paragraph 4 is your agreement to

20   pay some restitution in this case.

21        The next paragraph.

22            THE CLERK:  Mr. Mekaru, remember to keep your voice

23   up for the jurors.

24            MR. MEKARU:  Sorry.  Maybe I'll do this again.

25   Q.    *(BY MR. MEKARU)*  All right.  Paragraph 5 is your agreement

1    to pay some forfeiture, 6 agreeing to disclose where money

2    might be now.

3         More important, the most important part of what we're

4    getting at now, I think, is paragraph 7.  Paragraph 7, you

5    agreed to cooperate with the U.S. Attorney's Office and the FBI

6    and any other law enforcement agency, correct?

7    A.   Correct.

8    Q.   All right.  And that includes either meeting with the FBI

9    and disclosing information or testifying at trial if need be,

10   correct?

11   A.   Correct.

12   Q.   And you're testifying here today in part because of your

13   commitment in the plea agreement?

14   A.   Yes.

15   Q.   All right.  Why don't we go to the next page.

16        Okay.  This is a continuation of your cooperation

17   provisions.  There's a provision regarding how your sentence

18   might be computed.

19        Go down to the next page.  The next page.  That paragraph

20   that dealt with some of the -- your rights on appeal and about

21   your sentence.  Essentially you decided to let the judge

22   sentence you, but you're not going to ask that her sentence be

23   reviewed by the Court of Appeals.

24   A.   Right.

25   Q.   Is that about what it's providing?

1    A.   Yes.

2    Q.   Okay.  All right.  Now, this is what you're getting, I

3    guess, in exchange for your cooperation.

4         Would that be fair to say?

5    A.   Yes.

6    Q.   Paragraph 10, the U.S. Attorney's Office is agreeing to

7    move to dismiss all the other charges against you --

8    A.   Yes.

9    Q.   -- right?  I mean, this was a fairly lengthy Indictment,

10   so there might be some 40-plus charges, right?

11   A.   Correct.

12   Q.   Okay.

13        THE COURT:  Mr. Mekaru, one thing I would interject

14   here, it should be clear that Mr. Sherwood was represented by

15   counsel throughout these proceedings.  Correct?

16        MR. MEKARU:  Yes.  Yes, ma'am.

17   Q.   (BY MR. MEKARU)  All right.  Paragraph -- subparagraph B

18   deals with a way your sentence could possibly be reduced.  Is

19   that about right?

20   A.   Yes.

21   Q.   Now, in terms of your sentence, is it possible that there

22   really are a couple ways in which your sentence could be

23   reduced, one is by accepting responsibility for your crime?

24   A.   Yes.

25   Q.   And the other is if the government moves to reduce your

1   sentence based on your cooperation?

2   A.   Yes.

3   Q.   All right.  And you know all this based on your counsel's

4   advice to you and telling you about how the law kind of works

5   for your sentencing?

6   A.   Yes.

7   Q.   All right.  So at this point would it be pretty fair to

8   say that the decision to move for departure, though, really

9   rests with the United States Attorney's Office; is that right?

10  A.   Yes.

11  Q.   But even if we do move for a reduction, it's still up to

12  the judge, in this case Judge Neff, to decide whether to give

13  you a reduction or reduce your sentence, right?

14  A.   Correct.

15  Q.   Okay.  Let's go to next page, please.

16       That's a continuation of that paragraph and just an

17  acknowledgment that your information that's not known to the

18  government prior to your cooperation, prior to your proffer,

19  can still be used to help compute your sentence as it comes

20  time for sentencing, right?

21  A.   Right.

22  Q.   Okay.  Next page.

23       All right.  This is just an acknowledgment.  This is an

24  agreement between yourself and your attorney and the

25  United States government, correct?

1    A.    Correct.

2    Q.    But it does not necessarily bind this Court, Judge Neff?

3    A.    That's correct.

4    Q.    Okay.  Paragraph 12 is that it's limited to, again, to the

5    United States Attorney's Office and not any other prosecuting

6    authority.

7          Go to next page.  And the next page.

8          All right.  And this is a copy of the signature.  You

9    indicated this is your signature in the middle?

10   A.    Yes.

11   Q.    And that's your attorney's signature below?

12   A.    Yes.

13   Q.    All right.  And as the judge indicated, you were

14   represented through this whole proceeding?

15   A.    Correct.

16   Q.    All right.  Okay.  Now let me see if I can summarize here

17   where we're at.

18         Mr. Sherwood, so you're testifying here today really with

19   the hope and with the understanding, first of all, the

20   understanding that the government has agreed to reduce the

21   number of charges you're facing, right?

22   A.    Yes.

23   Q.    Which could have the potential of reducing the amount of

24   time that you ultimately face, right?

25   A.    Yes.

1    Q.   You're also testifying today with the hope that Judge Neff

2    and with the government's motion will reduce your sentence,

3    right?

4    A.   Yes.

5    Q.   So you really have some incentive here to testify; would

6    that be fair to say?

7    A.   Yes.

8    Q.   Okay.  But you also signed a proffer agreement?

9    A.   Yes.

10   Q.   And a plea agreement.  So there are two agreements here.

11   Again, the proffer agreement is another agreement that we won't

12   use your words against you essentially?

13   A.   Correct.

14   Q.   What's the effect of you lying at this point on the

15   proffer agreement and on the plea agreement?

16   A.   I would lose both the proffer agreement and the

17   plea agreement.

18   Q.   So the protection of the proffer agreement would go away?

19   A.   Yes.

20   Q.   And all your statements could be used against you?

21   A.   Correct.

22   Q.   Okay.  And you would lose the protection of the

23   plea agreement and all the charges could be brought back again?

24   A.   Yes.

25   Q.   All right.  Now, Mr. Sherwood, do you know

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    Pastor Alan Moody?

2    A.   Yes, I do.

3    Q.   How do you know Pastor Alan Moody?

4    A.   I met him at church, at First Baptist Church of

5    Middleville.

6    Q.   Did you eventually join that church?

7    A.   Yes, I did.

8    Q.   Now, were you aware at some point that Pastor Moody had --

9    and his family -- had come into some money?

10   A.   Yes.

11   Q.   And as far as you know, did they come into that money

12   prior to you joining the church?

13   A.   Yes.

14   Q.   And as far as you know, roughly how much time passed

15   between their receiving the money and you joining?

16   A.   I do not know.

17   Q.   Less than a year or so?

18   A.   No, it was longer than that.  I'm not sure.

19   Q.   All right.  Nonetheless, that had all happened before you

20   joined the church?

21   A.   Yes.

22   Q.   And when you joined the church, this is that First Baptist

23   Church in Middleville, at that point in time were you

24   representing yourself to be some sort of an investment advisor?

25   A.   Yes.

1   Q.   Financial advisor?

2   A.   Yes.

3   Q.   Were you in fact a genuine investment advisor?

4   A.   No.

5   Q.   That was a lie?

6   A.   Yes.

7   Q.   And did you have a discussion with Alan Moody,

8   Pastor Alan Moody, about investment opportunies that he could

9   participate in to help him get a better rate of return?

10   A.   Yes.

11   Q.   And did you present him with a plan for his money?

12   A.   Yes.

13   Q.   Was this investment -- what was this investment plan for

14   Pastor Moody's money?

15   A.   I introduced him to Michael Heshelman with the objective

16   of increasing his yield and that there would be a lot more

17   money made working with Michael than what he was currently

18   making at the time.

19   Q.   Well, what was the investment itself?

20   A.   The investment itself was presented as a bond opportunity

21   in Europe, a trade known as a buy/sell agreement, and that they

22   would buy bonds at a lower price and sell them at retail.

23   Q.   Now, as far as you know, does that, as a strategy, as an

24   investment strategy, does something like that even exist?

25   A.   Yes, on the United States bond markets people buy and sell

1    bonds all day long.

2    Q.    Okay.  What's the old adage:  Buy low, sell high?

3    A.    Yes.

4    Q.    That's how you make a profit?

5    A.    Correct.

6    Q.    Okay.  But as much as that might exist as a strategy

7    overall, was the plan that you were presenting to Pastor Moody,

8    that you and Michael Heshelman were presenting, was that a

9    legitimate investment?

10   A.    No.

11   Q.    Well, then what was going to happen to Pastor Moody's

12   money?

13   A.    It was going to be sent to an attorney's account in

14   Florida, and it would be managed from there, from the

15   attorney's account.

16   Q.    When you say -- what do you mean by managed?

17   A.    I would say it was supposed to have gone into a secured

18   account that was held in an escrow account, and then there was

19   supposedly money that would be made trading in bonds.  That the

20   yield was out of range for what could happen, and the reality

21   was the money was going to go there and be used for other

22   purposes.

23   Q.    Okay.  So jumping back and forth here, and I realize

24   there's a story that's being told to Pastor Moody about what's

25   going to supposedly happen to the money, and then there's the

1  reality of where the money actually went.  Would that be fair

2  to say?

3  A.   Yes.

4  Q.   Okay.  So let's focus first on what story is being told to

5  Pastor Moody.

6       What was Pastor Moody being told about what is going to

7  happen to his investment?

8  A.   He was told his funds would be held in a secure account

9  that would require two signatures to be moved out of that

10 account.

11 Q.   Okay.  And then once that money went into that secure

12 account, what was -- the investment you said would then be to

13 buy and sell these bonds?

14 A.   Yes, that's what was told to Mr. Moody.

15 Q.   Well, if the money is supposed to remain in the attorney

16 trust account or in this account, how would the money then be

17 used in these investment transactions?

18 A.   It couldn't be.

19 Q.   According to what was represented to Pastor Moody, were

20 these funds being used as some sort of collateral?

21 A.   I don't know.  They were not used -- I don't know what

22 they were used for.

23      Could you repeat the question, please?

24 Q.   Sorry.  Again I'm focusing here on what Pastor Moody is

25 being told about what is supposed to happen to his money.

1    A.   He was told that his money was going to stay in the

2    attorney escrow account, a trust account to be held for

3    the -- for collateral for the purchase of buy and sell 10-year

4    bonds.

5    Q.   Okay.  So again let me see if I understand this.  So

6    Pastor Moody's money was supposed to stay in this attorney's

7    account and be used as collateral for leverage to do these

8    other transactions?

9    A.   That's correct.

10   Q.   All right.  And did Pastor Moody eventually agree to

11   engage in this investment plan?

12   A.   Yes, he did.

13   Q.   Did he first send in December of 2000 a million dollars?

14   A.   Yes.

15   Q.   In March of 2001 did he again agree to send some more

16   money?

17   A.   Yes.

18   Q.   How much?

19   A.   $1.5 million.

20   Q.   And was he given instructions on where to send the money?

21   A.   Yes.

22   Q.   Where was he supposed to send it?

23   A.   To an Attorney Ken Warner's escrow account.

24   Q.   Now, this attorney, Ken Warner, was this attorney

25   Mr. Moody's attorney?

1   A.   No.

2   Q.   Was he your attorney?

3   A.   No.

4   Q.   Whose attorney was he?

5   A.   Michael's attorney.

6   Q.   Where was Ken Warner located?

7   A.   In Miami, Florida.

8   Q.   And at this time where was Mr. Heshelman?

9   A.   Either in Florida, in Sarasota, Florida, or Battle Creek,

10  Michigan.

11  Q.   Okay.  Did he also spend time in New York?

12  A.   Yeah, and also New York.

13  Q.   And what about in Europe?

14  A.   He had spent time in Zurich, and he had told me he had

15  been in London, Madrid, Spain, and cities in Germany.

16  Q.   Okay.  So as far as you know, was he spending a fair

17  amount of time in Europe?

18  A.   Yes.

19  Q.   All right.  So once the money went in and Pastor Moody

20  began to ask about the status of his investment, what was he

21  told?

22          MR. TRACY:  Your Honor, foundationally there's a lot

23  of "What was he told?" without who is telling him.  We're not

24  getting the foundation of who is having these conversations.

25          THE COURT:  That's fair enough.

1          Mr. Mekaru.

2          MR. MEKARU:  Okay.  Yeah, I think that makes sense.

3  Q.   (BY MR. MEKARU)  Let's focus on breaking it down to what

4  you're telling Pastor Moody.  And I gather at some points in

5  time you may have been a party to conversations where

6  Michael Heshelman is also talking to Pastor Moody.  True?

7  A.   Yes.  Yes.

8  Q.   All right.  So what were you telling Pastor Moody about

9  the status of his investment?

10  A.   I had --

11          THE COURT:  I'm sorry.

12          JUROR NUMBER 33:  A little closer to the microphone

13  maybe?

14          THE COURT:  Yes, please slide it forward.

15          MR. MEKARU:  Please slide it forward.  Thank you.

16          THE WITNESS:  Okay.

17          MR. MEKARU:  Much, much better.

18  Q.   (BY MR. MEKARU)  The question was:  What were you telling

19  Pastor Moody about his investment once the money went in?

20  A.   I repeated the -- I would talk to Michael, and he would

21  tell me what he was doing, and I would relay that message on to

22  Alan.

23          THE COURT:  Mr. Sherwood, I would ask you when you

24  refer to Michael, would you please make it clear who Michael

25  is.

1              *THE WITNESS:*  Yes, ma'am.  Michael Heshelman would

2      tell me what he was doing, and I would relay that message on to

3      Alan.

4      Q.    *(BY MR. MEKARU)*  All right.  So then what sort of

5      information was being passed on to Pastor Moody?

6      A.    That there were different deals being done, that there

7      would be a different transaction was taking place than what was

8      originally said.  That they were trying to do -- he was

9      attempting to do other deals that would make the money and

10     restore the money to Mr. Moody.

11     Q.    Now, were there multiple conversations with Pastor Moody

12     about the status of his money?

13     A.    Yes.

14     Q.    So regular conversation about what was happening with his

15     money?

16     A.    Yes.

17     Q.    And what were you telling Pastor Moody about the status of

18     his money and the status of the deal?

19     A.    I was telling him that Michael was

20     working -- Michael Heshelman was working on completing the

21     transactions, multiple different transactions, and that he

22     would keep us informed of what was going on in Europe at the

23     time.  In Zurich or whatever city he was in.

24     Q.    Was Pastor Moody given some indication that as much as he

25     was working on it, that it was close to being closed, close to

1   being finished, that his deal was almost done?

2   A.   Yes.  Yes, sir.

3   Q.   All right.  And was the statement that you made that

4   Michael Heshelman is trying to work on the deal, trying to

5   close the deal and -- trying to close the deal, was that

6   truthful or was that a lie?

7   A.   He had -- I had relayed the message from Michael, and I

8   told that to -- from Michael Heshelman, and I related that on

9   to Alan Moody.

10       Was it a lie?  I believe it was a lie, that there was no

11  deal.

12  Q.   And the statement that the money is coming, that the money

13  is almost -- is coming next week, is coming in the next day or

14  so, was that truthful or was that honest?  Truthful or honest

15  or a lie?

16  A.   That was a lie.

17  Q.   Now, what about some conversations that you participated

18  in where Mr. Heshelman is also talking to Pastor Moody?  What

19  was Mr. Heshelman telling Pastor Moody about his investment,

20  about the status of his investment?

21  A.   Mr. Heshelman was telling him that he was near to closing

22  several different transactions and that the original

23  transaction did not proceed, but he was -- he had other

24  transactions he was doing.  That he believed that he was about

25  to finish a major transaction that would restore the funds and

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  make money for Mr. Moody.

2  Q.   And were there multiple communications between

3  Mr. Heshelman and Mr. Moody that you participated in?

4  A.   I believe so, yes.

5  Q.   Was anything in common about the nature of those

6  communications?

7  A.   They were all attempting to keep Mr. Moody working with

8  Mr. Heshelman and myself.

9  Q.   Essentially to continue to delay things?

10  A.   Yes, continue to delay things.

11  Q.   And continue to delay his expectation that his money was

12  coming?

13  A.   Yes.

14  Q.   Or was Pastor Moody asking for his money back?

15  A.   I believe he had asked for his money back at a meeting we

16  had in Battle Creek, and then I believe -- I just can't exactly

17  remember, but he -- I can remember him asking about the status

18  of his money and when he would get it back, and that -- but I

19  cannot remember the exact location where we were when he asked

20  for it back.

21  Q.   Because eventually he did take some action to try to get

22  some monetary recovery, though, right?

23  A.   Yes, he did.

24  Q.   I mean, he -- he took some action to foreclose the home

25  you were living in.

1    A.    That's correct.

2    Q.    And -- let's see.

3    A.    Yes.

4    Q.    Sorry.  There were actually two mortgages that were given

5    to Pastor Moody.  Is that true?

6    A.    True.

7    Q.    There was first a mortgage that you gave him that you

8    signed, right?

9    A.    Yes.

10   Q.    But at the time you weren't actually on the deed of the

11   home, it was set into trust, it was in your wife's name, but

12   nonetheless, that first mortgage was not valid, right?

13   A.    Correct.  Correct.

14   Q.    And you knew at the time that you gave it to him that it

15   really wasn't a valid mortgage?

16   A.    Correct.

17   Q.    So you gave him a worthless piece of paper essentially?

18   A.    Yes.

19   Q.    And that was to induce him to invest another 1 1/2 million

20   dollars?

21   A.    Yes.

22   Q.    And when he tried to file it and found out that it wasn't

23   a genuine mortgage, did he come back to you and demand yet

24   another one from you and your wife?

25   A.    Yes.

1    Q.   And you gave him that?

2    A.   Yes.

3    Q.   Did you tell him that you had already gotten another

4    mortgage on that home?

5    A.   No.

6    Q.   That was another lie or omission?

7    A.   Yes.

8    Q.   That house that was mortgaged, this was the residence you

9    were living in?

10   A.   Yes.

11   Q.   How much was this house worth?

12   A.   Eight hundred to nine hundred thousand dollars.

13   Q.   And the house at some point when you bought it was paid in

14   full?

15   A.   Yes.

16   Q.   We'll come back to this, but the money for that house, did

17   that come from yet another investor?

18   A.   Yes.

19   Q.   So this is somebody else's money that you stole and used

20   to buy this house?

21   A.   Yes.

22   Q.   And then how much of a mortgage did you take out on the

23   house with the bank?

24   A.   I believe it was $400,000.

25   Q.   So let me see if I understand this.  You paid cash for

1    this house that was roughly a million dollars?

2    A.    Yes.

3    Q.    When you say 800 or 900, was it closer to a million or

4    thereabouts?

5    A.    Probably.

6    Q.    And you took out a mortgage, you got some more cash out of

7    the house?

8    A.    Yes.

9    Q.    Did you pay anything against that mortgage, make any

10   payments?

11   A.    No.   Not much.

12   Q.    So this house was -- you got a million in cash to pay for

13   a house you didn't have, and then you got from the bank another

14   400-something thousand dollars?

15   A.    Yes.

16   Q.    And then you gave a mortgage first to Pastor Moody that

17   was not genuine, and eventually when he did get one, he was

18   second in line?

19   A.    Yes.

20   Q.    Now, do you know Dennis Mickelson?

21   A.    Yes, I do.

22   Q.    He was also indicted with you?

23   A.    Yes, he was.

24   Q.    Did Dennis Mickelson play a part in selling Pastor Moody

25   on this investment?

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1    A.    Yes.

2    Q.    What was his role?

3    A.    I would meet people and introduce them to Dennis, and he

4    would talk with the client and proceed to verify that they had

5    the money, and then he would work with us to close the deal,

6    and the money would be sent to Kenneth Warner's escrow account.

7    Q.    So he helped pitch the deal?

8    A.    Yes.

9    Q.    Did he also act as some sort of reference?

10   A.    Yes.

11   Q.    So at times was he acting as a -- someone who was working

12   with this investment group and other times acting as an

13   investor who was successful?

14   A.    Yes.

15   Q.    And did other people also play a part in not necessarily

16   trying to pitch the deal on the front end, but on the back end

17   did other people play a part in trying to delay things, to

18   delay the demand for money?

19   A.    I think it was myself and Dennis and

20   Michael Hesh -- Dennis Mickelson and Michael Heshelman were the

21   ones that would keep the delay going.

22   Q.    Do you know Ron Featherstone?

23   A.    Yes, I know Ron Featherstone.

24   Q.    Okay.  Who is Ron Featherstone?

25   A.    He is -- he was an officer of Michael's company.

1    Michael Heshelman's company.

2    Q.    Did you have conversations with him?

3    A.    Yes.

4    Q.    Were you aware of what he was doing as part of all this?

5    A.    No.

6    Q.    Do you know his wife?

7    A.    No, I do not.

8    Q.    All right.  In addition to Pastor Moody, did you make this

9    same pitch on this investment scheme to others?

10   A.    Yes.

11   Q.    Let's go through a list, then.

12         Did you participate in the presentation to a Brian Turner?

13   A.    No.

14   Q.    How about a Timothy Oliver?

15   A.    No.

16   Q.    Paul Ramsey?

17   A.    Yes.

18   Q.    Okay.  And what was your participation with Paul Ramsey?

19   A.    I had introduced him to Michael Heshelman for the purpose

20   of placing money with him to create a higher-yield income from

21   those funds.

22   Q.    All right.  So he was essentially presented with the same

23   investment opportunity, that he could make more money and get a

24   greater return?

25   A.    Yes.

1   Q.   Was the investment instrument something similar to what

2   was presented to Pastor Moody?

3   A.   Yes.

4   Q.   Was that truthful and honest?

5   A.   No.

6   Q.   Or was that a lie?

7   A.   It was a lie.

8   Q.   How about Allen Clyde?

9   A.   Yes, I introduced him to Michael Heshelman as well.

10  Q.   And what was Allen Clyde told about this investment?

11  A.   That he would receive a significant yield far exceeding

12  what he could earn in the bond or equity markets.

13  Q.   And was that a lie?

14  A.   Yes.

15  Q.   And how about Stephen Williams?

16  A.   I don't know if I ever spoke with Stephen Williams

17  directly, but he was represented by an accountant named

18  Pierre LaBauve.

19  Q.   Pierre LaBauve.  And what was Pierre LaBauve told about

20  this investment?

21  A.   That there would be a significant yield, the same as we

22  had told the other investors.

23  Q.   And that, again, was a lie?

24  A.   Yes.

25  Q.   All right.  Now, did Mr. Ramsey send money and invest with

1  you and Michael Heshelman?

2  A.   Yes.

3  Q.   Did Mr. Clyde?

4  A.   Yes.

5  Q.   And Mr. Williams?

6  A.   Yes.

7  Q.   Now, when all of these people invested -- Mr. Ramsey,

8  Mr. Williams, Mr. Clyde -- did you receive some sort of money?

9  A.   Yes, I did.

10 Q.   Did other people who also had helped pitch this to

11 Mr. Ramsey, Mr. Clyde, and Mr. Williams, did they also receive

12 some money?

13 A.   Yes.

14 Q.   Did Mr. Mickelson also participate with any of these

15 people?

16 A.   Yes, he did.

17 Q.   Did you talk about the fact that you were receiving money

18 with Mr. Mickelson or Mr. Heshelman?  Did you -- did everyone

19 know that everyone was getting money?

20 A.   Yes.

21 Q.   And all this money that was sent by Mr. Ramsey, Mr. Clyde,

22 and Mr. Williams, did it go into Ken Warner's attorney trust

23 account?

24 A.   Yes, it did.

25 Q.   Did you have the authority to tell Ken Warner, "Send me

1    money"?

2    A.    No, I did not.

3    Q.    So how did you get your money?

4    A.    I would tell Mr. Heshelman -- we had agreed that there

5    would be payments to us upon the completion when the money was

6    sent into the attorney's escrow account.

7         I did one time pass along a note, an email to Mr. Warner

8    indicating that I had received direction from Mr. Heshelman to

9    pay out certain payments.  I believe that's part of the package

10   here.

11   Q.    Okay.

12   A.    But I did not have authority over the account.

13   Q.    So would it be fair to say you always had to ask

14   Michael Heshelman to get your money?

15   A.    Yes.

16   Q.    And you made reference to some sort of email or some sort

17   of document.

18   A.    Yes.

19   Q.    Can you flip your binder to Exhibit Number 3.  I'm sorry,

20   the other binder.

21        Are you there?

22   A.    Yes.

23   Q.    Okay.  Do you recognize Exhibit Number 3?

24   A.    Yes, I do.

25   Q.    What is Exhibit Number 3?

1    A.   It's my email to Ken Warner to pay in six different wire

2    transfers.

3    Q.   All right.  Could you put that up, please.

4         All right.  Beginning at the top with your name, and is

5    that your address?

6    A.   Yes.  Yes, it is.

7    Q.   And it's dated March 2nd, 2001?

8    A.   Yes.

9    Q.   Is it sent on or about that time?

10   A.   Yes, sir.

11   Q.   And it says, "To Ken."  Who is that?

12   A.   Ken Warner.

13   Q.   And the reference here is "Michael is in England . . ."

14   Who is Michael?

15   A.   Michael Heshelman.

16   Q.   ". . . and has, I believe, sent you a partial list of

17   people who are to receive payments today."

18        How did you know that?

19   A.   I had spoken with Mr. Heshelman, and he had given me

20   directions of who to pay, and I wrote up the email.

21   Q.   So this list that you're putting together is in

22   consultation with Michael Heshelman?

23   A.   Yes.

24   Q.   Now, "The funds should be in your account today.  There

25   will be a $1,500,000 deposit made coming from Northern Trust."

1    A.    Yes.

2    Q.    Now, the money, the 1.5 million, actually came in a little

3    later than March 2nd.  So was there a little bit of delay

4    between this fax and the money, or was this just prepared

5    earlier?

6    A.    I do not know.

7    Q.    And the 1.5 million, whose money was that?

8    A.    Mr. Moody's.

9    Q.    "Here are the people who are to receive funds."

10   "Paul Ramsey."

11        Is that the same Paul Ramsey who invested money with you

12   and Michael Heshelman?

13   A.    Yes.

14   Q.    Do you remember how much money Mr. Ramsey invested?

15   A.    Two -- over $2.5 million.

16   Q.    Any idea why Mr. Ramsey is getting $100,000 of

17   Pastor Moody's money?

18   A.    He was demanding an interest payment on his money.

19   Q.    Larry Hall gets $80,000.  Any idea why Mr. Hall is getting

20   $80,000?

21   A.    He was also an investor with Michael Heshelman.

22   Q.    Pierre LaBauve.  You had said that Pierre LaBauve was the

23   attorney or accountant or somehow related to Stephen Williams?

24   A.    Yes.

25   Q.    Why is Pierre LaBauve getting $89,600?

1    A.   He was receiving also an interest payment.

2    Q.   There's a parenthetical there.  "You have his banking.

3    Also, he owes me $10,400."

4         What's that about?

5    A.   I cannot remember.

6    Q.   Next there's "ICW Dream Homes, Larry Telford/

7    VIP Services."

8         Why is Mr. Telford and ICW receiving $60,000?

9    A.   Mr. Telford is also an investor with Mr. Heshelman.  And

10   it was an interest payment that was being demanded.

11   Q.   Now, Larry Telford, did Larry Telford have an association

12   with another, another individual by the name of Peter Fodor or

13   Peter Fodor?

14   A.   Yes.

15   Q.   I think that's F-O-D-O-R.  Does that sound about right?

16   A.   Yes.

17   Q.   Okay.  I'm just spelling it for the court reporter.

18        All right.  You had mentioned before that another investor

19   had given you around a million dollars to invest and that you

20   used that money to buy your house.

21   A.   Yes.

22   Q.   Was that somehow related to --

23   A.   Yes, it is.  It came from Larry Telford.

24   Q.   So you said that Mr. Telford was investing with

25   Michael Heshelman?

1    A.   Correct.

2    Q.   So were there -- was this one deal or two deals?

3    A.   Two deals.

4    Q.   So in one deal, Mr. Telford and Mr. Fodor invested with

5    you around a million dollars?

6    A.   Yes.

7    Q.   And how much did they invest with Michael Heshelman?

8    A.   I believe it was $760,000.

9    Q.   And the presentation to Mr. Telford, was it similar to,

10   the same presentation that was made to Mr. Ramsey, Mr. Clyde,

11   and Mr. Williams?

12   A.   Yes.  Yes, it was.

13   Q.   And did Mr. Fodor make efforts to try to get money back

14   from you?

15   A.   Yes.

16   Q.   So this $60,000 is being paid back to Larry Telford.  Is

17   that related to the money that you had taken as part of this

18   investment, or was it related to money that

19   Michael Heshelman --

20   A.   It was related to Michael Heshelman.

21   Q.   All right.  Dennis Mickelson gets $50,000.

22   A.   Yes.

23   Q.   Why is Dennis Mickelson getting $50,000?

24   A.   He had an agreement with Michael that he'd receive money

25   when depositors -- when deposits were made.

1    Q.    Get a cut?

2    A.    Yes.

3    Q.    The next item, Bryce Sherwood gets $160,400.

4    A.    Yes.

5    Q.    Is that your cut?

6    A.    Yes.

7    Q.    Now, who decided how much money that you would get?

8    A.    Michael Heshelman had an agreement that I would

9    get -- with me that I would get 10 percent of what I raised on

10   this last one, on this last transaction.

11   Q.    Well, you brought the money.  Couldn't you have demanded

12   more?

13   A.    Yes.

14   Q.    You could have asked for it, but who ultimately decides?

15   A.    Michael Heshelman.

16   Q.    And then attached to this there are a bunch of

17   instructions regarding where the money is going to be wired.

18   A.    Yes.

19   Q.    And are these all your accounts, you or your wife, and/or

20   your wife?

21   A.    Yes.  Yes.

22   Q.    And did you also pass along additional banking information

23   for these other instructions?  I don't believe it's in the

24   attachment, but do you remember at the time?

25   A.    I only -- I cannot remember, but maybe -- it's on the

1    list.  It says, "See attached banking for Paul Ramsey," so I

2    must have had that.

3    Q.   And was there a similar sort of distribution of money

4    every single time somebody invested with Michael Heshelman

5    where you participated in pitching the investment?

6    A.   Yeah, we would receive money every time that someone made

7    an investment.

8    Q.   Did you tell Alan Moody that you were getting $160,400 of

9    his money?

10   A.   No, I did not.

11   Q.   In fact, you told him at some point that you weren't going

12   to get paid until after the deal was done?

13   A.   That's correct.

14   Q.   You lied to him?

15   A.   Yes, I did.

16   Q.   To his face?

17   A.   Yes, I did.

18   Q.   And all these communications that you were having with

19   Mr. Moody were right to his face, right?

20   A.   Most of the time, yes.

21   Q.   And most of these conversations you're lying to him about

22   where his money is?

23   A.   Yes.

24   Q.   And the same sort of lies and lulling and telling that

25   money is coming and delaying were made to Mr. Ramsey,

1    Mr. Clyde, Mr. Williams, and to Mr. Telford?

2    A.    Yes.   Regarding Mr. Clyde, I had very little contact with

3    him.   I had spoken to his attorney.

4    Q.    Okay.   That was Mr. Jepson?

5    A.    Arron Jepson, who actually -- who knew Michael Heshelman

6    from previous encounters.

7    Q.    The same sort of delay --

8    A.    Yes.

9    Q.    -- was being passed along to Mr. Jepson?

10   A.    I believe so.   I did not have a lot of contact after

11   Mr. Jepson realized that he knew Michael directly, and then

12   they dealt directly.

