1                     UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF MICHIGAN

2                       SOUTHERN DIVISION

3     _____

4   UNITED STATES OF AMERICA,

5                    Plaintiff,
                                   DOCKET NO. 1:06-cr-44

6   vs.

7

8   MICHAEL WAYNE HESHELMAN,

                   Defendant.

9   _____/

10

11                       VOLUME V

12               TRANSCRIPT OF JURY TRIAL

13        BEFORE THE HONORABLE JANET T. NEFF

14          UNITED STATES DISTRICT JUDGE

15           GRAND RAPIDS, MICHIGAN

16             June 9, 2009

17

18   Court Reporter:         Glenda Trexler
                      Official Court Reporter

19                       United States District Court
                      685 Federal Building

20                       110 Michigan Street, N.W.
                      Grand Rapids, Michigan 49503

21

22   Proceedings reported by stenotype, transcript produced by

23   computer-aided transcription.

24

25

1    A P P E A R A N C E S:

2    FOR THE GOVERNMENT:

3         MR. DANIEL Y. MEKARU
          U.S. ATTORNEY
4         The Law Building
          330 Ionia Avenue, N.W.
5         P.O. Box 208
          Grand Rapids, Michigan 49501-0208
6         Phone:  (616) 456-2404
          Email:  Daniel.mekaru@usdoj.gov

7
     FOR THE DEFENDANT:
8
          MR. CHRISTOPHER E. TRACY
9         HONIGMAN, MILLER, SCHWARTZ, AND COHN, LLP
          444 West Michigan Avenue
10        Kalamazoo, Michigan 49007
          Phone:  (269) 337-7708
11        Email: ctracy@honigman.com

12                        *   *   *   *   *

13                                 Grand Rapids, Michigan

14                                 June 9, 2009

15                                 9:10 a.m.

16                     P R O C E E D I N G S

17        *(Jury entered the courtroom at 9:09 a.m.)*

18             *THE COURT:*  Good morning everybody.

19             *ALL:*  Good morning.

20             *THE COURT:*  Welcome back.  We are now resuming trial

21   in case number 1:06-cr-44, the United States of America versus

22   Michael Wayne Heshelman.

23             Good morning, Mr. Heshelman.

24             *THE DEFENDANT:*  Good morning, ma'am.

25             *THE COURT:*  Mr. Mekaru, are you ready?

1        MR. MEKARU:  Yes, Your Honor.

2        THE COURT:  Let's go.

3        MR. MEKARU:  Your Honor, before we proceed with this

4   witness by video link, again I would like to inquire of the

5   defendant and confirm his waiver of any sort of Sixth Amendment

6   right to confront a witness by video link for the witness

7   Mr. Turner coming from Ontario, Canada.

8        THE COURT:  Mr. Tracy, Mr. Heshelman.

9        MR. TRACY:  No objection, Your Honor.

10        THE DEFENDANT:  No objection.

11        THE COURT:  Thank you.

12        MR. MEKARU:  The government next calls Brian Turner.

13        THE CLERK:  Mr. Turner, would you raise your right

14   hand, please.

15                    BRIAN EDWARD TURNER

16              (The oath was administered)

17        THE WITNESS:  I do.

18        THE CLERK:  Thank you.  Would you state your full

19   name for the record, please.

20        THE WITNESS:  Brian Edward Turner.

21        THE COURT:  Good morning, Mr. Turner.  You can't see

22   me, but I'm United States District Judge Janet Neff, and we're

23   here in our courtroom in Grand Rapids, Michigan, where your

24   testimony will be seen and heard by a jury and the defendant

25   Mr. Heshelman, as well as counsel and other people who are

1    present in the courtroom this morning.

2              Mr. Mekaru.

3              *MR. MEKARU:*  Yes, Your Honor.

4                          DIRECT EXAMINATION

5    *BY MR. MEKARU:*

6    Q.    Mr. Turner, where do you live?

7    A.    Thornhill, Ontario, Canada.

8    Q.    And where are you at right now?

9    A.    New Market, Ontario, Canada.

10   Q.    Is that a major city that's near your home?

11   A.    It is one hour north of where I live, and it is a -- in

12   the scheme of things up here, it's a regional municipality.

13   Q.    Are you in a courtroom in that city?

14   A.    Yes.

15   Q.    Okay.  And are there other people present in the courtroom

16   on your end?

17   A.    Yes.

18   Q.    Okay.  Now, Mr. Turner, could you give us a little bit

19   about your background.  How are you employed?

20   A.    I'm not.  I've been self-employed all my life.  I'm a

21   chartered accountant or a CPA by United States designations,

22   and I operated in public practice for 25 years.

23          Subsequent to that I did real estate development work

24   until I retired.

25   Q.    Have you been involved in a number or series of

1    investments, either personally or through your business

2    activities?

3    A.    Um, no.  There have been some, but not a number.

4    Q.    Well, what -- could you give us some sort of idea about

5    what you indicate would be some investments.

6    A.    When I was developing and we had excess cash, we would

7    place it in CDs and things like that.

8    Q.    So you've had some -- I gather you've had some success

9    either professionally as a CPA or an accountant and some

10   success in doing development work, so did there come a point

11   where you had some money that was available for investing or

12   some investment opportunity?

13   A.    Yes.

14   Q.    And then at some point were you either approached or did

15   you come in contact with a man by the name of

16   Michael Heshelman?

17   A.    Yes.

18   Q.    Could you explain for us how it is that you came in

19   contact with Mr. Heshelman?

20   A.    I wish I could remember, but I don't.  Mr. Heshelman

21   contacted me, but I didn't know Mr. Heshelman for any period of

22   time or prior to his contacting me.

23   Q.    What was the nature of his communication with you?

24   A.    Mr. Heshelman was hosting or perhaps promoting a

25   high-yield investment style of program and wanted to know if we

1    wanted to participate.  And he did that on several occasions.

2    Q.   You say did that.  He presented this to you and spoke to

3    you on several occasions?

4    A.   Well, he presented different things.  I don't think it's

5    fair to characterize it as presenting a single proposal.  He

6    presented several.  If I recall properly, it was different

7    proposals.

8    Q.   All right.  And was there anything in common with these

9    proposals that he was presenting?

10   A.   Yes, the projected returns were unusually high in all

11   cases.

12   Q.   Now, did you ever meet with Mr. Heshelman in person?

13   A.   Not that I can remember.

14   Q.   So your communication with Mr. Heshelman, was it all

15   through the phone or was there any sort of correspondence?

16   A.   I only remember telephone conversations.

17   Q.   Did he ever send you any documents or any sort of

18   contracts or anything along those lines?

19   A.   He might have, but not that I remember.

20   Q.   Okay.  Well, based upon Mr. Heshelman's presentation to

21   you, either about one investment opportunity or a series, did

22   you decide to at least pursue this possibility a little

23   further?

24   A.   Yes.  I think your choice of words is good:  To pursue it.

25   We reserved judgment on whether or not we would actually

1   participate in it.

2   Q.   Okay.  Because I think in your mind, as I gather, that you

3   really didn't invest with him, but you did send him some money

4   with the possibility that might be invested if something

5   presented itself; would that be a fair way to characterize it?

6   A.   That's correct.

7   Q.   And let me back up a little bit.  Were you operating a

8   company by the name of Thornbrook International?

9   A.   Yes, sir.

10   Q.   So let me see if I understand this.  At some point did

11   you, or through your company Thornbrook International, did you

12   send some money to Mr. Heshelman?

13   A.   Yes, sir.

14   Q.   And could you describe for us, as best you can recall, the

15   transaction itself, what was involved in sending the money to

16   Mr. Heshelman?

17   A.   Excuse me, can I correct that last response?  We didn't

18   send it to Mr. Heshelman; we sent it to Mr. Heshelman's lawyer,

19   Mr. Warner, in trust.

20   Q.   That's what I was getting at in terms of the mechanics.

21   A.   Yes.  Yes, sir.

22   Q.   So the money, was it mailed, was there a check, or was

23   there a wire transfer of funds to Mr. Heshelman's attorney?

24   A.   It was a wire transfer.

25   Q.   And how much money did you -- well, because there was

*DIRECT EXAMINATION OF BRIAN EDWARD TURNER*

1  money that you sent to Mr. Warner, and I gather there may have

2  been some deduction for a fee or a wire transfer fee.  So how

3  much money did you in total send to -- intend to send to

4  Mr. Heshelman's attorney, and as best you can recall what was

5  the total amount that actually ended up in his account?

6  A.   I recall it to be a million dollars.

7  Q.   All right.  And was this in U.S. currency or in Canadian

8  currency?

9  A.   In U.S. dollars.

10  Q.   Now, you have before you a series of exhibits.  I'd like

11  you to turn to what's been marked as Exhibit 4B, and at the

12  bottom is a page number, page 102.

13  A.   Yes, sir, I have it.

14  Q.   All right.  Now, the -- there are more pages that are part

15  of Exhibit 4B.  I just sent you a single page of a bank

16  statement for this Florida Bar Association, Inc.,

17  Kenneth Warner Mayer -- excuse me -- Kenneth Warner, Attorney

18  at Law.  Do you see that?

19  A.   Yes, sir.

20  Q.   Now, you had said that you had sent money to

21  Mr. Heshelman's attorney.  Was Mr. Warner the attorney you

22  spoke of?

23  A.   Yes, sir.

24  Q.   And in the document itself you see in the detail here some

25  of the transactions.  September 8th, 2000, there's an incoming

1    wire transfer of $999,985, and below that it says, "From

2    Thornbrook International," it's abbreviated, "Inc."

3         Now, sir, is this the wire transfer you spoke of going to

4    Mr. Heshelman's attorney?

5    A.    I believe it is.

6    Q.    And the difference here, may I suggest, is that you

7    thought it was a million dollars.  May there have been some

8    sort of fee associated with that wire transfer to reduce the

9    total amount that was ultimately deposited?

10   A.    There might have been, but I don't remember.

11   Q.    Okay.

12   A.    It's a million dollars, and you're asking me what I

13   remember, and I remember it as being a million dollars, but I

14   wouldn't say that it's impossible that there was a -- some kind

15   of a deduction, but I don't remember.

16   Q.    Okay.  Now, when you sent the money to this attorney's

17   account, what was your understanding as to what would happen to

18   those funds once the money was sent there?

19   A.    The funds were to sit there in trust until such time as an

20   acceptable transaction, a transaction acceptable to me was

21   presented and I approved the utilization of the funds.

22   Q.    So was this money basically sitting there poised to

23   participate in some investment that was being presented in the

24   future by Mr. Heshelman?

25   A.    Correct.  If I thought that the -- it was an appropriate

1  thing for us to participate in.

2  Q.    So was there any sort of, as far as you can recall, any

3  sort of blanket authorization on your part for Mr. Heshelman to

4  invest these monies unilaterally?

5  A.    None whatsoever.

6  Q.    Any sort of agreement that Mr. Heshelman could use a

7  portion of this money immediately for expenses or costs that he

8  incurred in looking for investment opportunities for you?

9  A.    None whatsoever.

10  Q.    So as best that you can recall, how was Mr. Heshelman

11  going to be compensated for these investments?

12  A.    That remained to be seen.  Whatever investment was

13  presented, there undoubtedly would be some -- some element of

14  profit sharing, but it was never presented -- an acceptable one

15  was never presented, so there -- at this stage of the game

16  there was no approval for anything but the funds to stay in

17  trust subject to our authority to proceed with something.

18  Q.    Okay.  So those sort of costs or expenses or compensation,

19  would those have been packaged and presented at the same time

20  as some investment opportunity that was yet to be proposed?

21  A.    I didn't expect a proposal involving a series of expenses.

22  What I did expect was a proposal to share profits from any

23  acceptable transaction, and from Mr. Heshelman's share he would

24  be looking after whatever expenses he had to -- he incurred.

25  Q.    All right.  Once the money went into this attorney's,

1    Mr. Warner's, trust account, this attorney's account, did you

2    have any idea what happened to the money?

3    A.    None whatsoever.

4    Q.    And as far as you're concerned was the money just supposed

5    to stay there, or was there any option for that to be slid over

6    to any other account, again, an account being held for you?

7    A.    That's the same answer as I gave you before.  It was to

8    stay there.

9    Q.    Okay.

10   A.    The same as any lawyer's trust account would handle it.

11   Q.    Now, Mr. Warner, was Mr. Warner your attorney or was he

12   Mr. Heshelman's attorney?

13   A.    He was not my attorney.

14   Q.    So you didn't have any sort of client relationship with

15   him.  As far as the best you understood, was that relationship

16   with Mr. Heshelman?

17   A.    He was not mine.  That's all I can tell you.  I don't know

18   what relationship he had with Mr. Heshelman.  I assumed he was

19   Mr. Heshelman's attorney.

20   Q.    All right.

21   A.    And I may well have been told that he was --

22   Q.    All right.

23   A.    -- but I don't remember.

24   Q.    Now, Mr. Turner, we've had a financial analyst who works

25   with the FBI go through the bank records and reduce that

1    information to a spreadsheet and produce a series of exhibits

2    for us.  And the jury has gone through and seen a series of

3    these exhibits.  But I just want to show you a portion of a

4    couple of exhibits.  All right?

5    A.    Understood.

6    Q.    Okay.  Now, Exhibit 4D, one page.

7    A.    Yes, sir, I have it.

8    Q.    It's one page.

9    A.    Yes.

10   Q.    Page 37 of that exhibit.

11   A.    Yes, sir.

12   Q.    And as I told you before, some of these exhibits are much

13   longer, and I've just presented you with a single page.

14        This summary shows the wire transfer of $999,985 on

15   September 8th, 2000.  And the detail of that transaction is on

16   another document, but that's why I showed you the monthly

17   account statement.  And as you go down, there's an indication

18   here that $1 million was transferred four days later on

19   September 12, 2000, to another account.

20        Do you see that?

21   A.    Yes, I do.

22   Q.    Okay.  The other account and the activity in the other

23   account has been summarized in Exhibit 6C.

24   A.    I have it.

25   Q.    Turn to Exhibit 6C.  And towards the bottom of the first

1    page, 6C, I've given you three pages of that exhibit.  Do you

2    see towards the bottom on -- the transaction there on

3    September 12th, 2000, there's a deposit amount of $1 million.

4    A.    Yes, sir.

5    Q.    Are you with me?

6    A.    I see it.

7    Q.    Good.  Shortly following that deposit, September 15th,

8    beginning on September 15th, there's a series of withdrawals

9    from the account.

10        Now I'd like to go through this and see if you recognize

11   any of these names or if you authorized any of these funds to

12   be taken out of your $1 million.  All right?

13   A.    Yes, sir.

14   Q.    Okay.  So Marie Jose Madeline Gosse Gardet, do you

15   recognize that name at all?

16   A.    No, sir.

17   Q.    Did you authorize that money to come out of your million

18   dollars?

19   A.    No, sir.

20   Q.    Bristol Plaza.  Do you recognize that?

21   A.    No.

22   Q.    Did you have -- as an aside, did you have any idea where

23   Mr. Heshelman was living or where he was doing business from or

24   any sense at all?

25   A.    I know that he had a presence, whether he was living there

1    or not I don't know, but he had a presence in Longboat Key in

2    Florida, and I think he had a presence in Michigan, but I can't

3    say that I know where he was doing business from or where he

4    was living.

5    Q.    Okay.  Moving back to the exhibit.  There's a transfer

6    here that goes back to the other account, and we'll set that

7    aside.

8         And then there's a $10,000 wire transfer to a

9    Dennis Mickelson.  Your document has Mickelson spelled with an

10   "H," but I think it's actually spelled with a "K."

11        Do you recognize that name at all?

12   A.    No, sir.

13   Q.    Turning to the next page.  $10,000 going to Investors

14   First Bancorp Limited.  Do you recognize that name?

15   A.    No.

16   Q.    $10,000.  The next line is First Bancorp Limited.  Do you

17   recognize that?

18   A.    No.

19   Q.    Now, it's been the testimony of other witnesses that

20   Mr. Heshelman was using at various times Investors

21   First Bancorp or First Bancorp as the corporate entity of his

22   activities.

23        Does that refresh your recollection at all of any

24   association Mr. Heshelman may have had with those companies?

25   A.    I've never heard of it, that name before.

1    Q.    Okay.  So as far as you're concerned, the transaction or

2    this opportunity you were investing -- excuse me -- considering

3    was solely with Mr. Heshelman as an individual and not through

4    some other corporation or other entity?

5    A.    I believe that Mr. Heshelman represented himself, and it's

6    entirely possible that he might have presented a proposal that

7    would involve another company, but I didn't -- I never --

8    relations or communications between he and I never got to that

9    point.  I have no knowledge of -- there was never a program

10   that I came close to approving for participation.

11   Q.    All right.  The next line is an interest deposit into that

12   account.  Let's move on to the next one.  $3,000 going to

13   Mitch Miller.

14        Does that name ring a bell at all?

15   A.    No, sir.

16   Q.    The next line is $5,000, again to Dennis Mickelson.

17   You've indicated your lack of knowledge of him.

18        The next line is $5,000 to a Don E. Lee.  Does that name

19   ring any bells at all?  Do you know that name at all?

20   A.    No, sir.

21   Q.    All right.  Next is $5,000 to Orange County Teachers

22   Federal Credit Union.  Do you recognize that institution at

23   all?

24   A.    No, sir.

25   Q.    How about the name Featherstone, Ron Featherstone or

1  Debra Featherstone?

2  A.   No, sir.

3  Q.   The next item is a deposit -- we'll move past that.

4  There's another item here.  There's another transfer going back

5  to the other account.  We'll move past that.  More money going

6  to Bristol Plaza, more money for Investors First, and then

7  $25,000 again to First Bancorp.

8      Now we have a different name, $40,000 going to a John D.

9  Grayshan.  Do you recognize that name?

10 A.   No, sir.

11 Q.   All right.  Continuing, more to First Bancorp, another

12 transfer back to the other account, more money going to Marie

13 Gosse Gardet, Marie Jose Madeline Gosse Gardet, and then

14 $10,000 going to Kristen Rocks.

15     Do you recognize that name at all?

16 A.   No, sir.

17 Q.   Continuing, more money to First Bancorp, more money to

18 Orange County Teachers Federal Credit Union, Dennis Mickelson,

19 and then $15,000 going to Ralph Trustees Limited.

20     Any sense as to what that is?

21 A.   No, sir.

22 Q.   And, let's see, $3,300 is a fund transfer.  We'll move

23 past that.  More interest.  And then $5,000 for a Banco

24 Del Cafe de Nicaragua.  Any knowledge of that?

25 A.   No, sir.

1   *Q.*   All right.  Continuing, there's a $15,000 transaction

2   going to Olga Muzon.

3       Any knowledge of that?

4   *A.*   No, sir.

5   *Q.*   Another $80,000 going to Marie Jose Madeline Gosse Gardet.

6   $5,000 going to Donilo Monzon.

7       Any knowledge of Mr. Monzon or that individual?

8   *A.*   No, sir.

9   *Q.*   A transfer again going back into the account,

10  Bristol Plaza, First Bancorp, Investors First, and then there's

11  $25,000 going to an Anthony Loiacono.

12      Do you recognize that name at all?

13  *A.*   No, sir.

14  *Q.*   There's another transfer and a cash withdrawal, more money

15  to Investors First, and then a Truck -- the Truck Junction,

16  Inc.

17      Any knowledge of that entity?

18  *A.*   No, sir.

19  *Q.*   Okay.  Let's turn to the next page.  Bear with me for a

20  while longer as we go through this.

21      There's a transaction here going to a Robert Tringham.   I

22  don't know, there might be an extra "A" misspelled in here, but

23  I think it's Tringham.  Do you recognize that name at all?

24  *A.*   I have heard of that name.  I don't know in what context,

25  but I have heard that name before.

1  *Q.*   Was there -- as best you can recall, was there any

2  association between Mr. Heshelman and Mr. Tringham in that

3  context that you referred to?

4  *A.*   There might have been, but I don't remember.

5  *Q.*   All right.  More money to Mitch Miller, Ralph Trustees,

6  Sharon Carlson, and then $10,000 from a Merrill Lynch account.

7       Any knowledge of a Merrill Lynch account being opened on

8  your behalf or for your money?

9  *A.*   No, sir.

10  *Q.*   Debra Featherstone.  We asked you about whether you knew

11  anybody by the name Featherstone.  Investors First.

12       How about Erna Vanschelt, $50,000.  Any knowledge of

13  Ms. Vanschelt?

14  *A.*   No, sir.

15  *Q.*   All right.  Additional transfers going back to the other

16  account.  Mr. Tringham, Bristol Plaza, Ralph Trustees.  How

17  about Arron Jepson, $10,000.  Do you know Mr. Arron Jepson?

18  *A.*   No, sir.

19  *Q.*   First Bancorp, Investors First, and then $48,000 going to

20  a Bryce Sherwood.  Do you know Bryce Sherwood?

21  *A.*   No, sir.

22  *Q.*   And then another 52,000 going to Dennis Mickelson.

23  There's a debit memo and then $4,500 going to

24  Thornbrook International.

25       Now, this $4,500 going back to Thornbrook International,

1    any knowledge about that transaction?

2    A.   I believe that I had called for the return of the funds,

3    and for some reason the amount that came back was not the

4    million dollars.  I think it was short by -- I can't remember

5    what it was short by.  But that when I pressed for the return

6    of the rest of the funds, I believe this $4,500 was sent to us.

7    It wasn't the entire amount, but it substantially eliminated

8    the shortfall.

9    Q.   Okay.  Because the timing of this is December 8th, 2000.

10   So in December of 2000 were you asking for the return of all

11   your money?

12   A.   I believe it was prior to that.  I can't remember the

13   dates, but I do remember two payments, and I seem to recall

14   that the first one was a large sum.  You know, 900-plus

15   thousand dollars.  And I seem to recall that there was a --

16   when I pursued the balance of it, that there was a subsequent

17   transfer.  So that's the best I can do.  I don't remember the

18   dates.

19   Q.   Do you remember at all if there was any sort of delay

20   between your original request for the money and its actual

21   production?

22   A.   There was.

23   Q.   Any sense as to how long?

24   A.   Yes.  It was too long.  But I can't -- I can't give you a

25   number of days or a number of weeks.  It was -- it seems to me

1    it was at least a month, maybe longer.

2    Q.   During that delay were you expressing any sort of

3    dissatisfaction to Mr. Heshelman?

4    A.   Certainly.

5    Q.   Were you calling him often?

6    A.   Probably, but I can't remember.

7    Q.   Okay.  Well, sir, you don't strike me as a person who

8    would let the request for returning your money to go away

9    lightly, so is this something you think you probably pursued

10   pretty vigorously?

11   A.   I think that's fair, and I'd just add to that I think I

12   probably pursued Mr. Warner just as hard.

13   Q.   All right.  Now, you were referring to a larger amount of

14   money that came back to you.  You have before you another

15   exhibit.  Why don't you turn to 5A.

16   A.   Yes, sir.

17   Q.   Now, I realize that you probably haven't seen 5A before or

18   in the time frame of December of 2000, but I want to ask you

19   about the transaction that's reflected in 5A.  All right?

20   A.   Yes, sir.

21   Q.   Okay.  This indicates that there was an instruction for a

22   wire transfer of $995 -- excuse me -- $995,985 going to

23   Thornbrook International with some banking information.

24        Does this appear to be the instruction to wire your money

25   back to you?

1   A.   Well, I would expect that a document like this would have

2   to have been created in order to make that happen.

3        Yes, I -- the information on the document appears to be

4   correct in terms of the destination, the wire-to location and

5   accounts, and the amounts seem to be, if I recall -- I think

6   the amounts are right, that 995,985 plus the $4,500,

7   substantially -- substantially a million bucks.

8   Q.   Right.

9   A.   So, yeah, I think -- I think that the -- no, I haven't

10  ever seen it before.

11       Second, the information -- there would have to be this

12  information provided to the bank before a wire like that could

13  happen.

14  Q.   Okay.  Well, I understand that.  I was just -- what I was

15  asking is:  Did this appear to be the return of your money, the

16  transaction reflecting the return of your money in part?

17  A.   Yes.  Yes.

18  Q.   All right.  Just a few more questions, sir.

19       We've gone through your money coming in and then what

20  happened to it once it went into the attorney trust account.

21       As far as you're concerned -- and we've stopped going

22  through this, and I think if we keep going through it, we were

23  probably close to six or seven hundred thousand dollars at that

24  point.  In summary, as far as you're concerned, none of these

25  transactions that involved your money were authorized by you or

1   permitted by you; would that be fair to say?

2   A.   Correct.

3   Q.   And there was no provision for any sort of expenses or any

4   sort of costs to be fronted or paid out of your money and

5   directed by Mr. Heshelman; is that also true?

6   A.   That's correct.

7   Q.   Now, regarding the return of your funds, did you have any

8   knowledge as to where that money actually came from, the actual

9   source of that money?

10  A.   I expected that it was from Mr. Warner's trust account.

11  Q.   And did you --

12  A.   But knowledge, I didn't know.  I didn't know.

13  Q.   Did you just expect that to be, again, your own money

14  being returned to you?

15  A.   Yes, sir.

16  Q.   Do you know a man by the name of Pastor Alan Moody?

17  A.   No, sir.

18  Q.   Do you have any knowledge that his money was actually

19  being sent to you?

20  A.   No.

21  Q.   After you had received your money back from Mr. Heshelman

22  through his attorney, Mr. Warner, did you have any further

23  contact with Mr. Heshelman?

24  A.   I can't recall for certain, but I believe Mr. Heshelman

25  called me a few times.  I don't believe I ever talked to him.

1    Maybe once or twice.  I don't know.
2    Q.   Did you ever pursue any sort of other opportunities or did
3    you ever transfer money back to him with the thought of
4    pursuing any other opportunities?
5    A.   Never.
6             MR. MEKARU:  Thank you, Mr. Turner.
7             Your Honor, we'll pass the witness.
8             THE COURT:  Thank you, Mr. Mekaru.
9             Mr. Tracy.
10            MR. TRACY:  Thank you, Your Honor.
11                        CROSS-EXAMINATION
12   BY MR. TRACY:
13   Q.   Good morning, Mr. Turner.  I'm Chris Tracy.  I represent
14   Michael Heshelman.  How are you today?
15   A.   Fine, thank you.
16   Q.   Good.  So just to summarize a couple points.  I think
17   we've got them, but you know how the other attorney wants to
18   asks questions too, so I apologize if a little of this is
19   slightly repetitive.
20            You or Thornbrook International invested a million
21   dollars, and I use the term "invested" sort of lightly like you
22   used it before, but you put a million dollars with
23   Michael Heshelman into Mr. Warner's account, correct?
24   A.   Correct.
25   Q.   And then approximately a million dollars was returned to

1  you sometime after you requested that money back, correct?

2  A.  Correct.

3  Q.  And your profession is much better at math than mine, but

4  I believe you got that return of monies in two sums.  995,985

5  was one of the things we looked at, correct?

6  A.  Yes, sir.

7  Q.  And then a follow-up transfer of $4,500, correct?

8  A.  I'm not sure about the $4,500.  I know we got a second

9  one, and it could well be.  It's likely that that's right.

10  Q.  Well, from the government's paperwork, that's what it's

11  reflecting.  When I do the math -- but, again, you're dealing

12  with a lawyer here, so keep that in mind when you check the

13  math -- I come up with a transfer back to you between those two

14  of a 1,000,485 bucks.  Does that sound about right?

15  A.  That's what the numbers add up to.  For some reason I

16  believe that the transfer back was short something.

17  Q.  Okay.

18  A.  So that's why I questioned the amount of the 4,500.  But

19  we did get substantially all our funds back, and I did not

20  pursue what I recall as a shortfall.  You may be right.

21  Q.  Okay.  Thank you, sir.

22      And then earlier when you talked to Mr. Mekaru you talked

23  a little bit about the concept of if you were going to get into

24  an investment and actually move forward with one with

25  Mr. Heshelman, these were high-yield or high-return type

1    investments, correct?

2    A.   There were -- yes, "high-yield" being defined as better

3    than normal interest, bank interest income.

4    Q.   Okay.  So, in other words, back then -- this, of course,

5    would have been in the 2000, and then, you know, if you would

6    have moved forward, it would have gone into the 2001 period,

7    but for the 2000 period, whatever your normal bank income

8    interest rate was either in Canada or the United States at the

9    time, you were looking at receiving returns or yields higher

10   than that, correct?

11   A.   Yes, sir, that's correct.

12   Q.   Okay.  And was it your understanding in terms of talking

13   about these concepts with Mr. Heshelman that that would involve

14   a million dollars that you or Thornbrook invested essentially

15   being pooled -- if that word is okay with you, or use a

16   different one if you'd like a different one -- with other

17   people's investments to use that to access more monies that

18   would allow higher returns?  Was that your general

19   understanding?

20   A.   Yes, that might have -- that might have happened.

21   Q.   Okay.

22   A.   The conditions of the pooling had to be acceptable to me.

23   Q.   Exactly.  In other words, before you were actually going

24   to go forward, you and Mr. Heshelman would either have to meet

25   or have conversation by phone to explain it in more detail, I

1   presume paperwork would have to come to you, et cetera, and you

2   would have to approve that before you moved forward?

3   A.   Exactly.

4   Q.   Okay.  And I take it the two of you never met in person;

5   am I right about that?

6   A.   I don't remember meeting in person.

7   Q.   Okay.  So most of your -- if you ever met in person -- the

8   reality is most of your communications happened by phone or

9   email or something along those lines?

10  A.   Correct.

11  Q.   Okay.  Now, I believe you indicated you're retired at this

12  point, correct, sir?

13  A.   Yes, sir.

14  Q.   But some of your prior experience besides being a CPA or

15  an accountant also involved real estate developments, that type

16  of thing, correct?

17  A.   Yes, sir.

18  Q.   And did you do that both in Canada and the United States,

19  or where were those developments occurring?

20  A.   Yes to the first question, and to the second question in

21  the United Kingdom.