13   Q.    Okay.   Well, so all this money that's going to you, is any

14   of this going to any sort of investment on the behalf of these

15   investors?

16   A.    No.

17   Q.    You're spending it?

18   A.    Yes.

19   Q.    Using it for your use and benefit?

20   A.    Yes.

21   Q.    Paying bills, going to restaurants, travel?

22   A.    Uh-huh.   Yes.

23   Q.    I'll go through my list here.

24         All right.   You mentioned -- let's start up with 5A.

25         Okay.   Mr. Sherwood?   Mr. Sherwood?

1    A.    Yes.

2    Q.    It might be -- whatever is easier for you, but we'll put

3    it up on the screen, or if it's easier to see it off the hard

4    copy, that's fine.

5    A.    All right.

6    Q.    All right.  5A.  Money going to Thornbrook International.

7    Do you have any idea who that is?

8    A.    No, I do not.

9    Q.    Do you know anything about that transaction?

10   A.    No, I do not.

11   Q.    All right.  Turn to B, 5B, John Grayshan.  Do you know who

12   that is?

13   A.    No, I do not.

14   Q.    So did you instruct him to receive any money?

15   A.    No, I did not.

16   Q.    Mitch Miller.  Do you know who that is?

17   A.    I know Mitch Miller.  He was an acquaintance of

18   Michael Heshelman's.

19   Q.    An acquaintance.  Just a friend, or was he some sort of

20   business associate?  What was the nature of their connection?

21   A.    When I had met him, he was introduced as a business

22   associate of Michael Heshelman's.

23   Q.    He was introduced.  Who introduced you?

24   A.    Michael Heshelman introduced me to Mitch Miller.

25   Q.    So you actually met him in person?

1   A.   Yes, I did.

2   Q.   Where did you meet Mitch Miller?

3   A.   In New York.

4   Q.   This is in New York City?

5   A.   New York City.

6   Q.   Go to the -- we'll come back to New York City in just a

7   moment.  We'll go to the next one.

8        "Orange County Teachers Credit Union," and "Special

9   instructions, if any:  For further credit to

10  Debra Featherstone."

11       Any idea on why Debra Featherstone received money?

12  A.   No, I do not.

13  Q.   Are you directing this?

14  A.   No, I'm not.

15  Q.   Go to next one, 5E, EMA Hotel.  I think Betriebs actually

16  is German for company.  So EMA Hotel company?

17  A.   No idea.

18  Q.   But this indicates that it's in Zurich, Switzerland.  Does

19  Zurich, Switzerland, have any significance to you?

20  A.   That's where Michael Heshelman was located for several

21  years.  I could only speculate about what it's for.

22  Q.   Okay.  The next page, 5F, Investors First Bancorp?

23  A.   That was Mr. Heshelman's company.

24  Q.   Now, was this company -- did it consist of a

25  brick-and-mortar building?

1   A.   No, it did not.

2   Q.   What was it?

3   A.   It was a company that he held.  It was a paper company or

4   a documentation-type company, but I do not believe it had a

5   physical address, a brick-and-mortar office that I'm aware of.

6   Q.   Who was Investors First Bancorp?

7   A.   It was Michael Heshelman's company, a corporation.

8   Q.   And what did it consist of other than paper in terms of

9   people, anything?

10   A.   The only person that ever introduced himself as an officer

11   of the company was Ron Featherstone.

12   Q.   Next in 5G, Bristol Plaza.

13   A.   That's an apartment in -- building in New York City where

14   Michael Heshelman kept a residence.

15   Q.   Have you been there?

16   A.   Yes, I have.

17   Q.   You've stayed there?

18   A.   Yes, I have.

19   Q.   Now, this is a -- is it a long-term-stay hotel?

20   A.   I don't know, but it was a furnished apartment.

21   Q.   Okay.  How many apartments did Mr. Heshelman have?

22   A.   One that I'm aware of.

23   Q.   And was this an apartment that he had maintained for an

24   extended period of time?

25   A.   Yes.

1    Q.   How long?

2    A.   I had known about the apartment -- he had been in the same

3    place in New York for over a year.

4    Q.   Over one year?

5    A.   Over one year.

6    Q.   The next is 5H, this Arron Jepson, and this is the

7    individual you said might be associated with --

8    A.   With Allen Clyde.

9    Q.   I'm sorry, Allen Clyde?

10   A.   Yes, with Allen Clyde.

11   Q.   Pierre LaBauve was -- we'll get back to that.

12   First Bancorp, 5I?

13   A.   That was also a company of Michael Heshelman's.

14   Q.   Any building associated with it?  Any physical location

15   associated with this?

16   A.   None that I'm aware of.

17   Q.   As far as you know, who -- what was the entirety of

18   First Bancorp?  What was it?

19   A.   It was Michael Heshelman's shell-type company that was

20   just used in name.  It was a business company or a corporation.

21   Q.   All right.  5J is Paul Ramsey.

22   A.   Yes.

23   Q.   We already talked about Mr. Ramsey receiving money.  So

24   was this an actual follow-up on your fax instructing that money

25   be sent to Mr. Ramsey?

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   A.   I believe so.

2   Q.   It appears to be that?

3   A.   It appears to be that.

4   Q.   Okay.  5K, AutoOz.  Do you have any knowledge of that?

5   A.   AutoOz was a car remanufacturer.  It did upgrades to

6   vehicles, and it was owned by I believe it was a cousin of

7   Michael Heshelman's.

8   Q.   Okay.  5L, Marie Gosse-Gardet or Gardet.

9   A.   She was somebody that I had met in New York one time that

10  purported to be working with Michael Heshelman on some

11  investments.

12  Q.   Was it just -- as far as you know, was this purely a

13  business relationship, or was there any sort of personal

14  relationship with Ms. Gosse-Gardet?

15  A.   I believe it was just a business relationship.

16  Q.   And this was what was represented to you by whom?

17  A.   By Michael Heshelman.

18  Q.   Latimer Enterprises?

19  A.   No idea.

20  Q.   CMC Group, 5N?

21  A.   No idea.

22  Q.   5O, Sharon Carlson?

23  A.   No idea.

24  Q.   5P.  This is money that's going to you?

25  A.   It's going to me.

1   Q.   So this would be apparently some confirmation that money

2   is going to be sent to you?

3   A.   Yes.

4   Q.   And you did in fact receive money?

5   A.   Yes, I did.

6   Q.   Okay.  Next we have 5A -- 5Q to Michael Heshelman and HSBC

7   Bank in London, England.

8        I think you had mentioned once that Michael had spent some

9   time in London.

10  A.   Yes.

11  Q.   Do you know anything about this HSBC bank account?

12  A.   No, I do not.

13  Q.   5R, again Michael Heshelman, but it's going to UBS Bank in

14  Zurich.  Do you know anything about this UBS Bank?

15  A.   No, I do not.  I know about the bank, but I do not know

16  about this account.  I've heard --

17  Q.   You've heard of the bank?

18  A.   Yes.

19  Q.   Do you have any idea what Mr. Heshelman is doing with the

20  money that's at UBS or at HSBC?

21  A.   No.

22  Q.   Okay.  Go to 5S, Hanover Hill Heritage, further credit to

23  Larry Kibler/Earl and Patricia.

24  A.   No idea.

25  Q.   5T is money going to Joy Sherwood.  5U is money going to

1    Bryce or Joy Sherwood.  5V is going to Dennis Mickelson.  This

2    is all information that was on your --

3    A.   My fax.

4    Q.   -- one-page letter or fax.

5         Highland Equities?

6    A.   I do not know who Highland Equities, who that is.

7    Q.   Now, the $89,600 --

8    A.   Oh, okay.

9    Q.   -- does that ring a bell?

10   A.   Yes, it does.

11   Q.   Okay.

12   A.   I did not recognize the name Highland Equities.

13   Q.   But that was -- you had instructed that money be sent?

14   A.   That was for Pierre LaBauve.  And maybe that's the name of

15   his company that he uses.

16   Q.   X is more money to you and your wife.

17   A.   Uh-huh.

18   Q.   Y, Ralph Trustees Limited, the Athaeneum Hotel.  It's in

19   England.

20   A.   Uh-huh.

21   Q.   Do you know anything about this?

22   A.   No, I do not.

23   Q.   Do you have any idea where Michael Heshelman was

24   staying --

25   A.   No.

1    Q.    -- in London?

2    A.    No, I do not.

3    Q.    Next, 5Z, Prism Mortgage.  Do you know anything about

4    that?

5    A.    No, I do not.

6    Q.    How about the name Timothy Oliver?

7    A.    No.  Only from what we've heard here.

8    Q.    Okay.  5Z.  5AA, TD Bank, for further credit to ICW

9    Dream Homes.

10   A.    That's Larry Telford.

11   Q.    Okay.  More money -- 5BB is more money to you.

12         5CC is Erna Van Schelt.  Any idea who that is?

13   A.    No, I do not.

14   Q.    The money is going to Reinach, Switzerland.

15   A.    No, I --

16   Q.    5CC.

17   A.    I do not know that name.

18   Q.    Okay.  But Switzerland, again, is that where Mr. Heshelman

19   was living?

20   A.    Yes.

21   Q.    Money to Mitchell Miller.  Or Mitch Miller, excuse me.

22   And again more money to Arron Jepson.  And then money here on

23   5FF to Hans Wilof.  Any idea who Hans Wilof is?

24   A.    No, I do not.

25   Q.    5GG, Robert Tringham.

1   A.   I know Robert Tringham.

2   Q.   You know who that is?

3   A.   Yes, I do.

4   Q.   Okay.  Who is Robert Tringham?

5   A.   He was a person also living at the Bristol Hotel that

6   Michael Heshelman had a working relationship with.

7   Q.   Okay.  And what was the nature of the connection?

8   A.   They were attempting to do transactions together or

9   talking about transactions together.

10  Q.   Now, they are talking about doing transactions, and he's

11  talking about doing deals.  And you're talking to him on the

12  phone, and he's talking about doing this deal, and that's being

13  passed along to Pastor Moody.

14       As you're saying this, did you see any evidence that they

15  were actually doing and following through with what they are

16  claiming?

17  A.   No.

18  Q.   Any paperwork, any sort of documentation showing they are

19  doing this trading activity?

20  A.   I never saw any account statements or bank or brokerage

21  statements that would indicate there was a deal going on.

22  Q.   Now, as much as they are talking about this, did you ever

23  see any money come in from the investment returns?

24  A.   No, I did not.

25  Q.   The only money that's coming in, is that coming in from

1    other investors?

2    A.    Yes, it is.

3    Q.    5HH.  Again, money to the Bristol Plaza.

4          5II, it's a check going to Moore Homes.

5          Any idea what that might be for?

6    A.    I have an idea.

7    Q.    I'm sorry, who that's to.

8    A.    I believe it was to his -- this -- I believe it was to his

9    sister and brother-in-law.

10   Q.    What's his sister's name?

11   A.    Brenda Moore.

12   Q.    Are they related to Moore Homes?

13   A.    No idea.

14   Q.    Now -- okay.  Let's now turn to tab 12.

15         Do you have that in front of you?

16   A.    Yes, I do.

17   Q.    All right.  12A is a summary.  Do you see that?

18   A.    Yes, I do.

19   Q.    All right.  This is a summary of where Pastor Moody's

20   money went according to the bank statements.  And we've covered

21   all of that, I think, already through the individual wire

22   transfers.

23         12B is a list here of transactions associated with

24   Timothy Oliver and Prism Mortgage.

25         Now, you indicated that you did not participate in this --

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1  A.   That's correct.

2  Q.   -- this activity with Mr. Oliver.

3      So as we go through this, it doesn't appear that there's

4  any money being sent to you?

5  A.   That's correct.

6  Q.   The next, 12C, Allen Clyde.

7  A.   Yes.

8  Q.   Now, you said you had some communication with Allen Clyde.

9  Did you get any money?

10  A.   It doesn't show here, but yes, yes, I did.

11  Q.   So there's actually some activity, some transactions where

12  you received money, but it's not reflected in this summary?

13  A.   That's correct.

14  Q.   How much money did you receive?

15  A.   Approximately $470,000.  Not this account.  I mean, from

16  Mr. Clyde or from total?

17  Q.   Not total.  From Mr. Clyde.

18  A.   Oh.  $50,000.

19  Q.   There's some other people -- let's go forward.

20      Paul Ramsey, 12D.  You received money from Paul Ramsey's

21  investment?

22  A.   Yes.

23  Q.   There's some other names here.  Do you recognize any of

24  these other -- as you go through this, do you recognize any

25  other individuals who have been associated with

1    Michael Heshelman, any other names?

2    A.   I think we went through the list.  Dennis Mickelson,

3    myself, Mitch Miller, and the Orange County Teachers Federal

4    Credit Union was Featherstone.  That's the names I recognize.

5    And now Prism Mortgage because I've seen the page prior to

6    this.

7    Q.   Okay.  Let's go down to 12E, Mr. Williams.  And again,

8    this is an individual who had some association with

9    Pierre LaBauve?

10   A.   Yes.

11   Q.   Again, this, you can see you got a sum of money?

12   A.   Yes.

13   Q.   Now, 12F contains a summary of funds that have been

14   identified by the government as potentially being related to

15   Michael Heshelman either through his companies or by hotels and

16   such and totaling over 1.9 million.

17        There's under 12G a summary of accounts that have been

18   identified associated with you.

19   A.   Yes.

20   Q.   Now, as we indicated with respect to I think it was

21   Mr. Ramsey, there's another $50,000 that wasn't reflected on

22   the spreadsheet that may add to this total.

23        Assuming -- assuming this -- assume this with me, please:

24   That this summary of $470,000 did not include -- if it didn't

25   include that $50,000 from Mr. Ramsey's money, the total here

1   might increase to 500?

2   A.   It might, but I would -- I would think that it was a

3   carryover.  Some of the people came at the same time, so I may

4   have been double paid on one, under one ledger, and it would

5   reflect that, I think, if we went through it.

6   Q.   Okay.  So as best as you can recall, how much money did

7   you receive from your participation?

8   A.   This would be correct, I would believe, the $470,000.

9   There may be the other 50.  We'd have to look through this.

10  Q.   All right.  And last, Mr. Mickelson received about

11  1 1/2 million dollars.

12  A.   Yes, that's what I'm told.

13  Q.   Can you see any sense how it is that you

14  received -- forgive me, I'm going to use round numbers -- about

15  50,000, $500,000, Mr. Mickelson receives 1.5 million, and

16  Mr. Heshelman receives 1.9 million?  Can you give us some

17  explanation for this differentiation in how much money everyone

18  is getting?

19  A.   I cannot.  I would speculate on it.  That's all I could

20  do.  I don't know why they would get more.

21  Q.   Okay.  You have under that same binder a series of

22  transcripts.  I don't want to go through and play tapes again,

23  but I want to refer to transcripts.  It might be easier.

24  A.   Okay.

25  Q.   All right.  Let's go to 20F.  Page 10, please.  Let me

1    give you a little bit of context here for 20F.

2         20F is on January 5th, 2004.  This is a recording of a

3    meeting in person between yourself, Mr. Heshelman, and

4    Pastor Moody at a Steak 'n Shake restaurant.  I think it's in

5    Battle Creek.

6         Do you recall that?

7    A.   Yes.

8    Q.   Do you remember that meeting?

9    A.   I -- yes, I do.  I thought it was at Bob Evans, but . . .

10   Q.   Well, wasn't there a first meeting in person?

11   A.   Well, there were several -- there were a couple meetings

12   in person.  There were meetings in person, but I just -- at

13   this time I can't remember it being at Bob Evans or at

14   Steak 'n Shake.

15   Q.   You do remember meeting at a restaurant?

16   A.   I do remember meeting with Michael and Alan at two

17   different times.

18   Q.   Okay.  All right.  I want to bring your attention now

19   towards the middle of this.

20        Pastor Moody is asking some questions about -- can

21   everybody read this all right as is?  All right, we'll leave it

22   this size.

23        Asking some questions about at some point that you were

24   selling the business to Michael Heshelman or vice versa.  Was

25   that some sort of representation that was being made to

1   Pastor Moody, that there was -- somehow the business was being

2   handed over to Michael Heshelman?

3   A.   I may be on the wrong page.

4   Q.   I might be on the wrong page too.

5        Okay.  Let me start again.  Because I'm looking at

6   here -- so you were working for him.  Pastor Moody is asking.

7   He said, "No, no."  And then, "How does he get paid?  What do

8   you get out of this?"  And Michael, Michael Heshelman,

9   responds, "He gets paid out of the broker fee."

10  A.   I see.

11  Q.   And then you come in.  "I get a fee if everything

12  gets -- after everything gets done, I'll get paid.  If he's

13  successful.  If he's not successful, I've got a big bill to

14  pay."

15       That was a lie?

16  A.   Yes.

17  Q.   So -- "This has no effect on you, though."  So, again,

18  that was a lie?

19  A.   Yes.

20  Q.   Now, as we go along here we go into page 12 and into 13,

21  Pastor Moody is asking more questions about, "Well, what's

22  happening with the money?"  And pressing a little more.  And

23  also where the money is.

24       To give a little context here.  About the bottom of 12.

25  "I understand -- I understand there's a certain amount of faith

*DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    here.  Everyone has to have faith."  This is Michael Heshelman
2    speaking.  "I still stand up every day.  It's all for good
3    things too.  It's not just for self-indulgence.  There's a lot
4    of good things involved in what we're doing."
5        Now, there was some representation here that this money
6    was going to be used to raise -- for humanitarian purposes.  To
7    raise money for charities and other public works and that sort
8    of projects.
9    A.   Yes.
10   Q.   Is that true or was that a lie?  As far as what you and
11   Mr. Heshelman were doing.
12       Pastor Moody might have had that goal, but with respect to
13   what you and Michael Heshelman were doing, any truth to trying
14   to raise money for humanitarian reasons?
15   A.   No.
16   Q.   Now, Alan Moody continues with ". . . a lot tougher road.
17   We're getting caught up in things.  Time frames and covering
18   promises of year outs.  It's been hanging over me for a while.
19   Michael Heshelman wants a million dollars."  I think
20   "Careful" -- oh, I think "careful" might have been a server in
21   the background.
22       Then you chime in, "We get a check for a million dollars,
23   it will be really quick, and you would be expecting" -- "what
24   would be the magic number to make your not just original debt
25   but what are your expectations to receive?"  I'm sorry.  I'm

1   paraphrasing that section.  Forgive me.

2        You're chiming in here and asking about what his

3   expectation is for receiving rather than just questioning about

4   his pressure on when the money is coming in.

5        What was the point of that?

6   A.   To delay his expectations.

7   Q.   Changing subject?  You're changing subject a little bit

8   about what maybe the money might be coming in as opposed to

9   when it's coming in?

10  A.   Probably.

11  Q.   Okay.  As this continues on, they are asking about what

12  was the expectation here, what were we going to be spending the

13  money on.

14       You go to page 14.  There's some discussion about Texas

15  oil stuff, oil contracts.  Do you remember that being discussed

16  with Pastor Moody?

17  A.   No, I went through the transcript here.

18  Q.   Now, there were some -- would it be correct, though, that

19  there were some conversations -- were you advised there were

20  maybe some conversations between Pastor Moody and

21  Michael Heshelman that you did not participate in?

22  A.   Yes.

23  Q.   And then we turn to page 16, and you're talking about --

24  you're in the stock market.  You don't have any contracts.

25  Michael Heshelman:  "We're contracted to buy" -- the waiter is

1    probably dropping off a check -- he continues, in the amount of

2    millions dollars of dollars every day.  You know, we are

3    contracted to sell that every day.  So the market moves up and

4    down on a daily basis.  Buy and sell whatever he wants.  And

5    again you're chiming in here.  "We're just not doing anything.

6    Today we're just waiting for reports to come out tomorrow

7    before we do anything.  Dead day."

8        Did you really know what was going on?

9    A.   No.

10   Q.   So what are you doing?

11   A.   Trying to delay Mr. Moody from taking action.

12   Q.   Are you chiming in here trying to help Mr. Heshelman?

13   A.   Yes.

14   Q.   Trying to corroborate what he's saying to Pastor Moody?

15   A.   Yes.

16   Q.   And much of what you're doing when you're speaking with

17   Pastor Moody, is it an effort also to corroborate the

18   information that's being passed along from Michael Heshelman as

19   best you can?

20   A.   Yes.

21   Q.   All right.  Exhibit 21.  Do you see that?

22   A.   Yes, I do.

23   Q.   All right.  Now, I don't -- I don't know if you've

24   actually seen this document.  Have you seen it before?

25   A.   Yes.

1    Q.   When?

2    A.   Um, Monday.

3    Q.   Okay.  As part of the preparation for this case?

4    A.   Yes.

5    Q.   We asked you questions -- maybe the question was:  Have

6    you seen this document before?  Something along those lines

7    initially?

8    A.   No.

9    Q.   Okay.  I'm sorry.  So you hadn't seen it before?

10   A.   No, I have not.

11   Q.   But do you recognize the transaction that's occurring in

12   this that would be reflected in this invoice?

13   A.   Yes, I do.

14   Q.   The First Baptist Church of Middleville, Michigan.  That's

15   the church where you were a member?

16   A.   Yes.

17   Q.   That is Pastor Moody's church?

18   A.   Yes.

19   Q.   It reflects a transaction to buy a 1996 bus.

20        Do you remember that?

21   A.   Yes, I do.

22   Q.   Was there some discussion with Pastor Moody about

23   providing a bus to the church?

24   A.   Yes.

25   Q.   All right.  What was -- what were you telling Pastor Moody

1    about this bus?

2    A.   Pastor Moody asked about -- he said there was a need for a

3    bus for the church, and we had talked about it, and I

4    instructed him to ask Mr. Heshelman for the money to buy the

5    bus.  Maybe not instructed.  I directed him to

6    Michael Heshelman.

7    Q.   Okay.  So you weren't necessarily a party to those

8    conversations?

9    A.   I was a party to the conversation.  I asked -- but I was

10   not a party to the conversation when this -- when the money was

11   moved and the money went from Ken Warner to buy the bus.

12   Q.   All right.  Let me see if we can break this down.

13        At some point was there some discussion about somebody

14   either giving a bus, donating a bus, or buying a bus for the

15   church?

16   A.   Yes.

17   Q.   Was this conversation such that Pastor Moody was agreeing

18   to buy the bus for his own church?

19   A.   No.

20   Q.   Was it represented to Pastor Moody that somebody else

21   would provide the bus to the church?

22   A.   Yes.

23   Q.   Either being donated by a third-party or donated by

24   yourself or Michael Heshelman, but somebody was going to give a

25   bus to the church?

1    A.    Yes.

2    Q.    And rather than somebody else donating the bus, did you

3    have a conversation with Michael Heshelman about getting this

4    bus paid for?

5    A.    Yes.

6    Q.    And how was the bus going to be paid for?

7    A.    From Michael Heshelman's attorney's trust account with

8    Ken Warner.

9    Q.    Well, was there money already in there from somebody else?

10   A.    Somebody else or -- it was either somebody else's money or

11   Mr. Moody's money.

12   Q.    Now, how much time passed between Pastor Moody investing

13   1 1/2 million dollars and the bus being paid for?

14   A.    Two or three months maybe.

15   Q.    Well --

16   A.    I'm not sure.

17   Q.    Was it a relatively short period of time?

18   A.    It was a short period of time.

19   Q.    According to the banking records, it looks like the wire

20   transfer to Pastor Moody was on March 6th, 2001, and the

21   invoice is dated March 27th, 2001, but the banking information

22   behind that indicates that the wire transfer itself was made on

23   the 19th.

24   A.    Okay.

25   Q.    A matter of a couple of weeks.

1    A.    Okay.

2    Q.    Any reason to dispute that time line as being --

3    A.    No.

4    Q.    So when this issue came up for the actual payment of the

5    bus, who did you have to go talk to about making certain that

6    the bus actually got paid for?

7    A.    To Michael Heshelman.

8    Q.    And how did you reach him?

9    A.    Telephone.

10   Q.    Is that pretty -- is that probably the most common way in

11   which you spoke with Michael Heshelman?

12   A.    Yes.

13   Q.    Did Mr. Heshelman have a land line that you used, or was

14   it mostly --

15   A.    Mostly a cell phone.

16   Q.    So you met in person with Michael Heshelman, I think, on

17   numerous occasions?

18   A.    Yes.

19   Q.    Would you recognize him?

20   A.    Yes, I do.

21   Q.    Do you see him here in court today?

22   A.    Yes, I do.

23   Q.    Would you please describe for the record what he's

24   wearing.

25   A.    Wearing a black suit, white shirt, and a red tie.

1    *Q.*   Glasses?

2    *A.*   Glasses.

3        *MR. MEKARU:*  Your Honor, may the record reflect he's

4    identified the defendant?

5        *THE COURT:*  Yes.

6    *Q.*  *(BY MR. MEKARU)*  All right.  Just a few more points here,

7    Mr. Sherwood.

8        Mr. Sherwood, now in addition to the activity that you're

9    engaging in with Mr. Heshelman, you yourself have gone out and

10   done your own fraudulent activity, right?

11   *A.*   Yes, I have.

12   *Q.*   I mean, you've gone out and lied to other people and got

13   them to invest with you?

14   *A.*   Yes, I have.

15   *Q.*   You've indicated already that you had convinced

16   Mr. Telford and Mr. Fodor to send you a million dollars, and

17   that was in addition or apart from money that they already

18   invested with Mr. Heshelman, right?

19   *A.*   Correct.

20   *Q.*   Is there also a Denise Du Val?

21   *A.*   Yes.

22   *Q.*   Another individual who you convinced to give you money and

23   you paid her back?

24   *A.*   That's correct.

25   *Q.*   And that representation that there was some sort of

DIRECT EXAMINATION OF BRYCE HENRY SHERWOOD

1   investment or a loan or whatever, was that a lie?

2   A.   Yes.

3   Q.   How much money did you --

4   A.   $12,000.

5   Q.   All right.  How about a man by the name of Chuck Bunting?

6   A.   Chuck Bunting, presented the same, an opportunity that

7   wasn't real.

8   Q.   Larry Hall?

9   A.   Larry Hall was also known as Bud Riley, and he had -- he

10  was also an investor with Michael, and I also received funds

11  from him.

12          MR. MEKARU:  One moment, Your Honor.

13          Your Honor, thank you.  I'll pass the witness.

14          THE COURT:  Thank you.

15          At this time, Ladies and Gentlemen, we're going to

16  take our morning break, and because I have another commitment,

17  we're not going to come back until 12:30.  So you will have a

18  couple of hours, a couple-of-hours-and-a-half break, and then

19  we will come back for the cross-examination of Mr. Sherwood.

20          THE CLERK:  Sit down for a minute.

21          THE COURT:  I just want to briefly reiterate the

22  cautionary instructions I've already given you several times,

23  and that is not to discuss the matter with anybody, even among

24  yourselves.  Not to try to reach any conclusions.  Not to do

25  any research.  Not to use any various electronic devices to

1    contact others with regard to what you're doing here today and

2    throughout this trial.  Not to come to any opinion.

3           We've really just gotten into the meat of the issues

4    that are going to be decided, so please keep those instructions

5    in mind as you go about taking your break.  Thank you.

6           THE CLERK:  Everyone rise, please.  This Court is in

7    recess.

8       (Jury leaves courtroom at 10:06 a.m.)

9           THE COURT:  I just have one thing to put on the

10   record before we go.  And this, I think, is for -- more for the

11   jury's edification and really for my own, it's not clear to me,

12   Mr. Mekaru, what the relationship was between Mr. Sherwood and

13   Mr. Heshelman, and that is something that I would request that

14   somebody clear up before this witness is excused.

15          MR. MEKARU:  Yes, Your Honor.

16          THE COURT:  Thank you.  We're adjourned.

17      (Recess taken at 10:08 a.m.)

18      (Jury entered the courtroom at 12:48 p.m.)

19          THE COURT:  Mr. Tracy.

20          MR. TRACY:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. TRACY:

23   Q.   Good afternoon, Mr. Sherwood.  Can you hear me okay?

24   A.   Yes, I can.

25   Q.   I think you have the mic in a good spot there, but if I

1    see it moving a little bit, I may just remind you so to make

2    sure the jury can hear.  Okay?

3    A.   Okay.

4    Q.   Now, this morning we had a chance to hear from you a

5    little bit about the plea agreement that you took in your own

6    case, and I need to go back over a couple items regarding that.

7         Now, your attorney is Landon Miller, correct?

8    A.   Correct.

9    Q.   And he's from Florida?

10   A.   Yes.

11   Q.   He was representing you throughout the process that led up

12   to your plea agreement?

13   A.   Correct.

14   Q.   And I presume -- and I don't want to get into the details

15   of your conversation with your attorney, that's between you and

16   him -- I presume he had an opportunity to walk you through what

17   are called the Federal Sentencing Guidelines?

18   A.   Yes.

19   Q.   And he also had an opportunity to talk to you about if you

20   decided to go to trial and were found guilty what range you may

21   be looking at in terms of years in prison?

22   A.   Yes.

23   Q.   And in general, was that range somewhere in the 10- to

24   15-year range?

25        MR. MEKARU:  I'm going to object, Your Honor.  This

1   is getting into the issue of penalties.  To the extent that

2   this has any -- the discussion of this defendant on what the

3   implication would be in effect for Mr. Heshelman, the idea of

4   punishment isn't for the purview of the jury.  Just the fact it

5   might be greater than it might be with a plea I think is going

6   to be adequate for the consideration of the bias of this

7   witness.

8          THE COURT:  And what is the actual basis of your

9   objection, Mr. Mekaru?

10          MR. MEKARU:  The objection is that we're getting into

11   punishment, and punishment is not an appropriate consideration

12   for the jury.  The jury is only supposed to consider guilt or

13   innocence.  And even in the jury instruction, the punishment is

14   not for their consideration.

15          And to the extent we have some discussion about how

16   much time Mr. Sherwood might have been facing, the implication

17   would be that Mr. Heshelman might be facing the same.

18          THE COURT:  Mr. Tracy, in addition to all of that, I

19   have a difficult time seeing relevance here, and so I'm going

20   to instruct you to stay away from this area of punishment.

21          The jury has heard about the plea agreement, they

22   know that there are considerations being made that have been

23   made to Mr. Sherwood with regard to that, and they also have

24   heard that the discretion in sentencing will be mine and mine

25   alone.

1          MR. TRACY:  Can I speak to that for one more second,

2   Your Honor?

3          THE COURT:  No, you may not.

4          MR. TRACY:  Can we do it at sidebar, then?

5      (At sidebar on the record)

6          MR. TRACY:  If he had already taken a 5K, or maybe

7   Rule 35 is better, if he had been in jail for three years and

8   then he comes back to him and all of the sudden the sentence

9   gets reduced from 180 months down to 50, we'd let it in.  All

10  I'm doing is explaining to the jury that the benefit he's

11  getting might be fairly substantial, and that goes toward --

12         THE COURT:  I think the jury has already figured that

13  out, and I really do not see that as pertinent to what their

14  eventual determination is going to be in this case.

15         MR. TRACY:  Okay.  So just so the record is clear,

16  I'm asking to go into it, and you're not letting me?

17         THE COURT:  Exactly.

18         MR. TRACY:  Thank you very much, Your Honor.

19     (Sidebar discussion concluded)

20  Q.  (BY MR. TRACY)  Okay.  Let's move to a different part of

21  the plea agreement that I think you went over a little bit but

22  I just want to make sure we're clear on.

23      Your -- there's a cooperation paragraph that Dan walked

24  you through this morning, and we don't need to look at it

25  again, I think it's paragraph 7 there.  Part of the reason

1    you're testifying here is pursuant to that cooperation

2    paragraph, correct?