22  Q.   Okay.  And did you have partners or other investors that

23  were involved with those developments with you?

24  A.   Yes, sir.

25  Q.   So, in other words, it wasn't just your monies involved,

1    you would get other people involved as part of that process; is

2    that correct?

3    A.    I had partners.  And you seem to be asking a question that

4    relates to broad solicitation.  That's not the case.  My

5    partners were very narrow and were -- tended to be

6    single-source funders and joint venture partners on a

7    project-by-project basis.

8    Q.    Okay.  I wasn't trying to go to that.  I thank you for

9    clarifying that.

10        You had partners or other people that invested dollars

11   with you along with -- in these developments; is that fair to

12   say?

13   A.    Yes, sir.

14   Q.    And then you or attorneys on your behalf, you put together

15   these joint venture agreements, these types of things, that

16   would sort of spell out the details of how the investment was

17   going to work?

18   A.    Yes, sir.

19   Q.    So you were familiar, to some degree, with those types of

20   documents?

21   A.    Yes, as they related to the real estate activity.

22   Q.    Okay.

23   A.    Very narrow.

24   Q.    Okay.  Were some of these projects you were involved with,

25   besides sort of direct real estate, were they also related to

1  golf courses and the like?

2  A.   Yes, sir.

3  Q.   And in the process of pooling these monies together, do

4  you recall whether you ever used attorneys' trust accounts or

5  that kind of thing as part of the process?

6  A.   Yes, sir.

7  Q.   Do you recall during the course of doing these

8  developments, over whatever years you were doing them, did you

9  ever have a partner or one of the investors you were working

10  with opt to pull out of the joint venture?

11  A.   That's a long period of time, and I -- probably, but I

12  can't recall right off the top of my head.

13  Q.   Fair enough.  If that would have happened, and assuming it

14  did happen, I take it if someone pulled out, then part of your

15  role or the other people that you were working with, you would

16  have tried to find another partner or investor to replace that

17  person; is that right?

18       MR. MEKARU:  Your Honor, I'm going to object as to

19  the relevance of all of this.

20       THE COURT:  How is it relevant, Mr. Tracy?

21       MR. TRACY:  Um, we have a very similar process that

22  Mr. Turner was involved with for years and years of investments

23  that he was doing that had to be sort of a similar process to

24  the type of thing that he got involved with with Mr. Heshelman.

25  I'm just exploring the witness's understanding of how the

1    process works to make sure that it's consistent with the type

2    of thing that was --

3              THE COURT:  Well, why don't you ask the question in

4    that way rather than going around the barn to do it.

5              MR. TRACY:  Okay.

6    Q.   (BY MR. TRACY)  Well, my pending question is:  If you had

7    an investor or partner that had to pull out, was your plan or

8    would it be your plan with your partners you're working with

9    that you would look for somebody to replace that person?

10             MR. MEKARU:  Your Honor, again I'm going to object.

11   This is pure speculation.  He's asking this witness to go

12   through a hypothetical on something that isn't related.

13             This witness has testified he put some money into an

14   account, never invested with Mr. Heshelman because he didn't

15   present him with anything he thought was worthy of investing

16   his money, and then asked for it back.

17             MR. TRACY:  Well, the government --

18             THE COURT:  The objection is sustained, Mr. Tracy.

19   You really are getting way off track here and asking this

20   witness to speculate to relate to things that happened many

21   years ago that have no relationship to his dealings with

22   Mr. Heshelman.

23             MR. TRACY:  Okay.

24   Q.   (BY MR. TRACY)  After you received your money back from

25   Mr. Heshelman, or perhaps even before you did that, did you

1    talk with him about any possible golf course developments down

2    in the Florida area?

3    A.   I can't recall.  Not likely.  I wasn't working down there

4    at that time.

5    Q.   Okay.  Do you remember whether he spoke with you at all

6    about one in the Jacksonville, Florida, area that was maybe

7    a Ritz Carlton property?  Does that refresh your recollection

8    at all?

9    A.   No, it doesn't, but, you know, that could have happened,

10   but I don't remember.

11   Q.   Okay.  And in terms of -- Mr. Mekaru asked you about

12   contracts or agreements that you may have signed with

13   Mr. Heshelman related -- or with the company or whatever that

14   he had started up related to this transaction.

15      Do you recall ever getting a request or maybe a subpoena

16   from the U.S. government or the FBI related to getting copies

17   of those documents?

18   A.   (A) I don't believe there were any documents.  (B) I don't

19   recall getting a request.

20   Q.   Did you keep a file on this investment at all that you

21   made?

22   A.   Probably, but I can't recall.

23   Q.   Okay.  And at this point in time there's not any documents

24   out of that file or anything that you've turned over to

25   anybody, I take it; is that correct?

1    A.    No.  No.  You're right.

2              MR. TRACY:  Okay.  Thank you very much for your time,

3    Mr. Turner.  Have a good day.

4              THE COURT:  Thank you, Mr. Tracy.

5              THE WITNESS:  Thank you.

6              THE COURT:  Any redirect, Mr. Mekaru?

7              MR. MEKARU:  No, Your Honor.  Thank you.

8              THE COURT:  Thank you.

9              Mr. Turner, thank you very much for your time and

10   your testimony.  We will terminate the video feed at this time,

11   please.

12             THE WITNESS:  Thank you.

13             THE COURT:  Can we just turn it off?  Do we know how

14   to turn off the monitor?

15             MR. TRACY:  You want a direct answer, don't you,

16   Your Honor?  Don't let us touch it, please.

17             THE COURT:  Or do we have to get IT down here to do

18   that?

19             MR. TRACY:  Go ahead, Dan.

20             MR. MEKARU:  I remember last time they thought it was

21   a little distracting.

22             THE COURT:  I think we'd really like to have that

23   moved out of there, Mr. Mekaru.

24             MR. MEKARU:  We'll at least have it on standby.

25   Obviously it's blocking our witness.  This might be worth more

1    than I make, so I don't want to touch it.

2                 THE COURT:  Yeah, it's probably . . .

3                 MR. MEKARU:  We'll leave it.

4                 THE COURT:  Well, rather than sit here and look at

5    each other, why don't we just take a brief break until the IT

6    people can get this equipment out of here.

7                 We are done with it, right?

8                 MR. MEKARU:  Yes, Your Honor.  Thank you.

9                 THE COURT:  We'll take a brief break at this point.

10                 THE CLERK:  Everyone rise, please.  This Court is in

11   recess.

12        (Jury exited the courtroom at 10:00 a.m.)

13        (Jury entered the courtroom at 10:13 a.m.)

14                 THE COURT:  Mr. Mekaru.

15                 MR. MEKARU:  Yes, Your Honor, the government next

16   calls Anthony Loiacono.

17                 THE CLERK:  If you'll come right over here, please.

18   Raise your right hand.

19                         ANTHONY PHILIP LOIACONO

20                    (The oath was administered)

21                 THE WITNESS:  I do.

22                 THE CLERK:  Be seated, please.  State your name for

23   the record, please, and spell your last name.

24                 THE WITNESS:  Anthony Philip Loiacono,

25   L-O-I-A-C-O-N-O.

1              *THE CLERK:*  Thank you.

2                        DIRECT EXAMINATION

3    *BY MR. MEKARU:*

4    *Q.*   Mr. Loiacono, where do you live?

5    *A.*   Bonsall, California.

6    *Q.*   What do you do for a living?

7    *A.*   I'm a marketing executive.

8    *Q.*   Were you doing that same sort of activity back in '99,

9    2000, 2001?

10   *A.*   The last 30 years, yes, sir.

11   *Q.*   Mr. Loiacono, do you know Michael Heshelman?

12   *A.*   Very well.

13   *Q.*   Could you explain to the jury how you know Mr. Heshelman.

14   *A.*   Michael is my first cousin and my best man in my wedding

15   and a person I love very much.

16   *Q.*   Okay.  I just want to ask you a few questions here about

17   some of the other business activities you may have engaged in

18   with Mr. Heshelman.

19        Beyond your family relationship did you engage in some

20   sort of business transaction or business relationship with

21   Mr. Heshelman?

22   *A.*   One business transition [sic], correct.

23   *Q.*   Okay.  At some point were you associated with or did you

24   have a company called AutoOz?

25   *A.*   Yes, sir, I did.

1    Q.    What is AutoOz?  Or what was that?

2    A.    AutoOz is a customizer of vehicles, and we developed cars

3    for Ford Motor Company or with Ford Motor Company.

4    Q.    Okay.  Now, I guess back -- well, I'm sorry.

5          At some point did Mr. Heshelman agree to join you in this

6    business venture or some association with AutoOz or have some

7    association with AutoOz?

8    A.    His company did, yes.

9    Q.    Okay.  And you said "his company."  Do you remember the

10   name of Mr. Heshelman's company?

11   A.    The best I can recall it was Investors First or --

12   Investors First, I believe.

13   Q.    Okay.  Mr. Loiacono, could you -- why don't we slide the

14   microphone a little closer to you.  We had to twist it around

15   for our previous thing.

16   A.    No problem.  Is that better?  Is that better?  Can you

17   hear that now?

18              THE CLERK:  Pull it closer.

19              MR. MEKARU:  This is flexible.  We can turn it.

20              THE WITNESS:  Is that better?  Okay.

21   Q.    (BY MR. MEKARU)  Okay.  Could you explain to us what

22   Mr. Heshelman's role or participation in AutoOz was to be?

23   A.    He was going to be -- well, papers were signed where he

24   was -- his company was a 49 percent investor in the company

25   AutoOz.

1    Q.   Okay.  Well, his, I guess, equity position of 49 percent

2    in your company, was that based on sweat equity, his work,

3    going out and doing -- and building these things for you, or

4    was it some sort of capital position on his part, capital

5    participation?

6    A.   It was Investor First capital contribution.

7    Q.   Was it --

8    A.   Investment into the company so that we could build the

9    vehicles.

10   Q.   All right.  So was he supposed to bring money to the

11   table, and is that part of his -- is that part of his role with

12   the company?

13   A.   That is correct.

14   Q.   How much money did Mr. Heshelman agree to -- agree to

15   finance or bring to AutoOz?

16   A.   I believe it was $1.8 million.

17   Q.   All right.  Now I want to turn your attention to a few

18   actual transactions.

19        You have before you the exhibit books.  And I think I've

20   actually opened them up to pages that I would like you to read,

21   sir.

22   A.   Okay.

23   Q.   Exhibit 5K -- and I realize you may not have seen

24   Exhibit 5K prior to this proceeding, but I do want to ask you

25   about the transaction that's reflected here.

1      Do you have that?

2   A.   Yes, sir.

3   Q.   Okay.  Now, Exhibit 5K is instruction for a wire transfer

4   of $105,000 going to AutoOz in this Wells Fargo bank account.

5   This would have been in March of 2001.  It's March 7th.  I

6   think this is actually one of those -- the French 7, but it's

7   not 2, it's 7.

8      Do you remember receiving $105,000 from an attorney

9   account, Kenneth Warner, back in March of 2001?

10  A.   I remember receiving $105,000 based on the records that I

11  went back and looked at.  Kenneth Warner, I don't know that

12  name.

13  Q.   Well, who did the $105,000 come from as far as you were

14  concerned?

15  A.   Investor First, the investment part of the $1.8 million.

16  Q.   Okay.  And again, Investors First is Michael Heshelman's

17  company?

18  A.   Yes, sir.

19  Q.   All right.  The $105,000 from Mr. Heshelman's company, was

20  that given to you in any way to be invested in any sort of

21  financial instruments?

22  A.   No, sir.

23  Q.   All right.  AutoOz, it's not a brokerage firm, right?

24  A.   No, sir.

25  Q.   So no sort of securities, no sort of bonds or no other

1    trading activity that's occurring out of this $105,000?

2    A.    No, sir, we were a customized auto manufacturer.

3    Q.    This money, that $105,000, what would that have gone

4    towards?

5    A.    I tried to look back.  To the best of my ability, I think

6    50,000 went to Shaquille O'Neal.  Some money went to buy a

7    vehicle.  I'm not exactly sure of the exact numbers.

8    Q.    Shaquille O'Neal.  Let's cover that a little bit.  Your

9    company was doing this customized auto work.  At some point did

10   your company participate in some sort of agreement with

11   Shaquille O'Neal to produce a vehicle for him?

12   A.    Not for him.  A license under his name.

13   Q.    Okay.  So he was actually somehow associated with the

14   business plan itself?

15   A.    Much like an Eddie Bauer car, an affinity line of

16   vehicles.

17   Q.    And that was part of the money went to that.

18         Again, so the money was really going towards the expenses

19   and the costs associated with the AutoOz business?

20   A.    That is correct.

21   Q.    All right.  And I think this wiring instruction, and

22   behind it is page 2, the actual confirmation of the wire

23   transfer is reflected in Exhibit 14.  Do you see Exhibit 14?

24   A.    Okay.

25   Q.    What is Exhibit 14?

1    A.   This is Wells --

2    Q.   Don't publish it yet, please.  I'm sorry.  Just a moment.

3    Don't publish it yet, Cindy.  Thank you.

4         What is Exhibit 14, sir?

5    A.   Is it this one?

6    Q.   Yes, it's marked on the bottom.

7    A.   It says "Wells Fargo NA."

8    Q.   With a P.O. box.  And then is it basically a monthly bank

9    account statement for an account of AutoOz?

10   A.   It looks like that could be it.

11   Q.   All right.  And the time period that's covered here, it's

12   page 1, and it's possibly numerous pages, but it's a statement

13   date of March 9th, 2001?

14   A.   March 9th, 2001, correct.

15   Q.   Upper right-hand corner.

16   A.   Yes, sir.

17   Q.   Is this just one of the bank statements for AutoOz?

18   A.   I don't know that for a fact because it's so long ago, but

19   it looks like it could be, yes, sir.

20   Q.   Do you see here in the middle there's some sort of

21   transaction detail?

22   A.   February 16th, opening deposit.

23   Q.   Okay.  And then the March 7th transaction?

24   A.   Yes, sir.

25   Q.   Okay.  Does that correspond with your memory about

1   receiving monies, the $105,000?

2   A.   It seems logical, sir.

3   Q.   Okay.  Any reason to question that this is one of your

4   bank statements?

5   A.   No, sir.

6           MR. MEKARU:  I would move for the admission

7   of Exhibit Number 14.

8           THE COURT:  Mr. Tracy.

9           MR. TRACY:  No objection, Your Honor.

10          THE COURT:  It's admitted.

11          MR. MEKARU:  Okay.  We may publish this to the jury.

12  Q.   (BY MR. MEKARU)  So as we were kind of describing it here,

13  I think, for the record, in the middle here there was a deposit

14  and credit activity, and we see transaction detail.

15      It would appear that the account was opened sometime in

16  February, and then in March there was a WT fed number with

17  Mellon United National, it looks like some sort of

18  abbreviation, with the originator being Kenneth Warner,

19  Esquire, and $105,000.

20      So if I may, then, does this appear to be closing kind of

21  a circle, if you will, of we have 5K would be the money being

22  wired out and 14 being confirmation of the money coming in?

23  A.   It seems logical to me.

24  Q.   Okay.  In addition to the $105,000 that's reflected in

25  these documents, did you receive other monies from

1    Mr. Heshelman as part of his participation or his company's

2    participation with AutoOz?

3    A.   To the best of my looking back in records, there was a

4    total of $193,000 put into AutoOz by Investors First and

5    Michael Heshelman.

6    Q.   But the total commitment, though, I thought it was in the

7    neighborhood of 1 million -- in excess of 1 million.

8    1,800,000?

9    A.   Correct.

10   Q.   And just as another example of other monies that may have

11   come to AutoOz, I have tabbed --

12   A.   The GC number here?

13   Q.   Yeah, poor handwriting.  It's actually 6C.

14   A.   Okay.

15   Q.   And it's page 7 of 9.

16   A.   It looks like at the bottom 1-24-06.  Is that correct,

17   sir?

18   Q.   Yes.

19   A.   Yes, sir.

20   Q.   Okay.  This is a spreadsheet that was prepared by one of

21   the financial analysts with the FBI who went through the bank

22   records and just basically took all the detailed information

23   and produced this spreadsheet.  So it's a compilation of

24   information from a particular bank account.

25   A.   Okay.

1   Q.   Towards the bottom of page 7 of 9 --

2   A.   I think I'm here.

3   Q.   Okay.  It's actually on the screen as well.  Do you see

4   there's a $25,000 wire transfer to Anthony Loiacono?

5   A.   Okay.

6   Q.   Do you see that?

7   A.   Yes, sir.

8   Q.   Now, that $25,000 wire transfer, was that monies

9   associated with AutoOz, or was that money intended for you

10  personally?

11  A.   It would be AutoOz.  I've never taken personal -- used

12  personal funds that I would receive from Michael other than an

13  investment.

14  Q.   Okay.  Or the occasional gift or holiday thing, but

15  nothing of this size or magnitude for personal reasons?

16  A.   No.  No, sir.  It was all together with AutoOz.

17  Q.   So this again would represent another portion of the total

18  of $193,000 that Mr. Heshelman was paying towards this

19  relationship?

20  A.   That is correct.

21  Q.   Relationship with AutoOz, the business relationship?

22  A.   That is correct.

23  Q.   Okay.  Well, did Mr. Heshelman fulfill his obligation?

24  Did he fulfill the obligation to fund $1.8 million to AutoOz?

25  A.   No, sir, it was a total of, I believe, based on the

1    records, 193 total thousand dollars.

2    Q.   Did that have any impact on your business?

3    A.   Yes, sir.

4    Q.   Did that result in changing your business plan at all with

5    Mr. Heshelman?

6          MR. TRACY:   Your Honor, I'm going to object in terms

7    of what AutoOz's business is.   There is no relevance to the

8    issues in this case.

9          THE COURT:   What is the relevance, Mr. Mekaru?

10          MR. MEKARU:   Your Honor, I'm going to explore whether

11   there was any sort of return on this investment that came back

12   to Mr. Heshelman and whether that ultimately turned out to be

13   successful.

14          THE COURT:   Well, how is that relevant?

15          MR. MEKARU:   Well, to the extent that there's any

16   sort of cash flow -- this is the closest we've come to an

17   investment to see if there's any returning cash flow coming

18   back to First Investors Corp.

19          THE COURT:   I'll allow it.

20   Q.   (BY MR. MEKARU)  All right.  So now we've got some sort of

21   idea in terms of the framework here.  I want to explore a

22   couple things.

23        First, you had said that the participation with AutoOz was

24   through First Investors, right, and that was Mr. Heshelman's

25   company?

1    A.    I think it's Investors First, but . . .

2    Q.    Sorry.  Investors First.

3    A.    Sorry.  I'm doing my best.

4    Q.    My apologies.  Through some of the other things we've

5    heard in this trial we've heard different names.  So

6    Investors First.

7          Now, did you have any personal knowledge as to where

8    Mr. Heshelman was getting that money that he brought to AutoOz?

9    A.    He provided a document and -- on Investors First that gave

10   me some information and credibility to his financial ability to

11   perform.

12   Q.    Okay.  Did you get any sense at all of whether this was

13   Mr. Heshelman's personal money or if this was part of an

14   investment block that he was bringing to AutoOz?

15   A.    My belief would have been Investors First and his company.

16   Because that's where I got the documentation from.  But I've

17   known Michael my whole life too, so . . .

18   Q.    I'm sorry, I'm just wondering whether he gave you any

19   indication as to whether Investors First represented his own

20   personal monies that he was participating in this company with

21   or if there was some sense that that was an investment block or

22   some monies that he was managing for others and bringing it to

23   AutoOz.

24   A.    I can't answer that with concrete . . .

25   Q.    Okay.  You have no idea?

1   A.   I don't say no idea, but I can't recall that exact

2   conversation.  I know that Investors First was a company.  I

3   don't know exactly who the other parties were that were part of

4   that company.

5   Q.   Okay.

6   A.   I know that that was his company.

7   Q.   All right.  Well, Investors First had a 49 percent stake

8   in AutoOz, right?

9   A.   Correct.

10   Q.   But at some point did that change?

11   A.   Yes, sir.

12   Q.   Can you describe for us how it changed and why?

13   A.   There was a payment due, a cash call due, and a payment

14   was made that was insufficient funds that allowed me to call

15   Michael and Investors First to ask why, and I did so, and then

16   I reduced his Investor First equity position in the company.

17   Q.   Okay.  May I break this down a little?

18   A.   Yeah.

19   Q.   So at some point his commitment required him to send some

20   more money?

21   A.   That's correct.

22   Q.   And he sent a check, but that bounced?

23   A.   That's correct.

24   Q.   Did that trigger some sort of contractual change, or did

25   that trigger a contractual term that allowed you to modify the

1   equity position that Investors First held in AutoOz?

2   A.   Correct.

3   Q.   So what was the change?  It went from 49 percent down to

4   what?

5   A.   I looked at the document before I came that was sent to

6   the bank, and it was 5.1 percent.  So I believe what I did is I

7   calculated the 193 of the 1.8, and that shows a 5.1 percent

8   total investment.

9   Q.   Okay.  So forgive me again.  So then this 5.1 percent

10  basically represented -- the 193,000 was 5.1 percent of his

11  commitment of 1.8 million in rough terms?

12  A.   In rough terms.  I think it actually comes into -- if you

13  do the math, that's 10 percent, but he owned 49 percent of

14  that, so that's how the 5.1 percent was calculated, I believe.

15  Q.   Okay.  I'm following you now.

16       All right.  So now he has a 5 percent interest.  Was the

17  AutoOz company successful and able to return some sort of cash

18  flow back to Investors First?

19  A.   No, sir.

20  Q.   Any sort of monies at all coming back from this equity

21  position --

22  A.   No, sir.

23  Q.   -- of 49 percent or 5 percent?

24  A.   No, sir.

25  Q.   Did the change in the amount of money that

1    Mr. Heshelman was -- the difference between what he committed

2    and what he actually brought forward, did that cause any issues

3    or problems for AutoOz in the business plan?

4    A.   Yes, sir.

5    Q.   What happened?

6    A.   It mandated that I try to find equity to build the

7    vehicles and implement the program.  And I was able to find

8    some dollars to do that, but not enough to make it a viable

9    business, but we did our best.

10   Q.   What's the status of AutoOz?

11        MR. TRACY:  Your Honor, I think the question before

12   Dan indicated to the Court that he was going to explore was

13   whether there was a return or not.  Now we're getting into what

14   happened to the company.  So I still don't see the relevance of

15   that part.

16        THE COURT:  I see the relevance of the earlier

17   questioning.  I don't know what the relevance is of the failure

18   of the company.

19        MR. MEKARU:  Well, I don't know if we've gotten to

20   the point where he's actually said there was a failure of the

21   company.

22        The defendant has indicated that this is a continuing

23   matter, that there's still a possibility of more monies coming

24   in, and I'm exploring here this participation in AutoOz and

25   ultimately what happened to the company and whether there's any

1    possibility that that investment, albeit different than what

2    was represented, had any chance of returning any money to any

3    investors.

4              MR. TRACY:  Why can't we just ask that?

5              THE COURT:  That's a good question.  Why don't you

6    just ask that, Mr. Mekaru?

7              MR. MEKARU:  Okay.  Well, I think that's what I was

8    getting at.

9              THE COURT:  Well, but very slowly.  Let's try to be a

10   little more direct, please.

11   Q.   (BY MR. MEKARU)  Okay.  I'm sorry.  I was going through

12   some foundational questions.  But essentially, as you've heard

13   we've had this discussion, is AutoOz still in operation?

14   A.   No, sir.

15   Q.   So is it in any way able to provide any money as of today?

16   A.   No, sir.

17   Q.   So the total amount of monies that have ever been returned

18   back to Mr. Heshelman or to First Investors, would it be fair

19   to say, is zero?

20   A.   Correct.

21             MR. MEKARU:  Thank you.

22             THE COURT:  Thank you, Mr. Mekaru.

23             Mr. Tracy.

24             MR. TRACY:  Thank you, Your Honor.

25

1                    CROSS-EXAMINATION

2     BY MR. TRACY:

3     Q.    Tony, I've been working on your name.  Loiacono.

4     A.    Very good.

5     Q.    I'll probably get it wrong before we're done, but . . .

6     A.    Thank you.

7     Q.    Thanks again for traveling with us.

8           Just in summary, just to make sure that I understand,

9     through Investors First Michael had committed to invest certain

10    dollars with AutoOz, correct?

11    A.    Yes, sir.

12    Q.    And you used the total of I believe $1.8 million?

13    A.    Total investment, yes, sir.

14    Q.    Right.  And ultimately the amount of money that was

15    contributed only amounted to roughly 193,000, correct, sir?

16    A.    Correct.

17    Q.    So he, through Investors First, they failed to live up to

18    the complete commitment made to AutoOz; is that correct?

19    A.    Yes, sir.

20    Q.    Anything more to it than that really?

21    A.    No, sir.

22    Q.    He's still your cousin?

23    A.    Yes.

24    Q.    You still love him?

25    A.    With all my heart.

1    Q.   And I take it even though it didn't work this way, the

2    game plan all along was for AutoOz to be a successful company?

3    A.   Yes, sir.

4    Q.   That's what you were trying to do?

5    A.   Yes, sir.

6    Q.   Okay.  And from 2000 -- 2000 or so was the period of time

7    when the investment was made with AutoOz?

8    A.   I think it was -- it actually started -- yeah, right in

9    2000, 2001.

10   Q.   Okay.  From -- until late 2008 over periods of time did

11   you stay in contact with Mr. Heshelman?

12   A.   Yes, sir.

13   Q.   And during that period of time were you aware of the fact

14   that he was either traveling to or living in various locations?

15   A.   Yes, sir.

16   Q.   For example, were there periods of time that he was either

17   living or spending a decent amount of time in New York City?

18   A.   I knew there were a couple times that he was in New York

19   City.

20   Q.   Okay.  And were you aware that he was either living and

21   had a business arrangement in, say, for example, Zurich,

22   Switzerland?

23   A.   Very familiar.

24   Q.   And you were able to keep in contact with him throughout

25   that period of time?

1    A.    Yes, sir.

2    Q.    And kept in contact with him even after the investment

3    failed and he failed to live up to his commitment; is that fair

4    to say?

5    A.    Yes, sir.

6    Q.    And from your conversations with him during that period of

7    time, did it appear to you that he was working and doing things

8    in Zurich, for example?

9            MR. MEKARU:  I'm going to object, Your Honor.  This

10   is asking for hearsay.  All this information would only come

11   from Mr. Heshelman, and the basis of that knowledge would only

12   come from Mr. Heshelman.

13           THE COURT:  It's sustained.

14   Q.    (BY MR. TRACY)  Was he vacationing as far as you could

15   tell from your conversations with him?

16           MR. MEKARU:  Again, Your Honor, I'm going to object.

17           THE COURT:  Same ruling.  Sustained, Mr. Tracy.

18   Q.    (BY MR. TRACY)  When do you think is the last time you

19   spoke with your cousin?

20   A.    It's probably been, I don't know for sure, but I'd say 16

21   to 18 months.  Maybe a little bit more; maybe a little less.

22   Q.    So sometime in 2007 or 2008?

23   A.    I think that would be appropriate.

24   Q.    And as near as you can recall, was he in Switzerland at

25   the time that you last talked with him?

1    A.    Yes.

2              MR. MEKARU:  Again, Your Honor, I'm going to object.

3              THE COURT:  Well, we can object all day, Mr. Mekaru.

4    I think let's just move along, please.

5              MR. TRACY:  Okay.

6    Q.    (BY MR. TRACY)  I'm sorry, you said the answer was "yes"?

7    A.    Yes, sir.

8              MR. TRACY:  Thank you very much.  Safe travels back

9    to California.

10             THE COURT:  Any redirect, Mr. Mekaru?

11             MR. MEKARU:  No, Your Honor.  Thank you.

12             THE COURT:  Thank you, Mr. Loiacono.  You're excused.

13             THE WITNESS:  Thank you.

14             MR. MEKARU:  Should we call our next witness?

15             THE COURT:  Yes, please.

16             MR. MEKARU:  Your Honor, the government calls

17   Dennis Mickelson.

18             THE CLERK:  If you'll come forward, please.  You can

19   stop there, face me, raise your right hand.

20                       DENNIS R. MICKELSON

21                 (The oath was administered)

22             THE WITNESS:  I do.

23             THE CLERK:  Be seated, please.  State your full name,

24   please, spell your last name for the record.

25             THE WITNESS:  Dennis R. Mickelson, M-I-C-K-E-L-S-O-N.

1          *THE CLERK:*  Thank you.

2                    DIRECT EXAMINATION

3  *BY MR. MEKARU:*

4  Q.    Okay.  Mr. Mickelson, where do you live?

5  A.    I live in Central Valley, Pennsylvania.

6  Q.    What city is that near?

7  A.    Allentown, Bethlehem.

8  Q.    And how are you currently employed?

9  A.    I work for a company there called Natural Food Source.  I

10  am a sales representative there, and I sell containers of food.

11  We bring in about 400 containers a year, and I have -- I'm a

12  sales representative there to a number of clients I've

13  established.

14  Q.    Mr. Mickelson, in December of this past year,

15  December 2008, were you notified and advised that you had been

16  named in a federal Indictment?

17  A.    Yes.

18  Q.    Were you shown a copy of that Indictment?

19  A.    Yes, I was.

20  Q.    And were you indicted on charges associated with wire

21  fraud and money laundering?

22  A.    Yes, that's correct.

23  Q.    And were you named in that Indictment along with

24  Mr. Heshelman and Bryce Sherwood?

25  A.    Yes, I was.

1    Q.    And did you appear in court on those charges?

2    A.    Yes.

3    Q.    And were you retained -- excuse me -- were you

4    appointed -- I'll ask it this way:  Were you represented by an

5    attorney?