3    A.   Correct.

4    Q.   But you're hoping to receive an additional benefit because

5    of that, correct?

6    A.   Correct.

7    Q.   And what you hoped will happen is that the government

8    either prior to your sentencing or after your sentencing will

9    move for a further reduction of whatever time you may be

10   facing?

11   A.   Correct.

12   Q.   That's what you're hoping for, correct?

13   A.   Yes, sir.

14   Q.   Now, Kathy, if we could bring up Government Exhibit 12G,

15   please.

16        And, Mr. Sherwood, if it's easier for you to see the

17   books, fine.  Or if you see it here, just like you did with

18   Dan, that's fine too.

19        Now, this was gone again over a little bit in your direct.

20   Your best recollection was this $470,900, which is the total at

21   the bottom, was approximately what you received through the

22   course of these investments that were made, correct?

23   A.   Correct.

24   Q.   In other words, that's the amount of money that came out

25   of Mr. Warner's account to you?

1    A.   Yes.

2    Q.   Now, you weren't aware or you couldn't be completely sure

3    whether or not another $50,000 or something, perhaps from

4    the -- which deal was that, was that the Clyde deal?

5    A.   I believe so.

6    Q.   Okay.  So that's Arron Jepson was his attorney, but

7    Allen Clyde?

8    A.   Correct.

9    Q.   You couldn't be sure whether or not some additional amount

10   should also factor in here that was roughly another 50 grand?

11   A.   Correct.

12   Q.   Okay.  But other than that, your statement to the jury,

13   that's the entirety of any monies that you received relating to

14   these investments?

15   A.   To the best of my recollection it is.

16   Q.   Okay.  Now, if we could go to -- I think 12H is

17   Mr. Mickelson's.

18        And while we're going there, what did you do with the

19   money, the 470 or the 500,000 that was -- what did you do with

20   the money you received from the investments?

21   A.   Used it for my personal benefit.

22   Q.   Okay.  The other money you got out of Peter Fodor, which

23   maybe we'll go into in a little more detail later, that money

24   went into buying your home?

25   A.   Yes.

1  Q.   Was it just the home, or did you also have some acreage

2  around it?

3  A.   It was a home and acreage.

4  Q.   Okay.  But this other money you got, close to 500 grand or

5  something, that also went to your personal benefit?

6  A.   Yes.

7  Q.   Not related to expenses or anything along the lines in

8  terms of trying to get these investment platforms in place, but

9  rather went to your personal . . .

10  A.   Yes.

11  Q.   Okay.  Mr. Mickelson -- and I think if we go to the next

12  page of his, please.

13      Now, the total at the bottom for him is a little more than

14  $1.5 million, correct?

15  A.   Correct.

16  Q.   Now, before today did you know that he had that much come

17  to him?

18  A.   When I read the Indictment I did.

19  Q.   Okay.  And you read the Indictment, what, earlier this

20  year for the first time?

21  A.   In December.

22  Q.   December of '08?

23  A.   Correct.

24  Q.   That's the first time you were aware of the amount of

25  money that purports to have gone to him through these accounts?

1   A.   Correct.

2   Q.   Now, did you get any money from Mr. Mickelson?

3   A.   Um, I do not believe so.

4   Q.   You don't recall ever him sharing any of the monies that

5   he got through these investments with you?

6   A.   I don't know.

7   Q.   You're not sure?

8   A.   I'm not sure.

9   Q.   Okay.  If you got monies from Mr. Mickelson, then that

10  obviously would have increased the amount of monies you

11  obtained above the 500 grand roughly, correct?

12  A.   Correct.

13  Q.   But you're not sure one way or the other?

14  A.   Correct.

15  Q.   Now, just going back to the 470 or roughly 500, that money

16  that you obtained, did you report any of that income to the

17  IRS?

18  A.   No.

19  Q.   And why not?

20  A.   It was given to me as -- purported to be a loan as advance

21  fees that would be 1099'ed at some time.

22  Q.   I don't understand.

23  A.   I would be -- I was -- it was given to me at the front end

24  of the deal as an advance that would be . . .

25  Q.   And it was your understanding that because it was some

1    sort of advance, you didn't need to report that income in the

2    year given?

3    A.    Correct.

4    Q.    Okay.  Did you later report it?

5    A.    No.

6    Q.    You never have reported it?

7    A.    No.

8    Q.    Now let's talk about your efforts, and I'll say just

9    generally for the time period from '99 to 2008, and maybe we'll

10   need to narrow in on a more specific period.

11        Did you ever go to Switzerland to assist Mr. Heshelman

12   with any of his work?

13   A.    No.

14   Q.    Did you ever have any meetings with any of the people that

15   he was meeting with over in Zurich or other parts of Europe in

16   terms of the work he was trying to accomplish?

17   A.    No.

18   Q.    Did you ever join any conference calls with any of those

19   people?

20   A.    No.

21   Q.    Now, you were in New York City at least on one occasion,

22   correct?

23   A.    Correct.

24   Q.    And I believe Mr. Moody in his direct said something like

25   he even maybe saw you, he was there too with maybe some kids on

1    a visit to the city and they saw you when you were there?

2    A.    That's correct.

3    Q.    Now, do you remember roughly when that was?

4    A.    No, I do not.  It would be in 2000 or 2001.  I cannot

5    remember.  It was several years ago.

6    Q.    Okay.  I take it since Mr. Moody's investments were in

7    December of 2000 and March of '01, it probably would have been

8    after those investments, correct?

9    A.    Yes, correct.

10   Q.    So sometime after -- either in or after 2001?

11   A.    Yes.

12   Q.    Okay.  But when you were in New York, did you meet with

13   any of Michael's connections in New York pertaining to any of

14   the transactions?

15   A.    Yes.

16   Q.    And who was that?

17   A.    I met Robert Tringham.  I met Ronald Featherstone.  I met

18   Mitch Miller.  And I met other people.  And I think -- I may

19   get the name wrong, but I believe I met a Donello, and I can't

20   remember his last name.

21   Q.    Okay.  Now, on your direct -- I'm sorry, go ahead.

22   A.    And I met a Marie Gosse-Gardet.

23   Q.    Okay.  Anybody else?

24   A.    Not that I can remember right now.

25   Q.    Okay.  Were these all in one meeting, or were they

1    multiple meetings?

2    A.    Multiple, different times.   Whether in meetings or social.

3    They weren't necessarily meetings.

4    Q.    I believe on direct with respect to Robert Tringham, I

5    think is his name, right, something like that?

6    A.    Yes.

7    Q.    With respect to him, you didn't have any real detail about

8    the type of investment Michael and Mr. Tringham were working

9    on; is that correct?

10   A.    Only I was told that they were working on a transaction,

11   on a buy/sell agreement.

12   Q.    Beyond that did you know anything else?

13   A.    No.

14   Q.    And then Mr. Featherstone, I think you described him as

15   sort of a partner, he might even have an office or title maybe

16   with one of Mr. Heshelman's companies?

17   A.    Yes.

18   Q.    But did you know anything beyond that in terms of what his

19   activities were?

20   A.    No.

21   Q.    And did you ask him about it?

22   A.    He is -- yes, I did, and all he said was he was working

23   with Michael, and there was not much detail given.

24   Q.    Okay.  Did you probe more deeply at all or try to get more

25   information?

1    A.    I tried, but I did not receive any more information.

2    Q.    Okay.  And then Mitch Miller, correct?

3    A.    Right.

4    Q.    And Mr. Miller, was it your understanding that Michael and

5    Mr. Miller, perhaps others, were working on some sort of bond

6    deals or currency deals?

7    A.    Um, yes.  I only met Mr. Miller at -- I was at dinner with

8    him a couple of times, and there was not a lot of business

9    talk.  But it was implied that he was working with Michael on a

10   couple of transactions.

11   Q.    Okay.  And in the context of those discussions, maybe with

12   Mr. Heshelman and Mr. Miller, maybe there were others, did the

13   concept of these new Kuwaiti notes or bonds or any of that come

14   up in the context of those discussions?

15   A.    I cannot remember.

16   Q.    So you don't have a real good level of understanding in

17   terms of what specifically Mr. Miller was working on either?

18   A.    No.

19   Q.    Just generally that there were some efforts being made?

20   A.    Yes.

21   Q.    And these meetings that you would have participated in,

22   we're talking sort of in the '01/'02/'03 time frame, or when do

23   you think?

24   A.    I believe that would be the correct time frame.

25   Q.    Okay.  And from your impressions of what you saw --

1    because on direct you sort of suggested that, you know, maybe

2    with the benefit of 20/20 hindsight you don't think any genuine

3    efforts are being made, but when you're seeing these meetings

4    taking place, at the time did you believe there were genuine

5    efforts being made to try to get investments in place?

6    A.    I believe at the time there was -- they were talking about

7    genuine investments, but I did not believe they could succeed

8    at those particular investments.

9    Q.    And is that because they really didn't have the skills and

10   abilities to pull it off?

11   A.    I don't know that.  I thought the numbers were too high to

12   receive.  And, you know, I did not believe there was the

13   possibility of getting that kind of a yield from a bank from

14   bond transactions.

15   Q.    Okay.  So you questioned the marketability to generate the

16   kind of yield they were talking about?

17   A.    Yes.

18   Q.    Now, have you done any independent investigation, or in

19   your experience in financial matters, were the types of yields

20   that they were shooting for, do those exist in the world in

21   terms of people making investments?

22   A.    Not that I'm aware of.

23   Q.    Okay.  But you don't know for sure because you don't know

24   about every return of investments around the world, correct?

25   A.    Correct.

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1    Q.   But your reason for questioning whether things were

2    genuine was because the yield was higher than what you thought

3    it really could be?

4    A.   That and the -- we were constantly changing different --

5    there was a constantly changing different deal.  It was never a

6    conclusion.  It was just a delay or a change.

7    Q.   Okay.  But again, you don't know about the specifics of

8    what resulted in those delays, correct?

9    A.   Correct.

10   Q.   You don't know whether or not a deal was close to being

11   consummated and then a bank had some change in paperwork that

12   created, you know -- that precluded that deal from going

13   forward?  You don't know the details?

14   A.   That's correct.

15   Q.   Now, for most of the investors that got involved, you were

16   the initial contact person, correct?

17   A.   From seeing different names today, I'm not sure, but I

18   believe I was the majority of the money.

19   Q.   Right.  Because as you said on direct, Moody was you,

20   right?

21   A.   Correct.

22   Q.   Mr. Ramsey?

23   A.   Correct.

24   Q.   Clyde, several others?

25   A.   Yes.

1    *Q.*   So the way it was described to those people at the outset

2    and what the investment was going to involve was

3    Bryce Sherwood's words, right?

4    *A.*   No, I was repeating what -- I was telling what I was told.

5    *Q.*   Okay.  You have a spouse, correct?

6    *A.*   Yes.

7    *Q.*   Do you always repeat exactly correct what your spouse

8    tells you?  Does she think so?

9    *A.*   No.

10   *Q.*   Okay.  So what I want to be careful of, though, is the

11   meetings that were taking place, these were between

12   Bryce Sherwood and Alan Moody, for example?  In other words,

13   Michael Heshelman wasn't there?  These initial meetings.

14   *A.*   These initial meetings, they were just me.

15   *Q.*   Correct.  So what these investors are hearing about what

16   is going to be accomplished or what the platform may look like,

17   et cetera, that's your words to them that they are hearing for

18   the first time, correct?

19   *A.*   Yes.

20   *Q.*   Now, whether or not you repeated something that Michael

21   said or you repeated it correctly or not, we don't really know,

22   do we?

23   *A.*   That's right.

24   *Q.*   And then at some point, because we heard from this -- from

25   Mr. Moody on his examination -- at some point for some of these

1    investors you sort of bowed out of the way and lost

2    communication with them, correct?

3    A.    Yes.  Correct.

4    Q.    And for Mr. Moody, I think as he described it, that might

5    have happened pretty close in time to when you were being

6    evicted from your house and he was taking it over?

7    A.    Yes.

8    Q.    There was some tension created then?

9    A.    Yes.

10   Q.    And so from that point forward, you don't really know --

11   and that was maybe in the '04-'05 time frame -- you don't

12   really know what communications were going on between

13   Mr. Heshelman and Mr. Moody because you were out of the

14   picture?

15   A.    Correct.

16   Q.    But as far as you're aware, did Mr. Heshelman keep in

17   contact with these investors?

18   A.    As far as I'm aware.

19   Q.    Did you ever hear anything to the contrary?

20   A.    Yes, at times I would hear that he was hard to reach, and

21   people would call me and see if I had heard anything from him.

22   Q.    Okay.  But even though he was hard to reach -- I mean, he

23   was over in Switzerland, right?

24   A.    Right.

25   Q.    So that's a difference of a time zone of what, seven,

1   eight, nine hours or something like that, right?

2   A.   Five or six.

3   Q.   Five or six.  Okay.  So he's not right down the street.

4   But even though it may have been difficult and you couldn't get

5   him on that very same day, did he remain in contact as far as

6   you're aware with these investors?

7   A.   When --

8        MR. MEKARU:  Your Honor, I guess can we get a little

9   foundation as to how this witness might know that?  This is for

10  relevancy.

11       All we have was the transition from this witness

12  stopped talking to Pastor Moody and then some question that,

13  Well, Mr. Heshelman continued to speak with him, and there's no

14  foundation about how he would know that and no foundation how

15  he would know he was communicating with other investors.  So if

16  we could just explore that, please.

17       THE COURT:  I think that's fair comment, Mr. Tracy.

18       MR. TRACY:  Okay.

19  Q.   (BY MR. TRACY)  Now, you had indicated that there were

20  times that people, maybe for example Mr. Moody, had indicated

21  it was difficult to get ahold of Mr. Heshelman and they may

22  contact you; is that correct?

23  A.   Yes.

24  Q.   Okay.  And other than Mr. Moody, did any other investor

25  raise that issue with you?

1    A.    Yes.

2    Q.    For example, was Mr. Ramsey doing that?

3    A.    Mr. Ramsey would call and say he'd been trying for days or

4    weeks to reach Michael.

5    Q.    Okay.  Ultimately did you hear back from Mr. Ramsey that

6    he was successful in speaking with Mr. Heshelman?

7    A.    Yes, he would call me afterwards and said that he had

8    spoken to him.

9    Q.    So was there ever a time, whether it was Mr. Moody,

10   Mr. Ramsey, or anybody that called you and said, You know, I'm

11   giving up, I haven't heard from him for months, and the

12   communications are dead?  Did you ever have that kind of

13   contact with anybody?

14          MR. MEKARU:  Excuse me, Your Honor, to the extent

15   that he's getting this information from these other witnesses,

16   Mr. Ramsey, Pastor Moody, the fact that there's some sort of

17   communication itself is hearsay.  And Pastor Moody was

18   available to answer those questions directly rather than

19   getting -- eliciting this testimony from Mr. Sherwood.

20          THE COURT:  I think we take your point, Mr. Tracy,

21   and I do think there's really a lack of materiality here.  I

22   mean, it's -- your point is taken.  I think the jury gets it.

23   I think I get it too.

24          MR. TRACY:  Okay.  If we have that in there, then

25   we'll move on.

1    Q.   (BY MR. TRACY)  Now, Dan asked you some questions about --

2    on your direct -- on his direct about your financial background

3    and the fact that roughly in '99 or 2000 that you were not a

4    financial advisor.  Do you recall that?

5    A.   Yes.

6    Q.   Is that accurate, you were not a financial advisor?

7    A.   I was not registered.

8    Q.   But at one point you were?

9    A.   Yes.

10   Q.   In fact, what kind of securities registered license did

11   you have?

12   A.   I had a Series 7 license.

13   Q.   And could you just explain to the jury briefly, what does

14   that mean?

15   A.   I was a registered stockbroker.

16   Q.   You turned away --

17   A.   I was a registered stock broker.

18   Q.   Okay.  And what did that mean you could do?

19   A.   I could buy and sell securities for clients:  Stocks,

20   bonds, mutual funds.

21   Q.   And you did that for a period of years?

22   A.   Yes.

23   Q.   Did you do that on your own, or did you work for

24   companies?

25   A.   I worked for a company.

1  *Q.*   And what was the company?

2  *A.*   I worked for A.G. Edwards and McDonnell Investment.

3  *Q.*   Okay.  And how many years did you do that for?

4  *A.*   Two or three.

5  *Q.*   And in what time frame, approximately?

6  *A.*   '96 to '99.

7  *Q.*   Okay.  So just a little before the time period that these

8  investments took place?

9  *A.*   Yes, sir.

10  *Q.*   So I take it to get your Series 7, you had to go through

11  certain testing and requirements, correct?

12  *A.*   Correct.

13  *Q.*   So you understood what that was all about?

14  *A.*   Yes.

15  *Q.*   Could you still function in some -- in providing financial

16  advice, even though you couldn't do it as a registered advisor,

17  could you do that?  Or what was the situation?  When you

18  were -- '99 to 2000 after you let it lapse?

19  *A.*   Um, I'm not quite sure what you mean.  Could I give you

20  advice?  I could say yes I could tell people.

21  *Q.*   Right, but you couldn't do it in the context of actually

22  trading --

23  *A.*   Correct.

24  *Q.*   -- stocks and so forth?

25  *A.*   That's right.

1   Q.    Okay.  Were you doing that at the time, '99/2000, once you

2   let your license lapse?  Or what were you doing for employment?

3   A.    I was finding customers, clients for Michael.  I had been

4   trying to just -- basically trying to find -- raise capital.

5   Q.    And were you doing other things besides that in terms of

6   working with Mr. Heshelman?  Were you a farmer, or were you --

7   were you doing anything else for employment?

8   A.    No.

9   Q.    Did you go back to get a different job at some point in

10  time?

11  A.    I've tried continually.

12  Q.    Okay.  Do you have employment currently --

13  A.    Yes.

14  Q.    -- or recently with Barrington Capital?

15  A.    It's not employment.  I'm doing a -- I work with them in a

16  commodities business, and I also am working on a -- with a

17  company that is going to do stock promotions for small

18  companies.

19  Q.    And Barrington Capital, they are out of New York?

20  A.    Out of Florida.

21  Q.    Oh, they are out of Florida.  I'm sorry.

22  A.    Yes.

23  Q.    Okay.  And you live down in Florida now, correct?

24  A.    Yes, sir.

25  Q.    And what's this other company besides Barrington Capital

1   that you're working with?

2   A.   It's a company that we're finding customers that we'll do

3   stock promotion with to tell their stories, to promote the

4   stock.

5   Q.   Okay.  Do you remember the name of that company?

6   A.   Yes.  Heitzman Holding Company.

7   Q.   Where are they out of?

8   A.   Florida.

9   Q.   So is it fair to say for some period of the last 15 or 20

10  years, maybe longer, feel free to correct me, in some capacity

11  you've been involved with the financial arena?

12  A.   Yeah, for 10 years.

13  Q.   For 10 years?

14  A.   Yes.

15  Q.   Isn't it a little longer than that since you had your

16  Series 7 license going back to '96?

17  A.   Yeah, I guess so.  I . . .

18  Q.   Okay.  And as far as you're aware, Mr. Heshelman never had

19  a securities license, correct?

20  A.   Correct.

21  Q.   And you were -- were you the only person involved with

22  this investments that had that training and that registration

23  at some point as far as you're aware?

24  A.   I don't know.

25  Q.   You don't know whether Mr. Mickelson ever did or anybody

1  else?

2  A.    I'm not aware.

3  Q.    Okay.

4  A.    Mr. Tringham said that he had worked for Barclays Bank for

5  several years.

6  Q.    Mr. Tringham?

7  A.    Tringham.  Said he was a -- and I believe it was

8  Barclays Bank that he had worked for.

9  Q.    Okay.  Did you believe him when he said that?

10  A.    I had no reason not to believe him.

11  Q.    Okay.  Now, let's talk a little bit about the claims or

12  lawsuits, that kind of thing, that may or may not have arisen

13  out of the investments that were here.

14       Now, we heard that there was at least a foreclosure-type

15  proceeding involving your home, correct?

16  A.    Correct.

17  Q.    And that was between you and your wife and Mr. Moody?

18  A.    Correct.

19  Q.    And ultimately he obtained your home, but by that point in

20  time you had already put another mortgage on it, correct?

21  A.    Correct.

22  Q.    Other than that, did anybody -- any of the investors you

23  brought to the table, anybody, did anybody sue you?

24  A.    Um, any other investors?  Not that I'm aware of.  I don't

25  think so.

1   *Q.*   Did Mr. Ramsey sue you?

2   *A.*   No.

3   *Q.*   Mr. Clyde?

4   *A.*   No.

5   *Q.*   Mr. Oliver?

6   *A.*   I --

7   *Q.*   I don't think you know Mr. Oliver maybe.  But as far as

8   you're aware, nobody has brought a lawsuit against you?

9   *A.*   Correct.

10  *Q.*   Are you aware of any lawsuits being brought against

11  Mr. Warner?

12  *A.*   No.  I have had no contact with him.

13  *Q.*   Okay.  Are you aware of whether any civil lawsuits or

14  claims have been brought against Mr. Heshelman?

15  *A.*   I have no idea.

16  *Q.*   How about against Mr. Mickelson?

17  *A.*   I have no idea.

18  *Q.*   Now, I believe during direct -- feel free to correct me if

19  I get this wrong -- your recollection was you were not sure

20  whether Mr. Moody had ever actually asked for his money back;

21  is that correct?

22  *A.*   I think that's correct.

23  *Q.*   Okay.  And I take it that means you never received any --

24  "you" meaning you personally -- ever received any written

25  requests for the money back from Mr. Moody?

1   A.   Not that I can recollect.

2   Q.   And do you recall ever seeing a written request for his

3   money back, meaning Mr. Moody, that was made to Mr. Warner?

4   A.   I have no way of knowing that.

5   Q.   Okay.  And do you recall whether you ever saw any written

6   request made by Mr. Moody for his money back made to

7   Mr. Heshelman or Investors First the company?

8   A.   I have no idea.

9   Q.   You don't know one way or the other?

10  A.   That's correct.

11  Q.   Now, do you recall in the joint venture-type agreements,

12  these promissory notes, do you recall that the investors signed

13  those?

14  A.   Yes.

15  Q.   Okay.  And do you recall in there that there was a

16  procedure, cease and desist letter, demand letter, this type of

17  thing that they could request their money back?

18  A.   Yes.

19  Q.   And again, you don't recall seeing Mr. Moody or any

20  investor that type of cease and desist letter ever coming in?

21  A.   I didn't ever see any.  Mr. Ramsey told me he had sent

22  one.

23  Q.   But you never saw a copy?

24  A.   I never saw a copy.  Um . . .

25  Q.   Go ahead.

1    *A.*    I've seen one, I think -- I think I've seen one since

2    then.

3    *Q.*    Okay.

4    *A.*    But I can't remember.  We went through all these

5    documents, and I'm not sure if there was -- but Mr. Ramsey had

6    told me he had sent a cease and desist and asked for his money

7    back.  But I have not seen that document.

8    *Q.*    Okay.  Now, you're aware that some of the investors did

9    get their money back.  Are you aware of that now?

10   *A.*    Um, just what I saw in the paperwork on the bank

11   statements.

12   *Q.*    Okay.  Let's look at one.

13        Kathy, if you can bring up 12 -- Government Exhibit 12B,

14   please.

15        This is the first page.  I think we're going to end up

16   looking at three of them.

17        Now, again, your best recollection was you were not

18   involved with the Tim Oliver Prism deal, at least directly,

19   correct?

20   *A.*    Correct.

21   *Q.*    But if we go to page 3, please, do you see the deposit

22   amount?

23        *MR. MEKARU:*  Your Honor, then I'm going to object.

24   If this witness has no knowledge regarding anything that has to

25   do with Mr. Oliver or Prism Mortgage, then why are we asking

1    him about that activity?

2           MR. TRACY:  He says he wasn't involved with the deal.

3    I'm asking whether he knew or not whether the return came or

4    not.  It's going to be a very easy question for him to answer

5    he does or he doesn't.

6           THE COURT:  Well, I'm sure -- he just said he doesn't

7    know anything about it, so how can he answer that question in

8    the affirmative?

9           MR. TRACY:  He could have not been involved with

10   making the Oliver deal and still know whether or not money went

11   back to him.  It's -- the follow-up question is --

12          THE COURT:  Do you know anything about the Oliver

13   deal, Mr. Sherwood?

14          THE WITNESS:  No, ma'am.

15          THE COURT:  Thank you.  Please move on.

16   Q.   (BY MR. TRACY)  Now, if you could look at what has been

17   marked as Proposed Exhibit V.  There's a binder.  See the black

18   binder that's next to you?  It's the defendant's exhibits.

19        You do know something about the Paul Ramsey deal, correct?

20   A.   Yes.

21   Q.   And that's -- this is a joint venture trust agreement

22   between Investors First and Paul Ramsey, correct?

23   A.   Which one are we on?

24   Q.   "V" as in Victor.

25   A.   "V"?

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1   Q.   Are you there, sir?

2   A.   Yes.

3   Q.   So again, this is a joint venture trust agreement between

4   Paul Ramsey and Investors First, correct?

5   A.   Correct.

6   Q.   And this is the type of agreement that you've said you've

7   seen previously involving the investments, correct?

8   A.   Correct.

9   Q.   And in this one it appears that Mr. Ramsey invested a

10  little over a million dollars, correct?

11  A.   Correct.

12  Q.   And as part of this there's an agreement that dollars can

13  be used for expenses, correct?

14  A.   Correct.

15       MR. MEKARU:  Your Honor, is this exhibit in evidence?

16       THE COURT:  Not yet.

17       MR. MEKARU:  So in terms of questioning about the

18  substance of this exhibit, we're talking about -- asking

19  questions about an exhibit that's not in evidence.

20       THE COURT:  Are you offering this exhibit, Mr. Tracy?

21       MR. TRACY:  Sure, I can offer it.

22       MR. MEKARU:  Then I'm also going to object.  I don't

23  see any indication here that this witness participated in this

24  agreement.

25       MR. TRACY:  It's fine.  Mr. Ramsey is going to take

1    the stand, and the agreement is going to come in at that point.

2    But if we want to quarrel about it, I can go in a different

3    direction.

4              MR. MEKARU:  Well, Mr. Ramsey, I think, can testify

5    about it.  It sounds like we're asking a witness who doesn't

6    have knowledge about the document.

7              THE COURT:  Did you have anything to do with the

8    execution of this agreement, Mr. Sherwood?

9              THE WITNESS:  No.

10             THE COURT:  Have you ever seen it before this

11   litigation occurred?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  You did?

14             THE WITNESS:  Yes.

15             THE COURT:  When did you see it?

16             THE WITNESS:  I saw it when it was sent to

17   Mr. Ramsey.  I saw it -- I saw a copy of what was going to be

18   sent to him.

19             THE COURT:  So you were aware of it?

20             THE WITNESS:  Yes, ma'am.

21             MR. MEKARU:  Okay.

22             THE COURT:  It's admitted.

23   Q.   (BY MR. TRACY)  So if we could publish Exhibit V,

24   Defendant's Exhibit V, Your Honor.

25        Kathy, if you could, now it's been faxed maybe once or

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1    twice, the part about step 1.  There appears to be a step 1 or

2    2 or whatever.  In the middle of the page, please.

3         So it's a little hard to read, but it says there's a

4    million -- 1,080,000, right?

5    A.   Yes.

6    Q.   And it's talking about it going in, and then it goes on to

7    say $280,000 is released to the trust for expenses of

8    insurance, attorneys, travel, and the procurement of a bank

9    instrument acceptable to all parties.

10        Am I reading that correctly?

11   A.   Yes.

12   Q.   Okay.  You saw that prior to it going to Mr. Ramsey

13   because you saw a copy of it, correct?

14   A.   Correct.

15   Q.   And I take it -- did Mr. Ramsey ever object to that to

16   you?

17   A.   No, he did not.

18   Q.   And this expense-type thing, based on your recollection of

19   other similar agreements, was that in other agreements as well?

20   A.   Yes.

21   Q.   So $280,000 out of this portion of the investment for

22   Mr. Ramsey could be used for all of those things --

23   A.   Yes.

24   Q.   -- correct?

25   A.   Yes.

1  Q.   And as far as you're aware, were some of those monies used

2  for insurance or Mr. Warner's attorney's fees?  Do you know one

3  way or the other?

4  A.   No, I do not.

5  Q.   Okay.  I take it Mr. Heshelman did travel, because he went

6  over to Switzerland.

7  A.   Yes.

8  Q.   And you know he also traveled to New York?

9  A.   Yes.

10 Q.   Okay.  Now, Mr. Moody's recollection based on his

11 testimony was he never heard anything about expenses.

12      Does your recollection -- is it the same as Mr. Moody's or

13 different?

14 A.   I have no idea.  I believe we started with the same

15 documents.  I'm not -- I can't recall at the time.  It's been a

16 long time.

17 Q.   Independent of the documents, did you ever have any

18 discussion with Mr. Moody about whether expenses would have to

19 be taken out of the investment?

20 A.   No.

21 Q.   You don't recall having such a discussion?

22 A.   I do not recall the discussion.

23 Q.   Do you recall him ever asking about it?

24 A.   Yes.

25 Q.   And what did you tell him?

1   A.   It was on -- I don't know if it was -- it was not on the

2   first deposit he made but on the second.

3   Q.   Okay.  So his first deposit was of a million dollars in

4   December of 2000, correct?

5   A.   Correct.

6   Q.   And the second one was a million and a half in March of

7   2001?

8   A.   Correct.

9   Q.   You're saying what, in advance of the second one there was

10  some questions about expenses?

11  A.   He had asked if there would be -- what would be taken out

12  of that million and a half dollars.

13  Q.   And he asked that of whom?  You?

14  A.   Of me.

15  Q.   Anybody else present when it was asked?

16  A.   I can't -- I do not know if anyone else was present.  I

17  think we were alone.

18  Q.   Okay.  So this meeting took place sometime January,

19  February, or early March of 2001?

20  A.   Yes.

21  Q.   Okay.  And as far as you recall, was it a meeting in

22  person?

23  A.   Yes, we were together.

24  Q.   Okay.  And what is your recollection in terms of what you

25  told him?

1   A.   I told him that the money would be held for only one

2   purpose and that it would not be used for anything else.

3   Q.   So you told -- your statement to him was that it would not

4   be used for expenses?

5   A.   Correct.

6   Q.   So you lied to him?

7   A.   Yes, sir.

8   Q.   And you knew based on other people's agreements that

9   monies could be used for expenses?

10  A.   Yes.

11  Q.   Now, in the same binder -- if you still have the black one

12  in front of you, correct?

13  A.   Yes.

14  Q.   Exhibit B, Proposed Exhibit B --

15          THE COURT:   "B" as in boy?

16          MR. TRACY:   Yes, Your Honor, thank you, "B" as in

17  boy.

18  Q.   (BY MR. TRACY)   Have you ever seen this article before

19  that is called, "An Introduction to Bank Debenture Trading

20  Programs"?  And just so you know, behind B is Exhibit B1 which

21  is just a larger-print version of the same article.