6    A.    Yes.

7    Q.    Who was that?

8    A.    Um, it was just a court-appointed attorney there, and then

9    Scott Mertens here.

10   Q.    Okay.  So your initial appearance on these charges was in

11   Pennsylvania, and then ultimately when you came to Michigan to

12   face the formal proceedings you were represented by

13   Scott Mertens?

14   A.    That's correct.

15   Q.    And were you represented by Mr. Mertens through the

16   balance of the proceedings?

17   A.    Yes, I was.

18   Q.    Are you in fact still represented by Mr. Mertens?

19   A.    Correct.

20   Q.    Did you come to some sort of negotiated resolution with

21   the government regarding your charges?

22   A.    Yes.

23   Q.    And was that agreement reduced to writing?

24   A.    Yes, it was.

25   Q.    Was it reduced to a Plea Agreement?

1   A.   Yes.

2   Q.   All right.  Now, you've got two binders in front of you.

3   I want you to turn to volume number II which contains

4   Exhibit Number 23.

5   A.   Okay.  Volume II is to my right?

6       THE COURT:  It should be marked on the -- both on the

7   spine and on the front of the binder.

8       THE WITNESS:  I see.  23.  23.  Yes, I've found it.

9   Q.   (BY MR. MEKARU)  Okay.  Why don't you put that in front of

10  you.

11      Now, Mr. Mickelson, why don't you turn to the last page of

12  what's been marked as Proposed Exhibit Number 23.

13  A.   Yes, I have it.

14  Q.   Okay.  Is that your signature?

15  A.   Yes, it is.

16  Q.   Did you sign this document on or about May 12th, 2009?

17  A.   Yes, I did.

18  Q.   Below is the signature of a Scott Mertens.  Is that your

19  attorney that you were speaking of?

20  A.   Yes.

21  Q.   And is this your Plea Agreement?

22  A.   Yes.

23      MR. MEKARU:  I'd move for the admission

24  of Exhibit Number 23.

25      THE COURT:  Mr. Tracy.

1              *MR. TRACY:*  No objection, Your Honor.

2              *THE COURT:*  It's admitted.

3    *Q.   (BY MR. MEKARU)*  Okay.  Now let's turn back to the front.

4    On the first page, paragraph 1, you're agreeing to plead guilty

5    to Count 1 of the Indictment as well as not contesting a

6    forfeiture allegation.

7              Is that your understanding of what you pled guilty to?

8    *A.*   Yes.

9    *Q.*   All right.  Paragraph 2 outlines the elements.  I note

10   that -- go back out again.

11             This indicates it's a corrected Plea Agreement.  Did we go

12   back and correct the elements and make sure we had the proper

13   elements laid out for paragraph 2?

14   *A.*   Yes, that's correct.

15   *Q.*   Is that the nature of the correction?

16   *A.*   Yes.

17   *Q.*   Okay.  Paragraph 3 goes through the possible penalties

18   that might be imposed, and paragraph 4 and 5 go through and

19   discuss some of the financial aspects of your resolution of the

20   case.  There might be some restitution; there might be some

21   forfeiture.

22             And then paragraph 6 goes through, and there's a

23   commitment by you to assist in identifying any assets that may

24   be paid towards restitution and forfeiture.

25             Does that sound about right?

1   A.   Yes.

2   Q.   All right.  Paragraph 7.  Paragraph 7 is titled

3   "Defendant's Cooperation."

4        What's your understanding of your obligation under

5   paragraph 7?

6   A.   That I have to -- that I agree to fully cooperate with all

7   proceedings.

8   Q.   Okay.  Now, that cooperation, would that include a meeting

9   with the FBI?

10  A.   Yes.

11  Q.   Also include possibly testifying if called upon?

12  A.   Yes.

13  Q.   All right.  We'll come back to that in a moment.

14  Paragraph 8 goes through the guidelines that will help to

15  assist to compute your sentence.  And then paragraph 9 deals

16  with this waiver of appeal and collateral attack.

17       As far as you understand, does the law permit you to

18  appeal your sentence, the sentence that's imposed by this Court

19  and go to the Court of Appeals and ask that it be reviewed?

20  A.   No, I cannot do that.

21  Q.   The law provides for that?

22  A.   Yes.

23  Q.   But this paragraph says that you're giving up that right?

24  A.   Yes.

25  Q.   That basically you will accept whatever sentence this

1    Court imposes on you?

2    A.    That's correct.

3    Q.    Now, paragraph 10 goes through and starts to outline what

4    the government will do in exchange as far as this

5    Plea Agreement.

6         The U.S. Attorney's Office will move to dismiss the

7    remaining counts at the time of sentencing.

8         Were you named in a whole series of counts in the

9    Indictment?

10   A.    Yes, I was.

11   Q.    Were there approximately 40 charges?

12   A.    That's correct.

13   Q.    So you've only had to plead guilty to just one instead of

14   40?

15   A.    That's correct.

16   Q.    Subparagraph B, there's a paragraph here for reduction for

17   acceptance of responsibility.

18        As far as you understand, do the guidelines permit your

19   sentence to be reduced if you qualify for certain terms?

20   A.    Yes.

21   Q.    If you accept responsibility for your conduct, that that

22   can help to reduce your sentence?

23   A.    Yes, that's correct.

24   Q.    And one step towards that might be pleading guilty?

25   A.    Yes.

1    Q.    Paragraph C, has the government agreed that in addition to

2    that potential reduction for your acceptance of responsibility

3    that the government will review your cooperation and your

4    assistance and evaluate the possibility of asking the judge to

5    reduce your sentence more?

6    A.    That's correct.

7    Q.    Does the judge have to agree to reduce your sentence?

8    A.    No.  It's up to the Court.

9    Q.    Does the Court have the discretion to either go farther

10   and give you more of a reduction or a lesser reduction than the

11   government suggests?

12   A.    Yes, that's my understanding.

13   Q.    Okay.  And subparagraph D is the U.S. Attorney's Office

14   agreed not to use your statements and your admissions against

15   you in the computation of your sentence?

16   A.    Yes.

17   Q.    And paragraph 11, I think, is what you've already kind of

18   indicated here, is that this is really an agreement between

19   yourself and the United States Attorney's Office, but it

20   doesn't really bind the judge.  Is that true?

21   A.    Yes.

22   Q.    All right.  Now, in addition to the Plea Agreement, did

23   you also enter into what's called a Proffer Agreement?

24   A.    Yes.

25   Q.    And is that again some sort of formal provision where the

*DIRECT EXAMINATION OF DENNIS R. MICKELSON*

1    government agreed not to use your words against you?

2    A.   Yes.

3    Q.   But what would be the effect on both your Proffer

4    Agreement and your Plea Agreement if you lied?

5    A.   They would be null and void.

6    Q.   So all those charges, could those all come back?

7    A.   Yes.

8    Q.   And what about your statements, could all those statements

9    that you've made be used against you?

10   A.   Yes.

11   Q.   So let me see if I can kind of summarize here what your

12   bargain is with the government.

13        You're supposed to cooperate, right?

14   A.   Yes.

15   Q.   In exchange has the government reduced the total number of

16   charges just to one?

17   A.   Yes.

18   Q.   And basically capped out the max amount of time that you

19   could face?

20   A.   Yes.

21   Q.   In addition to what the government has done, are you also

22   hoping that the judge will impose a sentence that might even be

23   lower than you might otherwise get?

24   A.   Yes, I would hope that would be true, but it is up to the

25   Court.

1    Q.   All right.  And what are you required to do in exchange?

2    A.   I'm required to tell the truth and to cooperate in these

3    proceedings and any other proceedings that might pertain.

4    Q.   All right.  Is that why you're here testifying today?

5    A.   Yes.

6    Q.   All right.  Mr. Mickelson, do you know Michael Heshelman?

7    A.   Yes, I do.

8    Q.   Have you met with Mr. Heshelman in person?

9    A.   Yes, I have.

10   Q.   On just one occasion, or would it be several and numerous?

11   A.   I believe five occasions.

12   Q.   Do you see Mr. Heshelman in court here today?

13   A.   Yes, I do.  He's seated directly behind you.

14        MR. MEKARU:  Your Honor, may the record indicate that

15   the defendant has been identified by Mr. Mickelson?

16        THE COURT:  Yes, it may.

17        MR. MEKARU:  All right.

18   Q.   (BY MR. MEKARU)  Mr. Mickelson, how did you meet

19   Mr. Heshelman?

20   A.   It was through an introduction through Ellis Smith.

21   Q.   Okay.  Well, then how did you meet Mr. Smith?

22   A.   I was buying Chinese bonds at the time through Sam Kram,

23   and Sam Kram suggested that I call Ellis Smith, and Ellis Smith

24   said that I should talk to Michael Heshelman and that he might

25   be able to help me with those bonds.

1    Q.   Okay.  So there's a whole series of people.  Let's back

2    this up a little bit.

3         You talked about some bonds.

4    A.   Correct.

5    Q.   What were these bonds?

6    A.   These were Chinese gold-backed bonds.  They were

7    historical documents.

8    Q.   These Chinese bonds, were these -- were these being used

9    as some sort of an investment?

10   A.   Yes, that's correct.

11   Q.   Was this a legitimate investment or a fraudulent

12   investment?

13   A.   Fraudulent.

14   Q.   Now, the fact that this was a fraud, was that known by

15   Mr. Kram?

16   A.   Yes, I believe it was.

17   Q.   Okay.  And likewise, was this -- the nature of these

18   Chinese bonds and the fraud, was that also known to Mr. Smith?

19   A.   Yes, I believe so.

20   Q.   Now, basically, as far as you understand, were Mr. Kram

21   and Mr. Smith also engaged in some sort of fraudulent

22   activities as it relates to investments and those sort of

23   financial --

24   A.   Related to the bonds, yes.

25   Q.   So let me see if I understand this.  You have these

1   fraudulent bonds that Mr. Kram and Mr. Smith also had knowledge

2   of and they were helping you with.  And who did they direct you

3   towards as someone who might be able to help you with these

4   fraudulent bonds?

5   A.   Michael Heshelman.

6   Q.   Now, did you discuss the fact that these bonds were -- the

7   nature of these bonds with Mr. Heshelman?

8   A.   Yes.

9   Q.   Okay.  Well, as far as you know, why did these individuals

10  direct you to Mr. Heshelman?

11  A.   I believe that Mr. Heshelman was capable of doing

12  something with these bonds.

13  Q.   Okay.  What do you mean by capable of doing something with

14  them?

15  A.   Either selling them or being able to create a credit line

16  against them and using them in some fashion in a trading

17  program or some other illegitimate method.

18  Q.   So selling them.  I mean -- so misrepresenting their value

19  and selling them to someone?

20  A.   Yes, that's correct.

21  Q.   And using them as collateral.  Again, would that be --

22  involve some sort of misrepresentation about their value to be

23  able to inflate their perceived value so somebody would give

24  you money based on those documents?

25  A.   Yes.

1              THE COURT:  Mr. Tracy.

2              MR. TRACY:  Objection, Your Honor.  We have a lot of

3    leading going on here.  Most of the time I don't have a problem

4    with it, but I'm pretty unfamiliar with these bonds.

5              THE COURT:  I agree, Mr. Tracy.  You have, Mr. --

6    we've given you an awful lot of leeway on the leading,

7    Mr. Mekaru, but I think we are getting into an area that I

8    don't think anybody in the courtroom really has enough

9    familiarity with to let you go ahead and lead this witness so

10   extensively.

11             MR. MEKARU:  Okay.  I was trying to move through

12   this, but all right.  I'll rephrase the questions.

13   Q.   (BY MR. MEKARU)  All right.  So once the -- once you

14   actually had a conversation with Mr. Heshelman about the bonds,

15   what happened next with respect to the bonds?

16   A.   I gave Michael Heshelman 500 bonds approximately, and

17   transferred, transferred the physical bonds to him.

18   Q.   Had there been any exchange of money, not between you and

19   Mr. Heshelman, but before that when you came into the business

20   with these bonds?

21   A.   Yes.  Yes, I purchased these bonds from Sam Kram.  Quite a

22   number of bonds.  There was about $700,000 worth of bonds that

23   I purchased.

24   Q.   Did you use your own personal money?

25   A.   No, I did not.  I used other people's money to do that.

1   Q.   All right.  So, I'm sorry, I interrupted you.  You said

2   that you were given the bonds by Mr. Heshelman.

3        Then what happened next with respect to the bonds?

4   A.   Not much.  Time went by and nothing was really done with

5   them to create any kind of money.

6   Q.   All right.  Well, did you continue any sort of

7   relationship with Mr. Heshelman?

8   A.   Yes, I did.

9   Q.   Well, what happened next with respect to your relationship

10  with Mr. Heshelman?

11  A.   After I established a relationship with Mr. Heshelman, we

12  had talked about private placement and using bonds, another

13  type of bonds as a secured placement to be able to use

14  investors' money, which was also fraudulent.

15  Q.   Okay.  Now, you said "we talked about this."  Was this

16  your idea or was it Mr. Heshelman's?

17  A.   This was something that he said that he was able to do.

18  Q.   Did he describe for you how this investment plan would

19  work?

20  A.   Yes.  Basically monies would be held in an account, and in

21  this case monies would be sent to Ken Warner.  And this was a

22  situation where it was described to the investor to be safe.

23  And that most of this money would be held in an escrow account

24  with the attorney, and that there would be bank bonds that

25  would be purchased.  Bank bonds and with a spread.  And then

1    profits would be made.  At least 10 percent a month is what we

2    had told the investors.

3    Q.   Okay.  Now let me see if I can break this down a little

4    bit.

5         Was that the -- in actuality was that the plan, the course

6    of conduct that was going to be pursued, or was that what the

7    pitch to the investors was going to be?

8    A.   That was basically the pitch to the investors.

9    Q.   Well, in reality what was to happen with the money?

10   A.   The money went to Ken Warner's account, and it was

11   disbursed out to myself, to Michael Heshelman, and to other

12   parties.

13   Q.   Okay.  So I think I jumped ahead here a little bit about

14   what happened to it.  But did some investor actually get

15   presented with this program or this plan?

16   A.   Yes.  I had discussions with Mr. Heshelman, and he asked

17   me if I could find some investors.  And I did that in the form

18   of -- the first person that I had talked to about this was

19   Mike Edwards.  And Mike Edwards subsequently put $360,000 with

20   Mr. Heshelman after an introduction.  I introduced Mike Edwards

21   after I had basically outlined it to him, and he was

22   interested.  I put him in touch with Mr. Heshelman, and

23   contracts were done, money was transferred to Ken Warner's

24   account.

25   Q.   Okay.  How did you come to meet Mr. Edwards?

1   A.   This was through an introduction also through Bill Green.

2   Q.   All right.  Now, Mr. Edwards you said had invested some

3   $360,000 and transferred that money.  Did that $360,000 figure

4   come to have any significance as you go forward?

5   A.   Yes, it did actually.  It became a unit, what we talked to

6   investors about.  Subsequently other investors came in with

7   360, 720, a million eighty.  So it became a unit with -- that

8   we talked to investors about.

9   Q.   The $360,000 figure, though, was that what was originally

10  presented to Mr. Edwards as the unit that he was to put in for

11  this investment?

12  A.   No, actually it was the amount of money that he had

13  available to him to invest.  So it was an arbitrary amount.  It

14  wasn't a set amount.  It was not -- it just became the unit as

15  an arbitrary amount.

16  Q.   All right.  Now, you said Mr. Edwards then invested with

17  you and Mr. Heshelman's program.

18       Did he wire-transfer money to Ken Warner?

19  A.   Yes.

20  Q.   Now, Ken Warner, was he your attorney?

21  A.   No, it was -- he was not.

22  Q.   Whose attorney was he?

23  A.   This was Michael Heshelman's attorney that he selected for

24  this.

25  Q.   And prior to this participation where we have Mr. Edwards,

1   was there already some sort of relationship between

2   Mr. Heshelman and Mr. Warner?

3   A.   Yes, I believe that's correct.  I do remember discussions

4   with Mr. Heshelman that he said that he liked to use Ken Warner

5   because Ken did what he said he would do.  What he was

6   instructed to do.

7   Q.   All right.  Do you have, or did you at the time, did you

8   have any knowledge as to what happened to Mr. Edwards' money

9   once it went into the attorney's trust account?

10   A.   No, I did not.  I was not privy to the bank accounts or

11   had direct contact with Ken Warner.

12   Q.   Did you have any -- yourself any authority to direct money

13   to come out of that account, I mean coming back to you?

14   A.   No, I did not.  I had no direct contact with Ken Warner at

15   that time.

16   Q.   So did you receive any monies from Mr. Edwards' investment

17   of $360,000?

18   A.   No, not initially.

19   Q.   So I think you said here that Mr. Edwards was the first

20   investor?

21   A.   Correct.

22   Q.   Were there subsequent investors?

23   A.   Yes, there were.

24   Q.   Who was next?

25   A.   Tim Oliver was the second person that I talked to about

1    this and outlined this to him, and he was interested.   And

2    again I put him in touch with Mr. Heshelman after he expressed

3    interest, and contracts were drawn up, monies were sent in, and

4    then subsequently I did receive monies.

5    Q.   All right.   Mr. Oliver.   How did you come to find

6    Mr. Oliver?

7              *MR. TRACY:*   I think you called him Mr. Oliver.

8    Instead of saying "Mr. Mickelson," you said "Mr. Oliver."

9              *THE COURT:*   No, he just was referencing --

10             *MR. TRACY:*   Oh, sorry, it's a little confusing.

11   Q.   *(BY MR. MEKARU)*   Let's talk about Mr. Oliver a little

12   more.   How did you come to meet Mr. Oliver?

13   A.   Yes, again through Bill Green and one additional person,

14   Robert DeTour.

15   Q.   Let me explore this a little further.   What was your role

16   as it relates to this plan that you and Mr. Heshelman had?

17   A.   Well, he basically told me that he would pay me for each

18   investor that I brought forward.

19   Q.   So were you supposed to go out and find people for him?

20   A.   Yes.

21   Q.   And who was ultimately supposed to close the deal?

22   A.   I would present the initial pitch, if you want to use that

23   word, to the investors, and I would put them in touch with

24   Mr. Heshelman.

25   Q.   So as far as that actual negotiation of terms, the

1  contracts, and everything else that culminated in the

2  investment, did you participate in those sort of discussions?

3  A.   Would you repeat the question, please?

4  Q.   Yes, sir.  In terms of the actual contracts, the

5  negotiating a contract with the investor and determining the

6  terms of that contract, did you participate in those

7  negotiations with the customer?

8  A.   No, those were outlined by Mr. Heshelman.

9  Q.   All right.  Now, you had indicated that you received some

10  money as it relates to Mr. Oliver's participation.

11  A.   That's correct.  I received -- after Mr. Oliver put in

12  $360,000, I received $10,000.

13  Q.   Did you talk to Mr. Heshelman about receiving that money?

14  A.   Yes, I did.  He said, "Now you can tell people that you've

15  been paid on a trading program."

16  Q.   Well, what did that mean?  What was the significance of

17  that?

18  A.   Well, just basically stating that now I can tell people

19  that, yes, I have made money on this transaction.  And I also

20  received subsequent monies the second time Mr. Oliver put in

21  money, which was $720,000, which I received more money.

22  Q.   Okay.  Sorry.  Just to make sure we're clear here.  The

23  $720,000, is that Mr. Oliver's second investment?

24  A.   That's correct.

25  Q.   And how much money did you receive after his second

1    investment?

2    A.    At least $40,000.

3    Q.    So in total approximately how much money did you receive

4    off Mr. Oliver's money?

5    A.    At least $50,000.

6    Q.    Who decided how much money you would get?

7    A.    Mr. Heshelman.

8    Q.    Did you have any discretion again to go back to

9    Mr. Warner, now the second transaction, to go back to

10   Mr. Warner and say, Well, I want more?

11   A.    No.  No, Mr. Heshelman was the one that decided how much I

12   would receive and subsequently others would receive.

13   Q.    Did you -- I want to now go backwards a little bit here to

14   Mr. Edwards.  Was Mr. Edwards paid back any money on his

15   investment?

16   A.    Yes, he was.

17   Q.    Did you have discussions with Mr. Edwards about the fact

18   that he was getting money back?

19   A.    Yes, I did.

20   Q.    All right.  What was your understanding as to how much

21   money Mr. Edwards got back from his investment?

22   A.    He got his original investment back plus a little bit

23   more.

24   Q.    So it was $360,000 plus how much?

25   A.    Approximately 400,000, perhaps 409,000.

1    Q.   In total?

2    A.   In total.

3    Q.   The flow of money back to Mr. Edwards, did any of that

4    money that went back to Mr. Edwards come through you?

5    A.   Yes, it did.

6    Q.   And how is that?

7    A.   Mr. Heshelman distributed to me and asked me to be able

8    to -- initially there were a number of payments that went

9    directly to Mike Edwards, and at some point Mr. Heshelman

10   distributed that money to me, and I distributed it back to

11   Mike Edwards.

12   Q.   Now, we've seen in some of our other documents and

13   spreadsheets some monies go to a M.A. Edwards Associates.  M.A.

14   Edwards & Associates.

15   A.   Correct.  That's his company.

16   Q.   So if we see money on these spreadsheets or on the other

17   banking records coming from the attorney trust account back to

18   M.A. Edwards, that's the return of his money?

19   A.   That's the money that was directed back to him, correct.

20   Q.   But in addition, let me understand this, some of this

21   actually went through your own bank account?

22   A.   That's correct.

23   Q.   Why?

24   A.   Mr. Heshelman asked me to be able to send it directly to

25   him rather than from him.

1   Q.   Did you have any discussion with Mr. Heshelman why money

2   had to go through you?

3   A.   I wanted him to send it directly, but he sent it to me and

4   asked me to do it, instructed me to do it, and I did it.

5   Q.   Now, you have also before you Exhibit Number 26.  That's

6   not in evidence.

7   A.   Yes, I'm there.

8   Q.   Do you have that?

9   A.   Yes.

10  Q.   And in preparation for the, I guess, the litigation of

11  this case, did you go back and try to dig up some of your own

12  bank records?

13  A.   Yes, I did.  I wanted to see exactly amounts that were

14  correct before I told you anything.

15  Q.   Okay.  And did you go pull up your own bank records from

16  your own -- from your own collection of documents?

17  A.   Yes.

18  Q.   And did you put together essentially a spreadsheet kind of

19  tallying out some monies?

20  A.   That's correct.

21  Q.   What is Exhibit Number 26 then?

22  A.   This is monies that were paid to me that was sent back to

23  Mike Edwards or his girlfriend or in one case his attorney.

24  Q.   And did you -- I'm sorry, did you prepare this document?

25  A.   Yes, I did.

1    Q.   Behind that document are a series of bank statements.

2    A.   Correct.

3    Q.   What are those bank statements?

4    A.   That's supporting documentation showing monies that I sent

5    out from my account to M.A. Edwards & Associates or to

6    Mike Edwards or to his girlfriend or attorney.

7             MR. MEKARU:  I move for the admission

8    of Exhibit Number 26.

9             THE COURT:  Mr. Tracy?

10            MR. TRACY:  No objection, Your Honor.

11            THE COURT:  It's admitted.

12   Q.   (BY MR. MEKARU)  All right.  And, Mr. Mickelson, now did

13   you prepare this document at the request of the government or

14   the U.S. Attorney's Office?

15   A.   No.

16   Q.   When did you make the government aware that you had this

17   spreadsheet and present the spreadsheet and the bank records?

18   A.   Did you ask me why?

19   Q.   No, when.

20   A.   When.  This was within the last couple of weeks.  Two or

21   three weeks.

22   Q.   The actual bank statements, though, were these actually

23   turned over --

24   A.   Very recently.

25   Q.   -- last Friday?

1    A.    Yes.

2    Q.    Okay.  So let me just walk through this.  Can you flip to

3    the second page?

4          All right.  So there are two items that are being shown on

5    this document.  First Union is your bank account?

6    A.    Correct.

7    Q.    Is your bank?  Does there appear to be money coming in, am

8    I reading this right, from Ken Warner for $30,000?

9    A.    Yes.

10   Q.    And then money going out at $20,000.  And on the last line

11   there's an M.A. Edwards & Associates, Inc.?

12   A.    Correct.

13   Q.    Now, were these all wire transactions?

14   A.    Yes.

15   Q.    Money being wired in and money being wired out on to

16   Mr. Edwards?

17   A.    Yes.

18   Q.    And the date of that would be --

19   A.    January 5th, 2000.

20   Q.    Why don't I see that?  Can we back up, please?

21   A.    It's at the top.  In the right-hand portion on the top.

22   Q.    Okay.  May we look at the detail?  Posting date for that

23   particular transaction.

24   A.    Yes.

25   Q.    Okay.  So then did you take that information and reflect

1    that back on page 1?

2    A.   Yes, I did.

3    Q.   Can we go back to page 1, please?  January 5th, 2000, item

4    number 1, $20,000.

5    A.   Correct.

6    Q.   Now, I don't want to go through this whole exhibit, but

7    basically is that what you did to produce the summary page,

8    page number 1?

9    A.   Yes, with the one exception.

10   Q.   And with respect to this exhibit was there an exception?

11   A.   Yes, there was.

12   Q.   Okay.  What would that be?

13   A.   On number 5, this was monies that was given directly to

14   Mike Edwards by myself.  Mr. Heshelman told me to go ahead and

15   pay Mike Edwards $25,000 cash and that he would wire me the

16   money.

17   Q.   I'm sorry.  You lost me.  So do you not have the document

18   for that, or is that --

19   A.   No, this was not -- every other item on this page I have

20   supporting documentation on with the exception of number 5.

21   Q.   All right.

22   A.   I put number 5 on there because I am quite clear that I

23   paid Mike Edwards that money at the direction of

24   Michael Heshelman.

25   Q.   Okay.  Now, you said Mr. Edwards got a total of $400,000

1   back from his $360,000 investment.

2        Who made the decision to give him more money back?

3   A.   Mr. Heshelman.

4   Q.   Why?

5   A.   Well, it just made sense at the time.  I believe it's

6   better to have some people that are paid off.

7   Q.   Can you explain to the jury why that makes sense to have

8   an investor paid off?

9   A.   Well, it acts as a good reference, and it shows that some

10  people are making money.

11  Q.   So was Mr. Edwards then available as a reference for

12  future investors?

13  A.   Yes.

14  Q.   Did you ever call upon Mr. Edwards to give a reference or

15  make any sort of recommendation to other investors?

16  A.   It was not necessary.

17  Q.   But as you went forward, did you know that he was

18  potentially available to do so?

19  A.   Yes.

20  Q.   Okay.  Now, the money that went back to Mr. Edwards, did

21  you have any sense as to where that came from?

22  A.   It came from the trust account of Ken Warner, the

23  attorney, at the direction of Mr. Heshelman.

24  Q.   And those underlying funds, the source of the monies that

25  were in the trust account, did you have any sense of where

1   those underlying funds came from?

2   A.   Yes.   I had conversations with Mr. Heshelman in February,

3   approximately February of 2000, where Tim Oliver had already

4   received back $1.5 million on his -- you know, on the monies

5   that were directed to him, and that he couldn't expect more,

6   and that those monies did come from the trust account and from

7   subsequent other investors.

8   Q.   I'm sorry, could you explain this a little bit?  So this

9   conversation you had, was that with Mr. Heshelman?

10  A.   Yes.

11  Q.   All right.  And the context of the conversation relates to

12  Mr. Oliver?

13  A.   Correct.

14  Q.   Now, Mr. Oliver had invested approximately $1 million,

15  1 million --

16  A.   1,080,000.

17  Q.   And was Mr. Oliver getting money back from his investment?

18  A.   Yes.

19  Q.   And did you have some sense as to how much money

20  Mr. Oliver was getting back?

21  A.   Yes.  At that point in time he had gotten slightly more

22  than $1.5 million.

23  Q.   And who made the decision to give Mr. Oliver his money

24  back?

25  A.   Mr. Heshelman.

1  Q.   And how much -- and who made the decision about how much

2  money to give him back?

3  A.   Mr. Heshelman.

4  Q.   So, I'm sorry, then you were describing this conversation

5  you had with Mr. Heshelman.  Why were you talking to him about

6  the amount of money that he was getting -- that Mr. Oliver was

7  getting?

8  A.   Could you repeat the question, please?

9  Q.   I'm sorry.  Let me repeat that.

10       Tell me about the conversation you had with Mr. Heshelman

11  about Mr. Oliver getting his money back.

12  A.   Okay.  Basically it was I was talking to Mr. Heshelman,

13  and he had said that he had already received back over 1 1/2

14  million dollars and he couldn't expect to receive any more.  I

15  mean, what more could he want?

16  Q.   Now, why was Mr. Oliver given more money than he had put

17  in?

18  A.   This was a decision that was made by Mr. Heshelman.  He

19  had been in constant contact with Mr. Heshelman and was also an

20  attorney.

21  Q.   He -- I'm sorry, just so we're clear here, "he" who was an

22  attorney?

23  A.   Mr. Oliver --

24  Q.   Okay.

25  A.   -- was an attorney and was in quite close contact with

1   Mr. Heshelman.  And Mr. Heshelman made a decision to return his

2   money in that fashion.

3   Q.   All right.  So the first two people, they got their money

4   back and more; would that be fair to say?

5   A.   Yes.

6   Q.   Was there any discussion about having Mr. Oliver also

7   available to maybe act as a reference since he got more money

8   back?

9   A.   No, there was no immediate discussions, no.

10   Q.   Well, what happened next in chronological order with

11   respect to this investment plan with Mr. Heshelman?

12   A.   Next I introduced Bryce Sherwood to Mr. Heshelman, and at

13   that point in time Mr. Sherwood started bringing forward

14   investors.

15   Q.   Okay.  So how did you meet Bryce Sherwood?

16   A.   An introduction through Jeff Straiter.  Also talking to

17   him about the same type of investments, the same investment.

18   And he referred me to Bryce Sherwood, and I talked to

19   Bryce Sherwood about this, and he was keen on bringing -- at

20   least initially very receptive and then quickly after that

21   started bringing investors forward.