22  A.   Thank you.  Thank you.

23  Q.   But if you would have seen it, it would probably be in the

24  form of the first Exhibit B.

25  A.   I -- I don't think I've seen this before.

*Q.* Okay. Just to test your recollection a little bit on it, this may have something to do with some documents that Mr. Clyde or Mr. Jepson gathered about the time that Mr. Clyde was making his investment.

Does that refresh your recollection at all?

*A.* Um, no, I -- I had done some research and was trying to find information, but I can't remember if I saw this document or not.

*Q.* Okay.

*A.* I'd have to look at it in more detail.

*Q.* Okay. We'll leave it at that for now. Thank you.

Now, all of the investments that were made by the various people, was Mr. Moody's amongst the last ones?

*A.* Yes. Yes.

*Q.* March of 2001?

*A.* Yes.

*Q.* So no money -- new money came in after that; is that correct?

*A.* That's what I can recollect.

*Q.* Okay.

*A.* I did not have any other contracts that I'm aware of.

*Q.* And after that fact, you never tried to go back and get new money from Mr. Moody?

*A.* After -- after the million and a half?

*Q.* After the million and a half.

1    A.    No, I did not.

2    Q.    You didn't go back to Mr. Ramsey for new money?

3    A.    No.

4    Q.    You didn't go back to Mr. Clyde for new money?

5    A.    No.

6    Q.    And as far as you're aware, did Mr. Heshelman ever do

7    that?

8    A.    I would have no way of knowing that.

9    Q.    Okay.  But to your recollection, do you recall from

10   talking to these people, did any of them put new money in after

11   roughly March of 2001?

12   A.    No.

13   Q.    Now, on your direct we heard about some other deals that

14   didn't go so well for you that had, as I understood it, nothing

15   to do with Mr. Heshelman.

16   A.    Correct.

17   Q.    For example, this Chuck Bunting deal Mr. Heshelman knew

18   nothing about, correct?

19   A.    Correct.

20   Q.    That took place, what, in the '06-'07 time frame?

21   A.    Yes.

22   Q.    And one of the deals with Mr. Bunting, what was it for,

23   $40,000 or something?

24   A.    Yes.

25   Q.    Did Rameel Robinson get involved in that somehow, or did

1    you use his name?

2    A.    Yes.

3    Q.    That's a former 1989 University of Michigan basketball

4    player when they won the championship, right?

5    A.    Right.

6    Q.    Do you even know Rameel Robinson?

7    A.    No.

8    Q.    So you told Mr. Bunting that, what, Mr. Robinson was short

9    on some cash for a deal down in Florida?

10   A.    Yes.

11   Q.    And you got that 40 grand from him?

12   A.    Yes.

13   Q.    I take it none of it has been paid back?

14   A.    A small amount had been paid back.  Not much.

15   Q.    You paid him like a thousand dollars last week?

16   A.    Yes.

17   Q.    And then you also got Mr. Bunting or his partners involved

18   with another $150,000 deal?

19   A.    I didn't know it was that much.

20   Q.    Okay.  How much did you think it was?

21   A.    I had thought it was between 75 and a hundred thousand

22   dollars.

23   Q.    Okay.  But that one has also gone by the wayside?

24   A.    I don't know.  I believe so.

25   Q.    Okay.  And then this Denise Du Val.  I believe it's D-U

1    space capital V as in Victor A-L; is that right?

2    A.    That's right.

3    Q.    She was somebody else?  She had something to do with

4    HumaniGroup International?

5    A.    Yes.

6    Q.    So that's H-U-M-A-N-I and then G-R-O-U-P, all one word,

7    HumaniGroup International?

8    A.    Yes.

9    Q.    And this goes back to what, the '05-'06 time frame as

10   well?

11   A.    Yes.

12   Q.    Okay.  So Exhibit H, Proposed Exhibit H, for example, if

13   you can turn to that in your black binder.  And there's sort of

14   a group of pages here.  The first page of Proposed Exhibit H,

15   is that some emails --

16   A.    Uh-huh.

17   Q.    -- back and forth between you and Denise?

18   A.    Yes.

19   Q.    And you were giving her what, some update about the

20   investment, and she's inquiring about it?

21   A.    Yes.

22   Q.    Okay.  And these emails are from January 25 of '06,

23   correct?

24   A.    Yes.

25   Q.    And then the second page, this is a letter sent by

1   certified mail on the HumaniGroup stationary; is that correct?

2   A.   Yes.

3   Q.   And this one is dated January 31 of '06?

4   A.   Yes.

5   Q.   And it's from Denise to you?

6   A.   Yes.

7   Q.   And again, this pertains to her requesting monies back?

8   A.   Yes.

9   Q.   And the third page of the letter, this one is from a

10  Caesar Gaton, G-A-T-O-N?

11  A.   Yes.

12  Q.   Did you know who that was?

13  A.   That was an associate of Denise Du Val's.

14  Q.   So he was involved with the investment as well?

15  A.   Yes.

16  Q.   And he's authorizing Denise to do what she needs to do to

17  intervene on behalf of getting the money back?

18  A.   Yes.

19  Q.   Now, in here it seems like -- on direct you said something

20  about the investment being 12,000 or something.  Here it's

21  talking about 25,000.  What's your recollection on that?

22  A.   There was -- Mr. Gaton had put in $25,000, I believe.

23  Q.   So the total investment was actually --

24  A.   Thirty-seven, yeah.

25  Q.   So 12,000 pertaining to Denise Du Val and the

1   HumaniGroup --

2   A.   Yes.

3   Q.   -- and then an additional 25,000 from Mr. Gaton?

4   A.   Yes.

5   Q.   And none of that got paid back?

6   A.   Correct.

7   Q.   And then the final page of Proposed Exhibit H, another set

8   of emails between you and Miss Du Val, correct?

9   A.   Correct.

10  Q.   And these are in the July 2006 time period?

11  A.   Yes.

12  Q.   And you've seen all these documents before?

13  A.   Yes.

14          MR. TRACY:  Your Honor, I would move for the

15  admission of Defense Exhibit H.

16          THE COURT:  Mr. Mekaru.

17          MR. MEKARU:  No objection.

18          THE COURT:  It's admitted.

19  Q.   (BY MR. TRACY)  Now, I don't think we got quite sufficient

20  details, at least for me, as it pertains to Mr. Fodor.  Is it

21  F-O-D-O-R?

22  A.   Yes.

23  Q.   Peter is his first name?

24  A.   Yes.

25  Q.   Now, I heard you describe it on direct.  In addition to

1    maybe making some investment either directly or indirectly into

2    the investments with Mr. Heshelman, he also invested a separate

3    million dollars with you?

4    A.    Yes.

5    Q.    What was that for?  What was he investing in?

6    A.    We were -- I had told him the same story I told Michael, I

7    mean, that we had used, and I was using that story to raise

8    capital myself.

9    Q.    Okay.  But did you -- were you over in Switzerland and

10   doing any of that?

11   A.    No.

12   Q.    Okay.  So instead of bringing an additional million

13   dollars -- I take it Investors First would have been happy with

14   another million dollars to use, right?

15   A.    Right.

16   Q.    So is this like the old expression, "There's no honor

17   among thieves" or something?  Or what's the point?  Why weren't

18   you putting it -- if you're feeling like you're scamming

19   somebody, why aren't you putting the million dollars into

20   Investors First if you thought that was just all a scam anyway?

21   A.    I didn't do it.  I didn't want to.

22   Q.    So you were keeping it for yourself?

23   A.    Yes.

24   Q.    Okay.  But in reality Mr. Heshelman was in New York City

25   in meetings and so forth with Mitch Miller and others, correct?

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1    A.    Yes.

2    Q.    And he was living and had a business over in Switzerland,

3    in Zurich, correct?

4    A.    Yes.

5    Q.    You didn't have any of those things?

6    A.    Correct.

7    Q.    Now, what happened to Mr. Fodor's million dollars that he

8    invested with you?

9    A.    Well, the money came from -- I did not meet Mr. Fodor

10   until seven years later.

11   Q.    Okay.

12   A.    But it came through Larry Telford, and I used the funds to

13   buy a house.

14   Q.    That's the money you used to buy the house?

15   A.    Yes.

16   Q.    Did you ever pay Mr. Fodor back any of his money?

17   A.    No.

18   Q.    You gave him promissory notes and the like?

19   A.    Yes.

20   Q.    But those ended up being worth nothing?

21   A.    Correct.

22   Q.    Do you know whether Mr. Fodor got any of his investment

23   back that he invested with Mr. Heshelman?

24   A.    I do not know.

25   Q.    Now, if we could bring up Government Exhibit 6C, Kathy.

1    Kind of like we did this morning with Mr. Vos.  And if you can

2    catch like the last four or five lines there.  That's okay.

3    That's fine.  We can stay there for a second.

4         This is the first thing of 6C, and Mr. Vos is the FBI --

5    just so you understand the context, Mr. Sherwood -- he

6    testified this morning that he created spreadsheets or summary

7    charts off of Mr. Warner's -- amongst other things --

8    Mr. Warner's trust account so he could know where monies were

9    flowing, okay?  So that's what we're going to be looking at.

10        So if we go to the second page, and you see how the name

11   Kennedy Funding, Inc. is highlighted there?

12   A.   Yes.

13   Q.   And there's a wire from Mr. Warner's trust account in

14   October of '99 for $250,000 to Kennedy Funding.  Do you see

15   that?

16   A.   Yes.

17   Q.   Do you know what Kennedy Funding is?

18   A.   I know what they are, yes.

19   Q.   What are they?

20   A.   They are a mortgage company, a funding company.

21   Q.   Okay.  And they are out of New Jersey?

22   A.   I believe so.

23   Q.   Okay.  If you look at Proposed Defendant's Exhibit U,

24   which are some excerpts from Kennedy Funding's website.  Have

25   you ever gone to their website before?

1    A.    Yes.

2    Q.    Okay.  It's something you've looked at?

3    A.    Yes.

4    Q.    Does the -- there's three pages here.  There's the home

5    page, and then there's an overview of the company is page 2,

6    and then there's our story on page 3.

7          Have you looked at this stuff before?

8    A.    Yes.

9    Q.    The background of Kennedy Funding?

10   A.    Yes, I've seen this.

11   Q.    Okay.  Does this purport to be essentially in the same

12   format or basic form that you see on their website?

13   A.    I believe so.

14         MR. TRACY:  Okay.  Your Honor, I move for the

15   admission of Defense Exhibit U.

16         THE COURT:  Mr. Mekaru.

17         MR. MEKARU:  I guess my problem is, again, it's just

18   a foundation here.  I'll tell you what, that's fine, let's just

19   move for the admission.  We'll talk about this twice.  That's

20   fine.  No objection.

21         THE COURT:  I have some real serious questions about

22   this exhibit, Mr. Tracy.  I really, on a number of levels, I

23   really don't see the foundation, the necessary foundation.  So

24   even though the government seems not to have an objection, I

25   just have some serious questions about your foundation on this.

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1          I mean, you can take all kinds of things off the
2     Internet.  We've talked to the jury about not doing this exact
3     kind of thing.
4          MR. TRACY:  But they are not doing it, Your Honor.
5     We have done it with the witness who has looked at it himself.
6     I can ask him questions independently, but I've moved for the
7     admission, and there's no objection, so if the Court is not
8     going to let it in, then I'll move on.
9          THE COURT:  That's the ruling.  It's not in.
10    Q.   (BY MR. TRACY)  Okay.  Are you aware that Kennedy Funding
11    was founded back in the 1980s?
12    A.   I have no idea when they were founded.
13    Q.   Okay.  But you've heard of them in your --
14    A.   Yes.
15    Q.   -- in your circles in terms of what you've done in the
16    financial arena?
17    A.   Yes.
18    Q.   This $250,000 that was wired through Mr. Warner's account
19    to Kennedy Funding, were you involved with that?
20    A.   I don't think so.
21    Q.   Okay.  Do you know what the purpose was for sending them
22    the money related to any investment or anything?
23    A.   No.
24    Q.   Okay.  Did you ever happen to hear anything after that
25    investment was made pertaining to any status of anything with

1    Kennedy Funding?

2    A.    Not that I can recollect.

3    Q.    Okay.  If we could go to the next page, please.

4          Now, in the middle of the page there you see highlighted

5    in December, later December -- well, the day before Christmas

6    in '99, a $150,000 wire transfer over to Merrill Lynch.

7          You know who Merrill Lynch is?

8    A.    Yes.

9    Q.    Do you know whether or not there was any investment

10   platforms, trading-type things going on with Merrill Lynch?

11   A.    No.

12   Q.    You don't know one way or the other.

13         Okay.  Okay.  If we could go to page 5 of 9.  And first,

14   Kathy, if we could start at the top of the page, that first

15   four or five of them, please.

16         So you'll see again on June 23 a wire going of 35,000 over

17   to Merrill Lynch, correct?

18   A.    Yes.

19   Q.    And then below that you see $500,000 going to

20   Environmental Training Institute.  Do you see that?

21   A.    Yes.

22   Q.    Do you know anything about any investments being made for

23   a trading platform, that type of thing, through Environmental

24   Training Institute?

25   A.    No.

1    Q.   And then if we go -- span out again, we go to the bottom

2    of the page, this October 2000 million-dollar investment going

3    to Puffin Investment Company.   Do you see that?

4    A.   Yes.

5    Q.   And were you aware that a gentleman by the name of

6    Alan Shepherd was associated with Puffin Investment?

7    A.   I know that now.

8    Q.   And how do you know that now?

9    A.   I was asked that question two or -- two or three weeks

10   ago.

11   Q.   In preparation for this?

12   A.   Yeah.   When I was going through my plea agreement.

13   Q.   Okay.   And you know that now, but you didn't know it back

14   in the 2000 time period?

15   A.   No.

16   Q.   So you don't know whether or not the million dollars being

17   sent to Puffin had something to do again with an investment

18   platform, trading platform-type thing?

19   A.   No, I don't.

20   Q.   Could you look at Proposed Defendant Exhibit R that's in

21   the black binder in front of you, please.

22   A.   Yes, I have it.

23   Q.   Okay.   Mr. Moody previously testified that Charles Pinney

24   approached him, and Charles Pinney indicated that he would pay

25   Mr. Moody $18,000 if Mr. Moody would get the government to back

CROSS-EXAMINATION OF BRYCE HENRY SHERWOOD

1    away from its investigation of you.

2         Were you aware of that?

3    A.   No.

4    Q.   Do you know who Charles Pinney is?

5    A.   Yes, I do.

6    Q.   He's a friend of yours?

7    A.   No.

8    Q.   Somebody you know how?

9    A.   We were managing a 4X trading account for him.

10   Q.   What does that mean?

11   A.   I was trading currency for Mr. Pinney.

12   Q.   When?

13   A.   2003 or '4.

14   Q.   Okay.  So after the investments were made by Mr. Moody but

15   still during the period of time that you were speaking with

16   him?

17   A.   Yes.

18   Q.   Okay.  And did you ever see a copy of this Defendant's

19   Exhibit R before?

20   A.   No, I did not.

21   Q.   You've never seen it?

22   A.   No, sir.

23   Q.   You're referred to in it, correct?

24   A.   Yes.

25   Q.   Okay.  But nothing that ever crossed your desk?

1    A.    That's correct.

2    Q.    Okay.  Do you know whether Mr. Mickelson also knew

3    Charles Pinney?

4    A.    Yes, he did.

5    Q.    And how did he know him?

6    A.    I don't know how he knew him.  He introduced me to him.

7    Q.    Okay.  As far as you are aware, did Mr. Heshelman ever

8    know Mr. Pinney?

9    A.    I think -- yes, I think they spoke after the fact, after

10   this happened, after . . .

11   Q.    But you don't know for sure one way or the other?

12   A.    Yeah, I know that Michael knows him.  I know

13   Michael Heshelman knows him.

14   Q.    Okay.  But the two of them, Mr. Pinney and Mr. Heshelman,

15   weren't involved --

16   A.    That's correct.

17   Q.    -- the way you and Mr. Pinney were?

18   A.    That's correct.

19   Q.    Now, Government Exhibit 3 -- if we can bring that up,

20   Kathy, please.

21         We saw this -- maybe it will be okay on the screen,

22   Mr. Sherwood.  We saw this during your direct, correct?

23   A.    Yes.

24   Q.    Now, you described it as an email, I believe, right?

25   A.    Um, it was an email or an attachment to an email.

1    Q.   Because there's no email addresses here, but this could

2    have been an attachment to an email?

3    A.   That's correct.

4    Q.   But this is between you and Mr. Warner.  That's the "Ken"

5    in here, right?

6    A.   That's correct.

7    Q.   And there's no indication on this that there was any copy

8    that was sent to Mr. Heshelman, correct?

9    A.   Um . . .

10   Q.   I'm just asking on this document.

11   A.   On this document, no.

12   Q.   Okay.  And these are instructions that you sent to

13   Mr. Warner regarding payments to be made, correct?

14   A.   Yes, sir.  Yes, sir.

15   Q.   Now, the account in question where these monies are coming

16   out of, that's Mr. Warner's account, correct?

17   A.   Correct.

18   Q.   It's his trust account?

19   A.   Correct.

20   Q.   It's not an escrow account, it's a trust account?

21   A.   Yes.

22   Q.   And so the only person with authority over that account is

23   Ken Warner?

24   A.   Yes.

25   Q.   Not Michael Heshelman, correct?

1    A.    I would assume that, yes.

2    Q.    Not Bryce Sherwood?

3    A.    Correct.

4    Q.    And in this attachment or email, whatever it was, there

5    are no monies going to Mr. Heshelman, correct?

6    A.    That's correct.

7    Q.    There's monies going to you and Mr. Mickelson and to

8    others, but nothing is going on to Michael, correct?

9    A.    Correct.

10   Q.    Now, if we can also bring up Government Exhibit 1, please,

11   Kathy.

12        You can -- also, I didn't -- except this one, it can be

13   closed and just bring up 1.  I'm sorry.

14        Now, this is another one of those trust agreements or

15   promissory notes somewhat similar to one we saw with Ramsey

16   earlier, correct?

17   A.    Yeah.  I'd like to see it closer, but yes.

18   Q.    Okay.  Go ahead.  Just tell me when you have the binder in

19   front of you.

20   A.    Yes.

21   Q.    This one involves Mr. Moody, though?

22   A.    Yes.

23   Q.    And if we go to, I believe it's page 3, this one is

24   signed.  I mean, have you seen Mr. Heshelman's signature

25   before?

1    A.    Yes.

2    Q.    Does that appear to be his signature?

3    A.    Yes.

4    Q.    And it looks like you witnessed it, correct?

5    A.    Yes.

6    Q.    Is that your signature?

7    A.    Yes.

8    Q.    And then it looks like Mr. Moody's signature.  Does that

9    appear to be his from seeing it before?

10   A.    Yes.

11   Q.    And here at the bottom it says -- if we can scan out on

12   the bold stuff with Ken Warner.  Thank you.

13         Kenneth Warner Attorney at Law Trust Account, correct?

14   A.    Correct.

15   Q.    It doesn't say anything about an escrow account, correct?

16   A.    Correct.

17   Q.    Now, did you tell Mr. Moody something about an escrow

18   account?

19   A.    I can't remember if it's an escrow account or trust

20   account at this time.  I think I said escrow account.

21   Q.    Okay.  But that would have been your mistake?

22   A.    Yes.

23   Q.    Because it's a trust account?

24   A.    Yes.

25   Q.    And that's not something Mr. Heshelman told you to tell

1    him, that's just a mistake you made?

2    A.    If I made that mistake.

3    Q.    Okay.  Now, just briefly on this humanitarian stuff that

4    came up on your direct, because we didn't get into the detail

5    of that very much.  I take it that doing humanitarian projects,

6    that's fine, right?  You don't have any quarrel with that?

7    A.    That's correct.

8    Q.    And if monies were returned out of the investments, was

9    the game plan that some of the monies could be returned to the

10   investors but that some monies would also be available for

11   quote-unquote humanitarian projects?

12   A.    Yes.

13   Q.    And was the strategy related to that a tax strategy?  In

14   other words, let me flesh that out so you know where I'm going.

15        If $20 million was coming back to Mr. Moody and he wanted

16   to take 10 million of it directly but then 10 million of it

17   going towards a humanitarian project, had some advice been

18   given that that might be a tax strategy to avoid income that

19   would be attributed to him?

20   A.    I don't know.

21   Q.    You didn't investigate that?

22   A.    No.  There was --

23   Q.    Go ahead.

24   A.    There was a comment made that the particular money would

25   go to charity or nonprofit organizations or humanitarian

1  projects, but I don't remember -- I did not give tax advice.

2  Q.   Okay.  Proposed Exhibit Q in the black binder,

3  Defense Exhibit Q, is this a bank statement you've seen before?

4  A.   Yes.

5  Q.   From TCF Bank?

6  A.   Yes.  Yes.

7  Q.   In Ann Arbor, correct?

8  A.   Correct.

9  Q.   This is in your name?

10 A.   Yes.

11 Q.   And also in Larry Telford's name?

12 A.   Yes.

13 Q.   And the first page appears to be a page from a

14 September 19th, 2000, statement, correct?

15 A.   Correct.

16 Q.   And the second page, is that just perhaps a continuation

17 of that?

18 A.   I would believe so.

19 Q.   And then the third page, it's got I think it's a

20 government page number at the bottom, 236.

21 A.   Yes.

22 Q.   This is a portion of the statement or maybe the whole

23 statement from October 18th of 2000, correct?

24 A.   Correct.

25 Q.   And this is again relating to an account of yours?

1   A.   Yes.

2            MR. TRACY:   Okay.  I would move for the admission

3   of Defense Exhibit Q.

4            THE COURT:   Mr. Mekaru.

5            MR. MEKARU:   Your Honor, well, I realize we don't

6   have a foundation for this.  The relevance of this I think is

7   getting a little far afield.  We've already had lots of

8   testimony about the fact that this witness took money from

9   these individuals, even more documents on it, but I think we're

10  getting a little far afield from what's at issue here.  I think

11  he's admitted he's lied and stole from other people.

12           THE COURT:   Well, in looking at these bank

13  statements, Mr. Tracy, I'm having a hard time seeing the

14  relevance to this case.

15           MR. TRACY:   Well, Larry Telford is on there,

16  Your Honor, and the government brought him up during the

17  direct, and we don't know much about him, and now he and

18  Mr. Sherwood are on an account together.  I think I'm entitled

19  to ask about him.

20           THE COURT:   Well, you can ask him about Mr. Telford.

21  I just don't see what the record has to do --

22           MR. TRACY:   That's fine.  The government has about

23  five inches of bank statements, and I'm trying to get in three

24  pages, but that's fine.  I think this is the only bank

25  statement I have, Your Honor.  And my binder is nice and small,

1    and they have two of them, but okay.

2    Q.   (BY MR. TRACY)   Why were you on a bank statement with

3    Larry Telford?

4    A.   We were trying to do some things together.

5    Q.   And what did these things involve?

6    A.   We were trying to find other investments we could make.

7    Q.   That related to what?

8    A.   That related to trying to recover and to find a way to

9    make money to recover the losses.

10   Q.   Losses related to all of this?

11   A.   To the money that they put in with -- that he put in with

12   Michael.

13   Q.   Okay.  So you were trying to find a recovery?

14   A.   Yes.

15   Q.   Just like Mr. Heshelman, as far as you were aware, was

16   trying to do same thing and get a return in his efforts in

17   New York and Switzerland, correct?  As far as you knew, that's

18   what he was trying to do?

19   A.   Yes.

20   Q.   Okay.  Now let's just end with the bus, for example.  And

21   maybe your memory is not as good as Mr. Moody's.  But I believe

22   on direct you said that the discussions related to this bus

23   occurred between Mr. Moody and Mr. Heshelman and you weren't

24   hardly involved.

25   A.   I didn't say I was not hardly involved.

1    Q.    Okay.  What's the scenario then?

2    A.    Mr. Moody came and wanted to talk about the need for a bus

3    for the church, and he wanted -- and the church -- he had a

4    very successful ministry going with the young people, and there

5    was always transportation problems.  And he thought that if he

6    could get a bus, it would be good.  So we had talked about it,

7    and I can't remember where we talked about it.  If it was on

8    the phone or in person.

9    Q.    Let me just be careful.  Now you're starting to say "we."

10   This is you and Mr. Moody talking?

11   A.    I'm sorry, myself and Mr. Moody.

12   Q.    No Mr. Heshelman?

13   A.    No Mr. Heshelman.

14   Q.    He doesn't know anything about it at this point?

15   A.    At the first point, no.

16   Q.    Okay.

17   A.    And I remember saying we needed to talk to -- myself and

18   Mr. Moody would need to talk to Michael about the bus, about

19   getting a bus.

20   Q.    Okay.  And so your recollection is it had nothing to do

21   with the bus being donated?  You don't recall the conversation

22   between you and Mr. Moody?

23   A.    No, I said that was the idea, the objective was to have a

24   bus given to the church.

25   Q.    Okay.  And did you turn him on to some buses that were

1    down in Atlanta for that effect?

2    A.   I -- we looked on the Internet.  We were searching for

3    buses.  I can't -- I can't recall if I showed him some websites

4    or gave him some websites or phone numbers.  I don't know if I

5    directly found that bus or not, but I think we found some spots

6    where buses were available.

7    Q.   And the "we" would be you and --

8    A.   Myself and Mr. Moody.

9    Q.   Again, no Mr. Heshelman?

10   A.   No Mr. Heshelman.

11   Q.   Okay.  So at this point in time the discussions were

12   between you and Mr. Moody and that's it?

13   A.   That was -- that was the first initial discussion.

14   Q.   Okay.  And then ultimately sometime later the bus is

15   purchased?

16   A.   I want to interrupt if I could.  We had an initial

17   discussion, and then there was a discussion passed along, and

18   we talked to -- or as he talked with Mr. Heshelman, I was

19   trying to find some buses available, and I'm not sure if I was

20   the one that found this particular bus or he found it or talked

21   to somebody else or not.

22   Q.   Okay.  Do you ever recall a conversation with

23   Mr. Heshelman where you raised the issue of the bus and he

24   simply said to you, "Look, if Mr. Moody wants to use his money

25   for that, it's his money, we'll buy the bus and it will be

1    there for the church"?  Did you have that conversation with

2    Mr. Heshelman?

3    A.    No.

4    Q.    You don't ever recall that?

5    A.    I do not recall that.

6             MR. TRACY:  Nothing further, Your Honor.

7             THE COURT:  Mr. Mekaru, do you have any redirect?

8             MR. MEKARU:  I'll try to be quick.

9                          REDIRECT EXAMINATION

10   BY MR. MEKARU:

11   Q.    You were asked questions, let's see, whether Mr. Mickelson

12   gave you any money out of the monies he received.  So if he had

13   given you a substantial amount of money, would you have

14   remembered that?

15   A.    Yes.

16   Q.    Mr. Mickelson.  If Mr. Mickelson was giving substantial

17   portions of money, 10,000, $20,000, would you have remembered

18   something like that?

19   A.    Yes.

20   Q.    So did that ever happen?

21   A.    I do not believe so.

22   Q.    Now, counsel was asking about all of these -- about these

23   people who were talking about deals.  That Mr. Heshelman is in

24   Switzerland doing deals and talking about deals.  And he's in

25   New York City and talking about deals.  And he's introducing

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   you to people who are talking about deals.  So everything

2   you've heard about all these deals, is that all coming from the

3   oral representations of these people?

4   A.    Yes.

5   Q.    Did you see any sort of documentation to substantiate that

6   they were actually doing these deals?

7   A.    No.

8   Q.    Any sort of records?  How about monthly account

9   statements?

10  A.    No.

11  Q.    Any sort of bank statements showing that they have got

12  accounts?

13  A.    No, sir.

14  Q.    So everything you've heard about all this trading

15  activity, is it just coming from word of mouth from all these

16  people?

17        MR. TRACY:  Objection, Your Honor.  We went over this

18  ground in direct, and he's covered it already.

19        THE COURT:  I think that's correct, Mr. Mekaru.

20  Q.    (BY MR. MEKARU)  All right.  Now, at the times of these

21  meetings with these other individuals, this is on cross, you

22  said that you didn't think that these investments could

23  succeed, right?

24  A.    Correct.

25  Q.    You said you thought that the yield was too high.

1    A.    Correct.

2    Q.    That was part of it.  And also that the deal was

3    constantly changing.

4    A.    Correct.

5    Q.    In addition, did you also have some sense that the money

6    was also gone?

7    A.    Yes, I did.

8    Q.    So there was no money to be had for these deals?

9    A.    That is what I believed.

10   Q.    Now, counsel had brought up this point that you were a

11   Series 7 license.

12   A.    Yes.

13   Q.    That's the registered representative licensing.

14   A.    Yes, sir.

15   Q.    And there's also some tests and examinations, and there

16   are licensing for investment individuals.

17   A.    Yes.

18   Q.    Series 63 for the multistate, something along those lines.

19   And there may be some registration for certified financial

20   advisors.  There may be a whole nother area --

21   A.    I did not have that.  I did not have that license.

22   Q.    You didn't have that, right?

23   A.    No, I had a 63 and a 7.  And a 63 was a -- and I also had

24   an insurance license.

25   Q.    Okay.

1    A.    A 63 is not just multistate.  It's more of an able to sell

2    brokerage products but not individual securities.

3    Q.    So you had some background in these financial instruments?

4    A.    Yes.

5    Q.    Stocks and bonds.  In your training and going through the

6    study for this licensing, and in your experience in the

7    brokerage industry, had you ever done much of anything with

8    this -- these buy/sell agreements and the bonds that

9    Mr. Heshelman was speaking of?

10   A.    No, I did not.

11   Q.    So the information that you learned about all of this, did

12   this all come pretty much from Michael Heshelman?

13   A.    Yes.

14   Q.    Now, was he conversant, though, in some of the terminology

15   of the brokerage industry?

16   A.    Yes, very.

17   Q.    You talked about debentures, tranches.  These are all

18   terms of art for securities, right?

19   A.    Correct.

20   Q.    So did he at least have the aura of understanding some of

21   these instruments?

22   A.    Yes.

23   Q.    And did he oftentimes pass on that same sort of

24   information to potential investors?

25   A.    Yes.

1    Q.   And as far as you know he is not a registered

2    representative, he's not a certified financial advisor, he's

3    not licensed in any way.

4    A.   Yes.

5    Q.   Now, you were also asked a question on cross whether

6    Mr. -- excuse me -- whether Pastor Moody had requested any

7    money back, and you weren't actually sure.

8         He was asking about where his money is and when this deal

9    is going to be done and when he could get some money back.

10   A.   Yes.

11   Q.   But the words of "Give me my money back" may not have

12   actually been uttered?

13   A.   Correct.

14   Q.   But any time anybody was asking about getting their money,

15   what were you doing in response?

16        MR. TRACY:  Objection, Your Honor, it assumes that

17   somebody did.  There's no foundation for that.

18        THE COURT:  Well, he's already -- he's testified that

19   Mr. Moody asked for some of his money back.  When was he going

20   to get his money back.  And I think he testified that some

21   others, including Ms. Du Val -- am I correct about that?