22   Q.   So let me explore this a little bit.  Mr. Straiter, as far

23   as you know was Mr. Straiter involved in the same sort of

24   investment fraud?

25   A.   He was very keen on it, yes, and was receptive to it, yes.

1   *Q.*   So why didn't Mr. Straiter himself participate?

2   *A.*   He did not have any investors that I know of that he

3   brought to me.

4   *Q.*   So if he didn't have them, he then thought that

5   Mr. Sherwood would be interested in this investment fraud and

6   new people?

7   *A.*   Yes.

8   *Q.*   Okay.  So did you then meet with Mr. Sherwood?

9   *A.*   Yes, I talked to him over the telephone and subsequently

10  established a relationship, and he started to bring investors

11  forward.

12  *Q.*   Okay.  Well, did Mr. Sherwood have prior knowledge or a

13  prior relationship with Mr. Heshelman?

14  *A.*   No.

15  *Q.*   Well, what was Mr. Heshelman's reaction on your decision

16  to go out and get Mr. Sherwood involved?

17  *A.*   He said that he would pay me for each investor that was

18  brought forward.  That even though Bryce Sherwood was bringing

19  them forward, I would still get paid.

20  *Q.*   Okay.  Well, we'll come back to that.

21       So was Mr. Sherwood able to find investors for this

22  investment fraud?

23  *A.*   Yes.

24  *Q.*   Who did he find first?

25  *A.*   I believe it was Allan Clyde.

1    Q.    Now, did you participate in any communications with

2    Mr. Clyde in presenting this investment?

3    A.    No.

4    Q.    Did you act as any sort of a reference, anything along

5    those lines for Mr. Clyde?

6    A.    No.  That happened later, but for Mr. Clyde, no.

7    Q.    Well, do you have any sense, based on your conversations

8    with Mr. Sherwood or Mr. Heshelman, about whether Mr. Clyde

9    actually decided to invest?

10   A.    Yes, I was told that he was going to invest, and once that

11   money was available, I was paid quite handsomely.

12   Q.    Okay.  So at some point you -- who told you that Mr. Clyde

13   had decided to invest?

14   A.    Mr. Sherwood and Mr. Heshelman.  He said -- I had a

15   discussion with Mr. Heshelman, and he said he was taking

16   $180,000 and he was sending me $180,000.

17   Q.    Each?

18   A.    Each.

19   Q.    And of that $180,000, was any of that to go to

20   Mr. Sherwood?

21   A.    Yes, 25,000.

22   Q.    Who decided that amount?

23   A.    Mr. Heshelman.

24   Q.    And did you in fact forward $25,000 on to Mr. Sherwood?

25   A.    Yes, I did.  I don't have supporting documentation, but

1   from my memory, yes, I would have paid Mr. Sherwood 25,000.

2   Q.   Did you have any conversation with Mr. Heshelman about --

3   where he commented on the success of Mr. Clyde's investment,

4   the being able to close that deal or find that investor?

5   A.   Well, I got the sense that the better job I did, the more

6   money I would be paid.

7   Q.   Mr. Clyde's investment, that was in December of '99?

8   A.   Yes, December 23rd is when he sent that monies.

9   Q.   Did Mr. Heshelman comment anything about that being the

10  holiday season?

11  A.   Yes, as a matter of fact, he did.  He said it was going to

12  be a good Christmas.

13  Q.   All right.  Did you have any knowledge or understanding

14  about the terms of the contract with Mr. Clyde?

15  A.   Yes, it was my understanding that in that contract there

16  was a 30 percent clause.  70 percent was to be held in

17  Ken Warner's account, 30 percent could be used for expenses

18  to -- at Mr. Heshelman's discretion.

19  Q.   How much money did Mr. Clyde invest?

20  A.   1.08 million.  1,080,000.

21  Q.   So how many units did that reflect?

22  A.   Three.

23  Q.   So you knew about this 30 percent clause, but how much

24  money did you and Mr. Heshelman get immediately out of this

25  money?

1   A.   $360,000.

2   Q.   Was that within the terms?

3   A.   No, it was not.

4   Q.   All right.  I'm going to come back to this monies going to

5   Mr. Sherwood here, but let's go forward then to the next

6   investor.

7        After Mr. Clyde's participation or investment, who was

8   next?

9   A.   I believe it was Paul Ramsey.

10  Q.   Who found Mr. Ramsey?

11  A.   Again, Mr. Sherwood.

12  Q.   Did you ever speak to Mr. Ramsey, pitch this investment to

13  Mr. Ramsey?

14  A.   No, I did not.  It was not necessary.

15  Q.   Did you ever have to talk to Mr. Ramsey afterward about

16  the status of his investment?

17  A.   Not that I remember.

18  Q.   Were you told by Mr. Sherwood and Mr. -- and/or

19  Mr. Heshelman the total amount of monies coming in from

20  Mr. Ramsey?

21  A.   Yes, again I believe it was 1,080,000.  I'd have to refer

22  to the spreadsheets, but I believe that's correct.

23  Q.   And did Mr. Ramsey eventually decide to invest more money?

24  A.   I believe he did.

25  Q.   Okay.  Now, if you're not talking to Mr. Ramsey, how are

1    you getting your information about what Mr. Ramsey is doing?

2    A.   Through Mr. Sherwood and -- excuse me, first through

3    Mr. Heshelman and then Mr. Sherwood.

4    Q.   Okay.  When Mr. Ramsey decided to invest, decided to give

5    $1,080,000, were you compensated at all?

6    A.   Yes, I was.

7    Q.   How much money did you get?

8    A.   I'd have to look at the spreadsheet, but again I believe

9    it was $180,000.  And there were some other subsequent amounts

10   that I received that I directed back to Mike Edwards.  So

11   there's a flow of money going to me and through me.

12   Q.   Okay.  Now, you said you'd need to refer to the

13   spreadsheets.

14        In the litigation of this case, and I guess maybe going

15   back to even the grand jury, have you seen some spreadsheets

16   that were prepared by the FBI?

17   A.   Yes.

18   Q.   And you've seen some of the details of the transactions?

19   A.   Yes.

20   Q.   And do those transactions assist you in remembering

21   exactly who put in money when and how much?

22   A.   Yes, correct.

23   Q.   Okay.  Let's turn to -- I think Mr. Ramsey may help you

24   here.  I think it's in 12C.  No, 12D.

25   A.   I'm there.

*DIRECT EXAMINATION OF DENNIS R. MICKELSON*

1    *Q.*   Okay.  So you mentioned that he had invested $1,080,000.

2    If we go through the list, once the money came in -- we'll go

3    through the list of the money going out.  There's EMA or

4    EMA Hotel.  Do you have any knowledge of what that is?

5    *A.*   I did not stay there.  I believe this was a hotel bill

6    that was paid for Mr. Heshelman.

7    *Q.*   Okay.  This Hoffman Dorchedk, any idea what that is?

8    *A.*   No.

9    *Q.*   John Grayshan, any idea who that is?

10   *A.*   No.

11   *Q.*   Prism Mortgage is getting a hundred thousand dollars.  Who

12   is Prism Mortgage?

13   *A.*   Tim Oliver.

14   *Q.*   And then $180,000 goes to Dennis Mickelson?

15   *A.*   Correct.

16   *Q.*   And then later down, jumping ahead here, another $50,000

17   went to Bryce Sherwood?

18   *A.*   Yes.  At this point Mr. Sherwood was receiving monies

19   directly from Mr. Heshelman and also from myself.

20   *Q.*   So of that $180,000 that was sent to you, did any of that

21   go to Bryce Sherwood?

22   *A.*   I believe it did, yes.  I'd have to refer again back to

23   the other, but yes.  I'm sure $25,000.  There were some other

24   amounts that I listed there, so that would be accurate.

25   *Q.*   Okay.  We'll explore this a little now.

1      I guess in preparation for your testimony did you start

2  going through and start pulling other bank records like you did

3  for the Mike Edwards bank information?

4  A.   Yes, I did.

5  Q.   And did you go back to see if there were -- you had bank

6  records for monies that were being transferred from yourself to

7  Mr. Sherwood?

8  A.   Yes, I did.

9  Q.   Did you also prepare another spreadsheet or summary of all

10  that banking activity?

11  A.   Yes, I did.

12  Q.   And you have what's been marked as Exhibit Number 25 in

13  front of you?

14  A.   Yes.

15  Q.   Is that the spreadsheet?

16  A.   Yes, it is.

17  Q.   All right.  What are the pages behind that spreadsheet?

18  A.   Supporting documentation from my bank as showing fund

19  transfers to Mr. Sherwood.

20  Q.   Okay.  There's also some, I think, some handwritten

21  notations on these documents.  Is that your handwriting?

22  A.   Yes, it is.

23  Q.   I'll move for --

24  A.   Just correlating to the front page that I made.

25  Q.   All right.  And this document, did you present this to the

1    government on Friday of last week?

2    A.   Yes.

3          MR. MEKARU:  I move the admission of

4    Exhibit Number 25.

5          THE COURT:  Mr. Tracy.

6          MR. TRACY:  No objection, Your Honor.

7          THE COURT:  It's admitted.

8          MR. MEKARU:  Okay.

9    Q.   (BY MR. MEKARU)  Now, Mr. Mickelson, you had just

10   testified that there was another $25,000 that you had forwarded

11   on to Mr. Sherwood from the investment by Mr. Clyde.

12   A.   Correct.

13   Q.   Is that reflected on your summary on that spreadsheet?

14   A.   No, it is not.  I only put on this particular spreadsheet

15   what I had supporting documents from my bank.

16   Q.   So similar to the spreadsheet you had for Mr. Edwards, if

17   we flip back to page 2, the first item there --

18   A.   Yes, that first line shows $500 that was transferred to

19   Bryce Sherwood.

20   Q.   Was this a wire transfer?

21   A.   Yes.  All of these are wire transfers.

22   Q.   Okay.  So that first one was $500.  And then as you go

23   through your summary here, that increases in the next one to

24   $7,500?

25   A.   Correct.

1  Q.   With the same sort of detail on your bank statement

2  showing the recipient?

3  A.   Yes, "BS" refers to Bryce Sherwood.  BS1, BS2, BS3 to

4  coincide with the first page.

5  Q.   "BS," I'm sorry, that's your handwritten notation --

6  A.   Yes.

7  Q.   -- in the upper -- and back out of it so we see the whole

8  document -- up in the upper right-hand corner?

9  A.   Yes.

10  Q.   Okay.  So, Mr. Mickelson, how much money in total did you

11  transfer to Mr. Sherwood?

12  A.   That I have supporting documentation on, 166,750.

13  Q.   And then -- but based upon your recollection there was

14  another $25,000 that went to him?

15  A.   Yes, that's correct.

16  Q.   All this money that you're transferring to him, did it all

17  come or was it all related to this investment?

18  A.   Yes.

19  Q.   So if Mr. Sherwood were to deny ever getting any money

20  from you, you have documentation to support the fact that you

21  actually did give him money?

22  A.   That's correct.

23  Q.   Um, the dollar amounts -- can we go back to page 1,

24  please?  These dollar amounts that were being forwarded on or

25  being sent to Mr. Sherwood, are you deciding how much money

1   goes to Mr. Sherwood?

2   A.   I can see in all the $25,000 ones this was definite

3   instruction from Mr. Heshelman.  There may be some latitude as

4   to amounts, smaller amounts.  But I would say generally

5   speaking this is instruction by Mr. Heshelman.

6   Q.   Now, you said initially.  It sounded like you said

7   initially the money was mostly coming through you and then at

8   some point there was an overlap of money coming from you and

9   directly from Mr. Heshelman, and then eventually were the

10   monies coming directly from Mr. Heshelman?

11   A.   Yes.  For about a six-month period or so monies were

12   coming through me to Mr. Sherwood, and then after that period

13   there were monies that were coming from Mr. Heshelman and

14   myself to Mr. Sherwood.  And then eventually only from

15   Heshelman to Mr. Sherwood.

16   Q.   Why?  Why this flow of money through you?

17   A.   Again, it was the instructions of Mr. Heshelman.

18   Q.   Well --

19   A.   And there was more to it than that.  It was because I

20   brought in Mr. Sherwood, so basically it was a situation where

21   I was in charge of Mr. Sherwood at that point for

22   distributions.  So it was -- the reasoning was that I had

23   brought him forward.

24   Q.   So you were essentially responsible for him?

25   A.   Yes.

1    *Q.*   Now, you had mentioned some other names earlier.   A

2    Mr. Bill Green.

3    *A.*   Yes.

4    *Q.*   And a Mr. Robert DeTour, DeTour, D-E-T-O-U-R?

5    *A.*   Yes, I believe that's correct.

6    *Q.*   Okay.   Were any of the monies that came from Mr. Oliver or

7    Mr. Edwards sent to Mr. Green or Mr. DeTour?

8    *A.*   Yes.

9    *Q.*   Why?

10   *A.*   To compensate them for their role in this.

11   *Q.*   Because they did the introduction?

12   *A.*   Yes.

13   *Q.*   Can you give us any -- some sort of sense as to how much

14   money Mr. Green and Mr. DeTour were getting?

15   *A.*   I believe Mr. Green got less than $5,000.   I don't have

16   that spreadsheet that I had handwritten with me.   But

17   Mr. Detour -- I gave you amounts that I have supporting

18   documentation on, but there were additional amounts that I can

19   remember approximately, but I can't give you exact amounts on.

20   The ones that I disclosed to the Court here or to you were

21   exact amounts and exact dates.   Others, Mr. DeTour, I believe

22   would be in the range of about $50,000 or more.

23   *Q.*   Okay.

24   *A.*   Mr. Green less, like 5,000.

25   *Q.*   All right.   Now, going back to Mr. Ramsey's money.   Let's

1   go back to I think we're 12D.  All right.  5-22-2000, there's

2   $140,000 again going to you, and then it looks like on

3   June 8th, 2000, another $1,438,560 coming in from Mr. Ramsey.

4       So Mr. Ramsey's total participation was in the

5   neighborhood of 2 1/2 million dollars?

6   A.   Yes.

7   Q.   Of that $140,000 that went to you, you said that some --

8   of total monies that came to you, you said some of that went

9   back to Mr. Edwards?

10  A.   Yes.

11  Q.   There's $10,000 on May 16th, 2000, going through

12  Joseph Rosati Realty, Inc.

13      Do you know anything about Joseph Rosati Realty?

14  A.   Yes, I talked to Joseph Rosati a few times myself, and

15  this is a friend of Mr. Heshelman's.

16  Q.   Did Mr. Rosati have any participation or role with respect

17  to those gold bonds you were first talking about?

18  A.   Yes.

19  Q.   Can you explain that for us?

20  A.   They were returned to me through Joseph Rosati.

21  Q.   And help me out here.  So those gold bonds --

22  A.   I did not talk to him initially about the bonds, but I did

23  talk to him a few times and knew that he had some participation

24  with that and that those bonds were returned from Mr. Heshelman

25  to myself through Joseph Rosati.

1    Q.   Okay.  That's what I wanted to clarify.  So those bonds

2    went from Mr. Heshelman through Mr. Rosati back to you.

3         All right.  So the next investor, who was that?

4    A.   Stephen Williams.

5    Q.   Now, who found Mr. Williams?

6    A.   Again, this was Bryce Sherwood.

7    Q.   Did you have any conversation with Mr. Williams about the

8    investment?

9    A.   No.

10   Q.   Did you have any conversations with a Pierre LaBauve?

11   A.   No, not that I remember.

12   Q.   Did you ever speak to Mr. Heshelman about this Williams

13   investor or this investment by Mr. Pierre LaBauve?

14   A.   If I did, it was limited.  I didn't know that there was

15   monies coming out.  Mr. Heshelman would call me and tell me

16   that we'd gotten another one and he was sending me money.  So

17   at times I wasn't privy to all the information, but I was

18   always known that -- when an investor came in and that I was

19   paid.

20   Q.   So if we return to I think it's 12E.

21   A.   12E?

22   Q.   Yes.  Actually you can see it up on the screen as well.

23   A.   Okay.  I'm better off here.  12E.  Joint investor?  No.

24   12 --

25   Q.   Are you at 12E?

1    A.    No.  I am now.  I believe I'm at 12.  It says

2    "Stephen Williams"?

3    Q.    Yes.

4    A.    Okay.  I'm there.

5    Q.    Okay.  All right.  So you did in fact actually get some

6    money from Mr. Williams' participation?

7    A.    That's correct.

8    Q.    It looks like $20,000 plus another $140,000?

9    A.    Yes.

10   Q.    But if you didn't have any contact with Mr. Williams, why

11   are you still getting money?

12   A.    I had brought in Bryce Sherwood, and my initial agreement

13   was that I would be paid on every investor whether Mr. Sherwood

14   brought them in or I brought them in.

15   Q.    All right.  Who was the next investor?

16   A.    Alan Moody, I believe.  There might have been one other

17   person, but Alan Moody.

18   Q.    All right.

19   A.    I don't see it here.

20   Q.    Alan Moody's spreadsheet may be 12A.

21         Go forward in the book.  The other direction.  Nope, the

22   other direction.

23   A.    I'm there.

24   Q.    All right.  Who presented Mr. Moody with this investment

25   fraud?

1    *A.*   Mr. Sherwood did, but I helped in a reference capacity,

2    and I did talk with Alan Moody.  This is one investor that I

3    had some direct conversations with.

4    *Q.*   All right.  What did you tell Mr. Moody?

5    *A.*   I'd like to just back that up a second and say that

6    Mr. Sherwood asked me to be able to speak with Mr. Moody, that

7    he's a potential investor, and asked to -- if I would give a

8    reference for him and speak with Mr. Moody to further his

9    investment.

10   *Q.*   Okay.  Well, what was -- what was your role supposed to be

11   in this reference call?

12   *A.*   Basically a satisfied investor.  I gave Mr. Sherwood -- I

13   told him that I would do this.  And Alan Moody called me, and I

14   talked to him for approximately 15 minutes, and in that

15   conversation Mr. Moody asked me a number of different

16   questions.  Had I known Mr. Sherwood.  And I told Mr. Moody

17   that I did know Mr. Sherwood, that he was capable, that I had

18   placed money with him, and that I had received monies back with

19   profits and it had gone well.  And I had received the monies

20   back in a timely fashion.  In other words, according to the

21   agreement.

22   *Q.*   Was any of that truthful?

23   *A.*   No.

24   *Q.*   So you essentially lied to Pastor Moody?

25   *A.*   Yes, I did.

1  *Q.*  Did you speak with Michael Heshelman about Alan Moody's

2  investment?

3  *A.*  Yes, I certainly talked to him at the time I was paid.  I

4  talked to Mr. Sherwood also after that conversation that I had

5  with Mr. Moody to confirm that I had talked to Mr. Moody and

6  had given him a good reference.

7  *Q.*  Now, we have up on the screen here 12A.  It shows the

8  monies coming in from Pastor Moody and then the transactions

9  that happened shortly after the money came in.

10     Do you have any knowledge of Thornbrook International?

11  *A.*  No.

12  *Q.*  Or a man by the name of Brian Turner?

13  *A.*  No.  I've heard his name, but beyond that, no, I haven't.

14  *Q.*  As far as you know, did you or Mr. Sherwood participate at

15  all in presenting this investment to Mr. Heshelman?

16  *A.*  Say that again, please.

17  *Q.*  Did you or Mr. Sherwood participate at all in presenting

18  this investment fraud to Mr. Turner?

19  *A.*  Mr. Turner.  I did not.

20  *Q.*  Okay.

21  *A.*  I cannot speak for Mr. Sherwood.

22  *Q.*  Well, did he ever tell you that he was presenting this to

23  somebody else so that you'd get a percentage of or some portion

24  of it?

25  *A.*  Yes, I believe the name did come up.

1   Q.   With Mr. Sherwood?

2   A.   From Mr. Sherwood, yes.

3   Q.   But did you ever get any money, as far as you know, as it

4   relates to Mr. --

5   A.   No, I don't believe so.  Unless I'm wrong.  Maybe I lost

6   it here, but I don't believe so.

7   Q.   Okay.

8   A.   I remember receiving two amounts on Alan Moody.

9   Q.   Okay.  Well, we'll come back to Mr. Turner and his bank

10  records.  But would you -- if Mr. Sherwood had presented this

11  to Mr. Turner, would you be surprised at all if he received any

12  money as it relates to Mr. Turner?

13  A.   No.  I mean, that would be part of the agreement.

14  Q.   Okay.  And it would be consistent for you to get some

15  share?

16  A.   Yes.  Yes.

17  Q.   Now, you've gone through this list of individuals

18  receiving money with the government, correct?

19  A.   With Alan Moody, yes.  With Alan Moody, yes.

20  Q.   Okay.  And many of these, would it be fair to say, you

21  don't really recognize?

22  A.   That's correct.

23  Q.   All right.  But you do -- did you recognize the name of

24  Pablo Ramirez?

25  A.   Yes, I did.

1    *Q.*    All right.  I think Mr. Ramirez might be right in the

2    middle here, the $5,000.  Do you see that?

3    *A.*    Yes.  Yes.  Excuse me, I'm . . .

4    *Q.*    That's all right.  I just wanted to make sure we're all on

5    the same page here.

6    *A.*    Yes.  Yes, certainly.

7    *Q.*    What was your understanding as to who Mr. Ramirez was?

8    *A.*    He was a friend of Mr. Heshelman's.

9    *Q.*    All right.  There's also a transaction, I think it's on

10   page 2, that goes to Mr. Tringham?

11   *A.*    Yes.

12   *Q.*    $5,000.

13   *A.*    Yes, I see that.

14   *Q.*    Did you know Mr. Tringham?

15   *A.*    Yes, I did.

16   *Q.*    What was your understanding about who Mr. Tringham was?

17   *A.*    Mr. Tringham was somebody that I had introduced to

18   Mr. Heshelman, and subsequently he struck up a relationship

19   with him.  I had established a relationship with Mr. Tringham

20   before that, and I had presented Mr. Tringham with several

21   investors and have learned some knowledge of private placement,

22   et cetera, from Mr. Tringham.

23   *Q.*    So was Mr. Tringham somebody who was going out and finding

24   investors, or was Mr. Tringham someone who was presenting

25   himself as a sophisticated investor who would be able to invest

1   other people's money?

2   A.   As a sophisticated person who was capable of placing

3   investments with him.

4   Q.   More akin to Mr. Heshelman's?

5   A.   Yes.

6   Q.   All right.  Did you make any unilateral decisions about

7   how much money would come out of the attorney trust account

8   that -- originally from Pastor Moody?

9   A.   No.

10  Q.   Who made the decision about where did all the money go?

11  A.   Mr. Heshelman.

12  Q.   Did you ever speak with his attorney, Ken Warner?

13  A.   Yes, on at least two occasions.  Again, to confirm amounts

14  that were coming out to me.

15  Q.   Did you ever ask Mr. Warner to send you money and to

16  decide yourself how much money you wanted to get?

17  A.   No.  I would not have had that authority.

18  Q.   Mr. Mickelson, now, would it be fair to say this isn't the

19  first time that you've run through this chronology with the

20  United States Attorney's Office and with the government; is

21  that true?

22  A.   Yes.  Correct.

23  Q.   All right.  You've met before with your attorney, with

24  Agent Wetherbee, and even myself?

25  A.   Yes.

1    Q.    The first time we went through this were you as candid and

2    as detailed about providing all of the information you've

3    provided today?

4    A.    No.

5    Q.    Was this a bit of a process?

6    A.    Yes, it was.

7    Q.    Okay.  So would it be really kind of fair to say that

8    initially you might have been minimizing or maybe even lying

9    about the full scope of your conduct?

10   A.    Well, it took me a while really to understand my total

11   role in this, and I was kind of a little bit blind in some of

12   it.  But I had to reflect and think and go back and look at

13   some of my documents, et cetera, and to see that I -- what my

14   full role in this was.

15   Q.    In addition to the activities you described here that you

16   were engaging in with Mr. Heshelman, have you also engaged in

17   other activities where you've been receiving money from

18   individuals?  Substantial amounts of money, not just pocket

19   change.

20   A.    Are you referring to -- I did some currency investments

21   with Mr. Sherwood.  Are you relating to that?

22   Q.    Yes.  So you've been involved in other investment-type

23   activity?

24   A.    Yes.

25   Q.    That's with Mr. Sherwood?

1    A.    Yes.

2    Q.    Would it be fair to characterize this in the time frame of

3    2003/2004 that you may have been involved in finding people and

4    bringing people to Mr. Sherwood where Mr. Sherwood would engage

5    in some sort of currency trading?

6    A.    Yes, that's correct.

7    Q.    Now, were there accounts actually open for these customers

8    or these investors?

9    A.    Yes, that's correct, there were accounts that were opened

10   up in Gain Capital and one other trading house, currency

11   trading house.

12   Q.    And were these investors given monthly account statements

13   about the activities going on in their accounts?

14   A.    Yes.

15   Q.    And was there actually, in fact, currency trading activity

16   going on?

17   A.    Yes.

18   Q.    Who was managing the currency trading?

19   A.    Bryce Sherwood and one other trader at Mr. Sherwood's --

20   basically Mr. Sherwood was in control.

21   Q.    All right.  Now, were there approximately four people?

22   A.    Yes, that's correct.

23   Q.    And there was a Mr. Pinney, Charles Pinney?

24   A.    Yes, he was.  He was involved on one account, yes.

25   Q.    All right.  Mr. Caslov?

1   A.   Yes.

2           MR. MEKARU:  Your Honor, I'm going to lead just, if I

3   may --

4           THE WITNESS:  And Chris Smith and Barry Kennedy.

5   Q.   (BY MR. MEKARU)  Okay.  Was their trading activity

6   lucrative or financially successful for them?

7   A.   No, currency trading is up and down, but ultimately they

8   lost their money.

9   Q.   Lost all their money?

10  A.   Just about, yes.

11  Q.   Any sense as to in total how much money these four people

12  invested?

13  A.   $100,000 each.

14  Q.   For a total of $400,000?

15  A.   Yes, I would say that that's quite accurate.

16  Q.   And, excuse me, how much were you paid for finding these

17  investors?

18  A.   I was paid a commission out of the trading which totaled

19  $1,500.

20  Q.   And how was Mr. Sherwood being compensated?

21  A.   The same way.  I don't know the exact amounts he was being

22  compensated.  He was in charge of that particular situation.

23  Q.   Okay.  And those investments, were they -- those investors

24  you said were given monthly account statements as far as you

25  know.

DIRECT EXAMINATION OF DENNIS R. MICKELSON

1    Were the investments that we were talking about earlier

2    with Mr. Ramsey, Mr. Oliver, Mr. Clyde, Mr. Moody, as far as

3    you know were any of those people given any sort of monthly

4    account statements --

5    A.   No.

6    Q.   -- about the activity in their accounts?

7    A.   Not to my knowledge.

8    Q.   All right.  And as I understand, you may have also again

9    found more investors, more individuals for Mr. Sherwood more

10   recently in 2008?

11   A.   That's correct.

12   Q.   Another four people?

13   A.   Yes.

14   Q.   Who were they?

15   A.   Paul Fanuken, Kevin O'Brien, Peter Mosaro, and a close

16   friend of Paul Fanuken.  It was Frank and Kathleen, and I

17   cannot remember their last name at the moment.

18   Q.   And roughly how much money did they in total invest with

19   Mr. Sherwood?

20   A.   Kevin O'Brien put in a hundred thousand dollars and then

21   later put an additional 25,000.  Paul Fanuken put in 50,000.

22   His friends, close friends put in 50,000.  And Peter Mosaro

23   also put in, from what I remember, 50,000.

24   Q.   And what was -- do you have any understanding of what

25   their -- what sort of financial success or losses may have

1   occurred?

2   A.   At first it was successful.  Mr. Kevin O'Brien's account

3   went up to $190,000 and then it started to drop.  And he ended

4   up with an account final balance of around 85 or 90 thousand

5   dollars.

6        The other individuals put in fifty, and they ended up with

7   about $40,000 in their accounts.

8        Now, I did tell the people I had more control over the

9   situation this time and told them to be mentally prepared for

10  up to a 20 percent loss, and if they incurred a 20 percent

11  loss, to stop trading and pull out.  So in the initial stages

12  they were making money, they were happy, and then there was a

13  reverse, as does happen in currency, and so I told them to put

14  a hold on their accounts and to pull their money out.

15  Q.   How much money were you compensated in total for this 2008

16  trading activity?

17  A.   $1,500.

18  Q.   Now, in addition to the accounts that Mr. O'Brien had with

19  Mr. Sherwood, did he also engage in some trading activity

20  directly with you?

21  A.   Yes.  There was one other individual that I tried as a

22  trader, and Kevin O'Brien had put up a hundred thousand

23  dollars.  And there was also currency trading, and I advised

24  that he stop trading after about three to five days.  His

25  account balance ended up being 93,000.

1    Q.   So he lost $7,000?

2    A.   Yes.

3    Q.   Did you get any -- how much did you get in total in terms

4    of compensation for that?

5    A.   Nothing.

6    Q.   All right.  Now, separate from Mr. Sherwood, have you

7    yourself also had -- have you also received monies from

8    individuals?

9    A.   Yes, I had done a transaction with Martha Granger some

10   years back, and she invested $50,000 in a startup company, and

11   later on after -- years later she -- I'd still been in contact

12   with her.  She offered to lend me a thousand dollars, and I

13   took that loan, and I'm presently paying it back in small

14   monthly payments.

15   Q.   So there were two transactions with Martha Granger?

16   A.   Correct.

17   Q.   A thousand-dollar loan and this $50,000 invested in an

18   Internet company?

19   A.   Correct.

20   Q.   Did you actually receive those monies, or did you just

21   pass them along?

22   A.   The investment with the Internet company, I did not --

23   that monies was not directed to me, nor did I make any money on

24   that at all.  So it was an investment into a startup company.

25   Q.   As far as you know did the money actually go to that

1    startup company?

2    A.   Yes.

3    Q.   But has Ms. Granger filed some sort of complaint regarding

4    the $50,000?