22        MR. TRACY:  She's outside the investment, though.

23        THE COURT:  Well, I understand that, but . . .

24        MR. TRACY:  All right.

25   Q.   (BY MR. MEKARU)  So when people, Mr. Ramsey, Mr. Moody,

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1   other individuals who you had communication with, when they

2   were asking about when is money going to be coming in, whether

3   it be getting their money back or when is the deal going to be

4   done, are asking about getting some sort of return of money

5   coming their direction, weren't you just delaying them and

6   trying to put them off?

7   A.   Yes.

8   Q.   Every single time?

9   A.   Yes.

10  Q.   Lulled them into believing the deal is almost going to be

11  done?

12  A.   Yes.

13  Q.   To avoid that final -- any way you could to avoid that

14  final demand of "I just want to close out"?

15  A.   Yes.

16  Q.   All right.  Now, counsel has gone over a contract here

17  that I think was Defense Exhibit V where Mr. Ramsey's deal

18  included an express provision for expenses, right?

19  A.   Yes.

20  Q.   And I think counsel covered the fact that there were other

21  contracts with other investors that may have had a similar sort

22  of express provision for expenses, right?

23  A.   Correct.

24  Q.   But I think as we've gone over, the format, this -- well,

25  would you please call -- thank you.

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    We don't have V.  Well, do you have a way to put that

2   Exhibit 1 on one side and V next to it?  Or not.

3    Well, the joint venture trust agreement, that language is

4   similar between these two exhibits, right?

5   A.   Yes.

6   Q.   And in terms of some of the other language about how this

7   is in agreement with Investors -- here we go -- Investors First

8   Ventures, I think even the address is similar, right?

9   A.   Yes.

10   Q.   All right.  And is there some sort of promissory note

11   aspect to Exhibit V?  Maybe page 2, if you can go through it.

12   A.   I don't have -- on the one on the left I see the

13   promissory note.

14   Q.   Yeah.

15   A.   Yes.  I'm sorry.

16   Q.   So it's a different document, right?

17   A.   Yes.

18   Q.   It's a different type of agreement, right?

19   A.   Yes, it is.

20   Q.   You don't see anything like that, and you don't see

21   anything in Exhibit Number 1 where there's an agreement for

22   expenses?

23   A.   That's correct.

24   Q.   So the deal with Mr. Ramsey was different than the deal

25   with Pastor Moody?

1  A.   Yes.

2  Q.   And your express representation to Pastor Moody -- that's

3  with respect to the first million dollars, right?  Contract --

4  Exhibit Number 1, that promissory note, it is for the million

5  dollars, and that's with respect to the December 2000 monetary

6  transaction, right?

7  A.   I believe so.

8  Q.   All right.  And with respect to the $1.5 million

9  transaction, there was a mortgage that was put on that --

10  A.   Right.

11  Q.   -- to support that --

12  A.   Correct.

13  Q.   -- and there was an oral representation that no money

14  would come out of that for expenses?

15  A.   Correct.

16  Q.   Okay.  Just a few more points.

17       There was a comment here about "No honor among thieves."

18       You had used Mr. Heshelman's same story and pitched that

19  to I guess it was Mr. Telford, and ultimately that passed

20  through to Mr. Fodor, right?

21  A.   Yes.

22  Q.   And the suggestion, though, that since you're the one who

23  pitched it and was able to close that deal, you kept the money

24  to yourself rather than sharing it?

25  A.   Yes.

1    Q.   So as far as that portion of the deal, did you need

2    Mr. Heshelman's participation to further that deal?

3    A.   No.

4    Q.   Was there any complaint from Mr. Heshelman that you didn't

5    share any of that money with him?

6    A.   No.

7    Q.   Did you ever tell him that you got additional money from

8    him?

9    A.   No.

10   Q.   From him, "him" being Mr. --

11   A.   Telford.

12   Q.   -- Telford and Mr. Fodor.   Okay.   No, no, we'll move on.

13        All right.   Pull up Exhibit 6C, please.

14            MR. MEKARU:   Susan, can we switch over?

15   Q.   (BY MR. MEKARU)  6C.   All right.   This is where we were

16   with counsel on the summary of the -- don't worry about zooming

17   in -- of the statement.

18        Can we go to page 2.   All right.   Now we're going into the

19   actual transaction activity.

20            Now, counsel was pointing out that there was this

21   Kennedy Funding transaction.   It's towards the bottom.

22            MR. MEKARU:   If I can have my penlight.   Thank you,

23   Harper.

24   Q.   (BY MR. MEKARU)  Okay.   It's October of '99, right,

25   $250,000?   And it was also pointed out that there was this

*REDIRECT EXAMINATION OF BRYCE HENRY SHERWOOD*

1    Merrill Lynch in December of '99.  That might be on the next --

2              *THE CLERK:*  Keep your voice up.

3              *MR. MEKARU:*  Sorry?

4              *THE CLERK:*  Keep your voice up.

5    *Q.*   *(BY MR. MEKARU)*  December '99 Merrill Lynch.  Right?

6    $150,000.  And then we've got, excuse me, August of 2000 --

7              *MR. MEKARU:*  Keep going.  Oh, sorry.  Back up.

8    You're right.

9    *Q.*   *(BY MR. MEKARU)*  Puffin Investment.  All right.  And

10   pointing to all these transactions.

11       Mr. Sherwood, all of these transactions, did they all take

12   place prior to Pastor Moody's investments?  Pastor Moody's

13   first deposit was in December of 2000.  His next one was in

14   March of 2001.

15   *A.*   Yes, according to the ledger they did take place prior to

16   that.

17   *Q.*   So did any of Pastor Moody's money go to any of those

18   entities?

19   *A.*   No.

20   *Q.*   This is all predating anything that has to do with

21   Pastor Moody?

22   *A.*   Correct.

23   *Q.*   We've already, I think, gone over where Pastor Moody's

24   money went, right?

25   *A.*   Yes.

1   *Q.*   So to the extent this has any relevance, it might have

2   some relevance to somebody else's investment but not

3   Pastor Moody's?

4   *A.*   That's correct.

5   *Q.*   You said Kennedy Funding was a mortgage company?

6   *A.*   I believe they are a mortgage company, yes.  They do

7   funding on buildings and projects, and they are a bridge loan

8   company.

9   *Q.*   So -- all right.  A mortgage company.

10      If in the traditional sense if somebody is a customer of a

11   mortgage company, if they are sending money to a mortgage

12   company, wouldn't it be essentially repaying a loan that they

13   may have had with that mortgage company?

14   *A.*   Yes, but Kennedy Funding charges fees up front to do

15   projects.  They have an up-front charge.  I'm aware of that not

16   because of this situation, but I know Kennedy Funding does

17   charge for appraisals of sites, and they do that with an

18   up-front charge.

19   *Q.*   So it's a fee, but that's not an investment.

20   *A.*   That's correct.

21   *Q.*   Okay.  The instructions that you sent to Ken on

22   Exhibit Number 3.  All right.  He had asked whether you had any

23   authority on the account.  And the only person that can

24   actually move money out of that account was Ken Warner because

25   he was the account holder, right?

1    A.    Yes.

2    Q.    This is a trust account.   This is an attorney trust

3    account.   Isn't a trust account being held in trust for his

4    clients?

5              MR. TRACY:   Your Honor, we have no foundation that

6    this witness has any understanding of what an attorney trust

7    account is used for.   Objection.

8              THE COURT:   That objection is sustained.

9    Q.    (BY MR. MEKARU)   All right.   But whose client is

10   Ken Warner's?

11   A.    Michael Heshelman.

12   Q.    All right.   Now, there's this other last point, this

13   question about these humanitarian investments and that

14   discussion.

15        And there was all sorts of talk here about being able to

16   fund some of Pastor Moody's projects.

17   A.    Yes.

18   Q.    And there's some suggestion that it would have been easier

19   to use some of these deals and more money would be available to

20   fund these humanitarian projects, right?

21   A.    Right.

22   Q.    Was there some sense, then, that Pastor Moody might be

23   more recipient or more -- excuse me -- more willing to invest

24   this money and delay things with the hope that he would be able

25   to fund these humanitarian efforts as opposed to his own

1   personal benefit?

2   A.   I don't quite understand.

3   Q.   Did you have some sense here -- were you tapping into

4   Pastor Moody's desire to fund these humanitarian efforts by

5   dangling out the possibility of even larger monies being

6   available for this humanitarian -- these humanitarian projects?

7   A.   Yes.

8   Q.   Is that something you used to your benefit, that affinity

9   sort of connection?

10   A.   Yes.

11           MR. MEKARU:  Thank you.

12           THE COURT:  Mr. Tracy, do you have any recross?

13           MR. TRACY:  Yeah, just real briefly, Your Honor.

14   Thank you.

15           Kathy, if you could do like you did for Dan and bring

16   up Government Exhibit 1 and Defense Exhibit V together.

17                       RECROSS-EXAMINATION

18   BY MR. TRACY:

19   Q.   And Mr. Sherwood, it may be easier this time for you to

20   look at -- if you have the black binder in front of you with

21   Defendant's Exhibit V and you also keep the white one in front

22   of you with whichever -- the one that's got Government's

23   Exhibit 1 in it.  So if you have those close to one another,

24   that would be helpful, I think.

25           So Government Exhibit 1, again, that is involving

1    Mr. Moody, correct?

2    A.    Yes.  Yes.

3    Q.    And that's called Promissory Note and Joint Venture Trust

4    Warranty?

5    A.    Yes.

6    Q.    And you've seen that before in preparation for this trial?

7    A.    Yes.

8    Q.    Okay.  And then Defense Exhibit V, that's part of the

9    documents that pertain to Mr. Ramsey's investment, correct?

10   A.    Yes.

11   Q.    So, if you would, flip three pages and go to the fourth

12   page of Defense Exhibit V.

13   A.    Okay.

14   Q.    Okay?  Now let's compare apples to apples.  The Moody

15   document; the Ramsey document.

16        Now, these are both promissory notes and joint venture

17   trust warranties, correct?

18   A.    Correct.

19   Q.    And nowhere in Mr. Ramsey's warranty -- if you flip to the

20   second page, flip to the third page -- nowhere in the

21   promissory note and warranty for Mr. Ramsey does it say

22   anything about the expenses, correct?

23   A.    Correct.

24   Q.    Okay.  Now, when you flip back to the beginning of

25   Defense Exhibit V, which is the joint venture trust agreement

1    for Mr. Ramsey, that's where we get the layout of the expenses

2    that can be used, $280,000 for this portion of his investment,

3    280 out of the one million some, so nearly 25, 30 percent,

4    correct?

5    A.   Correct.

6    Q.   That's where that's set forth, right?

7    A.   Yes.

8    Q.   Now go back to Government Exhibit 1.  This is not the

9    joint venture trust agreement.  Nowhere in the Government

10   Exhibit 1 is that exhibit included, correct?

11   A.   Correct.

12   Q.   There's only the promissory note and joint venture trust

13   warranty, correct?

14   A.   Correct.

15   Q.   Through the government, Special Agent Wetherbee, the

16   attorneys you've met with, have you ever seen the joint venture

17   trust agreement between Mr. Moody and Investor First Ventures?

18   A.   No.

19   Q.   So as far as we're aware, since we're going to see other

20   ones later for other investors, there very well may be a joint

21   venture trust agreement between Mr. Moody and Investors First,

22   correct?

23   A.   I wouldn't know of it.

24   Q.   But there were for other investors?

25   A.   Yes.

*RECROSS-EXAMINATION OF BRYCE HENRY SHERWOOD*

1   Q.   But it's not here?

2   A.   It's not here.

3   Q.   And now, by the way, this Government Exhibit 1, this is

4   for the first million dollars that Mr. Moody invested, correct?

5   A.   I believe so, yes.

6   Q.   You see where it says "Promissory Note"?

7   A.   Yes.

8   Q.   $1 million, correct?

9   A.   Yes.

10  Q.   There's -- I can't find the date on the document, but this

11  would be the -- appears to be the first one that goes in in

12  December of 2000, right?

13  A.   Yes.

14  Q.   I'm not seeing the second investment of 1.5 million.

15       Are you?

16  A.   No.

17            MR. TRACY:  Okay.  Thank you very much.

18            THE COURT:  Can we excuse Mr. Sherwood?

19            MR. MEKARU:  Yes, Your Honor.

20            THE COURT:  Thank you, Mr. Sherwood.

21            MR. MEKARU:  The government next calls

22  Debra Featherstone.

23            THE COURT:  Ladies and Gentlemen, do you need a break

24  now, or can we hear from -- Mr. Mekaru, do you have any idea

25  how long this witness is going to be on the witness stand?

1          *MR. MEKARU:*  It should be pretty short.

2          *THE COURT:*  Translate that for me, would you?

3          *MR. MEKARU:*  About 15, 20 minutes.

4          *THE COURT:*  Ladies and Gentlemen, would you like to

5    take a break now, or would you want to wait to hear

6    Ms. Featherstone?

7          Okay.  We'll wait.  We'll hear Ms. Featherstone.

8    Thank you.

9          *THE CLERK:*  If you'll come forward, please.  Go over

10   here.  Raise your right hand.

11                   DEBRA KAY FEATHERSTONE

12                *(The oath was administered)*

13         *THE WITNESS:*  Yes.

14         *THE CLERK:*  Be seated, please.  State your name for

15   the record, please.

16         *THE WITNESS:*  Debra Kay Featherstone.

17         *THE CLERK:*  Would you spell your first name, please.

18         *THE WITNESS:*  D-E-B-R-A.

19         *THE CLERK:*  Thank you.

20                    DIRECT EXAMINATION

21   *BY MR. MEKARU:*

22   *Q.*   Ma'am, could you move the microphone closer to you,

23   please.

24   *A.*   Closer?

25   *Q.*   If you can, speak into it so we can all hear.

1    A.    Okay.

2    Q.    All right.  Ms. Featherstone, I'm not going to ask you

3    your specific street address, but can you just tell us the city

4    and street where you live?

5    A.    Salt Lake City, Utah.

6    Q.    And how long have you lived in Utah?

7    A.    Probably four years this time.

8    Q.    Prior to that did you live in California?

9    A.    Prior to that I lived in Arizona for a year, and then

10   prior to that Southern California.

11   Q.    Okay.  So if I may, then, sometime then during the time

12   period of 2000 to 2001 were you living in California?

13   A.    Yes, I was.

14   Q.    In the Huntington Beach area?

15   A.    Yes.

16   Q.    Back during that time period were you related -- have some

17   sort of relationship with Ron Featherstone?

18   A.    Yes.

19   Q.    And what was the relationship?

20   A.    He was my husband at that time.

21   Q.    Now, since then have the two of you divorced?

22   A.    Yes.

23   Q.    Is that something relatively recently?

24   A.    In the last year and a half.

25   Q.    All right.  Your ex-husband's health at this point, would

1    it be fair to say it's not good?

2    A.    Not good.

3    Q.    What's his condition?

4    A.    He's bedridden with MS, and he's in a home.

5    Q.    Now I want to turn your attention and dial the time back

6    here a little bit to focus for the most part on 2000 and 2001.

7          Did you have a bank account or an account with the Orange

8    County Teachers Federal Credit Union?

9    A.    Yes, sir.

10   Q.    All right.  And at some point did you have your husband

11   join you on that account?

12   A.    Yes, sir.

13   Q.    But nonetheless, since you originally opened the account,

14   were you the account holder?

15   A.    Yes, sir.

16   Q.    You have before you a binder.  I think that's going to be

17   the Volume I.  Could you get Volume II, please.  It's another

18   binder that's a white one.

19             THE COURT:  Probably that one up here.

20   Q.    (BY MR. MEKARU)  Could you turn to 16, please.

21         All right.  Is it there in front of you?

22   A.    Uh-huh.

23   Q.    16 and 16A.  Would you flip back to 16A first.  Is 16A the

24   signature page or the opening account document --

25   A.    Uh-huh.

1    *Q.*    -- for that account?

2    *A.*    Uh-huh.

3    *Q.*    Is that a "yes"?

4    *A.*    Yes, sir.

5    *Q.*    And is that for your account?

6    *A.*    Yes, sir.

7    *Q.*    With your husband as a joint owner?

8    *A.*    Yes.

9    *Q.*    And 16, is that one of the monthly account statements for

10   your credit union account --

11   *A.*    Yes.

12   *Q.*    -- for March of 2001?

13   *A.*    Uh-huh.  Yes, sir.

14          *MR. MEKARU:*  All right.  I would move the admission

15   of Exhibits 16 and 16A.

16          *THE COURT:*  Mr. Tracy.

17          *MR. TRACY:*  I believe I already stipulated to it, I

18   believe.

19          *MR. MEKARU:*  Oh.

20          *MR. TRACY:*  To make it easier.

21          *MR. MEKARU:*  You may have.

22          *MR. TRACY:*  I'm that kind of guy.

23          *MR. MEKARU:*  Thank you.

24          *THE COURT:*  They are both admitted.

25          *MR. MEKARU:*  It's stipulation number 7.

1          THE COURT:  I think we need to keep track a little

2     better, gentlemen, on what we're agreeing to and what we're

3     fighting about.

4          MR. MEKARU:  Yes, Your Honor.  There was some

5     question as to whether we could secure Ms. Featherstone's

6     appearance, so . . .

7     Q.   (BY MR. MEKARU)  All right.  So I want to turn your

8     attention to page -- page 3 of your monthly account statement.

9     A.   Okay.

10    Q.   All right?  Right about in the middle there's a

11    transaction here on 3-7.

12    A.   Uh-huh.

13    Q.   It says, "Deposit, incoming wire, $25,000."

14    A.   I see it.

15    Q.   Do you see that item?

16    A.   I do, sir.

17    Q.   Right below that is another indication.  Who is that wire

18    from?

19    A.   Kenneth Warner.

20    Q.   All right.  Now we want to start asking some questions

21    about Mr. Warner.

22         Why -- do you have any idea why Mr. Warner was sending

23    $25,000 into this account?

24    A.   From what I understood, Mr. Warner represented Michael --

25    excuse me -- Mr. Heshelman and was sending Ron wires for work

1    that he had done previous -- in previous years, in the early

2    nineties.

3    Q.   Okay.  Let's explore this a little more, then.  Was there

4    some sort of business relationship between Ron Featherstone and

5    Michael Heshelman?

6    A.   Yes, sir.

7    Q.   What was that?

8    A.   Well, from my understanding, my husband, Ron Featherstone,

9    at the time worked for Michael Heshelman.

10   Q.   What was the name of the business?

11   A.   Um.  Let me think for a minute.  Investors First,

12   something of this nature.  I don't remember.

13   Q.   All right.  Did you see any sort of records that are

14   associated with that business?

15   A.   The only thing that I saw were business cards.

16   Q.   Your ex-husband, Mr. Featherstone --

17   A.   Uh-huh.

18   Q.   -- what was his position with this company?

19   A.   As far as the business card, it said he was executive

20   vice president.

21   Q.   So executive vice president of this Investors First

22   Company.  Any sort of correspondence with that company?

23   A.   As far -- I don't understand.

24   Q.   Did you see any correspondence?

25   A.   No.

1    *Q.*   Any letters?

2    *A.*   No.  No letters.

3    *Q.*   Any sort of company documents?

4    *A.*   No.

5    *Q.*   Any sort of bank accounts or other records associated with

6    that particular company?

7    *A.*   No.

8    *Q.*   Any sort of contracts?

9    *A.*   No.

10   *Q.*   Any sort of documentation whatsoever other than just

11   business cards?

12   *A.*   No.

13            *MR. TRACY:*  Your Honor, foundationally I'm a little

14   bit at a loss why she would be seeing any of that when she has

15   nothing to do with the corporation.

16            *THE COURT:*  Well, what exactly is the basis for your

17   objection, Mr. Tracy?

18            *MR. TRACY:*  Foundation.

19            *THE COURT:*  Well, she -- she says she saw the cards.

20            *MR. TRACY:*  Sure.  My wife sees my card because I

21   give one to her at home so she knows how to get to me or others

22   can, but my wife doesn't see any of my corporate documents at

23   my office.  In fact, she shouldn't, because I have clients that

24   I need to keep confidential information from, just presumably

25   like Mr. Featherstone would if he's in the banking or financial

1    arena.

2              THE COURT:  Fair enough, Mr. Tracy.

3              Is there a foundation for this testimony, Mr. Mekaru?

4              MR. MEKARU:  Well, part of this is exploring what she

5    hasn't seen, but all right.

6    Q.    (BY MR. MEKARU)  Did Mr. Featherstone have an office

7    outside of the home?

8    A.    No.

9    Q.    Did he work out of the home?

10   A.    No.

11   Q.    Did he work?

12   A.    For Michael.

13   Q.    So in terms of all of his business activities, were those

14   primarily being conducted within the home?

15   A.    Yes, sir.

16   Q.    Okay.  So I'm back to my question again.

17         Any sort of records?

18   A.    Not that I was aware of that I saw.

19   Q.    Now, did you actually personally meet Michael Heshelman?

20   A.    Yes, sir.

21   Q.    Do you see him here in court today?

22   A.    Yes, sir.

23   Q.    All right.  Could you point him out, please?

24   A.    Right there (indicating).

25              MR. MEKARU:  May the record reflect she's indicated

1    the defendant Michael Heshelman?

2            *THE COURT:*  Yes.

3    *Q.*   *(BY MR. MEKARU)*  All right.  Now, what was

4    Ron Featherstone's role with this company?  What was he to do?

5    *A.*   He would take -- from what I understood, he would call

6    Michael in the morning --

7    *Q.*   Would you often overhear these conversations between --

8    *A.*   When I was getting ready for work, I would hear them early

9    in the morning.  He would talk to Michael, ask him what was

10   going on for the day as far as who he needed to talk to, what

11   investors, and then he would take care of and talk to those

12   investors throughout the day.

13   *Q.*   And did you ever hear those conversations between

14   Mr. Featherstone and these investors?

15   *A.*   I would hear, you know, "It's going to be paid on

16   Tuesday," or "The money is coming through," "This is what's

17   going to happen," and try to calm them down if they were upset.

18   *Q.*   Oftentimes would these investors be calling the home,

19   calling your house?

20   *A.*   Yes, sir.  They did.

21   *Q.*   Oftentimes would you pick up the phone and realize it was

22   an investor calling and try to reach your husband?

23   *A.*   Yes, sir.

24   *Q.*   Did any of these people identify themselves?

25   *A.*   There were a few, yes.

*DIRECT EXAMINATION OF DEBRA FEATHERSTONE*

1    *Q.*   Do you recall any names?

2    *A.*   I know I talked to you about it earlier.  I can't

3    remember.

4        I know Mr. Sherwood called.  Bryce Sherwood.  But I know

5    he wasn't an investor, he was -- he did the same thing that

6    Michael did.

7    *Q.*   I'll run some names past you.  Do you remember the name of

8    Paul Ramsey?

9    *A.*   Paul Ramsey, yes, sir.

10   *Q.*   Is this somebody you actually spoke with?

11   *A.*   Yes.

12   *Q.*   Did you get some sense of the nature of the conversation

13   and the tone of the conversation between your husband and

14   Mr. Ramsey?

15   *A.*   Mr. Ramsey was usually upset.

16   *Q.*   About what?

17   *A.*   About his investment and what he had put in and where his

18   money was.

19   *Q.*   And what was your husband saying?

20   *A.*   He would try to calm him down and tell him that the money

21   was coming in, to just be patient.

22   *Q.*   Did he give you any timetable as to when the money might

23   be coming?

24   *A.*   Well, it was usually going to be on a Tuesday that it was

25   going to come through.

*DIRECT EXAMINATION OF DEBRA FEATHERSTONE*

1   Q.   And this money coming in on a Tuesday, was that often

2   repeated to these investors who were calling?

3   A.   Yes, sir.

4   Q.   Did that take any sort of significance in your home?

5   A.   It was kind of a standing joke at our house that it was

6   going to come through every Tuesday.

7   Q.   The money --

8   A.   Not with Ron, but with my family, my children.

9   Q.   The money is coming on Tuesday.

10       Did you ever speak with Michael Heshelman about the

11   investments, about the status of money?

12   A.   Um, briefly.  I think I talked to him two or three times

13   on the phone.  Ron would ask me to talk to him just so that I

14   would be reassured that it was coming through.

15   Q.   Okay.  So tell me about the conversations you had with

16   Michael Heshelman.

17   A.   He would just try to tell me that -- what they were doing

18   with these investments and that the money was truly coming.

19   Q.   And did you ever question about the fact that there's been

20   this delay?

21   A.   No, I did not, sir.

22   Q.   Now, did you have any understanding as to where

23   Michael Heshelman was living during this period of 1999, 2000,

24   and 2001?

25   A.   Well, Ron told me at one time that he was in Switzerland,

1    but I don't know if he was at that time.

2    Q.   Did you have any understanding that Mr. Heshelman may have

3    also had some residence in New York City?

4    A.   Yes, sir, he did have.

5    Q.   How do you know that?

6    A.   Because I actually went to New York when my husband was

7    there for six weeks.

8    Q.   All right.  And did you see Mr. Heshelman also in

9    New York City?

10   A.   Yes, sir.

11   Q.   Where was he staying?

12   A.   At the Bristol Hotel, Bristol Inn, something like that.

13   Q.   Now, did you have any discussion at all with Mr. Heshelman

14   or get some sense as to how much -- how much the Bristol Plaza

15   was costing him?

16   A.   Ron told me how much the Bristol Plaza was costing.  It

17   was 6,000 a month per room.

18   Q.   Per room?

19   A.   Per room.

20   Q.   Was there more than one room?

21   A.   When we were -- when I was there visiting, yes, there was

22   more than one room.

23   Q.   Okay.  So we started out by talking about this wire

24   transfer --

25   A.   Uh-huh.

1    *Q.*    -- from Kenneth Warner for $25,000.

2         Now, you wouldn't have seen the underlying instructions

3    for this, but the wire itself was from Kenneth Warner,

4    instruction was from Kenneth Warner and going to your bank

5    account.

6         Were these monies at all being sent to you for some sort

7    of investment on behalf of someone else?

8    *A.*    Absolutely not.

9    *Q.*    Well, the money that went to your credit union account --

10   *A.*    Uh-huh.

11   *Q.*    -- what was that money being used for?

12   *A.*    We were just paying bills with it.

13   *Q.*    Expenses?

14   *A.*    Expenses.  Home expenses.

15   *Q.*    And this wasn't just the only transfer of money that went

16   into this credit union account from Mr. Warner.  Is that true?

17   *A.*    That is true.

18   *Q.*    And those other monies, are those other monies being at

19   all invested for someone?

20   *A.*    Absolutely not.

21   *Q.*    I mean, was your husband any sort of broker or any sort of

22   certified financial advisor?

23   *A.*    No, sir.

24   *Q.*    So all those monies that went to you, were they just for

25   your expenses?

1    A.   Yes, sir.

2    Q.   And as far as you understood, were these just some sort of

3    salary or commissions being paid to Mr. Featherstone for his

4    work that he had done for Mr. Heshelman?

5    A.   Yes, sir.

6            MR. MEKARU:  Nothing further.  I'll pass the witness.

7            THE COURT:  Mr. Tracy, any cross-examination for this

8    witness?

9            MR. TRACY:  Just briefly.  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. TRACY:

12   Q.   Ms. Featherstone, you still go by Ms. Featherstone; is

13   that correct?

14   A.   Yes, sir.

15   Q.   I represent Mr. Heshelman.  I'm sorry to hear about your

16   ex-husband's health.  I hope he does as well as he can.

17        You stay in contact with him, I take it?

18   A.   I do.

19   Q.   Okay.  The period of time that he was working with

20   Michael, in addition to the conversations that you went over

21   with Dan that you may have overheard, were there conversations

22   as well about collateral or security, that kind of stuff, that

23   they were trying to obtain for investments?

24   A.   Yes, sir.

25   Q.   And was that --

1           MR. MEKARU:  Your Honor, we're going to object.  To

2     the extent that these are coconspirator statements in

3     furtherance of the conspiracy, it's proper for the government

4     to elicit those statements from a witness.  For us to elicit

5     from a witness, but not for the defendant to elicit statements

6     of his own from our witness.  It's hearsay.  It would otherwise

7     be hearsay.

8           THE COURT:  Well, wait a minute, wait a minute, wait

9     a minute.  Who are you claiming as a coconspirator?

10    Mr. Featherstone?

11          MR. MEKARU:  Yes, Your Honor.

12          THE COURT:  Is he indicted?

13          MR. MEKARU:  No, Your Honor, but he is noted in -- it

14    is noted in the Indictment that there are others known and

15    unknown to the grand jury, along with Mr. Heshelman,

16    Mr. Sherwood, and Mr. Mickelson.

17          I mean, we're getting in lots of hearsay testimony.

18    The hearsay testimony is permitted because it was a

19    coconspirator statement in furtherance of the conspiracy, the

20    lulling of these investors.  That's the basis for my getting in

21    hearsay statements of her ex-husband.

22          It is inadmissible hearsay to permit the defendant to

23    try to elicit testimony about his own statements through our

24    witness.  We've briefed that as part of our trial brief.

25          THE COURT:  You did brief that, Mr. Mekaru, but it

1    sort of comes out of the atmosphere that you're claiming he was

2    a coconspirator.

3            I mean, that's a new wrinkle that we haven't heard

4    before.  And the testimony of Mrs. Featherstone, I suppose,

5    could be construed in that way, but not necessarily.  And you

6    opened the door rather widely with regard to hearsay.  I mean,

7    you may have been relying on your claim that he was a

8    coconspirator, but I'm not so sure that her testimony is

9    adequate to identify him as a coconspirator.  I mean, maybe I'm

10   wrong.  You tell me if I'm wrong.

11           MR. MEKARU:  Your Honor, the testimony of the witness

12   is that Ron Featherstone is being instructed to tell people --

13   to delay them and keep on telling them that money is coming,

14   that money is coming, and he's getting paid to tell them that.

15           THE COURT:  I'll sustain the objection.  I think

16   you're right, Mr. Mekaru.

17           MR. TRACY:  Your Honor, I wasn't asking her about any

18   conversations between her husband -- her former husband and

19   Mr. Heshelman.

20           THE COURT:  You were asking hearsay is what you were

21   doing, which is what Mr. Mekaru did as well.

22           MR. TRACY:  Okay.  I'm asking -- well, I'll ask it a

23   different way, and we'll see where this takes us.

24   Q.   (BY MR. TRACY)  So you were aware to some degree about

25   your husband's -- your former husband's work, correct?

1   *A.*   To some degree, yes.

2   *Q.*   Okay.  And did some of his work involve work relating to

3   the investments and things he was doing with Mr. Heshelman

4   pertaining to collateral or securities?

5   *A.*   Yes.

6   *Q.*   And was that in the nature of bonds?

7   *A.*   Yes.

8   *Q.*   And were you aware that he was working on that activity

9   for a period of months or years?

10  *A.*   Yes.

11  *Q.*   Okay.  And you considered that to be real work that he was

12  doing?

13  *A.*   No, I did not, but I couldn't get him to get a regular

14  job.  I mean, he said it was real work and . . .

15  *Q.*   Fair enough.  Fair enough.  We'll leave it at that,

16  Ms. Featherstone.  Have a safe trip back.  Thank you.

17  *A.*   Thank you.

18          *THE COURT:*  Mr. Mekaru, would you like any redirect?

19          *MR. MEKARU:*  No, Your Honor.

20          *THE COURT:*  Thank you very much, Mrs. Featherstone.