5    A.   Yes.

6    Q.   In addition, have you borrowed money from other people?

7    A.   Minor amounts of money from my family.

8    Q.   All right.  Have you borrowed -- did you borrow money from

9    Jeff English?

10   A.   Yes, I did, as a matter of fact.

11   Q.   How much money?

12   A.   I borrowed $12,500 from Jeff English.

13   Q.   Did you pay him back?

14   A.   Yes, I did.

15   Q.   How much money did you pay him back?

16   A.   $22,500.

17   Q.   Was that consistent with the terms of your agreement?

18   A.   Yes, it was.

19   Q.   Did you -- in paying him back, did you receive any monies

20   from Mr. Heshelman or Mr. Sherwood to assist you in paying him

21   back?

22   A.   Yes, that was actually above the 22,000 -- I paid him

23   about 22,600 or seven hundred dollars.  There were some

24   amounts, small amounts that Mr. Heshelman directed to

25   Jeff English on my behalf of about $350 and $450 on two

1    different occasions about two or three years ago.

2    Q.   Why?

3    A.   I asked them.  I was being pressured by Jeff English; I

4    asked them to assist.

5    Q.   I'm sorry, asked who to assist you?

6    A.   I asked Michael Heshelman to help me.

7    Q.   When was that?

8    A.   Two, three years ago.

9    Q.   Also, did you borrow money from a Davis Baldwin?

10   A.   Yes, I did.

11   Q.   How much money?

12   A.   $25,000.

13   Q.   Have you paid him back?

14   A.   No, not really.  I've been making small monthly payments

15   at this point.

16   Q.   How much did you agree to pay Mr. Baldwin for that loan?

17   A.   I agreed to pay him back $50,000.

18          THE COURT:  Mr. Mekaru, we're now more than --

19   getting close to an hour and a half of your direct.  We're at

20   the noon hour, and I'm wondering how close we are and what we

21   can expect in terms of looking at a noon break.

22          MR. MEKARU:  Your Honor, I'm pretty close here.  I'm

23   just covering essentially all other potential Giglio-type

24   material with the witness.

25          I have one other area I want to cover.  It will

1    probably take about five minutes.

2              THE COURT:   Okay.

3    Q.   (BY MR. MEKARU)  Tina Ruby.

4    A.   Yes.

5    Q.   Tell us about Tina Ruby.

6    A.   I had introduced Tina Ruby to Mr. Heshelman last year.

7    Q.   What was the nature of the introduction?

8    A.   She had some bank instruments that she said that she had

9    access to, and Mr. Heshelman said that he could perhaps sell

10   the instruments or buy them, buy the instruments.  Or arrange

11   for their purchase.

12   Q.   Were these legitimate documents or fraudulent documents?

13   A.   I believe they were fraudulent.

14   Q.   And as far as you know, did anything really happen with

15   respect to that?

16   A.   No, it did not.

17   Q.   All right.  And did you, separate from Mr. Heshelman, have

18   any other participation with Tina Ruby?

19   A.   Yes, I had received a gold offer from Tina Ruby which I

20   forwarded on to an associate Linda Johnson, and nothing

21   happened.  It was a commodity.

22   Q.   The gold offer, any sense of whether that was legitimate

23   or fraudulent?

24   A.   I cannot tell.

25   Q.   And the forwarding on to Linda Johnson, was Linda Johnson

1   somebody else who was interested in these fraudulent activities

2   or more legitimate?

3   A.   No, she was totally commodities.  She would buy and sell

4   sugar.  She would -- it's totally legitimate from what I can

5   understand.

6          MR. MEKARU:  Your Honor.  Thank you.  We'll pass the

7   witness.

8          THE COURT:  Thank you, Mr. Mekaru.

9          Ladies and Gentlemen, we'll now take our

10  much-deserved-and-needed noon break.  I remind you once again

11  please do not discuss anything that you've heard or seen.

12  Don't reach any conclusions.  If you run into anybody involved

13  in this case, please do not engage with them in any way.  No

14  research or anything of that nature.

15         And it's now a little bit after noon.  Let's be back

16  and ready to start promptly at 1:30.  Thank you.

17         You may step down, Mr. Mickelson.

18         THE CLERK:  Everyone rise, please.  This Court stands

19  adjourned.

20    (Recess taken at 12:05 p.m.)

21    (Jury entered the courtroom at 1:31 p.m.)

22         THE COURT:  Mr. Tracy, I think you're up.

23         MR. TRACY:  Thank you, Your Honor.

24         THE COURT:  Mr. Mickelson, you're still under oath

25  from this morning.

1            *THE WITNESS:*  I understand.

2                          CROSS-EXAMINATION

3    *BY MR. TRACY:*

4    *Q.*   Good afternoon, Mr. Mickelson.

5    *A.*   Good afternoon.

6    *Q.*   I'm Chris Tracy.  I represent Mr. Heshelman.

7          We've never spoken before, have we?

8    *A.*   No, we have not.

9    *Q.*   I don't think we've met before as far as I'm aware.

10   *A.*   That's correct.

11   *Q.*   If we could start with Government Exhibit 12H, and I'll

12   start to ask some questions as it comes up to the screen.

13          Just so you're -- I noticed on direct you were maybe

14   fishing around for things a little.  Tab 8 -- tab 12 is all of

15   the exhibits for that.  There's not a tab H and so forth, so

16   you just have to sort of find it as the government put it in

17   there.

18          So you're at 12H?

19   *A.*   Yes.

20   *Q.*   Tell me when you are.

21   *A.*   Yes, that's correct.

22   *Q.*   Okay.  Now, I believe besides testifying here today you

23   also testified before the grand jury in this matter, correct?

24   *A.*   That's correct.

25   *Q.*   And I've had the chance to -- I get a copy of the

CROSS-EXAMINATION OF DENNIS R. MICKELSON

1    transcript before you take the stand, so my recollection in

2    reviewing your testimony before the grand jury was you thought

3    you had received somewhere in the total amount of 900,000 to

4    1.2 million of monies out of the investments we've been talking

5    about.  Is that your recollection in terms of your testimony?

6    A.   Yes, I was talking in there about final amounts that I

7    ended up with.

8    Q.   Final amounts that you ended up with.

9    A.   Correct.  There were distributions that were done.

10   Q.   Okay.  So that was what your testimony was back in '06

11   when you testified before the grand jury?

12   A.   I believe that's correct.

13   Q.   Okay.  And when we look at Government Exhibit 12H, the

14   first page shows out of one of the Ken Warner accounts $430,000

15   coming to you, correct?

16   A.   Yes.

17   Q.   And when we go to page 2, we see I believe it's the funds

18   that also came from the other Ken Warner account, and that's

19   almost another 1.1 million you see at the bottom?

20   A.   I believe this -- yes, that's correct.

21   Q.   Okay.  And then when you total the two of those, you're

22   above one and a half million dollars in total, correct?

23   A.   Yes, that's correct.

24   Q.   So if I understand, sort of combining your grand jury

25   testimony to what we're saying now, you're not disputing that

*CROSS-EXAMINATION OF DENNIS R. MICKELSON*

1   one and a half million dollars in total came to you?

2   A.   No.

3   Q.   But then you're saying something like another three, four,

4   five hundred thousand dollars were paid out to others?

5   A.   Correct.

6   Q.   And is that consistent with Government's Exhibit 25 and 26

7   you went over earlier today, monies that went to Sherwood and

8   others?

9   A.   I believe that would be correct.

10  Q.   Okay.  But you still came away with somewhere in the

11  neighborhood of 900,000, a million dollars, something like

12  that?

13  A.   Yes, that's correct.

14  Q.   And I take it you used that to pay off bills and do other

15  things with, correct?

16  A.   Yes.

17  Q.   Did you owe other people money?

18  A.   Yes, I did.

19  Q.   And you paid certain monies to them?

20  A.   Yes.

21  Q.   Did you buy a big house with it at all?

22  A.   No.

23  Q.   We heard that from Mr. Sherwood.

24  A.   No.

25  Q.   No?

1    A.    No.

2    Q.    I take it you also have not paid any money back to any of

3    the investors that you brought into this investment?

4    A.    There were minor amounts of monies that were directed to

5    Charles Pinney that were given back to Alan Moody.

6    Q.    That were given to Alan Moody?

7    A.    Yes.  Supposedly.  I had no verification of that.

8    Q.    Through Charles Pinney?

9    A.    Yes.

10   Q.    That's what was supposed to happen?

11   A.    Yes.

12   Q.    But you're not sure whether it actually occurred?

13   A.    I did not talk to Mr. Moody about that, no.

14   Q.    Okay.  Other than that, no other monies paid back to any

15   investors?

16   A.    Correct.

17   Q.    Now, in your mind did you do anything to earn that money,

18   the 900,000, a million dollars, whatever you got?

19   A.    Legally, no.

20   Q.    Okay.  Were you supposed to be doing something in terms of

21   work on the investments or anything?  Were there any projects

22   that you were supposed to be working on?

23   A.    Not that I remember.  I was finding -- I was an investment

24   finder.

25   Q.    Okay.  And from -- this all started roughly in 1999, I

*CROSS-EXAMINATION OF DENNIS R. MICKELSON*

1    take it?

2    A.   Yes.

3    Q.   And for that matter, you didn't become aware of the

4    indictment or allegations against you until when, late '08?

5    A.   No.  That's correct.  I mean, I went to the grand jury in

6    2006, and nothing formally happened that I was charged until

7    December of last year, 2008.

8    Q.   Okay.  But you're saying your efforts with respect to

9    trying to help with any investment platforms or anything

10   essentially were nothing from the year '99 through 2008?

11   A.   Except for the introduction to -- with Tina Ruby.

12   Q.   To Tina Ruby?

13   A.   Yes.

14   Q.   And that's when Mr. Heshelman was over in Europe?

15   A.   That's correct.

16   Q.   Okay.  We'll come back to that one.

17   A.   At least that's the best recollection I have.

18   Q.   Okay.  And then some of this was gone over, but I want to

19   just make sure we cover it fully.

20        Monies did go to -- from you to Mr. Sherwood, correct?

21   A.   Yes, that's correct.

22   Q.   And I believe that one is Government Exhibit 25 if we

23   could bring that up.  Do you have that?

24        And the summary page here on the front, we don't need to

25   go into the detail behind it at this point, shows this almost

1   167,000, correct?

2   A.   Correct.

3   Q.   And then based on your memory, in addition to that another

4   25,000 went to Mr. Sherwood, but you didn't have paperwork to

5   verify that?

6   A.   That's correct.

7   Q.   So are you aware that Mr. Sherwood testified in this case

8   last week?

9   A.   Yes, I am.

10  Q.   And his testimony was he didn't receive any money from

11  you?

12  A.   I wasn't here, but from what I understand, that is his

13  testimony.

14  Q.   So he lied?

15  A.   Yes.

16  Q.   And you're clear as punch and you have some of the -- most

17  of the ones you have backup for in terms of transfers from you

18  to him --

19  A.   I have --

20  Q.   -- to support the monies that you transferred to him,

21  correct?

22  A.   Yes.

23  Q.   Now, at least initially, and then perhaps for some period

24  of time regarding the investment platforms, trading platforms

25  that were being discussed, your belief was that those

1    platforms, in fact, could work, correct?

2    A.   No.  No, I had discussions with Mr. Heshelman back at the

3    beginning of this that I could not nor could he produce any

4    evidence that these trading programs were real.

5            MR. TRACY:  Okay.  Your Honor, may I approach the

6    witness?

7            THE COURT:  Yes.

8    Q.   (BY MR. TRACY)  Okay.  I want to hand you a copy, sir, of

9    your grand jury testimony from January 26, 2006, and there's

10   probably times we'll go through different sections of that.

11   A.   Okay.

12   Q.   So you did testify before the grand jury?

13   A.   Yes.

14   Q.   And you were sworn under oath that day as well, correct?

15   A.   Yes.

16   Q.   And you understood that you were required to tell the

17   truth and the complete truth, correct?

18   A.   Yes.

19   Q.   Just like the same oath you took today?

20   A.   Yes.

21   Q.   And so on page 12 -- and you can read as much as you want.

22   I'm just going to take you to a point.  If you need to go back

23   and take a second, you take your time.

24        Mr. Mekaru, he was asking you questions that day before

25   the grand jury, right?

1    A.    Yes.

2    Q.    And he asked roughly beginning around line 11, he says --

3    well, let's go back to line 5 because we're talking about

4    Mr. Edwards here, and you talked about him on your direct,

5    correct?

6    A.    Yes.

7    Q.    And now -- he says -- so this is probably the same

8    Mike Edwards you talked about during your direct?

9    A.    Yes.

10   Q.    So Mr. Mekaru asked you, "Okay.  Now, was Mr. Edwards your

11   client that you introduced to Mr. Heshelman?"

12         Do you see that?

13   A.    Yes.

14   Q.    And you answered, "No, he was not a client.  No, not

15   per se.  I was not doing business or the term that he was a

16   client of mine."

17         Do you see that?

18   A.    Yes.

19   Q.    In other words, you didn't really consider him to be a

20   client; you were making an introduction on his behalf.  Is that

21   what you're explaining?

22   A.    Yes, I was the introducing party, but I also did outline

23   to Mr. Edwards what I had discussed with Mr. Heshelman.

24   Q.    Okay.  But -- and you're drifting from the mic a little

25   bit.

1    A.    Oh, I'm sorry.  I'm trying to read this.

2    Q.    If you go to the paper, take the mic with you so we can

3    hear you.  And I'm not trying to be rude.  I'm just trying to

4    make sure everybody can hear.

5    A.    Thank you.

6    Q.    Just for this purpose before we move on, you just didn't

7    consider him as really a client, you were making an

8    introduction between Mr. Edwards and Mr. Heshelman and

9    whomever, correct?  Is that what you were trying to explain?

10   A.    Yes.

11   Q.    Okay.  Now, on line 9 Dan continues, "But you were the

12   individual that introduced" -- and then I don't know if there

13   was -- it sort of gets cut off there.  And then you say, "I

14   was" -- the answer is, "I was the introducing party."  Right?

15   A.    Yes.

16   Q.    And you agree with that?

17   A.    Yes.

18   Q.    And then the next question is:  "Okay.  Now, as an

19   introducing party, had you done any sort of evaluation of

20   Heshelman's investment opportunity to see whether it was a good

21   one or not?"

22         Do you see that?

23   A.    Yes.

24   Q.    And your answer was:  "I was convinced that Mr. Heshelman

25   was capable of doing what he said he could do."  Correct?

1    A.    Yes.

2    Q.    All right.  And then it goes on from there, and then

3    you're welcome to continue to read it, but I'm going to take

4    you to the next page.  And there continues to be questions

5    about sort of what the financial plan is, right?

6    A.    Yes.

7    Q.    And then about line -- maybe around line 13 he's following

8    up about the financial plan, and Dan asks you:  "Why is that?"

9    And you say, answer at 14, "Well, I don't remember

10   specifically, but I will try and do my best to be able to tell

11   you what I remember.  More than likely it was some type of bank

12   paper."

13         Do you see that?

14   A.    Yes.

15   Q.    So you're talking with him about what the investment

16   opportunity, as best as you can recall, would involve?

17   A.    Yes.

18   Q.    Okay.  And then Dan says, "I'm sorry."  And then you

19   answer at 18, "More likely it was some type of bank paper.

20   Buying and selling of some sort of bank paper."

21         Do you see that?

22   A.    Yes.

23   Q.    And again is it fair to say on that part of whatever

24   transactions were being planned, that wasn't where

25   Dennis Mickelson was supposed to do -- make any effort,

1  correct?  You were only supposed to introduce people to the

2  concept?

3  A.    I was the introducing party, correct.

4  Q.    Okay.  And then on 21 Dan asks:  "I don't know.  I did not

5  have the connection" -- excuse me.  20, Dan asks:  "Okay.  What

6  sort of bank paper?"

7       21, you say, "I don't know.  I did not have the

8  connections that Michael Heshelman had."

9       Do you see that?

10  A.    Yes.

11  Q.    And then he asks, "And yet you introduced this investment

12  to," and then the question sort of gets broken off.  And your

13  answer is:  "Yes, I did.  Mr. Heshelman did convince me that he

14  was capable of doing what he said he could do."

15       Do you see that?

16  A.    Yes.

17  Q.    And that was your testimony before the grand jury,

18  correct --

19  A.    Yes.

20  Q.    -- back in 2006?

21  A.    Yes.

22  Q.    Now, I believe you indicated that one of the introductions

23  that you made to Mr. Heshelman in terms of an investor was

24  Tim Oliver and the Prism Mortgage stuff, correct?

25  A.    Yes.

1    Q.   And was it your understanding that Mr. Oliver is or was an

2    attorney?

3    A.   Yes.

4    Q.   I believe he's from Minnesota.  Right?

5    A.   Yes.

6    Q.   Okay.  And you knew he was an attorney?

7    A.   Yes.

8    Q.   And you made that introduction directly, or did you go

9    through anybody else, an intermediary to Mr. Oliver?

10   A.   Yes, it was Robert DeTour and Bill Green.

11   Q.   Okay.  So those are the people you spoke about during your

12   direct?

13   A.   Yes.

14   Q.   And how did you happen to know those folks?

15   A.   I discussed some bonds with them, historical bonds.

16   Q.   Historical bonds?

17   A.   Yes.

18   Q.   Some of the bonds like we heard about during your direct?

19   A.   Yes.

20   Q.   So we'll come back to that as well.

21        Now, is it my understanding that for purposes of the

22   Oliver transaction that ended up being -- wasn't that one that

23   was about 1,080,000?

24   A.   Yes.

25   Q.   Did you indicate you received somewhere in the

1   neighborhood of $10,000 for that introduction?

2   A.   No, I did not.

3   Q.   You didn't receive anything?

4   A.   No, that's not my statement.

5   Q.   Okay.  What was your statement?

6   A.   My statement -- I'd like to amplify my statement.  What I

7   had testified to was that Mr. Oliver had put in $320,000

8   initially, of which I received $10,000.

9        And the second time he put $720,000 in; I received a

10   minimum of approximately $40,000.

11   Q.   Okay.  So the first time it wasn't 360 but it was 320?

12   A.   360.

13   Q.   Because I just heard you say 320.

14   A.   Excuse me.

15   Q.   360.  And then you would have got 10 grand?

16   A.   Yes.

17   Q.   And then a second tranche or transaction came from him of

18   720?

19   A.   Yes.

20   Q.   And that one you got somewhere in the $40,000 range?

21   A.   Correct.

22   Q.   Okay.  So the total that came to you vis-a-vis the Oliver

23   transaction was somewhere in the neighborhood of 50,000,

24   correct?

25   A.   Yes, I would say that's correct.

*CROSS-EXAMINATION OF DENNIS R. MICKELSON*

1  Q.   Okay.  So can we bring up Government Exhibit 12B, please.

2       And you're welcome to go to it there as well.

3       Now, you may have looked at 12B on your direct.  I'm

4  sorry, I don't remember all the ones that you've looked at.

5       But, again, I think as Mr. Mekaru explained to you on his

6  direct, these are summary charts that you've seen before that

7  the government has created related to monies flowing out of

8  Mr. Warner's accounts, correct?

9  A.   Give me a second, please, I'm trying --

10 Q.   You tell me when you're ready, Mr. Mickelson, and we'll

11 continue on.

12 A.   Yes, I'm there.

13 Q.   Okay.  And my general question to you to begin with is

14 these are summary charts, either this one or other ones similar

15 to it that the government has shown you previously, even before

16 today, either preparing for your grand jury testimony or

17 otherwise, so you've seen these type of charts before, correct?

18 A.   Yes.

19 Q.   And you understand that one of the -- one of the people

20 working for the government, the FBI or whatever, he's created

21 these charts by going to Mr. Warner's bank statements and other

22 bank-related materials so that he could summarize this

23 information?

24 A.   Yes.

25 Q.   Okay.  So here we have Tim Oliver and Prism Mortgage, and

1    we have payments coming to you, correct?

2    A.    Yes.

3    Q.    So we see a $40,000 one, right?

4    A.    Yes.

5    Q.    Okay.  And then is there a second page?  And that's

6    consistent with what your recollection is, right?

7    A.    Yes.

8    Q.    Okay.  And then we go to the next page, which is again out

9    of the other account, and about the second one we see a $10,000

10   wire transfer coming to you, correct?

11   A.    Correct.

12   Q.    And again, that's consistent with your recollection,

13   right?

14   A.    Yes, it seems correct.

15   Q.    And then we go down about, oh, roughly 10 more, and we see

16   another $10,000 coming to you in September of '99.

17          Do you see that?  Roughly a little above the middle of the

18   page.

19   A.    Yes.  Yes.  Yes, I see it.

20   Q.    Okay.  Then we go down a few more past that, and we see

21   another $5,000 coming to you in October of '99, correct?

22   A.    Yes.

23   Q.    And now we have them highlighted up here too, if it's

24   easier for you.

25          And then later in October, just a week later we see

1   another 5,000 coming to you, correct?

2   A.   Yes.

3   Q.   And then later after that we see 32,000 coming to you in

4   November of '99.  Correct?

5   A.   Yes.

6   Q.   And then in -- later in November, a couple weeks after

7   that last one, we see another 30,000 coming to you, correct?

8   A.   Yes.

9   Q.   Okay.  And we'll go to the next page, then.

10       And then here on this one it's just showing monies being

11   returned to Prism, so we don't see your name on this page,

12   correct?

13   A.   Yes, I --

14   Q.   I don't see your name.  Do you see your name anywhere?

15   A.   No.  I would have to put on my other glasses, but . . .

16   Q.   So in actuality based on the Government's Exhibit 12B,

17   somewhere in the neighborhood of $130,000 flowed from you out

18   of the Oliver transaction, correct?

19   A.   There were other investors that came in in between this

20   time that I was compensated for.  I wasn't aware of which

21   accounts these are coming out of.  I assumed that everything

22   was coming from Ken Warner's account, which I believe is

23   correct.

24   Q.   Okay.

25   A.   I don't know how these things got assigned, nor did I

1    prepare these, but I was trying to reconstruct the transaction

2    to the best of my ability.

3    Q.    I understand.  But again, prior to today you've seen these

4    government summary charts before?

5    A.    Um --

6    Q.    That's what your testimony was just a few minutes ago.

7    A.    Yes.

8    Q.    Okay.

9    A.    I don't remember it being so clear on this particular

10   flowchart.

11   Q.    Okay.

12   A.    But I know I was given a whole packet of discovery, and at

13   some point in time I did probably scan this at the least.

14   Q.    And you do not quarrel with my math, the totals of what

15   we've just looked at add up to well over a hundred thousand

16   dollars, closer to $130,000 of monies according to the

17   government's chart, not my chart, flowed to you out of the

18   Oliver transactions, correct?

19   A.    There must have been other monies that were flowing in.

20   Q.    That's not my question.  Is my math approximately correct

21   in terms of the government's chart, 12B, of somewhere in the

22   neighborhood of $130,000 flowed to you?  I'm not asking you

23   what the explanation is.  I'm saying, do you agree that my math

24   is accurate?

25   A.    Yes.

1    Q.    Okay.  Now, on direct I believe you also indicated that

2    you introduced Mr. Sherwood to Mr. Heshelman, correct?

3    A.    Yes.

4    Q.    As far as you know, Mr. Heshelman never knew Mr. Sherwood

5    until you made that introduction?

6    A.    That's correct.

7    Q.    So are you aware of anybody else making an introduction as

8    well as yourself between the two of them?

9    A.    Say that one more time, please.

10   Q.    In other words, you know, sometimes you and a friend

11   introduce somebody.  I'm just trying to make sure that the

12   introduction that occurred between Heshelman and Sherwood, that

13   literally happened on the basis of Mickelson making the

14   introduction.

15   A.    Yes, that's correct.  There was a referring party, but I

16   made the direct introduction.

17   Q.    Okay.  And then as you indicated on direct, Sherwood

18   introduced other potential investors to Heshelman?

19   A.    Correct.

20   Q.    All right.  And one of those investors, as you indicated,

21   was Mr. Alan Moody.

22   A.    Correct.

23   Q.    And then on direct you talked about some of the things

24   that you were involved with as it pertains to Mr. Moody,

25   correct?

1    A.    Yes.

2    Q.    Including conversations that you had.

3    A.    Yes.

4    Q.    Now, I take it from your responses on direct, that when

5    you were talking to Mr. Moody, the person that you were

6    vouching for was Mr. Sherwood?

7    A.    Correct.

8    Q.    Not Mr. Heshelman?

9    A.    I was giving a reference -- Mr. Sherwood asked me to be

10   able to give a reference in terms of Moody stepping forward as

11   a potential investor.  That happened before the conversation.

12   Q.    Okay.

13   A.    And what that was for was an introduction to

14   Mr. Heshelman.

15   Q.    Did you tell that to Mr. Moody in your conversation?

16   A.    No, I did not.

17   Q.    So, again, the -- now you've got to bear with me.

18   A.    This was one conversation with Mr. Sherwood; one

19   conversation with Mr. Moody.

20   Q.    Yeah, but try and listen to my question.  I'm sort of --

21   just so I put it in context for you.

22         Mickelson and Moody are having a conversation?

23   A.    Yes.

24   Q.    The person that you're vouching for, making a reference

25   for during the Mickelson/Moody conversation is Bryce Sherwood,

1   correct?

2   A.   Yes.

3   Q.   Is that the only name that came up between Mickelson and

4   Moody in their conversation?

5   A.   I would have to think about that for a second, if I could

6   pause for a second and think.

7   Q.   Any time you need to think, it's fair game.  So you just

8   do what you need to do there.  That's fine.

9   A.   I knew it was going to be a potential investor for

10   Mr. Heshelman, but most of the conversation, if not all of it,

11   was in reference to Bryce Sherwood.

12   Q.   Okay.  And so as you sit here today, with the

13   Mickelson/Moody conversation -- by the way, let me go to

14   something else for a second.

15        Is this the only conversation you ever had with Mr. Moody?

16   A.   Yes, it was.

17   Q.   And was it on the phone or in person?

18   A.   It was on the phone.

19   Q.   Okay.  And as far as you were aware, he lives in this area

20   generally?  Middleville, Michigan, not too far from here?

21   A.   Yes.

22   Q.   You were living where at the time?

23   A.   I was living in Florida.

24   Q.   Okay.  And now you're up in Pennsylvania?

25   A.   Correct.

1    Q.   And at the time that you were living down in Florida, you

2    didn't make a trip up here to meet with Mr. Moody, you just had

3    a conversation with him on the phone?

4    A.   That's correct.

5    Q.   And as far as you are aware, you didn't have

6    Bryce Sherwood patched into that conversation?

7    A.   No.

8    Q.   And Michael Heshelman wasn't patched in?

9    A.   No.

10   Q.   The only two participants were you and Mr. Moody?

11   A.   Yes.

12   Q.   So now we're going back to that conversation.  As best as

13   your recollection is today, you can't say one way or the other

14   whether Mr. Heshelman's name or Investors First name or

15   whatever came up at all during the conversation between you and

16   Mr. Moody; am I correct?

17   A.   Yes.

18   Q.   And as far as you can recall, Mr. Moody didn't ask you

19   anything directly regarding Mr. Heshelman or his company?

20   A.   Yes.

21   Q.   Am I correct about that?

22   A.   Yes.

23   Q.   Now, I thought on direct you said something like you were

24   acting as a reference as being like a successful investor or

25   something along those lines.

1   A.   A satisfied investor, that's correct.

2   Q.   So that's what you indicated to Mr. Moody, that you were a

3   satisfied investor?

4   A.   Through his questions and through my statements about

5   Mr. Sherwood, yes.

6   Q.   Okay.  Now, do you recall being asked that same question

7   or that same line of questions during your grand jury

8   testimony?

9   A.   Yes, I believe I did.

10  Q.   Okay.  And if you go to page -- beginning on page 18.

11  Line 18 of page 18.  Mr. Mekaru asked you a question:  "Did you

12  ever speak with Alan Moody?"

13       Do you see that?  Tell me when you're there, please.

14  A.   Okay.  Yes.

15  Q.   And then you said, "Yes I did," right?

16  A.   Um --

17  Q.   Line 18 it begins with on page 18.

18  A.   Okay.

19  Q.   And the question is:  "Did you ever speak with

20  Alan Moody?"

21       And your answer is:  "Yes I did."  Correct?

22  A.   Yes.

23  Q.   And then he says, "Okay.  Why did you speak with

24  Alan Moody?"  And you say, "Answer:  Alan Moody called me in

25  just September of 2000 asking me about Bryce Sherwood."

1        Do you see that?

2    A.    Yes.

3    Q.    And then Mr. Mekaru goes on, "Okay.  What did you tell

4    him?"  And you go on, "I told him that I thought that

5    Bryce Sherwood was a capable individual."

6        Do you see that?

7    A.    Yes.

8    Q.    And then he says, "All right.  Now, did you tell Mr. Moody

9    that you were another investor or that you were another

10   individual who was introducing clients to him?"

11       And you say, "I did not specifically cover that.  I

12   had --" and then there's a break -- "the conversation was more

13   in reference to Mr. Sherwood."

14       Do you see that?

15   A.    Yes.

16   Q.    And then Mr. Mekaru says, "What do you mean?"

17       And you say, "Answer:  Basically asking for a reference,

18   character, name.  Not character, a reference or Mr. Sherwood."

19   Maybe it means "of Mr. Sherwood," I don't know.

20       And then he says, "Okay.  So how were you in a position to

21   be a reference for Mr. Sherwood?"

22       Your answer:  "He asked me that, just basically what I

23   thought of Mr. Sherwood, and if he was capable, and I thought

24   he was."

25       So the "he" in this, that's Mr. Moody asking you, correct?

1   A.   Yes.

2   Q.   And you went on to say that -- you told him that you

3   thought Mr. Sherwood was capable, correct?  I thought -- you

4   say, "I thought he was."