21  You're excused.

22          Ladies and Gentlemen, we're going to take our

23  afternoon break at this time.  It's about 2:35.  We are going

24  to go a little later today.  We're probably going to go until

25  about four, so please take a break, 15, 20 minutes, and then

```
 1    we'll come back here about five till or so and get started

 2    again with the next government witness.

 3            THE CLERK:  Everyone rise, please.  This Court is in

 4    recess.

 5        (Jury exited the courtroom at 2:38 p.m.)

 6        (Recess taken at 2:39 p.m.)

 7        (Jury entered the courtroom at 3:01 p.m.)

 8            THE COURT:  Mr. Mekaru.

 9            MR. MEKARU:  The government next calls

10    Samuel Gonzalez.

11            THE CLERK:  If you would come right up here, please.

12    If you can stop, face me, raise your right hand.

13                        SAMUEL GONZALEZ

14                (The oath was administered)

15            THE WITNESS:  Yes.

16            THE CLERK:  Be seated, please.  State your name for

17    the record, please.

18            THE WITNESS:  Samuel Gonzalez.

19                        DIRECT EXAMINATION

20    BY MR. MEKARU:

21    Q.   Could you spell your last name for the court reporter.

22    A.   G-O-N-Z-A-L-E-Z.

23    Q.   Mr. Gonzalez, I'm not interested in the particular street

24    address where you live, but can you tell us, where do you

25    reside?
```

1    A.    Queens, New York.

2            THE COURT:  I'm sorry?

3            THE WITNESS:  Queens, New York.

4            THE COURT:  Sir, would you pull that microphone

5    closer to you and speak directly into it so that everybody in

6    the room can hear you, and particularly the jury.

7            THE WITNESS:  Sure.

8    Q.    (BY MR. MEKARU)  I'm sorry.  So Queens, New York?

9    A.    Queens, New York.

10   Q.    Where do you work?

11   A.    I work for Milstein Properties.

12   Q.    Milstein Properties.  Does that company have any

13   association with the Bristol Plaza?

14   A.    Yes, it's the parent company.

15   Q.    I'm sorry?

16   A.    The parent company.

17   Q.    All right.  Does Milstein Properties have a number of

18   properties that it owns or manages?

19   A.    Yes.

20   Q.    Bristol Plaza is just one of them?

21   A.    Yes.

22   Q.    All right.  What do you do at Milstein Properties?

23   A.    I'm the controller.

24   Q.    And what do you do as the controller?

25   A.    I direct the financial activities and day-to-day

*DIRECT EXAMINATION OF SAMUEL GONZALEZ*

1  operations of the accounting department.

2  Q.   Is that for the greater Milstein Properties overall?

3  A.   No, particularly for the hotel division, which is

4  Bristol Plaza and Liberty View.

5  Q.   Okay.  Now, as a controller are you going to be seeing

6  documents that are on the financial side of the business things

7  like the payment of bills and expenses and things along those

8  lines?

9  A.   Yes.

10  Q.   Are you also going to see some of the paperwork that goes

11  with the day-to-day operations of the company?

12  A.   Yes.

13  Q.   Things like -- things that are associated with guests?

14  A.   Yes.

15  Q.   All right.  So contracts and things along those lines with

16  regard to guests?

17  A.   Correct.

18  Q.   Are you generally familiar with the books and records of

19  the Bristol Plaza?

20  A.   Yes.

21  Q.   Is there some effort to keep those records accurate --

22  A.   Yes.

23  Q.   -- as to the information contained therein?

24  A.   Yes.

25  Q.   And do you maintain those records on a -- do you have --

*DIRECT EXAMINATION OF SAMUEL GONZALEZ*

1    do you maintain those records in the regular course of

2    business?

3    A.    Yes.

4    Q.    All right.  But is there some sort of retention or time

5    period and window on how long you keep records?

6    A.    Normally seven years.

7    Q.    Normally seven years?

8         Okay.  Now, were you asked to go back and try to find some

9    records that might be associated with a Michael Heshelman?

10   A.    Yes.

11   Q.    And were you able to find some records?

12   A.    Maybe a few documents.  Two or three documents that I

13   could find as I recall.

14   Q.    Now, is that because some of this -- some of the activity

15   associated with Michael Heshelman is older than seven years

16   ago?

17   A.    Yes.

18   Q.    All right.  But you were able to find some things?

19   A.    Yes.

20   Q.    And did that include looking through records of other

21   guests that were relatively old records?

22   A.    Yes.

23   Q.    All right.  Now, you have before you a couple of binders.

24   I want you to turn to Volume II.  I think you have it in front

25   of you.  And look for tab 18.

1    A.    Okay.

2    Q.    All right.  Now, Exhibit 18, 18A, B, C, and D, were these

3    all records that were at the Bristol Plaza and that you found?

4    A.    Yes.

5          MR. MEKARU:  I would move for the admission of

6    Exhibits 18A, 18B, 18C, and 18D.

7          THE COURT:  Mr. Tracy?

8          MR. TRACY:  No objection, Your Honor.

9          THE COURT:  They are admitted.

10   Q.   (BY MR. MEKARU)  All right.  Now, I want to turn first to

11   18A.  Excuse me.  I'm sorry, 18.  I misspoke.  18.  Thank you.

12         All right.  This is a Bristol Plaza Payment Agreement?

13   A.    Yes.

14   Q.    Now, who is this agreement for?

15   A.    This agreement is between Mr. Michael Heshelman and the

16   Bristol Plaza.

17   Q.    All right.  But the account that this is referring to,

18   would that be this information up here?

19   A.    Yes.

20   Q.    Hope and care.com and Jill Hope?

21   A.    Yes.

22   Q.    This information, 18, 18A, 18B, and 18C, were all those

23   documents found in a file that was associated with Jill Hope

24   and Hope and care.com?

25   A.    That's correct.

DIRECT EXAMINATION OF SAMUEL GONZALEZ

1   Q.   But in going through the files, you were able to find

2   something that had Mr. Heshelman's name on it?

3   A.   Yes.

4   Q.   All right.  So help me read through this.  We have a

5   payment agreement for this client or guest.  And what is this

6   08-6771?

7   A.   That's just an internal account number.

8   Q.   Okay.  Now, account number 6771T with the date here, and a

9   due date, and then a unit.  What does the unit refer to?

10  A.   18L.

11  Q.   What is that?

12  A.   It's the 18th floor Apartment L.

13  Q.   Okay.  So that's an actual apartment?

14  A.   Yes.

15  Q.   Okay.  I think I may have skipped over this a little bit,

16  but what is the Bristol Plaza?

17  A.   We are an extended-stay residence.  Particularly we

18  provide accommodations for those people that are seeking to

19  stay in New York for more than 30 days.

20  Q.   So is it like a hotel room with just a bed and a bathroom?

21  A.   No, no, it's fully furnished apartments.

22  Q.   Okay.  And these apartments -- so this is, you know, a

23  room, kitchen, bedroom -- or kitchen, bathroom, and maybe a

24  living area?

25  A.   Correct.

1   *Q.*   Is there also maid service as part of your --

2   *A.*   Yes, daily maid service.

3   *Q.*   There's a balance due as of 8-15-01, including rent it

4   looks like for September.  The total balance due, am I reading

5   this correct, that Ms. Hope owed the Bristol Plaza, 44,464.91?

6   *A.*   Correct.

7   *Q.*   All right.  Now, there's account numbers, but these all

8   here -- are these all somehow related to her account?

9   *A.*   Yes, the first amount you see there of 41,000, that was

10  her apartment, 18L.

11      The other two amounts, apparently she had other people

12  staying at the Bristol as well for shorter stays, that's why I

13  say rider.  Basically a rider is attached to a lease.  So it

14  was attached to her lease.

15  *Q.*   So a rider is a type of an agreement not necessarily

16  identifying an individual?

17  *A.*   Right.

18  *Q.*   Like a rider on a contract --

19  *A.*   Correct.  But it is for two other apartments apparently.

20  *Q.*   Okay.  All right.  And then there's some sort of payment

21  made on the 14th of August in the year 2000 --

22  *A.*   Yes.

23  *Q.*   -- right?  Okay.  Back out of it, please.

24      And then what I see down here is some sort of payment

25  agreement on how this is going to be paid?

1   A.   Correct.

2   Q.   And when we scroll down, the commitment to actually make

3   good on these payments is who?

4   A.   Michael Heshelman.

5   Q.   And Paula Bush, was that --

6   A.   Paula Bush was the general manager at the time.

7   Q.   At the time?

8   A.   Right.

9   Q.   I'm going to turn now to 18A.  This is a wire transfer

10  from a Kenneth Warner to the Bristol Plaza, but this document

11  itself was in the Bristol Plaza's records?

12  A.   Yes.

13  Q.   And this document would suggest that $14,440.46 was wire

14  transferred to the Bristol Plaza?

15  A.   Correct.

16  Q.   Now, because these documents are together, does that

17  coincide with the payment schedule that was in

18  Exhibit Number 18?

19  A.   Yes.

20  Q.   So it appears that Mr. Heshelman or that Kenneth Warner

21  actually made good on Mr. Heshelman's agreement to pay

22  14,000 -- roughly $14,000?

23  A.   Yes.

24  Q.   All right.  Exhibit 18B, does this just look like the

25  handwritten outlines of the agreement that was formalized in

1    Exhibit 18?

2    A.    Yes.

3    Q.    You don't have any idea whose handwriting that is, though?

4    A.    No.

5    Q.    And then 18C, a copy of a check.  Now, on the check itself

6    there's no indication here as to -- it's to the Bristol Plaza

7    from Investors First Bancorp, and it looks like the signature

8    at the bottom here, does that appear to be the same as the

9    Michael Heshelman signature on the contract?

10   A.    Yes.

11   Q.    There's no indication here, notation here as to whose rent

12   is being paid with this check.

13   A.    Correct.

14   Q.    Any idea whose rent is being paid with this?

15   A.    It was in the file with the Hope and Company, so I can

16   only assume that it was meant for that account.

17   Q.    Okay.  So all the records that are associated with this

18   Hope and Care.com would have been kept together?

19   A.    Correct.

20   Q.    So, again, this is another instance where it appears that

21   Mr. Heshelman is paying some of the rent?

22   A.    Yes.

23   Q.    All right.  In addition to Mr. Heshelman paying for

24   somebody else's rent at the Bristol Plaza, was he himself a

25   guest at the Bristol Plaza?

1   A.   Yes.

2   Q.   And did you find some documents that substantiated the

3   fact that he was a guest at the Bristol Plaza?

4   A.   I found a document, a collections document.  It didn't

5   have his name on it, but it had Investors Bank.

6   Q.   Okay.  If you would take a look at 18D.

7        All right.  Now, this isn't a Bristol Plaza document, is

8   it?

9   A.   No, it's not.

10  Q.   Do you have some sort of contractual relationship with

11  DBF Collection Corp.?

12  A.   Yes.

13  Q.   Is this a company that does collections work for the

14  Milstein Group?

15  A.   Correct.

16  Q.   Now, with that contractual relationship are you given

17  blank forms by DBF Collection?

18  A.   That's correct.

19  Q.   And then you fill them out or send along the file and

20  request that they take action on some outstanding debt?

21  A.   That's correct.

22  Q.   So is that in a sense what we're looking at here is a

23  completed form?

24  A.   Yes.

25  Q.   So we have a landlord here, it looks like some sort of

1    Milva with -- nonetheless, this is that Milstein Group?

2    A.   Right.  Milva Associates is incorporated.  Milva

3    Associates, Incorporated, is d/b/a Bristol Plaza.  So it's the

4    legal name of Bristol Plaza.

5    Q.   The tenant is Investors First Bancorp.

6    A.   Yes.

7    Q.   There's an indication here that the address is 6M and 6H.

8    A.   Yes.

9    Q.   What does that mean?

10   A.   That's a sixth floor Apartment M, sixth floor Apartment H.

11   Q.   Two apartments?

12   A.   Two apartments.

13   Q.   So Investors First Bancorp had two apartments?

14   A.   Yes.

15   Q.   Were you familiar with the room rates back in 2001?

16   A.   The room rate for 6M in 2001 was approximately between

17   4,800 and 5,500.

18        6H would have been around 6,000 to 7,000 per month.

19   Q.   Per month?

20   A.   Per month.

21   Q.   Now, you had said that the Bristol Plaza was an

22   extended-stay hotel, right?

23   A.   Yes.

24   Q.   The clientele that typically stayed at the Bristol Plaza,

25   are we talking about transients?

1    A.    No, not transients.

2    Q.    Are you familiar with -- I mean, Milstein Properties has

3    other hotels.   There are many hotels in New York City.

4    A.    That's right.

5    Q.    So what sort of market is the Bristol Plaza working

6    towards?

7    A.    Luxury.  Upscale.  Five-star luxury property.  High-end.

8    Q.    Does that business allow -- does the Bristol Plaza allow

9    its guests to use their apartment as an office?

10   A.    Absolutely not.

11   Q.    So this is not to be some sort of business operation, this

12   is supposed to just be a residence?

13   A.    Yes.

14   Q.    Now, that doesn't mean people can't make business calls

15   and such, but nonetheless, they are not supposed to be

16   operating a business.   It's not like paying rent at an office

17   building to operate a business out of, right?

18   A.    Right.

19   Q.    Okay.  All right.  The current address, this is the

20   address that the guest gave apparently when they were

21   originally checking in?

22   A.    Yes.

23   Q.    In Battle Creek, Michigan.

24         Can we scroll down, please.  All right.  The breakdown of

25   monies due.

*DIRECT EXAMINATION OF SAMUEL GONZALEZ*

1    A.    Yes.

2    Q.    There's an indication $90,844.20.  What is that?

3    A.    At the time the tenant vacated they owed Bristol Plaza

4    $90,844.

5    Q.    All right.  Let's see.  And then according to this last

6    line, the apartments were vacated on October 31st, 2001.

7    A.    Yes.

8    Q.    Okay.  Which would have -- and this was sent in

9    December -- scroll down a little bit -- December 6th, 2001.

10   A.    Yes.

11   Q.    So if I'm reading this -- am I reading this correctly?  If

12   he -- if Investors First left on October 31st, 2001, there's

13   some nonpayment for the preceding months that resulted in a

14   $90,000 bill?

15   A.    Correct.

16   Q.    And there were two apartments, we're talking somewhere in

17   the neighborhood of 10, 10 to 13 thousand dollars a month?

18   A.    Correct.

19   Q.    So at $90,000, I don't know what the math is on it, but

20   maybe eight months, nine months or so?

21   A.    Yes.

22   Q.    Does the Bristol Plaza bill in advance or the end?

23   A.    We bill in advance.

24   Q.    All right.  I'm going to show you two documents that I

25   don't know that you would have seen, but I'm going to ask you

*DIRECT EXAMINATION OF SAMUEL GONZALEZ*

1  about the amounts coming in.  I'm going to first turn to 5G.

2      Mr. Gonzalez, it might be easier for us, I know looking at

3  the binders it's kind of tough, but can you see 5G on the

4  screen?

5  A.  Yes.

6  Q.  All right.  This is for $30,000, the Bank of New York,

7  Bristol Plaza, for the account of Michael Heshelman, March 7,

8  2001.  Do you recognize Bank of New York?

9  A.  Yes.

10  Q.  Is this the banking information for the Bristol Plaza?

11  A.  Yes, it is.

12  Q.  The $30,000, does this appear to be a payment of some sort

13  of bill?

14  A.  Yes, it appears to be a wire transfer for 30,000 for

15  Mr. Heshelman's account.

16  Q.  And based on what you've been able to sort out in the

17  records, do you have any idea as to how long Mr. Heshelman was

18  a guest at the Bristol Plaza?

19  A.  I believe it was somewhere in 2000, I think, he became a

20  guest.  I'm not sure if that's the one.

21  Q.  Sometime in 2000 --

22  A.  Sometime in 2000.

23  Q.  -- extending into 2001, and according to this document he

24  vacated in October of 2001?

25  A.  Yes.

1   Q.   So there's $30,000 paid towards the bill.  And then

2   Exhibit 5HH, there's another $12,000 going to that same

3   New York -- Bank of New York account for Bristol Plaza,

4   credited to the account of Michael Heshelman.

5       There's another $12,000 being paid to Bristol Plaza to pay

6   a hotel bill?

7   A.   Yes.

8   Q.   Now, there's no further notation here as to -- well, if

9   it's noted that it's for the account of Michael Heshelman, when

10  this comes into the Bristol Plaza, would these be credited to

11  his outstanding balance?

12  A.   Yes.

13  Q.   And when you compare that to 18A where there was no

14  notation here for any particular instructions, but based on the

15  location of this wire transfer, this wire, 18A, went to pay

16  somebody else's bill?

17  A.   Yes.

18          MR. MEKARU:  Okay.  Nothing further.  Thank you.

19          THE COURT:  Mr. Tracy.

20          MR. TRACY:  Thank you, Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. TRACY:

23  Q.   Good afternoon, Mr. Gonzalez.

24  A.   Good afternoon.

25  Q.   How was your trip here?

1    A.    Smooth.  Smooth ride.

2    Q.    Good.  You still have 18 in front of you, the tab 18?

3    A.    Sure.

4    Q.    Thanks.

5    A.    Okay.

6    Q.    So this first 18, that's just 18, not 18A or B or

7    anything?

8              MR. MEKARU:  Would you like it up?

9              MR. TRACY:  No, I think it's fine.

10             MR. MEKARU:  Okay.

11   Q.    (BY MR. TRACY)  That's in August or September of 2000,

12   correct?

13   A.    Correct.

14   Q.    Okay.  If you want to call up 18C, that would be fine,

15   though.

16        That's the check you talked about, right, that you may

17   have found in some paperwork that you went through?

18   A.    Yes.

19   Q.    Now, this is dated June 6th, correct?

20   A.    Yes.

21   Q.    And it doesn't even have a year on it.

22   A.    No, it does not.

23   Q.    So we don't know really what this pertains to.

24   A.    No.

25   Q.    So it would be really complete speculation on your part

1    whether it has anything to do with payment of Ms. Hope's

2    account or anything?

3    A.    Except for the fact that it was in with her account, with

4    her records.  That's the only thing I have.

5    Q.    I'm not trying to disparage you or the folks at

6    Bristol Plaza, but do you ever get a document in the wrong

7    file?

8    A.    Sure.

9    Q.    Okay.  It happens?

10   A.    It happens.

11   Q.    So just the mere fact that it's in her file really doesn't

12   tell us one way or the other whether it had anything to do with

13   the payment of hers?

14   A.    No.

15   Q.    I take it you and the people who work with you are very

16   proud of your establishment.

17   A.    Yes.

18   Q.    It's a great place to stay.

19   A.    Yes, it is.

20   Q.    And I take it you tout it to business travelers and others

21   that are coming for an extended stay in New York that it's a

22   great alternative as compared to paying really, really, really

23   high prices at the Waldorf or other high high-class hotels?

24   A.    Correct.

25   Q.    And I take it you also market it in such a way that the

1    people that are the movers and shakers in the financial arena

2    coming to New York should come to the Bristol Plaza for a great

3    experience and give them a break and a refreshing moment while

4    they are going on to do their business?

5    A.   Yes.

6    Q.   That's part of your -- I haven't written your marketing

7    stuff, but am I getting it about right?

8    A.   Yes.

9    Q.   Thank you very much, sir.  Have a great trip.

10   A.   Thank you.

11            THE COURT:  Mr. Mekaru, anything further?

12            MR. MEKARU:  No, Your Honor.

13            THE COURT:  Thank you.  Thank you, Mr. Gonzalez.  You

14   may step down.

15            THE WITNESS:  Thank you.

16            MR. MEKARU:  The government calls Mitch Miller.

17            THE CLERK:  Will you step forward, please.  Step up

18   here.  Face me, please, and raise your right hand.

19                     MITCHELL REED MILLER

20                 (The oath was administered)

21            THE WITNESS:  I do.

22            THE CLERK:  Be seated, please.  State your name for

23   the record, please.

24            THE WITNESS:  Mitchell Reed Miller.

25            THE CLERK:  I'm sorry, your middle name?

1              *THE WITNESS:*  Reed.

2              *THE CLERK:*  R-E-E-D?

3              *THE WITNESS:*  Correct.

4              *THE CLERK:*  Thank you.

5                         DIRECT EXAMINATION

6    *BY MR. MEKARU:*

7    *Q.*   All right.  Mr. Miller, where is your current residence?

8    *A.*   My full-time residence is in UAE, United Arab Emirates,

9    Dubai.

10   *Q.*   Are you a U.S. citizen?

11   *A.*   Yes.

12   *Q.*   And are you originally from, I guess, Florida?

13   *A.*   Yes.

14   *Q.*   And are you -- were you back in the States to visit family

15   in Florida?

16   *A.*   Yes.

17   *Q.*   So you still have some connection with Florida?

18   *A.*   Yes, I'm back fairly often.

19   *Q.*   All right.  And what -- what I would like to focus on here

20   is going back to 1999 to about 2001, all right?  And during

21   that time period were you still a Florida resident?

22   *A.*   Yes.

23   *Q.*   Okay.  But you were spending some time overseas, though?

24   *A.*   Yes.

25   *Q.*   Where was that?

1    A.   Zurich, Switzerland.

2    Q.   All right.  While you were in Switzerland, did you meet

3    Michael Heshelman?

4    A.   Yes, I did.

5    Q.   Do you see him here in the courtroom today?

6    A.   Yes, I do.

7    Q.   Would you point him out, please?

8    A.   Right there (indicating).

9         MR. MEKARU:  Your Honor, may the record reflect he

10   has indicated the defendant Michael Heshelman?

11        THE COURT:  Yes.

12   Q.   (BY MR. MEKARU)  All right.  So what was the nature of

13   your association with Mr. Heshelman?

14   A.   Well, I was there representing -- my partner and I were

15   looking for an investment opportunity, and I met Michael at a

16   luncheon where there were several Americans at the investment

17   opportunity.  And he was a stranger when I met him, and that's

18   how we were acquainted.  We met.

19   Q.   Sir, can you -- I want you to lift up the microphone a

20   little bit and direct it towards you, move it towards you.

21   Slide that up towards you also and it would help.

22   A.   Okay.

23   Q.   Okay.  So initially would you say it was some sort of

24   casual meeting?

25   A.   Yeah, it was an investment opportunity.  A lot of

*DIRECT EXAMINATION OF MITCHELL REED MILLER*

1  Americans were there at the meeting.  Michael was one of the
2  people at the meeting, and that's how we met.
3  Q.   At some point did you establish some sort of business
4  relationship with Michael Heshelman?
5  A.   Yeah, actually Michael was one of the people that helped
6  us understand that the opportunity wasn't a good one, and he
7  kind of became our new leader and kind of advised us.
8      A lot of us that were over there weren't -- we're from
9  different backgrounds, and we were all there looking for an
10 investment opportunity.  And he thought there were some
11 problems with it and kind of advised us, and he kind of became
12 our new banking leader, so to speak.
13 Q.   Okay.  But that sounds like something fairly informal.
14 Did you actually have a formalized working relationship with
15 Mr. Heshelman?
16 A.   Well, eventually I stayed there, and I kept working --
17 Michael kind of became my guru.  He kind of became the guy that
18 was telling me how the business worked over there.
19 Q.   The question is:  Did you work for him?
20 A.   No, no, no, no.
21 Q.   Okay.
22 A.   No.
23 Q.   Did he work for you?
24 A.   No, no, no.
25 Q.   All right.  So, again, this is just some sort of friendly

1   relationship where he's providing information?

2   A.   Sure.

3   Q.   Okay.  So at some point, though, was he willing to give

4   you money to help you with your efforts to try to raise money

5   for your own investment?

6   A.   Yeah, I think that back then when we first got there, you

7   know, we were all looking for an investment opportunity, and

8   when we saw that one wasn't going to work, we were still eager

9   to do what we wanted to accomplish.

10  Q.   You used the term "we."  Are we talking about

11  Mr. Heshelman?  Who are we speaking of?

12  A.   Let's talk about me.  I was over there representing my

13  partner and I to try to figure out how to raise some funds for

14  the development we were trying to do in the Dominican Republic.

15  So I was looking for an opportunity to find some investors and

16  partners for that, so that's why I was there.

17  Q.   All right.  And as you were looking, you also run into

18  Michael Heshelman?

19  A.   Right.

20  Q.   Did you have any sort of understanding of what he was

21  doing there?

22  A.   Um, it was one of those situations where he was by far the

23  most knowledgeable guy in the room, and we all just -- we

24  started to listen to him, and I think we were all very

25  impressed with him.  He seemed to understand international

1    banking and private banking over in that part of the world, and

2    certainly had a lot more experience and knowledge than the rest

3    of us, and I think he just kind of became the person we

4    listened to, so . . .

5    Q.   Okay.  Now, that sense you got that Mr. Heshelman was more

6    knowledgeable of this, is that all based on what he's telling

7    you?

8    A.   Yeah.  Yeah.

9    Q.   All right.  Did you see any sort of documentation or any

10   sort of contracts, statements, or anything else to corroborate

11   the statement that he's knowledgeable in this area?

12   A.   No, I don't think there was a -- we never questioned it.

13   Q.   Okay.  But, you know, he knew a lot of the language of

14   finance, though, right?

15   A.   Right.

16   Q.   He knew tranches, debentures, collateralized transactions,

17   bank-to-bank negotiated contracts, right?

18   A.   Exactly.  All the lingo, yeah.

19   Q.   All right.  And to some extent this was language that you

20   weren't familiar with and began to learn from

21   Michael Heshelman?

22   A.   Right.

23   Q.   Okay.  Now, I think the question was:  At some point did

24   he assist you and give you money?

25   A.   Yes.  After a while I couldn't afford to be there, and

1  Michael was incredibly generous and said, "Let me help you with

2  your expenses."  So he did that for several people, and I was

3  one of them.  And I thought he was a great guy, and I thought

4  he wanted to help me get my business -- make my business

5  successful.

6  Q.   So did he have the appearance of having money?

7  A.   Yes, he seemed -- he appeared to be very wealthy.

8  Q.   You, on the other hand, were you at the same level of

9  finance and status in terms of economic status?

10  A.   No, no, no, we were -- no, we were struggling.

11  Q.   All right.  Now, in Switzerland do you remember where he

12  was staying?

13  A.   I think when I met him, I think -- I think it was the

14  Marriott.

15  Q.   All right.

16  A.   And eventually he went to EMA House.

17  Q.   To where?

18  A.   EMA House.

19  Q.   EMA House.  I've been referring to it as E-M-A, but it's

20  the EMA House?

21  A.   I think that's what it was called, EMA House.

22  Q.   Another hotel in Switzerland?

23  A.   Yeah, it's kind of like an apartment.  But they have some

24  hotel amenities, but mainly it's like a little apartment.

25  Q.   Might be like an extended-stay?

1   A.    Yeah.  Yeah, something like that.

2   Q.    All right.  I want to show you some wire transfers.

3         Prior to this case you may not have seen these, but I'm

4   going to ask you about some of the documents that were sent to

5   you.

6         Can we start with Exhibit 4C on page 34.  This is a wire

7   transfer.  It's for $10,000 to Mr. Mitchell Miller.

8         Is that you?

9   A.    I'm not sure if I have the right page here.

10  Q.    Well, maybe look -- sir, it might be more helpful to look

11  at the screen.

12  A.    Okay.  Yes, that's me.

13  Q.    All right.  That's your bank account, Bank Atlantic?

14  A.    Yes.

15  Q.    $10,000?

16  A.    Yes.

17  Q.    Why did he give you $10,000?

18  A.    I think Michael was helping me with my expenses.

19  Q.    Was this money being given to you for you to invest on his

20  behalf?

21  A.    No, no, no, I needed help on my expenses, and he was just

22  helping me.

23  Q.    Okay.  4C, page 57.  Now, the $20,000, was this also being

24  given to you?

25  A.    Yes.

1    Q.   Right?

2    A.   Yes.

3    Q.   Okay.  And is this money also similar to the --

4    A.   Yes.

5    Q.   -- prior money that's for your expenses?

6    A.   Exactly.

7    Q.   And you're not investing this money for him?

8    A.   No, no, no.

9    Q.   Right?  You're not engaging in any sort of sophisticated

10   bond transactions for him?

11   A.   No, no, no.

12   Q.   5C.  $25,000 wire transfer to you?

13   A.   Uh-huh.

14   Q.   Is that a "yes"?

15   A.   Yes.  Yes.

16   Q.   Right?  $25,000, what is the $25,000 for?

17   A.   Again, I think -- I don't know if you've ever been to

18   Zurich, but it's a very expensive town between your hotel and

19   everything.  It's -- you're going through about five thousand a

20   week just to be there.  And I didn't have enough money to stay

21   there and keep working, and he just helped me, so . . .

22   Q.   And again, was this $25,000 in any way invested on his

23   behalf --

24   A.   No.

25   Q.   -- for any of his clients?

1    A.    No.

2    Q.    Were you doing any bond trading for him or anything along

3    those lines?

4    A.    No.

5    Q.    The last exhibit, 5DD, $20,000.

6    A.    Uh-huh.

7    Q.    Is that a "yes"?

8    A.    Yes.  Yes.

9    Q.    Okay.  You see that, that also goes to you?

10   A.    Uh-huh.

11   Q.    Again, is that a "yes"?

12   A.    Yes.  I'm sorry.

13   Q.    For the court reporter's sake, we need to have yeses and

14   nos.

15   A.    Sorry.

16   Q.    Again, this money, was this just expenses and some sort of

17   gratis on the part of Mr. Heshelman?

18   A.    To the best of my recollection, there was -- there was

19   some time there that we had done -- my partner and I had

20   purchased a bond from him, and there was a period of time there

21   where he needed -- he wanted the bond back, he had a better

22   buyer, and he asked us to sell it back to him, and he bought it

23   back from us, but I'm not sure -- this was so many years ago, I

24   can't remember exactly when he bought the bond back from us or

25   when it was -- you know, he was just helping me with expenses.

1   I have no way to look this up this was so many years ago.  I

2   just couldn't remember.

3   Q.   So all of this money, all of this 20 -- let's see, 40, 65,

4   $75,000, was any of this invested for Mr. Heshelman?

5   A.   No.

6   Q.   Exhibit 15 -- oh.  Thank you, Harper.

7        You have Exhibit 15 in a binder in front of you.  You need

8   to identify that first for us.

9            MR. MEKARU:  May I approach the witness?  It might

10  perhaps be easier.

11           THE COURT:  Yes.

12           MR. MEKARU:  There you go.

13           THE WITNESS:  Thank you.

14  Q.   (BY MR. MEKARU)  Do you recognize Exhibit 15?

15  A.   Yes.

16  Q.   Is that one of your monthly account statements?

17  A.   Yes.

18  Q.   All right.  And is that for March, March of 2001?

19  A.   Yes.

20           MR. MEKARU:  Okay.  I move for the admission

21  of Exhibit 15.

22           THE COURT:  Mr. Tracy?

23           MR. TRACY:  This is a bank statement?

24           MR. MEKARU:  Yes.

25           MR. TRACY:  Yes, that's fine.

1          *THE COURT:*  It's admitted.

2          *MR. MEKARU:*  Thank you.

3    *Q.*  *(BY MR. MEKARU)*  All right.  So -- just so we're clear,

4    are the wire transactions that were indicated in the prior

5    government exhibits reflected in your bank statement?  We'll

6    return to the next page.  And the next page.  Keep going.