5   A.   Okay.  What line was that on?

6   Q.   12 of page 19.

7   A.   I follow you.

8   Q.   Okay.  And then the next question is:  "Had you done any

9   business with Mr. Sherwood at that point?"

10       Do you see that?

11  A.   Yes.

12  Q.   And then your answer:  "Not that I recollect."

13       Do you see that?

14  A.   Yes.

15  Q.   So in reality the -- that's consistent with your testimony

16  today, right?  You had not done any business with Sherwood,

17  correct?

18  A.   Yes, that's correct.

19  Q.   And even though you were suggesting to Moody that you had,

20  that was not -- you were lying to Moody?

21  A.   Yes.

22  Q.   Okay.  16.  "So your recommendation of Mr. Sherwood wasn't

23  based on your own personal experience of having some financial

24  success with his investments?"  And then your answer:  "Not

25  that I can remember."

1        Do you see that?

2   A.   Yes.

3   Q.   "Question:  And that also would be true for Mr. Heshelman,

4   right?  You don't have any personal investment with

5   Mr. Heshelman that has been successful?"

6        "Answer:  That's correct."

7        Right?

8   A.   Yes.

9   Q.   And then, "Question:  Well, did you give Mr. Moody any

10  assurances about the safety of his investment or the

11  likelihood -- or likelihood that he would be getting his money

12  back or that his investment would" and then it tapers off.

13       Do you see that?

14  A.   Yes.

15  Q.   So now page 20, line 2.  "Answer:  I don't recall that

16  being part of the conversation."

17       Do you see that?

18  A.   Just give me a second to review it.

19  Q.   Okay.

20  A.   I see it.

21  Q.   Okay.  So now your answer to Mr. Mekaru in front of the

22  grand jury under oath was you don't recall that being part of

23  the conversation, correct?

24  A.   Yes.

25  Q.   And then the next question --

1  A.   Again, this is --

2  Q.   I'm not asking for an explanation.

3       MR. MEKARU:  Your Honor, he's not allowing him to

4  answer the question.

5       THE COURT:  Let him answer the question, would you,

6  please, Mr. Tracy?

7       MR. TRACY:  Sure.

8       THE WITNESS:  Okay.  At this time this was questions

9  that were off the cuff that I did not have time to really

10 recall, and this was a good five years in between asking about

11 a conversation.  And I answered to the best of my ability.  And

12 I'm trying to amplify my answer today.  I've had considerable

13 time to think about that, and I've tried to cooperate with the

14 Court and tried to answer to the best of my ability, and at

15 that time I didn't really have any previous time to even think

16 about it.  So it's a question right off the top of your head,

17 and I did not have time to really reflect on that.  I'm trying

18 to amplify my answer today.

19 Q.   (BY MR. TRACY)  Okay.  We'll go back into the transcript

20 for a minute now that you've opened up new ground for me.

21      So I take it when you received -- you received a

22 grand jury subpoena to testify before the grand jury, correct?

23 A.   Yes.

24 Q.   And that was before you testified in January of 2006,

25 right?

1   A.   Yes.

2   Q.   And I presume -- did you have an attorney that you

3   retained at that point in time?

4   A.   No, I did not.  I did not have a chance to talk to anyone.

5   Q.   I presume that when you received the grand jury subpoena

6   that you took that very seriously?

7   A.   Yes.

8   Q.   And you understood the oath that you were taking to

9   testify to the best of your ability and to tell the truth

10  before the grand jury, it's the same oath that you've taken

11  today?

12  A.   Yes.

13  Q.   And when you say that you -- it was five or six years

14  after the conversation with Moody, that's going back to a

15  period of time in 2006, correct?

16  A.   Yes.

17  Q.   And now we're another three years past that date, so it's

18  been more like eight or nine years since you've had the

19  conversation with Mr. Moody, correct?

20  A.   Yes.

21  Q.   So let's go back into the transcript.  So your last

22  response, page 20, line 2, "I don't recall that being part of

23  the conversation."

24       Correct?

25  A.   Yes.

1    *Q.* And Mr. Mekaru goes on and says, "Don't recall or it

2    didn't happen?"

3         Do you see that?

4    *A.* Yes.

5    *Q.* And your answer: "I don't recall."

6         "Question: So it's possible there was a conversation

7    along those lines?"

8         "Answer: I don't think so."

9         So he didn't just ask you one question about it. He

10   probed you further to test your memory, correct?

11   *A.* Yes.

12   *Q.* Okay. Next question: "Well, if somebody is calling as a

13   reference and asking about, you know, Hey, do I invest with

14   this person, and it sounds like it's a million dollars or more,

15   would it be," and then it trails off.

16        Your answer: "I don't think at that point in time it was

17   really formulated as to what he was going to invest."

18        Do you mean "he" there meaning Mr. Moody?

19   *A.* Yes.

20   *Q.* Okay. "Question: But no questions about the success of

21   Mr. Sherwood's success as an investment advisor?"

22        Your answer: "No, it was more in terms of a personal

23   reference. If I knew him and knew his character."

24        That was your answer, correct?

25   *A.* Yes.

1   *Q.*   "Question:  So if Mr. Moody said that he was told that you

2   were a multi-million-dollar investor, that wouldn't be true?"

3        Do you see that question?

4   *A.*   Yes.

5   *Q.*   And then your answer:  "Say that question again, please."

6        "Question:   If Mr. Moody said that you told him" -- that

7   "you" being Mickelson there, right?

8   *A.*   Yes.

9   *Q.*   And told "him" being Moody, right?

10  *A.*   Yes.

11  *Q.*   ". . . you told him that you were a multimillion-dollar

12  investor, that wouldn't be accurate?"

13       And then you answered sort of with a question.  You say,

14  "If I was a multimillion-dollar investor?"

15       Right?

16  *A.*   Yes.

17  *Q.*   "Question:  That you told him you were a

18  multimillion-dollar investor."

19       "Answer:  I don't recall that at all."

20       Correct?

21  *A.*   Yes.

22  *Q.*   And then question:  "Don't recall or it didn't happen?"

23       Your answer:  "I don't believe I ever would have said

24  that."

25       Now, we've been going on for two or three pages of this,

1    correct?

2    A.   Yes.

3    Q.   "Question:  Well, that's something pretty significant from

4    Dan, right?"

5         Your answer: "Yes, exactly.  I don't believe I would have

6    said that.  Now, maybe Mr. Moody's recollection of the

7    conversation was different, but I don't specifically recall

8    anything like that."

9         "Question:  Well, that's pretty significant.  That gets

10   down to something to something pretty simple.  Either you have

11   millions or you don't."

12        Your answer:  "Well, I did not have millions."

13        I assume that was accurate.  Correct?

14   A.   Yes.

15   Q.   And "Question:  And what did you tell Mr. Moody?"

16        "Answer:  I don't recollect that I told him that I was a

17   multi-million-dollar investor."

18        "Question:  Did you tell him at all about getting monies

19   regularly from your investment and earning the percentage of

20   what was guaranteed, 8 to 10 percent of the money?"

21        "Answer:  No, I do not."

22        So that was your testimony back in January of 2006,

23   correct?

24   A.   Yes.

25   Q.   Thank you.

*CROSS-EXAMINATION OF DENNIS R. MICKELSON*

1    Now, this money that you received, 900,000, million,
2    whatever it turned out to be, did you report any of that to the
3    IRS as income?
4    A.   No, I did not.
5    Q.   And to this day you still have not?
6    A.   That's correct.
7    Q.   Now, I take it from '99 to 2008 when -- late 2008 at this
8    point in time that Mr. Heshelman was arrested, you weren't with
9    him every day during that time period, correct?
10   A.   Yes.
11   Q.   You talked to him on occasion, though, right?
12   A.   Yes.
13   Q.   You knew he was living or at least traveling for
14   significant periods of time to places like, say, New York City,
15   for example?
16   A.   Yes.  He was living in New York City for -- at that time
17   period of which you are speaking of, I believe.
18   Q.   Okay.  So some period of time he also lived down in
19   Florida, didn't he?
20   A.   Yes.
21   Q.   And were you close to one another in Florida, or how far
22   were you apart?
23   A.   We were basically in the same area.
24   Q.   Okay.  But you knew that he had left Florida for periods
25   of time to be up in New York City?

CROSS-EXAMINATION OF DENNIS R. MICKELSON

1   A.   Yes, more times than he was in Florida.

2   Q.   Okay.  Was he also over in London for periods of time?

3   A.   Yes.

4   Q.   And eventually did he actually really move and move over

5   to Zurich, Switzerland?

6   A.   Yes.

7   Q.   And were you aware that he had a business or a business

8   address there that he was operating out of?

9   A.   Yes.

10  Q.   And I take it you were able to still stay in contact with

11  him?

12  A.   Yes, there were periods of time when -- long periods of

13  time when I was not in contact with him and other periods of

14  time when I was in contact with him frequently.

15  Q.   Okay.  And were some of the periods of time you weren't in

16  contact with him because of things you were busy with?

17  A.   Yes.

18  Q.   And some of the periods of time you weren't in contact

19  with him was because of things he was doing and he was out of

20  contact with you?

21  A.   Yes.

22  Q.   Kind of some of both?

23  A.   Yes.

24  Q.   But ultimately when you needed to get in touch with him

25  when he was over in Zurich or wherever, you were always able to

1    do it over -- after some period of time?

2    A.   Correct.

3    Q.   All right.  Now, some of the investments that were made by

4    Investors First -- and we can look at these in more detail off

5    of spreadsheets again -- were you aware of an investment that

6    was made with Puffin Investments?

7    A.   Only very, very minor.  I had some discussions with

8    Mr. Heshelman.

9    Q.   Okay.  Were you aware one of the gentlemen involved with

10   Puffin Investments was a guy by the name of Alan Shepherd?

11          MR. MEKARU:  I'm going to object, Your Honor.  The

12   witness has indicated his knowledge of this was solely based on

13   what he learned from the defendant, which would be hearsay.

14          THE COURT:  Sustained.

15   Q.   (BY MR. TRACY)  Okay.  Did you have any other knowledge

16   pertaining to the Puffin Investments other than what you've

17   heard from Mr. Heshelman?

18   A.   I heard the name Alan Shepherd mentioned by Mr. Sherwood.

19   Q.   So also through Mr. Sherwood?

20   A.   Yes.  But there was -- that's very minor from what I

21   heard.

22   Q.   Okay.  And were you aware of the amount of money that was

23   invested by Investors First with Puffin Investment?

24   A.   I believe it was $1 million.

25          MR. MEKARU:  Again, Your Honor, to the extent that

1    this information came from somebody else, even if it's

2    Mr. Sherwood, it's still hearsay.

3           THE COURT:  It sounds like it's double hearsay to me.

4    Q.   (BY MR. TRACY)  Did you see any of the investment records

5    or bank records showing the transaction being made with

6    Puffin Investments?

7    A.   No, I did not.

8    Q.   How about any investments with Kennedy Funding?  Did you

9    have any involvement with any of that?

10   A.   No.

11   Q.   How about investments with anything called Environmental

12   Training Institute, did you have any involvement?

13   A.   No.

14   Q.   Now, Exhibit 23 -- and I don't think we're going to go

15   through it in much more detail -- that's your Plea Agreement in

16   this case, correct?

17   A.   Yes.

18   Q.   And you looked at that during the course of your direct

19   examination, right?

20   A.   Yes.

21   Q.   And just, again, to hit on a couple points, there is a

22   cooperation part of that paragraph?

23   A.   Yes, there is.

24   Q.   Paragraph 7 or whatever it is.  And I take it that what

25   you're hoping happens is that -- what you have in that

1   agreement is essentially a five-year cap or maximum on what

2   your sentence can be?

3   A.   Yes.

4   Q.   But through your testimony here today and other

5   cooperation, you're looking to try to get below that amount of

6   time served, correct?

7   A.   Yes.

8   Q.   And as part of that you want your testimony to benefit

9   what the government is doing in this case?

10  A.   It's to my interest, yes.

11  Q.   Okay.  Now, on your direct we had some discussion about

12  Chinese bonds or something like that, right?

13  A.   Yes.

14  Q.   Okay.  And this involved at least one gentleman that I

15  heard his name, Ellis Smith?

16  A.   Yes.

17  Q.   And then there was another guy by the name of Sam

18  something?

19  A.   Sam Kram.

20  Q.   Sam and then Kram?

21  A.   Yes.

22  Q.   How does he spell his last name?

23  A.   K-R-A-M.

24  Q.   That's his real name?

25  A.   Yes.

1   Q.   Okay.

2   A.   As far as --

3   Q.   He doesn't go by Samuel or something?

4   A.   Well, perhaps his legal name is Samuel.  I don't know.

5   Q.   Okay.  Anyhow.  It's -- it's got a rhythmic tone to it.

6        You made introductions in 1998 to Mr. Heshelman of these

7   two gentlemen; is that correct?

8   A.   No.

9   Q.   No?

10  A.   Are you talking about Sam Kram and Ellis Smith?

11  Q.   Yes.

12  A.   No, Sam Kram introduced me to Ellis Smith; Ellis Smith

13  introduced me to Michael Heshelman.

14  Q.   You didn't make the introduction?

15  A.   No.

16  Q.   Okay.  But that's how you first got to meet Mr. Heshelman?

17  A.   Correct.

18  Q.   Now, what is -- is Mr. Smith still alive?

19  A.   Yes, as far as I know.

20  Q.   What's he doing today?

21  A.   I'm not sure.

22  Q.   Where was he from?

23  A.   He was from Wisconsin.

24  Q.   Okay.  And Mr. Kram, is he still alive?

25  A.   As far as I know.

1    *Q.*    And where was he from?

2    *A.*    Florida.

3    *Q.*    Do you know what he's doing today?

4    *A.*    No, I do not.

5    *Q.*    How old a gentleman would these guys be?

6    *A.*    Um, Mr. Kram is probably close to 80 years old.

7    *Q.*    And how about Mr. Smith?

8    *A.*    I would expect that Mr. Smith would be somewhere in his

9    fifties.  Maybe older.

10   *Q.*    Okay.  All right.  Now, I believe you talked about these

11   Chinese bonds in your opinion being essentially fraudulent; is

12   that correct?

13   *A.*    Yes.  They are historical documents that are sold, but the

14   way in which they are used creates a -- creates a fraud.

15   *Q.*    Okay.  But do you know anything about what Ellis Smith's

16   business was back in 1998?

17   *A.*    I knew there was some associations with bonds.

18   *Q.*    Okay.  Do you know whether there were parts of his

19   business that were completely legitimate?

20   *A.*    I would imagine that that is a very distinct possibility.

21   *Q.*    Okay.  So you're not an expert on what day-to-day

22   activities Mr. Smith was doing?

23   *A.*    No.

24   *Q.*    And I take it that's the same thing regarding Mr. Kram?

25   *A.*    Correct.

*CROSS-EXAMINATION OF DENNIS R. MICKELSON*

1  Q.   Okay.  But you call these historical documents, correct?

2  A.   Yes.

3  Q.   Do they trace back to the time before China became a

4  Communist nation?

5  A.   Yes.

6  Q.   So back to the time of Kai-shek before Mao Tse Tung?

7  A.   They were 1913 issue.  I'm not sure of the political

8  associations of China at that time.

9  Q.   Okay.  But you recall Mao Tse Tung came into power in the

10 forties?

11 A.   Yes.

12 Q.   So these predate Mao Tse Tung?

13 A.   Yes.

14 Q.   And as historical documents, I take it they probably have

15 some value?

16 A.   Minor amounts, yes.

17 Q.   Well, minor amounts to you.  I mean, you --

18 A.   I understand.  I can qualify -- I can certainly qualify

19 that.

20 Q.   A million and a half dollars is quite a bit of money that

21 flowed to you.  Minor amounts to other people may mean

22 something different.  Tens of thousands of dollars worth of

23 value?  Hundreds of thousands of dollars?

24 A.   The Chinese bonds in reference to this I paid $200 a bond

25 for.

1    *Q.*    Two hundred dollars a bond?

2    *A.*    Yes.

3    *Q.*    But you paid at or over $700,000 in total for these bonds?

4    *A.*    Yes.

5    *Q.*    Now, where did that money come from?

6    *A.*    It came from other people's money.  Investors.

7    *Q.*    Okay.  OPM, right, other people's money?

8    *A.*    Yes.

9    *Q.*    But this is way -- this is before you ever were involved

10   with Mr. Heshelman?

11   *A.*    Yes.

12   *Q.*    So it had nothing to do with the Investors First

13   investments?

14   *A.*    That's correct.

15   *Q.*    So you got other people's money to invest?

16   *A.*    Yes.

17   *Q.*    And part of the things that you decided to invest in were

18   these Chinese bonds?

19   *A.*    Yes.

20   *Q.*    I presume you were hoping to make money on them?

21   *A.*    Yes.

22   *Q.*    And I lost the train of thought a little bit in your

23   direct.  Do you now have possession of most of the bonds or all

24   of the bonds?

25   *A.*    No, I do not.

1    Q.   Who does?

2    A.   They are gone.

3    Q.   And how so?  Did you sell them?  What did you do with

4    them?

5    A.   Some were lost.  Some were given to some people to try and

6    do things with.  Others were just sold.  Others were just --

7    basically people had taken them and not paid me.

8    Q.   Okay.  And I also take it you're not holding yourself out

9    as an authority on Chinese bonds, correct?

10   A.   No, I'm not.

11   Q.   All right.  Are you aware of any court cases or ongoing

12   matters within the United States or China about determining the

13   value of those bonds?

14   A.   There could be, but I have no direct knowledge of court

15   cases or seen court cases or anything of that nature.

16   Q.   So you don't have any knowledge one way or the other on

17   that?

18   A.   That's correct.

19   Q.   Did you ever actually see the bonds?

20   A.   Yes.

21   Q.   Were they pretty interesting to look at?

22   A.   Yes.

23   Q.   Okay.  Now, we also on your direct had a chance to hear

24   about some other things that you and Mr. Sherwood were up to,

25   right?

1    A.    Yes.

2    Q.    And these things, like for example, this stuff in 2008

3    involving currency trading, that had nothing to do with

4    Mr. Heshelman, right?

5    A.    That's correct.

6    Q.    And we heard some monies went to Mr. O'Brien -- came from

7    Mr. O'Brien and et cetera, right?

8    A.    Yes.

9    Q.    Now, I take it from your testimony what you were

10   attempting to do with those currency trades, that was

11   completely legitimate, right?

12   A.    Yes.

13   Q.    Those are legal transactions to deal with?

14   A.    From my understanding, if you are trading a few accounts

15   at a time, it's legal, and it becomes restricted and needing a

16   license after a certain number of accounts.

17   Q.    So you can trade at higher amounts, but you have to go

18   through certain certification or licensing?

19   A.    Yes, you can have more clients, but you have to be able to

20   have a license at that point.

21   Q.    And is that through the SEC, if you know?

22   A.    Yes, it's a -- they are audited.  It's monitored.  They

23   have currency trading houses that house the money, and they

24   have a fiduciary responsibility to the customers, much like a

25   bank has a fiduciary responsibility to its clients.

1   Q.   Okay.  And I take it you didn't have that kind of
2   licensing?
3   A.   No, I did not.
4   Q.   And as far as you're aware Mr. Sherwood didn't either?
5   A.   That's correct.
6   Q.   But you were aware at some point in time he was registered
7   and licensed with the SEC, Mr. Sherwood that is?
8   A.   Yes.
9   Q.   But at the point in time in 2008 when you were dealing
10  with this, he had none of that licensing and registration?
11  A.   Not that I'm aware of.
12  Q.   Now, it sounded like on direct that the people that you
13  brought to this currency trading you explained the risks to
14  them relating to the investment.
15  A.   Yes, on the second part of it I explained it more
16  thoroughly.
17  Q.   Yeah, the second part being in the 2008 period?
18  A.   Correct.  Correct.
19  Q.   You took more of an active role, correct?
20  A.   Yes.  I made sure that they would not lose all their
21  money.
22  Q.   Okay.  And it sounded like with respect to some of them
23  you actually took enough of a role that you even advised them
24  when they may want to get out of an investment?
25  A.   Yes, that's correct.

1   *Q.*   All right.  Now, from that discussion I take it that you

2   understood at least to some degree something about the currency

3   trading?

4   *A.*   Yes.

5   *Q.*   And you were somewhat, maybe not day-to-day but close to

6   day-to-day involved with that process?

7   *A.*   I understood the workings of it, and I worked with the

8   clients to be able to make sure that their money was protected.

9   *Q.*   Okay.  I want to compare that to what Investors First and

10   Mr. Heshelman were trying to put in place.

11   Those types of trading platforms on the international

12   banking level you did not have any familiarity with, correct?

13   *A.*   Yes, I -- to this, that's correct.

14   *Q.*   Okay.  And again, you never participated with

15   Mr. Heshelman with any meetings that took place with bankers or

16   financial people over in Zurich, correct?

17   *A.*   No, I did not.

18   *Q.*   Nor did you participate with him in any such meetings that

19   happened in London?

20   *A.*   No, I did not.

21   *Q.*   Nor with any meetings that happened in New York City?

22   *A.*   That's correct.

23   *Q.*   Now, you may have somebody particular in mind, but during

24   your direct I also got the sense that sometime maybe in the

25   '07/'08 period, in other words, just within the last year or

1   two, you also made other introductions to Mr. Heshelman of

2   people over in Europe, correct?

3   *A.*   That's correct.

4   *Q.*   And part of the reason why you continue to make those

5   introductions is that you were still hopeful that the type of

6   trading platform that he was trying to get into place could

7   happen to show a return on the people's investment, correct?

8   *A.*   I thought there was an outside chance that there might be

9   something that could be done that was legal, but I did not see

10  any of the direct information.

11      One of the other reasons why I did that is so that I could

12  see if Mr. Heshelman did have monies, if he was capable of

13  perhaps assisting in this situation to try and return some of

14  the monies to the investors on this particular court

15  proceedings today.

16  *Q.*   Okay.  So you knew that there were still literally

17  hundreds of thousands of dollars out there to be paid back on

18  people's investments, correct?

19  *A.*   Yes, there was more than that I believe, obviously.

20  *Q.*   Okay.  And you were making introductions to people in

21  Europe for Mr. Heshelman for two purposes, then, as I

22  understand it.  One was so you could kind of keep tabs on them

23  and see whether or not he had potential monies that might help

24  pay back some of the people that invested; is that right?

25  *A.*   Yes.

1    Q.   And the second was that you were holding out some outside

2    chance, remote possibility that something may come into place

3    in terms of a trading platform?

4    A.   Not a trading platform but some sort of legal means in

5    which to be able to assist in here.  I think a trading platform

6    is maybe overstating it.

7    Q.   Some type of investment, whether it's --

8    A.   Yes.

9    Q.   -- bonds or whatever the case may be?

10   A.   Yes.

11   Q.   That would return an investment and hopefully pay the

12   people back?

13   A.   Yes.

14   Q.   And you were doing that as late as last year?

15   A.   Yes.

16          MR. TRACY:  Okay.  Thank you very much.

17          Nothing further, Your Honor.

18          THE COURT:  Thank you, Mr. Tracy.

19          Any redirect, Mr. Mekaru?

20          MR. MEKARU:  Yes, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. MEKARU:

23   Q.   Okay.  Mr. Mickelson, you were asked some questions here,

24   I guess, about the difference between your recollection of how

25   much money you received from Mr. Oliver and the spreadsheets --

1   A.   Yes.

2   Q.   -- right?  Now, as much as you may have seen the

3   spreadsheets that were prepared by the government before today,

4   before your testimony -- excuse me -- before your preparation

5   for your testimony, maybe even all the way back to 2006, did

6   you participate at all in preparing those documents and

7   identifying what monies were actually associated with the

8   particular transaction?

9   A.   No.

10  Q.   So it was really the government who went through and

11  decided what to include in there without your participation?

12  A.   Yes.

13  Q.   And as far as you're concerned, in your recollection how

14  much money did you get from Mr. Oliver's transaction?

15  A.   I believe it was around -- I know it was $10,000 on the

16  first $360,000, and I believe it was an additional 40,000.

17  Q.   And those other monies, it's possible those might be

18  associated with Mr. Oliver, but it's also possible it may be

19  associated with some other, some other investment?

20  A.   Yes, that's correct.  From the overlapping dates that I

21  see, there were other new investors that had come forward

22  during those dates.

23  Q.   Now, you were asked lots of questions about your

24  grand jury testimony.  You remember that, right?

25  A.   Yes.

1    Q.   You were issued a subpoena to come in and testify back on

2    January 26th, 2006.

3         Now, you said that you were not represented, right?

4    A.   That's correct, I had not talked to anyone.

5    Q.   You were called in to provide some information to the

6    grand jury who was at that point still investigating this

7    matter, right?

8    A.   That's correct.

9    Q.   So you said you weren't represented.  So the

10   plea agreement that you had and that cooperation agreement that

11   you had with the government, did that apply to your testimony

12   before the grand jury?

13   A.   No.   In 2006 I was not represented with counsel.

14   Q.   So you weren't obliged in 2006 to cooperate with the

15   government, were you?

16   A.   That's correct.

17   Q.   Now, you did take an oath to testify truthfully, though,

18   right?

19   A.   Yes.

20   Q.   And as you indicated -- as we indicated earlier in your

21   direct testimony, though, you've already -- you've already

22   indicated that when you were first asked about this whole

23   activity that you were less than fully candid, right?

24   A.   Yes.

25   Q.   So you didn't provide the information when you were first

1   asked about -- you didn't provide the government with a full

2   picture of everything that was going on the first time you were

3   asked?

4   A.   Correct.

5   Q.   Maybe not even the second or third time.  But eventually,

6   as far as you're concerned, have you given the jury the full

7   picture of your activities?

8   A.   Yes.

9   Q.   So there may be some instances where you were asked

10  questions back in 2006 where you were less than fully candid?

11  A.   Yes.

12  Q.   And maybe even --

13  A.   With the Moody thing, that conversation caught me a little

14  offguard because I couldn't remember at that time.  That's --

15  after giving it some thought, it was easier to remember what

16  actually had occurred.

17  Q.   Well, do you find that that's true for you, that if you

18  spend some time thinking about something, you're able to recall

19  it better?

20  A.   Yes, after five years someone comes up to you and says,

21  you know, What was the address of Mr. Jones five years ago?

22  It's hard to recall it immediately.  If you have a chance to

23  think about it, then many times it's clearer in your mind.

24  Q.   Okay.  Well, I think counsel has a point, though.  I mean,

25  that was five years after a conversation.  We're now at nine,

1    10 years after the conversation.

2    A.   Well, there's another factor there that you're not

3    considering, and that after given that question I was able to

4    be able to think about it at that time.

5    Q.   So let me see if I'm clear now.  Even though more time has

6    passed, is your recollection of that conversation clearer now

7    or was it clearer back then?

8    A.   Clearer now.

9    Q.   All right.  Now, you were asked some questions about where

10   Mr. Heshelman was back in this period of '99 through 2008.

11        You said he was in Florida, New York, sometimes in London,

12   Zurich.  But you were still able to contact him, right?

13   A.   Yes.

14   Q.   But you were able to contact him by phone --

15   A.   Yes.

16   Q.   -- right?  And these phones, were these landline phones or

17   cellular phones?

18   A.   In almost all instances they were cellular phones on the

19   part of Mr. Heshelman.

20   Q.   And that's what I was actually referring to.  Thank you

21   for clarifying.  So we're talking about what sort of phone is

22   Mr. Heshelman on.  So really he could be anywhere?

23   A.   I would assume that he was in Switzerland since I was

24   calling Switzerland.  I don't know all of the -- how far those

25   particular phones pick up, but I guess there's world chips, I

1    guess there's different -- I assume that he was in Switzerland.

2    Q.   But in terms of exact location of where he is in

3    Switzerland even?

4    A.   No.  No.

5    Q.   All right.  Counsel was asking you some questions about

6    you don't know what Mr. Heshelman was doing in Switzerland, you

7    don't know if maybe he was actually doing some real deals or

8    not.

9         All right.  Sure.  Okay.  Maybe we don't know what

10   Mr. Heshelman is doing on a day-to-day basis in Switzerland or

11   London or New York, but let's focus again on what you do know.

12        The investment proposal that you had with Mr. Heshelman to

13   go to these investors, to go to Mr. Edwards, Mr. Oliver,

14   Mr. Clyde, Mr. Ramsey, Mr. Williams, and Mr. Moody, was there

15   anything at all legitimate about this investment plan that was

16   being proposed by Mr. Heshelman and that you were conveying to

17   these other people?

18   A.   I don't believe so.  I had conversations with

19   Mr. Heshelman that there were no proof -- that I had no proof,

20   nor did he have any proof, that at that time that these trading

21   programs actually existed, yet I was going out --

22   Q.   Personally they may not have even existed, but --

23   A.   But I went out and -- I went out and I found investors.

24   Q.   Okay.  Let's assume even if these did exist, based on your

25   knowledge of what was going on, was there any sort of trading

1    activity that was even going on?

2    A.    No, not to my knowledge.

3    Q.    What was happening with the money?

4    A.    The money was coming into Ken Warner's account and it was

5    going out.  Obviously I -- there was money that was sort of

6    directed by Mr. Heshelman.  I think the spreadsheets are more

7    accurate than what I could explain.  But there was money coming

8    in and money going out very quickly.

9    Q.    And all the decisions about where that money went, that

10   was Mr. Heshelman's?

11   A.    Yes.

12             *MR. MEKARU:*  Thank you.

13             *THE COURT:*  Anything further, Mr. Tracy?

14             *MR. TRACY:*  Are you all set?

15             *MR. MEKARU:*  Yes.

16             *MR. TRACY:*  Just a couple, Your Honor.  Thank you.

17                         RECROSS-EXAMINATION

18   *BY MR. TRACY:*

19   Q.    So, Mr. Mickelson, I just need to re-cover a little ground

20   here.

21        This giving some thought to Moody, the Moody

22   conversation --

23   A.    Yes.

24   Q.    -- I take it that the government has encouraged you to

25   give some thought to your involvement, correct?