7    *A.*    Yes.

8    *Q.*    Here we go.

9    *A.*    Yes.

10   *Q.*    On the 17th and the 14th we see the 25,000 and the $20,000

11   being added to the account.

12   *A.*    Correct.

13   *Q.*    All right.  So this is just closing the loop on -- the

14   money actually did go into your account?

15   *A.*    Yes, I did receive it.

16          *THE COURT:*  I think you both need to not talk over

17   one another.  It's very, very difficult for the court reporter.

18   So if you would wait until he finishes his question, and if you

19   would wait until he finishes his answer, it would be easier for

20   everybody.

21   *Q.*  *(BY MR. MEKARU)*  Okay.  You have -- let me hand this to

22   you also.

23          *MR. MEKARU:*  May I approach?

24          *THE COURT:*  Yes.

25   *Q.*  *(BY MR. MEKARU)*  I've handed you what's been entered as

1    20D.  Do you see that transcript?

2    A.   Yes.

3    Q.   All right.  Did you get that earlier this week?

4    A.   Yes.

5    Q.   I sent that to you to review, right?

6    A.   Yes.

7    Q.   Okay.  I don't want to be playing -- I don't want to play

8    the tape here, but I just want to review the transcript.

9         On the bottom of page 1, there's some discussion here, MH

10   is Michael Heshelman; AM is Alan Moody.  We're talking about

11   the tranches, the total amount -- we're going to do this again

12   so Your Honor -- we're going to summarize and move along.

13        Finally at the bottom Alan Moody is asking, "But who are

14   the partners that you're working with?"  Michael Heshelman's

15   response:  "I'm sorry."

16        Let's go to the next page.  Alan Moody continues, "The

17   partners that you mentioned, who -- that you're workin' with

18   over there."  Michael Heshelman responding:  "Yeah,

19   Mitch Miller and Ira and a couple of other guys, Elizabeth."

20   Alan Moody's brief response.  And then Michael Heshelman is

21   continuing, "They are -- they are -- they are the finance

22   engineers that put this all together."

23        Mr. Miller, were you the finance engineer that was putting

24   things together for him?

25   A.   No, I was -- no, I was not.  And I don't know an

 1   Alan Moody, never even heard of an Alan Moody.

 2   Q.   Do you have any idea what he's referring to here when he's

 3   talking about you with Ira and Elizabeth and --

 4   A.   No.  I remember there -- I remember one of the friends was

 5   an Ira, and I know that he had an associate named Elizabeth

 6   that lived in Vienna, but I never met her, never did any

 7   business with her.

 8   Q.   "He" who?

 9   A.   Michael.

10   Q.   But as far as you are concerned, were you in any way some

11   sort of finance engineer?

12   A.   No.

13   Q.   Were you putting together deals for Michael Heshelman?

14   A.   No, I wouldn't put it that way.  I was trying to get

15   something put together for myself to get our funding for our

16   project.

17   Q.   So you were trying to get your own business done?

18   A.   Right.

19   Q.   At the same time Mr. Heshelman was trying to get his own

20   business done?

21   A.   Correct.

22   Q.   And you were just talking to each other, perhaps as

23   associates or friends?

24   A.   Yeah, all the Americans over there, we became friends, and

25   we started, you know, seeing each other socially a lot, so we

1    were together a lot.  Dinner and lunches.

2        Mike was -- Mike to all of us, I think, was some --

3    somebody that we very much trusted.  He seemed to have the

4    wisdom and the experience and the knowledge that most of us did

5    not, and I think we all felt pretty fortunate that we were able

6    to be around him and learn from him, so it was --

7    Q.   As far as you know -- I'm sorry, there really wasn't a

8    question pending there -- was Mr. Heshelman ever able to close

9    a deal?

10   A.   Not that I know of, but I wasn't working --

11   Q.   No further questions.

12   A.   I wasn't working with him, sir.

13   Q.   Thank you.

14           *THE COURT:*  Mr. Tracy.

15           *MR. TRACY:*  Excuse me one second, Your Honor.

16                    CROSS-EXAMINATION

17   *BY MR. TRACY:*

18   Q.   Good afternoon, Mr. Miller.

19   A.   Hello.

20   Q.   I'm Chris Tracy.  I represent Mr. Heshelman.  Thanks for

21   being with us.

22        You had a chance to look at a couple exhibits.  One that

23   you didn't see.  Kathy, if you could bring up Government

24   Exhibit 5CC, please.  And I know we looked at 5C, which was one

25   of your wire transfers, and 5DD another one, but I want to look

1    at one that's not pertaining to you just to see if you

2    recognize the name.

3        So this appears to be another one right out of

4    Ken Warner's bank account and Mellon Bank, but this one is not

5    coming to you, right?

6    A.    Right, it looks like Erna, Erna Vanschelt or something.

7    Q.    Yeah.  S-C-H-E-L-T after the "Van."

8        Is that somebody you recognize, that name?

9    A.    No, no.

10   Q.    Not at all?

11   A.    No, not at all.

12   Q.    Do you remember anything about New Kuwaiti dinar?  Am I

13   saying that name right?

14   A.    Yeah, I remember hearing about them all the time.

15   Q.    Okay.  Were you working on any efforts with respect to

16   NKDs or these new Kuwaiti dollars?

17   A.    We never got -- number one, I think most of us never

18   really learned exactly what they were.  Whether they were real.

19   There was a lot of talk, but I don't think any business was

20   ever done in that area.  Not that I'm aware of at least.

21   Q.    Do you know, now that I mention that, does this name

22   associated with NKDs mean anything to you at all?

23   A.    No.

24   Q.    And then this purchase of the bond from Michael that you

25   sort of briefly mentioned, and I think you kind of got cut off

1    there --

2    A.    Right.

3    Q.    -- that involved just you, or did that involve another

4    partner of yours?

5    A.    My partner, Dr. Pineda.

6    Q.    Who was that again?

7    A.    Dr. Pineda.

8    Q.    Okay.  How do you spell that last name?

9    A.    P-I-N-E-D-A.

10   Q.    Is Jose his first name?

11   A.    Yes, Jose Pineda.

12   Q.    So Dr. Pineda -- am I saying that right?

13   A.    Pineda.

14   Q.    All right.  You purchased some sort of bond from Michael?

15   A.    Correct.

16   Q.    Was that directly from him, or was that through the

17   Investors First company of his?  Do you remember at all

18   or . . .

19   A.    You know, I don't remember how the legal part of it was

20   done, but we bought it and we sold it back to him.

21   Q.    Because it sounded like you said you may have a better

22   lead or some other lead in terms of some other transactions.

23   A.    You know, I tried to remember the whole thing, and I think

24   I actually called Dr. Pineda about it to see if he could

25   remember.  We think Michael told us that he thought he had a

1    better buyer, and as a favor he wanted us to sell it back to

2    him, and he paid us, so . . .

3    Q.   Do you remember what type of bond that was?

4    A.   I couldn't remember.  I even asked Dr. Pineda yesterday,

5    and I called him and he didn't remember either.

6    Q.   Do you remember was it issued out of a certain country?

7    You don't even remember that?

8    A.   I don't remember.

9    Q.   Okay.  Other than that bond deal, were there any other

10   types of bonds or related investments that the two of you were

11   at least talking about together?  And I mean the two of you,

12   now I mean you and Mr. Heshelman, not the doctor, your partner.

13   A.   We talked about things.  We saw each other in groups all

14   the time, so -- but I can't remember us ever doing any

15   successful business.

16   Q.   Okay.  And the reality was, you had certain -- you were

17   talking together to kind of compare notes and share ideas, but

18   you, sir, had your goals that you were trying to achieve, and

19   Mr. Heshelman appeared to have his goals he was trying to

20   achieve --

21   A.   Yeah.

22   Q.   -- am I fairly characterizing it?

23   A.   Yes.

24   Q.   This Elizabeth that came up in the one transcript, you

25   said she's somebody you recognized as a friend or associate of

*CROSS-EXAMINATION OF MITCHELL REED MILLER*

1    his from Vienna?

2    A.    Actually -- actually, I didn't -- when I first heard the

3    name, I didn't recognize it at all, and I started thinking back

4    with my memory, I remember he knew someone from there, but I

5    could even be wrong about the name.  It might not have been an

6    Elizabeth.

7    Q.    But that's somebody that lived in Austria?

8    A.    I believe so.

9    Q.    But the details of that and what exactly their association

10    was or the kind of business they were doing --

11    A.    I have no idea.

12    Q.    -- you don't have a recollection of?

13    A.    No.  I wasn't part -- it wasn't any of my business,

14    so I -- Mike didn't talk about it with me.

15    Q.    Right.  That's not something you had any involvement with?

16    A.    No, none whatsoever.

17    Q.    Thank you very much, sir.

18    A.    Thank you.

19            THE COURT:  Anything on redirect, Mr. Mekaru?

20            MR. MEKARU:  Your Honor, with the Court's indulgence

21    and Mr. Tracy's indulgence, may I reopen direct?

22            THE COURT:  For what purpose?

23            MR. MEKARU:  I just wanted to run through a list of

24    names.

25            THE COURT:  Do you have any objection to that,

CROSS-EXAMINATION OF MITCHELL REED MILLER

1    Mr. Tracy?

2              MR. TRACY:  Can we go to sidebar for a minute?

3              THE COURT:  Sure.

4         (At sidebar on the record)

5              MR. MEKARU:  He knows some of the people who received

6    money.  He knows Danilo Marzon, Pablo Ramiriez, he knows

7    Ron Featherstone, Bryce Sherwood, Robert Tringham.  So those

8    are people who actually received some monies of Alan Moody's

9    1.5 million.

10             THE COURT:  And how does he know that?

11             MR. MEKARU:  Well, he personally knows Danilo Marzon,

12   Pablo Ramirez.  These are people who were hanging out in

13   Zurich.

14             THE COURT:  Can you narrow that down by date in terms

15   of Mr. Moody's deposits?

16             MR. MEKARU:  When they were there?

17             THE COURT:  Yeah.

18             MR. MEKARU:  Yeah, I think so.  I think they were

19   there around that time period.

20             THE COURT:  Okay.

21             MR. TRACY:  I don't -- I mean, that's all in the

22   record already.  How does going over that with this witness

23   help us at all?  I mean, we're already sort of strapped for

24   time for the afternoon.

25             THE COURT:  It is a little tenuous, I'll admit, but

1   how long is this going to take?

2          *MR. MEKARU:*  The only thing I want to cover here is

3   that he knows who these people are and what they were doing.

4   I'm trying to eliminate money to say this is not an investment,

5   that's not an investment, this isn't an investment.  I'm just

6   going through it.  So it should be quick.

7          *THE COURT:*  As in?

8          *MR. MEKARU:*  Probably about three minutes.  I mean,

9   three to five minutes.  We'll throw up the 12B -- A, show him

10  the names, does he know this person, and I'll go through the

11  list.

12         *MR. TRACY:*  But he's not going to know what they used

13  the monies for.  How is this witness going to know --

14         *THE COURT:*  I think Mr. Tracy is correct, Mr. Mekaru.

15  I think this is really collateral, and I just don't see that as

16  helping the jury to reach its ultimate conclusions in this

17  case, so the request is denied.

18         *MR. MEKARU:*  Yes, ma'am.

19     *(Sidebar discussion concluded)*

20         *THE COURT:*  Anything for Mr. Miller on redirect?

21         *MR. MEKARU:*  No, Your Honor, thank you.

22         *THE COURT:*  Thank you.  Thank you, Mr. Miller.

23  You're excused.

24         *MR. MEKARU:*  All right.  We next call

25  Stephen Williams.

1    *THE CLERK:*  Sir, if you'll come up here, please.  You

2  can stop right there and turn and face me and raise your right

3  hand.

4                        STEPHEN WILLIAMS

5                  *(The oath was administered)*

6            *THE WITNESS:*  I do.

7            *THE CLERK:*  Be seated, please.

8            Would you state your name for the record, please, and

9  spell your first name.

10           *THE WITNESS:*  Stephen Williams, S-T-E-P-H-E-N.

11           *THE CLERK:*  Thank you.

12                      DIRECT EXAMINATION

13  *BY MR. MEKARU:*

14  *Q.*   Mr. Williams, I'm not interested in your street address,

15  but in what city and state do you live?

16  *A.*   Rocklin, California.

17  *Q.*   And I want to go back in time here to 1999, 2000, 2001.

18  Did you have some business or some association with

19  Michael Heshelman?

20  *A.*   We invested money with him.

21  *Q.*   Okay.  When you say "we" --

22           *THE COURT:*  Mr. Williams, I'm going to ask you if you

23  would pull that microphone a little closer to you.  You don't

24  have to talk right into it, but you do need to speak well into

25  it so that the jury can and the court reporter can catch all

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1    you say.

2              THE WITNESS:  Okay.

3    Q.   (BY MR. MEKARU)  Okay.  You said "we invested."  Who is

4    "we"?

5    A.   My family.  My mother-in-law, my brother-in-law, my

6    sister, me and my wife.

7    Q.   So did your family pool some money together?

8    A.   Yes.

9    Q.   How much money?

10   A.   A million dollars.

11   Q.   And was this investment, this association with

12   Mr. Heshelman, was this coordinated with the assistance of

13   another individual?

14   A.   Yes.

15   Q.   Was that Pierre LaBauve?

16   A.   Uh-huh.

17   Q.   Is that a "yes"?

18   A.   Yes.

19   Q.   Who is Pierre LaBauve?

20   A.   He was -- a friend of mine had a friend who had invested

21   some money through her accountant.  Her accountant was

22   Pierre LaBauve.  And so we were interested in investing as

23   well.

24   Q.   All right.  Now, did this group of investors, with the

25   assistance of Mr. LaBauve, did it have some sort of name

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1   associated with it?

2   A.   Highland Equities.

3   Q.   All right.  Now, Highland Equities and yourself, you said

4   you invested a million dollars with Mr. Heshelman.  What was

5   the nature of the investment?

6   A.   It was supposed to be invested in government bonds.

7   Q.   Treasury bonds that were just being held, or was there

8   some sort of trading associated with that investment?

9   A.   Well, it was being used as leverage.  It was supposed to

10  be put in an attorney trust account where the money would stay

11  and be used as leverage to buy a larger amount of government

12  bonds, and then they would trade these bonds.  And because they

13  were buying them in large volume, they would get a small

14  discount, and then they'd just continue trading and make this

15  small profit on each trade.

16  Q.   Were you given any sense as to how much you might expect

17  as returns on this investment?

18  A.   On the money that we were putting in, it was -- it's kind

19  of stupid now -- that it would be like a hundred percent return

20  on a weekly basis.

21  Q.   On a weekly basis?

22  A.   I believe that's what it was.

23  Q.   Now, that sounds like a pretty extraordinary amount of

24  money.  Did you have any concerns about the veracity of that

25  sort of trading?

DIRECT EXAMINATION OF STEPHEN WILLIAMS

1    A.   Well, we had two things that made it, we thought, so safe.

2    The money that was wired over in the attorney trust account

3    was -- required my signature for it to be released.  So it was

4    only supposed to be used as a collateral.  And then we also had

5    a promissory note.

6    Q.   All right.  A promissory note.  Was that some sort of

7    document between yourself or Highland Equities and

8    Mr. Heshelman?

9    A.   Yes.

10   Q.   Is that something that you drafted, or was that something

11   that Mr. Heshelman drafted?

12   A.   I didn't draft it.  I believe he drafted it.

13   Q.   Did he provide it to you?

14   A.   Yes.

15   Q.   Okay.  The promissory note, was that for the entire amount

16   of the investment?

17   A.   Yes.

18   Q.   And the terms that you indicated or the restriction that

19   you indicated, that the money wouldn't move out of that account

20   without your signature, was that reduced to some sort of

21   writing?

22   A.   Yeah, we have that in the contract.

23   Q.   So you actually had some sort of written contract and some

24   sort of promissory note?

25   A.   Correct.

1   Q.   Out of that million dollars or so, was there any sort of
2   provision for expenses to be paid?
3   A.   He could take out I believe it was 280,000 for expenses.
4   Q.   But the balance, was that to stay in the account?
5   A.   Yes.
6   Q.   So at some point did you authorize the wire transfer of
7   the money to the attorney account?
8   A.   To the attorney account, yes.
9   Q.   And once it went there, do you have -- at the time did you
10  have any idea what happened to the money?
11  A.   No, it stayed in the account.
12  Q.   And what was the representation to you as to what was
13  happening with the money and the trading activity?
14  A.   Well, every time I talked with Heshelman, there was always
15  a delay.  So weekly there was some reason, but next Friday,
16  next Monday trading was going to start.
17  Q.   Do you remember when you originally invested?
18  A.   I believe it was May of 2000.
19  Q.   Maybe it would help you here with some of this.  Why don't
20  we pull up 12E.
21       All right.  Mr. Williams, this is a summary of some of the
22  activities, banking activity that occurred in this
23  Kenneth Warner attorney at law account.  There are two wire
24  transfers in here that total $1 million on May 16th, 2000, and
25  May 19th, 2000.  And the source is identified as

1    Highland Equities.

2         Is this the money that you and your family invested with

3    Mr. Heshelman?

4    A.   Yes.

5    Q.   Now, the last monies going in is on the 19th.  On the

6    23rd, beginning on the 23rd and continuing through June 9th

7    there were a series of transactions where the money is going

8    out.  Did you authorize any of these transactions?

9    A.   No.

10   Q.   Do you recognize any of the names of these individuals or

11   entities that were receiving money?

12   A.   I recognize the name Bryce Sherwood.

13   Q.   How does the name Bryce Sherwood --

14   A.   Pierre LaBauve spoke with him a couple times.  I don't

15   know how often he spoke with him, but he had mentioned him to

16   me.  I assume he worked with Heshelman.

17   Q.   So as far as you understood, there was some sort of an

18   association between Michael Heshelman and Bryce Sherwood?

19   A.   Yes.

20   Q.   Eventually did you demand or request the money back?

21   A.   Yes.

22   Q.   Did you -- beyond just asking about the status of your

23   investment, did you actually ask for your money back?

24   A.   Yes.  Many times.

25   Q.   Who were you asking to get your money back?  From who?

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1    A.    Heshelman, his attorney, many, many times.

2    Q.    Were you able to contact Mr. Heshelman?

3    A.    I spoke with him on the phone.

4    Q.    Do you know where Mr. Heshelman was when you were talking

5    to him on the phone?

6    A.    No.  I mean, I -- sometimes he was in Michigan; sometimes

7    he was in Zurich.

8    Q.    So the phone you were using -- you were talking to him on,

9    was that a cell phone?

10   A.    I believe so.

11   Q.    The number you were calling was a cell phone.

12         All right.  At some point in March of 2001 did

13   Highland Equities get some money back from Michael Heshelman?

14   A.    We did.

15   Q.    How much money?

16   A.    It was about $89,000.

17   Q.    Would you please call up 5W.

18         Now, Mr. Williams, you may not have seen this document

19   before, but this is a request for a wire transfer to

20   Highland Equities in the amount of $89,600 with some banking

21   information, U.S. Bank, with a City of Roseville, California.

22         Was that the -- excuse me -- was that the

23   Highland Equities bank account?

24   A.    Yes.

25   Q.    And is this $89,600 the amount you just referred to as

DIRECT EXAMINATION OF STEPHEN WILLIAMS

1  receiving back?

2  A.   Yes.

3  Q.   Now, did you have any conversation with Michael Heshelman

4  about getting money back and about what this money represented?

5  A.   This was our first payment.  It was an interest payment.

6  Q.   According to who?

7  A.   According to him.  I have an email from him saying, "I'll

8  be getting you your first payment."

9  Q.   From Michael Heshelman?

10  A.   Yes.

11  Q.   As much as he said that, do you have any idea where that

12  money actually came from?  Did you at the time?

13  A.   I thought it was from our investment.

14  Q.   This investment was all the way back in May of 2000.

15     You get some money in March of 2001 of $89,600.  Have you

16  received any other money?

17  A.   No.

18  Q.   So in total for the million-dollar investment you made,

19  how much money have you gotten back from Mr. Heshelman?

20  A.   $89,600.

21  Q.   You said that you had many conversations with

22  Mr. Heshelman about the money.  Can you give us some sort of

23  estimate of how many times you would have spoken to

24  Mr. Heshelman about getting your money back?

25  A.   On the phone?  Probably five or six times.  Email, a ton.

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1    And his attorney, I tracked him all over Florida and faxed him

2    and everything I could do.

3    Q.   The attorney, is that Mr. Ken Warner?

4    A.   Yes.

5    Q.   Was he responsive to your request for -- asking about the

6    status of the money?  I'm sorry, was Mr. Heshelman responsive?

7    Did he get back to you?

8    A.   No, never.  He was done.

9         MR. MEKARU:  Thank you, Your Honor.  We pass the

10   witness.

11        THE COURT:  Did you intend to offer Exhibits 24A and

12   24?

13        MR. MEKARU:  Oh, Your Honor, I'm sorry.  Thank you.

14   Q.   (BY MR. MEKARU)  It slipped my mind, Mr. Williams.

15        In the book that you have in front of you all the way to

16   the last tab --

17        MR. TRACY:  I have no objection to them coming in,

18   Your Honor, if that saves a little time.

19        MR. MEKARU:  Thank you.

20        THE COURT:  Actually, what I have is 24A and 24B.  Is

21   there a 24?

22        MR. MEKARU:  No, Your Honor.

23        THE COURT:  I see.  Okay.  Those exhibits are

24   admitted.

25        MR. MEKARU:  All right.  So maybe -- I'm rushing.

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1    MR. TRACY:  I have no objection to either 24A or 24B.

2    THE COURT:  Thank you.

3    Anything further of this witness, Mr. Mekaru?

4    MR. MEKARU:  May we publish these to the jury, then,

5    Your Honor?

6    THE COURT:  Well, have we published -- we haven't

7    published any of the exhibits to the jury yet, have we?

8    MR. MEKARU:  24.

9    MR. TRACY:  I mean, on the screen.

10   THE COURT:  Oh, on the screen, yes.

11   MR. TRACY:  I'll put them up there.  They can go up

12   right now?

13   THE COURT:  Yes, they should go up right now.

14   Did you have some questions for the witness about 24A

15   and 24B?

16   MR. MEKARU:  Yes, Your Honor, just so we can get this

17   foundation of what they are.

18   Q.   (BY MR. MEKARU)  All right.  You made reference to this

19   agreement that you had -- you made reference of an agreement

20   that you had with Michael Heshelman?

21   A.   Yes.

22   Q.   All right.  And you said you had some sort of agreement

23   and promissory note.  Is that contained in Exhibit 24A?

24   A.   Yes.

25   Q.   And 24A provides that a certain portion of this could be

*DIRECT EXAMINATION OF STEPHEN WILLIAMS*

1    used for expenses, but the balance, as far as you're concerned,

2    what was to happen to the balance of the money?

3    A.    It stayed in the attorney trust account.

4    Q.    All right.  And then 24B, what is 24B?

5    A.    That's the promissory note.

6    Q.    It's up on the -- put 24B up on the screen.

7              THE COURT:  It's the very last one in the book --

8              THE WITNESS:  Right.

9              THE COURT:  -- Mr. Williams.

10             THE WITNESS:  That's when we got the payment.  That's

11   just letting us know that's our interest payment.

12   Q.    (BY MR. MEKARU)  This is a letter addressed to

13   Highland Equities from Michael Heshelman?

14   A.    Yes.

15   Q.    "In response to your telephone inquiry July 23rd, 2001,

16   the previous bonds you received from Investors First or

17   Bryce Sherwood were an interest payment on your promissory note

18   and joint venture agreement."

19        To what is Mr. Heshelman referring?  What previous amount

20   is he referring to?

21   A.    The 89,000.

22   Q.    Okay.  I just wanted to be clear.

23   A.    Okay.

24             MR. MEKARU:  Thank you, Your Honor.

25             THE COURT:  Anything further, Mr. Mekaru, for

 1   Mr. Williams?

 2            *MR. MEKARU:*  No, we pass the witness.

 3            *THE COURT:*  Thank you.

 4            Mr. Tracy.

 5            *MR. TRACY:*  Okay.  Thank you, Your Honor.

 6                      CROSS-EXAMINATION

 7   *BY MR. TRACY:*

 8   *Q.*   Good afternoon, Mr. Williams.  I'm Chris Tracy.  I

 9   represent Mr. Heshelman in this matter.

10        So the investment came through an entity called

11   Highland Equities?

12   *A.*   Yes.

13   *Q.*   And is that a company or an LLC or something?

14   *A.*   We just made it up.  It's an LLC.

15   *Q.*   Okay.  And did Pierre LaBauve assist you with creating

16   that or something?

17   *A.*   Yes.

18   *Q.*   Pierre, was he your accountant or CPA something like that?

19   *A.*   He was not my accountant.  He was just -- he got us hooked

20   up.

21   *Q.*   He happens to be an accountant?

22   *A.*   Yes.

23   *Q.*   Is he still practicing at that as far as you're aware?

24   *A.*   I have no idea.

25   *Q.*   And then Highland Equities, that was made up by you and

1   other members of your family, I take it?

2   A.   Yes.

3   Q.   Was this the first investment that Highland Equities

4   itself, that entity did, or were there others before?

5   A.   This was the first one.  I mean, we had done one -- well,

6   we had done one prior, and we had gotten our money back from

7   them, and then we moved on to this one.

8   Q.   Was the prior one also arranged through Mr. LaBauve?

9   A.   Yes.

10  Q.   Okay.  And what, in general, did that involve, if you can

11  recall?

12  A.   A similar sort of transaction.  This one was much safer,

13  though, because this one the money we were putting in went into

14  a trust account.  The other one hadn't.

15       It also made us feel better about this one because the

16  other one we got the money back no problem.

17  Q.   Okay.  So the other one didn't have a trust account

18  situation?

19  A.   No.

20  Q.   How much money did you invest, if you can recall?

21  A.   A million.  It was about the same amount.

22  Q.   And what -- in relation to time, how long prior to the

23  time you invested in May of 2000 with Mr. Heshelman was the

24  other -- did the other one occur?

25  A.   Six months.

1    *Q.    Okay.  And when you say you got your money back, you got*

2    *your principal back, or was there any return as well?*

3    *A.    We just got our principal back.*

4    *Q.    Did you ask for it back and it was paid back?*

5    *A.    Yes.*

6    *Q.    Do you recall why you asked for it back?  Anything in*

7    *particular?*

8    *A.    It was taking too long.*

9    *Q.    It was taking too long?*

10   *A.    Yes.*

11   *Q.    Okay.  So you had had experience when you made an*

12   *investment of how to get your money back.  One of the ways to*

13   *do it is ask for it, right?*

14   *A.    Correct.*

15   *Q.    Okay.  Now, I think for Highland Equities, I believe*

16   *Mr. LaBauve signed certain documents as the general partner or*

17   *something like that?*

18   *A.    Right.*

19   *Q.    Was he the general partner?*

20   *A.    I guess.*

21   *Q.    Okay.  At least that's what it appears to be on the*

22   *documents?*

23   *A.    Right.*

24   *Q.    What did that mean to you?  Anything?*

25   *A.    He was more in touch with Heshelman than I was.*

1    *Q.*    Okay.  So he was the primary contact?

2    *A.*    Right.

3    *Q.*    And then at times you also had conversations?

4    *A.*    Once we wired money, I became much more involved.

5    *Q.*    Okay.  Was this Mr. Sherwood somebody that you ever spoke

6    with?

7    *A.*    I don't believe so.

8    *Q.*    And how about a Mr. Mickelson?

9    *A.*    I don't know him.

10   *Q.*    But you had mentioned before that Mr. LaBauve mentioned

11   the name Mr. Sherwood?

12   *A.*    Yes.

13   *Q.*    Do you know whether Mr.LaBauve's first contact with

14   respect to the investment occurred through Mr. Sherwood or

15   through Mr. Heshelman?

16   *A.*    I don't know.

17   *Q.*    You don't know one way or the other?

18   *A.*    No.

19   *Q.*    Okay.  Now, there seems to be a little discrepancy when

20   you looked at -- we can pull them up if we need to --

21   Government Exhibit 12E, which is a summary chart created by

22   somebody working for the FBI on behalf of the government, shows

23   a million-dollar investment by Highland Equities.  But then in

24   your promissory note, Government Exhibit Number 24A and B, it

25   reflects a $1,080,000 payment, correct?

1  A.   Right.

2  Q.   Did it end up just being the million?

3  A.   No, it was the 1,080,000.  That's what was needed to go

4  in.

5  Q.   Okay.  So if we could bring up Government Exhibit 12E.

6  See where it says just the million there?

7  A.   Yes.

8  Q.   That's wrong from your standpoint?

9  A.   That's what we wired.

10  Q.   Where did the other eighty go?

11  A.   The other 80,000 came from somebody Pierre got.  I believe

12  his name was Bud.

13  Q.   Oh, somebody else?

14  A.   Yes.

15  Q.   So the million is correct as it pertains to what you,

16  Steve Williams, through Highland Equities invested?

17  A.   Correct.

18  Q.   Okay.  I understand.  But the promissory note is also

19  correct in that it says $1,080,000, because some other monies

20  came in from some other area?

21  A.   Right.

22  Q.   Okay.  And then a payment was made of somewhere in the

23  neighborhood of $89,000 in terms of a return, if you will?

24  A.   Yes.

25  Q.   And as far as you can recall, that was the only payment

1    made?

2    A.    Yes.

3    Q.    Now let's talk a little bit about due diligence in terms

4    of sort of exploring this investment.

5          Were you primarily relying on Mr. LaBauve?

6    A.    Yes.

7    Q.    And you had confidence in him based on what, that prior

8    transaction that you did?

9    A.    Yes.

10   Q.    Any other thing?

11   A.    No.

12   Q.    How long had you known Mr. LaBauve at about the point in

13   time you invested, I believe, in May of 2000 or so?

14   A.    I don't know.  Maybe six months.

15   Q.    Okay.  And what is your profession?

16   A.    I own a small business.  I work in the real estate field.

17   Q.    Okay.  Did you meet him through that, or was --

18   Mr. LaBauve through that, or was it separate from that?

19   A.    No, it had nothing to do with that.

20   Q.    Okay.  Did you have any other lawyer or anything review

21   the investment for you prior to making the investment?

22   A.    Unfortunately, no.

23   Q.    Did you have any other -- maybe a financial advisor,

24   somebody else that you would go to for financial advice review

25   the investment?

1   A.   No.

2   Q.   Do you know whether prior to the investment -- well, let

3   me ask it this way:  Did you speak with Mr. Warner prior to the

4   investment?

5   A.   Ken Warner, the attorney?

6   Q.   The attorney, correct.

7   A.   No.

8   Q.   Do you know whether Mr. LaBauve spoke with him in advance

9   of making the investment?

10  A.   No idea.

11  Q.   But I believe you indicated that you did speak with

12  Mr. Warner after the investment was made?

13  A.   Right.

14  Q.   And was that on multiple occasions?

15  A.   I think I was only able ever to get ahold of him once.

16  Every law firm I called would say, He's no longer here, he's

17  moved to this law firm, and I would track him down there.

18  Q.   So it took you some time to track him down?

19  A.   Oh, yeah.

20  Q.   But you eventually spoke with him?

21  A.   That was before he was on the run.

22  Q.   Okay.  And when you spoke with him, what did you ask and

23  what did he tell you?  What was the general nature of the

24  conversation?