1    A.    This thought process --

2    Q.    Just -- that's really a yes or no.

3          *THE COURT:*  No, it isn't really, Mr. Tracy.  I mean,

4    give the man an opportunity to respond to the question fairly,

5    please.

6          *MR. TRACY:*  Okay.

7          *THE WITNESS:*  Okay.  After going to a grand jury and

8    being asked that question, I obviously started to probe my --

9    after I came back, I started to think about that.  And I've

10   tried to amplify my answer to date to the best of my ability

11   and to clarify that.

12         So I had more time to think about it, and I clarified

13   my answer to date to the best of my ability.

14   Q.    *(BY MR. TRACY)*  So since that period of time you've had a

15   chance to meet with Agent Wetherbee?

16   A.    Yes.

17   Q.    On several occasions?

18   A.    Yes.  This was much later, though.  This was much later

19   after the thought process.

20   Q.    That's fine.  You keep adding things.  I'm just asking you

21   very simple questions.  Okay?

22   A.    Sure.

23   Q.    And you've also had a chance to meet with Dan Mekaru?

24   A.    Yes.

25   Q.    And you've also had a chance to talk with them about

1    Mr. Moody's understanding of his version of the conversation

2    that you had, correct?  In fact, Dan Mekaru asked you about

3    that component of it during the grand jury.  That's what we

4    just went through.

5    A.   Yes.  We did not spend a whole lot of time talking about

6    Mr. Moody, that conversation only.  As far as him probing me or

7    anything like that, I don't -- that did not really occur.

8    Q.   But they did tell you that Mr. Moody's recollection on his

9    side of the conversation was that you portrayed yourself as an

10   investor, correct?

11   A.   Yes.  Yes.

12   Q.   Now, this landline versus cell phone stuff, we've had that

13   with a few witnesses.  I take it over the course of your life

14   you've had people tell you the truth while they are talking on

15   a cell phone with you?

16   A.   Yes.

17   Q.   I take it over the course of your life you've had people

18   lie to you on the course of a cell phone?

19        MR. MEKARU:  Your Honor, I'm going to object.

20        THE COURT:  Mr. Tracy, there's an objection, please.

21        MR. TRACY:  Okay.

22        MR. MEKARU:  Again what we're talking about here is

23   what he's being told.  What this witness is being told about

24   where the defendant is is all going to be hearsay.  It's

25   permissible for me to probe that with this witness about what

1    he's being told about where the defendant is, but it's not

2    permissible for the defense.

3            MR. TRACY:  That's not my question at all.  I'm

4    asking him whether he's had conversations on cell phones where

5    people --

6            THE COURT:  Mr. Tracy, let's just move on.

7            MR. TRACY:  I didn't bring it up.

8            THE COURT:  That's self-evident, okay?

9            MR. TRACY:  So it's self-evident that people can talk

10   on landlines and cell phones --

11           THE COURT:  I mean, obviously.

12           MR. TRACY:  Okay.  It wasn't my line of inquiry.

13   Q.   (BY MR. TRACY)  Now, back to the prior lies or failures to

14   tell the complete truth that apparently occurred from what I

15   heard on your direct and redirect.  You're saying that you

16   failed to tell the complete story to the government for at

17   least the period of time that you were before the grand jury,

18   correct?

19   A.   Again, it was a question that I had no time to think about

20   or prepare.  It's just like someone asking you who your grade

21   school teacher was in third grade.

22   Q.   I'll tell you.

23   A.   Okay.

24   Q.   Mrs. Owens.

25   A.   You have a wonderful memory.  I wish my memory was as good

1    as -- that I could recall facts as instantaneously as that.

2         Perhaps when you get my age they won't appear so

3    instantaneously.

4    Q.    Okay.  But today is the magic day, today is the truth day,

5    today is the day you've got it all in your head.  Is that my

6    understanding?

7    A.    I've gotten a chance to reflect much more on that question

8    back in 2006, and I was able to formulate my thoughts about

9    that at that period of time and since that time, and I am

10   amplifying my answer to the best of my ability today.

11   Q.    Thank you for your amplifications today, sir.  Thank you.

12   A.    You're welcome.

13             THE COURT:  Are we done with Mr. Mickelson?

14             MR. TRACY:  I'm all done.  Thank you.

15             MR. MEKARU:  Yes, Your Honor, thank you.

16             THE COURT:  Thank you, Mr. Mickelson.  You may step

17   down.

18             THE WITNESS:  Thank you.

19             THE COURT:  Mr. Mekaru.

20             MR. MEKARU:  Your Honor, I wanted to read a

21   stipulation into the record.

22             The parties have -- this is a new stipulation.

23   Stipulation number 8.  Let me tender this to your clerk.

24   Your Honor, it just occurred to me I wanted to clarify a point.

25   The parties stipulate and agree that wire transfers are wire

1    communications.  The jury may find this fact as proven at

2    trial.

3            THE COURT:  Thank you, Mr. Mekaru.

4            MR. MEKARU:  And with that, Your Honor, the

5    government will close its case-in-chief.

6            THE COURT:  Well, this is probably a good time to

7    take a break, Ladies and Gentlemen.  We've been at it for about

8    an hour this afternoon.  The government has now closed its

9    case-in-chief which will require us to -- will require me to

10   have some inquiry with counsel, so we'll take a break here of

11   about 15 minutes or so, and then we'll hopefully know where we

12   are going forward.

13        (Jury exited the courtroom at 2:34 p.m.)

14            THE COURT:  Have a seat, please.

15            MR. TRACY:  Thank you.

16            THE COURT:  Where are we now, Mr. Tracy?  The ball

17   seems to be in your court at this point.

18            MR. TRACY:  Well, for the record, at some point I

19   would like to just put a Rule 29 motion on the record at the

20   close of the government's case, so we can do that maybe during

21   this break if the Court would like to.

22            THE COURT:  Well, what I would like to do is know

23   from you beyond that whether you're prepared to put on any

24   testimony this afternoon.

25            MR. TRACY:  Yep, we can, Your Honor.  My -- do you

1    want me to sit down?

2            THE COURT:  It --

3            MR. TRACY:  However?  Mike Boyd is the sort of expert

4    or fact witness on some of the --

5            THE COURT:  Opinion witness is how to say that.

6            MR. TRACY:  Thank you.  I believe his flight comes in

7    at quarter-to-eleven tomorrow, so he'll be here about 11:30.

8    So I was planning on putting him on after lunch.  And then I

9    need to talk to Mr. Heshelman about whether or not he's going

10   to take the stand, and my preference would be to do that

11   tomorrow and not this afternoon.

12           And then the other witness that I was considering

13   calling because the government hasn't called them is maybe

14   calling Agent Wetherbee to the stand.  So the only person I

15   would really like to move forward with, but I would like to

16   have a chance to talk to my client again for a few minutes, is

17   whether or not we put Agent Wetherbee on the stand this

18   afternoon.

19           THE COURT:  Why don't we do that.  Why don't you talk

20   with Mr. Heshelman, make that decision about his testimony and

21   Mr. Wetherbee's testimony before we hear your motion.

22           MR. TRACY:  That's fine.  And then we would -- can I

23   take five or 10 minutes to do that?

24           THE COURT:  Yes, we'll give you a little -- a minute

25   to take that, and we'll come back and put your decision on the

1    record and hear your motion.

2            *MR. TRACY:*  Okay.  Thank you very much, Your Honor.

3            *THE COURT:*  Thank you.

4            *THE CLERK:*  Everyone rise.  This Court is in recess.

5        *(Recess taken at 2:36 p.m.)*

6        *(Back on the record at 3:00 p.m.)*

7            *THE COURT:*  Mr. Tracy, before we get into your

8    motion, I'm just trying to decide here whether to send the jury

9    home.  It's going to take probably a half an hour to get

10   through your motion between the time you present and Mr. Mekaru

11   argues and so forth.

12           Are you prepared to put on any testimony this

13   afternoon or not?

14           *MR. TRACY:*  I was going to put Agent Wetherbee on

15   this afternoon if the Court would like, or that can occur first

16   thing in the morning.  It does not matter to me.

17           *THE COURT:*  What do you anticipate in terms of timing

18   with regard to him?

19           *MR. TRACY:*  My questions would probably be a

20   half-hour or less.

21           *THE COURT:*  So we might be able to finish -- if we

22   finish with him today, I've got a matter starting at 8:30 in

23   the morning.  No, 8:00 in the morning.

24           *THE CLERK:*  8:00.

25           *THE COURT:*  I've got a matter starting at 8:00.  We

1    can start here surely not later than 9:00.

2            Are you prepared to go ahead then tomorrow morning

3    with testimony or not?

4            MR. TRACY:  Well, if we don't do Agent Wetherbee

5    today, then, yes, I'd be prepared with him, and then I'll

6    get -- I'm going to talk with Mr. Heshelman further about

7    whether he'll take the stand.

8            THE COURT:  You haven't decided that yet?

9            MR. TRACY:  No.  I think that's probably going to

10   happen, but I want to talk to him a little bit more after we

11   break today.  That's probably going to happen, Your Honor, but

12   we'll make the final decision later this evening.  Mr. Boyd --

13           THE COURT:  See, that's the juggle part, because if

14   Mr. Heshelman isn't going to testify, then we have nothing to

15   fill up the morning tomorrow if we finish with Mr. Wetherbee

16   today.  And if that's the case, I'd just as soon send the jury

17   home.

18           MR. TRACY:  I think that's probably the way to do it

19   right now if that's okay with Your Honor.  That way we can

20   start kind of fresh in the morning, and I'll know for sure from

21   my conversations with my client about whether he's going to

22   take the stand, and we can start with Agent Wetherbee first

23   thing in the morning.

24           THE COURT:  All right.  Let's do that.

25           Susan, would you bring the jury in, and I'll send

 1   them home.

 2        THE CLERK:  We may be missing two.  When I told them

 3   there was a legal issue, two of them said, "Can we go back

 4   downstairs?"

 5        THE COURT:  Maybe one of the CSOs can go round them

 6   up.

 7        MR. TRACY:  Do you want to hang around and still do

 8   the 29 today on the record?

 9        THE COURT:  No, I -- yes.

10        MR. TRACY:  After they are gone?

11        THE COURT:  Yes.  I want to send the jury home, and

12   then we'll hear your motion.

13        MR. TRACY:  Okay.  Do you want to talk a little

14   housekeeping before they come in, Your Honor?

15        THE COURT:  Sure.  What's up?

16        MR. TRACY:  So I think one way or the other we would

17   be done -- I don't know if Dan will have rebuttal, obviously --

18   but we'll be done in the afternoon once Mr. Boyd takes the

19   stand.  So is the Court thinking, depending on what the

20   rebuttal case is, that closing arguments would probably be

21   first thing Thursday?

22        THE COURT:  That's what I'm thinking.  My thought was

23   that we would have our instruction conference after -- tomorrow

24   afternoon and then start with -- the way I do it is to instruct

25   first and then arguments.

1          *MR. TRACY:*  Oh, you'll do the instructions first?

2          *THE COURT:*  Yes.

3          *MR. TRACY:*  So they have that --

4          *THE COURT:*  Yes, so they have a legal context for the

5    arguments they're going to hear.  So that was kind of my

6    optimistic view, that the jury would get the case on Thursday

7    morning.

8          *MR. TRACY:*  Okay.  So probably you'd be through your

9    instructions, what, a half-hour, 45 minutes normally?  Is that

10   about right?

11         *THE COURT:*  Yeah, probably.

12         *MR. TRACY:*  So if we started at eight-thirty or nine,

13   then we would follow with closing arguments?

14         *THE COURT:*  Right.  Right.  How did we do?

15         *COURT SECURITY OFFICER:*  They are on their way.

16         *THE COURT:*  Okay.  Thank you very much.

17       *(Jury entered the courtroom at 3:06 p.m.)*

18         *THE COURT:*  Ladies and Gentlemen, after discussing

19   things with the lawyers, I've decided that this is a place to

20   break for the day.  We do have a legal matter to take up that

21   will take some little time, and then we can start fresh

22   tomorrow morning with the defense putting in its case.

23         So we're going to break for now.  I hope to be

24   able -- I can't think of any reason why we can't start by 8:45

25   tomorrow morning.  I've got a matter that I have to hear at

1    8:00, and that shouldn't take more than a half an hour.  So if

2    you could be back in the jury room at 8:30 tomorrow, ready to

3    go by 8:45, we'll get started first off with Mr. Tracy.

4            And again, no discussions, no research.  You know,

5    sort of when you go away from the jury room, kind of forget

6    what went on.  Just, you know, go about your daily business and

7    be fresh for tomorrow morning when we come back and start

8    hearing some more testimony.  Okay?  Thanks.

9         *(Jury exited the courtroom at 3:07 p.m.)*

10            *THE COURT:*  Mr. Tracy, your motion.

11            *MR. TRACY:*  Thank you, Your Honor.

12            Right here, is that fine, Your Honor, to do it?

13            *THE COURT:*  Yes.

14            *MR. TRACY:*  Okay.  And hopefully I won't take quite

15    as long as you've given me.  I won't rehash the closing

16    argument that we'll hear hopefully on Thursday.

17            *THE COURT:*  You can turn that if you want, if you're

18    more comfortable.

19            *MR. TRACY:*  This is fine, Your Honor, if it doesn't

20    bug you.

21            Pursuant to Federal Rule of Criminal Procedure

22    Rule 29(a), we're making a motion for a judgment of aquittal.

23    Obviously for purposes of that rule the government doesn't need

24    to meet its "beyond a reasonable doubt" standard.  I think the

25    standard is set out in a couple different cases, but probably

 1    both the Court and the government -- the government and the

 2    Court are probably aware of, so I won't go into that part of

 3    it.

 4         Our focus is very simple, Your Honor.  There's no

 5    doubt that the government has shown the wire transfers and all

 6    of the prerequisite elements of the charges they have made.

 7    The focus is on the whole question of intent.  And the basis

 8    for our motion here, and then we're asking the Court to acquit,

 9    essentially to find that no reasonable jury could come to the

10    conclusion that there was an intent to defraud.  And that's the

11    element that we're focusing on.

12         Rather you'll hear testimony, including today from

13    Mr. Mickelson, even as of 2008 he introduced people to

14    Mr. Heshelman over in Europe.  And I think his terms were there

15    was an outside chance, a remote possibility that things would

16    still come through in terms of the investments.

17         We heard the same thing last week from various

18    investors, most notably from Paul Ramsey.  And I think that his

19    testimony was the most helpful for purposes of at least our

20    side of the case on that issue.

21         There's no doubt that monies were lost and

22    investments did not turn out in the manner in which they had

23    hoped.  Some people did get their monies returned.  There's no

24    doubt that if this were a civil case that, you know, burdens

25    would have been met in terms of promissory notes not being paid

1    on and the like.  But this is a criminal case, and the

2    government must prove the intent to defraud, and based upon the

3    testimony we've heard, we respectfully submit to this Court

4    that that intent element has not been proven, and we're asking

5    for aquittal.  Thank you, Your Honor.

6              *THE COURT:*  Mr. Mekaru.

7              *MR. MEKARU:*  Well, I guess I want to be clear here.

8    Is counsel moving for a Rule 29 aquittal for all 46 counts?

9              *MR. TRACY:*  Yes, Your Honor.

10             *MR. MEKARU:*  Okay.  Well, then albeit short on his

11   part, that actually puts a lot on me to go through and

12   establish.

13             Look, Rule 29, as the Court is well aware, that the

14   Court has to consider the evidence in a light most favorable to

15   the government.  Essentially whether there is wholly -- a

16   wholly lack -- there's a lack of evidence to support any of the

17   counts as charged, that no jury could find the defendant guilty

18   on any of the 46 counts.

19             So beginning with count number 1, conspiracy, whether

20   there was an agreement between two or more persons, whether the

21   defendant knowingly, voluntarily joined the conspiracy, and

22   whether one of the overt acts was committed by one of the

23   conspirators in furtherance of the conspiracy.

24             Well, two or more people, at the very least we have

25   Mr. Sherwood and Mr. Mickelson saying that they agreed that

1    they were going to be committing an investment fraud.  They

2    have admitted to such.

3          Now, the architect of all of this was Mr. Heshelman.

4    So Mr. Heshelman would be that third conspirator.  And we've

5    also had testimony about other individuals who participated and

6    joined in this conspiracy, even if they weren't indicted and

7    named as such.

8          The defendant knowingly joined and volunteered to

9    join this conspiracy.  Well, again, the defendant was the

10   architect.  There's no question here that there was evidence

11   that the defendant joined the conspiracy.  You had

12   Mr. Mickelson testify that, yes, this was what the defendant

13   had come up with.  This was his idea.  All sorts of testimony

14   corroborating that testimony that the investors said that they

15   were told about the nature of this investment, it was

16   represented to them to be safe and secure, and rather than that

17   being the case, that -- obviously we won't get into the wire

18   fraud aspect -- but the money was spent.

19         Overt acts.  Overt acts in the Indictment including

20   monies coming in from Mr. Oliver, Mr. Ramsey, Mr. Clyde,

21   Mr. Williams, Mr. Moody, and those monies not being kept safe

22   as represented, and there's more than ample evidence that the

23   money was not maintained safe and secure as represented.

24         So with respect to Count 1, I think we have more than

25   sufficient evidence to substantiate not only proof beyond a

1    reasonable doubt, but at the very least allowing Count 1 to go

2    to the jury.

3            Counts 2 through 27, wire fraud.  What is the scheme

4    to defraud?  Did the defendant devise a scheme to defraud?

5    This is the whole crux of this case, but this was an investment

6    fraud.  That was the scheme.  The scheme to defraud means some

7    sort of device or mechanism to lie to people to get their money

8    from them.  That's essentially what this investment fraud was.

9    There's no doubt that there was a scheme to defraud.  The

10   question was whether the defendant devised it.

11           Again, we have testimony that he was the one who came

12   up with the scheme.  He was the one who perpetuated it.  He was

13   the one who closed the deal with investors.  Whether there was

14   a material misstatement, some sort of material fact that was

15   being conveyed to these investors.  I can't think of anything

16   more material than the fact that their money would be safe and

17   their money wouldn't be invested.  That, again, goes to the

18   heart of the matter.

19           Whether the defendant acted or whether there was some

20   sort of wire transfer in furtherance of this scheme, we've had

21   34 wires that have been listed as exhibits, and Exhibit 5A

22   through 5HH.  The check being the last one.  In addition to the

23   other wires that are scattered throughout the other exhibits

24   that have been entered into this case.  So there's clearly

25   wiring activity.  It is in furtherance of the scheme.

1          While that's not necessarily a -- it's not a

2     necessary element that it be the heart of the fraud, in this

3     case it is.  The wiring of the money ultimately was the proof

4     of the intent to defraud.

5          Bear with me.  I was going off the top of my head

6     here regarding the wire fraud elements.  Oh, intent to defraud.

7     Again, those -- the defendant is suggesting there is no

8     evidence of the intent to defraud.

9          As the Court will instruct the jury, this intent,

10    this knowledge, this ability to peer into somebody else's brain

11    isn't possible, so we have to look to other evidence that would

12    give rise to support the belief that the defendant had the

13    intent to defraud.

14         Where do we find that?  In the fact that he's telling

15    the people one set of statements.  A set of lies about what's

16    going to happen to their money and then turning around and

17    spending it.

18         That in and of itself is a clear indication that the

19    defendant had no intention of actually investing the money as

20    represented, and second, he was just going to spend it.  And

21    then he had to perpetuate this scheme by continuing to lie to

22    these people to lull them into believing that just around the

23    corner there's more money to be had.

24         The fact that these people believed that there was

25    some possibility that maybe they will be able to get their

money, maybe there's hope, is again just preying on their faith

and belief that it's possible.  Because why would they want to

believe this?

           Well, for the investors because they lost millions.

Mr. Ramsey lost two and a half million dollars.  If there's no

chance for him to get this money back, he has to write that

off.

           So we're talking about the investors' hope and

belief.  That's distinct from the defendant's intent to

defraud.  He is just playing on their desire that perhaps they

are going to be able to get their money back.

           Likewise, with Mr. Mickelson, I'm sure there's some

hope that if the defendant wins the lottery and has all this

money and is able to give it back, maybe everything goes away.

Maybe this case will just vaporize and he'll be safe, he won't

have to face an Indictment, he won't be a convicted felon.

That is a statement of faith and hope on that witness's part.

It does not give evidence to this defendant's intent to

defraud.

           The intent to defraud is all found in the defendant's

original statements and about the fact that this was going to

be the scheme, and they laid it all out on how they were going

to be able to take these people's money and use the attorney

account to misdirect them about where their money was going.

           All right.  Now, with respect to the individual

1    counts, Your Honor, we've laid them out.  I do note, I don't

2    know how, but Counts 2 and 3, we'll point this out to the jury

3    again, that the wire transfer as charged is on March 7th, 2001.

4    All the evidence has come in it's clear that it's March 6th,

5    2001.  That Mr. Moody -- excuse me -- Pastor Moody had

6    wire-transferred in two installments $750,000 to the attorney

7    trust account.  That is clearly fixed by the on or about

8    instruction.  I think we're fine with that.

9           With respect to the rest of the transactions, I think

10   we've got all of the wires that could show the movement of the

11   money, that there is ample evidence here to allow each count to

12   go forward to the jury.

13          All right.  Count 28 is the conspiracy to commit

14   money laundering.  Now, we've advised the Court that offense

15   only really has two elements.  That there was an agreement and

16   that the defendant knowingly joined this agreement.  And again,

17   well, there is this substantial overlap between the conspiracy

18   to commit wire fraud and the conspiracy to commit money

19   laundering.

20          The Court is well aware that a single action can

21   implicate multiple criminal statutes.  That's essentially what

22   we're talking about here.  The wire fraud, which really was the

23   movement of the money.  The money laundering would have been

24   the goal and desire of these individuals to perpetuate the

25   scheme to further its purpose, to continue its life.  And they

needed to do that by establishing that the defendant had some appearance of financial wherewithal, that he was out there working and trying to get all this money and had the status and even the physical location to close these deals.  That was part of the veneer that the defendant was trying to present to these investors.  So that's regarding the conspiracy.

Now, with respect to the substantive charges, the money laundering, Counts 29 through 34, I'll go through the elements.

All right.  First, the defendant conducted a financial transaction.  Second, the financial transaction involved property that represented proceeds of wire fraud. Third, the defendant knew the property involved in the financial transaction represented the proceeds of some form of unlawful activity.  Fourth, that the defendant had the intent to promote the carry on of wire fraud.

All right.  The first element, conducted a financial transaction.  Again, the record is filled with information regarding wiring activity.  The movement of money.  These are all clearly financial transactions.  And that is true with respect to each individual count that's listed in 29 through 34.

Second, the financial transaction involved property that represented the proceeds of wire fraud.  Well, the wire fraud was essentially, on a bigger picture, was this investment

1    fraud that we've taken and charged as a particular wire --

2    wiring activity or wire fraud as the actual substantive

3    offense.

4            There's no real question here that the money that was

5    charged with respect to 29 through 34, the ultimate source of

6    all that money was Pastor Alan Moody.

7            The financial transaction, does wiring involve

8    property that represented the proceeds of wire fraud?

9    Pastor Moody was lied to about his investment, the $750,000.

10   An additional $750,000.  1.5 million is all proceeds.  This is

11   all the profits from his fraud where he's able to finally get

12   somebody -- well, finally able to get Pastor Moody to send

13   another $1.5 million.  That's proceeds.  And then he engaged in

14   a financial transaction.  What transaction?  Took those

15   proceeds, Pastor Moody's money, and then began this doling out

16   process and passing it along with the intent to promote the

17   carry on of the wire fraud.

18           Now, this is why we've got certain transactions that

19   go towards spending under 1957 and promoting versus -- under

20   1956.

21           Look what we charge here in Count 29.  The money

22   going to Arron Jepson are funds for Allan Clyde.  That's to

23   perpetuate the belief on Allan Clyde's part that this is still

24   possible.  That his money is still going to be around the

25   corner, that it's still coming, to again create this belief and

1    this lulling that he can expect the money at some point.

2            Orange County Teachers Federal Credit Union.  That

3    was money to pay Ron Featherstone.  As we heard the testimony,

4    Ron Featherstone was the luller.  He was an individual who was

5    calling these investors and telling them the money is coming,

6    the money is coming.  Clearly intended to perpetuate this

7    scheme to defraud.

8            Likewise, Paul Ramsey, again to perpetuate this

9    belief, which apparently was successful, that Mr. Ramsey was

10   still hoping that money could come.  That he could recoup his

11   losses instead of losing -- well, with that it would be

12   knocking him down from 2.5 to 2.4 million, and maybe there's

13   more money coming.

14           That's also true with Stephen Williams, with the

15   total amount of money there was $89,600.  But, again, trying to

16   perpetuate this belief and the lulling.

17           More money going to Timothy Oliver, $30,000.  Now,

18   Mr. Oliver had gotten more money than he originally invested,

19   and that decision was being made by Mr. Heshelman.

20           Mr. Mickelson had testified that with respect to

21   Mr. Edwards that there was some belief that it would be a good

22   idea to have some of the early investors actually making money

23   so they might be available to act as a reference, to vouch for

24   the fact that they invested money and they got more.

25           That was true with Mr. Edwards.  Now, he didn't

1    participate in the decision here with Mr. Oliver, but again, it

2    makes sense that Mr. Oliver now is in a position to also vouch

3    for the financial success, except for the fact that Mr. Oliver

4    turned out to be involved in a whole nother matter which

5    upended his value as a potential voucher or potential

6    reference.  But nonetheless, more money going to Mr. Oliver was

7    again to help to perpetuate the veneer that the defendant has

8    the financial wherewithal to continue with this trading

9    platform.

10         Again, more money going to Arron Jepson for the same

11   reasons, that it would create the impression with Mr. Clyde

12   that this investment was just around corner, was going to

13   mature and provide some stream of income.

14         International money laundering.  All right.

15   International money laundering is Counts 35 through 38.  First,

16   the defendant transmitted a monetary instrument or funds.

17   Second, the defendant's transmission or transfer was from a

18   place in the United States to or through a place outside of the

19   United States.  Third, that the defendant's transmission or

20   transfer of monetary issues or funds was done with the intent

21   to protest the carrying on of the wire fraud.

22         Three elements:  Again, transmission of monetary

23   instruments or funds.  As listed in the Indictment, we clearly

24   have the wire transfer of monies.

25         That the transmission or transfer was from a place in

1    the United States to or through a place outside the

2    United States.

3            The evidence has come in very clearly that the money

4    started in Michigan, Pastor Moody's money, looped through

5    Florida, and then from Florida was sent overseas.  And what we

6    have here is the EMA Hotel, Zurich, Switzerland.  Clearly

7    international.

8            The next count, 36, going to the Bank of London.

9    Excuse me, HSBC -- HSBC Bank in London, England.  Again

10   overseas.  The next transaction is UBS Bank in Zurich.  And

11   last, the Athaeneum Hotel.  And while the banking was in

12   Manchester, England, I think all the testimony is that the

13   Athaeneum Hotel is in -- and stipulation is that it is in

14   London.  Again, that distinction apart, it's still overseas.

15           The question then is:  Are these transmissions or

16   transfers of these monetary instruments done with the intent to

17   promote the carrying out of the wire fraud?

18           We've heard lots of testimony here suggesting that

19   the defendant is in Zurich working on a deal, that he's in

20   London going to these financial centers.  In New York and going

21   to these financial centers.

22           You know, Your Honor, I skipped over some of the

23   other counts here on the other money laundering.  I'll come

24   back to that.

25           Again, what the defendant was doing was sending this

1    money overseas to continue this appearance that he is a

2    financial mover and shaker, that he has the financial ability

3    to do this, and he has the status and the location where he can

4    conduct these financial transactions.  And he can represent to

5    people that "I'm in Zurich.  I'm working on a deal.  I'm in

6    London.  I'm meeting with other people."  All of this as well

7    as the ability to continue to finance that activity by sending

8    money to HSBC and to UBS Bank so they would give adequate

9    information on that.

10           Your Honor, if I may, with respect to other money

11   laundering, I think I skipped over this on the wire fraud.  Or

12   in particular the wire fraud.  There are 27 counts.  Is it

13   necessary for me to go through all of the facts?

14           THE COURT:  No, it's not.

15           MR. MEKARU:  I hope not.  Thank you.

16           All right.  The last block of charges would be the

17   money laundering counts 36 through -- 39 through 46, excuse me.

18           As the Court is aware, 1957 is essentially the

19   spending of proceeds.  It's the spending violation for money

20   laundering.  Essentially if you spend more than $10,000 of

21   dirty money, that you could be charged with a violation of

22   1957.

23           The elements of that are obviously more elegantly

24   stated than I just put it, but let's go through that.

25           First, the defendant knowingly engaged in a monetary

1    transaction.  Second, that the monetary transaction was in

2    property derived from wire fraud.  Third, that the property had

3    a value greater than $10,000.  Fourth, that the defendant knew

4    that the transaction was intended to provide property.  And

5    fifth, that the monetary transaction took place within the

6    United States or that the monetary transaction took place

7    outside the United States, but the defendant is a U.S. citizen.

8         Again, knowingly engaged in a monetary transaction,

9    the first element, it's the wiring of money.  The defendant is

10   instructing his lawyer to wire money.  That is a monetary

11   transaction.  That these wires, these monies involved property

12   derived from wire fraud.  Whether this money came from his wire

13   fraud.  And that is, again, very similar to what we had with

14   respect to the 1956 charge.  The flow of money came from Pastor

15   Alan Moody to the attorney account and then went on.  That is

16   all -- each one of these blocks of money represent property or

17   funds derived from this wire fraud.

18        Third, that the property have value greater than

19   $10,000.  Property.  We're talking about blocks of money.  The

20   block of money that he sent was greater than $10,000.  And

21   that's clearly true when we have wiring of 25, 75, 25, 30,000,

22   30,000, well over the $10,000 threshold.