25  A.   The general nature was we wanted our money back, and he

1    said he couldn't give it back until he had authorization from

2    Heshelman.

3    Q.    Okay.  But the money was in his account?  The money went

4    into his account, his trust account, correct?

5    A.    Yes.

6    Q.    And as far as you're aware, the only person that had

7    authority over that trust account was Ken Warner because it was

8    his?

9    A.    Right, which didn't make any sense to me, because it

10   required my signature to go out, so I should be able to get it

11   back.

12   Q.    And you, I presume, conveyed that to Mr. Warner that it

13   didn't make sense?

14   A.    Clearly.

15   Q.    Did you say you also sent faxes or maybe emails or

16   something to Mr. Warner as well?

17   A.    Yes.

18   Q.    And did the government ask for copies of those faxes from

19   you?

20   A.    No.

21   Q.    Do you still have them somewhere?

22   A.    Yes.

23   Q.    But you never turned those over in this case?

24   A.    No.  They are all date and time stamped.  Tons of them.

25   Q.    Okay.  Now, if we -- do we still have 12E up, or can we

1    have that up?

2          And I did the math -- and as I've said before, not in

3    front of you, but sometimes lawyers are not the best at math --

4    but assuming I'm correct -- and feel free to double-check me --

5    I believe from what the government purports, again, this is the

6    summary chart, 12E, that once your money came in, it went out

7    to certain people, including to Dennis Mickelson, in three

8    pretty decent-sized payments.  You see the one there for 140,

9    another for 175, and then there's a little bit smaller one for

10   20?

11   A.    Yes.

12   Q.    So I think that adds up and totals to $335,000.  Were you

13   aware that that money was going to Mr. Mickelson?

14   A.    No.

15   Q.    And then also there's a payment or two to this guy

16   Bryce Sherwood, one of 50,000, another 50,000, for a total of a

17   hundred grand.  Are you aware of any money going to

18   Bryce Sherwood?

19   A.    No.

20   Q.    Do you have any clue what either of them were doing or

21   were supposed to be doing to assist with the investment?

22   A.    No.

23   Q.    Now, you do agree that based upon one of the documents

24   that was signed that $280,000 of the investment could be used

25   for expenses?

1    *A.*    Correct.

2    *Q.*    And I just want to be -- I think before you said something

3    along the lines in direct that you didn't think any of the

4    money was going to move, but you understood that 280 could be

5    released from the account for purposes of expenses?

6    *A.*    Correct.

7    *Q.*    So that could include attorney's fees and travel and the

8    like?

9    *A.*    Yes.

10   *Q.*    Have you talked to any of the other investors that were

11   invested in this?

12   *A.*    Well, witnesses that are here today, but . . .

13   *Q.*    You had a chance to speak with them today?

14   *A.*    Uh-huh.

15   *Q.*    That was the first time?

16   *A.*    Yes.

17   *Q.*    Did you happen to talk with them at all about whether

18   their agreements were similar, whether expenses could be

19   covered?

20   *A.*    We did not.

21   *Q.*    You didn't talk about that particular issue?

22   *A.*    No.  We were mostly complaining.

23   *Q.*    That's a fair comment.

24         And if we could bring 24 back up again, please.

25         Now, if you can't see it very well -- do you see how --

1    there's various steps that are laid out here, correct?

2    A.    Yes.

3    Q.    And this is in the joint venture trust agreement?

4    A.    Yes.

5    Q.    Right.  It's a -- step 1 we just kind of went over.

6    Monies are going to come in, and some of them may be used for

7    expenses, correct?

8    A.    Correct.

9    Q.    Now, if we could go to the next page.  Step 5 talks about

10   these bank instruments, correct?

11   A.    Yes.

12   Q.    So if you -- and I'm not saying you necessarily read every

13   document.  I mean, actually this document I don't think you

14   actually signed.  You let Pierre sign it as the general

15   partner, right?

16   A.    Yes.

17   Q.    But I presume you probably reviewed it at some point.

18   A.    Right.

19   Q.    Maybe not with a fine-toothed comb, right?

20   A.    I'm not an attorney.

21   Q.    Okay.  But you didn't ask an attorney to look at it

22   either?

23   A.    No.

24   Q.    At least at the point in time that you invested you

25   didn't.

1   *A.*   Correct.

2   *Q.*   So you talked about the bank instruments ranging from this

3   100 million to 500 million, correct?

4   *A.*   Yes.

5   *Q.*   But you didn't -- was it your understanding ever that a

6   hundred or 500 million would end up in Ken Warner's trust

7   account?

8   *A.*   I had no idea where.  If that would go into his trust

9   account.

10  *Q.*   Okay.  But was it ever explained to you that the goal was

11  to raise somewhere in the neighborhood of about $10 million to

12  be able to then either leverage that or use that money as

13  collateral or something to be able to access more in the range

14  of a hundred million or 500 million?

15  *A.*   Yes.

16  *Q.*   So you generally understood that?

17  *A.*   Right.

18  *Q.*   Okay.  Then when you go down a little farther on the page

19  past the steps, past this line that says "JV Trust

20  Investors First Ventures LTD," et cetera, the second paragraph

21  talks again a little bit about the bank instruments, correct?

22  *A.*   Are you on step 6?

23  *Q.*   Go past the steps.  Do you see where there's sort of a new

24  title in the middle of the page?

25  *A.*   Yes.

1    Q.    It says "JV Trust"?

2    A.    Yeah.

3    Q.    Okay.  And then the first paragraph after that talks about

4    the trader, right?

5    A.    Uh-huh.

6    Q.    And then the next one starts to talk about the bank

7    instruments again a little bit, correct?

8    A.    Correct.

9    Q.    So it says, Bank instruments vary in availability and cost

10   depending on a price we purchase, a LC bank guarantee,

11   et cetera.  All are top-100 world banks.  They are screened for

12   acceptance, et cetera.

13        Okay.  Do you recall reading that at the time that you

14   entered into or Pierre on your behalf entered into the

15   agreement?

16   A.    Yeah.

17   Q.    Did it mean anything to you?

18   A.    Just they're government bonds.

19   Q.    Okay.  But it doesn't say "government bonds" there.  It

20   says "bank instruments," correct?

21   A.    Correct.  My understanding of bank instruments are CDs and

22   bond-related investments.

23   Q.    Okay.  Okay.  Now, you talked about asking for the money

24   back.  What I want to understand -- I'm going just slightly an

25   additional step beyond that -- did you ever, you personally or

*CROSS-EXAMINATION OF STEPHEN WILLIAMS*

1   Highland Equities, ever sue anybody related to the investment?

2   A.   No.

3   Q.   You didn't sue Mr. Warner?

4   A.   No.

5   Q.   You didn't sue Mr. Heshelman?

6   A.   No.

7   Q.   Did you explore any claims potentially against

8   Mr. Warner's insurance policy or coverage he would have as an

9   attorney?

10   A.   I hired an attorney to investigate him.

11   Q.   Okay.

12   A.   And the attorney could not find any assets, couldn't find

13   even Heshelman.  So it was a waste of time.

14   Q.   What about Mr. Warner?  Did he also look into Mr. Warner,

15   the attorney?

16   A.   Yeah, I complained to the Florida State Bar --

17   Q.   Okay.

18   A.   -- and they didn't care.  They said, "Sue him."

19   Q.   The Florida State Bar?

20   A.   Yeah.

21   Q.   That's what their response to you was?

22   A.   Right.

23   Q.   Are you aware of things like error and omission-type

24   policies?  Maybe you even have one on your business, I don't

25   know.  But these kinds of things that lawyers or accountants,

1    people that are in that kind of profession may have.  Have you

2    heard that term before?

3    A.    Yes.

4    Q.    Did your attorney that you retained, do you know whether

5    he or she explored potential claims against Mr. Warner's errors

6    and omissions policies at all?

7    A.    I don't know if he did.  I don't think so.

8    Q.    Okay.  Now, at some point in time you had a fair amount of

9    communication with Mr. Heshelman?

10   A.    Brief, but, yeah, several.

11   Q.    Several phone calls?

12   A.    Uh-huh.

13   Q.    Is that correct?

14   A.    Yes.

15   Q.    And at that point in time you were talking with him, was

16   it your understanding he was living and working over in

17   Switzerland?

18   A.    He was going back and forth.  Sometimes he was back in

19   Michigan.  Sometimes he was in New York.  In fact, after, I

20   think, 9-11 he was there doing -- volunteering for help, for

21   cleanup, things like that.

22   Q.    Okay.  But sometimes he was in Europe?

23   A.    Uh-huh.

24   Q.    Is that a "yes"?

25   A.    Yes.

1   Q.   You're saying -- it's hard for the court reporter.

2   A.   Yeah.

3   Q.   The times that you were able to track him down, did you

4   always get him the first time, or did you have to leave

5   messages, or how did it work?

6   A.   Sometimes I would leave messages.  Sometimes he would

7   answer.

8   Q.   Okay.  Did he ultimately always talk with you about what

9   the status of things were?

10  A.   No.  I mean, we talked a few times about the status, and

11  then when we wanted our money back, that's it, he was done with

12  us, he would not return my calls.

13  Q.   Okay.  How about with Pierre LaBauve, do you know whether

14  he stayed in communications with Mr. LaBauve?

15  A.   I have no idea.

16  Q.   Okay.  You haven't asked Mr. LaBauve?

17  A.   Well, last we talked, he couldn't get ahold of him either.

18  Q.   Okay.  But you don't know -- when was the last time you

19  think you spoke to Mr. Heshelman?

20  A.   Heshelman?  Probably, I don't know, I'm guessing late

21  2001.  I don't know.

22  Q.   Never after that?

23  A.   I don't think so, no.

24  Q.   Okay.  And do you know whether Mr. LaBauve kept in

25  communications with him in '02, '03, '04, '05, that time

1    period?

2    A.    I have no idea.

3    Q.    Did you also have an email address for Mr. Heshelman?

4    A.    Yes.

5    Q.    Did you use that on occasion?

6    A.    Yes.

7    Q.    And do you have some copies of email correspondence

8    between the two of you?

9    A.    Yes.

10   Q.    Was that ever obtained by the government?

11   A.    No.

12   Q.    Do you still have that?

13   A.    I have -- yeah, I've got the last one where he said, Your

14   payment is coming.  I'll get your money back as soon as I get

15   back.

16   Q.    Okay.  Now, are you aware that others -- other investors

17   did get full returns?

18   A.    No.

19   Q.    Are you aware that Mr. Oliver and Prism Mortgage was one

20   of the investors that invested approximately a million and got

21   back 1.8 million?

22   A.    No.

23   Q.    Nobody ever told you that?

24   A.    No.

25   Q.    Now, I take it besides --

1           *MR. TRACY:*  I'm sorry, Your Honor.

2  *Q.  (BY MR. TRACY)*  -- besides the investment we talked about

3  prior to this one that you did with Highland Equities and this

4  one, I take it you've probably been involved with other

5  developments during your life, correct?

6  *A.*   Yes.

7  *Q.*   Maybe some in the stock markets or with mutual funds and

8  that kind of thing?

9  *A.*   Yes.

10  *Q.*   Have you experienced losses with other investments?

11  *A.*   I have experienced losses.  Not everything.  I still own

12  those stocks.

13  *Q.*   Okay.  You understand to a certain extent there's an

14  inherent risk any time you make those types of investments?

15  *A.*   Yes.

16  *Q.*   Thank you very much, sir.  Travel safe.

17  *A.*   Thank you.

18           *THE COURT:*  Mr. Williams, just a point of

19  clarification for me, if you would.  You mentioned two

20  million-dollar investments that you made through Mr. LaBauve.

21           *THE WITNESS:*  Yes.

22           *THE COURT:*  The second one was with -- involved

23  Mr. Heshelman.  Did the first one involve Mr. Heshelman also?

24           *THE WITNESS:*  No.

25           *THE COURT:*  Okay.  I just was not clear about that.

1              Mr. Mekaru, do you have any redirect for

2    Mr. Williams?

3              MR. MEKARU:  Just two points.

4                    REDIRECT EXAMINATION

5    BY MR. MEKARU:

6    Q.   You were asked some questions here about owning stock and

7    the inherent risk in owning stock.

8         This stock, is it held in an investment account, brokerage

9    account --

10   A.   Yes.

11   Q.   -- right?  With a brokerage firm?

12   A.   Yes.

13   Q.   Do they send you statements?

14   A.   Yes.

15   Q.   Monthly?  Quarterly?

16   A.   Yes.

17   Q.   You're watching it go down perhaps recently?

18   A.   Yeah.

19   Q.   But nonetheless, you're getting statements?

20   A.   Yes.

21   Q.   Did you ever get any statements from Mr. Heshelman?

22   A.   No.

23   Q.   Other than the original contract, did you get any other

24   sort of documentation from Mr. Heshelman?

25   A.   No.

*REDIRECT EXAMINATION OF STEPHEN WILLIAMS*

1   Q.   Any sort of confirmation about where your money is being

2   invested?

3   A.   No.

4   Q.   You're getting confirmation about where your money is

5   invested in your investment statement, though, right?  Your

6   brokerage firm statement?

7   A.   Yes.

8   Q.   You can see the stock itself, right?

9   A.   Correct.

10  Q.   You can take that information and corroborate it against

11  what's listed in the *Wall Street Journal*, right?

12  A.   Yes.

13  Q.   Were you able to do anything like that with the investment

14  that you had with Michael Heshelman?

15  A.   No.

16  Q.   And with the account that you have with this other

17  brokerage firm, are you able to direct them to sell stock on

18  your behalf?

19  A.   Yes.

20  Q.   To get money out if you wanted?

21  A.   Yes.

22  Q.   And get your money back?

23  A.   Yes.

24  Q.   Maybe not all of it, but you can get your money back?

25  A.   Yes.

*REDIRECT EXAMINATION OF STEPHEN WILLIAMS*

1   *Q.*   You demanded your money back from Mr. Heshelman.

2        Other than the $89,600, did you get any other money?

3   *A.*   No.

4   *Q.*   And even though he said in his last email payment is

5   coming, you never got any more money?

6   *A.*   No.

7              *MR. MEKARU:*  Thank you.

8              *THE COURT:*  Mr. Tracy?

9              *MR. TRACY:*  Nothing further, Your Honor.

10             *THE COURT:*  Thank you, Mr. Williams.  You may be

11   excused.

12             Ladies and Gentlemen, we're going to break for the

13   day here, and you're going to get a little bit of a break for

14   tomorrow morning because Mr. Mekaru and Mr. Tracy and I have a

15   legal matter to take up first thing, so you won't have to be

16   back here until we will start around 9:00.  Okay?

17             Oh, cautionary instructions.  And I don't mean to

18   make light of that.  It is really important.  And, you know, I

19   think probably the temptation is great to talk about what you

20   have heard after a long day, to maybe do some other things that

21   I've already told you you're not to do.  So please keep those

22   cautionary instructions in mind.

23             No discussions.  Don't begin to form any opinions or

24   conclusions.  When you go home, I don't have any idea if

25   there's been any press here during the week, but if there is

1    anything in the media, please don't read it or pay any

2    attention to it.  Everything that you will need to decide this

3    case is what is going on in this courtroom in front of you.

4            And I thank you very much for your -- you've been a

5    very, very attentive jury in somewhat difficult circumstances.

6    So thank you very much.  And we'll see you tomorrow morning.

7            MR. TRACY:  Your Honor, can we make maybe just one

8    other little housekeeping matter?  That festival starts

9    tomorrow, doesn't it?

10           THE CLERK:  Yes.

11           MR. TRACY:  So it may be a little hard parking for

12   everybody.

13           THE COURT:  It doesn't start until noon.

14           MR. TRACY:  Oh, it doesn't?

15           THE COURT:  No.

16           MR. TRACY:  I thought maybe it started at nine or

17   ten.

18           THE COURT:  No, the big kickoff is at noon.  So you

19   should be able to get into parking in the morning.

20           MR. TRACY:  Thank you.

21           THE COURT:  It will be getting out of here tomorrow

22   night that will be the real trick.

23       *(Jury exited the courtroom at 4:27 p.m.)*

24           THE COURT:  I have -- just before we get to question

25   of Mr. Warner, I want to just make sure that I have all of the

1    right stuff about exhibits.  And here is what my notes show.

2              My notes show that Exhibits 15, 16, 16A, 18, and 18A

3    through D, 22, 24A and 24B of the government's exhibits were

4    offered and admitted.

5              And as to the defense exhibits, H was admitted, I was

6    offered -- no, I'm sorry.  I beg your pardon.  Q was offered

7    but not admitted.  U and V -- U was offered and not admitted.

8    And I'm not sure what we did with V.  Did you offer V?

9              *MR. TRACY:*  Yeah, that's admitted, I believe.

10             *THE COURT:*  Okay.

11             *MR. MEKARU:*  We have that noted as admitted.

12             *THE COURT:*  Okay.  Now with regard to the issue of

13   Mr. Warner's claim of attorney-client privilege.  Now, you

14   indicated -- please be seated.

15             *MR. TRACY:*  Oh, okay, thank you, Your Honor.

16             *THE COURT:*  I'm sorry.  You indicated earlier that

17   you had both spoken with him, although at the time of the

18   hearing on the motion to dismiss, Mr. Tracy, you indicated that

19   you couldn't find him.

20             *MR. TRACY:*  Yeah, I think the government found him

21   Friday.

22             *THE COURT:*  Um --

23             *MR. TRACY:*  Maybe I'm off a little bit.  But I spoke

24   to him -- I think maybe Kathy spoke to him first, and I maybe

25   spoke to him the first time, Your Honor, was maybe Sunday or

1  Monday of this week.  They are all running together right now.

2  I had not talked to him, and I don't think the government had,

3  at the time of the motion to dismiss.

4          MR. MEKARU:  That's correct.

5          THE COURT:  He is going -- he is going to be your

6  witness, Mr. Mekaru?

7          MR. MEKARU:  Yes, Your Honor.

8          THE COURT:  Have you -- can you give me, just in

9  general terms, and this is because the brief research I've done

10 has indicated to me that there may be some things that fall

11 within the privilege and some things that don't, and in

12 preparation for that I'd like to have some idea from you, if

13 you can give it to me without giving away your case, what you

14 intend to explore with him, just in general, so we can be a

15 little more prepared for tomorrow.

16          MR. MEKARU:  Yes, Your Honor.  Well, I think what we

17 want to establish here is that he was in fact -- Mr. Warner was

18 in fact the attorney for Mr. Heshelman.  And that that was the

19 nature of the relationship.  Not with Mr. Sherwood; not with

20 Mr. Moody.  So I don't think that that itself is going to be an

21 attorney-client -- start impinging upon the --

22          THE COURT:  I'm not so sure that's correct.  We have

23 Mr. Sherwood and Mr. Moody already saying that Mr. Warner

24 wasn't his lawyer, but there may well be some case law out

25 there based upon -- just, again, on some very brief research I

1   did -- that indicates that just the disclosure of the

2   relationship may violate the privilege.  So you may want to do

3   a little digging yourself tonight.

4          What else were you planning to get into with him?

5          MR. MEKARU:  I checked briefly with some of my

6   colleagues, and we checked into this, that the ministerial acts

7   of what would be transferring money may not be a communication

8   that would be covered by the privilege.  We wanted to talk to

9   him about who was directing the movement of the money.

10          As we understand it, the privilege would extend to

11   any sort of legal communication.  Any advice, legal advice that

12   Mr. Warner may have given to Mr. Heshelman.  We're not really

13   looking into that at all.

14          We did ask him whether, whether he drafted the

15   agreements, and his indication was that wasn't his work

16   product, that's not his document.  These trust agreements and

17   those other documents.

18          Your Honor, much of what we're doing in the

19   government's case is almost proving the negative as to who is

20   not responsible for this activity, who is not an investment

21   mechanism.

22          So we're calling people that are saying, I'm not --

23   I'm not a bond trader.  I wasn't investing money for

24   Mr. Heshelman.  And Mr. Warner is along those lines.  And I

25   didn't want to leave the government's case here with some loose

1    end that -- where is Mr. Warner?  Why isn't Mr. Warner being

2    called?

3            So we'll produce him.  To the extent that

4    Mr. Heshelman wants to assert some sort of privilege over that

5    relationship, that's fine, but we do want to point out here

6    that we've made the effort to contact him and that he's --

7    there are things that he can say that are still outside of the

8    privilege, that he met with Mr. Moody and confirmed that he

9    spoke with Mr. Sherwood and others, and then try to, at least

10   as best we can, tie up that loose end.

11       *THE COURT:*  In your conversations with him, do you

12   have any sense that we may be looking at a Fifth Amendment

13   claim?

14       *MR. MEKARU:*  I did ask him that, and he seemed to say

15   no, he doesn't know anything about his business.  He just was

16   doing the ministerial acts of moving money.  He had an

17   attorney-client relationship, and he was basically being told,

18   This is where you need to send the money.  Okay.  He sent the

19   money.  When he came in, All right, here is where it goes, and

20   he sent it along.

21           The additional knowledge of what the money was for,

22   he claims to have no knowledge.  Now, I do realize there's

23   going to be perhaps some discrepancy between what Pastor Moody

24   believes was represented to him and what Mr. Warner is going to

25   testify about.  And I don't know.  I mean, Pastor Moody's

1   recollection is he specifically asked:  Is my money safe in

2   your account?  And when we queried Mr. Warner on that, his

3   statement was:  If money goes into my attorney trust account, I

4   don't touch it.  I do with it whatever my client says to do

5   with it, so it's safe in that account.

6          If that's what he told Pastor Moody, it's accurate,

7   it's just not answering his question about his own personal

8   money.  If the client's money goes in, it's safe, he doesn't do

9   anything with it unless his client tells him to do something

10  with it.  It is safe.  That is accurate.  But the more pointed

11  question:  Did you know that money was supposed to stay there

12  for Pastor Moody?  Things along those lines.  He says, no, that

13  wasn't what he understood.

14         So I don't think he's going to -- I didn't get the

15  indication that he was going to assert the Fifth.  We asked

16  him, so . . .

17         *THE COURT:*  I'm just going to leave you with two

18  thoughts.  Any time you want to jump in here, Mr. Tracy, you

19  just feel free to get on your feet.

20         First of all, if you do have any fundamental research

21  that might be of any assistance to me tomorrow, get it to me as

22  soon as you can.

23         And secondly, I think what I'd like to do is do a

24  little voir dire with Mr. Warner before I put him in front of

25  the jury to find out exactly what it is he is going to be

1    claiming.

2            So we will meet here tomorrow morning at 8:30 and

3    hopefully be able to run through that and make sure that we

4    aren't stepping on anybody's privileges, either Mr. Heshelman's

5    or putting Mr. Warner in jeopardy either.  So if anybody has a

6    better idea for how to proceed, now is the time to tell me.

7            MR. MEKARU:  Well, I guess the question then, query

8    to Mr. Heshelman, is he willing to accept that there is a

9    privilege to be had?  Is he willing to waive that so we can

10   inquire of Mr. Warner of his activities in these -- as alleged

11   in the Indictment?

12           MR. TRACY:  I've had that discussion, and Mr. --

13   Michael has indicated, he'll put on the record as well, that

14   he's not willing to waive the privilege.

15           THE COURT:  He does understand that there is a limit

16   to the privilege?  I mean, the privilege is not --

17           MR. TRACY:  Right.

18           THE COURT:  -- all-encompassing.  There are things

19   that are clearly permissible for Mr. Warner to testify to.

20           MR. TRACY:  Yeah, and I spoke to him about that,

21   which would include some things already mentioned.  Obviously

22   if Mr. Warner had a discussion in a meeting with Mr. Moody,

23   there's no privilege there at all.  That's a discussion that

24   the two of them had, and it can't be covered by privilege.

25           Similarly, if he had discussions with Mr. Sherwood

1  and it was outside the context of any attorney-client

2  relationship, that has to be able to come in.  I've explained

3  that to Mr. Heshelman, and I think he well understands those

4  boundaries.

5  What specifically Mr. Warner is going to say, I mean,

6  I think Dan has had more thorough discussions with him on that

7  front than I have.  Mine have been a little bit quick as he's

8  running to court and doing things.  But I have no problem with

9  him testifying to those things.  It's clearly not covered by

10  any privilege.

11  *THE COURT:*  Okay.  Well, we'll meet here tomorrow

12  morning at 8:30, and we will try to at least scope out what

13  he's going to claim.

14  *MR. TRACY:*  Just from housekeeping a little bit,

15  Your Honor, because I don't know what your schedule is

16  tomorrow.

17  *THE COURT:*  You have me all day.

18  *MR. TRACY:*  Okay.

19  *THE COURT:*  I'm yours for the day.

20  *MR. MEKARU:*  Might that extend to after four?

21  *MR. TRACY:*  Because you have Oliver now to get on

22  too, don't you?

23  *MR. MEKARU:*  Yes, Your Honor, we have Mr. Oliver.

24  Unfortunately, I was rushing more than I should have, but I was

25  rushing to try to get Mr. Oliver in.  We're going to hold him

1    over tonight, but he is --

2            *MR. TRACY:*  Are you going to try to get him on first

3    so he can get on his way?

4            *MR. MEKARU:*  I don't know.

5            *THE COURT:*  My only concern, really, is -- I'm quite

6    serious.  I'm available all day tomorrow.  We can only go so

7    far with the court reporter.  I mean, we can't really expect

8    her to go into the wee hours, so --

9            *MR. TRACY:*  She's strong, Your Honor.

10           *THE COURT:*  We do have to be mindful.

11           *THE CLERK:*  Can I interrupt and add something?

12           *THE COURT:*  Sure.

13           *THE CLERK:*  The jurors were specifically asking me,

14   "What time are we ending tomorrow?"  And I said, "I honestly

15   cannot tell you."  And they said, "Well, the judge said 3:00,

16   3:30 usually, but today she said 4:00 and it was 4:30."  And I

17   said, "I'm sorry, I can't tell you a specific time."  So I just

18   throw that out for what it's worth.

19           *MR. TRACY:*  I have no problem ending at 3:30

20   personally.  But I also want him to be able to get the

21   witnesses on --

22           *MR. MEKARU:*  So we --

23           *MR. TRACY:*  You're the bad guy.

24           *MR. MEKARU:*  We're trying.  We lost -- we agreed to

25   it, and we've been trying to move it through.

1          So I'm, just as a courtesy to the fact that we have

2     witnesses here, we have more people flying in from out of town.

3     We have these video links all hooked up.  So there's some

4     things I can push over to next week:  The deputy's testimony.

5     Agent Wetherbee's testimony.  But I really would like to be

6     able to get -- Mr. Mickelson is coming from -- is here from

7     Pennsylvania.  Mr. Oliver is here from Minnesota.

8               THE COURT:  Well, Mr. Mickelson has a deal with you,

9     doesn't he?

10              MR. MEKARU:  And we do have a lot more leverage.

11              THE COURT:  Yeah, you certainly do, yes.

12              MR. MEKARU:  That is true.  So we could potentially

13    send him home and bring him back on Tuesday.

14              And that just is more a matter of an expense.  The

15    inconvenience is something he'll have to deal with.  But we do

16    have a commitment here for this video link with Mr. Turner and

17    Mr. Clyde that would be, I think, really --

18              MR. TRACY:  Mr. Ramsey.  You have three of them.

19              THE COURT:  Well, let me just say that we will --

20              MR. MEKARU:  Turner is Tuesday.  I misspoke.

21    Mr. Ramsey and Mr. Clyde.  Sorry, Your Honor.

22              THE COURT:  We'll do our best to accommodate you, but

23    as I say, there really are some limits both for the jury and

24    for the court reporter.  We just -- there just are limits, and

25    we will have to observe those.

1          I will also say I have, excuse me, a note here from

2    Susan who says that one of the jurors has indicated that at

3    least at the last sidebar she could hear everything you were

4    saying, so you're going to have to be a little more quiet in

5    your sidebar.

6          We do have a lot of problems with that microphone and

7    so forth.  So just be advised to be a little more careful on

8    those, if you would.

9          Anything else we need to talk about this afternoon?

10         MR. TRACY:  No, Your Honor.

11         THE COURT:  I have a couple of lawyers who are

12    patiently waiting to meet with me in chambers.

13         MR. TRACY:  Okay.

14         THE COURT:  Okay?

15         MR. TRACY:  Sorry, Your Honor.  Thanks for giving us

16    some extra time.

17         THE CLERK:  Everyone rise.  Court stands adjourned.

18     (Proceeding concluded at 4:42 p.m.)

19                    *   *   *   *   *

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2   from the record of proceedings in the above-entitled matter.

3

4   Date:  August 14, 2009

5

6                              **/s/ Glenda Trexler**
                               _____
7                              Glenda Trexler, CSR-1436, RPR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX

 2                                               PAGE

 3   GOVERNMENT WITNESSES CONTINUED

 4   BILL VOS

 5        CROSS-EXAMINATION BY MR. TRACY:        356

 6        REDIRECT EXAMINATION BY MR. MEKARU:    366

 7   BRYCE HENRY SHERWOOD

 8        DIRECT EXAMINATION BY MR. MEKARU:      369

 9        CROSS-EXAMINATION BY MR. TRACY:        427

10        REDIRECT EXAMINATION BY MR. MEKARU:    484

11        RECROSS-EXAMINATION BY MR. TRACY:      496

12   DEBRA KAY FEATHERSTONE

13        DIRECT EXAMINATION BY MR. MEKARU:      500

14        CROSS-EXAMINATION BY MR. TRACY:        513

15   SAMUEL GONZALEZ

16        DIRECT EXAMINATION BY MR. MEKARU:      517

17        CROSS-EXAMINATION BY MR. TRACY:        531

18   MITCHELL REED MILLER

19        DIRECT EXAMINATION BY MR. MEKARU:      535

20        CROSS-EXAMINATION BY MR. TRACY:        548

21   STEPHEN WILLIAMS

22        DIRECT EXAMINATION BY MR. MEKARU:      555

23        CROSS-EXAMINATION BY MR. TRACY:        566

24        REDIRECT EXAMINATION BY MR. MEKARU:    584

25                    *   *   *   *   *
```

*EXHIBIT INDEX*

| EXHIBIT | | OFFERED | ADMITTED |
|---------|---|---------|----------|
| DFT H | Emails and letters | 465 | 465 |
| DFT Q | Bank statement | 480 | |
| DFT U | Excerpts from Kennedy Funding's website | 469 | |
| DFT V | Joint venture trust agreement | 454 | 455 |
| GVT 15 | Bank statement of Mitchell Miller | 544 | 545 |
| GVT 16 | Credit union account statement | 503 | 503 |
| GVT 16A | Credit Union membership application | 503 | 503 |
| GVT 18A | Instructions for Transfer of Funds to Bristol Plaza | 521 | 521 |
| GVT 18B | Handwritten Statement of Account | 521 | 521 |
| GVT 18C | Copy of check to Bristol Plaza | 521 | 521 |
| GVT 18D | Real Estate Collection Placement Form | 521 | 521 |
| GVT 22 | Sherwood Plea Agreement | 371 | 371 |
| GVT 24A | Joint Venture Trust Agreement and Promissory Note & Joint Venture Trust Warrantee | 563 | 563 |
| GVT 24B | Letter dated 07-24-01 | 563 | 563 |