23        Fourth, the defendant knew that the transaction was

24   criminally to derive property.  He knew that it was, if I may,

25   dirty money.  How does he know that?  Because he knows the

money is coming from Pastor Alan Moody.  He's directly involved

in this transaction.

Fifth, that the monetary transaction took place

within the United States or outside of the United States and we

have proof that he's a U.S. citizen.

So, Your Honor, for all of the domestic transactions,

I think they will speak for themselves that we have money being

sent to First Bancorp, Investors First Bancorp, Bristol Plaza,

and another one to the Bristol Plaza.  Those are all domestic.

With respect to the international transactions, the

EMA House, HSBC, UBS, and Athaeneum Hotel.  While those were

outside of the United States, we had the deputy come and

produce his passport establishing the fact that he's a U.S.

citizen.

Now, I do realize we have an overlap between 1957

transactions and 1956 transactions.  And as I suggested to this

Court, a single act could take on multiple aspects of the

criminal conduct.  On one hand he's spending.  This lifestyle

that he's trying to perpetuate has two functions.  One is to

create the appearance that he has the financial wherewithal,

that he is a mover and shaker.  He himself said, "I need more

money because I don't want to look like a bum."

In 20M, that transcript, he knew that it was

important to maintain the appearance of having a financial

wherewithal.  Number 1.  That's the promoting under 1956.

1    1957 -- well, he's also living the life.  He's living

2  this high life of living in luxury hotels in Zurich, luxury

3  hotels in New York, luxury hotels in London, spending all sorts

4  of money on restaurants, on flight and travel.  This is an

5  individual who was living a lavish lifestyle on the backs of

6  these victims and investors.

7    So these monetary transactions represent, again, two

8  things:  Perpetuating his veneer, but also to live the high

9  life.  And that's entirely appropriate to have single conduct

10  to implicate two different statutes.

11    So, Your Honor, with respect to Counts 1 through 46,

12  I think we have more than ample evidence to allow all of these

13  counts to go forward and to be presented to the jury for their

14  consideration.  The evidence considered in the light most

15  favorable to the government would clearly indicate that this

16  could all be given to the jury for their consideration and

17  final determination.  Thank you.

18    *THE COURT:*  Thank you, Mr. Mekaru.  Under Federal

19  Rule of Criminal Procedure 29(a), after the government closes

20  its evidence or after the close of all the evidence, the Court

21  on the defendant's motion must enter a judgment of aquittal for

22  any offense for which the evidence is insufficient to sustain a

23  conviction.  And this standard implements the requirement that

24  the prosecution must prove a prima facie case by its own

25  evidence before the defendant must be put to his defense.

1    Now, as indicated by Mr. Mekaru in detail, there are

2    numerous counts in this case which -- some of which bear

3    different elements which must be established by the government

4    through its testimony and witnesses.  The first is which -- of

5    which is Count 1, conspiracy to commit wire fraud.

6    And I should point out here that in evaluating a

7    Rule 29 motion, the Court is specifically instructed that it

8    may not weigh credibility so long as the witnesses have not

9    been -- are not so totally incredible as to be insubstantial as

10    a matter of law.

11    So the question is whether the testimony of the

12    government witnesses in this case, if believed, would present

13    evidence sufficient to support a conviction.

14    On Count 1, conspiracy to commit wire fraud, I think

15    pretty clearly that the answer to that is yes.  As indicated by

16    the government, the elements of conspiracy to commit wire fraud

17    are relatively straightforward.  Two or more persons conspired

18    or agreed.  We have two people who testified that there were at

19    least three people who conspired or agreed.

20    Secondly, that the defendant knowingly and willingly

21    participated in the agreement, and both of the witnesses who

22    testified, Mr. Mickelson and Mr. Sherwood, both testified that

23    Mr. Heshelman, the defendant here, willingly involved himself

24    in the agreement and may well have been the moving force behind

25    it.

1    And finally, the third element of the conspiracy to

2    commit a wire fraud is that a member of the conspiracy did one

3    of the overt acts described in the Indictment.  The Indictment

4    describes, I believe, nine separate overt acts, and there

5    certainly was plenty of testimony that each of these members of

6    the conspiracy conducted certain overt acts.

7    So with regard to Count 1 of the Indictment,

8    conspiracy to commit wire fraud, the motion for dismissal under

9    Rule 29(a) is denied.

10    Counts 2 through 27 are the substantive charges of

11    wire fraud itself.  And again, this is the area in which really

12    the defense makes its only argument, I think, and that is on

13    the intent issue, but I think it's incumbent to discuss the

14    other elements of wire fraud under 18 U.S.C. 1343.

15    It seems pretty clear based on the testimony not only

16    of Mr. Mickelson and Mr. Sherwood but of the alleged victims

17    that there was a scheme to defraud and that both

18    Mr. Mickelson -- particularly Mr. Mickelson but also

19    Mr. Sherwood -- supports a finding that the government has

20    established a prima facie case that the defendant devised or at

21    the very least knowingly participated in the scheme to defraud

22    and that there were material misrepresentations made, and those

23    were actually in several different areas their money would be

24    safe, it could not be moved out of Mr. Warner's trust account

25    without the approval and signature of the people who deposited

1  the money, and that those were clearly material

2  misrepresentations.

3  And the intent to defraud, certainly if all we had

4  was the testimony of Mr. Mickelson, it would be more than

5  enough to establish a prima facie case that the intent was not

6  to invest this money but was to use it for other purposes

7  personal to the defendant and the others involved in the

8  various actions.

9  And finally, the fourth element of the wire fraud is

10  the use, obviously, of wire communications or causing those

11  kinds of communications to be used.  And here the money came in

12  via wire, and at the direction of the defendant, Mr. Heshelman,

13  the testimony is that he directed it out of the trust account

14  via wire.

15  Count 28, the conspiracy to commit money laundering.

16  And this is the 19 -- Section 1956(h) count.

17  Again, pretty straightforward.  The elements are only

18  two.  Two or more persons conspired or agreed.  And again we

19  have the testimony of Mr. Mickelson and Mr. Sherwood that there

20  was this agreement to commit the crime of money laundering.

21  And that certainly the defendant, Mr. Heshelman, knowingly and

22  voluntarily joined this conspiracy.

23  So we should go back, I guess.  With regard to

24  Counts 2 through 27, the motion under Rule 29 to dismiss is

25  denied.  And as to Count 28, it is likewise denied because the

1    government has established a prima facie case.

2         Counts 29 through 34 are the actual money laundering

3    counts.  And the elements here include the defendant conducting

4    financial transactions.  We have plenty of testimony of moving

5    money across the wire, which includes conducting -- either

6    initiating, concluding, or participating in the movement of

7    these kinds of transactions.

8         Certainly the second element, the financial

9    transaction involved property that represented the proceeds of

10   wire fraud.  And clearly this is the money Pastor Moody wired

11   to Mr. Warner's trust account.

12        Knowledge is the third element of the offense.  That

13   the defendant knew the property was involved in a financial

14   transaction which represented the proceeds of wire fraud.

15        Clearly the testimony of Mr. Mickelson, Mr. Sherwood

16   in particular, satisfies that element.  And that the defendant

17   again had the intent to promote the carrying on of the wire

18   fraud via the activities set forth by Mr. Mekaru in his

19   argument here, which is, I dare say, rather typical for a

20   fraudulent scheme to obtain money and move it around, send some

21   back to some investors, but essentially delaying others so that

22   the money can be spent by the members of the conspiracy.  So

23   with regard to Counts 29 to 34, the motion is denied.

24        Counts 35 through 38, international money laundering.

25   Essentially the same kinds of testimony supports the

1  transmittal of a monetary instrument.  The money flowed, as we

2  have heard in exquisite detail, from Mr. Moody to Mr. Warner to

3  various places outside the country, including Zurich,

4  Switzerland, and London, England.  And that the transmission of

5  the money was done with the intent to promote the carrying on

6  of a wire fraud.

7       The money was transferred without the knowledge or

8  authorization of Mr. Moody, and he was continually told that

9  work was being done, and this served to lead him on to delay

10  his demand for return of his funds.  And so with regard to

11  Counts 35 through 38 the motion is denied.

12       Finally, with regard to Counts 39 through 46, money

13  laundering in violation of 18 U.S.C. 1957, there is -- the

14  defendant is charged with spending more than $10,000 of the

15  proceeds from the wire fraud.  And again, the testimony of

16  Mr. Warner, Mr. Mickelson, and Mr. Sherwood clearly establish a

17  prima facie case of the defendant's knowing engagement in money

18  transactions, his instructions to his lawyer to wire the money,

19  that the money involved in this transaction was property

20  derived from a wire fraud.  The money which was obtained from

21  Mr. Moody via the fraud.  It's clear that there was property

22  greatly in excess of $10,000.

23       Fourth, the defendant knew that the transaction was

24  criminally derived property.  We've heard both Mr. Sherwood and

25  Mr. Mickelson testify that -- particularly Mr. Mickelson --

1    that the transactions were clearly not intended for legitimate

2    purposes.  They were fraudulent in their inception and

3    execution.

4            And finally, that the monetary transaction involved

5    the defendant who is a citizen of the United States, which we

6    have clearly established here.  So with regard to Counts 39

7    through 46, the motion is respectfully denied.

8            Before we break, I need to simply, at least from my

9    perspective, just go through one more time.  I believe we

10   admitted some exhibits today starting with Government 14.  It's

11   the first one I have indicated as of today.  Government 23.

12   Government 25 and 26.  Those are the exhibits that my notes

13   indicate have been admitted today.

14           Does anybody have anything different from that?

15           *MR. MEKARU:*  Yes, Your Honor, confirmed.

16           *THE COURT:*  Thank you.

17           *MR. TRACY:*  We have the same, Your Honor.

18           *THE COURT:*  Thank you.  Is there anything else we

19   need to cover this afternoon before we adjourn?

20           *MR. TRACY:*  Maybe one little point just to flag for

21   tomorrow.  If Mr. Heshelman takes the stand, that I'm aware of

22   he only has one prior conviction that goes back to '89 or '90

23   that related to some separate business that was going on back

24   then.  It was like an $1,800 insufficient funds check.  I don't

25   believe there's any basis for the government to get into that

1    during the course of cross-examination given the charges here.

2    And if the government plans to go into that, I'd like a chance

3    to speak to the Court about that, whether it's at a morning

4    break or sometime so that we can address that situation.

5    That's just a flag for the Court.  So it's not an issue now.  I

6    just want to foreshadow it in case it comes up tomorrow.

7         *THE COURT:*  Okay.  We do have some, if I recall

8    correctly -- let's make sure I have this right.  Your trial

9    brief, Mr. Mekaru, does talk about some 404(b) issues.  Am I

10   correct?

11        *MR. MEKARU:*  Yes, Your Honor, but I don't think we

12   expressly address that matter.

13        *THE COURT:*  I'm not even finding it.  Did I make that

14   up?  Oh, there it is.  I did not remember anything in your

15   brief, and it starts at page 19 on 404(b) which is

16   relatively -- I don't believe I remember anything about that,

17   about a NSF check or anything of that nature, Mr. Mekaru.

18        *MR. MEKARU:*  No, Your Honor, and it wasn't our

19   intention -- when I traditionally think of 404(b) evidence, I

20   typically think of it in the context of what the government

21   would intend to present as part of its case-in-chief.

22        There have been instances, for example, where

23   knowledge, intent, identity may be at issue where we would want

24   to establish like modus operandi-type evidence --

25        *THE COURT:*  Correct.

1      *MR. MEKARU:* -- and we would want that as part of our

2   case-in-chief.  We never intended to introduce our

3   case-in-chief evidence regarding Mr. Heshelman's prior

4   conviction, so that's why we didn't brief that.

5          Now, this would -- it would be -- my analysis,

6   Your Honor, at this point would trigger two issues.  One would

7   be the possibility of a 404(b) issue as it relates to the

8   defendant as his status as a defendant, but 609 as a witness,

9   and under 609 whether it's proper impeachment for a witness to

10  go into this issue of a prior conviction.

11         Generally speaking, crimes that go to truth or

12  veracity can be, and I haven't looked at it very closely, I'm

13  sorry, but it was my understanding it had to be with respect to

14  a felony conviction, not necessarily a misdemeanor.  I don't

15  know.  I don't know.  As I said, I just haven't looked at it

16  very closely.

17         *THE COURT:*  Well, you also have -- for purposes of

18  609 you have the time limit.  You said it was 1989?

19         *MR. TRACY:*  Correct, Your Honor.

20         *THE COURT:*  So even if it was a conviction, I think

21  you may have -- you may run into the 10-year time limit.

22         *MR. MEKARU:*  Here we go.  Sorry, Your Honor.

23  Generally it is with a felony, but subsection (2), (a)(2),

24  evidence any witness has been convicted of a crime shall be

25  admitted regardless of the punishment if it readily can be

1    determined that establishing the elements of the crime required

2    proof or admission of an act of dishonesty or false statement

3    by the witness, so --

4            THE COURT:  Now, what are you reading?

5            MR. MEKARU:  I'm sorry, I'm reading through this very

6    quickly.  609(a)(2).

7            THE COURT:  Except 609(b) --

8            MR. MEKARU:  Yes.  Yes, Your Honor, I'm sorry.  I

9    just wanted to take it incrementally.  Because I didn't want to

10   leave you with the misunderstanding that it had to be a felony,

11   and that was my recollection, but if it's a crime of

12   dishonesty, then even a misdemeanor could be appropriate.

13           THE COURT:  Right.

14           MR. MEKARU:  But then that's all, obviously, going to

15   be restricted by the time limitation, so I was taking it

16   incrementally.

17           THE COURT:  Okay.

18           MR. MEKARU:  Your Honor, it was -- Your Honor, I

19   think we've got ample evidence here, so it wasn't necessarily

20   my intention to raise an issue that was as old as that.  But,

21   on the other hand, if the defendant opens the door and makes

22   some sort of declaration about his general honesty, that he

23   would never commit a crime, that this was something that he

24   would never do, that could open the door for us to, I think,

25   introduce this conviction.

1    I'm sure Mr. Tracy will advise his client to avoid

2    that issue, but if that does happen, I think we can approach

3    the Court either at a sidebar or during a break.  And to the

4    extent that we're going to go anywhere near that, we will

5    advise the Court first before pursuing it.

6          MR. TRACY:  I don't plan to open the door.

7          THE COURT:  I didn't think you did.

8          MR. TRACY:  Your morning session tomorrow, do you

9    need us to move things off the table?

10          THE COURT:  No, it's going to be in chambers.

11          MR. TRACY:  So we can leave things here?

12          THE COURT:  You can leave things here, and just, if

13    you will, please be in attendance at 8:30.  I would really like

14    to get started by quarter-of-nine if we can.

15          MR. TRACY:  I had no other issues, Your Honor.  I

16    just wanted to flag that one.

17          THE COURT:  That's fine.  Anything further,

18    Mr. Mekaru?

19          MR. MEKARU:  Your Honor, I have spoken with Mr. Boyd.

20    Counsel was gracious enough to permit me to speak to their

21    expert, and I do have some concerns about his testimony.

22          It's my understanding that Mr. Boyd does have some

23    personal knowledge of the defendant and that there may be some

24    testimony that may be offered regarding what Mr. Boyd thought

25    the defendant was doing, what activities he was actually

1  engaged in.

2        THE COURT:  He had some personal knowledge during the

3  course of the time that these transactions were taking place?

4        MR. MEKARU:  Yes, Your Honor.  Now, it would be my

5  position again that that all is hearsay.  I don't want to be in

6  a position again where I'm -- I don't want to sound like I'm

7  trying to conceal anything from the jury, but we have our

8  rules.  And so I just want to flag that issue that we may be

9  getting to that area again.

10        THE COURT:  The question -- one question I had for

11  you, Mr. Mekaru, is whether you intend to dispute or challenge

12  Mr. Boyd's credentials to offer opinion testimony.  And I say

13  that -- I don't have any opinion on it.

14        In looking at his CV, it's unusual for opinion

15  witnesses -- the CV is unusual.

16        MR. MEKARU:  Yes, Your Honor.  And I really wasn't

17  able to glean much about his background from his CV.  In

18  speaking with him, it sounds like he is knowledgeable in

19  securities trading and in the various markets that are possible

20  and that are out there.  So -- and I don't know -- I don't know

21  if this is maybe an area that you may want to voir dire him

22  first outside of the presence of the jury, because this is --

23  Mr. Boyd, as I understand it, does in fact engage in

24  sophisticated trading activity.  It's true.  And he can

25  describe this idea of doing structured transactions where you

1    already know what the sales price is going to be and you can

2    buy things at a lower price so you know what your guaranteed

3    markup or guaranteed profit is going to be and all of that.

4          Now, I have shown Mr. Boyd the bank records of what

5    actually happened.  There's no correlation between what he does

6    and what he knows about and what the defendant did in his bank

7    records.  And he'll acknowledge that.  He'll say, Yes, these

8    things do exist, but according to the bank records the

9    defendant didn't do anything along these lines at all.  He was

10    talking about it, and he knew very little bit about it, but

11    enough to get -- well, apparently enough to get him in trouble

12    I think was almost his words, but not that he had any evidence

13    whatsoever that he was able to do it.

14          Now, I don't know exactly where Mr. Tracy is going.

15    This is clearly his case.  I don't know if he's trying to

16    establish some sort of good-faith defense.  But there is

17    nothing to -- there's no correlation between the evidence and

18    what's actually been presented and what this individual knows

19    about what Mr. Heshelman is doing and what he does.  So . . .

20         *THE COURT:*  Well, there may be a fine line there

21    between the jury's prerogative on weighing the testimony and

22    whether the witness has the necessary credentials to properly

23    offer an opinion for the jury to consider.  That was really --

24    I don't know the answer to that.

25         *MR. MEKARU:*  Well, and I think regarding opinion, I

1    think we've talked about this a little bit.  I don't know if

2    this is really -- and I don't know if counsel is going to ask

3    Mr. Boyd.  But I don't know if it's in the nature of an opinion

4    or if it's -- it's possible -- or if it's in the nature of just

5    instruction and advising the jury about some of this

6    terminology and what things actually exist and what's out

7    there.

8            But that -- you know, that opinion that he believed

9    what he thought he was doing, that he was actually doing it,

10   that opinion in and of itself is really not appropriate.  It's

11   not an appropriate opinion to give this jury.  That's for the

12   jury to decide.

13           I mean, all of the rules regarding expert opinions

14   would allow every expert to go walk up to the line but not

15   render their final opinion that the defendant is not guilty by

16   reason of insanity, didn't have the requisite intent.  They can

17   talk about the psychosis, they can talk about the fact that

18   this individual may have all those indications of that

19   psychosis, but they can't take the next step and say,

20   Therefore, he's not guilty.

21           Likewise, this witness is not going to be permitted

22   to go through this whole thing and talk about all this trading

23   activity that was going on and seeing everything the defendant

24   was doing and, therefore, he was in good faith trying.  That is

25   not permissible.  He can't take that away from the jury.  That

1   is for the jury to decide.  All he can do is instruct the jury.

2   And that's why I have a little question here, and it's along

3   the same lines as the Court's question about his own bases,

4   but -- in terms of foundation for all of this, but really it's

5   relevance to the evidence we have in this case, it's just that

6   some of these things exist, but it doesn't -- there's no proof

7   here that the defendant was actually doing any of them,

8   so . . .

9          THE COURT:  Well, I guess we'll find out tomorrow,

10  but, again, you know, as I say, I think that the CV that is the

11  Defendant's Proposed Exhibit A is unusual, and whether it --

12  whether he will be able to support giving any kind of an

13  opinion, particularly since there's no evidence in this case of

14  any particular type of investment that was being pursued.  At

15  least, I mean, there are some vague references, but nothing

16  specific.

17         MR. TRACY:  Do you want any comments from me on any

18  of that or not right now?  Short ones?

19         THE COURT:  I'm always interested in hearing from

20  you, Mr. Tracy.

21         MR. TRACY:  One, the whiteboard was brought in, I

22  believe.  Maybe you always have it in here.

23         THE COURT:  It is.

24         MR. TRACY:  But Mr. Boyd was planning to use that

25  instructionally.  And I think that part of his testimony is not

1    opinion at all.  All he's going to talk -- you'll find -- I

2    agree with you, the CV, because he's a little different branch

3    of what he's doing now, is not what I would normally see as a

4    resume.  You'll hear about the time he ran Merrill Lynch,

5    literally ran the bond desk.  I think he did the same thing at

6    Citibank or Credit Suisse.

7             So I think if the government opts to voir dire, which

8    is fine, the Court and the government would be more than

9    satisfied in terms of what his banking experience has been in

10   the financial arena.  He can speak to factually what goes on in

11   terms of the type of trading platforms that at least have been

12   talked about in some manner during the course of the case.  So

13   that I don't even think is opinion.  It's just him talking

14   about factually what exists in the world.

15        *THE COURT:*  I guess that's part of my problem here.

16   I don't know that there has been really any adequately specific

17   testimony about what these trading platforms were.

18        *MR. TRACY:*  Well, the government gets to put its case

19   on the way it decides to, and I don't obviously get to put any

20   of that evidence in until the course of --

21        *THE COURT:*  Well, but my concern is that Mr. Boyd not

22   make assumptions that aren't based on anything that's in front

23   of the jury already.  That he -- I don't think -- I think we're

24   going to have to be wary of making assumptions that

25   Mr. Heshelman was -- unless we hear from somebody who does say,

1    Here's what Mr. Heshelman was doing specifically, I think it's

2    going to be very difficult for Mr. Boyd to render an opinion.

3         MR. TRACY:  I don't see that as an opinion,

4    Your Honor, I'm sorry.  Maybe I just respectfully disagree with

5    that.  I think we should be equally wary that the jury goes

6    back and deliberates and is left with the conclusion or some

7    doubt in their mind that these trading platforms don't take

8    place day-in and day-out in the world.

9         THE COURT:  But when you say "these trading

10   platforms," we don't have any basis on which to evaluate what

11   they were, and he won't either.

12        MR. TRACY:  Right, but he's going to be talking about

13   how the leveraging happens, exact -- if you have a $10 million

14   pool of money, how that if you park that at a bank or another

15   institution, that that can give you access to a hundred million

16   or 500 million.  How it works.  How you have to have a deal in

17   place.  All of that I think the jury is completely entitled to

18   hear so that they know that this does exist in the world.

19   Whether or not Mr. Heshelman or others he was working with had

20   the wherewithal to pull it off is another issue, but . . .

21        THE COURT:  But pull what off?  I mean, that's my

22   problem.  It's like wandering around in the dark without my

23   glasses on.

24        You know, I mean, all sorts of things are out there,

25   you know.  I mean -- and yet I just -- it's difficult for me,

1    and maybe I will be enlightened tomorrow, but it's difficult

2    for me to see how he can testify about a huge universe of

3    investment potentials when there isn't any specifics for him to

4    discuss with regard to Mr. Heshelman.

5            MR. TRACY:  Well, I guess a couple points on that.

6    One, I think that's why it's helpful that he actually knew

7    Michael a little bit.  Didn't know him well, but through an

8    acquaintance in Switzerland was introduced to him.  So he had

9    some sort of discussion about the types of things --

10           THE COURT:  You see, that's where you're going to get

11   into trouble, I think, with your hearsay.

12           MR. TRACY:  Well, it's not being used for the truth

13   of the matter asserted.  It's being as an expert, somebody

14   that's an opinion person that has dealt with these types of

15   transactions.  It's not that he's doing it in a vacuum.  He has

16   some context, so it's -- addresses the Court's concern.  He has

17   some context in terms of which of these transactions.  Not that

18   he's saying he knew he verified that something that was

19   happening at UBS was real or not, he has some level of

20   discussion -- it would be like a psychologist or a psychiatrist

21   actually having a chance to evaluate the witness or a defendant

22   rather than just doing something completely in a vacuum.  So it

23   takes it away from the Court's concern about some universe of

24   things and narrows it down.

25           Furthermore, I mean, it's not really fair to say that

1    there hasn't been testimony that narrows it down already.  And,

2    of course, whether it's Dan speaking to Mike Boyd about this or

3    me, not about testimony in the case but about where testimony

4    may go, we're able to hone him in on something more specific

5    than just a whole broad universe.  We have the benefit of what

6    Sherwood and Mickelson have said about what these things are

7    going to involve.  We have the benefit of Clyde's testimony

8    about what he understood.  And similarly with other investors.

9    So it's not just he might invest in something over in China

10   regarding XYZ.  It's a particular type of leveraging or trading

11   platform that Mike Boyd has seen over and over again at

12   different levels, either in this country or at the

13   international level.  And he can speak to how it needs to be --

14   how it's done and the types of things you need to have in place

15   to do it effectively.  I think that's all he's really trying to

16   do.  Which I think the jury should welcome in terms of

17   instructional facts so that they understand and they don't go

18   back to the jury room later saying, Jeez, I think this is just

19   mumbo jumbo that doesn't exist in the world at all.  We've

20   heard from somebody that, yes, these things can be pulled off,

21   but here are the levels of steps and difficulty you need to go

22   through to be able to do it effectively.  And that's what I

23   think he's really here to explain to them.

24          THE COURT:  I remain somewhat skeptical.  And unless

25   there is some specific testimony or evidence about what

 1  Mr. Heshelman was working on, I remain skeptical that Mr. Boyd

 2  can verify that it is a valid investment vehicle.

 3          *MR. TRACY:*  But I'm not asking him to do that.  I'm

 4  not asking him at all.  I'm saying, Do you -- are you aware of

 5  situations, Mr. Boyd, where 8 or 9 or $10 million can be parked

 6  at, say, Mellon Bank?  And by parking that money there, and the

 7  bank having that essentially as collateral, that will allow for

 8  a hundred million or $500 million access to it for purposes of

 9  other trades that you're doing.  How does that work?  What kind

10  of connections do you need to have?  And he just walks through

11  the process for the jury.  So they are not left with this,

12  Well, you know what, I don't even think that's real.  Because

13  they don't know anything -- I doubt any of them know anything

14  about it.  I doubt any of them have any experiences with any of

15  it.  If it was buying a car, we wouldn't need this witness,

16  because they would have firsthand knowledge most likely, every

17  single one of them, how does that transaction flow.

18          All Boyd is doing is saying, Let me take, you know,

19  trading platform or leverage 101 for you and simplify it in

20  terms that you can understand it, almost like if you were going

21  out to buy a car.  And that way they can then have an ability

22  to sort of understand what that world looks like, and they can

23  judge it for themselves in terms of whether Heshelman had deals

24  in the works that might be along those lines, where it fell

25  down, whether it was just a bunch of garbage, whatever the jury

1  decides to deliberate on.  But I think they need to have that

2  context, because it's not like a transaction that happens

3  day-in and day-out that they would have any familiarity with.

4  That's all I'm trying to provide for.  And I think that's

5  completely fair for them to have.

6          *THE COURT:*  Okay.  Anything else?

7          *MR. TRACY:*  Nothing from me, Your Honor.

8          *MR. MEKARU:*  Just two points, Your Honor.  You hit it

9  on the head.  There's no evidence that anybody was, to use an

10  example, buying a car.  If we had evidence of buying a car, we

11  would be talking about buying a car.  But we don't have any

12  evidence of what this trading activity is.  We're asking

13  somebody else to fill in the blank what they think this

14  defendant was talking about and insert that.

15          And to the extent that we're asked -- that this is

16  being offered for the truth of the matter asserted?  That's not

17  true.  It is exactly being offered for the truth of the matter

18  asserted, that this is what the defendant said he was trying to

19  do.  The only -- that exception to the hearsay rule really puts

20  into context what somebody does next or what they took from it.

21          All he wants to do is to -- Mr. Boyd's trading

22  activity isn't implicated one way or another about what

23  Mr. Heshelman is doing.  So he doesn't take this information

24  and then do anything with it.  He's just being told that's what

25  he's doing.  And that's what he's trying to elicit from this

1    witness.  And it is for the purposes of trying to get it in

2    front of the jury to suggest this is the truth of the matter

3    asserted, this is what the defendant was trying to do, and this

4    is what he said he was doing.  That's classic hearsay.

5            So on those two points, Your Honor, I would just

6    respond to that.  And thank you for your patience.

7            THE COURT:  Which is wearing thin.  Thank you both.

8    I'll see you tomorrow morning.

9            MR. TRACY:  Okay.  Thank you, Your Honor.  Have a

10   good evening.

11           THE COURT:  You too.

12           THE CLERK:  Everyone rise.  Everyone rise, please.

13   This Court stands adjourned.

14       (Proceeding adjourned at 4:12 p.m.)

15                   *   *   *   *   *

16           I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   Date:  August 14, 2009

20

21                        **/s/ Glenda Trexler**

22                        _____
                          Glenda Trexler, CSR-1436, RPR, CRR

23

24

25

*EXAMINATION INDEX*

                                                    *PAGE*

BRIAN EDWARD TURNER

        DIRECT EXAMINATION BY MR. MEKARU:          824

        CROSS-EXAMINATION BY MR. TRACY:            843

ANTHONY PHILIP LOIACONO

        DIRECT EXAMINATION BY MR. MEKARU:          853

        CROSS-EXAMINATION BY MR. TRACY:            868

DENNIS R. MICKELSON

        DIRECT EXAMINATION BY MR. MEKARU:          872

        CROSS-EXAMINATION BY MR. TRACY:            929

        REDIRECT EXAMINATION BY MR. MEKARU:        973

        RECROSS-EXAMINATION BY MR. TRACY:          979

                    *   *   *   *   *

*EXHIBIT INDEX*

EXHIBIT                                    OFFERED    ADMITTED

GVT 14    AutoOz, LLC March '01 bank        859        859
          statement

GVT 23    Mickelson Plea Agreement          874        875

GVT 25    Document entitled Payments Made   907        907
          to Bryce Sherwood with the
          supporting documentation

GVT 26    Documentation of payments from    893        893
          Mickelson to Edwards directly
          and indirectly